UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NASSER AL-AULAQI,

Plaintiff,

v.

No. 10-cv-_____

BARACK H. OBAMA, *et al.*,

Defendants.

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel. 202-457-0800
Fax 202-452.1868
artspitzer@aol.com

Jameel Jaffer (to be admitted *pro hac vice*)
Ben Wizner (to be admitted *pro hac vice*)
Jonathan M. Manes
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7814
jjaffer@aclu.org

Pardiss Kebriaei (to be admitted *pro hac vice*)
Maria C. LaHood (to be admitted *pro hac vice*)
William Quigley
Center for Constitutional Rights
666 Broadway, 7th floor
New York, NY 10012
(212) 614-6452
pkebriaei@ccrjustice.org

August 30, 2010

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 3

ARGUMENT ..................................................................................................................... 7

    **A.    PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON
THE MERITS.** ............................................................................................ 8

      **1.    The Constitution has extraterritorial application to the government's
conduct against U.S. citizens abroad.** .............................................................. 8

      **2.    Outside the context of armed conflict, the government's targeted
killing of a U.S. citizen violates the Fourth Amendment unless the
citizen poses an imminent threat of death or serious physical injury
and the use of lethal force is a last resort.** .................................................... 10

      **3.    Outside the context of armed conflict, the government's targeted
killing of a U.S. citizen violates the Fifth Amendment unless the
citizen poses an imminent threat of death or serious physical injury
and the use of lethal force is a last resort.** .................................................... 16

      **4.    Outside of armed conflict, international law prohibits targeted killing
unless the targeted individual poses an imminent threat of death or
serious physical injury and the use of lethal force is a last resort.** .............. 23

        a.    Extrajudicial killing is actionable under the Alien Tort Statute. ................... 23

        b.    A deliberate killing without judicial process where lethal force is not a
last resort to prevent an imminent threat to life or serious physical
injury violates the international norm against extrajudicial killing. ............. 26

      **5.    Defendants' targeted killing policy violates the Fifth Amendment by
subjecting U.S. citizens to the possibility of death on the basis of
standards that are secret or non-existent.** .................................................... 32

    **B.    PLAINTIFF WILL SUFFER IRREPARABLE INJURY ABSENT AN
INJUNCTION.** ....................................................................................... 34

    **C.    DEFENDANTS WILL NOT SUFFER SUBSTANTIAL HARM AS A
RESULT OF A PRELIMINARY INJUNCTION.** ................................. 36

    **D.    THE PUBLIC INTEREST STRONGLY FAVORS GRANTING AN
INJUNCTION.** ....................................................................................... 37

CONCLUSION ................................................................................................................ 39

**INTRODUCTION**

This case concerns the executive's asserted authority to carry out "targeted killings" of U.S. citizens suspected of terrorism far from any field of armed conflict. According to numerous published reports, the government maintains lists of suspects— "kill lists"—against whom lethal force can be used without charge, trial, or conviction. Individuals, including U.S. citizens, are added to the lists based on executive determinations that secret criteria have been satisfied. Executive officials are thus invested with sweeping authority to impose extrajudicial death sentences in violation of the Constitution and international law.

The right to life is the most fundamental of all rights. Outside the context of armed conflict, the intentional use of lethal force without prior judicial process is an abridgement of this right except in the narrowest and most extraordinary circumstances.

The United States is not at war with Yemen, or within it. Nonetheless, U.S. government officials have disclosed the government's intention to carry out the targeted killing of U.S. citizen Anwar Al-Aulaqi, who is in hiding there. In early 2010, several newspapers reported that U.S. government officials had confirmed Anwar Al-Aulaqi's placement on government kill lists; these lists amount to standing authorizations to use lethal force. Numerous subsequent reports have corroborated those accounts. According to one media report, there have already been as many as a dozen unsuccessful attempts on Anwar Al-Aulaqi's life. Anwar Al-Aulaqi has been in hiding since at least January 2010. Plaintiff Nasser Al-Aulaqi is Anwar Al-Aulaqi's father; he brings this action on his own behalf and as next friend to his son.

Outside of armed conflict, both the Constitution and international law prohibit targeted killing except as a last resort to protect against concrete, specific, and imminent threats of death or serious physical injury. The summary use of force is lawful in these narrow circumstances only because the imminence of the threat makes judicial process infeasible. A targeted killing policy under which individuals are added to kill lists after a bureaucratic process and remain on these lists for months at a time plainly goes beyond the use of lethal force as a last resort to address imminent threats, and accordingly goes beyond what the Constitution and international law permit.

The government's refusal to disclose the standard by which it determines to target U.S. citizens for death independently violates the Constitution: U.S. citizens have a right to know what conduct may subject them to execution at the hands of their own government. Due process requires, at a minimum, that citizens be put on notice of what may cause them to be put to death by the state.

Through this action, Plaintiff seeks a declaration from this Court that the Constitution and international law prohibit the government from carrying out targeted killings outside of armed conflict except as a last resort to protect against concrete, specific, and imminent threats of death or serious physical injury; and an injunction prohibiting the targeted killing of U.S. citizen Anwar Al-Aulaqi outside this narrow context. Plaintiff also seeks an injunction requiring the government to disclose the standards under which it determines whether U.S. citizens can be targeted for death.

**FACTUAL BACKGROUND**

<u>Targeted Killings by the United States Outside of Armed Conflict</u>

Since 2001, the United States has carried out targeted killings in connection with the "war on terror."  Declaration of Ben Wizner ("Wizner Decl.") ¶ 3, Ex. O-P.  While many of these killings have been conducted by the U.S. military in the context of the armed conflicts in Afghanistan and Iraq, the United States has also carried out targeted killings outside the context of armed conflict, *id.* ¶ 3, Ex. A-D, and it is these killings that are at issue here.  Both the Central Intelligence Agency ("CIA") and the U.S. military's Joint Special Operations Command ("JSOC") are involved in authorizing, planning, and carrying out targeted killings, including of U.S. citizens, outside the context of armed conflict.  *Id.* ¶ 4, Ex. E-H.

The first reported post-2001 targeted killing by the U.S. government outside Afghanistan occurred in Yemen in November 2002, when a CIA-operated Predator drone fired a missile at a suspected terrorist traveling in a car with other passengers.  *Id.* ¶ 3, Ex. A-D.  The strike killed all passengers in the vehicle, including a U.S. citizen.  *Id.* Ex. B-C.  The United Nations Special Rapporteur on Extrajudicial Killings later stated that the strike constituted "a clear case of extrajudicial killing" and set an "alarming precedent." *Id.* Ex. D.  Since 2001, there has been an increase in targeted killings by the United States against terrorism suspects outside of Afghanistan and Iraq.

The government has publicly claimed the authority to carry out targeted killings of civilians, including U.S. citizens, outside the context of armed conflict.  *Id.* ¶¶ 3-5, Ex. A-J, L-P, R-S.  For example, in February 2010, then-Director of National Intelligence Dennis Blair, in response to a question by a member of Congress about the targeted

killing of U.S. citizens, stated that the United States takes "direct action" against suspected terrorists and that "if we think that direct action will involve killing an American, we get specific permission to do that."  *Id.* ¶ 5(a), Ex. G.  In June 2010, Deputy National Security Advisor John Brennan responded to questions about the targeted killing program by stating, "If an American person or citizen is in Yemen or in Pakistan or in Somalia or another place, and they are trying to carry out attacks against U.S. interests, they will also face the full brunt of a U.S. response."  *Id.* ¶ 5(b), Ex. H.

Although the government has publicly claimed the authority to carry out targeted killings of civilians outside the context of armed conflict, it has not explained on what basis individuals are added to kill lists, or the circumstances in which the asserted authority to carry out targeted killings will actually be exercised.

<u>Specific Authorization to Kill Plaintiff's Son Anwar Al-Aulaqi</u>

Plaintiff Nasser Al-Aulaqi moved to the United States in 1966 to pursue his studies as a Fulbright scholar at New Mexico State University.  Declaration of Nasser Al-Aulaqi ("Al-Aulaqi Decl.") ¶ 3.  Plaintiff's son, Anwar Al-Aulaqi, was born in New Mexico in 1971.  *Id.* ¶ 4.  Plaintiff remained in the United States with his family for the next seven years, until 1978, when they moved back to Yemen.  *Id.* ¶ 3.  Plaintiff went on to serve as Minister of Agriculture and Fisheries in the Government of Yemen, and later founded and served as president of Ibb University and served as president of Sana'a University.  *Id.*  Plaintiff currently resides in Yemen with his wife, who is an American citizen, and their family.  *Id.* ¶ 2.

In 1991, Plaintiff's son Anwar Al-Aulaqi returned to the United States to attend college at Colorado State University.  *Id.* ¶ 4.  Anwar Al-Aulaqi went on to obtain his

master's degree at San Diego State University and later enrolled in a Ph.D. program at George Washington University, which he attended through December 2001. *Id*. He married and had three children while living in the United States. *Id*. He moved to the United Kingdom in 2003, and to Yemen in 2004. *Id*.

In January 2010, the Washington Post reported that Anwar Al-Aulaqi had been added to "a shortlist of U.S. citizens" that JSOC was specifically authorized to kill. Wizner Decl. ¶ 11(b), Ex. F. The same article reported that Anwar Al-Aulaqi had survived a JSOC-assisted strike in Yemen in late December 2009. *Id.*; *see also* ¶ 13(a), Ex. L. That strike reportedly killed 41 civilians, mostly children and women. *Id.* ¶ 10(b)-(c), Ex. Q-R. Another January 2010 news report stated that Anwar Al-Aulaqi was "all but certain" to be added to a list of suspects that the CIA was specifically authorized to kill. *Id.* ¶ 11(a), Ex. E. In April 2010, the Washington Post and other media sources reported that Anwar Al-Aulaqi had been added to the CIA's list. *Id.* ¶ 12, Ex. H, L-M.

Numerous news reports have corroborated that Defendants have authorized the targeted killing of Anwar Al-Aulaqi and are actively pursuing him. According to one media report, he has already been the target of as many as a dozen unsuccessful strikes. *Id.* ¶ 13, Ex. S. One U.S. official stated that "he's in everybody's sights." *Id.* ¶ 12(b), Ex. L. In the context of a discussion about targeted killing, Defendant CIA Director Leon Panetta stated that Anwar Al-Aulaqi is "someone that we're looking for" and that "there isn't any question that he's one of the individuals that we're focusing on." *Id.* Ex. J.

Defendants added Anwar Al-Aulaqi to the CIA and JSOC kill lists after a closed executive process. *Id.* ¶ 6, Ex. E, G, K. In the course of that process, Defendants and other executive officials determined that Anwar Al-Aulaqi satisfied secret criteria that

determine whether a U.S. citizen can be killed by his own government.  Anwar Al-Aulaqi is now subject to a standing order that permits the CIA and JSOC to kill him.  *Id.* ¶¶ 9, 11-13, Ex. E-I, L-O, R-S.

Individuals placed on the CIA and JSOC targeted killing lists remain on those lists for months at a time.  *Id.* ¶ 8, Ex. E, L.  An intelligence official who was questioned about the CIA's kill list stated that individuals would be removed from the kill list if their names "hadn't popped on the screen for over a year, or there was no intelligence linking [them] to known terrorists or plans."  *Id.* Ex. E.

Defendants have authorized the CIA and JSOC to kill Anwar Al-Aulaqi without regard to whether, at the time lethal force will be used, he presents a concrete, specific, and imminent threat to life, or whether there are reasonable means short of lethal force that could be used to address any such threat.

Executive officials have condemned Anwar Al-Aulaqi's public statements and sermons; they have also alleged that he has "cast his lot" with terrorist groups and assumed an "operational" role in a terrorist organization.  *Id.* ¶ 14, Ex. H, K, M, T.  The U.S. government has not, however, publicly indicted Anwar Al-Aulaqi for any terrorism-related crime.

In response to reports that the United States has placed Anwar Al-Aulaqi on "kill lists," Yemeni officials, including the Prime Minister, the Foreign Minister, and the Director of the National Security Agency, have publicly stated that their government's security forces are taking measures to arrest Anwar Al-Aulaqi for possible charge and trial.  *Id.* ¶ 15, Ex. F, U-X.  Yemeni cabinet members have also publicly requested that the United States provide the Yemeni government with any evidence against Anwar al-

Aulaqi to support arresting him and bringing him to trial. The Yemeni government has prosecuted other residents of Yemen for terrorism-related crimes, and the Yemeni government is currently prosecuting at least one U.S. citizen who is alleged to be a member of a terrorist organization. *Id.* ¶ 17, Ex. Z. Anwar Al-Aulaqi has in the past been detained by the Yemeni government and was imprisoned for 18 months in 2006 and 2007. *Id.* ¶ 18, Ex. AA.

Anwar Al-Aulaqi has been in hiding in Yemen since at least January 2010. *Id.* ¶ 19, Ex. AA-AB. Plaintiff has had no communication with his son during that time. Al-Aulaqi Decl. ¶ 9. Anwar Al-Aulaqi cannot communicate with his father or counsel without endangering his own life. *Id.*

## ARGUMENT

Plaintiff is entitled to a preliminary injunction because (1) he has "a substantial likelihood of success on the merits"; (2) he and his son "would suffer irreparable injury were an injunction not granted"; (3) an injunction would not "substantially injure other interested parties"; and (4) "the grant of an injunction would further the public interest." *Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009). "These factors interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360-61 (D.C. Cir. 1999) (citation omitted).

"'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" *Belbacha v. Bush*, 520 F.3d 452, 459 (D.C. Cir. 2008) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). When a plaintiff "makes a very strong showing of irreparable

harm and there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success." *Davis*, 571 F.3d at 1292 (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)); *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986) ("Injunctive relief may be granted with either a high likelihood of success and some injury, or *vice versa*." (citation omitted)). Even where success on the merits is "far from clear," a motion for preliminary injunction cannot fail as a matter of law if the prospective harm is sufficiently grave. *See Belbacha*, 520 F.3d at 459 (finding risk of torture sufficiently grave to warrant preliminary injunction).

Plaintiff meets the threshold necessary for a preliminary injunction. His claims that the targeting of his son for killing is unconstitutional and violates international law are extremely strong on the merits. Plaintiff's son will suffer the most irreparable of harms, and Plaintiff will also suffer irreparable harm, if Defendants are allowed to carry out an unlawful killing. A preliminary injunction will not, however, harm Defendants; the injunction would leave undisturbed Defendants' authority, recognized under domestic and international law, to use lethal force as a last resort against individuals who pose an imminent threat of death or physical injury. The public interest also strongly favors upholding the U.S. Constitution and laws and preventing unlawful government killings.

## A.  PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

### 1.  The Constitution has extraterritorial application to the government's conduct against U.S. citizens abroad.

It is "well settled that the Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed against United States citizens." *In re Terrorist*

*Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 167 (2d Cir. 2008) (discussing the applicability of the Fourth Amendment to citizens abroad) (internal quotation marks omitted); *see also Reid v. Covert*, 354 U.S. 1, 5-6 (1957) (plurality opinion) ("[W]e reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights.  The United States is entirely a creature of the Constitution.  Its power and authority have no other source.  It can only act in accordance with all the limitations imposed by the Constitution."); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 270 (1990) ("[*Reid v. Covert*] decided that United States citizens stationed abroad could invoke the protection of the Fifth and Sixth Amendments.").

The Constitution applies with full force to the government conduct challenged here.  While the government has argued in some contexts that the Constitution applies differently in the context of armed conflict, *but see Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (holding that the Due Process Clause applies even to U.S. citizen captured on the battlefield in the context of armed conflict), the United States is not engaged in armed conflict with Yemen, or within it.  *See Rise of the Drones II:  Hearing Before the Subcomm. on Nat'l Security and Foreign Affairs of the H. Comm. on Gov't Oversight and Reform*, 111th Cong. 2-4 (2010) (testimony of Mary Ellen O'Connell).[1]  That the United States is engaged in an armed conflict in Afghanistan does not mean that the law of war applies in Yemen, or anywhere else in the world that a suspected terrorist may be found.  *See* Report of the Special Rapporteur, Study on Targeted Killings, U.N. Doc. A/HRC/14/24/Add.6, ¶¶ 52-56 (discussing the criteria for non-international armed conflict and concluding that these factors "make it problematic for the U.S. to show

---

[1] Available at: http://www.fas.org/irp/congress/2010_hr/042810oconnell.pdf.

that—outside the context of the armed conflicts in Afghanistan or Iraq—it is in a transnational non-international armed conflict against 'al Qaeda, the Taliban, and other associated forces'"); Mary Ellen O'Connell, *Combatants and the Combat Zone*, 43 U. Rich. L. Rev. 845, 858 (2009) ("In addition to exchange, intensity, and duration, armed conflicts have a spatial dimension.  It is not the case that if there is an armed conflict in one state—for example, Afghanistan—that all the world is at war, or even that Afghanis and Americans are at war with each other all over the planet."); *Prosecutor v. Tadić*, Case No. IT-94-1-T, Judgment, ¶ 562 (Int'l Crim. Trib. for the Former Yugoslavia May 7, 1997) (distinguishing non-international armed conflicts from "banditry, unorganized and short-lived insurrections, or terrorist activities, which are not subject to international humanitarian law."); *cf. Ex Parte Milligan*, 71 U.S. (4 Wall.) 2, 127 (1866) ("Martial rule . . . is . . . confined to the locality of actual war.").

The Constitution thus applies with full force to the government conduct challenged in this case.

   **2.  Outside the context of armed conflict, the government's targeted killing of a U.S. citizen violates the Fourth Amendment unless the citizen poses an imminent threat of death or serious physical injury and the use of lethal force is a last resort.**

The Supreme Court has held that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Today we make explicit what was implicit in *Garner*'s analysis, and hold that all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be

analyzed under the Forth Amendment and its 'reasonableness' standard . . . .").[2] Determining whether the force used to effect a particular seizure is "reasonable" involves "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Scott v. Harris*, 550 U.S. 372, 383 (2007) (internal quotation marks omitted).  Whether a seizure is justified requires consideration of the "totality of the circumstances."  *Garner*, 471 U.S. at 9.

The Supreme Court has made clear that there is no special analytical framework for analyzing, under the Fourth Amendment, the reasonableness of the government's intentional use of lethal force.  *Scott*, 550 U.S. at 382 ("*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'").  However, among the factors the courts consider in evaluating such claims are the seriousness and nature of the threat, the imminence of the threat, and whether there are non-lethal means that could reasonably be used to neutralize the threat.  The government's use of lethal force against a citizen is constitutional only if, at the time lethal force is employed, the citizen poses an imminent threat of death or serious physical injury and there are no non-lethal means that could reasonably be used to neutralize the threat.

In *Tennessee v. Garner*, for example, the Supreme Court considered the use of lethal force by police officers who had sought to prevent the escape of an apparently unarmed burglary suspect.  *Garner*, 471 U.S. at 1.  In holding that the use of lethal force

---

[2] "[A] Fourth Amendment seizure . . . occur[s] . . .  when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis in original).

by police had been unreasonable under the Fourth Amendment, the Court stated: "Where the suspect poses *no immediate threat* to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id*. at 11 (emphasis added).  The Court also emphasized that the reasonableness of the use of lethal force turns at least in part on the seriousness and nature of the threat.  *Id*. (indicating that reasonableness turns in part on whether "the police officer has probable cause to believe that the suspect poses a threat of serious physical harm").  In analyzing the reasonableness of the officer's use of deadly force, the Court acknowledged the "governmental interests in effective law enforcement," but also observed that "the intrusiveness of a seizure by means of deadly force is unmatched."  *Id*. at 9.  The Court explained: "The suspect's fundamental interest in his own life need not be elaborated upon.  The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment."  *Id*.

In *Scott v. Harris*, the Court considered whether a police officer had acted unreasonably by terminating the flight of a high-speed motorist by ramming the rear bumper of the suspect's vehicle, causing an accident that rendered the suspect a quadriplegic.  In holding that the police had acted reasonably, the Court wrote: "[I]t is clear . . . that respondent posed *an actual and imminent threat* to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the case."  550 U.S. at 384 (emphasis added); *see also id*. at 386 (holding that use of lethal force was not unreasonable because respondent had "posed *a substantial and immediate risk* of serious physical injury to others" (emphasis added)).  The Court also noted that the police officer had considered non-lethal means to neutralize the threat, and

resorted to lethal force only after concluding that other means would be ineffective. *Id.* at 385.

The circuit courts have considered the same factors—the seriousness and nature of the threat, the imminence of the threat, and the availability of alternatives to lethal force—in their analyses of reasonableness under the Fourth Amendment.  Thus, the circuits have emphasized that lethal force is reasonable only in response to a threat of serious physical harm.  *See, e.g.*, *Graham v. Davis,* 880 F.2d 1414, 1419 (D.C. Cir. 1989) (officer was "only entitled to use an amount of force that was reasonably required to protect himself"); *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010) ("[T]he excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended." (internal quotation marks omitted)); *Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008) ("As a matter of law, an unarmed and nondangerous suspect has a constitutional right not to be shot by police officers."); *Gray-Hopkins v. Prince George's County, Md.*, 309 F.3d 224, 231 (4th Cir. 2002) ("Deadly force . . . is justified only where a reasonable officer would have sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." (internal quotation marks and alteration omitted)).

The courts have also insisted that deadly force may be used only against concrete, specific, and imminent threats.  *See, e.g.*, *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) ("Case law has clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others."); *Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009) ("When an officer

employs such a level of force that death is nearly certain, he must do so based on more than the general dangers posed by reckless driving."); *cf. Hundley v. District of Columbia*, 494 F.3d 1097 (D.C. Cir. 2007) (holding that jury could not find officer's use of lethal force against a suspect reasonable in light of the jury's specific finding that the suspect did not lunge at police officer in a threatening manner).

In one particularly relevant series of cases, the Ninth Circuit found unconstitutional "special rules of engagement" that permitted FBI agents involved in the Ruby Ridge standoff to shoot on sight "any armed adult male" seen in the vicinity of a particular cabin, without regard to whether those individuals posed any imminent threat. *Harris v. Roderick*, 126 F.3d 1189, 1202 (9th Cir. 1997), *cert. denied*, 522 U.S. 1115 (1998); *Idaho v. Horiuchi*, 253 F.3d 359, 377 (9th Cir. 2001) (en banc) (per Kozinski, J.) ("[T]his is not a case where a law enforcement agent fired his weapon under a mistaken belief that his fellow agents or members of the public were in immediate danger. Rather, a group of FBI agents formulated rules of engagement that permitted their colleagues to hide in the bushes and gun down men who posed no immediate threat. Such wartime rules are patently unconstitutional for a police action."), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001).

Furthermore, the courts have consistently examined whether the force used was "greater than [was] reasonable under the circumstances." *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (internal quotation marks omitted). In conducting that inquiry, courts have considered whether less intrusive measures were attempted before the state resorted to greater force. *See, e.g.*, *Scott*, 550 U.S. at 385;

*Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) ("the availability of alternative methods of capturing or subduing a suspect may be a factor to consider.").

To be sure, the Fourth Amendment's reasonableness inquiry is context-specific; what is unreasonable in one context may be reasonable in another. *Graham*, 490 U.S. at 396 ("The test of reasonableness under the Fourth Amendment . . . requires careful attention to the facts and circumstances of each particular case . . . ." (internal quotation marks omitted)). As the Supreme Court noted in *Garner*, however, there is no seizure more intrusive than one that employs deadly force, and the individual's interest in his own life is "unmatched." *Garner*, 471 U.S. at 9; *see also Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008) ("Given the extreme intrusion caused by use of deadly force, the countervailing governmental interests must be weighty indeed; only in rare instances may an officer seize a suspect by use of deadly force." (internal quotation marks omitted)). Accordingly, in *every* context the government's authority to use lethal force against its own citizens must be narrowly circumscribed.

The standing order to kill Anwar Al-Aulaqi runs afoul of the Fourth Amendment. As the cases make plain, the reasonableness of the government's use of lethal force turns on the imminence of the threat, the gravity of the threat, and the availability of other alternatives *at the time lethal force is actually applied.* The government cannot reasonably use lethal force now to address a threat that was determined to be imminent months ago but is no longer imminent now. The use of lethal force is reasonable only if, at the time lethal force is actually employed, the targeted individual presents a concrete, specific, and imminent threat to life or physical safety. Kill lists—to the extent that they

authorize individuals to be killed irrespective of the threat they pose at the time lethal

force is used—are fundamentally inconsistent with this principle.

3. **Outside the context of armed conflict, the government's targeted killing of a U.S. citizen violates the Fifth Amendment unless the citizen poses an imminent threat of death or serious physical injury and the use of lethal force is a last resort.**

While the Fourth Amendment protects against unreasonable seizures, the Fifth

Amendment provides more general protection against the deprivation of life without due

process of law in circumstances where no seizure has occurred. *Graham*, 490 U.S. at 395

(discussing relationship between Fourth and Fifth Amendments in the context of

excessive force claims). Should the Court conclude that targeted killings abroad are not

properly analyzed under the Fourth Amendment, it must then apply a Fifth Amendment

standard to the allegations in the Complaint. *See County of Sacramento v. Lewis*, 523

U.S. 833, 842-45 (1998) (holding, in the context of lethal force claim against police, that

"substantive due process analysis is . . . inappropriate . . . only if [a] claim is 'covered by'

the Fourth Amendment"). In this context, the Fourth and Fifth Amendment standards are

virtually identical.

The Fifth Amendment's protection against the deprivation of life "without due

process of law" is perhaps the most important of the Constitution's guarantees, reflecting

a principle that has been central to the Anglo-American legal tradition since at least the

13th century. *See* Magna Carta, ch. 39 (1215) ("No freeman shall be taken or imprisoned

or disseised or exiled *or in any way destroyed*, nor will we go upon him nor send upon

him, except by the lawful judgment of his peers or by the law of the land." (emphasis

added)). In the language of Fifth Amendment doctrine, the right to life is "fundamental."

*See, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (recognizing that the

right to life is afforded substantive protection by the Due Process Clause); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy . . . and to establish them as principles to be applied by the courts.  One's right to life . . . may not be submitted to vote; [it] depend[s] on the outcome of no elections.").

Because the right to life is fundamental, a government policy that permits that right to be extinguished is evaluated under the strictest scrutiny.  *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997); *Reno v. Flores*, 507 U.S. 292, 302 (1993) (stating that Due Process clause forecloses government from "infring[ing] . . . fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest" (internal quotation marks omitted)).  Indeed, because "the action of the sovereign in taking the life of one of its citizens . . . differs dramatically from any other legitimate state action," *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977), the courts have applied the strictest scrutiny even where the government takes life pursuant to a sentence imposed after trial and conviction.  *See, e.g.*, *Baze v. Rees*, 553 U.S. 35, 84 (2008) ("[A] number of our decisions rel[y] on the premise that 'death is different' from every other form of punishment to justify rules minimizing the risk of error in capital cases."); *California v. Ramos*, 463 U.S. 992, 998-99 (1983) ("The Court . . . has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny . . . ."); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("[T]he imposition of death by public authority is . . . profoundly different from all other penalties . . . .").

17

Government policies that deprive a citizen of life can be justified only if the governmental interest is compelling, and only if the taking of life is narrowly tailored to that interest.  Outside the context of armed conflict, this generally means that the government cannot deprive a citizen of life except pursuant to a sentence imposed after trial and conviction based on proof beyond a reasonable doubt.  *See, e.g.*, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165-67 (1963) ("Our forefathers 'intended to safeguard the people of this country from punishment without trial by duly constituted courts.'" (quoting *United States v. Lovett*, 328 U.S. 303, 317 (1946))); *Screws v. United States*, 325 U.S. 91, 106 (1945) (plurality opinion of Douglas, J.) ("Those who decide to take the law into their own hands and act as prosecutor, jury, judge, and executioner plainly act to deprive a prisoner of the trial which due process of law guarantees him."); *In re Winship*, 397 U.S. 358 (1970).  Even after trial and conviction, of course, the government's power to deprive a citizen of life is not without limit.  *See, e.g.*, *Kennedy v. Louisiana*, 128 S. Ct. 2641 (2008) (rejecting death penalty for child rape); *Coker v. Georgia*, 433 U.S. 584 (1977) (rejecting death penalty for rape).

Outside the context of armed conflict, the government's targeted killing of a citizen can survive strict scrutiny only if the citizen poses a concrete, specific, and imminent threat to life or physical safety, and only if there are no non-lethal means that can reasonably be employed to neutralize the threat.  In other words, the Fifth Amendment prescribes the same limitations that the Fourth Amendment does.

1. Threat to life or physical safety.  Absent a threat to life or serious physical injury, the government's interest in neutralizing a threat is insufficient to justify the use of lethal force.  The Supreme Court has stated this principle clearly in the context of the

Fourth Amendment, *see, e.g.*, *Garner*, 471 U.S. at 11 (distinguishing "threat[s] of serious physical harm" from threats insufficient to warrant use of lethal force), but the same principle can be drawn from the Fifth Amendment. *See, e.g.*, *Garner v. Memphis Police Dep't*, 710 F.2d 240, 247 (6th Cir. 1983) (holding, under the Fifth Amendment, that the government's interest in using lethal force to stop a fleeing felon "[is] compelling when the fleeing felon poses a danger to the safety of others" but not when it seeks "to protect only property rights"), *aff'd on Fourth Amd't grounds sub nom. Tennessee v. Garner*, 471 U.S. 1; *Mattis v. Schnarr*, 547 F.2d 1007, 1019 (8th Cir. 1976) ("The state . . . must demonstrate the existence of an interest equivalent to, or greater than, the right to life to justify the use of deadly force against fleeing felons."), *vacated as moot sub nom. Ashcroft v. Mattis*, 431 U.S. 171 (1977). *Cf. Beard v. United States*, 158 U.S. 550, 562 (1895) (holding that "[t]he weight of modern authority" establishes that deadly force may be used in lawful self-defense only where the person "being without fault, and in a place where he has a right to be, is violently assaulted"); Wayne R. LaFave, *Substantive Criminal Law* § 10.4(b) (2009) (explaining that "the law recognizes that the amount of force which he may justifiably use [in self-defense] must be reasonably related to the harm which he seeks to avoid.") (collecting cases). Given the magnitude of the private interest at stake (the citizen's interest in his own life), only the weightiest government interest can suffice to justify the use of lethal force.

2. <u>Imminence.</u> To justify the use of lethal force against a citizen without judicial process, the threat in question must not only be grave but be imminent as well. Where a threat is imminent, judicial process is infeasible by definition. Where a threat is more remote, however, the state has no legitimate interest in depriving the citizen of an

opportunity to know the charges against him and to be heard. To the contrary, the state

has an affirmative interest in providing this process, because a judicial process separates

the innocent from the guilty and gives legitimacy to the state's actions. *See, e.g.*, *Garner*,

471 U.S. at 10. Simply put, the government has no legitimate interest in using *immediate*

lethal force against a citizen who does not present an *immediate* threat. *Cf.* LaFave,

*Substantive Criminal Law* § 10.4(d) ("Case law and legislation concerning self-defense

require that the defendant reasonably believe his adversary's unlawful violence to be

almost immediately forthcoming. Most of the modern codes require that the defendant

reasonably perceive an 'imminent' use of force, although other language making the

same point is sometimes to be found.") (collecting cases).

The "imminence" requirement also follows from basic principles of *procedural*

due process. Under *Mathews v. Eldridge*, what process is due turns on the significance of

(i) the private interest that will be affected by the official action; (ii) the risk of an

erroneous deprivation of such interest through the procedures used, and the probable

value, if any, of additional or substitute procedural safeguards; and (iii) the government's

interest, including the function involved and the fiscal and administrative burdens that the

additional or substitute procedural requirement would entail. 424 U.S. 319, 334-35

(1976). Except where a threat to life is imminent, each of these factors weighs decisively

in favor of requiring judicial process.

First, a citizen's interest in his own life is uniquely weighty. Second, without

judicial process, the risk that the government will execute an innocent citizen—or, for

that matter, a citizen who has engaged in criminal conduct but who does not present a

grave and imminent threat to life—is high. The risk is particularly high where targeting

decisions are made on the basis of intelligence rather than admissible evidence, because intelligence often includes hearsay, information obtained through the use of coercive methods, information obtained from sources with complex motives and of questionable reliability, information that has never been subjected to public scrutiny, and information whose reliability has never been tested in court.[3]  At the same time, there is no question that additional procedural safeguards would reduce the risk of error—indeed, our entire criminal justice system is based on the theory that procedural safeguards help sort the innocent from the guilty.  *Cf. Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (holding that due process requires some process for a U.S. citizen detained in the United States by military authorities even when that citizen was captured on the battlefield in the context of armed conflict)[4]  Finally, the burden of a criminal trial, while certainly not insubstantial, is minimal in relation to the significance of the private interest at stake.  To be sure, the burden of providing a criminal trial is substantial *if the threat in question is imminent*, because in that context the requirement of process would entirely defeat the government's ability to act before the threat is fully realized.  Where a threat is more remote, however,

---

[3] 51 prisoners at Guantánamo Bay have now had their cases decided by courts.  In each one of those cases, the government argued that the intelligence and other information in its possession established that the prisoner was "part of" or "substantially supported" Al Qaeda, the Taliban or affiliated groups.  Yet in nearly three-quarters (37) of those cases, the government's evidence failed to withstand scrutiny when submitted to review by a *habeas* court on a preponderance-of-the-evidence standard.  *See* Center for Constitutional Rights, Guantanamo Habeas Scorecard (Aug. 17, 2010), available at http://ccrjustice.org/learn-more/faqs/guantanamo-bay-habeas-decision-scorecard.

[4] There is also, of course, the risk that the government's use of lethal force will result in the deaths of innocent bystanders.  *See, e.g.*, Dexter Filkins*, Operators of Drones are Faulted in Afghan Deaths*, N.Y. Times, May 29, 2010; Peter Bergen & Katherine Tiedemann, *The Year of the Drone*, Foreign Policy Magazine, Apr. 26, 2010; Scott Shane, *CIA to Expand Drone Use in Pakistan*, N.Y. Times, Dec. 3, 2009; Daniel L. Byman, *Do Targeted Killings Work?*, The Brookings Institution, July 14, 2009.

the government's interest in neutralizing the threat is not impaired by requiring it to provide ordinary judicial process.[5]

3. <u>Last resort</u>.  If the state's interest in preventing death or serious injury can be served by means that do not violate the right to life, then killing is, by definition, unnecessary.  In other words, if a threat can be defused by means short of killing, the government is constitutionally required to use those means.  Killing must be a genuinely last resort, used only if other means have been attempted or are unavailable.  A policy of targeted killing without exhausting less intrusive options that could avert a threat is simply not narrowly tailored to serve the government's legitimate interests.

The government's standing authorization to kill Anwar Al-Aulaqi violates these Fifth Amendment principles for the same reasons that it violates Fourth Amendment principles.  Under the Fifth Amendment, as under the Fourth Amendment, the question whether a citizen presents a concrete, specific, and imminent threat to life or physical safety, and the question whether there are non-lethal alternatives that can reasonably be used to neutralize the threat, must be answered at the time lethal force is actually employed.  The government's kill lists—which give the CIA and JSOC standing authority to use lethal force against specific individuals—are fundamentally inconsistent with that rule.  This is certainly true of kill lists on which names remain for months at a time.  A threat that was determined months ago to be imminent but is no longer imminent does not satisfy the constitutional "imminence" requirement.  The government cannot impose an extrajudicial death sentence on a citizen on the ground that he presented a

---

[5] A corollary of the imminence requirement is that the government may not use lethal force solely as retribution for past acts.  *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979) (holding that under the Fifth Amendment pre-trial detainees may not be punished "prior to an adjudication of guilt in accordance with due process of law").

threat in the past or that he might present a threat in the future.  Indeed, to invest the

government with this kind of power, outside the context of armed conflict, would do

profound and lasting damage to the rule of law.

The existence of a terrorist threat to the United States does not permit the

government to cast aside the principles that Americans have fought to safeguard for more

than two centuries.  The Supreme Court has long recognized that "[t]he imperative

necessity for safeguarding [the right] to procedural due process under the gravest of

emergencies has existed throughout our constitutional history, for it is then, under the

pressing exigencies of crisis, that there is the greatest temptation to dispense with

fundamental constitutional guarantees which, it is feared, will inhibit governmental

action."  *Kennedy*, 372 U.S. at 164-65; *see also Ex Parte Milligan*, 72 U.S. at 120-21

("The Constitution of the United States is a law for rulers and people, equally in war and

in peace, and covers with the shield of its protection all classes of men, at all times, and

under all circumstances.").

**4. Outside of armed conflict, international law prohibits targeted killing unless the targeted individual poses an imminent threat of death or serious physical injury and the use of lethal force is a last resort.**

a.   Extrajudicial killing is actionable under the Alien Tort Statute.

Arbitrary deprivation of life by the state is universally prohibited and condemned

under international law, as expressed in both treaty and customary law.[6]  Like the

---

[6] *See, e.g.*, Universal Declaration of Human Rights, art. 3, G.A. Res. 217 (III) A, U.N. Doc. A/RES/217(III) (Dec. 10, 1948); International Covenant on Civil and Political Rights, art. 6, GA res. 2200A (XXI), 21 UN GAOR Supp. (No. 16) at 52, UN Doc. A/6316 (Dec. 16, 1966); European Convention on Human Rights, art. 2, Nov. 4, 1950, 213 U.N.T.S. 221; American Convention on Human Rights, art. 4, Nov. 21, 1969, 1144 U.N.T.S. 123; African Charter on Human and Peoples' Rights, art. 4, June 27, 1981, 1520 U.N.T.S. 217; American Declaration of the Rights and Duties of Man, art. 1, O.A.S.

prohibitions against genocide, slavery, and torture, the prohibition against arbitrary killing, including extrajudicial killing, has the rare status of a *jus cogens* norm—a fundamental rule of international law accepted and recognized by the international community as a whole as permitting no derogation under any circumstances.[7]

The Alien Tort Statute ("ATS") confers jurisdiction upon district courts for "any civil action by an alien for a tort … committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.[8]  In *Sosa v. Alvarez-Machain*, the Supreme Court held that claims under the statute must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized."  *Sosa*, 542 U.S. 692, 725 (2004).  Endorsing the reasoning of previous courts, the Court clarified that the underlying norms must be "specific, universal and obligatory."  *Id*. at 732 (quoting *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984) and *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994)).

---

Res. XXX (May 2, 1948); *see also* Nils Melzer, *Targeted Killing in International Law* 184-89 (2008) (discussing evidence of the customary nature of the prohibition against arbitrary deprivation of life).

[7] *See, e.g.*, Military and Paramilitary Activities in and Against Nicaragua (*Nicar. v. U.S.*), Merits, 1986 I.C.J. 218 (June 27); Human Rights Committee, Gen. Cmt. No. 24, ¶ 10, 52nd Sess., U.N. Doc. CCPR/C/21/Rev.1/Add.6 (Apr. 11, 1994), and Gen. Cmt. No. 29, ¶ 11, 1950th mtg., U.N. Doc. CCPR/C/21/Rev.1/Add.11 (July 21, 2001); *see also* Melzer, *supra* note 6, at 215-20 (discussing evidence of the *jus cogens* character of the prohibition against arbitrary deprivation of life).

[8] The injunctive relief Plaintiff seeks is available under the ATS.  The court in *Kadic v. Karadzic*, in exercising its "equitable powers . . . and the Court's authority under the Alien Tort Claims Act," granted plaintiffs with ATS claims against Radovan Karadzic a permanent injunction to enjoin him from committing or facilitating various acts, including extrajudicial killings.  *Kadic*, No. 93-1163, at 2 (S.D.N.Y. Aug. 16, 2000) (order granting permanent injunction).

Federal courts have uniformly held that claims of extrajudicial killing—a deliberate killing without judicial process that is not otherwise lawful—by the state are actionable under the ATS, both before and after *Sosa.  See, e.g.*, *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 383 (S.D.N.Y. 2009); *In re Xe Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 593 (E.D. Va. 2009); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1178-79 (C.D. Cal. 2005); *Kadic v. Karadzic*, 70 F.3d 232, 243 (2d Cir. 1995); *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1542 (N.D. Cal. 1987).  From the beginning of modern ATS jurisprudence, extrajudicial killing has been identified as the subject of "unequivocal international condemnation" and one of "a handful of heinous actions—each of which violates definable, universal and obligatory norms."  *Tel-Oren*, 726 F.2d at 781, 791 (Edwards, J., concurring).  Indeed, "every instrument or agreement that has attempted to define the scope of international human rights has 'recognized a right to life coupled with a right to due process to protect that right.'"  *Xuncax v. Gramajo*, 886 F. Supp. 162, 185 (D. Mass. 1995) (internal citation omitted).

When it enacted the Torture Victim Protection Act of 1991 ("TVPA"), Congress explicitly included a prohibition against extrajudicial killing which, Congress recognized, had already "assumed the status of customary international law."[9]  *See Wiwa*, 626 F. Supp. 2d at 383 (citing the TVPA and finding "unpersuasive Defendants' argument that there is no customary international law norm against summary execution . . . that meets the *Sosa* standard"); *In re Xe Servs. Alien Tort Litig.*, 665 F. Supp. 2d at 593 (citing the TVPA as "support for the existence of an international norm prohibiting official summary executions").  Indeed, the Supreme Court in *Sosa* read the TVPA as providing a "clear

---

[9] S. Rep. No. 102-249, at 3 (1991); H.R. Rep. No. 102-367, at 2-3 (1991).

mandate" for federal courts to recognize claims of extrajudicial killing and torture, including under the ATS.  542 U.S. at 728, 731.

Section 3(a) of the TVPA defines extrajudicial killing as

a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note.

Given the TVPA's clear definition of extrajudicial killing codifying customary international law,[10] and *Sosa*'s endorsement of the TVPA as establishing "an unambiguous and modern basis for federal claims of … extrajudicial killing," 542 U.S. at 728 (internal citation and quotation marks omitted), a killing that meets the TVPA definition would be actionable under the ATS as well.[11]

b.    A deliberate killing without judicial process where lethal force is not a last resort to prevent an imminent threat to life or serious physical injury violates the international norm against extrajudicial killing.

Defendants' authorization of the targeted killing of Plaintiff's son followed an executive determination based on secret criteria, and is being implemented outside the context of the armed conflicts involving the United States in Afghanistan and Iraq.  The deliberate nature of the authorized killing pursuant to a process devoid of any of the basic procedural protections required before the state may take an individual's life plainly satisfies the TVPA definition of "a deliberated killing" that was "not authorized by a

_____

[10] S. Rep. No. 102-249, at 6 (1991).

[11] This claim is brought by Plaintiff Nasser Al-Aulaqi on his own behalf for the injury he would suffer if Defendants were to kill his son.

previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."

In the absence of due process, under the body of international law applicable outside armed conflict, a state may intentionally deprive an individual of life only when the use of lethal force meets certain stringent criteria—of "proportionality," "necessity" and "precaution."[12]  To be lawful, a targeted killing must satisfy all three of these criteria.

As a general rule, the threshold requirement of proportionality ensures that lethal force will be used only to prevent threats to life.  It prohibits the use of lethal force except "in self-defense or defense of others against the imminent threat of death or serious injury, to prevent the perpetration of a particularly serious crime involving grave threat to life, to arrest a person presenting such a danger and resisting their authority, or to prevent his or her escape."  Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, princ. 9, U.N. Doc. A/CONF.144/28/Rev.1 at 112 (Aug. 27-Sept. 7, 1990).  In the context of counter-terrorism operations, a general threat emanating from an organization as a whole, or a threat based on allegations of past conduct, does not

---

[12] International law does not recognize a territorial limitation on the right to life. While human rights treaties restrict their applicability to individuals who are subject to the "jurisdiction" of a given state, jurisdiction is not determined by the territory in which a violation has occurred, but by the "relationship between the individual and the State" in relation to the violation, wherever it has occurred.  *Burgos v. Uruguay*, Comm. No. R.12/52, Human Rights Committee, U.N. Doc. Supp. No. 40 (A/36/40) at 176, ¶ 12.2 (1981); *see also Coard v. United States*, Case No. 10.951, Inter-Am. Comm'n H.R., Report No. 109/99, ¶ 37 (1999); *Alejandre*, Case 11.589, Inter-Am. Comm'n H.R., ¶ 23. The concept of jurisdiction under human rights law focuses on conduct rather than territory, and requires states to comply with human rights standards with respect to all individuals who may be under their effective control or directly affected by their actions. In the context of targeted killings in particular, killings by state agents occurring outside the territory of the acting state "brings[] the targeted person within the jurisdiction of that state" within the meaning of international law.  Melzer, *supra* note 6, at 138; *see generally id.* at 122-138, 212 (discussing the extraterritorial scope of the right to life).

justify an intentional killing. Rather, a threat must be concrete, specific and imminent.
*See Aytekin v. Turkey*, App. No. 22880/93, Eur. Comm'n H.R., ¶¶ 95-96 (1997) (in the
absence of specific circumstances justifying the fatal shooting of a suspect, finding that
"the fact that the area was subject to terrorist activity does not of its own accord give the
security forces the right to open fire upon people or persons that they deem suspicious");
*Andronicou and Constantinou v. Cyprus*, App. No. 25052/94, Eur. Ct. H.R., ¶ 191 (1997)
(finding that a fatal shooting was justified in light of a perceived "real and immediate
danger" to life); *Neira-Alegría v. Peru*, Merits, Inter-Am. Ct. H.R. (ser. C) No. 20, ¶ 74
(Jan. 19, 1995) (finding that the actual danger under the circumstances did not justify the
use of lethal force even where the targets were "highly dangerous and [] in fact armed").
Responding with lethal force to threats that fall short of these standards can never be
proportionate or lawful, even if the failure to use lethal force results in a lost opportunity
to arrest the suspect. *See Nachova and Others v. Bulgaria*, App. No. 43577/98, Eur. Ct.
H.R., ¶ 95 (2005).

Even where justified in light of the gravity of a given threat and thus
proportionate, the use of lethal force must also be "strictly unavoidable" and thus
necessary to prevent the loss of life[13]—a measure of last resort only after non-lethal
means to avert the threat have been exhausted. *See Andronicou*, App. No. 25052/94, ¶¶

---

[13] Basic Principles, princ. 9 (permitting intentional lethal force only when "strictly
unavoidable in order to protect life"); *see also* Code of Conduct for Law Enforcement
Officials, art. 3 and cmt., G.A. res. 34/169, annex, 34 U.N. GAOR Supp. (No. 46) at 186,
U.N. Doc. A/34/46 (Dec. 17, 1979) (permitting force "only when strictly necessary" as an
"extreme measure"); *McCann*, App. No. 18984/91, ¶ 148 (1995) ("[t]he use of force …
must be no more than "absolutely necessary"); Report on Terrorism and Human Rights,
Inter-Am. Comm'n H.R., OEA/Ser.L/V/II.116, Doc. 5 rev. 1 corr., ¶ 87 (Oct. 22, 2002)
(permitting lethal force only where "strictly unavoidable" and "strictly necessary and
proportionate").

183-85 (finding that the use of lethal force was "a considered one of last resort" after negotiations had been attempted "right up to the last possible moment" and failed); *McCann and Others v. United Kingdom*, App. No. 18984/91, Eur. Ct. H.R., ¶¶ 201-13 (1995) (holding that the fatal shooting of terrorist suspects was not "absolutely necessary" because the suspects could have been apprehended at an earlier moment in time); *Alejandre v. Cuba*, Case 11.589, Inter-Am. Comm'n H.R., Report No. 86/99, OEA/Ser.L/V/II.106 Doc. 3 rev. at 586, ¶ 42 (1999) (finding that government agents "made no effort to use means other than lethal force" in violation of the right to life); *see also* Basic Principles, princ. 4 (requiring "as far as possible … non-violent means before resorting to the use of force and firearms"), princ. 9 (permitting lethal force "only when less extreme means are insufficient to achieve lawful objectives"); Code of Conduct, art. 3 cmt. (permitting lethal force only when "less extreme measures are not sufficient to restrain or apprehend the suspected offender"); Report of the Special Rapporteur on Extrajudicial Executions, Comm'n H.R., 62nd Sess., ¶ 48, E/CN.4/2006/53 (Mar. 8, 2006) (by Philip Alston) ("[n]on-lethal tactics for capture or prevention must always be attempted if feasible" and "law enforcement officers must … employ a graduated resort to force"). Necessity also has a temporal element, requiring that potential recourse to lethal force be constantly reassessed and necessary at the very moment of application.[14] The question of necessity can thus "hardly be determined in advance." Report of the Special Rapporteur on Extrajudicial Executions, G.A., 61st Sess., ¶ 41, G.A. Res. 59/197, A/61/311 (Sept. 5, 2006) (by Philip Alston).

---

[14] *See* Melzer, *supra* note 6, at 101, 116, 228 (citing cases).

Lethal force that is both proportionate and necessary must further satisfy the requirement of precaution, which compels states to plan, organize, and control operations to the greatest extent possible so as to minimize recourse to lethal force. *See McCann*, App. No. 18984/91, ¶¶ 201-13 (finding that the failure to apprehend terrorist suspects prior to fatally shooting them, the failure to allow for the possibility of erroneous intelligence assessments, and the automatic recourse to lethal force were evidence of a lack of requisite care in the organization and control of the operation); *see also Nachova*, App. No. 43577/98, ¶ 103 (holding that the authorities had failed to comply with the obligation to minimize the risk to loss of life "since the arresting officers were instructed to use all available means to arrest [the victims], in disregard of the fact that the fugitives were unarmed and posed no danger to life or limb"). To be lawful, the summary use of lethal force by a state must satisfy all three of these criteria.

It bears noting that where a targeted killing entails the use of force by one state in the territory of another outside the context of armed conflict, the legality of the extraterritorial use of force by the targeting state is separate and distinct from the question whether the targeting of the individual himself is lawful. Article 2(4) of the U.N. Charter imposes a general ban on the use of extraterritorial force by states outside a situation of armed conflict, except when a state has consented to the use of force in its territory, or when the targeting state has asserted a right to use force in self-defense because the second state is unwilling or unable to stop attacks from its territory. *See* U.N. Charter. art. 2, para. 4; Report of the Special Rapporteur on Extrajudicial Executions, Human Rights Council, 14th Sess., ¶ 35, A/HRC/14/24/Add.6 (May 28, 2010) (by Philip Alston). But even a state's consent, or a targeting state's asserted right to self-defense, does not

render a targeted killing permissible if the individual himself is not a lawful object of lethal force under the applicable international law.

On its face, a policy predicated on "kill lists" of approved targets against whom the government has predetermined to use lethal force, where names remain on lists for months at a time, cannot be consistent with the requirements governing the use of lethal force by states. These standards limit force to imminent and specific threats (proportionality), permit lethal force only as a last resort and require constant reassessment of its need, including at the moment of application (necessity), and require states to minimize recourse to lethal force to the greatest degree possible in planning operations (precaution).

The danger of creating exceptions to this rule in the face of terrorist threats was articulated by the United Nations Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions in 2004:

> Empowering Governments to identify and kill "known terrorists" places no verifiable obligation upon them to demonstrate in any way that those against whom lethal force is used are indeed terrorists, or to demonstrate that every other alternative has been exhausted. While it is portrayed as a limited "exception" to international norms, it actually creates the potential for endless expansion of the relevant category to include any enemies of the State, social misfits, political opponents, or others. And it makes a mockery of whatever accountability mechanisms may have otherwise constrained or exposed such illegal action under either humanitarian or human rights law.

Report of the Special Rapporteur on Extrajudicial Executions, Comm'n H.R., 61st Sess., ¶ 41, E/CN.4/2005/7 (Dec. 22, 2004) (by Philip Alston).

For these reasons, international law expressly prohibits the use of lethal force against civilians outside of armed conflict except as a last resort to prevent an imminent attack that is likely to cause death or serious physical injury. A targeted killing policy

under which names are added to "kill lists" after a bureaucratic process and remain there for months at a time cannot be limited to the use of lethal force as a last resort to address imminent threats.

5. **Defendants' targeted killing policy violates the Fifth Amendment by subjecting U.S. citizens to the possibility of death on the basis of standards that are secret or non-existent.**

The government's refusal to disclose the standard by which it targets U.S. citizens for death is independently unconstitutional: U.S. citizens have a right to know what conduct may subject them to extrajudicial execution at the hands of their own government so that they may conform their conduct accordingly. Due process requires, at a minimum, that citizens be put on notice of what may cause them to be put to death.

It is "the first essential of due process of law" that the government must provide notice of what it forbids before it takes a person's life, liberty or property. *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). The Supreme Court has repeatedly made clear that all persons "are entitled to be informed as to what the State commands or forbids," *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (internal quotation marks omitted), and that providing "fair warning . . . of what the law intends to do if a certain line is passed" has "long been part of our tradition." *United States v. Bass*, 404 U.S. 336, 348 (1971) (internal quotation marks omitted).

The Due Process Clause's notice requirement is animated by several concerns that are engaged here. First, a notice requirement reflects the principle that basic notions of fairness would be violated if penalties were visited on individuals who had no reasonable notice that their conduct would result in such penalties, and thus had no meaningful opportunity to conform their behavior to the law. *Landgraf v. USI Film Prods.*, 511 U.S.

244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly"); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) ("[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.").

Second, in the absence of clearly stated rules, there is little to restrain the government from acting arbitrarily. As the Court has explained, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108; s*ee also Kolender v. Lawson*, 461 U.S. 352, 357, 361 (1983) (holding statute in question unconstitutionally vague "because it encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute" ); *Smith v. Goguen*, 415 U.S. 566, at 572-73 (1974) ("[The due process doctrine of vagueness] requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement.") (internal quotation marks omitted).

Applying these principles, courts have invalidated criminal statutes that fail to put individuals on fair notice as to what is prohibited. *See, e.g.*, *Cline v. Frink Dairy Co.*, 274 U.S. 445, 458 (1927) ("[Due process] certainly imposes upon a state an obligation to frame its criminal statutes so that those to whom they are addressed may know what standard of conduct is intended to be required."); *Connally,* 269 U.S. at 391 (holding that "the terms of a penal statute . . . must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties"). Where

serious deprivations may be imposed in a civil proceeding, courts have applied the same

notice standard.  *See, e.g.*, *Jordan v. De George*, 341 U.S. 223, 231 (1951); *Gen. Elec.*

*Co. v. U.S. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (holding that stringent fair notice

requirements apply "when sanctions are drastic").

It follows that when the government seeks to impose the gravest of all

deprivations—death—the notice requirements of the Due Process Clause are fully

engaged.  That the government has targeted a U.S. citizen for death without the typical

pre-deprivation process of a criminal trial only heightens the government's obligation to

provide clear notice of its targeting criteria.  In these circumstances, the Court is not

tasked with interpreting uncertain or imprecise terms, nor is it asked to divine whether a

published standard provides a reasonably clear line between illegal and legal conduct.

The government has gone beyond mere imprecision; it has failed to provide any public

language whatsoever to guide either this Court or an individual contemplating the

consequences of his actions.

Due process demands fair notice of what conduct will expose an individual to

government sanctions, particularly where the penalty involved is severe.  A policy of

targeted killing predicated on executive determinations that U.S. citizens meet a secret

definition of threat cannot survive constitutional scrutiny.  If the government is to adopt a

policy permitting the lethal targeting of U.S. citizens, it may not do so constitutionally

without informing the public of the criteria that it applies.

## B.  PLAINTIFF WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION.

The irreparable injury in this case—death—is obvious and could not be greater.

In order to obtain a preliminary injunction, Plaintiff need not demonstrate that irreparable

injury is certain, but only that it "is *likely* in the absence of an injunction." *Winter v.*
*Natural Res. Def. Council*, 129 S. Ct. 365, 375 (2008) (emphasis in original). Here,
absent a preliminary injunction, Plaintiff's son could be killed at any moment so long as
he remains on a targeted "kill list."

Death is precisely the type of irreparable harm preliminary injunctions are
designed to prevent. *See, e.g.*, *Wilson v. Group Hospitalization & Med. Servs., Inc.*, 791
F. Supp. 309, 313-314 (D.D.C. 1992) (granting preliminary injunction where, absent
injunctive relief preventing denial of medical benefits, plaintiff "faced nearly certain
death, the ultimate irreparable injury"); *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 286
(D.D.C. 2005) (finding irreparable harm where plaintiff faced a "great risk of harm and
death as a result of his continuing service" on active duty in Iraq); *Williams v. Chrans*, 50
F.3d 1363, 1364 (7th Cir. 1995) (per curiam) ("In this case, as in all death cases, there is
no question of irreparable injury."); *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958,
961 (8th Cir. 1995) ("It is hard to imagine a greater harm than losing a chance for
potentially life-saving medical treatment." (citation omitted)); *Harris v. Bd. of*
*Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (holding that "pain, infection, amputation,
medical complications, and death" constitute irreparable harm).

Indeed, by threatening Anwar Al-Aulaqi with the imminent loss of his
constitutionally protected right to life, defendants have *ipso facto* threatened him with
irreparable injury. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir.
2009) (holding, in the context of a Fourth Amendment challenge, that "[i]t has long been
established that the loss of constitutional freedoms, 'for even minimal periods of time,
unquestionably constitutes irreparable injury'" (quoting *Elrod v. Burns*, 427 U.S. 347,

373 (1976)); *Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 (D.D.C. 2002)

(deprivation of liberty in violation of Due Process Clause "is an undeniably substantial

and irreparable harm").

      Finally, the threatened killing of Plaintiff's son has obvious severe consequences

for Plaintiff in his own right as well as in his next friend capacity.  If injunctive relief is

not granted, Plaintiff will suffer the irreparable and irreplaceable loss of his son and the

grave psychological, emotional, and potentially physical pain that results from such loss.

*See, e.g., Vencor Nursing Ctrs, L.P. v. Shalala*, 63 F. Supp. 2d 1, 12 (D.D.C. 1999)

("court may consider subjective, psychological harm in its irreparable-harm analysis");

*see also, Petties v. District of Columbia*, 881 F. Supp. 63, 70 (D.D.C. 1995) (finding

irreparable harm where, inter alia, defendant's actions "exact[ed] a psychological,

emotional and physical toll").  Even the temporary loss of contact with family can

constitute irreparable harm.  *See, e.g., Parrish v. Brownlee*, 335 F. Supp. 2d 661, 668

(E.D.N.C. 2004) (finding loss of "companionship of family" during time of unjustified

call to active military duty "significant and irreparable"); *see also Keirnan v. Utah

Transit Auth.*, 339 F.3d 1217, 1220 (10th Cir. 2003) (finding lost "contact with friends

and family" helped demonstrate irreparable harm).

## C.  DEFENDANTS WILL NOT SUFFER SUBSTANTIAL HARM AS A RESULT OF A PRELIMINARY INJUNCTION.

      A preliminary injunction to enjoin the government from killing a U.S. citizen

outside of armed conflict in violation of the Constitution and international law will not

"substantially harm" Defendants.  *Davis*, 571 F.3d at 1291.  The government cannot

suffer harm by being required to comply with the law, and the notion that it could runs

contrary to the most basic elements of our legal system.  Preventing Defendants from

carrying out an unlawful killing does not prevent them from pursuing Anwar Al-Aulaqi with constitutional law enforcement tools.

An injunction that confines the government's behavior to its lawful bounds and checks the overreach of executive power protects us all. *See, e.g.*, *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.'").

## D.  THE PUBLIC INTEREST STRONGLY FAVORS GRANTING AN INJUNCTION.

The public has an exceedingly strong interest in ensuring that the government abides by the Constitution and laws of the United States.  The deliberate and premeditated killing of a U.S. citizen without any judicial process, outside the narrow circumstances that permit the use of lethal force by the state, is contrary to the unambiguous language of the Fifth Amendment, and is abhorrent to a well-functioning democracy.  An injunction ensuring that the United States conducts its operations within legal confines would substantially "further the public interest." *Ark. Dairy Coop. Ass'n*, 573 F.3d at 821.

The public interest is served when a preliminary injunction seeks to uphold constitutional protections. *See, e.g.*, *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) ("[I]ssuance of a preliminary injunction would serve the public's interest in maintaining a system of laws free of unconstitutional racial classifications."); *Kotz v. Lappin*, 515 F. Supp. 2d 143, 152 (D.D.C. 2007) ("The public certainly has an interest in the judiciary intervening when prisoners raise allegations of constitutional violations." (citing *Rhodes v. Chapman*, 452 U.S. 337, 362 (1981));

*Seretse-Khama*, 215 F. Supp. 2d at 54 (public interest served by release of detainee where "continued indefinite detention [would] pose[] serious constitutional risks"); *Cortez III Serv. Corp. v. Nat'l Aeronautics & Space Admin.*, 950 F. Supp. 357, 363 (D.D.C. 1996) (public interest served by upholding the Constitution); *see also G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). This same consideration applies to ensuring government actors abide by the law generally. *See, e.g.*, *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (noting "the general public interest served by agencies' compliance with the law" in context of preliminary injunctions).

Claims of "national security" do not override these core legal principles, especially where significant individual rights are at stake. In *Al-Marri v. Bush*, the court granted a Guantanamo Bay detainee's motion for a preliminary injunction seeking 30 days notice before a transfer, rejecting the government's argument that the relief was contrary to the public interest "because it could frustrate the Government's ability to conduct foreign policy, which ultimately could harm the nation by impairing the effectiveness of the war on terrorism." No. 04-2035, 2005 U.S. Dist. LEXIS 6259, at *20 (D.D.C. Apr. 4, 2005). The court observed that the government's argument "'simply conflate[d] the public interest with [the Government's] own position'" *Id*. (quoting *Mahmoad Abdah v. Bush*, 2005 U.S. Dist. LEXIS 4942 (D.D.C. Mar. 29, 2005)). "In contrast, the public interest undeniably is served by ensuring that Petitioner's constitutional rights can be adjudicated in an appropriate manner." *Id*. at *20-21.

Furthermore, the injunction sought by Plaintiff would not prevent the government from taking a variety of appropriate and lawful actions to address any threat of harm. It would not prohibit the government from using lethal force, as a last resort, against individuals, including U.S. citizens, who present concrete, specific, and imminent threats of death or physical injury.

Any purported national security interest the government may assert is far outweighed by the dangers of allowing Defendants to carry out targeted killings of citizens on the basis of secret criteria in a closed executive process, insulated from any kind of judicial review. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 128 S. Ct. 2229, 2277 (2008) ("Security depends upon a sophisticated intelligence apparatus and the ability of our Armed Forces to act and to interdict. There are further considerations, however. Security subsists, too, in fidelity to freedom's first principles. Chief among these are freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers."). *See also, Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934) ("[E]ven the war power does not remove constitutional limitations safeguarding essential liberties."). Granting preliminary injunctive relief will further serve the public interest by permitting the judicial review necessary for this extraordinary government policy.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court (i) declare that, outside of armed conflict, the Constitution prohibits Defendants from carrying out the targeted killing of U.S. citizens, including Plaintiff's son, except in circumstances in which they present concrete, specific, and imminent threats to life or

physical safety, and there are no means other than lethal force that could reasonably be

employed to neutralize the threats; (ii) declare that, outside of armed conflict, treaty and

customary international law prohibit Defendants from carrying out the targeted killing of

individuals, including Plaintiff's son, except in circumstances in which they present

concrete, specific, and imminent threats to life or physical safety, and there are no means

other than lethal force that could reasonably be employed to neutralize the threats; (iii)

enjoin defendants from intentionally killing U.S. citizen Anwar Al-Aulaqi unless he is

found to present a concrete, specific, and imminent threat to life or physical safety, and

there are no means other than lethal force that could reasonably be employed to neutralize

the threat; and (iv) order Defendants to disclose the criteria that are used in determining

whether the government will carry out the targeted killing of a U.S. citizen.

<div style="margin-left: 40%;">

Respectfully submitted,

  /s/ Arthur B. Spitzer
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
of the Nation's Capital
1400 20th Street, N.W., Suite 119
Washington, DC 20036
Tel. 202-457-0800
Fax 202-452.1868
artspitzer@aol.com

Jameel Jaffer (to be admitted *pro hac vice*)
Ben Wizner (to be admitted *pro hac vice*)
Jonathan M. Manes
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7814
jjaffer@aclu.org

Pardiss Kebriaei (to be admitted *pro hac vice*)
Maria C. LaHood (to be admitted *pro hac vice*)

</div>

William Quigley
Center for Constitutional Rights
666 Broadway, 7th floor
New York, NY 10012
(212) 614-6452
pkebriaei@ccrjustice.org


August 30, 2010