UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NASSER AL-AULAQI,

          Plaintiff,

    v.                              No. 10-cv-_____

BARACK H. OBAMA, *et al.*,

          Defendants.

**DECLARATION OF BEN WIZNER**

I, Ben Wizner, under penalty of perjury declare as follows:

1.     I represent Plaintiff Nasser al-Aulaqi in this action concerning the executive's asserted authority to carry out, far from any field of armed conflict, "targeted killings" of U.S. citizens suspected of terrorism and, in particular, of Plaintiff's son Anwar al-Aulaqi.

2.     I submit this declaration in support of Plaintiff's motion for a preliminary injunction.  The purpose of this declaration is to bring to the Court's attention official government disclosures, as well as information in the public domain, about the government's targeted killing policy, its specific standing authorization to kill Plaintiff's son, and related matters.

**The United States' Targeted Killing Policy**

3.     Since 2001 the United States has carried out many targeted killings outside of the armed conflicts in Afghanistan and Iraq.  The first reported targeted killing by the U.S. government outside of the context of armed conflict occurred in Yemen in November 2002 and was conducted by the CIA using a Predator drone.  Among those killed was a U.S. citizen wanted in connection with a terrorism investigation and prosecution in Buffalo, New York.

a.      Attached hereto as Exhibit A is a true and correct copy of David Johnston & David E. Sanger, *Fatal Strike in Yemen Was Based on Rules Set Out by Bush*, N.Y. Times, Nov. 6, 2002 (quoting several government officials acknowledging and defending the CIA's targeted killing in Yemen and describing the strike as being "carried out under broad authority that President Bush has given the C.I.A. over the past year to pursue the terror network well beyond the borders of Afghanistan.").

b.      Attached hereto as Exhibit B is a true and correct copy of Michael Powell & Dana Priest, *Officials: American Killed in Yemen Led New York Cell*, Wash. Post, Nov. 10, 2002 ("The U.S. citizen killed by a missile launched from a drone aircraft over Yemen was the ringleader of an alleged terrorist sleeper cell in Lackawanna, N.Y., administration officials said Friday.").

c.      Attached hereto as Exhibit C is a true and correct copy of Howard Witt, *U.S.: Killing of al Qaeda Suspects Was Lawful*, Chi. Trib., Nov. 24, 2002 (describing concerns about legality of 2002 targeted killing in Yemen that killed U.S. citizen, and quoting then-National Security Advisor Condoleezza Rice and then-Secretary of State Colin Powell defending the strike).

d.      Attached hereto as Exhibit D is a true and correct copy of the relevant portions of Special Rapporteur on Extrajudicial, Summary, or Arbitrary Executions, *Report of the Special Rapporteur*, ¶¶ 37-39, *delivered to the Commission on Human Rights*, U.N. Doc. E/CN.4/2003/3 (Jan. 13, 2003) ("The Special Rapporteur is extremely concerned that should the information received be accurate, an alarming precedent might have been set for extrajudicial execution by consent of Government. . . . In the opinion of the Special Rapporteur, the attack in Yemen constitutes a clear case of extrajudicial killing.")

2

4.     The Central Intelligence Agency ("CIA") and the armed forces' Joint Special
Operations Command ("JSOC") both conduct targeted killings and maintain separate lists of
individuals who can be targeted and killed.

a.     Attached hereto as Exhibit E is a true and correct copy of Greg Miller,
*From Memo to Missile: The CIA's Hit List*, L.A. Times, Jan. 31, 2010 (describing in
detail the procedures surrounding the CIA's targeting killing list and adding that "[t]he
U.S. military, which has expanded its presence in Yemen, keeps a separate list of
individuals to capture or kill.").

b.     Attached hereto as Exhibit F is a true and correct copy of Dana Priest, *U.S.
Military Teams, Intelligence Deeply Involved in Aiding Yemen on Strikes*, Wash. Post,
Jan. 27, 2010 ("Both the CIA and the JSOC maintain lists of individuals, called 'High
Value Targets' and 'High Value Individuals,' whom they seek to kill or capture.").

c.     Attached hereto as Exhibit G is a true and correct copy of Ellen
Nakashima, *Intelligence Chief Acknowledges U.S. May Target Americans Involved in
Terrorism*, Wash. Post., Feb. 4, 2010 (quoting then-Director of National Intelligence
Dennis Blair, testifying before the House Intelligence Committee: "We take direct action
against terrorists in the intelligence community.").

d.     Attached hereto as Exhibit H is a true and correct copy of Scott Shane,
*U.S. Approves Targeted Killing of American Cleric*, N.Y. Times, Apr. 6, 2010 ("Both
the C.I.A. and the military maintain lists of terrorists linked to Al Qaeda and its affiliates
who are approved for capture or killing, former officials said.").

5.     The CIA and JSOC targeted killing lists can include U.S. citizens.

a.     Exhibit G, Ellen Nakashima, *Intelligence Chief Acknowledges U.S. May
Target Americans Involved in Terrorism*, Wash. Post., Feb. 4, 2010 (quoting then-

Director of National Intelligence Dennis Blair, testifying before the House Intelligence Committee: "We take direct action against terrorists in the intelligence community.  If that direct action, we think that direct action will involve killing an American, we get specific permission to do that.").

      b.     Attached hereto as Exhibit I is a true and correct copy of Eli Lake, *Dozens of Americans Believed to Have Joined Terrorists*, Wash. Times, June 24, 2010 (quoting current Deputy National Security Adviser for Homeland Security and Counterterrorism John O. Brennan: "If an American person or citizen is in a Yemen or in a Pakistan or in Somalia or another place, and they are trying to carry out attacks against U.S. interests, they also will face the full brunt of a U.S. response.  And it can take many forms.").

      c.     Exhibit E, Greg Miller, *From Memo to Missile: The CIA's Hit List*, L.A. Times, Jan. 31, 2010 ("Awlaki's status as a U.S. citizen requires special consideration, according to former officials familiar with the criteria for the CIA's targeted killing program.").

      d.     Exhibit F, Dana Priest, *U.S. Military Teams, Intelligence Deeply Involved in Aiding Yemen on Strikes*, Wash. Post, Jan. 27, 2010 ("After the Sept. 11 attacks, Bush gave the CIA, and later the military, authority to kill U.S. citizens abroad if strong evidence existed that an American was involved in organizing or carrying out terrorist actions against the United States or U.S. interests, military and intelligence officials said. . . . The Obama administration has adopted the same stance. . . .  Both the CIA and the JSOC maintain lists of individuals . . . whom they seek to kill or capture.  The JSOC list includes three Americans, including Aulaqi, whose name was added late last year.").

      e.     Attached hereto as Exhibit J is a true and correct copy of Keith Johnson, *U.S. Seeks Cleric Backing Jihad*, Wall St. J., Mar. 26, 2010 ("An order to kill an

4

American, however, 'has to meet legal thresholds,' the official said. He declined to be more specific.")

6.      Names are added to the JSOC and CIA lists after a secret bureaucratic process conducted entirely within the executive branch.

a.      Attached hereto as Exhibit K is a true and correct copy of Transcript of Press Briefing by Press Secretary Robert Gibbs, The White House (Aug. 3, 2010) (Press Secretary Robert Gibbs states that "[t]here's a process in place that I'm not at liberty to discuss" in response to a question about whether "there is a process in place that we don't know about" with regard to the targeted killing of U.S. citizens.)

b.      Exhibit G, Ellen Nakashima, *Intelligence Chief Acknowledges U.S. May Target Americans Involved in Terrorism*, Wash. Post., Feb. 4, 2010 ("[Former Director of National Intelligence] Blair told members of the House intelligence committee that he was speaking publicly about the issue to reassure Americans that intelligence agencies and the Department of Defense 'follow a set of defined policy and legal procedures that are very carefully observed' in the use of lethal force against U.S. citizens.").

c.      Exhibit E, Greg Miller, *From Memo to Missile: The CIA's Hit List*, L.A. Times, Jan. 31, 2010 (describing the CIA process in detail and stating that "From beginning to end, the CIA's process for carrying out Predator strikes is remarkably self-contained.  Almost every key step takes place within the Langley, Va., campus, from proposing targets to piloting the remotely controlled planes.").

7.      In order to add the name of a U.S. citizen to the CIA's targeted killing list, approval must be obtained from the National Security Council.

a.      Attached hereto as Exhibit L is a true and correct copy of Greg Miller, *Muslim Cleric Aulaqi Is 1st U.S. Citizen on List of Those CIA Is Allowed To Kill*, Wash.

Post, Apr. 7, 2010 ("Because he is a U.S. citizen, adding Aulaqi to the CIA list required

special approval from the White House, officials said.").

      b.    Attached hereto as Exhibit M is a true and correct copy of Adam Entous,

*U.S. Targets American-Born Cleric in Yemen: Officials*, Reuters, Apr. 6, 2010 ("The

decision to add Anwar al-Awlaki, of al Qaeda in the Arabian Peninsula, to the target list

followed a National Security Council review prompted by his status as a U.S. citizen.").

8.      The names of individuals placed on the CIA and JSOC targeted killing lists

remain on those lists for months at a time.  The CIA list is subject to review approximately every

six months.

      a.    Exhibit E, Greg Miller, *From Memo to Missile: The CIA's Hit List*, L.A.

Times, Jan. 31, 2010 ("The [CIA] list is scrutinized every six months, officials said, and

in some cases names are removed if the intelligence on them has grown stale.").

      b.    Exhibit L, Greg Miller, *Muslim Cleric Aulaqi Is 1st U.S. Citizen on List of*

*Those CIA Is Allowed To Kill*, Wash. Post, Apr. 7, 2010 (reporting that Anwar al-Aulaqi

was added to the CIA's target list months after being added to the JSOC list).

9.      Placement of a name on a list constitutes a standing authorization to kill that

person.  Subsequent review of specific strikes does not involve a determination that the person

constitutes an imminent threat at that time.

      a.    Attached hereto as Exhibit N is a true and correct copy of Peter Finn &

Joby Warrick, *Under Panetta, A More Aggressive CIA*, Wash. Post., Mar. 21, 2010

(describing the process by which the CIA Director gave final approval to a particular

strike and making clear that such approval does not involve a determination that the

person constituted an imminent threat at the time).

b.      Attached hereto as Exhibit O is a true and correct copy of Jane Mayer, *The Predator War*, The New Yorker (Oct. 26, 2009) ("A top military expert, who declined to be named, spoke of the military's system, saying, 'There's a whole taxonomy of targets.'  Some people are approved for killing on sight.  For others, additional permission is needed.  A target's location enters the equation, too.  If a school, hospital, or mosque is within the likely blast radius of a missile, that, too, is weighed by a computer algorithm before a lethal strike is authorized.").

c.      Exhibit H, Scott Shane, *U.S. Approves Targeted Killing of American Cleric*, N.Y. Times, Apr. 6, 2010 ("Both the C.I.A. and the military maintain lists of terrorists linked to Al Qaeda and its affiliates who are approved for capture or killing, former officials said.").

10.    Targeted killing operations have resulted in the deaths of many civilians.  One strike in Yemen resulted in the death of 41 civilians, along with 14 terrorism suspects.

a.      Attached hereto as Exhibit P is a true and correct copy of Scott Shane, *CIA to Expand Drone Use in Pakistan*, N.Y. Times, Dec. 3, 2009 ("The New America Foundation, a policy group in Washington, studied press reports and estimated that since 2006 at least 500 militants and 250 civilians had been killed in the drone strikes.  A separate count, by The Long War Journal, found 885 militants' deaths and 94 civilians'.  But the government official insisted on the accuracy of his far lower figure of approximately 20 civilian deaths.").

b.      Attached hereto as Exhibit Q is a true and correct copy of the relevant portions of Amnesty International, Yemen: Cracking Down Under Pressure 29-33 (2010) (detailing investigations into a December 17, 2009 strike that killed 41 civilians).

7

c.      Attached hereto as exhibit R is a true and correct copy of Scott Shane, Mark Mazzetti & Robert F. Worth, *Secret Assault on Terrorism Widens on Two Continents*, N.Y. Times, Aug. 14, 2010 (confirming that the December 17, 2009 strike that killed 41 individuals was launched from a U.S. Navy ship).

**Specific Authorization to Kill Plaintiff's Son and Related Issues**

11.      In January 2010, government officials disclosed that Anwar al-Aulaqi had been added to "a shortlist of U.S. citizens" that JSOC is specifically authorized to kill.

a.      Exhibit E, Greg Miller, *From Memo to Missile: The CIA's Hit List*, L.A. Times, Jan. 31, 2010 ("Awlaki is already on the military's list, which is maintained by the U.S. Joint Special Operations Command.").

b.      Exhibit F, Dana Priest, *U.S. Military Teams, Intelligence Deeply Involved in Aiding Yemen on Strikes*, Wash. Post, Jan. 27, 2010 ("[Aulaqi] has since been added to a shortlist of U.S. citizens specifically targeted for killing or capture by the JSOC, military officials said.").

12.      In April 2010, government officials disclosed that Anwar al-Aulaqi had been added the list of individuals that the CIA is specifically authorized to kill.

a.      Exhibit M, Adam Entous, *U.S. Targets American-Born Cleric in Yemen: Officials*, Reuters, Apr. 6, 2010 (quoting a U.S. official stating, with regards to Anwar al-Aulaqi: "He's being targeted.").

b.      Exhibit L, Greg Miller, *Muslim Cleric Aulaqi Is 1st U.S. Citizen on List of Those CIA Is Allowed To Kill*, Wash. Post, Apr. 7, 2010 ("A Muslim cleric tied to the attempted bombing of a Detroit-bound airliner has become the first U.S. citizen added to a list of suspected terrorists the CIA is authorized to kill, a U.S. official said Tuesday.

8

Anwar al-Aulaqi, who resides in Yemen, was previously placed on a target list

maintained by the U.S. military's Joint Special Operations Command. . . . 'He's in

everybody's sights,' said the U.S. official.").

     c.    Exhibit H, Scott Shane, *U.S. Approves Targeted Killing of American

Cleric*, N.Y. Times, Apr. 6, 2010 (quoting and citing government officials for the

proposition that "[t]he Obama administration has taken the extraordinary step of

authorizing the targeted killing of an American citizen, the radical cleric Anwar al-

Awlaki").

13.    The United States has already conducted at least one strike – and as many as 12

according to one account – with the intent of killing Anwar al-Aulaqi.  The United States

continues to attempt to kill him.

     a.    Exhibit L, Greg Miller, *Muslim Cleric Aulaqi Is 1st U.S. Citizen on List of

Those CIA Is Allowed To Kill*, Wash. Post, Apr. 7, 2010 ("Anwar al-Aulaqi, who resides

in Yemen, was previously placed on a target list maintained by the U.S. military's Joint

Special Operations Command and has survived at least one strike carried out by Yemeni

forces with U.S. assistance against a gathering of suspected al-Qaeda operatives.").

     b.    Exhibit F, Dana Priest, *U.S. Military Teams, Intelligence Deeply Involved

in Aiding Yemen on Strikes*, Wash. Post, Jan. 27, 2010 ("Obama approved a Dec. 24

strike against a compound where a U.S. citizen, Anwar al-Aulaqi, was thought to be

meeting with other regional al-Qaeda leaders.").

     c.    Attached hereto as Exhibit S is a true and correct copy of the transcript of

Dina Temple-Raston, *U.S. Turns Up Heat on Internet Imam Awlaki*, Nat'l Pub. Radio

Morning Edition (July 29, 2000) ("Intelligence sources tell NPR that there have been

almost a dozen drone and airstrikes targeting Awlaki in Yemen.").

14.    Executive officials have condemned Anwar al-Aulaqi's public statements and sermons and also allege that he has "cast his lot" with terrorist groups and assumed an "operational" role in a terrorist organization.

a.    Exhibit M, Adam Entous, *U.S. Targets American-Born Cleric in Yemen: Officials*, Reuters, Apr. 6, 2010 ("U.S. intelligence agencies had viewed Awlaki as chiefly an al Qaeda sympathizer and recruiter for Islamist causes with possible ties to some of the September 11, 2001, hijackers.")

b.    Exhibit H, Scott Shane, *U.S. Approves Targeted Killing of American Cleric*, N.Y. Times, Apr. 6, 2010 (quoting an American official statubg: "'The danger Awlaki poses to this country is no longer confined to words . . . . He's gotten involved in plots.'")

c.    Attached hereto as Exhibit T is a true and correct copy of Press Release, U.S. Department of the Treasury, *Treasury Designates Anwar Al-Aulaqi, Key Leader of Al-Qa'ida in the Arabian Peninsula* (July 16, 2010) (quoting Under Secretary for Terrorism and Financial Intelligence Stuart Levey stating: "He has involved himself in every aspect of the supply chain of terrorism -- fundraising for terrorist groups, recruiting and training operatives, and planning and ordering attacks on innocents.").

d.    Exhibit K, Transcript of Press Briefing by Press Secretary Robert Gibbs, The White House (Aug. 3, 2010) (quoting Press Secretary Robert Gibbs stating: "Anwar al-Awlaki has in videos cast his lot with al Qaeda and its extremist allies.  Anwar al-Awlaki is acting as a regional commander for al Qaeda in the Arabian Peninsula.").

15.    Yemeni officials have publicly stated that Yemen's security forces are taking measures to arrest Anwar al-Aulaqi for possible charge and trial in Yemen.

a.    Attached hereto as Exhibit U is a true and correct copy of *Yemen Won't Extradite Radical Cleric*, Assoc. Press, June 8, 2010 ("Yemen's Islamic Affairs Minister Hamoud al-Hitar told The Associated Press that Yemen is encouraging al-Awlaki to turn himself in, but if and when in Yemeni custody, he will not be extradited to the U.S. 'There are constitutional and legal texts the government cannot get around,' al-Hitar said. He said the U.S. should provide any proof it has of al-Awlaki's terrorist ties 'to the Yemeni justice system, so it can do its job.'")

b.    Attached hereto as Exhibit V is a true and correct copy of Maamoun Youssef, *Anwar al Awlaki, Yemeni Cleric, Advocates Killing Americans in Al Qaeda Video*, Assoc. Press, May 23, 2010 ("Ali Mohammed al-Ansi, Yemen's national security chief and head of the president's office, said in remarks published Sunday in Yemen's ruling-party newspaper that the country's security forces will continue to pursue al-Awlaki until he turns himself in or he is arrested.  Yemen has indicated that if its security forces capture al-Awlaki, it wants to try the cleric on Yemeni soil.")

c.    Attached hereto as Exhibit W is a true and correct copy of *Al-Qirbi: Yemen Will Not Extradite al-Awlaki to U.S.*, Yemen News Agency (Saba), May 10, 2010 (quoting Yemeni Foreign Minister Abu Bakr al-Qirbi stating: "We have clearly said that because of his recent terrorist activity, al-Awlaki is now wanted by the Yemeni government; hence, he must be tried once he is captured and convicted in his homeland but never by other governments. . . . Yemen's position over handing the man to the U.S. is clear and firm because we refuse to hand our people to other countries.")

d.    Exhibit F, Dana Priest, *U.S. Military Teams, Intelligence Deeply Involved in Aiding Yemen on Strikes*, Wash. Post, Jan. 27, 2010 ("Yemeni Foreign Minister Abubaker al-Qirbi said in Washington last week that his government's present goal is to

11

persuade Aulaqi to surrender so he can face local criminal charges stemming from his

contacts with the Fort Hood suspect.  Aulaqi is being tracked by the country's security

forces, the minister added, and is now thought to be in the southern province of

Shabwa.").

   e. Attached hereto as Exhibit X is a true and correct copy of Margaret Coker

& Charles Levinson, *Yemen in Talks for Surrender of Cleric*, Wall St. J., Jan. 15, 2010

("Ali Mohamed Al Anisi, the director of Yemen's National Security Agency and a senior

presidential adviser, said talks were under way with members of Mr. Awlaki's tribe in an

effort to convince the cleric to turn himself in. . . . He said Yemeni forces were prepared

to bring him in forcibly if negotiations fail. 'We are ready to launch more operations to

hunt him down,' he said.")

16. Yemeni cabinet members have publicly requested that the United States provide

the Yemeni government with additional evidence against Anwar al-Aulaqi so as to permit them

to arrest him and bring him to trial in Yemen.

   a. Attached hereto as Exhibit Y is a true and correct copy of *Yemen Says*

*Seeks Cleric, Yet to Get U.S. Intelligence*, Reuters, Apr. 11, 2010 ("'He (Awlaki) is

wanted by Yemeni justice for questioning, so that he can clear his name ... or face trial,'

Yemeni Foreign Minister Abubakr al-Qirbi told Al Jazeera television. . . . Qirbi said

Yemen had not received U.S. intelligence on Awlaki's contacts with a Nigerian suspect

in the attempted bombing of the transatlantic passenger plane and with a U.S. Army

psychiatrist accused of shooting dead 13 people at a military base in Texas in November.

'The detailed information . . . and evidence gathered by U.S. agencies has not been given

to Yemen,' Qirbi said.")

b.    Exhibit U, *Yemen Won't Extradite Radical Cleric*, Assoc. Press, June 8,

2010 ("Yemen's Islamic Affairs Minister Hamoud al-Hitar . . . said the U.S. should

provide any proof it has of al-Awlaki's terrorist ties 'to the Yemeni justice system, so it

can do its job.'")

17.    The Yemeni government is currently prosecuting at least one U.S. citizen who is

alleged to be a member of al Qaeda and has deported others.

a.    Attached hereto as Exhibit Z is a true and correct copy of Ahmed al-Haj,

*American al-Qaida Suspect to Go on Trial in Yemen*, Assoc. Press, Aug. 24, 2010 ("An

American al-Qaida suspect will go on trial in Yemen next month over the killing of a

Yemeni soldier and the wounding of another during a failed escape attempt, a security

official said Tuesday. . . . [A]uthorities have since June deported 25 foreigners, including

Americans, suspected of having links to al-Qaida.").

18.    The Yemeni government has in the past arrested Anwar al-Aulaqi and detained

him for 18 months prior to his release in December 2007.  He was released only after the United

States signaled that it no longer insisted on his continued incarceration.

a.    Attached hereto as Exhibit AA is a true and correct copy of Scott Shane &

Souad Mekhennet, *Imam's Path From Condemning Terror to Preaching Jihad*, N.Y.

Times, May 8, 2010 ("In mid-2006, after he intervened in a tribal dispute, Mr. Awlaki

was imprisoned for 18 months by the Yemeni authorities. . . .  Two F.B.I. agents

questioned him in the Yemeni prison, and Mr. Awlaki blamed the United States for his

prolonged incarceration.  He was right; John D. Negroponte, then the director of national

intelligence, told Yemeni officials that the United States did not object to his detention,

according to American and Yemeni sources.  But by the end of 2007, American officials,

some of whom were disturbed at the imprisonment without charges of a United States

13

citizen, signaled that they no longer insisted on Mr. Awlaki's incarceration, and he was released.").

19.     Anwar al-Aulaqi is in hiding and cannot communicate with his father or counsel because of the United States' attempts to kill him.

   a.     Exhibit AA, Scott Shane & Souad Mekhennet, *Imam's Path From Condemning Terror to Preaching Jihad*, N.Y. Times, May 8, 2010 ("Last October, friends said, [Anwar al-Aulaki] heard the distant whine of a drone aircraft circling overhead.  Worried that he was endangering his relatives, he fled to the mountains.").

   b.     Attached hereto as Exhibit AB is a true and correct copy of Lee Keath & Ahmed al-Haj, *Tribe in Yemen Protecting U.S. Cleric Anwar al-Awlaki*, Assoc. Press, Jan. 19, 2010 (reporting extensively on Anwar al-Aulaqi's circumstances in Yemen).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed on August 30, 2010.

_____
Ben Wizner

14

# Exhibit A

**The New York Times**
nytimes.com

---

November 6, 2002
THREATS AND RESPONSES: HUNT FOR SUSPECTS

# THREATS AND RESPONSES: HUNT FOR SUSPECTS; Fatal Strike in Yemen Was Based on Rules Set Out by Bush

By DAVID JOHNSTON and DAVID E. SANGER

WASHINGTON, Nov. 5— The lethal missile strike that killed a suspected leader of Al Qaeda in Yemen was carried out under broad authority that President Bush has given the C.I.A. over the past year to pursue the terror network well beyond the borders of Afghanistan, senior government officials said today.

The president was not asked to authorize the specific decision to fire the missile that killed the suspected Qaeda leader, Qaed Salim Sinan al-Harethi, the officials said. But Mr. Bush had been advised that the C.I.A was pursuing Mr. Harethi.

Under the rules that Mr. Bush had approved, his personal approval for specific operations was not required. He had delegated operational control over Predator strikes against Al Qaeda to his military and intelligence team. Officials would not identify the officials who did approve the strike.

The decision to approve the missile launch was made by "very senior officials" below the level of the president who had been closely monitoring the surveillance of Mr. Harethi and his associates, the officials said. They were seeking an opportunity to kill Mr. Harethi in a setting that would minimize the chance of unintentional casualties.

The officials said C.I.A. officials wanted to avoid a repeat of their failed effort last year to use a Predator to kill Mullah Muhammad Omar, the Taliban leader. The strike against him was aborted because of the possibility that others in a crowded house might be killed.

The strike was authorized under the same set of classified presidential findings, legal opinions and policy directives, some of which were prepared after last year's attacks, that have set the rules for the administration's campaign to prevent terror. These orders gave the C.I.A. wide powers to pursue Qaeda terrorists anywhere in the world. But the Predator attack was the first known use of lethal military force outside Afghanistan.

The missile strike represented a tougher phase of the campaign against terror and moved the Bush administration away from the law enforcement-based tactics of arrests and detentions of Qaeda suspects that it had employed outside Afghanistan in the months since the fighting there ended.

Instead, the officials said, the missile strike demonstrated that the United States was prepared to employ deadly force against individual suspects in countries like Yemen, where Al Qaeda is believed to have regrouped in recent months.

At the same time, the State Department's spokesman today reiterated American opposition to "targeted killings" of Palestinian militants by Israeli forces. The spokesman, Richard A. Boucher, rejected comparisons with Israel's practice against Palestinian militants, saying circumstances were not comparable.

Senior Bush administration officials said the attacks reflected the broader definition of the battlefield on which the campaign against Islamic terrorism would be conducted.

Today, Mr. Bush's spokesman, Ari Fleischer, speaking to reporters aboard Air Force One as the president

returned to Washington, said the United States was engaged in "a different kind of war with a different kind of battlefield."

He added, "The president has also made clear to the American people that one of the best ways to fight the war on terror is political, diplomatic, military and that sometimes the best defense is a good offense."

Paul D. Wolfowitz, the deputy defense secretary, said in an interview with CNN, "We've just got to keep the pressure on everywhere we are able to, and we've got to deny the sanctuaries everywhere we are able to, and we've got to put pressure on every government that is giving these people support to get out of that business."

The missile strike did not violate the longstanding ban on the assassination of political leaders because none of the men were regarded as leaders under the law, current and former officials said. Government officials have said since Sept. 11 that the assassination ban does not apply to Al Qaeda.

In Yemen, local officials said they are investigating the killings, and Interior Minister Rashad Muhammad al-Alimi gave the cabinet a report about the blast. Members of the cabinet -- who have faced criticism over Yemen's image as a haven for Muslim militants -- urged Yemenis to cooperate with security forces in tracking down terrorists.

But Yemeni officials were silent on the question of whether their forces were involved in the operation. Yemeni officials have made clear in recent weeks, however, that they were aware that American drones were active in their area.

The possible risks of the Bush administration's more aggressive approach were immediately apparent. Today, the State Department announced that the American Embassy in Yemen would be closed for a security review.

The Yemenis were killed on Sunday when a Hellfire air-to-ground missile launched by a pilotless Predator aircraft struck the car in which six men were riding desert outside Sana, the capital, in Marib Province. All the men were killed, including the intended target, Mr. Harethi, a suspect in the bombing of the Navy destroyer Cole in October 2000.

It was unclear how the target was identified, but the Predator's video can identify certain details like the number of people in the car.

Although Mr. Harthi's name was not widely known publicly, intelligence and law enforcement officials had been tracking his movements for months before the attack, one official said.

The official would not describe the evidence linking Mr. Harthi to the Cole attack, but said his involvement was a widely accepted within intelligence and law enforcement circles.

Before the Yemen assault, American counterterrorism operations outside Afghanistan had focused in large part on rounding up terrorist suspects, imprisoning them and seeking to obtain information from them about Al Qaeda's methods and targets. F.B.I. agents overseas and foreign military and security services worked in concert in that effort, detaining several thousand suspects since the attacks on the World Trade Center and the Pentagon.

The strike closely resembled deadly Israeli attacks against Palestinian militant leaders that have been regularly condemned by the State Department, but today Mr. Boucher, the department's spokesman, sought to distinguish between the targeted killings by Israelis and the American strike.

"I think we all understand that the situation with regard to Israeli-Palestinian issues and the prospects of peace and the prospects of negotiation, the need to create an atmosphere for progress, a lot of different things come into play there," he said.

Israel's supporters in the United States have complained about the Bush administration's opposition to Israel's "targeted killings," contending that the United States would act similarly under the same circumstances.

Israel has maintained that the killings are a means of pre-emptive self-defense. Palestinians leaders call the killings assassinations.

Mr. Harethi was not on the F.B.I.'s list of the 22-most-wanted terrorist fugitives in the world compiled after the Sept. 11 attacks.

Although investigators wanted to question Mr. Harethi about the Cole bombing, the C.I.A. did not consult law enforcement officials before the Yemeni operation, a senior law enforcement official said. But today law enforcement officials said there were few complaints about the missile strike or the killing of Mr. Harethi.

One senior law enforcement official said: "I'm ecstatic. We're at war, and we've got to use the means at our disposal to protect the country. You've got to use all your tools, and this is a kind of war which requires us to fight on multiple fronts with all the weapons at our disposal."

Photos: Men in Sana, Yemen's capital, yesterday read about the missile strike that killed six suspected Qaeda members, including a suspected leader.; Qaed Salim Sinan al-Harethi was suspected in the bombing of the American destroyer Cole. (Photographs by Associated Press)

Copyright 2010 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | | Help | Contact Us | Back to Top

Exhibit B

Case 1:10-cv-01469-JDB    Document 3-2    Filed 08/30/10    Page 20 of 153
Westlaw.                                                                        NewsRoom

11/10/02 CHICAGOTR 3                                                                Page 1

11/10/02 Chi. Trib. 3
2002 WLNR 12684674

CHICAGO TRIBUNE
Copyright 2002 Chicago Tribune Company

November 10, 2002

Section: News

Officials: American killed in Yemen led New York cell
Michael Powell and Dana Priest, The Washington Post.

The U.S. citizen killed by a missile launched from a drone aircraft over Yemen was the ringleader of an alleged terrorist sleeper cell in Lackawanna, N.Y., administration officials said Friday.

Kamal Derwish, one of two unindicted co-conspirators in the Lackawanna case, died along with the intended target of the attack, senior Al Qaeda leader Ali Qaed Sinan al-Harthi, who is accused of masterminding the October 2000 attack on the USS Cole in which 17 sailors died.

These two men and four others were traveling in a car outside the Yemeni capital of San'a when they were hit by a Hellfire missile operated hundreds of miles away by the CIA. Derwish had been identified by sources Thursday as Ahmed Hijazi, an alias.

The CIA knew Derwish had returned to Yemen and was, as one administration official described him, a "fellow traveler" in a tight circle of terrorists atop the United States' unofficial most-wanted list. But the CIA officers who targeted the car, following it by live video from the drone and ultimately firing the missile, did not know Derwish was a passenger, the official said.

But, as the administration official--who did not want to be identified--said: "It would not have made a difference. If you're a terrorist, you're a terrorist."

Six American-born men accused of being Derwish's recruits were arrested in September and have been indicted in Buffalo on charges of giving material support to a terrorist organization, Al Qaeda. Prosecutors charge that the men trained in Al Qaeda camps in Afghanistan and were awaiting orders to carry out terrorist attacks.

Derwish, 29, an unindicted co-conspirator, was the most mysterious of the men from Lackawanna named in court papers and, according to U.S. prosecutors, the most influential. They portrayed him as the devoutly religious provocateur who lured the six indicted men into Al Qaeda's orbit.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Derwish was a very religious man, but obviously no one here is going to like that he was in that car with an Al Qaeda leader," said Khalid Qazi, head of the American Muslim Council of Western New York. "We want to know what happened, but these men should get what they deserved."

Derwish, according to accounts in the Buffalo News and interviews with those who knew him, was born in Buffalo and spent his early years in the nearby suburb of Lackawanna, a down-at-its-heels former steel town by the shores of Lake Erie.

Copyright © 2002 Chicago Tribune Company

---- INDEX REFERENCES ---

NEWS SUBJECT: (International Terrorism (1IN37))

REGION: (Middle East (1MI23); USA (1US73); Americas (1AM92); Yemen (1YE36); North America (1NO39); New York (1NE72); Arab States (1AR46))

Language: EN

OTHER INDEXING: (AHMED HIJAZI; AMERICAN MUSLIM COUNCIL; CIA; LACKAWANNA) (Al Qaeda; Ali Qaed; Derwish; Harthi; Kamal Derwish; Khalid Qazi; San)

KEYWORDS: YEMEN; TERRORISM; NEW YORK; DEATH

EDITION: Chicagoland

Word Count: 484
11/10/02 CHICAGOTR 3
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit C

Westlaw.

11/24/02 Chi. Trib. 1
2002 WLNR 12663981

CHICAGO TRIBUNE
Copyright 2002 Chicago Tribune Company

November 24, 2002

Section: News

U.S.: Killing of Al Qaeda suspects was lawful
Howard Witt, Tribune senior correspondent.

When the CIA used a pilotless aircraft to kill a suspected Al Qaeda terrorist leader in Yemen earlier this month, the United States demonstrated a new determination to hunt down and destroy enemies outside any established field of battle.

But the diplomacy to explain and justify the deadly policy is not yet so precise as the weaponry.

To some human-rights groups and European leaders, the U.S. action looked very much like the kind of "targeted killings" for which Washington condemns Israel each time its army singles out a suspected Palestinian terrorist with a missile attack. Meanwhile, questions were raised over whether the White House was violating the long-standing U.S. ban against staging foreign assassinations.

"If this was the deliberate killing of suspects in lieu of arrest, in circumstances in which they did not pose an immediate threat, the killings would be extrajudicial executions in violation of international human-rights law," the human-rights group Amnesty International wrote to President Bush.

Sweden's foreign minister, Anna Lindh, called the Yemen attack "a summary execution."

Bush administration officials bristle at such accusations, insisting that the boundaryless nature of the war on terrorism necessitates the tactics. Despite the critics' suggestions, they add, this is not a radical new departure in U.S. policy.

"We're in a new kind of war, and we've made very clear that it is important that this new kind of war be fought on different battlefields," National Security Adviser Condoleezza Rice told a TV interviewer recently.

"I don't know what you called it when President Clinton launched cruise missiles into Afghanistan some years ago," said Secretary of State Colin Powell, referring to the U.S. retaliation against Osama bin Laden and Al

Qaeda for the 1998 bombings of two U.S. Embassies in Africa. "That was not intended to knock down a tent. So I don't know that previous administrations have completely avoided this kind of action."

Clinton also launched missiles against Iraq in 1993 in retaliation for an alleged plot to assassinate former President George Bush, and President Ronald Reagan ordered the bombing of Libyan leader Moammar Gadhafi's compounds in 1986 in response to Libyan-backed terrorist attacks.

Because terrorists target civilians away from any recognized battlefield, many argue that striking at them in the same way is a fair way to fight back. But even some who support the policy say the administration has done an inadequate job of explaining it to the American public and the international community.

"After Sept. 11, the strike in Yemen looks to most people like an appropriate action in the war on terror," said Lee Feinstein, a senior fellow at the Council on Foreign Relations and a State Department adviser in the Clinton administration. "But what the administration needs to do is to explain why these kinds of tactics are appropriate. And that's difficult, because the nature of this war is so different from the kinds of wars that international rules were set up to address."

Suspect in Cole attack

The Nov. 3 attack in Yemen, involving a missile fired from a remote-controlled CIA Predator drone, killed suspected Al Qaeda leader Ali Qaed Sinan al-Harthi and five other alleged terrorist operatives, including an American citizen, Ahmed Hijazi.

The strike was justified under international rules of war, the administration contends, because al-Harthi was a suspect in the October 2000 bombing of the USS Cole in Yemen and therefore qualified as an "enemy combatant."

Yemen's sovereignty was not violated, officials say, because the government there gave permission for the attack. Previous attempts by Yemeni authorities to arrest Al Qaeda suspects on their territory led to bloody firefights in which several police officers and soldiers were killed.

The administration also maintains that the Predator attack, because it occurred in the context of a war against terrorism, did not violate a 1976 executive order banning assassinations, signed by President Gerald Ford and still in force. That order says that "no person employed by or acting on behalf of the United States Government shall engage in, or conspire to engage in, assassination."

"I can assure you that no constitutional questions are raised here," Rice said. The president, she continued, is "well within the bounds of accepted practice and the letter of his constitutional authority."

Some experts concur with the administration's view of the legality of the Yemen strike but express caution about

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:10-cv-01469-JDB    Document 3-2    Filed 08/30/10    Page 25 of 153

the precedent it might set.

Wisdom questioned

"No matter how you slice it, it looks to me like this is lawful," said Michael Glennon, a professor of international-al law at the Fletcher School of Law and Diplomacy at Tufts University. "The question is not whether it's lawful; it's whether it's wise. There's a danger of retaliation against American political leaders."

The Predator attack "was not an assassination--it was simply a responsive military strike," said Jeffrey Smith, a former CIA general counsel.

"But we have to be very careful about engaging in these strikes to make certain we have the very best intelligence, to make sure these individuals are directly linked to attacks against us, and that we do not engage in lethal force against people who are merely political supporters of Al Qaeda," Smith said.

"We have to be consistent. We cannot on the one hand authorize these activities ourselves and then say to some other government, `We can do it, but you can't.'"

Double standard?

Yet that is precisely how the situation appears to many Israel supporters. Whenever Israel has tracked and killed a militant Palestinian leader--often by firing rockets from U.S.-made helicopter gunships--the government of Prime Minister Ariel Sharon has said the action was justified to prevent further terrorist attacks against Israelis.

But the State Department issues a condemnation of the action nevertheless.

Powell insisted that the American and Israeli attacks are not comparable.

"What makes it different in this case is that we have a situation in the Middle East where we're trying to get a peace process moving, where there are other ways to try to resolve this crisis between the Israelis and the Palestinians," Powell said. "I think targeted assassinations in that context are not helpful."

Copyright © 2002 Chicago Tribune Company

---- INDEX REFERENCES ---

COMPANY: STATE DEPARTMENT

NEWS SUBJECT: (Violent Crime (1VI27); International Terrorism (1IN37); Social Issues (1SO05); Government (1GO80); Crime (1CR87); International Issues (1IN59))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

REGION: (North Africa (1NO44); Americas (1AM92); Yemen (1YE36); North America (1NO39); Mediterranean (1ME20); Middle East (1MI23); Libya (1LI91); USA (1US73); Africa (1AF90); Palestine (1PA37); Israel (1IS16); Arab States (1AR46))

Language: EN

OTHER INDEXING: (AL QAEDA; CIA; FLETCHER SCHOOL OF LAW; NATIONAL SECURITY ADVISER; PALESTINIANS; STATE DEPARTMENT; TUFTS UNIVERSITY; TV; US EMBASSIES; WHITE HOUSE) (Ahmed Hijazi; Ali Qaed; Anna Lindh; Ariel Sharon; Bush; Clinton; Colin Powell; Double; George Bush; Gerald Ford; Harthi; Jeffrey Smith; Lee Feinstein; Michael Glennon; Moammar Gadhafi; Powell; Rice; Ronald Reagan; Smith; Wisdom)

KEYWORDS: TERRORISM; YEMEN; OFFICIAL; DEATH; UNITED STATES

EDITION: Chicagoland Final

Word Count: 1273
11/24/02 CHICAGOTR 1
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit D

**UNITED
NATIONS**

**E**



**Economic and Social
Council**

Distr.
GENERAL

E/CN.4/2003/3
13 January 2003

Original:  ENGLISH

COMMISSION ON HUMAN RIGHTS
Fifty-ninth session
Item 11 (b) of the provisional agenda

**CIVIL AND POLITICAL RIGHTS, INCLUDING THE QUESTIONS OF
DISAPPEARANCES AND SUMMARY EXECUTIONS**

**Extrajudicial, summary or arbitrary executions**

**Report of the Special Rapporteur, Asma Jahangir, submitted pursuant to
Commission on Human Rights resolution 2002/36**

GE.03-10327  (E)    070203

E/CN.4/2003/3
page 2

## Executive summary

The present report, which is submitted pursuant to Commission on Human Rights resolution 2002/36, covers information received and communications sent by the Special Rapporteur on extrajudicial, summary or arbitrary executions in the period from 2 December 2001 to 1 December 2002, unless otherwise stated. The report is divided into five sections, focusing on different aspects of the problem of extrajudicial, summary or arbitrary executions, and contains the Special Rapporteur's observations on issues falling within the purview of her mandate.

Section I of the report provides a summary of the mandate entrusted to the Special Rapporteur. In section II the Special Rapporteur presents the main activities she has undertaken in the framework of her mandate during the period under review. Section III gives an overview of the various situations involving violations of the right to life relevant to the Special Rapporteur's mandate, including observations regarding violations of the right to life of special groups and issues of special focus. Section IV provides an overview of developments, in follow-up to the Special Rapporteur's country visits. Finally, section V is devoted to addressing developments of special concern and the Special Rapporteur also presents her conclusions and a number of recommendations she feels could be helpful in preventing and combating the problem of extrajudicial, summary or arbitrary executions.

It should be emphasized that the report should be read in conjunction with addendum 1 (E/CN.4/2003/3/Add.1), which presents a summary of all urgent appeals and letters of allegation sent during the reporting period, as well as summaries of replies from Governments.

The Special Rapporteur's report briefly describes action taken in regard to various forms of violations of the right to life, including deaths in custody, deaths due to excessive use of force by law enforcement agents, killings by security forces or paramilitary groups, and death threats. The report also discusses the issue of capital punishment and makes reference to death penalty cases in which the Special Rapporteur has intervened in reaction to reports that the sentences concerned had been passed in violation of international restrictions and human rights standards. In her report, the Special Rapporteur also discusses the situation of a number of specific categories of victims, who are particularly vulnerable or have been directly targeted for extrajudicial execution. These groups include human rights defenders, lawyers, journalists, demonstrators, members of national, ethnic, religious or linguistic minorities, internally displaced people, women, children, members of indigenous communities and persons extrajudicially killed and/or exposed to death threats because of their sexual orientation.

The report additionally includes a section devoted to follow-up in relation to missions undertaken by the Special Rapporteur. This section includes follow-up information on her visits to Mexico, Turkey and Honduras.

The Special Rapporteur concludes her report by highlighting some disturbing trends identified during the reporting period, and presents a number of recommendations. She highlights the imperative of avoiding a culture of impunity and ensuring accountability. Her recommendations include the following:

E/CN.4/2003/3
page 3

(a)     Greater focus and effort needs to be placed on preventive action;

(b)     A stronger system for response to early warnings must be conceptualized and made effective;

(c)     The Special Rapporteur encourages organizations of journalists to keep the United Nations human rights mechanisms informed of any incident of human rights violations, in particular death threats, imminent danger to their lives, or incidents of extrajudicial killings;

(d)     The military should be used, if at all, as a last resort for internal security demands and must be held accountable;

(e)     Safeguards and restrictions contained in international guidelines and customary law must be respected in each and every case when imposing or executing the death penalty;

(f)     Governments must end systematic and institutional impunity for those who kill women in the name of honour and so-called morality.

E/CN.4/2003/3
page 4

# CONTENTS

|  |  |  | Paragraphs | Page |
|---|---|---|---|---|
| Introduction ................................................................... | | | 1 - 5 | 6 |
| I. | THE MANDATE ................................................... | | 6 - 12 | 6 |
|  | A. | Terms of reference ................................... | 6 - 7 | 6 |
|  | B. | Violations of the right to life upon which the Special Rapporteur takes action ........................... | 8 - 9 | 7 |
|  | C. | Legal framework and methods of work .............................. | 10 - 12 | 9 |
| II. | ACTIVITIES ......................................................... | | 13 - 28 | 10 |
|  | A. | General remarks ...................................... | 13 | 10 |
|  | B. | Communications ..................................... | 14 - 23 | 11 |
|  | C. | Visits .................................................. | 24 - 28 | 12 |
| III. | OVERVIEW OF SITUATIONS INVOLVING VIOLATIONS OF THE RIGHT TO LIFE .................................. | | 29 - 75 | 14 |
|  | A. | Genocide and crimes against humanity ................................ | 29 - 30 | 14 |
|  | B. | The right to life and the administration of justice, deaths due to excessive use of force by law enforcement officials and deaths in custody ........................ | 31 - 34 | 14 |
|  | C. | Deaths due to attacks or killings by security forces, paramilitary groups or private forces cooperating with or tolerated by the State, and violations of the right to life during armed conflict ......................................... | 35 - 44 | 15 |
|  | D. | Capital punishment ............................................... | 45 - 51 | 17 |
|  | E. | Death threats ........................................................ | 52 - 54 | 18 |
|  | F. | Expulsion, return of persons to a country or place where their lives are in danger (refoulement), violations of the right to life concerning refugees and internally displaced persons ................................................ | 55 - 57 | 18 |
|  | G. | Violations of the right to life of children and women ......... | 58 - 61 | 19 |

E/CN.4/2003/3
page 5

CONTENTS (continued)

|  |  |  | Paragraphs | Page |
|---|---|---|---|---|
| | H. | Violations of the right to life of persons belonging to national, ethnic, religious or linguistic minorities ........... | 62 - 64 | 20 |
| | I. | Violations of the right to life of persons exercising their right to freedom of opinion and expression ................ | 65 | 20 |
| | J. | Violations of the right to life of persons because of their sexual orientation .................................................... | 66 - 67 | 20 |
| | K. | Violations of the right to life of persons carrying out peaceful activities in defence of human rights and freedoms, and persons who have cooperated with representatives of United Nations human rights bodies ...... | 68 - 71 | 21 |
| | L. | Impunity, compensation and the rights of victims ............. | 72 - 75 | 21 |
| IV. | | FOLLOW UP TO RECOMMENDATIONS  ............................... | 76 - 81 | 22 |
| V. | | CONCLUDING REMARKS AND RECOMMENDATIONS  .... | 82 - 98 | 23 |

E/CN.4/2003/3
page 15

Republic of the Congo, Ecuador, Egypt, Equatorial Guinea, Ethiopia, Georgia, Germany, Guatemala, India, Indonesia, Kazakhstan, Liberia, Libyan Arab Jamahiriya, Nepal, Pakistan, Peru, Russian Federation, Sierra Leone, Spain, Sri Lanka, Sudan, Turkey, Uganda, United States of America, Uruguay, Uzbekistan and Venezuela.

32.    The Special Rapporteur addressed a number of letters to Governments regarding excessive use of force by law enforcement officials. She wrote to the following Governments: Argentina, Algeria, Azerbaijan, Bangladesh, Bolivia, Cameroon, Colombia, Ethiopia, Germany, Honduras, India, Indonesia, Jamaica, Mexico, Mozambique, Myanmar, Nepal, Peru, Philippines, Russian Federation, Spain, Sri Lanka, Sudan, Thailand, Turkey, United States of America, Uzbekistan and Yemen. In a few cases there was an excessive use of force, under the guise of dealing with terrorists, against farmers and others who brought up social or economic issues. Witnesses to police excesses, students who held peaceful demonstrations and journalists exposing misuse of authority by the security forces were killed by excessive use of force. The military and special forces, in particular, are reported to use excessive force with impunity. The Special Rapporteur wishes to express her appreciation to the Government of Germany for a comprehensive reply which put the record straight to her satisfaction.

33.    The Special Rapporteur is particularly concerned about reports concerning Bolivia, where in 2002 the police and army reportedly used excessive force to disperse demonstrators in Cochamamba, and allegedly killed six persons. Concern is also expressed about reports from Algeria about several reported cases of excessive use of force and extrajudicial killings by law enforcement officials. The Special Rapporteur is also increasingly concerned about the recent developments in Nepal and reports of excessive use of force by the police there.

34.    Concern is also expressed about the actions by Russian police/security forces in the October 2002 incident in a Moscow theatre where Chechen separatists were holding several hundred civilians hostage. During the attack against the separatists more than 100 civilians died, allegedly because of a gas deployed by the Russian forces to disable the hostage takers. The Special Rapporteur has been collecting information from various sources about the incident and plans to take the issue up in 2003 with the Government of the Russian Federation.

### C. Deaths due to attacks or killings by security forces, paramilitary groups or private forces cooperating with or tolerated by the State, and violations of the right to life during armed conflict

35.    The Special Rapporteur transmitted urgent appeals to the following Governments in relation to reports of violations of the right to life due to attacks or killings by security forces, paramilitary groups or private forces cooperating with or tolerated by the State: Bolivia, Colombia, India, Indonesia, Mexico, Myanmar, Nepal, Peru, Philippines, Russian Federation, Sri Lanka, Sudan, Thailand, Turkey, United States of America and Yemen.

36.    In this regard the Special Rapporteur is particularly concerned about reports relating to actions by government-controlled or -condoned paramilitary groups, as well as the use of the military in operations against civilians resulting in extrajudicial killings. In particular, Bangladesh, Colombia, Guatemala and Mexico are of concern in this regard.

E/CN.4/2003/3
page 16

37.    A truly disturbing development was the events in Yemen in November 2002. It is reported that six men were allegedly killed while travelling in a car on 3 November 2002 in Yemen by a missile launched by a United States-controlled Predator drone aircraft. According to the information, one of the persons in the car was allegedly suspected of being a senior figure in the al-Qa'idah organization. The strike was reportedly carried out with the cooperation and approval of the Government of Yemen. On 15 November the Special Rapporteur addressed letters to the Governments of the United State and Yemen requesting their comments on these reports.

38.    The Government of Yemen replied on 17 December 2002. As the Special Rapporteur is still awaiting the official translation, at this stage a brief summary of the letter can be provided. In its letter the Government of Yemen acknowledges that the attack did take place, and gives the names of the six persons killed. It further informs the Special Rapporteur that the six men had been involved in the attacks on the United States military vessel, the USS *Cole*, as well as a French tanker out of the port of Aden. It is further reported that the Government on several occasions had, unsuccessfully, sought to apprehend these six individuals. The Government stresses that had the persons come forward all their rights would have been protected, including a fair trial and a defence lawyer during trial. At the time of writing the United States Government had not sent a reply.

39.    The Special Rapporteur is extremely concerned that should the information received be accurate, an alarming precedent might have been set for extrajudicial execution by consent of Government. The Special Rapporteur acknowledges that Governments have a responsibility to protect their citizens against the excesses of non-State actors or other authorities, but these actions must be taken in accordance with international human rights and humanitarian law. In the opinion of the Special Rapporteur, the attack in Yemen constitutes a clear case of extrajudicial killing.

40.    The Special Rapporteur continues to be alarmed by reports of civilians killed in the context of armed conflict. All parties to an armed conflict must respect the rights of the civilian population in accordance with international humanitarian and human rights law.

41.    The Special Rapporteur fully endorses the Secretary-General's efforts with regard to the protection of civilians in armed conflict as outlined in his report released in November 2002 (S/2002/1300). She supports the efforts to create a culture of protection, with a view to ensuring the protection of the right to life of civilians in armed conflict, and urges all States to support this process. She welcomes the active role of the Security Council in this regard.

42.    The Special Rapporteur has followed the developments in Côte d'Ivoire with increasing concern. Reports of extrajudicial killings of civilians on the part of both the Government and rebel forces and reports of recent mass graves are a cause of great concern. On 12 December 2002 the Special Rapporteur issued a press statement urging all parties to refrain from committing extrajudicial executions and recalled the need for accountability. She believes that the action of the international community is crucial in order to prevent further killings of civilians.

# Exhibit E

Westlaw.

**News**Room

1/31/10 LATIMES 1

Page 1

1/31/10 L.A. Times 1
2010 WLNR 2018766

Los Angeles Times
Copyright 2010 Los Angeles Times

January 31, 2010

Section: Main News

From memo to missile: the CIA's hit list
The likely addition of a U.S. citizen to the roster of drone targets sheds light on the selection process.

**Greg Miller**

WASHINGTON

Lead story

The **CIA sequence** for **a Predator strike** ends with a missile but begins with a memo. Usually no more than two or three pages long, it bears the name of a suspected terrorist, the latest intelligence on his activities, and a case for why he should be added to a list of people the agency is trying to kill.

The list typically contains about two dozen names, a number that expands each time a new memo is signed by CIA executives on the seventh floor at agency headquarters, and contracts as targets thousands of miles away, in places including Pakistan and Yemen, seem to spontaneously explode.

No U.S. citizen has ever been on the CIA's target list, which mainly names Al Qaeda leaders, including Osama bin Laden, according to current and former U.S. officials. But that is expected to change as CIA analysts compile a case against a Muslim cleric who was born in New Mexico but now resides in Yemen.

Anwar al Awlaki poses a dilemma for U.S. counter-terrorism officials. He is a U.S. citizen and until recently was mainly known as a preacher espousing radical Islamic views. But Awlaki's ties to November's shootings at Ft. Hood and the failed Christmas Day airline plot have helped convince CIA analysts that his role has changed.

"Over the past several years, Awlaki has gone from propagandist to recruiter to operational player," said a U.S. counter-terrorism official.

Awlaki's status as a U.S. citizen requires special consideration, according to former officials familiar with the criteria for the CIA's targeted killing program. But while Awlaki has not yet been placed on the CIA list, the of-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ficials said it is all but certain that he will be added because of the threat he poses.

"If an American is stupid enough to make cause with terrorists abroad, to frequent their camps and take part in their plans, he or she can't expect their citizenship to work as a magic shield," said another U.S. official. "If you join the enemy, you join your fate to his."

The complications surrounding Awlaki's case provide a rare window into the highly secretive process by which the CIA selects targets.

CIA spokesman Paul Gimigliano declined to comment, saying that it is "remarkably foolish in a war of this kind to discuss publicly procedures used to identify the enemy, an enemy who wears no uniform and relies heavily on stealth and deception."

Other current and former U.S. officials agreed to discuss the outlines of the CIA's target selection procedures on the condition of anonymity because of their sensitive nature. Some wanted to defend a program that critics have accused of causing unnecessary civilian casualties.

Decisions to add names to the CIA target list are "all reviewed carefully, not just by policy people but by attorneys," said the second U.S. official. "Principles like necessity, proportionality, and the minimization of collateral damage -- to persons and property -- always apply."

The U.S. military, which has expanded its presence in Yemen, keeps a separate list of individuals to capture or kill. Awlaki is already on the military's list, which is maintained by the U.S. Joint Special Operations Command. Awlaki apparently survived a Dec. 24 airstrike conducted jointly by U.S. and Yemeni forces.

The CIA has also deployed more operatives and analysts to Yemen. CIA Deputy Director Stephen Kappes was in the country last month, just weeks before a Nigerian accused of training with Al Qaeda in Yemen boarded a jetliner bound for Detroit on Christmas Day.

From beginning to end, the CIA's process for carrying out Predator strikes is remarkably self-contained. Almost every key step takes place within the Langley, Va., campus, from proposing targets to piloting the remotely controlled planes.

The memos proposing new targets are drafted by analysts in the CIA's Counter-Terrorism Center. Former officials said analysts typically submit several new names each month to high-level officials, including the CIA general counsel and sometimes Director Leon E. Panetta.

Former officials involved in the program said it was handled with sober awareness of the stakes. All memos are circulated on paper, so those granting approval would "have to write their names in ink," said one former official. "It was a jarring thing, to sign off on people getting killed."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The program is governed by extensive procedures and rules, but targeting decisions come down to a single criterion: whether the individual in question is "deemed to be a continuing threat to U.S. persons or interests."

Given that standard, the list mainly comprises Al Qaeda leaders and those seen as playing a direct role in devising or executing attacks. Espousing violence or providing financial support to Al Qaeda would not meet the threshold, officials said. But providing training to would-be terrorists or helping them get to Al Qaeda camps probably would.

The list is scrutinized every six months, officials said, and in some cases names are removed if the intelligence on them has grown stale.

"If someone hadn't popped on the screen for over a year, or there was no intelligence linking him to known terrorists or plans, we'd take him off," the former official said.

The National Security Council oversees the program, which is based on a legal finding signed after the Sept. 11 attacks by then-President George W. Bush. But the CIA is given extensive latitude to execute the program, and generally does not need White House approval when adding names to the target list.

The only exception, officials said, would be when the name is a U.S. citizen's.

The CIA has at times considered adding Americans' names to the target list. None were ever approved, the officials said, not because their citizenship protected them but because they didn't meet the "continuing threat" threshold.

Adam Gadahn, a California native now believed to be hiding in Pakistan, has been indicted on charges of treason and providing support to Al Qaeda. But Gadahn, former officials said, has mainly served in a propaganda role.

Officials said that whether Awlaki is added to the list hinges more on intelligence agencies' understanding of his role than any concern about his status as a U.S. citizen.

"If you are a legitimate military target abroad -- a part of an enemy force -- the fact that you're a U.S. citizen doesn't change that," said Michael Edney, who served as deputy legal advisor to the National Security Council from 2007 until 2009.

Awlaki, 38, was known for delivering fiery sermons at mosques in San Diego and suburban Virginia before moving to Yemen in 2004. Because of his radical online postings, he has been portrayed as a catalyst or motivator in nearly a dozen terrorism cases in the U.S. and abroad.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

But it was his involvement in the two recent cases that triggered new alarms. U.S. officials uncovered as many as 18 e-mails between Awlaki and Nidal Malik Hasan, a U.S. Army major accused of killing 13 people at Ft. Hood, Texas. Awlaki also has been tied to Umar Farouk Abdulmutallab, the Nigerian accused of attempting to detonate a bomb on a Detroit-bound flight.

"Awlaki's interested in operations outside of Yemen, and he's trying to recruit more extremists, including Westerners," said the U.S. counter-terrorism official. "His knowledge of Western culture and language makes him valuable to [the offshoot] Al Qaeda on the Arabian Peninsula.

"Taking him off the street," the official said of Awlaki, "would deal a blow to the group."

The CIA has carried out dozens of Predator strikes in Pakistan over the last year. The program is not foolproof, as drone strikes often kill multiple people even when the intended target escapes. The CIA has also made grievous mistakes in counter-terrorism operations, including capturing individuals misidentified as terrorism suspects. But the program remains valuable to U.S. officials.

President Obama alluded to the campaign in his State of the Union speech last week, saying that during his first year in office, "hundreds of Al Qaeda's fighters and affiliates, including many senior leaders, have been captured or killed -- far more than in 2008."

Many of those strikes were aimed at gatherings of militant groups or training complexes, current and former officials said. In such cases, the CIA is free to fire even if it does not have intelligence indicating the presence of anyone on its target list.

The CIA has carried out Predator attacks in Yemen since at least 2002, when a drone strike killed six suspected Al Qaeda operatives traveling in a vehicle across desert terrain.

The agency knew that one of the operatives was an American, Kamal Derwish, who was among those killed. Derwish was never on the CIA's target list, officials said, and the strike was aimed at a senior Al Qaeda operative, Qaed Sinan Harithi, accused of orchestrating the 2000 attack on the U.S. destroyer Cole.

--

greg.miller@latimes.com

Julian E. Barnes in the Washington bureau contributed to this report.

PHOTO: UNDER SCRUTINY: Anwar al Awlaki was known for delivering fiery sermons in the U.S. before he moved to Yemen. His link to recent terrorism cases has raised alarm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

PHOTOGRAPHER:Muhammad ud-Deen Associated Press

---- INDEX REFERENCES ---

COMPANY: WHITEHOUSE; INFORMATICA APLICATA SA; IMMOBILIARE AZIONARIA SPA

NEWS SUBJECT: (Counter-Terrorism (1CO40); Contracts & Orders (1CO29); International Terrorism (1IN37); Sales & Marketing (1MA51); Business Management (1BU42))

INDUSTRY: (Physical Security (1PH53); Security Agencies (1SE35); Security (1SE29))

REGION: (Nigeria (1NI88); Pakistan (1PA05); Yemen (1YE36); Western Asia (1WE54); North America (1NO39); USA (1US73); Americas (1AM92); Asia (1AS61); Africa (1AF90); Middle East (1MI23); Arab States (1AR46); Indian Subcontinent (1IN32); Southern Asia (1SO52); Michigan (1MI45); West Africa (1WE48))

Language: EN

OTHER INDEXING: (AWLAKI; CIA; NATIONAL SECURITY COUNCIL; NIDAL MALIK HASAN; OSAMA; US ARMY; US JOINT SPECIAL OPERATIONS COMMAND; WESTERNERS; WHITE HOUSE) (Adam Gadahn; Al Qaeda; Anwar; Deen; Derwish; Gadahn; George W. Bush; greg.miller; Julian E. Barnes; Kamal Derwish; Lead; Leon E. Panetta; Michael Edney; Obama; Paul Gimigliano; Principles; Qaed Sinan Harithi; Stephen Kappes; Umar Farouk Abdulmutallab)

KEYWORDS: CENTRAL INTELLIGENCE AGENCY; TERRORISM; TERRORISTS

EDITION: Home Edition

Word Count: 1824
1/31/10 LATIMES 1
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit F

# The Washington Post

**CORRECTION TO THIS ARTICLE**
The article referred incorrectly to the presence of U.S. citizens on a CIA list of people the agency seeks to kill or capture. After The Post's report w as published, a source said that a statement the source made about the CIA list w as misunderstood. Additional reporting produced no independent confirmation of the original report, and a CIA spokesman said that The Post's account of the list w as incorrect. The military's Joint Special Operations Command maintains a target list that includes several Americans. In recent w eeks, U.S. officials have said that the government is prepared to kill U.S. citizens w ho are believed to be involved in terrorist activities that threaten Americans.

---

## U.S. military teams, intelligence deeply involved in aiding Yemen on strikes

By Dana Priest
Washington Post Staff Writer
Wednesday, January 27, 2010; A01

U.S. military teams and intelligence agencies are deeply involved in secret joint operations with Yemeni troops who in the past six weeks have killed scores of people, among them six of 15 top leaders of a regional al-Qaeda affiliate, according to senior administration officials.

The operations, approved by <u>President Obama</u> and begun six weeks ago, involve several dozen troops from the U.S. military's clandestine Joint Special Operations Command (JSOC), whose main mission is tracking and killing suspected terrorists. The American advisers do not take part in raids in Yemen, but help plan missions, develop tactics and provide weapons and munitions. Highly sensitive intelligence is being shared with the Yemeni forces, including electronic and video surveillance, as well as three-dimensional terrain maps and detailed analysis of the al-Qaeda network.

As part of the operations, Obama approved a Dec. 24 strike against a compound where a U.S. citizen, Anwar al-Aulaqi, was thought to be meeting with other regional al-Qaeda leaders. Although he was not the focus of the strike and was not killed, he has since been added to a shortlist of U.S. citizens specifically targeted for killing or capture by the JSOC, military officials said. The officials, like others interviewed for this article, spoke on the condition of anonymity because of the sensitivity of the operations.

The broad outlines of the U.S. involvement in Yemen have come to light in the past month, but the extent and nature of the operations have not been previously reported. The far-reaching U.S. role could prove politically challenging for Yemen's president, Ali Abdullah Saleh, who must balance his desire for American support against the possibility of a backlash by tribal, political and religious groups whose members resent what they see as U.S. interference in Yemen.

The collaboration with Yemen provides the starkest illustration to date of the Obama administration's efforts to ramp up counterterrorism operations, including in areas outside the Iraq and Afghanistan war zones.

Advertisement



AT&T and BlackBerry®
have teamed up to evolve
the smartphone.

BlackBerry

Torch™

$199.99

BUY NOW

Rethink Possible™

2 year service agreement on voice and
min. $15/mo. data plan required.
BlackBerry® is a trademark of Research
in Motion Limited used under license.

"We are very pleased with the direction this is going," a senior administration official said of the cooperation with Yemen.

Obama has ordered a dramatic increase in the pace of CIA drone-launched missile strikes into Pakistan in an effort to kill al-Qaeda and Taliban members in the ungoverned tribal areas along the Afghan border. There have been more such strikes in the first year of Obama's administration than in the last three years under President George W. Bush, according to a military officer who tracks the attacks.

Obama also has sent U.S. military forces briefly into Somalia as part of an operation to kill Saleh Ali Nabhan, a Kenyan sought in the 2002 bombing of an Israeli-owned resort in Kenya.

Republican lawmakers and former vice president Richard B. Cheney have sought to characterize the new president as soft on terrorism after he banned the harsh interrogation methods permitted under Bush and announced his intention to close the U.S. military prison at Guantanamo Bay, Cuba.

Obama has rejected those two elements of Bush's counterterrorism program, but he has embraced the notion that the most effective way to kill or capture members of al-Qaeda and its affiliates is to work closely with foreign partners, including those that have feeble democracies, shoddy human rights records and weak accountability over the vast sums of money Washington is giving them to win their continued participation in these efforts.

In the case of Yemen, a steady stream of high-ranking officials has visited Saleh, including the rarely seen JSOC commander, Vice Adm. William H. McRaven; White House counterterrorism adviser John O. Brennan; and Gen. David H. Petraeus, head of U.S. Central Command.

A Yemeni official briefed on security matters said Tuesday that the two countries maintained a "steadfast cooperation in combating AQAP, but there are clear limits to the U.S. involvement on the ground. Information sharing has been a key in carrying out recent successful counterterrorism operations." AQAP is the abbreviation for al-Qaeda in the Arabian Peninsula, the affiliate operating in Yemen.

In a newly built joint operations center, the American advisers are acting as intermediaries between the Yemeni forces and hundreds of U.S. military and intelligence officers working in Washington, Virginia and Tampa and at Fort Meade, Md., to collect, analyze and route intelligence.

The combined efforts have resulted in more than two dozen ground raids and airstrikes. Military and intelligence officials suspect there are several hundred members of AQAP, a group that has historical links to the main al-Qaeda organization but that is thought to operate independently.

The chairman of the Joint Chiefs of Staff, Adm. Mike Mullen, told a Navy War College class in early January that the United States had "no plans" to send ground troops to Yemen and that he had been concerned about the growing al-Qaeda presence there "for a long time now."

"We have worked hard to try to improve our relationships and training, education and war-fighting support," Mullen said. "And, yet, we still have a long way to go."

Saleh has faced pressure not only from the United States but also his country's main financial backers, Saudi Arabia and the United Arab Emirates, to gain better control over its lawless northern border. In August, Saleh asked U.S. officials to begin a more in-depth conversation over how the two countries might work together, according to administration officials. The current operation evolved from those talks.

"President Saleh was serious about going after al-Qaeda and wasn't going to resist our encouragement," the senior official said.

The Obama administration's deepening of bilateral intelligence relations builds on ties forged during George J. Tenet's tenure as CIA director.

Shortly after the Sept. 11, 2001, attacks, Tenet coaxed Saleh into a partnership that would give the CIA and U.S. military units the means to attack terrorist training camps and al-Qaeda targets. Saleh agreed, in part, because he believed that his country, the ancestral home of Osama bin Laden, was next on the U.S. invasion list, according to an adviser to the Yemeni president.

Tenet provided Saleh's forces with helicopters, eavesdropping equipment and 100 Army Special Forces members to train an antiterrorism unit. He also won Saleh's approval to fly Predator drones armed with Hellfire missiles over the country. In November 2002, a CIA missile strike killed six al-Qaeda operatives driving through the desert. The target was Abu Ali al-Harithi, organizer of the 2000 attack on the USS Cole. Killed with him was a U.S. citizen, Kamal Derwish, who the CIA knew was in the car.

Word that the CIA had purposefully killed Derwish drew attention to the unconventional nature of the new conflict and to the secret legal deliberations over whether killing a U.S. citizen was legal and ethical.

After the Sept. 11 attacks, Bush gave the CIA, and later the military, authority to kill U.S. citizens abroad if strong evidence existed that an American was involved in organizing or carrying out terrorist actions against the United States or U.S. interests, military and intelligence officials said. The evidence has to meet a certain, defined threshold. The person, for instance, has to pose "a continuing and imminent threat to U.S. persons and interests," said one former intelligence official.

The Obama administration has adopted the same stance. If a U.S. citizen joins al-Qaeda, "it doesn't really change anything from the standpoint of whether we can target them," a senior administration official said. "They are then part of the enemy."

Both the CIA and the JSOC maintain lists of individuals, called "High Value Targets" and "High Value Individuals," whom they seek to kill or capture. The JSOC list includes three Americans, including Aulaqi, whose name was added late last year. As of several months ago, the CIA list included three U.S. citizens, and an intelligence official said that Aulaqi's name has now been added.

Intelligence officials say the New Mexico-born imam also has been linked to the Army psychiatrist who is accused of killing 12 soldiers and a civilian at Fort Hood, Tex., although his communications with Maj. Nidal M. Hasan were largely academic in nature. Authorities say that Aulaqi is the most important native, English-speaking al-Qaeda figure and that he was in contact with the Nigerian accused of attempting to bomb a U.S. airliner on Christmas Day.

Yemeni Foreign Minister Abubaker al-Qirbi said in Washington last week that his government's present goal is to persuade Aulaqi to surrender so he can face local criminal charges stemming from his contacts with the Fort Hood suspect. Aulaqi is being tracked by the country's security forces, the minister added, and is now thought to be in the southern province of Shabwa.

*Staff writer R. Jeffrey Smith and staff researcher Julie Tate contributed to this report.*

View all comments that have been posted about this article.

**Sponsored Links**

**I Had High Blood Pressure**
Now it's down to 120/75. Find out how I did it without drugs

**Business On Main**
Articles, Tools & Resources for Small Business, Connected by Sprint!

**Get NYC Deals**
Amazing Daily Deals 50-90% OffRestaurants, Spas, Events and More!

Buy a link here

© 2010 The Washington Post Company

Exhibit G

# The Washington Post

## Intelligence chief acknowledges U.S. may target Americans involved in terrorism

Advertisement

By Ellen Nakashima
Washington Post Staff Writer
Thursday, February 4, 2010; A03

Director of National Intelligence Dennis C. Blair acknowledged Wednesday that government agencies may kill U.S. citizens abroad who are involved in terrorist activities if they are "taking action that threatens Americans."

Blair told members of the House intelligence committee that he was speaking publicly about the issue to reassure Americans that intelligence agencies and the Department of Defense "follow a set of defined policy and legal procedures that are very carefully observed" in the use of lethal force against U.S. citizens.

Blair's unusually frank remarks come as the issue of targeting Americans for lethal action has attracted more notice. As the United States steps up its campaign against suspected terrorists overseas, it has become more apparent that some extremists may be U.S. citizens.

The most prominent case to date is that of a U.S.-born cleric, Anwar al-Aulaqi, who lives in Yemen and has been linked to the Army major who allegedly shot and killed 13 people at Fort Hood, Tex., in November, and to the Nigerian accused of attempting to bomb a Northwest Airlines plane on Christmas Day.

Aulaqi is a member of al-Qaeda in the Arabian Peninsula, an affiliate of the main al-Qaeda organization, and has been linked to the Fort Hood shooter as well as the Nigerian. He was thought to be meeting with regional al-Qaeda leaders at a compound in Yemen targeted by a Dec. 24 strike. He was not said to be the focus of the strike, and he was not killed. But U.S. officials said at the time that they thought he might have been killed.

"I just don't want Americans who are watching this to think that we are careless about endangering -- in fact, we're not careless about endangering American lives as we try to carry out the policies to protect most of the country," Blair said at the annual threat briefing before the panel. He did not specifically refer to the targeting of Aulaqi.

In response to questions from Rep. Peter Hoekstra (R-Mich.), the panel's ranking Republican, Blair said: "We take direct action against terrorists in the intelligence community. If that direct action, we think that direct action will involve killing an American, we get specific permission to do that."

Hoekstra pressed for clarification of the policy, especially its threshold for targeting Americans for lethal action.

"The concern that I have today is that I'm not sure that . . . [it is] very well understood as to what you and the people in your organization can do when it comes to Americans who have joined the enemy," Hoekstra told Blair.

The director of national intelligence said the factors that "primarily" weigh on the decision to target an American include "whether that American is involved in a group that is trying to attack us, whether that American is a threat to other Americans."

<u>View all comments</u> that have been posted about this article.

---

**Post a Comment**

<u>View all comments</u> that have been posted about this article.

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the <u>full rules</u> governing commentaries and discussions. You are fully responsible for the content that you post.

---

**Sponsored Links**

**Get Serious Savings**
Auto Insurance Quote: Get Discounts & Bonuses to Help You Save Big!
www.Allstate.com

**A Reverse Mortgage?**
Near 70? Find out how much money you can get from a reverse mortgage.
New Retirement.com

**Free Penny Stock Picks!**
Our last pick exploded 3550% - Join our free newsletter today!
www.PennyStocksExpert.com

**Buy a link here**

© 2010 The Washington Post Company

Exhibit H

**The New York Times** · Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for
distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any
article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

April 6, 2010

# U.S. Approves Targeted Killing of American Cleric

**By SCOTT SHANE**

WASHINGTON — The Obama administration has taken the extraordinary step of authorizing the targeted killing of an American citizen, the radical Muslim cleric Anwar al-Awlaki, who is believed to have shifted from encouraging attacks on the United States to directly participating in them, intelligence and counterterrorism officials said Tuesday.

Mr. Awlaki, who was born in New Mexico and spent years in the United States as an imam, is in hiding in Yemen. He has been the focus of intense scrutiny since he was linked to Maj. Nidal Malik Hasan, the Army psychiatrist accused of killing 13 people at Fort Hood, Tex., in November, and then to Umar Farouk Abdulmutallab, the Nigerian man charged with trying to blow up a Detroit-bound airliner on Dec. 25.

American counterterrorism officials say Mr. Awlaki is an operative of Al Qaeda in the Arabian Peninsula, the affiliate of the terror network in Yemen and Saudi Arabia. They say they believe that he has become a recruiter for the terrorist network, feeding prospects into plots aimed at the United States and at Americans abroad, the officials said.

It is extremely rare, if not unprecedented, for an American to be approved for targeted killing, officials said. A former senior legal official in the administration of George W. Bush said he did not know of any American who was approved for targeted killing under the former president.

But the director of national intelligence, Dennis C. Blair, told a House hearing in February that such a step was possible. "We take direct actions against terrorists in the intelligence community," he said. "If we think that direct action will involve killing an American, we get specific permission to do that." He did not name Mr. Awlaki as a target.

The step taken against Mr. Awlaki, which occurred earlier this year, is a vivid illustration of his rise to prominence in the constellation of terrorist leaders. But his popularity as a cleric, whose lectures on Islamic scripture have a large following among English-speaking Muslims, means any action against him could rebound against the United States in the larger ideological campaign against Al Qaeda.

The possibility that Mr. Awlaki might be added to the target list was reported by The Los Angeles Times in January, and Reuters reported on Tuesday that he was approved for capture or killing.

"The danger Awlaki poses to this country is no longer confined to words," said an American official, who like other current and former officials interviewed for this article spoke of the classified counterterrorism measures on the condition of anonymity. "He's gotten involved in plots."

The official added: "The United States works, exactly as the American people expect, to overcome threats to their security, and this individual — through his own actions — has become one. Awlaki knows what he's done, and he knows he won't be met with handshakes and flowers. None of this should surprise anyone."

As a general principle, international law permits the use of lethal force against individuals and groups that pose an imminent threat to a country, and officials said that was the standard used in adding names to the list of targets. In addition, Congress approved the use of military force against Al Qaeda after the Sept. 11, 2001, terrorist attacks. People on the target list are considered to be military enemies of the United States and therefore not subject to the ban on political assassination first approved by President Gerald R. Ford.

Both the C.I.A. and the military maintain lists of terrorists linked to Al Qaeda and its affiliates who are approved for capture or killing, former officials said. But because Mr. Awlaki is an American, his inclusion on those lists had to be approved by the National Security Council, the officials said.

At a panel discussion in Washington on Tuesday, Representative Jane Harman, Democrat of California and chairwoman of a House subcommittee on homeland security, called Mr. Awlaki "probably the person, the terrorist, who would be terrorist No. 1 in terms of threat against us."

# Exhibit I

# The Washington Times

## Dozens of Americans believed to have joined terrorists
*Threat called 'worrisome'*

By Eli Lake

-



The Washington Times

8:35 p.m., Thursday, June 24, 2010

Dozens of Americans have joined terrorist groups and are posing a threat to the United States and its interests abroad, the president's most senior adviser on counterterrorism and homeland security said Thursday.

"There are, in my mind, dozens of U.S. persons who are in different parts of the world, and they are very concerning to us," said John O. Brennan, deputy White House national security adviser for homeland security and counterterrorism.

In a wide-ranging interview with The Washington Times, Mr. Brennan said he would not talk about lists of targeted American terrorists. However, U.S. intelligence and law enforcement agencies have been tracking down U.S. nationals and U.S. passport holders who pose security threats, like the Yemen-based al Qaeda cleric Anwar al-Awlaki, he said.

"They are concerning to us, not just because of the passport they hold, but because they understand our operational environment here, they bring with them certain skills, whether it be language skills or familiarity with potential targets, and they are very worrisome, and we are determined to take away their ability to assist with terrorist attacks," Mr. Brennan said.

The remarks came in response to questions about procedures used by the president to order lethal strikes on U.S. citizens who have joined al Qaeda or other terrorist groups.

Dozens of Americans believed to have...

On Feb. 3, Dennis C. Blair, then director of national intelligence, said in congressional testimony that special permission must first be obtained by military or intelligence forces before what he termed "direct action" strikes against American citizens.

The main weapon in recent CIA and U.S. military counterterrorism operations has been attacks with missile-equipped unmanned aerial vehicles in Afghanistan, Iraq, Pakistan, Somalia and Yemen. The administration has said it has killed dozens or perhaps scores of terrorists with these strikes over the past several years.

That practice was criticized in a report earlier this month authored by Philip Alston, the independent U.N. investigator on extrajudicial killings, who said the practice may violate international humanitarian law.

The American Civil Liberties Union in a letter to Mr. Obama on April 28 warned that the current program to kill terrorists in foreign countries would create a precedent for other countries to kill suspected terrorists all over the world.

The American-born cleric and U.S. citizen who now resides in Yemen is thought to be high on the list of those targeted for killing by the United States.

Mr. Brennan would not comment on the details of lethal operations or the procedure for targeting Americans.

"If a person is a U.S. citizen, and he is on the battlefield in Afghanistan or Iraq trying to attack our troops, he will face the full brunt of the U.S. military response," Mr. Brennan said. "If an American person or citizen is in a Yemen or in a Pakistan or in Somalia or another place, and they are trying to carry out attacks against U.S. interests, they also will face the full brunt of a U.S. response. And it can take many forms."

Mr. Brennan added, "To me, terrorists should not be able to hide behind their passports and their citizenship, and that includes U.S. citizens, whether they are overseas or whether they are here in the United States. What we need to do is to apply the appropriate tool and the appropriate response."

Attempts by U.S. citizens at carrying out unsophisticated terrorist attacks in the United States have increased sharply in recent years. The latest example was Faisal Shahzad, who confessed in court this week that he left a vehicle rigged with explosives in New York's Times Square on the evening of May 1. In court testimony, he also admitted to having trained in bomb making with the Pakistani Taliban.

A recent Rand Corp. study of so-called "homegrown" U.S. radicalism reported a significant increase in indictments of Americans who were recruited for jihadist violence in the past two years.

The report said 81 were indicted for terrorism-related crimes between 2002 and 2008. Forty-two people were indicted for such crimes in 2009, and two more have been indicted in 2010.

The study, authored by former U.S. special-operations officer Brian Jenkins, concluded that one in 30,000 Muslim Americans is vulnerable to radicalization, a fact "suggesting an American Muslim population that remains hostile to jihadist ideology and its exhortations to violence."

In the interview Thursday, Mr. Brennan also said that the vision of Islam put forth by Osama bin Laden and other al Qaeda leaders was widely rejected by the Muslim world. Last month, Mr. Brennan drew criticism for a speech in which he said, "Jihad is holy struggle, a legitimate tenet of Islam, meaning to purify oneself or one's community."

Mr. Brennan said that he opposed granting any legitimacy to what he called al Qaeda's "twisted" interpretation of Islam.

"Clearly, bin laden and al Qaeda believe they are on this very holy agenda and this jihad," he said. "However, in my view, what we cannot do is to allow them to think, and the rest of the world to think, and for the future terrorists of the world to believe al Qaeda is a legitimate representation of jihad and Islam."

Mr. Brennan also said that the U.S. law enforcement community has the means to monitor Web forums affiliated with al Qaeda that have in the past proven to be a gateway for recruitment into the terrorist organization.

But he also said that any investigations or monitoring of such sites needed to first pass a threshold of probable cause.

"There needs to be some type of predicate or premise for there to be reasonable suspicion that someone is engaged in activity that is unlawful," he said. "The mere engagement in political speech, even if it is radical, is not in itself a cause for investigation."

Mr. Brennan toward the end of the interview acknowledged that, despite some differences, there is considerable continuity between the counterterrorism policies of President Bush and President Obama.

"There has been a lot of continuity of effort here from the previous administration to this one," he said. "There are some important distinctions, but sometimes there is too much made of those distinctions. We are building upon some of the good foundational work that has been done."

**Ads by Google**    Terrorism Democracy    War Terrorism    Study Terrorism    Iraq Terrorism    Military Terrorism

# Exhibit J

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format.    Order a reprint of this article now

## THE WALL STREET JOURNAL.

WSJ.com

WORLD NEWS   |   MARCH 26, 2010

# U.S. Seeks Cleric Backing Jihad

*Preacher Radicalized Activists With Writings, Officials Say*

By KEITH JOHNSON

WASHINGTON—One of the U.S.'s prime terrorism suspects doesn't carry a rifle or explosives. But U.S.-born cleric Anwar al Awlaki's prominence as an apologist for jihad—especially in the English-speaking world—has put him squarely in the cross hairs of the antiterror effort.

Mr. Awlaki, born in New Mexico in 1971 to Yemeni parents and believed to be hiding in Yemen, is the most prominent of a handful of native-English-speaking preachers, whose calls for jihad, or holy war, are helping radicalize a new generation through the Internet, counterterrorism investigators say.



View Full Image

Associated Press

U.S.-born cleric Anwar al Awlaki exchanged emails with the shooter behind last year's fatal rampage at Fort Hood in Killeen, Texas.

He exchanged dozens of emails with Fort Hood shooter Maj. Nidal Hasan in the months before the November killing spree at a U.S. Army base. He calls Umar Farouk Abdulmutallab, the underwear bomber who allegedly tried to blow up a Detroit-bound airliner on Christmas Day, "my student." His writings helped to radicalize several Canadians, at least one of whom went to fight for al Qaeda in Somalia.

"He's clearly someone that we're looking for," said Leon Panetta, director of the Central Intelligence Agency, in an interview last week. "There isn't any question that he's one of the individuals that we're focusing on."

Mr. Panetta cited Mr. Awlaki's role in inspiring past attacks as well as his efforts to "inspire additional attacks on the United States."

In a statement disseminated widely on pro-Jihadi Web sites last week, Mr. Awlaki ratcheted up his calls for jihad against the West, especially the U.S., and said that thanks in part to the spread of his ideas, "Jihad is becoming as American as apple pie and as British as afternoon tea."

Mr. Awlaki's importance as an instigator of jihad has increased at the same time that al Qaeda has become more decentralized. Recent terrorist acts against the U.S. have been attempted or carried

out by individuals with little or no formal connection to al Qaeda's core, some of whom may have become radicalized by reading English-language versions of violent treatises, such as Mr. Awlaki's "Constants on the Path of Jihad."

U.S. officials aren't making that distinction. "He's considered al Qaeda," a senior intelligence official said, adding that the U.S. government doesn't let terrorist suspects "self-define."

Shortly after the Sept. 11, 2001, attacks on the U.S., a presidential covert action finding signed by George W. Bush authorized the capturing or killing of al Qaeda operatives, including Americans. At the time, Congress authorized the president to use all necessary force against groups or persons linked to the 9/11 strikes.



View Full Image

Getty Images

Lt. Col. Charles Keller and his family at a vigil for victims of the attack.

An order to kill an American, however, "has to meet legal thresholds," the official said. He declined to be more specific.

Mr. Awlaki burst into the spotlight after the Fort Hood shootings, when it emerged that he had counseled Maj. Hasan by email about the immorality of a Muslim serving in the U.S. Army.

But Mr. Awlaki's links to radical Islam go further back, according to the 9/11 Commission Report. In the late 1990s, while living in California, he was investigated by the Federal Bureau of Investigation for ties to the Palestinian group Hamas. After 9/11, he was questioned by the FBI about his relationship with two of the hijackers, whom he met while serving as imam at a mosque in northern Virginia.

Mr. Awlaki fled the U.S. for Europe, and eventually settled in Yemen, where he was detained by authorities in 2006 and questioned by the FBI. He was later released.

"The combination of perfect English, having the proper religious credentials, and being a jihadi theorist makes him a very significant figure, both in terms of radicalizing people and perhaps even in an operational context," said Daveed Gartenstein-Ross, director of the Center for Terrorism Research at the Foundation for the Defense of Democracies in Washington.

In late December, Yemeni forces bombed a rural hideout where Mr. Awlaki and other terrorism targets were believed to be hiding. Mr. Awlaki was initially thought killed, but he promptly resurfaced on the Internet, through recorded statements and interviews with Arab media.

—Siobhan Gorman
contributed to this article.

**Write to** Keith Johnson at keith.johnson@wsj.com

Copyright 2009 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

Exhibit K

Get Email Updates     Contact Us

*Home • Briefing Room • Press Briefings*

Search WhiteHouse.gov    Search

**The White House**

Office of the Press Secretary

For Immediate Release                August 03, 2010

**Press Briefing by Press Secretary Robert Gibbs, 8/3/2010**

**James S. Brady Press Briefing Room**

See below for an answer to a question(marked with an asterisk) posed in the briefing that required follow up.

*To date we have billed BP and other responsible parties $222 million for response and cleanup activities. The next bill should be delivered next week and we will continue billing them until all the costs are covered.

12:42 P.M. EDT

MR. GIBBS: Wow, look at this, Sunday best, everybody in their new seats. Church is full today, that's good to see. Ms. Ryan, you're going to ask that gentlemen in front of you to sit down a little bit because he's -- (laughter) -- he's a little on the tall side, Ms. Ryan. I'm just saying that it's --

Q  I'm vertically challenged.

Q  She'll put a phone book in her seat.

Q  Oh, come on now.

MR. GIBBS: There's a gizmo up here if you want to use that.

Q  A booster seat?

Q  Seriously.

MR. GIBBS: But seriously? Is that -- are you trying to bring us down a little bit here?

Q  What's the big deal about all this?

MR. GIBBS: Brother, you're asking the wrong guy.

Take us back to seriousness.

Q  In the Gulf, obviously the static kill procedure, trying to move forward with that. And I know you've said before that the President gets updated daily, I think. I assume that's still true, right?

MR. GIBBS: Yes, it is.

Q  Is there anything special about now that they may be coming to the end of the leak -- anything special about how he's getting updated, by whom?

MR. GIBBS: Well, I know Secretary Chu and others are down in Houston today. I think he will likely touch base with them at some point -- I don't have the schedule in front of me -- but likely at some point today speak with Secretary Chu and others that are in Houston and are monitoring the activities.

I think it is important to know the static kill, injecting the mud into the top of the well, is certainly one part of the long-term effort to finally kill the well. That will be followed by activities at the bottom part of the well. And then ultimately, as we've talked about, the permanent solution is still the relief well that is ongoing.

Q  So you guys wouldn't be sort of declaring victory on this until you get the relief well done?

MR. GIBBS: No, no. Again, I still think that -- and the science -- the scientists believe that the long-term

## HEALTH CARE REFORM

More Information

**BLOG POSTS ON THIS ISSUE**

August 27, 2010 3:59 PM EDT
**Setting the Record Straight on Weatherization**
A close look from the Energy Department on the progress of the Administration's efforts to weatherize homes, a key part of the emerging clean energy economy.

August 27, 2010 3:39 PM EDT
**Improving America's Disaster Response**
In recognition of the fifth anniversary of Hurricane Katrina, DHS Secretary Napolitano discusses the department's progress in helping the Gulf Coast recover and strengthening the nation's ability to respond to and recover from disasters.

August 27, 2010 2:57 PM EDT
**More than 600,000 White House Visitor Records Online**
As part of his commitment to transparency, President Obama ordered that White House visitor records be released. This White House has released over 600,000 records to date.

VIEW ALL RELATED BLOG POSTS

| Facebook | YouTube |
|---|---|
| Twitter | Vimeo |
| Flickr | iTunes |
| MySpace | LinkedIn |

permanent solution is still ultimately the relief well.

Look, I would touch on a few things over the past couple of days. Obviously it's always good news that since the sealing cap went on some weeks ago now, oil has not been flowing into the Gulf. I would point out the release put out by EPA yesterday on toxicology tests, which are important, surrounding dispersants, and that -- and their findings, and their continued testing by EPA, NOAA and others to ensure that we're monitoring that environment, all of which is tremendously important as we move forward.

Q  Let me just switch topics quickly. We had the Iraq speech yesterday, the first of several, I take it, planned on that topic. We have a second round tomorrow on the developments in the auto industry. What are some of the other topics that we should expect to see the President focusing on as success stories, good news, achievement kind of --

MR. GIBBS: Well, let's say that -- now that you mention those, let's just touch a little bit on them. I mean, obviously the President -- and I think many of you that covered the campaign, regardless of which campaign you covered -- without a doubt, I think it is safe to say that the President's plan to remove our combat forces was among the most hotly debated in both the primary and in the general election.

And I'll be honest with you, I think if you look back at what was said over the course of many months both during the latter part of the general election, during the transition in the first part of the administration, I think many people believed that having -- changing the mission away from combat by August 31st, 2010, was likely not doable. That we know now is on pace to happen. Some 90,000 troops will be pulled out, along with 2 million pieces of equipment -- pulled out of Iraq by the end of this month.

You mentioned the President visiting on Thursday the Ford facility outside of Chicago --

Q  Thursday, not tomorrow -- getting ahead of myself, aren't I?

MR. GIBBS: Right. And, look, we've spent a lot of time on autos here both in the briefing room and certainly in the West Wing. And I think we are still encouraged by what we see in a newly revitalized auto industry. We're getting auto sales figures today. GM's were out earlier and showed an increase in sales, not just from last month, but a more than 24 percent increase year to year, which I think also gives you a sense of making overall economic progress, because the discussions that we were having about the auto industry was in many ways predicated on an economic environment where you were selling -- going from a height of selling 17 to 17.5 million cars a year down to selling, during the height of our economic downturn, sales that approached 9 to 9.5 million. Now we're closer to -- on track for closer to 11 to 11.5 million, which means that the investments that the President and the team made in the auto industry and the hard work of the workers in those facilities has led to a strongly revitalized auto industry.

Look, I think that the President will continue to talk about the steps that we took to revitalize the economy, the steps that have been taken to make us safer and more secure, all of which he'll spend some time over the course of the next several months reminding people.

Q  Are there other sorts of achievement areas or specific achievements that he intends to kind of pluck out and talk about in a way that he has these as we get closer to November?

MR. GIBBS: Yes. I mean, look, I don't have the schedule in front of me, but I anticipate that we will spend, as I said, a bunch of our time over the course of the next several months or at least some of that time reminding people of where we've come from. That will definitely be a big part of our fall.

Yes, sir.

Q  A couple questions. On the international front, Israeli and Lebanese forces clashed on the border there, five dead. What, if any, message does the President have for both sides?

MR. GIBBS: Well, look, obviously it's a -- it is an enormously tense region. I think we have seen, over the course of the last several months, real progress in proximity talks and in building towards what we hope can soon be direct talks on a comprehensive peace. And we hope that the conditions -- conditions certainly throughout the region don't change that.

Q  Is there any call for restraint on the part of the U.S.?

MR. GIBBS: Well, obviously I think that is something that I'm sure you'll hear out of the State Department today as well.

Q  And on the domestic front, Treasury Secretary Geithner was speaking today about Elizabeth Warren as a potential candidate for the Consumer Financial Protection Agency chief. How much closer is the President to making a decision on that? Will he do so before he goes off to Martha's Vineyard for vacation?

MR. GIBBS: I don't know whether he'll make a decision on that before the 19th of August. I do not expect

anything this week on that topic. I don't think anything is imminent.

Yes, ma'am.

Q   Robert, two questions. First of all, President Zardari told Le Monde today that "the international community to which Pakistan belongs is losing the war against the Taliban. Above all, it is because we've lost the battle for hearts and minds." When a partner like that -- a supposed partner says something like that, what does that say about where we are in Afghanistan?

MR. GIBBS: Well, I don't think the President would agree that -- with President Zardari's conclusion that the war is lost. I don't -- again, I haven't seen the interview. I don't know what he -- why he's come to that conclusion. But I think it is safe to say that the actions and the efforts that the coalition, international forces and American forces, have taken over the last several months have very much the hearts and minds of the Afghan people at the forefront.

And I would say this. The Afghan people know of the brutality of the Taliban, just as the Pakistani people, on the actions that their extremist counterparts were taking in Pakistan last year to move on the capital of Pakistan is why the country of Pakistan started to take more direct action against safe havens.

So I think that the hearts and minds of those in Afghanistan and Pakistan are obviously a key part of our strategy, as well as the hearts -- what is in the hearts and the minds of the extremists that seek to do Afghans or Pakistanis harm.

Q   Just to follow up?

MR. GIBBS: Let me go around.

Q   I just wanted to ask something a little off topic, a little more fun. The President's birthday is tomorrow.

MR. GIBBS: It is.

Q   Any special plans?

MR. GIBBS: Obviously we travel to Chicago later tomorrow afternoon. We'll probably have more information on this later, but I assume that -- I think his plans for tomorrow are dinner with some friends in Chicago. And I think he is looking forward to spending the night in his house for a change.

Q   He's been referencing his age a lot lately. He did it at the sub shop, talking about his slowing metabolism. He did it yesterday, talking about his graying hair. Does he feel like the weight of the presidency is perhaps accelerating his aging?

MR. GIBBS: I can't imagine that the weight of the job doesn't take a toll physically and mentally on anybody that does it. But at the same time, I think he's still -- I would say he's still in pretty good shape and is having -- is enjoying the job even with its many challenges. He knew what he was getting himself into in deciding several years ago to undertake this.

There's no doubt that it takes an enormous physical and mental strain on making the decisions that you make, on sending young men and women off to war or tackling the greatest economic calamity our country has faced since the Great Depression. But I know he greatly enjoys it, and it will just require him to get more frequent haircuts.

Yes, ma'am.

Q   There's a debate that's taking --

MR. GIBBS: Likely I'm going to hear about that. (Laughter.)

Q   There's a debate that's taking place in New York City whether or not it's appropriate to build a mosque, an Islamic cultural center, near the site of Ground Zero. What is the administration's position on this?

MR. GIBBS: Suzanne, I've been asked about this a couple times. I think this is rightly a matter for New York City and the local community to decide.

Q   The President takes a position on religious freedom, on tolerance. Why wouldn't the administration weigh in on this?

MR. GIBBS: Well, I think we have -- I think you've heard this administration and the last administration talk about the fact that we are not at war with a religion but with an idea that has corrupted a religion. But, that having been said, I'm not from here going to get involved in local decision-making like that.

Q　Do you think the Anti-Defamation League has a correct point of view in saying, out of the sensitivity to some of the victims of 9/11, it's not appropriate?

MR. GIBBS:  Suzanne, again, I think it is a decision that is appropriately debated at the local level.

Q　On another topic -- McCain, Coburn report that cites economic stimulus money they say has been mismanaged or wasted.  They cite 97 projects out of 70,000.  Do you believe that this is good news, bad news?  Is there some acknowledgment that some of those projects actually might not be well managed?

MR. GIBBS:  Well, I think there was an acknowledgment on their part, in pulling a couple of their projects out of their report that weren't ultimately recovery projects.  I think this has, Suzanne, much more to do with politics.  I think maybe the best person for Senator McCain to debate on this would be the chief economic adviser of his own presidential campaign, who not only weighed in on the President's recovery plan, but has in the last week written an analysis of what our economy would look like without the steps that we took.

It's a report that instead of 8 million jobs having been lost, that figure would be 16 million jobs.  So I think this is a -- look, every day, the Vice President and the Vice President's staff work diligently to ensure that projects that receive funding abide by certain standards.  All of that is on the Internet -- a level of transparency not seen in government programs, particularly those of the magnitude of this.  And I would suggest that John McCain and his chief economic adviser during that campaign, I think the debate is probably better between the two of them.

Q　Do you it's a credible report?

MR. GIBBS:  From what I've read, no.

Yes, sir.

Q　Following up on that, for those of us who covered the McCain campaign, I don't think anybody thought Zandi was actually the chief economic adviser.  He was somebody who was consulted.  And Zandi has told me that he's a registered Democrat.  So, I mean, isn't it a little disingenuous to hold him out there as an example of Republican thinking?

MR. GIBBS:  Because he's a registered Democrat?

Q　Well, they were reaching out to people who think differently.  He is not the person who formulated the McCain economic plan.  He's not their chief economic adviser.

MR. GIBBS:  Was he not a McCain -- okay, was it --

Q　He was an outside adviser to the campaign --

MR. GIBBS:  He was a key economic adviser?

Q　No, he was somebody they consulted on economic issues.  But, I mean, to treat him as the guy who formulated the McCain economic plan I think is just not accurate.

MR. GIBBS:  Well, I -- apparently, according to you, Chip, he took part in a couple conference calls.  I don't think either John McCain or Mark Zandi have portrayed their role quite as minimally as you have.  I would say --

Q　But I'm just saying he was not the person who formulated the core of the McCain economic plan.

MR. GIBBS:  Well, needless to say he was an active participant regardless of his party registration on the campaign of John McCain.  I don't think we're going to doubt that his support was for John McCain.  And John McCain has apparently come into a disagreement with a guy that played a prominent role in his presidential campaign.

Q　Hasn't he also advised your administration?

MR. GIBBS:  Pardon me?

Q　Zandi -- hasn't Zandi also advised this administration with the stimulus?

MR. GIBBS:  They certainly have -- we talked to a whole host of economists.

Q　Exactly, that's how they described his role with the McCain campaign, that they talked to a whole host of economists.

MR. GIBBS:  One of them being Mark Zandi.

Q   Just as the White House -- he is one of the people you consult.

MR. GIBBS: We're happy to list Mark as somebody who we've taken advice from. We thought his advice was so right on the stimulus that we pursued an economic recovery plan that I think Mark's own paper describes along with Alan Blinder, the former vice chair of the Fed, as having had a significant impact on ensuring that the depth of our recession didn't reach a Great Depression.

Q   Do you agree then with Mark Zandi, who said the tax cuts shouldn't be allowed to expire in the middle of a recession?

MR. GIBBS: The President believes that we should not raise taxes on the middle class.

Q   He says across the board.

MR. GIBBS: Right. The President believes that adding $700 billion to our deficit for tax cuts for those making in excess of $250,000 a year doesn't make sense.

Q   So is Zandi wrong about that?

Q   That includes businesses.

MR. GIBBS: We disagree with him on that.

Q   And that includes businesses though, Robert, it's not just individuals, right?

MR. GIBBS: Well, understand that, again, this is the debate we had during the campaign in which we now know which way the participants line up. The number -- you'll hear this a lot during this debate -- "You're going to raise taxes on" --

Q   Small business.

MR. GIBBS: Right. Just as we said during the campaign that about 2 percent of small businesses fall into that category. So when you hear -- I mean, let's be clear, this isn't about small business, because if you were for cutting taxes on small business, would you be holding up a small business tax cut in the United States Senate right now? Would you be holding up a bill that allows them to deduct more of their investment in equipment if you were supportive of small business? Would you be holding up a bill that eliminates capital gains for small business? Well, no, right, because you're for small business, except when you're not for small business.

I would say I think they use the moniker of small business when it fits their political lens. But in reality, this isn't something that is going to impact on 98 percent of small businesses. It's not going to hit a majority of families in this country. The President believes we ought to protect those in the middle class.

Q   Changing topics. The President is hitting the campaign trail. Has the White House heard -- there have been these reports recently that the White House has heard from various Democrats that they prefer the President not come to their districts and campaign for them. Has the White House heard from people who have suggested that? And if so, why do you think that is and will the President honor their request?

MR. GIBBS: Chip, we'll help people where they think we can help them the most. I think that's largely been -- that's been how it was when the President campaigned for Democrats as a senator, when he was running for the Senate in 2004, and I think how most White Houses deal with political requests that come in.

Q   But in 2006 and 2008, just about everybody wanted him to come to their districts and now there seem to be a lot of people who don't. Why do you think that is?

MR. GIBBS: I don't necessarily believe that in 2006 -- I think if you look in 2006 and 2008, we stayed in a certain number of states. I don't -- we never said we were going to all 50 states.

Look, Chip, again, I think it's a fairly well worn adage that we will go to places where candidates think that that's helpful. We will raise money for places -- in places where candidates and committees think that that's helpful. We'll be in mail, we'll be in --

Q   Will you stay away from places if it's not helpful?

MR. GIBBS: Well, of course. Absolutely. No, we're not going to go to places where people think it's unhelpful that we go. That would be crazy. (Laughter.) I mean, I -- breaking news alert, but, you know --

Q   Are there a lot of those places, you think? (Laughter.)

MR. GIBBS: I don't think so. I don't --

Q   Can you name them?

Q   Which districts?

Q   Could you name those places?

Q   Could you get back to us with a list?

MR. GIBBS:  Yes, I think I've broken new ground here.  We will not go places where candidates think it is unhelpful for us to go.  Story and film at 11:00.  (Laughter.)

Q   On the Gulf, in the Oval Office address, the President talked about a Gulf restoration plan eventually that BP would pay for.  Where are we on that?  Is there going to be an announcement of that at some point?

MR. GIBBS:  Well, I would say this --

Q   And what kind of money are we talking about?

MR. GIBBS:  Well, I would say -- I don't think we've reached that point yet.  There are a series of -- there will be a series of fines.  There will be a fine that the government requires BP to pay that will be based off of the amount of pollution put into the Gulf, which I think by any accord will be a substantial fine.

In addition to that -- and I can check on where the exact process is -- natural resources damage assessments will be made -- BP is liable for the damage that it's caused to the environment above -- that's different than a penalty for the pollution that's been emitted.

Secretary Mabus is working through the process of Gulf Coast restoration.  And we expect I think his report to the President sometime the latter part of September.

Q   And are we talking about a fund of billions of dollars that BP will be --

MR. GIBBS:  Well, I think maybe --

Q   -- paying into this?

MR. GIBBS:  I think that the penalty on the oil emitted, if I'm not mistaken, that is a penalty that goes to the Treasury.  The natural -- the damage assessment, I think will, be without having a lot of backing on this directly in front of me, I think will be a substantial penalty based on the damage that the pollution has caused.

Q   And the last question.  Is the President upset at all that his family is not going to be with him on his birthday?

MR. GIBBS:  Well, you get a long answer about -- I think it's safe to say that of course he will miss them.  He has a daughter at camp that I know he's already talked to a couple of us that obviously he dearly misses.  But they'll be all back together soon.

Q   Has he called camp?

MR. GIBBS:  I'm not going to get into that.

Wendell, welcome to the front row.

Q   Thank you.

Q   Can we get a readout of that?  (Laughter.)

Q   If I can follow on Jennifer -- if I can follow on Jennifer's question, in Secretary Geithner's op-ed, "Welcome to the Recovery," he cites a number of statistics, including the auto industry recovery and increased savings rates.  And I wonder if the President believes there is enough good economic news to get people past the 9.5 percent unemployment rate?

MR. GIBBS:  Well, look, I think before and after Secretary Geithner's op-ed, I don't think Secretary Geithner in his own op-ed believes that 9.5 percent unemployment doesn't present serious challenges.  And I don't think anybody -- the President and the Secretary included -- believe that despite the progress that we made in where we were and where we've come to, I don't think anybody is satisfied that we're -- that we've made enough or that we're out of the woods.

We'll get jobs numbers at the end of the week.  I will stipulate, as I have many months in a row, that I don't see

those numbers before they're announced. I don't know what this week's -- or this month's numbers will show. But our hope is that we will build off of positive private sector job growth heading into the seventh month in a row as a positive sign.

Is the economy adding jobs fast enough or as fast as we would like to see it? No, of course not. I think one of the things that would be a good antidote to where we are is the Senate passing a small business bill that would spur investment by small businesses and provide them the credit they need to expand and hire.

Q   Given the economic difficulties, pollsters Pat Caddell and Doug Schoen say the tone of the President's comments, especially in political circumstances recently, seems to have abandoned the politics of hope to be appealing more to the Democrats' base. Are they --

MR. GIBBS: How so?

Q   More negative. For example, yesterday at the DNC fundraiser, talking about, as he has in the past, whether or not we should give the keys to the Republicans and put the car in reverse or drive. One, has he abandoned the politics of hope, at least for the midterm elections? And two, does R and D stand for reverse and drive, or Republican and Democrat?

MR. GIBBS: Both. An analogy he used during the campaign in which I think we were criticized as being too much about hope. I don't -- I can't divine what Pat Caddell and Doug Schoen -- what their agenda is. I will say this, Wendell. The President believes that there is a choice that will be made, and it is exemplified in the analogy that he uses -- are we going to go backwards to the type of policies that led us to the greatest economic calamity that most of us have ever known, or are we going to continue to make progress and go forward?

Understand the agenda of those on Capitol Hill. Let's take, for instance, the last piece of -- the last piece of reform that the President put into place was financial reform, new rules for the way Wall Street and banks operate. The Republican plan for that: repeal it. That seems like a fine thing to debate come this fall.

Q   Is he concerned that he might turn off independent voters?

MR. GIBBS: No, I think independent voters want rules in the road for -- new rules in the road for --

Q   Looking at the poll, not just talking about this specific legislation.

MR. GIBBS: Look, I think if you look at the tone of the President's remarks in the auto factories in Detroit and Hamtramck on Friday, I think the President -- the President said don't bet against the American worker. I think that's the tone that he'll have a lot during the fall.

Any interesting emails, Ms. Guthrie? (Laughter.)

Q   Oh, sorry. (Laughter.) Gosh, that was embarrassing. On taxes --

MR. GIBBS: I didn't ask you to read them, I just -- (laughter.)

Q   You might want to.

MR. GIBBS: Bill, stop emailing Savannah. (Laughter.)

Q   It's from my boss. On letting the Bush tax cuts expire, given the continuing economic difficulties, would the administration be open to a compromise position of having the Bush tax cuts for the wealthiest Americans be phased out over time?

MR. GIBBS: Well, look, our viewpoint is that for the wealthiest Americans -- I don't think the wealthiest among us have -- well, they certainly haven't felt the type of economic downturn that the middle class not only experienced during that economic downturn, but in the years that led up to it. And, again, as we've said, adding those tax cuts on, continuing those tax cuts, likely adds another $700 billion to our debt.

Q   So no room on compromise, on letting them expire at the end of this year?

MR. GIBBS: I think the President -- the President's viewpoint is protect our middle class -- protect the middle-class tax cuts and let those for the wealthy expire.

Q   On the judge's decision yesterday in the Virginia lawsuit -- I know it's procedural in nature, but he did say that one of the strongest claims the government made in defense of that health care individual mandate was that it derived from the government's power to tax. By pressing a legal argument in court that that individual mandate is a tax, is the administration acknowledging it's basically passed a tax on everybody and would violate your pledge not to tax the middle class?

MR. GIBBS: No. Again, I'd go back to something like the car insurance example. I think we all pay a tax when

all of us don't have health care, right?  We pay a tax in your health care premiums, because instead of having health care that pays for the bills if you're in an auto accident, if you don't have insurance you go to the emergency room and the rest of us pay it.

The President believed -- and this was not a position he originally took in the campaign, but believed that if we're going to bring down health care costs, you have to have everybody in the system.

Q    But you're acknowledging it's a tax?

MR. GIBBS:  Again, I think that the President believed that if we're going to have the type of savings that we need, if we're going to have the type of benefits we all know can come from health care, everybody has to be in the system.

Q    Is it a violation of the pledge not to raise taxes on the middle class?

MR. GIBBS:  No.

Q    How come?

MR. GIBBS:  Again, I think the President has spoken pretty clearly to the reasons for making sure that each of us has coverage.

Q    Okay, one last thing real quick.  Just to get it on the record, the First Lady's trip to Spain with Sasha, what portion of that is paid by taxpayers and what portion by --

MR. GIBBS:  I would point you over to the First Lady's office.  It's a private trip and is being paid for that way.

Q    The President tomorrow meets with the AFL-CIO.  Is he going to reassure them that trade pacts -- excuse me, free trade agreements with Korea and other countries have strict labor rules in place to protect American workers?

MR. GIBBS:  Well, look, the President believes that we ought to have rules in place that make sure that trade works for everybody here in America.  That's why the President has pledged before going to Korea in the fall that we'd present an agreement that made sense for the auto industry, made sense for the beef industry, and not just simply passing along a free trade agreement that existed before.  The President believes that -- and I think if you look at either the GDP numbers or any reasonable economic growth plan for the future, it involves having to increase our exports.

Here's a good example, and it's sort of in the realm of some of the concerns that were had about the free trade agreement under the Bush administration were about autos.  And, look, because of help that Ford is getting from the Department of Energy, the factory the President will visit outside of Chicago got money to help retool.  That retooling allows the new Ford Explorer not to be built on a truck frame but to be built on a car frame, which means the car itself is more fuel efficient, and that is a gateway for -- and Ford's business plan calls for specifically marketing this car not just in this country but overseas.  That helps -- they just added 1,200 jobs, by the way, at that facility, so that helps put people to work; that helps grow our economy; that helps with our trade deficit and our increase in exports.

Q    Will he make any new assurances of things that he wants to see?

MR. GIBBS:  I have not seen the draft of the speech in total yet.  I think the President will talk about the economic decisions that we have made and where we go -- where we're going forward.

Peter.

Q    Robert, following up on a couple questions you took earlier about the Gulf situation, what kind of reassurance can the administration offer to people who live there who are worried that once you do have the ultimate solution with the relief well that the government and BP are not going to be there for the long haul on the environmental cleanup?

MR. GIBBS:  It's a very good question, and, look, I think if you go back to the answers that I gave around BP's decision to change CEOs, I think certainly Thad Allen, Carol Browner and others have at every opportunity taken the chance to both tell BP they can't leave, and reassuring people that we're in the Gulf for the long haul.

Capping the well, though for the past 100 or so days has been our most immediate project, that does not, as you say, that does not allow us to, and this government will not, walk away from the obligations to continue protecting the coastline, continue cleaning up the damage that has been done, billing BP for that damage, as we talked about in both the cleanup activities themselves as well as the damage assessments that will be made about that damage, and continuing to work to implement the escrow fund that will pay for not just the environmental but then the economic damages caused by the spill in that region.

I think that we would all agree, we do all agree, that what has happened requires our continued focus long past capping that well and our commitment is to continue to do so.

Q   Is there any initial dollar estimate or time estimate on the cleanup?  How much it's going to cost and how long it's going to take?

MR. GIBBS:  Let me see if they have -- without me sort of guessing on this, let me see what type of updated figures.  I assume partly, too, what I said earlier in the question where I answered about Secretary Mabus, I think some of that will likely also come in his report again to the President later in September.*

Yes, ma'am.

Q   Senator McConnell said in an interview today that the President's immigration lawsuit against Arizona was a "blatant political move to help his reelection."  He said it was more about helping the President get reelected in 2012 than helping the Democrats in 2010.  Do you have any reaction to that?

MR. GIBBS:  Well, I think later in the interview -- didn't later in the interview then he surmise that we ought to take a look at the 14th Amendment?  So I guess -- I don't know if that was based on 2010 or 2012, but my hunch is it's based purely on politics.

The President and the Justice Department were concerned about the law creating a patchwork of environmental -- I'm sorry -- of immigration policies.  The case that we made to the court in Arizona was just that, and the court ruled indeed that Arizona and other states can't and shouldn't create a patchwork of immigration laws throughout the country.  So it wasn't an argument that was based on anything other than a legal argument, and honestly a legal argument that the Justice Department prove to a judge.

Q   So the idea that this will have a long-term benefit for Democrats --

MR. GIBBS:  I will say -- I've said this before, I'll say this again -- it builds off of Chip's political question.  The President has made a lot of decisions in this White House.  I think if you were to -- I think if you look at the polling on the particular decision, the numbers aren't exactly with us, right?  If we were making decisions based on politics, or on polling, we'd get a new pollster.  I don't think -- no, the DNC has a pollster.  We wouldn't -- those decisions are made on what's best for the country, not on politics.

Q   He also said that Elizabeth Warren would be a very controversial nominee to the Consumer Protection Agency.  Do you have any comment on that?

MR. GIBBS:  Based on what?

Q   That's what he said during the interview.

MR. GIBBS:  I don't know what he bases -- it would be interesting to know what he based his comments on.

Q   A lot of people have said that she could be a controversial pick.

MR. GIBBS:  Based on?

Q   I mean, Senator Dodd has said that she might not get enough votes to be --

MR. GIBBS:  Based on?

Q   Okay, the AFL-CIO event, can I just ask one thing -- is it at the White House tomorrow?

MR. GIBBS:  I believe it's at the Convention Center, yes.

Q   And why is the President meeting with them?  Do you have any background on the meeting tomorrow?

MR. GIBBS:  We can get it.  It hasn't been put out yet.  But we'll send it out.  I mean, look, I think working men and women are an important part of this country.  And the President looks forward to speaking tomorrow with the executive council as he's done on a number of occasions.

Ari.

Q   Human rights lawyers are challenging the administration's assertion that an American citizen can be targeted for killing overseas.  Should Americans worry that if they go overseas, their own government could target them to be killed?  Anwar al-Awlaki is the person in question, but the legal principle --

MR. GIBBS:  Okay, let's -- let me just for the point of -- I don't know what I would make -- I think you just largely said a tourist going overseas and Anwar al-Awlaki are somehow analogous in nature.  I'm not a --

Q   But if the U.S. decides that an American citizen is affiliated with a terrorist group --

MR. GIBBS:  No, no, let's be clear, let's be -- no, no, let's be clear.

Q   Is there any legal process?

MR. GIBBS:  Let's be clear about Anwar al-Awlaki, okay?  The United States hasn't decided that Anwar al-Awlaki is aligned with a terrorist group.  Anwar al-Awlaki has in videos cast his lot with al Qaeda and its extremist allies.  Anwar al-Awlaki is acting as a regional commander for al Qaeda in the Arabian Peninsula.  So let's not take a tourist that might visit Italy overseas and equate him to somebody who has on countless times in video pledged to uphold and support the violent and murderous theories of al Qaeda.  There --

Q   The U.S. has mistakenly identified people as terrorists in many instances in the last eight years, and if Americans can be targeted for killing --

MR. GIBBS:  Ari, it's hard to imagine an issue in which two things have been conflated more than your question in the past 18 months of me taking questions here.  I think the notion that somehow anybody in this country confuses traveling overseas and the role that Anwar al-Awlaki has in inciting violence -- they're not even in the same ballpark.

Q   Are you acknowledging that Awlaki is on the assassination list, then?

MR. GIBBS:  I just answered his question about comparing Joe the Tourist to Anwar al-Awlaki.

Q   Just a quick follow to that.  U.S. citizens are entitled to a certain judicial process when it comes to questions like this, when it comes to sentencing to death.  And is there a process in place that we don't know about?

MR. GIBBS:  There's a process in place that I'm not at liberty to discuss.

Q   Thank you.  Returning to the tension in the Middle East, if it begins an all-out war involving Hamas, Hezbollah and Iran, the countries around -- would the U.S. come to Israel's defense militarily?

MR. GIBBS:  It's hypothetical day here at the White House.  I'm, Connie, not going to obviously get into discussing what if there was an all-out war in the Middle East.  Obviously the President has since the moment he walked into the Oval Office taken steps to pull us back from those type of tensions.  I have on countless times stated our long-held, countrywide position of protecting the security of Israel and its people, and the White House and this country will continue to do so.

Q   And anything new from Iran -- on the three hostages in Iran?

MR. GIBBS:  Nothing new.  Obviously it's been -- Friday and Saturday represented a year of them being wrongly held by the Iranian government.  And the President on Friday called for and continues to call for the release of three people that are wrongly held.

Q   Thanks, Robert, two questions.  One, the President has been trying his best to bring those who do not support the U.S. on terrorism and also who does harbor and finance terrorists in the Afghanistan region.  Does the President now believe Pakistani intelligence, Pakistani military, and Pakistani civilian governments, that they will not -- they will support the U.S. from now on?

MR. GIBBS:  Well, I will give you largely what I gave last week on this, and that is I think if you look at the progress that we have made with Pakistan on safe havens, on confronting terrorists, I think that is a record that they and we can be proud of.  Is it -- does more have to be done?  Unquestionable.  We have tough work ahead in Pakistan and in Afghanistan.  And together with our partners, we'll make progress.

Q   And second, on immigration -- and, first of all, my happy birthday to the President in advance.

Q   Oh, boy.  (Laughter.)

Q   My second question is on immigration.

Q   I have a follow-up.  (Laughter.)

MR. GIBBS:  I'm going to put George and Peter down as no happy birthday for the President.

All right, go ahead.  I'm done.  (Laughter.)

Q   Thank you.  Second on immigration, most of the police chiefs around the countries are against the Arizona

immigration law. What they are saying is that if this spreads around the country, it will bring more violence and it might be out of the hands of the police around the country. So where do we go from here?

MR. GIBBS: Well, look, obviously the court ruled and stayed many of the provisions that were set to go into effect last Thursday around this law. I think police chiefs in Phoenix and Tucson -- the two largest cities in Arizona -- have, as you said, Goyal, expressed many reservations about what they believed this law would intend for them to do, and along with others, spoke out and filed briefs with the court.

Where it leaves us is the same place that it leaves us -- left us last week. And if -- Senator McConnell brought up immigration earlier. If Senator McConnell would like to solve a problem rather than to continue to talk about one that we haven't solved at a federal level for many years -- it's time to bring together Democrats and Republicans to do just that.

That's the only way we're going to make progress on comprehensive immigration reform, is to do it together and to do it in a way that's bipartisan.

Q Thanks, Robert. With the Kagan vote coming up this week, I wanted to ask, on July 19th, written answers to the Judiciary Committee, she said that she had ceased doing her full duties as Solicitor General after the May 10th nomination. Has she been receiving her full salary as Solicitor General since then, or should she?

MR. GIBBS: I'd point you over to the Department of Justice on that. I don't know what the pay records are.

Q Do you think she should receive --

MR. GIBBS: I'd point you to the Department of Justice.

Glenn.

Q Robert, over the last couple of weeks you folks have put the President out there and brought folks to the briefing to emphasize sort of the things that you have accomplished in the past 18 months. We had the -- an update on the auto bailout; we had his Iraq speech yesterday. A lot of this doesn't seem to be getting through to voters in general. We saw a Gallup poll today that has the President at 41 percent, which is low, I think, on their scale for the administration. Is it frustrating --

MR. GIBBS: Leaving aside that the other Gallup poll showed it at 45. But I'll leave Gallup to explain the margin of error.

Q Gallup versus Gallup. Or is it Gallup versus Zandi?

MR. GIBBS: I guess. I think Gallup is with -- kidding. (Laughter.) Go ahead.

Q Is it frustrating to the President that these messages on these accomplishments don't seem to be getting through to people, and why do you think they're not?

MR. GIBBS: Look, I would say, Glenn, I don't think the President spends a lot of time -- the President spends a lot of time worried about how we make progress, not worried about whether people are giving him enough credit for the progress that's been made.

I'll be honest with you -- and I said this last week, Glenn -- I don't think people -- I don't -- I wouldn't hold the auto investment against the American people because I don't think the story has been told. I don't think that the American people knew that for the first time in 10 years we were adding jobs to the auto industry, and had added 55,000 jobs since GM emerged from bankruptcy; or that for the first quarter since 2004, all three companies at the same time posted an operating profit; or that the money invested by this administration was very likely to be repaid in full.

I don't -- I think in many ways the auto story where we started -- or where it began in late March of 2009, and where we are now in late July and early August of 2010 is in a much different place. I think the President believes that, and hopes that people will, whether it's adding jobs in the auto industry, whether it's taking 94,000 soldiers out of Iraq, I think that the President only hopes that people look at what he's done and base their conclusions off that.

I get the --

Q How much of it is the unemployment rate?

MR. GIBBS: A lot of it.

Q I mean, you can send him out on a sales pitch every day, but as long as the product includes 9.5 percent, can you get around that?

MR. GIBBS: I think as the President has said before, if a pollster called you and you thought your economic situation was not as good as it could be, it was too expensive to send your daughter to college, your neighbor had just lost their house, and your -- somebody else in your family just lost a job, and the pollster asked you how they thought the President was doing, I don't think he would be surprised that the American people would answer to a pollster that they're concerned.

Q   How does he get around that, though?

MR. GIBBS: Well, two things: continuing to tell people what we're doing, and to continue to tell people the choices that we have to make. And I think, as I said earlier -- again, I don't think a lot of people had the totality of what the auto story was. I don't know how many people know that we're at the lowest point in I don't know how many years in our troop level in Iraq, or that if you look at civilian deaths -- what are likely to be the number of civilian deaths in Iraq in 2010 and what they were at the height of the Iraq war, we're talking about a reduction of 92 percent.

But that's what the President's job is to continue to tell people what's been done.

Ms. Ryan.

Q   Robert, on the crack cocaine sentencing law, it's down from 100 to one to 18 to one, but some on Capitol Hill feel that the fight still needs to continue to bring the disparity down to one to one. What is this administration's efforts on that push? Are you leaving it here and just accepting this, or moving forward, still trying to bring the disparity down?

MR. GIBBS: Well, let me see if there's any guidance on it. I will say this, April, I think the signing of today's bill into law represents the hard work of Democrats and Republicans coming -- this is a good example -- of coming together and making progress on something that people had identified as a glaring blight on the law.

Look, I think if you look at the people that were there at that signing, they're not of the political persuasions that either always or even part of the time agree. I think that demonstrates the, as I said, the glaring nature of what these penalties had -- the glaring nature of what these penalties had done to people and how unfair they were. And I think the President was proud to sign that into law.

Q   And also, Senate Republicans are being blamed again for holding up or delaying the stand-alone vote for the Black Farmers. And John Boyd, the head of the National Black Farmers Association, wants a meeting with the President and wants assurances that the Black Farmers will be paid their settlement monies. And he's likening it to the assurances that were given to Blanche Lincoln -- Senator Blanche Lincoln for $1.5 billion farm relief subsidy payments.

MR. GIBBS: Well, again, this administration has worked a lot over the past several months to try to get this to a point where we can make good on the judgment that was handed down, and the administration will continue to try to do that, April.

Q   Will he meet with -- will the President meet with John Boyd at all?

MR. GIBBS: I think he met very recently with Valerie Jarrett.

Q   He wants to meet with the President to express his concern.

MR. GIBBS: I don't have any knowledge that that's on the schedule.

Q   Thank you, Robert.

MR. GIBBS: Margaret.

Q   Robert, thanks. Do you have any information, any detail about what's on deck for Friday? I checked the schedule and it said something about news.

MR. GIBBS: Off the top of my head, I don't. I'm trying to conjure that up, but let me see if there's any guidance for Friday.

Q   And then quickly, this is probably preface to Ari's question earlier, but there is a lawsuit that the Center for Constitutional Rights and the ACLU is bringing today regarding the policies or lack -- perceived lack of policies as they relate to Mr. al-Awlaki. And what I wanted to ask is -- I mean, you just told us there is a process in place that you're not at liberty to discuss. Is that going to be the government's position, or are you going to disclose what the policy is? Do you think there's any merit to this lawsuit?

MR. GIBBS: Well, look, again, there is -- I'm just not at liberty to discuss intelligence matters, Margaret. I would say -- I will repeat that Anwar al-Awlaki is someone who has sworn allegiance to al Qaeda in the Arabian

Peninsula, is a regional commander for that group in Yemen, has and continues to direct attacks there and, as we know, against innocent men, women and children in this country.

And this President will take the steps necessary to keep our country safe from thugs like him.

Q   I understand that.  But the President is also a lawyer with constitutional law training.  He made clear during the campaign that sort of dotting the i's and crossing the t's mattered, even if you're going after bad guys.

MR. GIBBS:  And I think it's safe to assume that if -- without getting deep into this -- the President understands the process and the President will do all that is necessary to keep this country safe from people like him.

Richard.

Q   Just quick on the tax cuts.  Does the President want the middle-class tax cuts to be extended permanently or --

MR. GIBBS:  Yes, permanent.

Q   He wants permanent?

MR. GIBBS:  Yes.

Yes, sir.

Q   The British Prime Minister last week said that he would not tolerate export of terrorism from Pakistan.  Does the President agree with the views --

MR. GIBBS:  I'll let Mr. Cameron deal with that.

Yes, sir.

Q   President Ahmadinejad of Iran said that he was ready for face-to-face talks with President Obama.  I was wondering if the White House has an initial reaction to that?

MR. GIBBS:  I would say this, that obviously Iran has on any number of occasions changed their position based on I think largely the pain that they're feeling on sanctions, based on the decisions that their government has made that don't jibe with where the people are.  We have always said that we would be willing to sit down and discuss Iran's illicit nuclear program if Iran is serious about doing that.  To date, that seriousness has not been there.  Iran has obligations that it needs to meet, and failure to meet those obligations will continue to result in unilateral sanctions by this government, U.N. sanctions that have been passed, European Union sanctions that have been passed, and other countries beyond this taking unilateral action.  I think those sanctions are beginning to have an impact, or else the Iranian government would not be changing its position so often about discussing its program.

Thanks, guys.

       END     1:39 P.M. EDT

W W W . W H I T E H O U S E . G O V

En español | Accessibility | Copyright Information | Privacy Policy | Contact
USA.gov | Subscribe to RSS Feeds | Apply for a Job

Exhibit L

# The Washington Post

## Muslim cleric Aulaqi is 1st U.S. citizen on list of those CIA is allowed to kill

By Greg Miller
Washington Post Staff Writer
Wednesday, April 7, 2010; A08

Advertisement



AT&T lets you call more countries worldwide **for just pennies.**

A Muslim cleric tied to the attempted bombing of a Detroit-bound airliner has become the first U.S. citizen added to a list of suspected terrorists the CIA is authorized to kill, a U.S. official said Tuesday.

Anwar al-Aulaqi, who resides in Yemen, was previously placed on a target list maintained by the U.S. military's Joint Special Operations Command and has survived at least one strike carried out by Yemeni forces with U.S. assistance against a gathering of suspected al-Qaeda operatives.

Because he is a U.S. citizen, adding Aulaqi to the CIA list required special approval from the White House, officials said. The move means that Aulaqi would be considered a legitimate target not only for a military strike carried out by U.S. and Yemeni forces, but also for lethal CIA operations.

"He's in everybody's sights," said the U.S. official, who spoke on the condition of anonymity because of the topic's sensitivity.

CIA spokesman Paul Gimigliano said: "This agency conducts its counterterrorism operations in strict accord with the law."

The decision to add Aulaqi to the CIA target list reflects the view among agency analysts that a man previously regarded mainly as a militant preacher has taken on an expanded role in al-Qaeda's Yemen-based offshoot.

"He's recently become an operational figure for al-Qaeda in the Arabian Peninsula," said a second U.S. official. "He's working actively to kill Americans, so it's both lawful and sensible to try to stop him." The official stressed that there are "careful procedures our government follows in these kinds of cases, but U.S. citizenship hardly gives you blanket protection overseas to plot the murder of your fellow citizens."

Aulaqi corresponded by e-mail with Maj. Nidal M. Hasan, the Army psychiatrist accused of killing 12 soldiers and one civilian at Fort Hood, Tex., last year. Aulaqi is not believed to have helped plan the attack, although he praised Hasan in an online posting for carrying it out.

Concern grew about the cleric's role after he was linked to the Nigerian accused of attempting to bomb a U.S. airliner on Christmas Day by detonating an explosive device he had smuggled in his underwear. Aulaqi acknowledged teaching and corresponding with the Nigerian but denied ordering the attack.

The CIA is known to have carried out at least one Predator strike in Yemen. A U.S. citizen, Kamal Derwish,


was among six alleged al-Qaeda operatives killed in that 2002 operation but was not the target.

View all comments that have been posted about this article.

## Post a Comment

View all comments that have been posted about this article.

You must be logged in to leave a comment. Login | Register

[ Submit ]

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

Sponsored Links

**I Had High Blood Pressure**
Now it's down to 120/75. Find out how I did it without drugs

**Business On Main**
Join The Community of Ideas, Tools, & Resources, Connected by Sprint!

**Get NYC Deals**
Amazing Daily Deals 50-90% OffRestaurants, Spas, Events and More!

Buy a link here

© 2010 The Washington Post Company

# Exhibit M



**» Print**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# U.S. targets American-born cleric in Yemen: officials

Tue, Apr 6 2010

By Adam Entous

WASHINGTON (Reuters) - The Obama administration has authorized operations to capture or kill a U.S.-born Muslim cleric based in Yemen, who is described by a key lawmaker as America's top terrorist threat, officials said on Tuesday.

The decision to add Anwar al-Awlaki, of al Qaeda in the Arabian Peninsula, to the target list followed a National Security Council review prompted by his status as a U.S. citizen.

Officials said Awlaki directly threatened the United States. "Awlaki is a proven threat," said a U.S. official, speaking on condition of anonymity. "He's being targeted."

Rep. Jane Harman, chairwoman of the House of Representatives Homeland Security Subcommittee on Intelligence, described Awlaki as "probably the person, the terrorist, who would be terrorist No. 1 in terms of threat against us."

"He is very much in the sights of the Yemenis, with us helping them," said Harman, who recently visited Yemen to meet with U.S. and Yemeni officials.

She told Reuters that Awlaki's U.S. citizenship made going after him "certainly complicated."

But Harman said President Barack Obama and his administration "made very clear that people, including Americans who are trying to attack our country, are people we will definitely pursue... are targets of the United States."

The U.S. target list is secret and it was not immediately clear whether Awlaki was the first American added, as some experts had suggested he would be.

Yemen has carried out air strikes with U.S. assistance to target al Qaeda leaders, but there have been conflicting reports about whether Awlaki was present during any of those attacks. U.S. officials believe he remains in hiding in Yemen.

CHANGING ASSESSMENT

U.S. intelligence agencies had viewed Awlaki as chiefly an al Qaeda sympathizer and recruiter for Islamist causes with possible ties to some of the September 11, 2001, hijackers.

That assessment changed late last year with revelations about his contacts with a Nigerian suspect in the attempted bombing of a transatlantic passenger jet as it approached Detroit on December 25 and with a U.S. Army psychiatrist accused of shooting dead 13 people at a military base in Texas on November 5.

Al Qaeda in the Arabian Peninsula (AQAP) claimed responsibility for the attempted Christmas Day bombing of the flight from Amsterdam to Detroit.

The suspected bomber, Umar Farouk Abdulmutallab, has been cooperating with U.S. authorities, providing intelligence about the group, which allegedly supplied him with explosives that were sewn into his underwear, officials said.

U.S. counterterrorism officials described Awlaki as the main force behind AQAP's decision to transform itself from a regional threat into what U.S. spy agencies see as al Qaeda's most active affiliate outside Pakistan and Afghanistan.

Born in New Mexico, Awlaki was an imam at mosques in Denver, San Diego and Falls Church, Virginia, just outside Washington. He returned to Yemen in 2004 where he taught at a university before he was arrested and imprisoned in 2006 for suspected links to al Qaeda and involvement in attacks.

Awlaki, part of a prominent Yemeni family, was released in December 2007 because he said he had repented, according to a Yemeni security official. But he was later charged again on similar counts and went into hiding.

After Major Nidal Malik Hasan, a U.S. Army psychiatrist, went on a shooting rampage at Fort Hood, Texas, U.S. authorities said he had frequently been in email contact with Awlaki.

And after the Christmas Day plot, U.S. and Yemeni officials said they learned that Awlaki had met with Abdulmutallab in

Reuters.com

Yemen.

In a recent interview with a Yemeni freelance journalist, posted on Al Jazeera television's website, Awlaki described Abdulmutallab as "one of my students" but said he did not encourage the attack.

(Reporting by Adam Entous; Editing by David Alexander and David Storey)

© Thomson Reuters 2010. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Exhibit N

# The Washington Post

## Under Panetta, a more aggressive CIA

By Peter Finn and Joby Warrick
Washington Post Staff Writer
Sunday, March 21, 2010; A01

Advertisement



The plan was a standard one in the CIA's war against extremists in Pakistan: The agency was using a Predator drone to monitor a residential compound; a Taliban leader was expected to arrive shortly; a CIA missile would kill him.

On the morning of Aug. 5, CIA Director Leon Panetta was informed that Baitullah Mehsud was about to reach his father-in-law's home. Mehsud would be in the open, minimizing the risk that civilians would be injured or killed. Panetta authorized the strike, according to a senior intelligence official who described the sequence of events.

Some hours later, officials at CIA headquarters in Langley identified Mehsud on a feed from the Predator's camera. He was seen resting on the roof of the house, hooked up to a drip to palliate a kidney problem. He was not alone.

Panetta was pulled out of a White House meeting and told that Mehsud's wife was also on the rooftop, giving her husband a massage. Mehsud, implicated in suicide bombings and the assassination of former Pakistani prime minister Benazir Bhutto, was a major target. Panetta told his officers to take the shot. Mehsud and his wife were killed.

Panetta, an earthy former congressman with exquisitely honed Washington smarts, was President Obama's surprise choice to head the CIA. During his 13 months in the job, Panetta has led a relentless assault on al-Qaeda and Taliban operatives in Pakistan, delivering on Obama's promise to target them more aggressively than his predecessor.

Apart from a brief stint as a military intelligence officer in the 1960s, little in Panetta's résumé appeared to merit his nomination to become the 19th director of the CIA, but his willingness to use force has won over skeptics inside the agency and on Capitol Hill. Said one former senior intelligence official: "I've never sensed him shirking from it."

The stepped-up drone strikes, Panetta's opposition to the release of information about CIA interrogation practices, and his resistance to greater oversight of the agency by the Office of the Director of National Intelligence (ODNI) have prompted criticism that he is a thrall of the agency's old guard. In the meantime, the strikes have begun to draw greater scrutiny, with watchdog groups demanding to know more about how they are carried out and the legal reasoning behind the killings.

In an interview Wednesday at CIA headquarters, Panetta refused to directly address the matter of Predator strikes, in keeping with the agency's long-standing practice of shielding its actions in Pakistan from public view.

But he said that U.S. counterterrorism policies in the country are legal and highly effective, and that he is acutely aware of the gravity of some of the decisions thrust upon him.

"Any time you make decisions on life and death, I don't take that lightly. That's a serious decision," he said. "And yet, I also feel very comfortable with making those decisions because I know I'm dealing with people who threaten the safety of this country and are prepared to attack us at any moment."

Mehsud's followers and their al-Qaeda allies vowed to avenge his death, and within months they put into motion a plan that culminated in a Dec. 30 suicide bombing that killed seven CIA officers and contractors at a base in eastern Afghanistan.

On the Monday after the bombing, the regular 8:30 a.m. meeting of senior staff members at CIA began with a minute of silence. Then the director spoke.

"We're in a war," Panetta said, according to one participant. "We cannot afford to be hesitant. . . . The fact is we're doing the right thing. My approach is going to be to work that much harder . . . that we beat these sons of bitches."

### Drone strikes scrutinized

At the end of the George W. Bush administration, the CIA could keep seven Predators in the air round-the-clock, but the number will double by the end of this year, according to the senior intelligence official. Like other current and former officials interviewed for this report, this source spoke on the condition of anonymity because the agency does not acknowledge its actions in Pakistan.

Since 2009, as many as 666 terrorism suspects, including at least 20 senior figures, have been killed by missiles fired from unmanned aircraft flying over Pakistan, according to figures compiled by the New America Foundation as of mid-March. From 2004 to 2008, the number was 230. According to the foundation, 177 civilians may also have been killed in the airstrikes since 2009. Intelligence officials say their count of noncombatants killed is much lower and noted that on Aug. 5 only Mehsud and his wife were killed, despite reports that other family members and bodyguards died in the attack.

Panetta authorizes every strike, sometimes reversing his decision or reauthorizing a target if the situation on the ground changes, according to current and former senior intelligence officials. "He asks a lot of questions about the target, the intelligence picture, potential collateral damage, women and children in the vicinity," said the senior intelligence official.

Killing by drone has drawn increased scrutiny from human rights activists, who say such strikes raise legal questions when used outside the traditional battlefield. Some critics worry that the antiseptic quality of drone attacks, in which targets are identified on a video screen and killed with the press of a button, is anesthetizing policymakers and the public to the costs of war. The ACLU sued the government this month to compel the disclosure of the legal basis for its use of unmanned aircraft overseas.

"The government's use of drones to conduct targeted killings raises complicated questions -- not only legal questions, but policy and moral questions as well," said Jameel Jaffer, director of the ACLU's National Security Project. "These kinds of questions ought to be discussed and debated publicly, not resolved secretly behind closed doors."

Under Panetta, a more aggressive CIA

After weathering a number of storms on Capitol Hill, including a face-off with House Speaker Nancy Pelosi after the California Democrat accused the CIA of lying, Panetta has studiously cultivated his old colleagues, holding informal get-togethers with the Senate and House intelligence committees.

"It's Krispy Kremes and coffee," said Sen. Dianne Feinstein (D-Calif.), chairman of the Senate intelligence committee. "People are relaxed, the conversation is free-flow, and I think that is very useful."

Last summer, Panetta shut down a still-embryonic Bush-era plan to create an assassination team that would target terrorism suspects and was irritated that Congress had never been informed of the plan. "He found it offensive," said the former senior intelligence official, recalling that it was one of the few times he had seen Panetta visibly angry.

Panetta has impressed the ranking Republican on the Senate intelligence committee. "I'm from the Show-Me State. He's done a pretty good job of showing me," said Sen. Christopher S. Bond (Mo.), an early doubter of Panetta's ability to lead the CIA. "I think the CIA knows . . . at least their director is supporting them even though other elements of the administration [are] causing them pain and grief."

Another former senior intelligence official, who served under Bush, commends Panetta for his aggression but noted that the current successes are built upon agreements made with Pakistan in the final year of the previous administration. The Obama administration has "been operating along the same continuum," the former official said.

Retired CIA officer Henry Crumpton, who pioneered the use of armed Predator drones in Afghanistan and was a top counterterrorism official at the State Department under Bush, said the number of strikes tells only part of the story.

"You have to know where to put the bird to begin with," Crumpton said. "It's a dynamic process. . . . Once you have a strike, you have disruptions and you have more intelligence to collect. It's a wonderful cycle that involves all-source collection and analysis, and the Predator is only part of it."

## Advocate for his agency

Expectations were low when Panetta arrived at CIA headquarters in February 2009. One recently retired officer recalled that some of his colleagues were initially angered by the appointment of a liberal politician who lacked extensive experience in the intelligence world and had publicly equated waterboarding with torture.

But almost from the first week, Panetta positioned himself as a strong advocate for the CIA, even when it put him at odds with the White House and the Office of the Director of National Intelligence. Panetta lobbied fiercely against the release of Justice Department memos that spelled out how the Bush administration had authorized the use of waterboarding and other coercive interrogation measures. He famously unleashed an epithet-laden tirade at a White House meeting over Attorney General Eric H. Holder Jr.'s decision to investigate CIA officers who participated in the interrogations.

Panetta has refused to yield to the ODNI over the CIA's independence and preeminence in overseas intelligence-gathering. The long-simmering conflict came to a head last spring when Director of National Intelligence Dennis C. Blair asserted that his agency should directly oversee the CIA's covert operations, while also deciding who would serve as the chief U.S. intelligence officer in overseas locations. Traditionally, the top CIA officer in each country automatically assumed that title.

<u>Vice President Biden</u>, Panetta's longtime friend, was summoned to referee the dispute, which was resolved mostly in the CIA's favor: The CIA station chief would continue to be the top intelligence officer, and the agency would be required only to consult with the ODNI about its covert missions.

"Panetta was not only standing up for the agency, but he was seen as a guy who could just go and talk to the president," the recently retired officer said. "He doesn't have to bow 18 times. It's really valuable for the CIA to have someone who can do that."

Since becoming director, Panetta has visited more than 20 CIA stations worldwide, where he holds all-hands meetings and works the room with his easy charm, according to insiders. "Morale is good, especially downrange" in forward areas, Crumpton said.

Critics worry that Panetta has become a captive of the agency he leads.

"To survive in the CIA, he had to become more Catholic than the pope," said Anthony D. Romero, executive director of the ACLU. "He opposed important public disclosure of past use of torture and abuse, and has worked to limit the scope of criminal investigations into any crimes committed by CIA officials."

**In the worst of times**

On Dec. 30, a couple of hours before dawn, Panetta was awakened by his security detail at his home in California and informed that something had gone wrong at a CIA base in eastern Afghanistan. By about 8 a.m., Panetta was told that nine people had been killed there: seven CIA officers and contractors, including the base chief, one of the agency's leading al-Qaeda experts; a Jordanian intelligence officer; and an Afghan driver. The attack also wounded several others.

Panetta has launched an internal review of the episode, in which, Feinstein said, "clearly tradecraft wasn't followed." A report is expected next month.

In the interview, Panetta said he recognized that the administration's strategy entailed risk. "You can't just conduct the kind of aggressive operations we are conducting against the enemy and not expect that they are not going to try to retaliate," he said.

Panetta has led the mourning at the CIA, holding a service at headquarters attended by more than 1,000 people, including the president. The tenor John McDermott sang the wistful ballad "Danny Boy."

"The workforce takes a shot like this in the stomach, it takes the wind out of them," said <u>John O. Brennan</u>, Obama's principal counterterrorism adviser. "Leon showed his leadership by engaging the workforce from the very beginning and overseeing the mourning that goes on."

On Feb. 3, at a snow-blanketed Arlington National Cemetery, Panetta attended the funeral of the base chief, a 45-year-old mother of three. Just before the playing of taps, he handed a folded American flag to the family and later watched one of the woman's young sons carry it away from the grave.

As Panetta took his seat in his car after the service, an aide said, he exhaled deeply.

*Staff researcher Julie Tate contributed to this report.*

# Exhibit O



SWANN S



Pablo Picasso, *L'homme à la Guitare*, engraving, 1915.
Estimate $15,000 to $20,000. At auction Nov 9.

**AT AUCTION**

**Nov 5 at 10:30am & 2:30pm**
**Old Master through Modern Prints**

**Nov 9 at 2:30pm**
**The James B. Parks Collection**
**of Fine Prints**

*Specialist: Todd Weyman, 212-254-4710, ext 32*
tweyman@swanngalleries.com

104 East 25th St • New York, NY 10010
View catalogues and bid online at
**www.swanngalleries.com**    IAG



SEDARIS READS
SEDARIS. SEAN PENN
READS BOB DYLAN.
GLADWELL READS
GLADWELL. DONALD
SUTHERLAND READS
ERNEST HEMINGWAY.

**Listen for**
**yourself.**

Authors read their own works.

Artists perform best-selling
audiobooks.

Choose from over 60,000 audiobooks & more

Works with iPod®, BlackBerry®,
and 500+ mp3 players

**audible.com**

## THE POLITICAL SCENE

# THE PREDATOR WAR

*What are the risks of the C.I.A.'s covert drone program?*

### BY JANE MAYER

On August 5th, officials at the Central Intelligence Agency, in Langley, Virginia, watched a live video feed relaying closeup footage of one of the most wanted terrorists in Pakistan. Baitullah Mehsud, the leader of the Taliban in Pakistan, could be seen reclining on the rooftop of his father-in-law's house, in Zanghara, a hamlet in South Waziristan. It was a hot summer night, and he was joined outside by his wife and his uncle, a medic; at one point, the remarkably crisp images showed that Mehsud, who suffered from diabetes and a kidney ailment, was receiving an intravenous drip.

The video was being captured by the infrared camera of a Predator drone, a remotely controlled, unmanned plane that had been hovering, undetected, two miles or so above the house. Pakistan's Interior Minister, A. Rehman Malik, told me recently that Mehsud was resting on his back. Malik, using his hands to make a picture frame, explained that the Predator's targeters could see Mehsud's entire body, not just the top of his head. "It was a perfect picture," Malik, who watched the videotape later, said. "We used to see James Bond movies where he talked into his shoe or his watch. We thought it was a fairy tale. But this was fact!" The image remained just as stable when the C.I.A. remotely launched two Hellfire missiles from the Predator. Authorities watched the fiery blast in real time. After the dust cloud dissipated, all that remained of Mehsud was a detached torso. Eleven others died: his wife, his father-in-law, his mother-in-law, a lieutenant, and seven bodyguards.

Pakistan's government considered Mehsud its top enemy, holding him responsible for the vast majority of recent terrorist attacks inside the country, including the assassination of former Prime Minister Benazir Bhutto in December, 2007, and the bombing, last September, of the Marriott Hotel in Islamabad, which killed more than fifty people. Mehsud was also thought to have helped his Afghan confederates attack American and coalition troops across the border. Roger Cressey, a former counterterrorism official on the National Security Council, who is now a partner at Good Harbor, a consulting firm, told me, "Mehsud was someone both we and Pakistan were happy to see go up in smoke." Indeed, there was no controversy when, a few days after the missile strike, CNN reported that President Barack Obama had authorized it.

However, at about the same time, there was widespread anger after the *Wall Street Journal* revealed that during the Bush Administration the C.I.A. had considered setting up hit squads to capture or kill Al Qaeda operatives around the world. The furor grew when the *Times* reported that the C.I.A. had turned to a private contractor to help with this highly sensitive operation: the controversial firm Blackwater, now known as Xe Services. Members of the Senate and House intelligence committees demanded investigations of the program, which, they said, had been hidden from them. And many legal experts argued that, had the program become fully operational, it would have violated a 1976 executive order, signed by President Gerald R. Ford, banning American intelligence forces from engaging in assassination.

Hina Shamsi, a human-rights lawyer at the New York University School of Law, was struck by the inconsistency of the public's responses. "We got so upset about a targeted-killing program that didn't happen," she told me. "But the drone program *exists*." She said of the Predator program, "These are targeted international killings by the state." The program, as it happens, also uses private contractors for a variety of tasks, including flying the drones. Employees of Xe Services maintain and load the Hellfire missiles on the aircraft. Vicki Divoll, a former C.I.A. lawyer, who now teaches at the U.S. Naval Academy, in Annapolis, ob-



*The "push-button" approach to fighting Al Qaeda represents a radically new use of state-sanctioned lethal force.*

served, "People are a lot more comfortable with a Predator strike that kills many people than with a throat-slitting that kills one." But, she added, "mechanized killing is still killing."

The U.S. government runs two drone programs. The military's version, which is publicly acknowledged, operates in the recognized war zones of Afghanistan and Iraq, and targets enemies of U.S. troops stationed there. As such, it is an extension of conventional warfare. The C.I.A.'s program is aimed at terror suspects around the world, including in countries where U.S. troops are not based. It was initiated by the Bush Administration and, according to Juan Zarate, a counterterrorism adviser in the Bush White House, Obama has left in place virtually all the key personnel. The program is classified as covert, and the intelligence agency declines to provide any information to the public about where it operates, how it selects targets, who is in charge, or how many people have been killed.

Nevertheless, reports of fatal air strikes in Pakistan emerge every few days. Such stories are often secondhand and difficult to confirm, as the Pakistani government and the military have tried to wall off the tribal areas from journalists. But, even if a precise account is elusive, the outlines are clear: the C.I.A. has joined the Pakistani intelligence service in an aggressive campaign to eradicate local and foreign militants, who have taken refuge in some of the most inaccessible parts of the country.

The first two C.I.A. air strikes of the Obama Administration took place on the morning of January 23rd—the President's third day in office. Within hours, it was clear that the morning's bombings, in Pakistan, had killed an estimated twenty people. In one strike, four Arabs, all likely affiliated with Al Qaeda, died. But in the second strike a drone targeted the wrong house, hitting the residence of a pro-government tribal leader six miles outside the town of Wana, in South Waziristan. The blast killed the tribal leader's entire family, including three chil-

dren, one of them five years old. In keeping with U.S. policy, there was no official acknowledgment of either strike.

Since then, the C.I.A. bombardments have continued at a rapid pace. According to a just completed study by the New America Foundation, the number of drone strikes has risen dramatically since Obama became President. During his first nine and a half months in office, he has authorized as many C.I.A. aerial attacks in Pakistan as George W. Bush did in his final three years in office. The study's authors, Peter Bergen and Katherine Tiedemann, report that the Obama Administration has sanctioned at least forty-one C.I.A. missile strikes in Pakistan since taking office—a rate of approximately one bombing a week. So far this year, various estimates suggest, the C.I.A. attacks have killed between three hundred and twenty-six and five hundred and thirty-eight people. Critics say that many of the victims have been innocent bystanders, including children.

In the last week of September alone,

GUY BILLOUT



*"He works and plays well with others."*

•    •

there were reportedly four such attacks—three of them in one twenty-four-hour period. At any given moment, a former White House counterterrorism official says, the C.I.A. has multiple drones flying over Pakistan, scouting for targets. According to the official, "there are so many drones" in the air that arguments have erupted over which remote operators can claim which targets, provoking "command-and-control issues."

General Atomics Aeronautical Systems, the defense contractor that manufactures the Predator and its more heavily armed sibling, the Reaper, can barely keep up with the government's demand. The Air Force's fleet has grown from some fifty drones in 2001 to nearly two hundred; the C.I.A. will not divulge how many drones it operates. The government plans to commission hundreds more, including new generations of tiny "nano" drones, which can fly after their prey like

a killer bee through an open window.

With public disenchantment mounting over the U.S. troop deployment in Afghanistan, and the Obama Administration divided over whether to escalate the American military presence there, many in Washington support an even greater reliance on Predator strikes. In this view, the U.S., rather than trying to stabilize Afghanistan by waging a counter-insurgency operation against Taliban forces, should focus purely on counterterrorism, and use the latest technology to surgically eliminate Al Qaeda leaders and their allies. In September, the conservative pundit George Will published an influential column in the Washington *Post*, "Time to Get Out of Afghanistan," arguing that "America should do only what can be done from offshore, using intelligence, drones, cruise missiles, air strikes and small, potent Special Forces units, concentrating on the porous 1,500-mile bor-

der with Pakistan, a nation that actually matters." Vice-President Joseph Biden reportedly holds a similar view.

It's easy to understand the appeal of a "push-button" approach to fighting Al Qaeda, but the embrace of the Predator program has occurred with remarkably little public discussion, given that it represents a radically new and geographically unbounded use of state-sanctioned lethal force. And, because of the C.I.A. program's secrecy, there is no visible system of accountability in place, despite the fact that the agency has killed many civilians inside a politically fragile, nuclear-armed country with which the U.S. is not at war. Should something go wrong in the C.I.A.'s program—last month, the Air Force lost control of a drone and had to shoot it down over Afghanistan—it's unclear what the consequences would be.

The Predators in the C.I.A. program are "flown" by civilians, both intelligence officers and private contractors. According to a former counterterrorism official, the contractors are "seasoned professionals—often retired military and intelligence officials." (The intelligence agency outsources a significant portion of its work.) Within the C.I.A., control of the unmanned vehicles is split among several teams. One set of pilots and operators works abroad, near hidden airfields in Afghanistan and Pakistan, handling takeoffs and landings. Once the drones are aloft, the former counterterrorism official said, the controls are electronically "slewed over" to a set of "reachback operators," in Langley. Using joysticks that resemble video-game controls, the reachback operators—who don't need conventional flight training—sit next to intelligence officers and watch, on large flat-screen monitors, a live video feed from the drone's camera. From their suburban redoubt, they can turn the plane, zoom in on the landscape below, and decide whether to lock onto a target. A stream of additional "signal" intelligence, sent to Langley by the National Security Administration, provides electronic means of corroborating that a target has been correctly identified. The White House has delegated trigger authority to C.I.A. officials, including the head of the Counter-Terrorist Center, whose identity remains veiled from the public because the agency has placed him under cover.

People who have seen an air strike live

on a monitor described it as both awe-inspiring and horrifying. "You could see these little figures scurrying, and the explosion going off, and when the smoke cleared there was just rubble and charred stuff," a former C.I.A. officer who was based in Afghanistan after September 11th says of one attack. (He watched the carnage on a small monitor in the field.) Human beings running for cover are such a common sight that they have inspired a slang term: "squirters."

Peter W. Singer, the author of "Wired for War," a recent book about the robotics revolution in modern combat, argues that the drone technology is worryingly "seductive," because it creates the perception that war can be "costless." Cut off from the realities of the bombings in Pakistan, Americans have been insulated from the human toll, as well as from the political and the moral consequences. Nearly all the victims have remained faceless, and the damage caused by the bombings has remained unseen. In contrast to Gaza, where the targeted killing of Hamas fighters by the Israeli military has been extensively documented—making clear that the collateral damage, and the loss of civilian life, can be severe—Pakistan's tribal areas have become largely forbidden territory for media organizations. As a result, no videos of a drone attack in progress have been released, and only a few photographs of the immediate aftermath of a Predator strike have been published.

The seeming unreality of the Predator enterprise is also felt by the pilots. Some of them reportedly wear flight suits when they operate a drone's remote controls. When their shifts end, of course, these cubicle warriors can drive home to have dinner with their families. Critics have suggested that unmanned systems, by sparing these combatants from danger and sacrifice, are creating what Sir Brian Burridge, a former British Air Chief Marshal in Iraq, has called "a virtueless war," requiring neither courage nor heroism. According to Singer, some Predator pilots suffer from combat stress that equals, or exceeds, that of pilots in the battlefield. This suggests that virtual killing, for all its sterile trappings, is a discomfiting form of warfare. Meanwhile, some social critics, such as Mary Dudziak, a professor at the University of Southern California's Gould School of Law, argue that the Predator strategy has a larger political cost. As she

40    THE NEW YORKER, OCTOBER 26, 2009

puts it, "Drones are a technological step that further isolates the American people from military action, undermining political checks on . . . endless war."

The advent of the Predator targeted-killing program "is really a sea change," says Gary Solis, who teaches at Georgetown University's Law Center and recently retired from running the law program at the U.S. Military Academy. "Not only would we have expressed abhorrence of such a policy a few years ago; we did." In July, 2001, two months before Al Qaeda's attacks on New York and Washington profoundly altered America's mindset, the U.S. denounced Israel's use of targeted killing against Palestinian terrorists. The American Ambassador to Israel, Martin Indyk, said at the time, "The United States government is very clearly on record as against targeted assassinations. . . . They are extrajudicial killings, and we do not support that."

Before September 11th, the C.I.A., which had been chastened by past assassination scandals, refused to deploy the Predator for anything other than surveillance. Daniel Benjamin, the State Department's counterterrorism director, and Steven Simon, a former counterterrorism adviser, report in their 2002 book "The Age of Sacred Terror" that the week before Al Qaeda attacked the U.S. George Tenet, then the agency's director, argued that it would be "a terrible mistake" for "the Director of Central Intelligence to fire a weapon like this."

Yet once America had suffered terrorist attacks on its own soil the agency's posture changed, and it petitioned the White House for new authority. Within days, President Bush had signed a secret Memorandum of Notification, giving the C.I.A. the right to kill members of Al Qaeda and their confederates virtually anywhere in the world. Congress endorsed this policy, passing a bill called the Authorization for Use of Military Force. Bush's legal advisers modelled their rationale on Israel's position against terrorism, arguing that the U.S. government had the right to use lethal force against suspected terrorists in "anticipatory" self-defense. By classifying terrorism as an act of war, rather than as a crime, the Bush Administration reasoned that it was no longer bound by legal constraints requiring the government

to give suspected terrorists due process.

In November, 2002, top Bush Administration officials publicly announced a successful Predator strike against an Al Qaeda target, Qaed Salim Sinan al-Harethi, a suspect in the 2000 bombing of the U.S.S. Cole. Harethi was killed after a Hellfire missile vaporized the car in which he and five other passengers were riding, on a desert road in Yemen. Paul Wolfowitz, then the Deputy Defense Secretary, praised the new tactic, telling CNN, "One hopes each time that you get a success like that, not only to have gotten rid of somebody dangerous but to have imposed changes in their tactics, operations, and procedures."

At first, some intelligence experts were uneasy about drone attacks. In 2002, Jeffrey Smith, a former C.I.A. general counsel, told Seymour M. Hersh, for an article in this magazine, "If they're dead, they're not talking to you, and you create more martyrs." And, in an interview with the Washington Post, Smith said that ongoing drone attacks could "suggest that it's acceptable behavior to assassinate people. . . . Assassination as a norm of international conduct exposes American leaders and Americans overseas."

Seven years later, there is no longer any doubt that targeted killing has become official U.S. policy. "The things we were complaining about from Israel a few years ago we now embrace," Solis says. Now, he notes, nobody in the government calls it assassination.

The Predator program is described by many in the intelligence world as America's single most effective weapon against Al Qaeda. In May, Leon Panetta, the C.I.A.'s director, referred to the Predator program as "the only game in town" in an unguarded moment after a public lecture. Counterterrorism officials credit drones with having killed more than a dozen senior Al Qaeda leaders and their allies in the past year, eliminating more than half of the C.I.A.'s twenty most wanted "high value" targets. In addition to Baitullah Mehsud, the list includes Nazimuddin Zalalov, a former lieutenant of Osama bin Laden; Ilyas Kashmiri, Al Qaeda's chief of paramilitary operations in Pakistan; Saad bin Laden, Osama's eldest son; Abu Sulayman al-Jazairi, an Algerian Al Qaeda planner who is believed to have helped train operatives for attacks in Europe and the United States; and Osama

al-Kini and Sheikh Ahmed Salim Swedan, Al Qaeda operatives who are thought to have played central roles in the 1998 bombings of American embassies in East Africa.

Juan Zarate, the Bush counterterrorism adviser, believes that "Al Qaeda is on its heels" partly because "so many bigwigs" have been killed by drones. Though he acknowledges that Osama bin Laden and Ayman al-Zawahiri, the group's top leaders, remain at large, he estimates that no more than fifty members of Al Qaeda's senior leadership still exist, along with two to three hundred senior members outside the terror organization's "inner core."

Zarate and other supporters of the Predator program argue that it has had positive ripple effects. Surviving militants are forced to operate far more cautiously, which diverts their energy from planning new attacks. And there is evidence that the drone strikes, which depend on local informants for targeting information, have caused debilitating suspicion and discord within the ranks. Four Europeans who were captured last December after trying to join Al Qaeda in Pakistan described a life of constant fear and distrust among the militants, whose obsession with drone strikes had led them to communicate only with elaborate secrecy and to leave their squalid hideouts only at night. As the *Times* has reported, militants have been so unnerved by the drone program that they have released a video showing the execution of accused informants. Pakistanis have also been gripped by rumors that paid C.I.A. informants have been planting tiny silicon-chip homing devices for the drones in the tribal areas.

The drone program, for all its tactical successes, has stirred deep ethical concerns. Michael Walzer, a political philosopher and the author of the book "Just and Unjust Wars," says that he is unsettled by the notion of an intelligence agency wielding such lethal power in secret. "Under what code does the C.I.A. operate?" he asks. "I don't know. The military operates under a legal code, and it has judicial mechanisms." He said of the C.I.A.'s drone program, "There should be a limited, finite group of people who are targets, and that list should be publicly defensible and available. Instead, it's not being publicly defended. People are being killed, and we generally

require some public justification when we go about killing people."

Since 2004, Philip Alston, an Australian human-rights lawyer who has served as the United Nations Special Rapporteur on Extrajudicial, Summary, or Arbitrary Executions, has repeatedly tried, but failed, to get a response to basic questions about the C.I.A.'s program—first from the Bush Administration, and now from Obama's. When he asked, in formal correspondence, for the C.I.A.'s legal justifications for targeted killings, he says, "they blew me off." (A C.I.A. spokesperson told me that the agency "uses lawful, highly accurate, and effective tools and tactics to take the fight to Al Qaeda and its violent allies. That careful, precise approach has brought major success against a very dangerous and deadly enemy.") Alston then presented a critical report on the drone program to the U.N. Human Rights Council, but, he says, the U.S. representatives ignored his concerns.

Alston describes the C.I.A. program as operating in "an accountability void," adding, "It's a lot like the torture issue. You start by saying we'll just go after the handful of 9/11 masterminds. But, once you've put the regimen for waterboarding and other techniques in place, you use it much more indiscriminately. It becomes standard operating procedure. It becomes all too easy. Planners start saying, 'Let's use drones in a broader context.' Once you use targeting less stringently, it can become indiscriminate."

Under international law, in order for the U.S. government to legally target civilian terror suspects abroad it has to define a terrorist group as one engaging in armed conflict, and the use of force must be a "military necessity." There must be no reasonable alternative to killing, such as capture, and to warrant death the target must be "directly participating in hostilities." The use of force has to be considered "proportionate" to the threat. Finally, the foreign nation in which such

targeted killing takes place has to give its permission.

Many lawyers who have looked at America's drone program in Pakistan believe that it meets these basic legal tests. But they are nevertheless troubled, as the U.S. government keeps broadening the definition of acceptable high-value targets. Last March, the Obama Administration made an unannounced decision to win support for the drone program inside Pakistan by giving President Asif Ali Zardari more control over whom to target. "A lot of the targets are nominated by the Pakistanis—it's part of the bargain of getting Pakistani coöperation," says Bruce Riedel, a former C.I.A. officer who has served as an adviser to the Obama Administration on Afghanistan and Pakistan. According to the New America Foundation's study, only six of the forty-one C.I.A. drone strikes conducted by the Obama Administration in Pakistan have targeted Al Qaeda members. Eighteen were directed at Taliban targets in Pakistan, and fifteen were aimed specifically at Baitullah Mehsud. Talat Masood, a retired Pakistani lieutenant general and an authority on security issues, says that the U.S.'s tactical shift, along with the elimination of Mehsud, has quieted some of the Pakistani criticism of the American air strikes, although the bombings are still seen as undercutting the country's sovereignty. But, given that many of the targeted Pakistani Taliban figures were obscure in U.S. counterterrorism circles, some critics have wondered whether they were legitimate targets for a Predator strike. "These strikes are killing a lot of low-level militants, which raises the question of whether they are going beyond the authorization to kill leaders," Peter Bergen told me. Roger Cressey, the former National Security Council official, who remains a strong supporter of the drone program, says, "The debate is that we've been doing this so long we're now bombing low-level guys who don't deserve a Hellfire missile up their ass." (In his view, "Not every target has to be a rock star.")

The Obama Administration has also widened the scope of authorized drone attacks in Afghanistan. An August report by the Senate Foreign Relations Committee disclosed that the Joint Integrated Prioritized Target List—the Pentagon's roster of approved terrorist targets, containing three hundred and sixty-seven



names—was recently expanded to include some fifty Afghan drug lords who are suspected of giving money to help finance the Taliban. These new targets are a step removed from Al Qaeda. According to the Senate report, "There is no evidence that any significant amount of the drug proceeds goes to Al Qaeda." The inclusion of Afghan narcotics traffickers on the U.S. target list could prove awkward, some observers say, given that President Hamid Karzai's running mate, Marshal Mohammad Qasim Fahim, and the President's brother, Ahmed Wali Karzai, are strongly suspected of involvement in narcotics. Andrew Bacevich, a professor of history and international relations at Boston University, who has written extensively on military matters, said, "Are they going to target Karzai's brother?" He went on, "We should be very careful about who we define as the enemy we have to kill. Leaders of Al Qaeda, of course. But you can't kill people on Tuesday and negotiate with them on Wednesday."

Defining who is and who is not too tangential for the U.S. to kill can be difficult. John Radsan, a former lawyer in the C.I.A.'s office of general counsel, who is now a professor at William Mitchell College of Law, in St. Paul, Minnesota, says, "You can't target someone just because he visited an Al Qaeda Web site. But you also don't want to wait until they're about to detonate a bomb. It's a sliding scale." Equally fraught is the question of how many civilian deaths can be justified. "If it's Osama bin Laden in a house with a four-year-old, most people will say go ahead," Radsan says. "But if it's three or four children? Some say that's too many. And if he's in a school? Many say don't do it." Such judgment calls are being made daily by the C.I.A., which, Radsan points out, "doesn't have much experience with killing. Traditionally, the agency that does that is the Department of Defense."

Though the C.I.A.'s methodology remains unknown, the Pentagon has created elaborate formulas to help the military make such lethal calculations. A top military expert, who declined to be named, spoke of the military's system, saying, "There's a whole taxonomy of targets." Some people are approved for killing on sight. For others, additional permission is needed. A target's location enters the equation, too. If a school, hospital, or mosque is within the likely blast



*"The dealer will allow me to return the limo if my investments go bad."*

• • •

radius of a missile, that, too, is weighed by a computer algorithm before a lethal strike is authorized. According to the recent Senate Foreign Relations Committee report, the U.S. military places no name on its targeting list until there are "two verifiable human sources" and "substantial additional evidence" that the person is an enemy.

In Israel, which conducts unmanned air strikes in the Palestinian territories, the process of identifying targets, in theory at least, is even more exacting. Military lawyers have to be convinced that the target can't reasonably be captured, and that he poses a threat to national security. Military specialists in Arab culture also have to be convinced that the hit will do more good than harm. "You have to be incredibly cautious," Amos Guiora, a law professor at the University of Utah, says. From 1994 to 1997, he advised Israeli commanders on targeted killings in the Gaza Strip. "Not everyone is at the level appropriate for targeted killing," he says. "You want a leader, the hub with many spokes." Guiora, who follows the Predator program closely, fears that national-security officials here lack a clear policy and a firm definition of success. "Once you start targeted killing, you better make

damn sure there's a policy guiding it," he says. "It can't be just catch-as-catch-can."

Daniel Byman, the director of Georgetown University's Center for Peace and Security Studies, argues that, when possible, "it's almost always better to arrest terrorists than to kill them. You get intelligence then. Dead men tell no tales." The C.I.A.'s killing of Saad bin Laden, Osama's son, provides a case in point. By the time that Saad bin Laden had reached Pakistan's tribal areas, late last year, there was little chance that any law-enforcement authority could capture him alive. But, according to Hillary Mann Leverett, an adviser to the National Security Council between 2001 and 2003, the Bush Administration would have had several opportunities to interrogate Saad bin Laden earlier, if it had been willing to make a deal with Iran, where, according to U.S. intelligence, he lived occasionally after September 11th. "The Iranians offered to work out an international framework for transferring terror suspects, but the Bush Administration refused," she said. In December, 2008, Saad bin Laden left Iran for Pakistan; within months, according to NPR, a Predator missile had ended his life. "We absolutely did not get the most we could," Leverett said. "Saad bin Laden

would have been very, very valuable in terms of what he knew. He probably would have been a gold mine."

Byman is working on a book about Israel's experiences with counterterrorism, including targeted killing. Though the strikes there have weakened the Palestinian leadership, he said, "if you use these tools wrong, you can lose the moral high ground, which is going to hurt you. Inevitably, some of the intelligence is going to be wrong, so you're always rolling the dice. That's the reality of real-time intelligence."

Indeed, the history of targeted killing is marked by errors. In 1973, for example, Israeli intelligence agents murdered a Moroccan waiter by mistake. They thought that he was a terrorist who had been involved in slaughtering Israeli athletes at the Munich Olympics, a year earlier. And in 1986 the Reagan Administration attempted to retaliate against the Libyan leader Muammar Qaddafi for his suspected role in the deadly bombing of a disco frequented by American servicemen in Germany. The U.S. launched an air strike on Qaddafi's household. The bombs missed him, but they did kill his fifteen-month-old daughter.

The C.I.A.'s early attempts at targeting Osama bin Laden were also problematic. After Al Qaeda blew up the U.S. Embassies in Tanzania and Kenya, in August, 1998, President Bill Clinton retaliated, by launching seventy-five Tomahawk cruise missiles at a site in Afghanistan where bin Laden was expected to attend a summit meeting. According to reports, the bombardment killed some twenty Pakistani militants but missed bin Laden, who had left the scene hours earlier.

The development of the Predator, in the early nineteen-nineties, was supposed to help eliminate such mistakes. The drones can hover above a target for up to forty hours before refuelling, and the precise video footage makes it much easier to identify targets. But the strikes are only as accurate as the intelligence that goes into them. Tips from informants on the ground are subject to error, as is the interpretation of video images. Not long before September 11, 2001, for instance, several U.S. counterterrorism officials became certain that a drone had captured footage of bin Laden in a locale he was known to frequent in Afghanistan. The video showed a tall man in robes, surrounded by armed bodyguards in a dia-

mond formation. At that point, drones were unarmed, and were used only for surveillance. "The optics were not great, but it was him," Henry Crumpton, then the C.I.A.'s top covert-operations officer for the region, told Time. But two other former C.I.A. officers, who also saw the footage, have doubts. "It's like an urban legend," one of them told me. "They just jumped to conclusions. You couldn't see his face. It could have been Joe Schmo. Believe me, no tall man with a beard is safe anywhere in Southwest Asia." In February, 2002, along the mountainous eastern border of Afghanistan, a Predator reportedly followed and killed three suspicious Afghans, including a tall man in robes who was thought to be bin Laden. The victims turned out to be innocent villagers, gathering scrap metal.

In Afghanistan and Pakistan, the local informants, who also serve as confirming witnesses for the air strikes, are notoriously unreliable. A former C.I.A. officer who was based in Afghanistan after September 11th told me that an Afghan source had once sworn to him that one of Al Qaeda's top leaders was being treated in a nearby clinic. The former officer said that he could barely hold off an air strike after he passed on the tip to his superiors. "They scrambled together an élite team," he recalled. "We caught hell from headquarters. They said 'Why aren't you moving on it?' when we insisted on checking it out first." It turned out to be an intentionally false lead. "Sometimes you're dealing with tribal chiefs," the former officer said, "Often, they say an enemy of theirs is Al Qaeda because they just want to get rid of somebody. Or they made crap up because they wanted to prove they were valuable, so that they could make money. You couldn't take their word."

The consequences of bad ground intelligence can be tragic. In September, a NATO air strike in Afghanistan killed between seventy and a hundred and twenty-five people, many of them civilians, who were taking fuel from two stranded oil trucks; they had been mistaken for Taliban insurgents. (The incident is being investigated by NATO.) According to a reporter for the Guardian, the bomb strike, by an F-15E fighter plane, left such a tangle of body parts that village elders resorted to handing out pieces of unidentifiable corpses to the grieving families, so that they could have some-



"Diagnosis cookie?"

thing to bury. One Afghan villager told the newspaper, "I took a piece of flesh with me home and I called it my son."

Predator drones, with their superior surveillance abilities, have a better track record for accuracy than fighter jets, according to intelligence officials. Also, the drone's smaller Hellfire missiles are said to cause far less collateral damage. Still, the recent campaign to kill Baitullah Mehsud offers a sobering case study of the hazards of robotic warfare. It appears to have taken sixteen missile strikes, and fourteen months, before the C.I.A. succeeded in killing him. During this hunt, between two hundred and seven and three hundred and twenty-one additional people were killed, depending on which news accounts you rely upon. It's all but impossible to get a complete picture of whom the C.I.A. killed during this campaign, which took place largely in Waziristan. Not only has the Pakistani government closed off the region to the outside press; it has also shut out international humanitarian organizations like the International Committee for the Red Cross and Doctors Without Borders. "We can't get within a hundred kilometres of Waziristan," Brice de la Vingne, the operational coördinator for Doctors Without Borders in Pakistan, told me. "We tried to set up an emergency room, but the authorities wouldn't give us authorization."

A few Pakistani and international news stories, most of which rely on secondhand sources rather than on eyewitness accounts, offer the basic details. On June 14, 2008, a C.I.A. drone strike on Mehsud's home town, Makeen, killed an unidentified person. On January 2, 2009, four more unidentified people were killed. On February 14th, more than thirty people were killed, twenty-five of whom were apparently members of Al Qaeda and the Taliban, though none were identified as major leaders. On April 1st, a drone attack on Mehsud's deputy, Hakimullah Mehsud, killed ten to twelve of his followers instead. On April 29th, missiles fired from drones killed between six and ten more people, one of whom was believed to be an Al Qaeda leader. On May 9th, five to ten more unidentified people were killed; on May 12th, as many as eight people died. On June 14th, three to eight more people were killed by drone attacks. On June 23rd, the C.I.A. report-

edly killed between two and six unidentified militants outside Makeen, and then killed dozens more people—possibly as many as eighty-six—during funeral prayers for the earlier casualties. An account in the Pakistani publication The News described ten of the dead as children. Four were identified as elderly tribal leaders. One eyewitness, who lost his right leg during the bombing, told Agence France-Presse that the mourners suspected what was coming: "After the prayers ended, people were asking each other to leave the area, as drones were hovering." The drones, which make a buzzing noise, are nicknamed mackey ("wasps") by the Pashtun natives, and can sometimes be seen and heard, depending on weather conditions. Before the mourners could clear out, the eyewitness said, two drones started firing into the crowd. "It created havoc," he said. "There was smoke and dust everywhere. Injured people were crying and asking for help." Then a third missile hit. "I fell to the ground," he said.

The local population was clearly angered by the Pakistani government for allowing the U.S. to target a funeral. (Intelligence had suggested that Mehsud would be among the mourners.) An editorial in The News denounced the strike as sinking to the level of the terrorists. The Urdu newspaper Jang declared that Obama was "shutting his ears to the screams of thousands of women whose your drones have turned into dust." U.S. officials were undeterred, continuing drone strikes in the region until Mehsud was killed.

After such attacks, the Taliban, attempting to stir up anti-American sentiment in the region, routinely claims, falsely, that the victims are all innocent civilians. In several Pakistani cities, large protests have been held to decry the drone program. And, in the past year, perpetrators of terrorist bombings in Pakistan have begun presenting their acts as "revenge for the drone attacks." In recent weeks, a rash of bloody assaults on Pakistani government strongholds has raised the spectre that formerly unaligned militant groups have joined together against the Zardari Administration.

David Kilcullen, a counter-insurgency warfare expert who has advised General David Petraeus in Iraq, has said that the propaganda costs of drone attacks have been disastrously high. Militants have used the drone strikes to denounce the

Zardari government—a shaky and unpopular regime—as little more than an American puppet. A study that Kilcullen co-wrote for the Center for New American Security, a think tank, argues, "Every one of these dead non-combatants represents an alienated family, a new revenge feud, and more recruits for a militant movement that has grown exponentially even as drone strikes have increased." His co-writer, Andrew Exum, a former Army Ranger who has advised General Stanley McChrystal in Afghanistan, told me, "Neither Kilcullen nor I is a fundamentalist—we're not saying drones are not part of the strategy. But we are saying that right now they are part of the problem. If we use tactics that are killing people's brothers and sons, not to mention their sisters and wives, we can work at cross-purposes with insuring that the tribal population doesn't side with the militants. Using the Predator is a tactic, not a strategy."

Exum says that he's worried by the remote-control nature of Predator warfare. "As a military person, I put myself in the shoes of someone in FATA"—Pakistan's Federally Administered Tribal Areas—"and there's something about pilotless drones that doesn't strike me as an honorable way of warfare," he said. "As a classics major, I have a classical sense of what it means to be a warrior." An Iraq combat veteran who helped design much of the military's doctrine for using unmanned drones also has qualms. He said, "There's something important about putting your own sons and daughters at risk when you choose to wage war as a nation. We risk losing that flesh-and-blood investment if we go too far down this road."

Bruce Riedel, who has been deeply involved in these debates during the past few years, sees the choices facing Obama as exceedingly hard. "Is the drone program helping or hurting?" he asked. "It's a tough question. These are not cost-free operations." He likened the drone attacks to "going after a beehive, one bee at a time." The problem is that, inevitably, "the hive will always produce more bees." But, he said, "the only pressure currently being put on Pakistan and Afghanistan is the drones." He added, "It's really all we've got to disrupt Al Qaeda. The reason the Administration continues to use it is obvious: it doesn't really have anything else." ♦

THE NEW YORKER, OCTOBER 26, 2009    45

Exhibit P

**The New York Times**

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

PRINTER-FRIENDLY FORMAT
SPONSORED BY

STARRING
NATALIE
PORTMAN


December 4, 2009

# C.I.A. to Expand Use of Drones in Pakistan

**By SCOTT SHANE**

WASHINGTON — Two weeks ago in Pakistan, Central Intelligence Agency sharpshooters killed eight people suspected of being militants of the Taliban and Al Qaeda, and wounded two others in a compound that was said to be used for terrorist training.

Then, the job in North Waziristan done, the C.I.A. officers could head home from the agency's Langley, Va., headquarters, facing only the hazards of the area's famously snarled suburban traffic.

It was only the latest strike by the agency's covert program to kill operatives of Al Qaeda, the Taliban and their allies using Hellfire missiles fired from Predator aircraft controlled from half a world away.

The White House has authorized an expansion of the C.I.A.'s drone program in Pakistan's lawless tribal areas, officials said this week, to parallel the president's decision, announced Tuesday, to send 30,000 more troops to Afghanistan. American officials are talking with Pakistan about the possibility of striking in Baluchistan for the first time — a controversial move since it is outside the tribal areas — because that is where Afghan Taliban leaders are believed to hide.

By increasing covert pressure on Al Qaeda and its allies in Pakistan, while ground forces push back the Taliban's advances in Afghanistan, American officials hope to eliminate any haven for militants in the region.

One of Washington's worst-kept secrets, the drone program is quietly hailed by counterterrorism officials as a resounding success, eliminating key terrorists and throwing their operations into disarray. But despite close cooperation from Pakistani intelligence, the program has generated public anger in Pakistan, and some counterinsurgency experts wonder whether it does more harm than good.

Assessments of the drone campaign have relied largely on sketchy reports in the Pakistani press, and some have estimated several hundred civilian casualties. Saying that such numbers are wrong, one government official agreed to speak about the program on the condition of anonymity. About 80 missile attacks from drones in less than two years have killed "more than 400" enemy fighters, the official said, offering a number lower than most estimates but in the same range. His account of collateral damage, however, was strikingly lower than many

unofficial counts: "We believe the number of civilian casualties is just over 20, and those were people who were either at the side of major terrorists or were at facilities used by terrorists."

That claim, which the official said reflected the Predators' ability to loiter over a target feeding video images for hours before and after a strike, is likely to come under scrutiny from human rights advocates. Tom Parker, policy director for counterterrorism at Amnesty International, said he found the estimate "unlikely," noting that reassessments of strikes in past wars had usually found civilian deaths undercounted. Mr. Parker said his group was uneasy about drone attacks anyway: "Anything that dehumanizes the process makes it easier to pull the trigger."

Yet with few other tools to use against Al Qaeda, the drone program has enjoyed bipartisan support in Congress and was escalated by the Obama administration in January. More C.I.A. drone attacks have been conducted under President Obama than under President George W. Bush. The political consensus in support of the drone program, its antiseptic, high-tech appeal and its secrecy have obscured just how radical it is. For the first time in history, a civilian intelligence agency is using robots to carry out a military mission, selecting people for killing in a country where the United States is not officially at war.

In the months after the Sept. 11, 2001, attacks, C.I.A. officials were not eager to embrace killing terrorists from afar with video-game controls, said one former intelligence official. "There was also a lot of reluctance at Langley to get into a lethal program like this," the official said. But officers grew comfortable with the program as they checked off their hit list more than a dozen notorious figures, including Abu Khabab al-Masri, a Qaeda expert on explosives; Rashid Rauf, accused of being the planner of the 2006 trans-Atlantic airliner plot; and Baitullah Mehsud, leader of the Pakistani Taliban.

The drone warfare pioneered by the C.I.A. in Pakistan and the Air Force in Iraq and Afghanistan is the leading edge of a wave of push-button combat that will raise legal, moral and political questions around the world, said P. W. Singer, a scholar at the Brookings Institution and author of the book "Wired for War."

Forty-four countries have unmanned aircraft for surveillance, Mr. Singer said. So far, only the United States and Israel have used the planes for strikes, but that number will grow.

"We're talking about a technology that's not going away," he said.

There is little doubt that "warheads on foreheads," in the macho lingo of intelligence officers, have been disruptive to the militants in Pakistan, removing leaders and fighters, slowing movement and sowing dissension as survivors hunt for spies who may be tipping off the Americans. Yet the drones are unpopular with many Pakistanis, who see them as a violation of their country's sovereignty — one reason the United States refuses to officially acknowledge the attacks. A poll by Gallup Pakistan last summer found only 9 percent of Pakistanis in favor of the attacks and 67 percent against, with a majority ranking the United States as a greater threat to Pakistan than its archrival, India, or the Pakistani Taliban.

Interestingly, residents of the tribal areas where the attacks actually occur, who bitterly resent the militants' brutal rule, are far less critical of the drones, said Farhat Taj, an anthropologist with the Aryana Institute for Regional Research and Advocacy. A study of 550 professional people living in the tribal areas was conducted late last year by the institute, a Pakistani research group. About half of those interviewed called the drone strikes "accurate," 6 in 10 said they damaged militant organizations, and almost as many denied they increased anti-Americanism.

Dr. Taj, who lived at the edge of the tribal areas until 2002, said residents would prefer to be protected by the Pakistani Army. "But they feel powerless toward the militants and they see the drones as their liberator," she said.

In an interview this week with the German magazine Der Spiegel, the Pakistani prime minister, Syed Yousuf Raza Gilani, said the drone strikes "do no good, because they boost anti-American resentment throughout the country." American officials say that despite such public comments, Pakistan privately supplies crucial intelligence, proposes targets and allows the Predators to take off from a base in Baluchistan.

Pakistan's public criticism of the drone attacks has muddied the legal status of the strikes, which United States officials say are justified as defensive measures against groups that have vowed to attack Americans. Philip Alston, the United Nations' special rapporteur for extrajudicial executions and a prominent critic of the program, has said it is impossible to judge whether the program violates international law without knowing whether Pakistan permits the incursions, how targets are selected and what is done to minimize civilian casualties.

A spokesman for the C.I.A., Paul Gimigliano, defended the program without quite acknowledging its existence. "While the C.I.A. does not comment on reports of Predator operations, the tools we use in the fight against Al Qaeda and its violent allies are exceptionally accurate, precise and effective," he said. "Press reports suggesting that hundreds of Pakistani civilians have somehow been killed as a result of alleged or supposed U.S. activities are — to state what should be obvious under any circumstances — flat-out false."

From 2004 to 2007, the C.I.A. carried out only a handful of strikes. But pressure from the Congressional intelligence committees, greater confidence in the technology and reduced resistance from Pakistan led to a sharp increase starting in the summer of 2008.

Former C.I.A. officials say there is a rigorous protocol for identifying militants, using video from the Predators, intercepted cellphone calls and tips from Pakistani intelligence, often originating with militants' resentful neighbors. Operators at C.I.A. headquarters can use the drones' video feed to study a militant's identity and follow fighters to training areas or weapons caches, officials say. Targeters often can see where wives and children are located in a compound or wait until fighters drive away from a house or village before they are hit.

Mr. Mehsud's wife and parents-in-law were killed with him, but that was an exceptional decision prompted by the rare chance to attack him, the official said.

The New America Foundation, a policy group in Washington, studied press reports and estimated that since 2006 at least 500 militants and 250 civilians had been killed in the drone strikes. A separate count, by The Long War Journal, found 885 militants' deaths and 94 civilians'.

But the government official insisted on the accuracy of his far lower figure of approximately 20 civilian deaths, noting that the Pakistani press rarely reported local protests about civilian deaths, routine occurrences when bombs in Afghanistan have gone astray.

Daniel S. Markey, who studies South Asia at the Council on Foreign Relations, said the comments of two anti-Taliban tribal leaders he spoke with on a recent trip to Pakistan seemed to capture the paradox of the drones.

The tribal leaders told him that the strikes were eliminating dangerous militants while causing few civilian deaths. But they pleaded for a halt to the attacks, saying the strikes stirred up anger toward the United States and the Pakistani Army, and "made them look like puppets," he said.

"It gave the lie," Mr. Markey said, "to the argument we've made for a long time: that this fight is theirs, too."

Copyright 2010 The New York Times Company

Privacy Policy | Terms of Service | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

# Exhibit Q

# 3. AL-QA'IDA AND THE RESPONSE

## Amnesty International condemns all attacks that deliberately target members of the public; such attacks can never be justified under any circumstances.

The role of armed Islamist militants in Yemen rose to prominence during the civil war in 1994, when they fought alongside the army of the former YAR (North Yemen) to defeat the armed forces of the former PDRY (South Yemen). The PDRY was a secular state, widely perceived to be communist and backed by the USSR. The Islamist militants siding with the YAR comprised Yemenis and other nationals, mainly from Arab countries. Many had settled in Yemen, with the encouragement of the government in the north, after taking part in the war against the Soviet occupation of Afghanistan during the 1980s.

Following the civil war, some militants, with the acquiescence of the authorities, acted as a kind of religious police, particularly in the south. There, they attempted to enforce their own vision of Islamic morality, such as strict dress codes for women and the prohibition of alcohol, and used violence on occasion.

In early 2009, according to media reports, al-Qa'ida in Yemen merged with its counterpart in Saudi Arabia, some of whose members are believed to be in hiding in Yemen. Estimates of the size of the group, said to be called al-Qa'ida in the Arabian Peninsula, range from a few dozen to several hundred. The government tends to blame all attacks by Islamist militants on al-Qa'ida, but some militants have said they belong to other groups, such as Yemeni Islamic Jihad and the Brigades of the Soldiers of Yemen. Some have been accused of belonging to such groups when brought to trial. It is unclear to what extent such groups are affiliated with al-Qa'ida.

Clearly, governments have a duty to take measures to protect citizens and other people within their jurisdiction from attack by armed groups, but the measures must be lawful, proportionate to the threat posed and consistent with international human rights law and standards (and, in situations that rise to the level of an armed conflict, international humanitarian law). The Yemeni authorities have become increasingly willing to use or condone methods that are manifestly outside such parameters when confronting people suspected of links to al-Qa'ida, and are branding as "terrorists" a wide range of opponents and using "anti-terrorist" measures against them. Further, they are citing the defence of

national security as a pretext to stifle peaceful criticism of the government.

The armed attacks by al-Qa'ida and the government's response to them have not crossed the threshold of intensity and scale that would mean the situation is categorized as an armed conflict.[101] Accordingly, the proper standards applicable to operations against al-Qai'da and other armed groups in Yemen are law enforcement standards. These oblige the Yemeni authorities to seek to arrest suspected militants rather than to carry out premeditated killings, not to use unnecessary or excessive force during arrest operations, and to conduct prompt and effective investigations after incidents in which suspects are killed.

## ATTACKS BY AL-QA'IDA AND OTHER ARMED GROUPS

Starting in the 1990s, some Islamist militants began carrying out violent attacks. According to *26 September*, a pro-government daily newspaper, "al-Qa'ida elements" carried out 65 "terrorist operations" in Yemen between 1992 and December 2009.[102] Suicide and other bomb attacks have been reported sporadically since then.

The targets of suicide bombings and other attacks have included government officials, foreign embassies and tourists. More than 30 people, not including security force members and attackers, have been killed since 1998. For example, on 28 December 1998 the kidnappings of 16 tourists and four Yemeni drivers by members of the Islamic Army armed group resulted in the killings next day of three British nationals and an Australian. They were killed during a rescue attempt by Yemeni security forces; it was unclear whether they died at the hands of the armed group or were killed by the security forces in their effort to rescue them.[103] More recently, in July 2007 a suicide bomber killed eight Spanish tourists and two Yemeni drivers accompanying them in Ma'rib.[104] In September 2008 a suicide bomb attack against the US embassy in Sana'a killed at least 16 people, including people waiting outside, security guards and six attackers.[105] In March 2009 a bomb killed four South Korean tourists and their Yemeni guide in Shibam in Hadramawt.[106] In April 2010 the British ambassador in Sana'a narrowly escaped a bomb attack claimed by al-Qa'ida.[107] In June 2010 an attack on the Political Security building in Aden resulted in the deaths of seven security officers, three women and a seven-year-old child. The government said the attack was carried out by al-Qa'ida and that some detainees had escaped during the incident.[108]

Amnesty International condemns all attacks that deliberately target members of the public, which can never be justified under any circumstances. It calls for prompt, thorough and impartial investigations into such attacks and for those responsible to be brought to justice in proceedings that meet international standards of fairness, and without the imposition of the death penalty.

## UNLAWFUL KILLINGS BY SECURITY FORCES

The security forces have killed at least 113 people since the beginning of 2009 in operations that the government said were targeting people they described as "terrorists". Such attacks appear to have become more frequent since December 2009. In some cases, people were said to have been killed during exchanges of fire between militants and security forces trying to apprehend them. In others, the security forces appear to have made no attempt to detain the militants, and the killings may have amounted to extrajudicial executions. In yet other cases, the security forces unlawfully killed people by using excessive force. Amnesty International is not aware of judicial investigations into any such incidents to determine

whether or not the use of lethal force by security forces was justified or not in the particular circumstances or unlawful.

Two of the most serious incidents were the killing of 41 men, women and children on 17 December 2009 in the southern governorate of Abyan (see box below), in an attack apparently targeting Mohammad al-Kazemi and other people suspected of links to al-Qa'ida, and an attack one week later which killed as many as 30 people, alleged to be suspected members of al-Qa'ida, when missiles were fired into a farmhouse in Rafadh in the eastern governorate of Shabwah.

## ABYAN ATTACK



Part of a cruise missile carrying cluster munitions, Yemen © Private

At dawn on 17 December 2009, missiles were fired at two settlements in al-Ma'jalah area in al-Mahfad district of Abyan. By the time the attack was over, at least 41 people lay dead, 21 of them children and 14 of them women. The Yemeni authorities announced that the attack had targeted a "terrorist training camp". They acknowledged that some women and children might have been killed, but denied any responsibility, claiming that al-Qa'ida had brought families into the camp and so were exclusively to blame for any deaths of women and children that had occurred as a result of the attack.

A Yemeni parliamentary committee investigated the incident. Its members visited the site a week after the attack and took a number of photographs of the scene of the attack. The committee concluded that five missiles had been fired, killing 14 members of the al-Haidra family in one settlement and 27 members of the al-Anbour family in the other. The sole survivor from the al-Haidra family, a 13-year-old girl, was reported to

have been sent abroad to receive medical treatment for her injuries. In its report the committee said that on arrival at the scene of the attack it "found that all the homes and their contents were burnt and all that was left were traces of furniture." It added that the committee "found traces of blood of the victims and a number of holes in the ground left by the bombing. ... as well as a number of unexploded bombs".

The committee presented its report to parliament, which approved it on 3 March 2010. It called on the government to open a judicial investigation and bring to justice those responsible for the killings of the "innocent", but no such investigation is known to have been held as yet. The same day, the government apologized to the victims' families, describing the killings as a "mistake" during an operation that was meant to target al-Qa'ida militants, and said that committees would be established to provide compensation for the people killed and the property destroyed.

Representatives of the parliamentary committee told Amnesty International that they had found no evidence of a military training camp in al-Ma'jalah and that in their view the attack was based on faulty intelligence. They said that they questioned seriously the authorities' assertion that it would not have been possible for the security forces to approach the settlements by road in order to effect the arrest of any al-Qa'ida members who were present at the settlements because their remote location would have inevitably meant failure. At no point did the parliamentary committee confirm whether the military operation had been carried out by Yemeni forces alone or with other forces assisting them.

Amnesty International obtained photographs, apparently taken following the attack, which suggest that the attack used a US-manufactured cruise missile that carried cluster munitions. The photographs enable the positive identification of damaged missile parts, which appear to be from sections of a BGM-109D Tomahawk land-attack cruise missile. This type of missile, launched from a warship or submarine, is designed to carry 166 cluster sub-munitions (bomblets) which each explode into over 200 sharp steel fragments that can cause injuries up to 150m away. Incendiary material inside the bomblet also spreads fragments of burning zirconium designed to set fire to nearby flammable objects.



A further photograph, apparently taken within half an hour of the others, shows an unexploded BLU 97 A/B submunition itself, the type carried by BGM-109D missiles.[109] These missiles are only known to be held by US forces and are capable of pinpoint accuracy;[110] Yemeni armed forces are unlikely to be capable of using such a missile.

Shortly after the attack, some US media reported alleged statements by unnamed US government sources who said that US cruise missiles launched on presidential orders had been fired at two alleged al-Qa'ida sites in Yemen.[111]

Part of a cruise missile carrying cluster munitions, Yemen © Private

Amnesty International has requested information from the Pentagon about the involvement of US forces in the al-Ma'jalah attack, and what precautions may have been taken to minimize deaths and injuries, but has yet to receive a response. However, a press report stated that the USA declined to comment on the strike, saying

questions on operations against al-Qa'ida should be posed to the Yemeni government. Pentagon spokesman Bryan Whitman added: "that said, the Yemen government should be commended for dealing with the al Qaeda threat in their nation. Al Qaeda in the Arabian Peninsula threatens the stability of the region and poses an increasing threat to Yemenis and Americans". He further added: "we strongly support actions against al Qaeda in the Arabian Peninsula and cooperate closely with Yemen and other countries on counterterrorism initiatives."[112]

Outside a situation of armed conflict, which did not exist at the relevant place and time in this case, a premeditated military strike targeting people accused of criminal conduct, perpetrated without having first made reasonable attempts to detain them, and in the absence of the individuals targeted posing any specific imminent deadly threat to others, constitutes unlawful killing in violation of the right to life under international law. In this case, others who were apparently not the targets of the operation, including many women and children, were also killed by the attack, constituting further unlawful killings in violation of their right to life.

Furthermore, cluster munitions have indiscriminate effects and unexploded bomblets threaten lives and livelihoods for years afterwards. All governments responsible for using them must urgently provide assistance to clear unexploded munitions. Neither the USA nor Yemen has yet signed the Convention on Cluster Munitions, a treaty designed to comprehensively ban such weapons and which is due to enter into force on 1 August 2010. Nonetheless, Amnesty International regards the use of cluster munitions in civilian areas to be indiscriminate and therefore contrary to international law,[113] and supports a complete ban on their manufacture, transfer and use.

One recent fatal attack by the security forces was on 25 May 2010 in Ma'rib, when four people were killed, including Jaber al-Shabwani, the deputy governor of Ma'rib. Jaber al-Shabwani was reported to have been travelling to meet and mediate with al-Qa'ida members to persuade them to surrender to the authorities, when the vehicle he was in was attacked. According to press reports, the attack was carried out from an aircraft, although some sources say it may have been an unmanned drone. As with the 17 December 2009 attack in Abyan, the USA appears to have been involved. Shortly after the incident in Ma'rib, a US diplomat stated that the USA had trained Yemeni forces, shared information and provided equipment: "So we are working together. The Yemeni forces always take the lead in operations carried out in Yemen..."[114] On 5 June, Yemen's Foreign Affairs Minister said the government would investigate whether drones were used in the attack, and if so, whether they were used by Yemeni security forces or others. He later confirmed that "others" could include the USA.[115] No outcome from this investigation was known to have been disclosed by the end of June 2010.

Other people accused by the government of belonging to al-Qa'ida and reported to have been killed in 2010 include two men on a wanted list who were stopped and killed during a clash at a checkpoint in al-Hudaydah on 18 April;[116] three people who were killed on 14 March, including two men alleged to be al-Qa'ida leaders;[117] the father of an al-Qa'ida suspect shot dead in his home by a soldier on 4 March after the father reportedly fired at the soldier;[118] six people killed on 15 January, including **Qassem Yahya Mahdi al-Raymi**, alleged to be a leader of al-Qa'ida;[119] a man alleged to be a senior al-Qa'ida leader killed in Shabwah on 12 January;[120] and at least two people killed on 4 January, including the nephew of Mohammad al-Haniq who was the target but escaped.[121]

Exhibit R

**The New York Times** • Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

August 14, 2010

# Secret Assault on Terrorism Widens on Two Continents

**By SCOTT SHANE, MARK MAZZETTI and ROBERT F. WORTH**

*This article is by **Scott Shane**, **Mark Mazzetti** and **Robert F. Worth**.*

WASHINGTON — At first, the news from Yemen on May 25 sounded like a modest victory in the campaign against terrorists: an airstrike had hit a group suspected of being operatives for Al Qaeda in the remote desert of Marib Province, birthplace of the legendary queen of Sheba.

But the strike, it turned out, had also killed the province's deputy governor, a respected local leader who Yemeni officials said had been trying to talk Qaeda members into giving up their fight. Yemen's president, Ali Abdullah Saleh, accepted responsibility for the death and paid blood money to the offended tribes.

The strike, though, was not the work of Mr. Saleh's decrepit Soviet-era air force. It was a secret mission by the United States military, according to American officials, at least the fourth such assault on Al Qaeda in the arid mountains and deserts of Yemen since December.

The attack offered a glimpse of the Obama administration's shadow war against Al Qaeda and its allies. In roughly a dozen countries — from the deserts of North Africa, to the mountains of Pakistan, to former Soviet republics crippled by ethnic and religious strife — the United States has significantly increased military and intelligence operations, pursuing the enemy using robotic drones and commando teams, paying contractors to spy and training local operatives to chase terrorists.

The White House has intensified the Central Intelligence Agency's drone missile campaign in Pakistan, approved raids against Qaeda operatives in Somalia and launched clandestine operations from Kenya. The administration has worked with European allies to dismantle terrorist groups in North Africa, efforts that include a recent French strike in Algeria. And the Pentagon tapped a network of private contractors to gather intelligence about things like militant hide-outs in Pakistan and the location of an American soldier currently in Taliban hands.

While the stealth war began in the Bush administration, it has expanded under President Obama, who rose to prominence in part for his early opposition to the invasion of Iraq. Virtually none of the newly aggressive steps undertaken by the United States government have been publicly acknowledged. In contrast with the troop buildup in Afghanistan, which came after months of robust debate, for example, the American military campaign in Yemen began without notice in December and has never been officially confirmed.

Obama administration officials point to the benefits of bringing the fight against Al Qaeda and other militants into the shadows. Afghanistan and Iraq, they said, have sobered American politicians and voters about the staggering costs of big wars that topple governments, require years of occupation and can be a catalyst for further radicalization throughout the Muslim world.

Instead of "the hammer," in the words of John O. Brennan, President Obama's top counterterrorism adviser, America will rely on the "scalpel." In a speech in May, Mr. Brennan, an architect of the White House strategy, used this analogy while pledging a "multigenerational" campaign against Al Qaeda and its extremist affiliates.

Yet such wars come with many risks: the potential for botched operations that fuel anti-American rage; a blurring of the lines between soldiers and spies that could put troops at risk of being denied Geneva Convention protections; a weakening of the Congressional oversight system put in place to prevent abuses by America's secret operatives; and a reliance on authoritarian foreign leaders and surrogates with sometimes murky loyalties.

The May strike in Yemen, for example, provoked a revenge attack on an oil pipeline by local tribesmen and produced a propaganda bonanza for Al Qaeda in the Arabian Peninsula. It also left President Saleh privately furious about the death of the provincial official, Jabir al-Shabwani, and scrambling to prevent an anti-American backlash, according to Yemeni officials.

The administration's demands have accelerated a transformation of the C.I.A. into a paramilitary organization as much as a spying agency, which some critics worry could lower the threshold for future quasi-military operations. In Pakistan's mountains, the agency had broadened its drone campaign beyond selective strikes against Qaeda leaders and now regularly obliterates suspected enemy compounds and logistics convoys, just as the military would grind down an enemy force.

For its part, the Pentagon is becoming more like the C.I.A. Across the Middle East and elsewhere, Special Operations troops under secret "Execute Orders" have conducted spying missions that were once the preserve of civilian intelligence agencies. With code names like Eager Pawn and Indigo Spade, such programs typically operate with even less transparency

and Congressional oversight than traditional covert actions by the C.I.A.

And, as American counterterrorism operations spread beyond war zones into territory hostile to the military, private contractors have taken on a prominent role, raising concerns that the United States has outsourced some of its most important missions to a sometimes unaccountable private army.

## A Proving Ground

Yemen is a testing ground for the "scalpel" approach Mr. Brennan endorses. Administration officials warn of the growing strength of Al Qaeda's affiliate there, citing as evidence its attempt on Dec. 25 to blow up a trans-Atlantic jetliner using a young Nigerian operative. Some American officials believe that militants in Yemen could now pose an even greater threat than Al Qaeda's leadership in Pakistan.

The officials said that they have benefited from the Yemeni government's new resolve to fight Al Qaeda and that the American strikes — carried out with cruise missiles and Harrier fighter jets — had been approved by Yemen's leaders. The strikes, administration officials say, have killed dozens of militants suspected of plotting future attacks. The Pentagon and the C.I.A. have quietly bulked up the number of their operatives at the embassy in Sana, the Yemeni capital, over the past year.

"Where we want to get is to much more small scale, preferably locally driven operations," said Representative Adam Smith, Democrat of Washington, who serves on the Intelligence and Armed Services Committees.

"For the first time in our history, an entity has declared a covert war against us," Mr. Smith said, referring to Al Qaeda. "And we are using similar elements of American power to respond to that covert war."

Some security experts draw parallels to the cold war, when the United States drew heavily on covert operations as it fought a series of proxy battles with the Soviet Union.

And some of the central players of those days have returned to take on supporting roles in the shadow war. Michael G. Vickers, who helped run the C.I.A.'s campaign to funnel guns and money to the Afghanistan mujahedeen in the 1980s and was featured in the book and movie "Charlie Wilson's War," is now the top Pentagon official overseeing Special Operations troops around the globe. Duane R. Clarridge, a profane former C.I.A. officer who ran operations in Central America and was indicted in the Iran-contra scandal, turned up this year helping run a Pentagon-financed private spying operation in Pakistan.

In pursuing this strategy, the White House is benefiting from a unique political landscape. Republican lawmakers have been unwilling to take Mr. Obama to task for aggressively hunting terrorists, and many Democrats seem eager to embrace any move away from the long, costly wars begun by the Bush administration.

Still, it has astonished some old hands of the military and intelligence establishment. Jack Devine, a former top C.I.A. clandestine officer who helped run the covert war against the Soviet Army in Afghanistan in the 1980s, said his record showed that he was "not exactly a cream puff" when it came to advocating secret operations.

But he warned that the safeguards introduced after Congressional investigations into clandestine wars of the past — from C.I.A. assassination attempts to the Iran-contra affair, in which money from secret arms dealings with Iran was funneled to right-wing rebels in Nicaragua known as the contras — were beginning to be weakened. "We got the covert action programs under well-defined rules after we had made mistakes and learned from them," he said. "Now, we're coming up with a new model, and I'm concerned there are not clear rules."

## Cooperation and Control

The initial American strike in Yemen came on Dec. 17, hitting what was believed to be a Qaeda training camp in Abyan Province, in the southern part of the country. The first report from the Yemeni government said that its air force had killed "around 34" Qaeda fighters there, and that others had been captured elsewhere in coordinated ground operations.

The next day, Mr. Obama called President Saleh to thank him for his cooperation and pledge continuing American support. Mr. Saleh's approval for the strike — rushed because of intelligence reports that Qaeda suicide bombers might be headed to Sana — was the culmination of administration efforts to win him over, including visits by Mr. Brennan and Gen. David H. Petraeus, then the commander of military operations in the Middle East.

The accounts of the American strikes in Yemen, which include many details that have not previously been reported, are based on interviews with American and Yemeni officials who requested anonymity because the military campaign in Yemen is classified, as well as documents from Yemeni investigators.

As word of the Dec. 17 attack filtered out, a very mixed picture emerged. The Yemeni press quickly identified the United States as responsible for the strike. Qaeda members seized on video of dead children and joined a protest rally a few days later, broadcast by Al Jazeera, in which a speaker shouldering an AK-47 rifle appealed to Yemeni counterterrorism troops.

"Soldiers, you should know we do not want to fight you," the Qaeda operative, standing amid

angry Yemenis, declared. "There is no problem between you and us. The problem is between us and America and its agents. Beware taking the side of America!"

A Navy ship offshore had fired the weapon in the attack, a cruise missile loaded with cluster bombs, according to a report by Amnesty International. Unlike conventional bombs, cluster bombs disperse small munitions, some of which do not immediately explode, increasing the likelihood of civilian causalities. The use of cluster munitions, later documented by Amnesty, was condemned by human rights groups.

An inquiry by the Yemeni Parliament found that the strike had killed at least 41 members of two families living near the makeshift Qaeda camp. Three more civilians were killed and nine were wounded four days later when they stepped on unexploded munitions from the strike, the inquiry found.

American officials cited strained resources for decisions about some of the Yemen strikes. With the C.I.A.'s armed drones tied up with the bombing campaign in Pakistan, the officials said, cruise missiles were all that was available at the time. Drones are favored by the White House for clandestine strikes because they can linger over targets for hours or days before unleashing Hellfire missiles, reducing the risk that women, children or other noncombatants will fall victim.

The Yemen operation has raised a broader question: who should be running the shadow war? White House officials are debating whether the C.I.A. should take over the Yemen campaign as a "covert action," which would allow the United States to carry out operations even without the approval of Yemen's government. By law, covert action programs require presidential authorization and formal notification to the Congressional intelligence committees. No such requirements apply to the military's so-called Special Access Programs, like the Yemen strikes.

Obama administration officials defend their efforts in Yemen. The strikes have been "conducted very methodically," and claims of innocent civilians being killed are "very much exaggerated," said a senior counterterrorism official. He added that comparing the nascent Yemen campaign with American drone strikes in Pakistan was unfair, since the United States has had a decade to build an intelligence network in Pakistan that feeds the drone program.

In Yemen, officials said, there is a dearth of solid intelligence about Qaeda operations. "It will take time to develop and grow that capability," the senior official said.

On Dec. 24, another cruise missile struck in a remote valley called Rafadh, about 400 miles southeast of the Yemeni capital and two hours from the nearest paved road. The Yemeni authorities said the strike killed dozens of Qaeda operatives, including the leader of the Qaeda branch in Yemen, Nasser al-Wuhayshi, and his Saudi deputy, Said Ali al-Shihri. But officials

later acknowledged that neither man was hit, and local witnesses say the missile killed five low-level Qaeda members.

The next known American strike, on March 14, was more successful, killing a Qaeda operative named Jamil al-Anbari and possibly another militant. Al Qaeda's Yemeni branch acknowledged Mr. Anbari's death. On June 19, the group retaliated with a lethal attack on a government security compound in Aden that left 11 people dead and said the "brigade of the martyr Jamil al-Anbari" carried it out.

In part, the spotty record of the Yemen airstrikes may derive from another unavoidable risk of the new shadow war: the need to depend on local proxies who may be unreliable or corrupt, or whose agendas differ from that of the United States.

American officials have a troubled history with Mr. Saleh, a wily political survivor who cultivates radical clerics at election time and has a history of making deals with jihadists. Until recently, taking on Al Qaeda had not been a priority for his government, which has been fighting an intermittent armed rebellion since 2004.

And for all Mr. Saleh's power — his portraits hang everywhere in the Yemeni capital — his government is deeply unpopular in the remote provinces where the militants have sought sanctuary. The tribes there tend to regularly switch sides, making it difficult to depend on them for information about Al Qaeda. "My state is anyone who fills my pocket with money," goes one old tribal motto.

The Yemeni security services are similarly unreliable and have collaborated with jihadists at times. The United States has trained elite counterterrorism teams there in recent years, but the military still suffers from corruption and poor discipline.

It is still not clear why Mr. Shabwani, the Marib deputy governor, was killed. The day he died, he was planning to meet members of Al Qaeda's Yemeni branch in Wadi Abeeda, a remote, lawless plain dotted with orange groves east of Yemen's capital. The most widely accepted explanation is that Yemeni and American officials failed to fully communicate before the attack.

Abdul Ghani al-Eryani, a Yemeni political analyst, said the civilian deaths in the first strike and the killing of the deputy governor in May "had a devastating impact." The mishaps, he said, "embarrassed the government and gave ammunition to Al Qaeda and the Salafists," he said, referring to adherents of the form of Islam embraced by militants.

American officials said President Saleh was angry about the strike in May, but not so angry as to call for a halt to the clandestine American operations. "At the end of the day, it's not like he said, 'No more,' " said one Obama administration official. "He didn't kick us out of the country."

## Weighing Success

Despite the airstrike campaign, the leadership of Al Qaeda in the Arabian Peninsula survives, and there is little sign the group is much weaker.

Attacks by Qaeda militants in Yemen have picked up again, with several deadly assaults on Yemeni army convoys in recent weeks. Al Qaeda's Yemen branch has managed to put out its first English-language online magazine, Inspire, complete with bomb-making instructions. Intelligence officials believe that Samir Khan, a 24-year-old American who arrived from North Carolina last year, played a major role in producing the slick publication.

As a test case, the strikes have raised the classic trade-off of the post-Sept. 11 era: Do the selective hits make the United States safer by eliminating terrorists? Or do they help the terrorist network frame its violence as a heroic religious struggle against American aggression, recruiting new operatives for the enemy?

Al Qaeda has worked tirelessly to exploit the strikes, and in Anwar al-Awlaki, the American-born cleric now hiding in Yemen, the group has perhaps the most sophisticated ideological opponent the United States has faced since 2001.

"If George W. Bush is remembered by getting America stuck in Afghanistan and Iraq, it's looking like Obama wants to be remembered as the president who got America stuck in Yemen," the cleric said in a March Internet address that was almost gleeful about the American campaign.

Most Yemenis have little sympathy for Al Qaeda and have observed the American strikes with "passive indignation," Mr. Eryani said. But, he added, "I think the strikes over all have been counterproductive."

Edmund J. Hull, the United States ambassador to Yemen from 2001 to 2004, cautioned that American policy must not be limited to using force against Al Qaeda.

"I think it's both understandable and defensible for the Obama administration to pursue aggressive counterterrorism operations," Mr. Hull said. But he added: "I'm concerned that counterterrorism is defined as an intelligence and military program. To be successful in the long run, we have to take a far broader approach that emphasizes political, social and economic forces."

Obama administration officials say that is exactly what they are doing — sharply increasing the foreign aid budget for Yemen and offering both money and advice to address the country's

crippling problems. They emphasized that the core of the American effort was not the strikes but training for elite Yemeni units, providing equipment and sharing intelligence to support Yemeni sweeps against Al Qaeda.

Still, the historical track record of limited military efforts like the Yemen strikes is not encouraging. Micah Zenko, a fellow at the Center for Preventive Action at the Council on Foreign Relations, examines in a forthcoming book what he has labeled "discrete military operations" from the Balkans to Pakistan since the end of the cold war in 1991. He found that these operations seldom achieve either their military or political objectives.

But he said that over the years, military force had proved to be a seductive tool that tended to dominate "all the discussions and planning" and push more subtle solutions to the side.

When terrorists threaten Americans, Mr. Zenko said, "there is tremendous pressure from the National Security Council and the Congressional committees to, quote, 'do something.' "

That is apparent to visitors at the American Embassy in Sana, who have noticed that it is increasingly crowded with military personnel and intelligence operatives. For now, the shadow warriors are taking the lead.

*Muhammad al-Ahmadi contributed reporting from Yemen.*

*This article has been revised to reflect the following correction:*

### Correction: August 22, 2010

An article last Sunday about the Obama administration's shadow war against Al Qaeda and its allies in roughly a dozen countries gave an outdated affiliation in some editions for Micah Zenko, who in a forthcoming book looks at what he calls "discrete military operations" from the Balkans to Pakistan since the end of the cold war. Mr. Zenko is a fellow at the Center for Preventive Action at the Council on Foreign Relations; he is no longer a scholar at the Kennedy School of Government at Harvard.

Exhibit S

August 26, 2010

# npr

**FIND A STATION**

SEARCH [                    ]

home    news    arts & life    music    programs     listen

News > U.S. > National Security

E-mail    Share    Comments (3)    Recommend (9)    Print

## < U.S. Turns Up Heat On Internet Imam Awlaki

*Copyright ©2010 National Public Radio®. For personal, noncommercial use only. See Terms of Use. For other uses, prior permission required.*

*Heard on Morning Edition*       text size A A A

July 29, 2010 - RENEE MONTAGNE, host:

This is MORNING EDITION from NPR News. I'm Renee Montagne.

DON GONYEA, host:

And I'm Don Gonyea.

The U.S. government is turning up the heat on an American-born radical cleric. His name is Anwar al-Awlaki. He's thought to be a key operative of al-Qaida's arm in Yemen. He's been linked to the Fort Hood shootings in Texas and the attempted bombing of a U.S. airliner last Christmas Day.

Several months ago, intelligence officials acknowledged he was on the CIA's capture or kill list. That means he's essentially a target for assassination. Yet al-Awlaki has not been formerly indicted for anything. NPR's Dina Temple-Raston explains.

DINA TEMPLE-RASTON: NPR has learned that about a month ago several U.S. lawmakers received unexpected phone call from Yemen. It was from a Dr. Nasser al-Awlaki, an accomplished academic and former Yemeni government official. He also happens to be the father of Anwar al-Awlaki, who was born in New Mexico while his dad was studying in the U.S.

His father told the lawyers that his son had been falsely accused and that he wanted to sue. He said that by putting his son on the CIA's capture or kill list, the U.S. government has deprived him of his Fifth Amendment right - the right to due process.

Mr. JUAN ZARATE (Former Deputy, National Security Council): I don't think there's much of a case here.

TEMPLE-RASTON: Juan Zarate is a former deputy at the National Security Council.

Mr. ZARATE: When an individual like Anwar Awlaki joins the enemy force in an ongoing war, which the Obama administration calls a war on al-Qaida in a global context, there's very little that that American citizen can do in court to challenge what may happen to that individual in the field of battle.

TEMPLE-RASTON: Intelligence sources tell NPR that there have been almost a dozen drone and airstrikes targeting Awlaki in Yemen. So far he's escaped them all.

Not long after Dr. Awlaki called the U.S. attorneys, an interesting thing happened. The U.S. Treasury put Awlaki on their list of designated global terrorists. And then a day after that, the U.N. branded him a bona fide member of al-Qaida. Zarate says a formal indictment is next.

Mr. ZARATE: If an indictment hasn't been brought already, I would anticipate one coming, given the fact that Awlaki has crossed the line from merely being a radical ideologue to actually being an operational part of al-Qaida in the Arabian Peninsula.

TEMPLE-RASTON: Officials declined to comment on the record about Awlaki and the legal moves against him. In fact, he may have already been indicted and we wouldn't know about it if the



Join NPR's
**Audience Advisory Panel**

be **HEARD >**

Become an NPR Sponsor

# donate      Give now ●

**Support the NPR programming you love** with a tax-deductible gift today.

# shop      Visit the NPR Shop ●



**WEATHER OR NOT, BE READY**
FR800 Weather Tracker Radio
Available Now >

indictment were under seal.

Officials said they knew that Awlaki's father was considering a suit against the government, but they wouldn't say whether that is what motivated them to put Awlaki on terrorist watch lists now. There are other possible reasons.

Professor SAM RASCOFF (New York University): Im Sam Rascoff. I'm a law professor at NYU. I used to run intelligence analysis for the New York City Police Department.

TEMPLE-RASTON: Rascoff has been tracking Awlaki for years and watched him go from a propagandist for al-Qaida to a leader for the group.

Mr. RASCOFF: Were beginning to hear more and more of Awlaki as a senior operative, a lieutenant as it were, for Osama bin Laden, someone who's actually taking concrete terrorist decisions and actually causing operatives like the December 25th bomber to get on planes and try to blow things up.

TEMPLE-RASTON: Intelligence officials say Awlaki is thought to have actually trained a cell of foreign fighters in Yemen late last year, one of whom was the young Nigerian who allegedly tried to blow up Northwest Flight 253 on Christmas Day. The sources claim there's no doubt about Awlaki's decision to go from al-Qaida propagandist to operative. But they haven't had to prove that in court.

Mr. RASCOFF: Here the executive is claiming the power to go ahead and target al-Awlaki for assassination without going through anything that resembles traditional legal process, most specifically without a jury conviction.

TEMPLE-RASTON: Again, NYU law professor Sam Rascoff.

Mr. RASCOFF: It essentially amounts to going right to the death penalty phase of things.

TEMPLE-RASTON: And shouldn't that worry us?

Mr. RASCOFF: Well, I think it ought to give us pause. It ought to make us return to our first principles and think: What are we trying to achieve here? Who is Awlaki? Is he considered more like a criminal accused in an American court by virtue of his American citizenship? Or is he something closer to an enemy fighter? In which case the fact that he happens to be an American shouldn't matter very much.

TEMPLE-RASTON: The answer to that question could become clearer in the coming days if the Justice Department makes Awlaki's indictment official.

Dina Temple-Raston, NPR News.

*Copyright © 2010 National Public Radio®. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to National Public Radio. This transcript is provided for personal, noncommercial use only, pursuant to our Terms of Use. Any other use requires NPR's prior permission. Visit our permissions page for further Information.*

*NPR transcripts are created on a rush deadline by a contractor for NPR, and accuracy and availability may vary. This text may not be in its final form and may be updated or revised in the future. Please be aware that the authoritative record of NPR's programming is the audio.*

---

| E-mail | Share | Comments (3) | Recommend (9) | Print |

## More National Security

national security
### Report: Military Needs New Office To Stem Suicides
The report says the services' existing prevention programs don't work as well as they could.


national security
### Marines Need To Regain 'Maritime Soul,' Gates Says
The defense secretary says Marines should be able to

PODCAST + RSS FEEDS

Podcast   RSS

National Security

Morning Edition

Exhibit T



July 16, 2010
TG-779

**Treasury Designates Anwar Al-Aulaqi,**
**Key Leader of Al-Qa'ida in the Arabian Peninsula**

*Treasury Targets al-Qa'ida Leader with Ties to Umar Farouk Abdulmutallab*

**WASHINGTON** – The U.S. Department of the Treasury today designated Anwar al-Aulaqi, a key leader for al-Qa'ida in the Arabian Peninsula (AQAP), a Yemen-based terrorist group. Aulaqi was designated pursuant to Executive Order 13224 for supporting acts of terrorism and for acting for or on behalf of AQAP. Since its inception in January 2009, AQAP has claimed responsibility for numerous terrorist attacks against Saudi, Korean, Yemeni and U.S. targets. Executive Order 13224 freezes any assets Aulaqi has under U.S. jurisdiction and prohibits U.S. persons from engaging in any transactions with him.

"Anwar al-Aulaqi has proven that he is extraordinarily dangerous, committed to carrying out deadly attacks on Americans and others worldwide," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. "He has involved himself in every aspect of the supply chain of terrorism -- fundraising for terrorist groups, recruiting and training operatives, and planning and ordering attacks on innocents."

Aulaqi has pledged an oath of loyalty to AQAP emir, Nasir al-Wahishi, and plays a major role in setting the strategic direction for AQAP. Aulaqi has also recruited individuals to join AQAP, facilitated training at camps in Yemen in support of acts of terrorism, and helped focus AQAP's attention on planning attacks on U.S. interests.

Since late 2009, Aulaqi has taken on an increasingly operational role in the group, including preparing Umar Farouk Abdulmutallab, who attempted to detonate an explosive device aboard a Northwest Airlines flight from Amsterdam to Detroit on Christmas Day 2009, for his operation. In November 2009, while in Yemen, Abdulmutallab swore allegiance to the emir of AQAP and shortly thereafter received instructions from Aulaqi to detonate an explosive device aboard a U.S. airplane over U.S. airspace. After receiving this direction from Aulaqi, Abdulmutallab obtained the explosive device he used in the attempted Christmas Day attack.

Aulaqi was imprisoned in Yemen in 2006 on charges of kidnapping for ransom and being involved in an al-Qa'ida plot to kidnap a U.S. official but was released from jail in December 2007 and subsequently went into hiding in Yemen.

"Aulaqi has sought to encourage his supporters to provide money for terrorist causes. Those who provide material support to Aulaqi or AQAP violate sanctions and expose themselves to serious consequences," continued Levey.

Today's action supports the international effort to degrade AQAP's capabilities to execute violent attacks and to disrupt, dismantle, and defeat its financial and support networks. The U.S. Government will continue to work with allies to identify and take action against persons acting for or on behalf of, or providing financial and other prohibited support to, Aulaqi and AQAP.

Identifying Information

**Individual:**
Anwar al-Aulaqi
**AKA:**
Anwar al-Awlaki
**AKA:**
Anwar al-Awlaqi
**AKA:**
Anwar Nasser Aulaqi
**AKA:**
Anwar Nasser Abdulla Aulaqi
**AKA:**
Anwar Nasswer Aulaqi
**DOB:**
April 21, 1971
**Alternate DOB:**
April 22, 1971
**POB:**
Las Cruces, New Mexico
**Citizenship:**
United States
**Citizenship:**
Yemen
**Location:**
Shabwah Governorate, Yemen

###

Exhibit U

# Yemen won't extradite radical cleric

**Official: Laws prohibit sending al-Awlaki to U.S.**

**AP** Associated Press

updated 6/8/2010 7:39:35 AM ET

SAN'A, Yemen — Yemen would not hand over a U.S.-born, al-Qaida-linked cleric to the United States because the country's law bans extradition of its citizens, a Yemeni official said Tuesday.

The radical Yemeni-American cleric, Anwar al-Awlaki, is believed to be hiding in Yemen since 2004.

The U.S. says he is an active al-Qaida recruiter and has placed him on the CIA's list of targets for assassination, despite his American citizenship. Yemen's al-Qaida offshoot last month released a video of al-Awlaki calling for the killing of Americans.

Al-Awlaki is also believed to have helped inspire recent attacks in the U.S., including the Fort Hood shooting, the Times Square bombing attempt and the failed Christmas Day airline bombing.

Yemen's Islamic Affairs Minister Hamoud al-Hitar told The Associated Press that Yemen is encouraging al-Awlaki to turn himself in, but if and when in Yemeni custody, he will not be extradited to the U.S.

"There are constitutional and legal texts the government cannot get around," al-Hitar said.

He said the U.S. should provide any proof it has of al-Awlaki's terrorist ties "to the Yemeni justice system, so it can do its job."

Al-Hitar's remarks come as the U.S. has encouraged Yemen to step up its crackdown on al-Qaida.

**Al-Qaida refuge?**

U.S officials worry the network's offshoot has found refuge in the country's remote, lawless areas and could be plotting attacks against U.S. and other Western targets from the hideouts. There are also concerns that insurgents, including Americans, are training in militant camps in Yemen.

On Monday, the U.S. State Department said Yemeni authorities had arrested 12 Americans. The arrests may be connected to a joint U.S.-Yemeni anti-terror campaign, though a department spokesman did not provide details.

High on the list of U.S. concerns is that al-Awlaki, born in New Mexico to Yemeni parents, has used his fluent English and deep understanding of American culture to explain the philosophy of violent jihad to young Muslims in America and elsewhere in the West.

Members of al-Awlaki's tribe deny he is connected to al-Qaida despite last month's video posting featuring his calls for killing of Americans. In the 45-minute video, al-Awlaki said U.S. deaths are justified and encouraged, citing what he said was U.S. intentional killing of a million Muslim civilians in Iraq, Afghanistan and elsewhere.

*Copyright 2010 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

Exhibit V

Check out our Google Chrome Extension. Get up to-the-minute reports, blogs and analysis with quick-view articles from all sections.

August 27, 2010



This is the print preview: Back to normal view »

# Anwar Al Awlaki, Yemeni Cleric, Advocates Killing Americans In Al Qaeda Video

MAAMOUN YOUSSEF | 05/23/10 09:54 PM | 

CAIRO — A U.S.-born cleric who has encouraged Muslims to kill American soldiers called for the killing of U.S. civilians in his first video released by a Yemeni offshoot of al-Qaida, providing the most overt link yet between the radical preacher and the terror group.

Dressed in a white Yemeni robe, turban and with a traditional jambiyah dagger tucked into his waistband, Anwar Al-Awlaki used the 45-minute video posted Sunday to justify civilian deaths – and encourage them – by accusing the United States of intentionally killing a million Muslim civilians in Iraq, Afghanistan and elsewhere.

American civilians are to blame, he said, because "the American people, in general, are taking part in this and they elected this administration and they are financing the war."

"Those who might be killed in a plane are merely a drop of water in a sea," he said in the video in response to a question about Muslim groups that disapproved of the airliner plot because it targeted civilians.

Al-Awlaki, who was born in New Mexico and is believed to be hiding in his parents' native Yemen, has used his personal website to encourage Muslims around the world to kill U.S. troops in Iraq.

He has emerged as a prominent al-Qaida recruiter and has been tied by U.S. intelligence to the 9/11 hijackers, the suspects in the November shooting at an Army base in Fort Hood, Texas, and the December attempt to blow up a U.S. jetliner bound for Detroit.

For U.S. officials, al-Awlaki is of particular concern because he is one of the few English-speaking radical clerics able to explain to young Muslims in America and other Western countries the philosophy of violent jihad.

Al-Awlaki's direct role in al-Qaida – if any – remains unclear. The U.S. says he is an active participant in the group, though members of his tribe have denied that.

However, Sunday's video provides the clearest link yet between the cleric and the terror group.

It was produced by al-Qaida in the Arabian Peninsula's media arm, which touted the recording as its first interview with al-Awlaki. It may also indicate al-Qaida is trying to seize upon al-Awlaki's recruiting prowess by featuring him in its videos.

In the months before the Fort Hood shooting, which killed 13 people, al-Awlaki exchanged e-mails with the alleged attacker, U.S. Maj. Nidal Malik Hasan. Hasan initiated the contacts, drawn by al-Awlaki's Internet sermons, and approached him for religious advice.

Yemen's government says al-Awlaki is also suspected of contacts with Umar Farouk Abdulmutallab, who traveled to Yemen late last year, and U.S. investigators say Abdulmutallab told them he received training and his bomb from Yemen's al-Qaida offshoot.

In Sunday's video, al-Awlaki praised both men and referred to them as his "students."

Speaking of Hasan, the cleric said, "What he did was heroic and great. ... I ask every Muslim serving in the U.S. Army to follow suit."

Because of what U.S. officials view as al-Awlaki's growing role with al-Qaida, the Obama administration placed him on the CIA's list of targets for assassination – despite his American citizenship.

White House spokesman Robert Gibbs said Sunday that the U.S. is "actively trying to find" al-Awlaki.

"The president will continue to take action directly at terrorists like Awlaki and keep our country safe from their murderous thugs," Gibbs said on CBS's "Face the Nation."

Ali Mohammed al-Ansi, Yemen's national security chief and head of the president's office, said in remarks published Sunday in Yemen's ruling-party newspaper that the country's security forces will continue to pursue al-Awlaki until he turns himself in or he is arrested.

Yemen has indicated that if its security forces capture al-Awlaki, it wants to try the cleric on Yemeni soil.

Al-Awlaki was born in 1971 in New Mexico. His father, Nasser al-Awlaki, was in the United States studying agriculture at the time and later returned with his family to Yemen to serve as agriculture minister. The father remains a prominent figure in Yemen, teaching at San'a University in the capital.

The younger al-Awlaki returned to the United States in 1991 to study civil engineering at Colorado State University, then education at San Diego State University, followed by doctoral work at George Washington University in Washington, D.C.

He was also a preacher at mosques in California and Virginia before returning to Yemen in 2004.

"We have had more freedom in America than in any Muslim country," he said in Sunday's

video. "But when America started to feel the danger of Islam's message, it tightened limits on freedom, and after 9/11 it was impossible to live in America as a Muslim."

Al-Awlaki is believed to be hiding in Yemen's Shabwa province, the rugged region of towering mountains that is home to his large tribe. He said he was moving from place to place under the protection of his tribe.

"As for the Americans, I will never surrender to them," al-Awlaki said. "If the Americans want me, let them come look for me. God is the protector."

Join HuffPost Social News and connect with your friends on Twitter

 

Exhibit W



SABA - Yemen news agency

Print date: 27-08-2010
Article link: http://www.sabanews.net/ar/news213826.htm

Local

## Al-Qirbi: Yemen will not extradite al-Awlaki to U.S.

[10/May/2010]

SANA'A, May 10 (Saba) – Foreign Minister Abu Bakr al-Qirbi has said that Yemen would not hand Anwar al-Awlaki to the U.S.

The man the U.S. wants to be extradited will stand trial in Yemen under the national law, the minister said in an interview with the Kuwaiti Al-Dar Newspaper.

We have clearly said that because of his recent terrorist activity, al-Awlaki is now wanted by the Yemeni government; hence, he must be tried once he is captured and convicted in his homeland but never by other governments, he added.

Yemen's position over handing the man to the U.S. is clear and firm because we refuse to hand our people to other countries, he affirmed.

The minister also denied there was a Syrian initiative to reconcile the Yemeni parties.

What Syrians did in this regard was offering suggestions to start dialogue between the ruling party and the opposition, he said.

Moreover, al-Qirbi highlighted the condition of the secessionist movement in the south saying the movement receives financial support from separatists who gained wealth after the 1994 separation war.

There are also Yemenis swerving and spreading the culture of hatred among the Yemeni people and using the case of the south at the expense of their country's interest, he said.

But we assure that the government is able to address all issues in the best interest of the Yemeni people and bring all outlaws and criminals to justice, he concluded.

The U.S. accuses al-Awlaki, who is currently fugitive, of contacting the U.S. officer who killed 13 people, including 12 soldiers, and injured 30 others in a shootout at a Texas army base in late last year.

FR

Exhibit X

| World | U.S. | New York | Business | Markets | Tech | Personal Finance |
|---|---|---|---|---|---|---|

Life & Culture    Opinion    Careers    Real Estate    Small Business



Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com.

See a sample reprint in PDF format.    Order a reprint of this article now

# THE WALL STREET JOURNAL

WSJ.com

MIDDLE EAST NEWS  |  JANUARY 15, 2010

# Yemen in Talks for Surrender of Cleric

*Government Negotiates With Tribe Sheltering U.S.-Born Imam; Official Threatens More Military Efforts to Catch Suspect*

By MARGARET COKER And CHARLES LEVINSON

SAN'A, Yemen—The Yemeni government is negotiating terms for the surrender of Anwar al Awlaki, the U.S.-born cleric linked to the alleged Christmas Day bomber, according to Yemen's head of intelligence.

Ali Mohamed Al Anisi, the director of Yemen's National Security Agency and a senior presidential adviser, said talks were under way with members of Mr. Awlaki's tribe in an effort to convince the cleric to turn himself in.



Anwar al Awlaki, shown on Sept. 21, 2001, at his Falls Church, Va., mosque, returned to Yemen in 2004.

Landov

Mr. Anisi said Mr. Awlaki was in hiding in Yemen's remote Shabwa province, under the protection of relatives, whose tribe controls the region.

He said Yemeni forces were prepared to bring him in forcibly if negotiations fail. "We are ready to launch more operations to hunt him down," he said.

Yemen is under international pressure to show progress in its battle against al Qaeda in the Arabian Peninsula, the Yemen-based affiliate of the global terror network. The affiliate claimed responsibility for the thwarted bombing of a Detroit-bound Northwest Airlines flight on Dec. 25. The group also said it was behind an assassination attempt in August against a leading member of the Saudi royal family. Local al Qaeda elements were also blamed for an attack on the U.S. Embassy in San'a in 2008.

Mr. Awlaki, 38 years old, emerged as a focus of the probe into the alleged Christmas Day bombing plot, according to Yemeni and U.S. officials, after reportedly telling a U.S. official he had blessed the operation.

**More on Yemen**

WSJ.com/Mideast: News, video, graphics

Years ago, he was the imam at a Virginia mosque attended by U.S. Army Maj. Nidal Hasan, the suspect in the Fort Hood, Texas, shooting spree in November, and said in interview in the fall that he counseled Maj. Hasan before the attack.

Investigators say he also had incidental contact with two of the 9/11 hijackers.

There is no indication Mr. Awlaki played a direct role in any of the attacks, and he has never been indicted in the U.S.

Yemeni and U.S. officials say Mr. Awlaki has now become a key inspirational figure for the al Qaeda branch in Yemen.

"Anwar Awlaki is a member of the al Qaeda leadership in Yemen," said a U.S. security official. "We believe that he should be captured, tried and convicted."

Attempts to reach Awlaki family members to comment weren't successful. People close to the New Mexico-born preacher deny he is a member of al Qaeda, saying he disapproves of attacks on civilians.

Yemen's deputy prime minister has said Mr. Awlaki "likely" met with Umar Farouk Abdulmutallab, the Nigerian charged in the attempted bombing of the Dec. 25 flight, in Yemen last fall.

Mr. Awlaki has been on a Yemeni list of terror suspects for the past three years and has been under surveillance since that time, but didn't become "a big figure" in al Qaeda until this fall, when his name came up in relation to the Fort Hood case, Mr. Anisi said.

"That made him jump up the ranks and raised his influence here," Mr. Anisi said.

Mr. Anisi said Mr. Awlaki survived a Dec. 24 airstrike aimed at a group of suspected al Qaeda leaders meeting in Shabwa province.

Yemeni officials and those who have heard Mr. Awlaki preach describe him as a roving preacher, traveling village-to-village through Yemen's tribal-controlled hinterland, spearheading the terror group's efforts to recruit poor Yemeni youth to take up anti-Western jihad.

Last year, about two dozen young men gathered under a tent in the rugged terrain of Mareb province to hear Mr. Awlaki speak, according to a person who was present.

Using a laptop computer and a projector screen, Mr. Awlaki showed the seated youth a series of DVDs about civilians dying in Iraq, this person said. Many in the crowd, who had never seen a computer or a movie before, were visibly enraged.

Later, over a lunch provided by the cleric, Mr. Awlaki spoke of the need for Muslims to defend their brethren against the U.S. and other unjust forces, this person said.

Mr. Awlaki had returned to Yemen in 2004 after spending nearly 14 years in the U.S. He served as an imam first in San Diego and later at the Dar al-Hijrah Islamic Center in Fairfax, Va. In the U.S., he was repeatedly questioned in connection with terror investigations, but never arrested or charged.

Back in San'a, Mr. Awlaki began preaching regularly at a mosque in the Sunayna slums on the city's western periphery. He wrote a series of editorials in the English language Yemen Observer newspaper, which is considered progovernment. He lectured at the city's Al Iman University, whose founder, Abdel Majeed al-Zindani, was named in 2004 by the United Nations Security Council and the U.S. Department of the Treasury as an al Qaeda affiliate.

A businessman in San'a said he met the cleric two years ago, while Mr. Awlaki was hunting for real

estate in the capital. The businessman said he was immediately struck by the charisma of the cleric. "It was like talking to [Bill] Clinton," he said. "You felt like he understood everything about you."

Mr. Awlaki was arrested by the Yemeni authorities in mid-2006 and served 18 months in prison. Conflicting reasons have been given for the arrest.

After his release in December 2007, Mr. Awlaki left San'a and relocated to the rugged mountains that connect the southernmost province of Abyan to the province of Shabwa. The central government has little presence there.

The area is populated by Mr. Awlaki's native Awalek tribe, whose tribal anthem proclaims, "We are the sparks of Hell; whomever interferes with us will be burned."

**Write to** Margaret Coker at margaret.coker@wsj.com and Charles Levinson at charles.levinson@wsj.com

Copyright 2009 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law . For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit

www.djreprints.com

Exhibit Y

Reuters.com



» Print

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Yemen says seeks cleric, yet to get U.S. intelligence

Sun, Apr 11 2010

DUBAI (Reuters) - Yemen said on Sunday it is trying to detain a Muslim cleric wanted dead or alive by Washington, but has yet to receive intelligence from the United States on the U.S.-born militant's activities.

U.S. officials said on Tuesday that the administration of President Barack Obama had authorized operations to capture or kill U.S.-born Anwar al-Awlaki -- a leading figure linked to al Qaeda's Yemen-based regional wing which claimed responsibility for a failed bombing of a U.S.-bound plane in December.

"He (Awlaki) is wanted by Yemeni justice for questioning, so that he can clear his name ... or face trial," Yemeni Foreign Minister Abubakr al-Qirbi told Al Jazeera television.

Qirbi did not give details of any manhunt by Yemeni security forces to arrest Awalaki, but referred to an air raid on a suspected al Qaeda gathering last December which the cleric reportedly had attended.

Qirbi said Yemen had not received U.S. intelligence on Awlaki's contacts with a Nigerian suspect in the attempted bombing of the transatlantic passenger plane and with a U.S. Army psychiatrist accused of shooting dead 13 people at a military base in Texas in November.

"The detailed information ... and evidence gathered by U.S. agencies has not been given to Yemen," Qirbi said.

Qirbi had been quoted by media reports as saying that Yemen saw Awlaki as a preacher and not a terrorist, but he told Al Jazeera that those remarks referred to the period just after Awlaki's return to Yemen when he was not suspected of wrongdoing by the United States.

Born in New Mexico, Awlaki led prayers at U.S. mosques. He returned to Yemen in 2004 where he taught at a university before he was arrested and imprisoned in 2006 for suspected links to al Qaeda and involvement in attacks. Awlaki was released in December 2007 after he was said to have repented.

Awlaki's tribe has denounced U.S. plans to target him, vowing it "will not stand by idly and watch."

Heavily armed tribes in Yemen, the poorest Arab country, often try to protect their kin by seeking to gain their release or favorable treatment. At times, they have kidnapped foreign tourists to pressure the government.

Western countries fear that al Qaeda's resurgent regional wing is exploiting instability in Yemen to launch attacks in the region and beyond.

Yemen has carried out air strikes with U.S. assistance to target al Qaeda leaders, but there have been conflicting reports about whether Awlaki was present during any of those attacks.

U.S. officials believe he remains in hiding in Yemen.

(Reporting by Firouz Sedarat; Editing by Michael Roddy)

© Thomson Reuters 2010. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

Exhibit Z



**arab news**.com
The Middle East's Leading English Language Daily

# American Al-Qaeda suspect to go on trial in Yemen

By AHMED AL-HAJ | AP

**Published:** Aug 24, 2010 23:20 **Updated:** Aug 24, 2010 23:20

**SAN'A, Yemen: An American Al-Qaeda suspect will go on trial in Yemen next month over the killing of a Yemeni soldier and the wounding of another during a failed escape attempt, a security official said Tuesday.**

If convicted, Sharif Mobley of New Jersey could face the death penalty.

The 26-year-old American of Somali descent was arrested on suspicion of having links to Al-Qaeda and attempted his escape in March while receiving treatment at a Yemeni hospital for a leg condition. Authorities say he fooled his hospital guards into unshackling him by asking to join them for prayers and then killed a guard who had laid down his weapon.

The official spoke about his trial on condition of anonymity because he was not authorized to speak to the media.

US officials say Mobley, who grew up in Buena, New Jersey, traveled to Yemen more than two years ago with the goal of joining a terror group and that the US government was aware of his potential extremist ties long before his arrest.

While living in the United States, Mobley passed a criminal background check and worked as a laborer at several nuclear power plants, but there is no indication that his work had any connection to his alleged involvement with terror groups.

Separately, a Yemeni counterterrorism official said Tuesday that authorities have since June deported 25 foreigners, including Americans, suspected of having links to Al-Qaeda.

The official, who also spoke on condition of anonymity, said all 25 confessed to having made contact with American-Yemeni radical cleric Anwar Al-Awlaki and Omar Farouk Abdulmutallab, the Nigerian suspect in the failed attempt to blow up a Detroit-bound airliner on Christmas Day.

The official did not say how many Americans were among those deported. The 25 included citizens of France, Britain and Asian nations, he said.

A number of foreigners remain in detention because of suspected links to Al-Qaeda, said the official. He did not elaborate.

In June, the US State Department said only three out of 12 Americans being held in Yemen have been detained on terror-related charges.

Yemen's weak central government has struggled with a growing Al-Qaeda threat from militants who are increasing their operations in the impoverished and largely lawless country on the southern tip

of the Arabian Peninsula.

Al-Qaida's offshoot in Yemen amassed strength after key leaders escaped from a Yemeni jail in 2006. In 2009, it was further bolstered by a merger with Saudi Al-Qaeda militants to form Al-Qaeda in the Arabian Peninsula.

The US Embassy, which was attacked twice by Al-Qaeda in 2008, barred its personnel from nonessential travel outside Yemen's capital. Tuesday's decision was in response to "continuing threats from Al-Qaeda," an embassy statement said.

© 2010 Arab New s

# Exhibit AA

**The New York Times** Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for
distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any
article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

May 8, 2010

# Imam's Path From Condemning Terror to Preaching Jihad

**By SCOTT SHANE and SOUAD MEKHENNET**

WASHINGTON — In the weeks after the Sept. 11 attacks, the eloquent 30-year-old imam of a mosque outside Washington became a go-to Muslim cleric for reporters scrambling to explain Islam. He condemned the mass murder, invited television crews to follow him around and patiently explained the rituals of his religion.

"We came here to build, not to destroy," the cleric, Anwar al-Awlaki, said in a sermon. "We are the bridge between Americans and one billion Muslims worldwide."

At first glance, it seemed plausible that this lanky, ambitious man, with the scholarly wire-rims and equal command of English and Arabic, could indeed be such a bridge. CD sets of his engaging lectures on the Prophet Muhammad were in thousands of Muslim homes. American-born, he had a sense of humor, loved deep-sea fishing, had dabbled in get-rich-quick investment schemes and dropped references to "Joe Sixpack" into his sermons. A few weeks before the attacks he had preached in the United States Capitol.

Nine years later, from his hide-out in Yemen, Mr. Awlaki has declared war on the United States.

"America as a whole has turned into a nation of evil," he said in a statement posted on extremist Web sites in March. Though he had spent 21 of his 39 years in the United States, he added, "I eventually came to the conclusion that jihad against America is binding upon myself, just as it is binding on every other able Muslim."

His mix of scripture and vitriol has helped lure young Muslims into a dozen plots. He cheered on the Fort Hood gunman and had a role in prompting the attempted airliner bombing on Dec. 25, intelligence officials say. And last week, Faisal Shahzad, who is charged in the attempted bombing in Times Square, told investigators that Mr. Awlaki's prolific online lectures urging jihad as a religious duty helped inspire him to act.

At a time of new concern about the attraction of Western Muslims to violent extremism, there

is no figure more central than Mr. Awlaki, who has harnessed the Internet for the goals of Al Qaeda. Counterterrorism officials are gravely concerned about his powerful appeal for many others who are following his path to radicalization.

"He's a magnetic character," said Philip Mudd, a veteran of the C.I.A.'s Counterterrorism Center who just stepped down after nearly five years as a top F.B.I. intelligence adviser. "He's a powerful orator in a revolutionary movement."

Convinced that he is a lethal threat, the United States government has responded in kind. This year Mr. Awlaki became the first American citizen on the C.I.A.'s list of terrorists approved as a target for killing, a designation that has only enhanced his status with admirers like Shahidur Rahman, 27, a British Muslim of Bangladeshi descent who studied with Mr. Awlaki in London in 2003.

Other clerics equivocated about whether terrorist violence could be reconciled with Islam, Mr. Rahman said, but even seven years ago Mr. Awlaki made clear that he had few such qualms.

"He said suicide is not allowed in Islam," Mr. Rahman said in an interview, "but self-sacrifice is different."

There are two conventional narratives of Mr. Awlaki's path to jihad. The first is his own: He was a nonviolent moderate until the United States attacked Muslims openly in Afghanistan and Iraq, covertly in Pakistan and Yemen, and even at home, by making targets of Muslims for raids and arrests. He merely followed the religious obligation to defend his faith, he said.

"What am I accused of?" he asks in a recent video bearing the imprint of Al Qaeda in the Arabian Peninsula. "Of calling for the truth? Of calling for jihad for the sake of Allah? Of calling to defend the causes of the Islamic nation?"

A contrasting version of Mr. Awlaki's story, explored though never confirmed by the national Sept. 11 commission, maintains that he was a secret agent of Al Qaeda starting well before the attacks, when three of the hijackers turned up at his mosques. By this account, all that has changed since then is that Mr. Awlaki has stopped hiding his true views.

The tale that emerges from visits to his mosques, and interviews with two dozen people who knew him, is more complex and elusive. A product both of Yemen's deeply conservative religious culture and freewheeling American ways, he hesitated to shake hands with women but patronized prostitutes. He was first enthralled with jihad as a teenager — but the cause he embraced, the defeat of Soviet troops in Afghanistan, was then America's cause too. After a summer visit to the land of the victorious mujahedeen, he brought back an Afghan hat and wore it proudly around the Colorado State campus in Fort Collins where he studied engineering.

Later, Mr. Awlaki seems to have tried out multiple personas: the representative of a tolerant Islam in a multicultural United States (starring in a WashingtonPost.com video explaining Ramadan); the fiery American activist talking about Muslims' constitutional rights (and citing both Malcolm X and H. Rap Brown); the conspiracy theorist who publicly doubted the Muslim role in the Sept. 11 attacks. (The F.B.I., he wrote a few days afterward, simply blamed passengers with Muslim names.)

All along he remained a conservative, fundamentalist preacher who invariably started with a scriptural story from the seventh century and drew its personal or political lessons for today, a tradition called salafism, for the Salafs, or ancestors, the leaders of the earliest generations of Islam.

Finally, after the Yemeni authorities, under American pressure, imprisoned him in 2006 and 2007, Mr. Awlaki seems to have hardened into a fully committed ideologist of jihad, condemning non-Muslims and cheerleading for slaughter. His message has become indistinguishable from that of Osama bin Laden — except for his excellent English and his cultural familiarity with the United States and Britain. Those traits make him especially dangerous, counterterrorism officials fear, and he flaunts them.

"Jihad," Mr. Awlaki said in a March statement, "is becoming as American as apple pie and as British as afternoon tea."

## 'Skinny Teenager With Brains'

Twenty years ago, long before the Sept. 11 attacks and the wars that followed, a shy freshman named Anwar turned up at the little mosque in a converted church a short walk from the Colorado State campus. His American accent was misleading: born in New Mexico in 1971, when his father was studying agriculture there, he had lived in the United States until the age of 7.

But he had spent his adolescence in Yemen, where memorizing the Koran was a matter of course for an educated young man, and women were largely excluded from public life.

His father, Nasser, was a prominent figure who would serve as agriculture minister and chancellor of two universities and who was close to President Ali Abdullah Saleh, the country's authoritarian leader. Anwar was sent to Azal Modern School, among the country's most prestigious private schools.

"I recall Anwar as a skinny teenager with brains," said Walid al-Saqaf, a neighbor in the 1980s in Sana, the Yemeni capital. For boys of their generation, Afghanistan and its fight to oust the godless Soviet Army was the greatest cause.

"There was constant talk of the heroes who were leaving Yemen to join the fight and become martyrs and go to paradise," recalled Mr. Saqaf, now a doctoral student in Sweden. In the Awlakis' neighborhood, families would gather to watch the latest videotapes of the mujahedeen, he said.

But Nasser al-Awlaki had other ideas for his son, who studied civil engineering in Colorado in preparation for the kind of technocratic career his father had pursued. There was one odd note, given the family's relative wealth: just after arriving, Anwar applied for a Social Security number and claimed falsely he had been born in Yemen, evidently to qualify for scholarship money reserved for foreign citizens.

Yusuf Siddiqui, a fellow student who was active with Mr. Awlaki in the mosque and the Muslim Student Association, said there were regular reminders of his Yemeni upbringing.

"If you made some pop culture reference, he might not recognize it," Mr. Siddiqui said. Once, Anwar astonished his Americanized friends by climbing a nearby mountain barefoot. "He just said, 'That's how we do it in Yemen,'" Mr. Siddiqui recalled.

Accustomed to Yemeni mores, he was not comfortable interacting with women. Once, when a female American student stopped by the Muslim Student Association to ask for help with math homework, "He said to me in a low tone of voice, 'Why don't you do it?'" Mr. Siddiqui said.

Still, Mr. Awlaki was neither among the most conservative Muslim students nor among the libertines who tossed aside religious restrictions on drinking and sex. He ran successfully for president of the Muslim Student Association against a Saudi student who was far stricter.

"I remember Anwar saying, 'He would want your mom to cover her face. I'm not like that,'" Mr. Siddiqui said.

His vacation trip to Afghanistan, around the time the Soviet-backed Communist government fell from power, appears to have brought a new interest in the nexus of politics and religion. He wore an Eritrean T-shirt and the Afghan hat and quoted Abdullah Azzam, a prominent Palestinian scholar who provided theological justification for the Afghan jihad and was later known as a mentor to Osama bin Laden.

Meanwhile, at the Islamic Center of Fort Collins, the little mosque where volunteers took turns giving the Friday sermon, Mr. Awlaki discovered a knack for preaching. If he could boast of no deep scholarship, he knew the Koran and the sayings of the prophet, spoke fluent English and had a light touch.

"He was very knowledgeable," said Mumtaz Hussain, 71, a Pakistani immigrant active in the

mosque for two decades. "He was an excellent person — very nice, dedicated to religion."

He expressed no anti-American sentiments, said Mr. Hussain, whose son served in the National Guard. "This is our motherland now. People would not tolerate sermons of that kind," he said.

Years later, on his blog, Mr. Awlaki would compare Thomas Gradgrind, Charles Dickens's notoriously utilitarian headmaster in "Hard Times," "to some Muslim parents who are programmed to think that only medicine or engineering are worthy professions for their children."

It sounds like a hint at his own experience, and some family acquaintances say there was tension between Anwar and his father over career choices. But in 1994, Mr. Awlaki married a cousin from Yemen — whom by custom he did not introduce to his male friends — left behind engineering, and took a part-time job as imam at the Denver Islamic Society.

### 'He Had a Beautiful Tongue'

Like many an evangelical Christian pastor, Mr. Awlaki preached against vice and sin, lauded family values and parsed the scripture, winning fans and rising to successively larger mosques.

In Denver, however, there was an episode that might have been an omen. A Saudi student at the University of Denver told an elder that he had decided, with Mr. Awlaki's encouragement, to travel to Chechnya to join the jihad against the Russians. The elder, a Palestinian American in his 60s, thought it ill advised and confronted Mr. Awlaki in a loud argument.

"He had a beautiful tongue," recalled the elder, who asked not to be named. "But I told him: 'Don't talk to my people about jihad.' He left two weeks later."

At 25, he landed for five years at Arribat al-Islami, a stucco building with blue-green tile under a towering palm tree at the edge of San Diego. "He lit up when he was with the youth," said Jamal Ali, 40, an airport driver. He played soccer with younger children and took teenagers paintballing. "I saw him evolving in trying to understand where he fit into Islam," Mr. Ali said.

Lincoln W. Higgie III, 71, an art dealer who lived across quiet Saranac Street from the mosque and the small adjoining house where Mr. Awlaki lived with his wife and two toddlers, recalls an engaging neighbor who apologized about parking problems that came with the flood of Friday worshipers.

On Thursdays, Mr. Higgie remembered, Mr. Awlaki liked to go fishing for albacore, and he would often bring over a sample of the catch, deliciously prepared by his wife. The Awlakis' son and daughter would play on Mr. Higgie's floor, chasing his pet macaw, while the men compared

notes on their travels.

"I remember he was very partial to the Blue Mosque in Istanbul," Mr. Higgie said. He detected no hostility to non-Muslims, no simmering resentment against America.

In his private life, he was not always puritanical. Even as he preached about the sanctity of marriage amid the temptations of American life ("especially in Western societies, every haram is available," he said, using the Arabic word for the forbidden), he was picked up twice by the San Diego police for soliciting prostitutes; he was given probation.

He displayed a very American entrepreneurial streak, exploring a possible business importing Yemeni honey and attending seminars in Las Vegas focused on investing in gold and minerals (and once losing $20,000 lent by relatives). Eventually a regular at the mosque proposed a venture that would prove hugely successful: recording Mr. Awlaki's lectures on CD.

Starting in 2000, Mr. Awlaki would record a series of highly popular boxed sets — three, totaling 53 CDs, devoted to the "Life of Muhammad" alone; others covering the lesser prophets of Islam (including Moses and Jesus), the companions of the prophet and an account of the hereafter.

The recordings appear free of obvious radicalism. (IslamicBookstore.com has added a notice to its Web listings of Mr. Awlaki's work, saying the recording "has been reviewed and does not contain any extremist statements.")

Shakir Muhammad, a Fort Collins engineer who is active in the mosque there, said he became a fan of the CD sets, finding them enthralling even on repeated listening. Only once did a passage give him pause; Mr. Awlaki discussed suicidal violence and did not quite condemn it.

"I thought, 'This guy may be for it,'" Mr. Muhammad said. "It bothered me."

## A Mysterious Goodbye

One day in August 2001, Mr. Awlaki knocked at the door of Mr. Higgie, his neighbor, to say goodbye. He had moved the previous year to Virginia, becoming imam at the far bigger Dar al-Hijrah mosque, and he had returned to pick up a few things he had left behind.

As Mr. Higgie tells it, he told the imam to stop by if he was ever in the area — and got a strange response. "He said, 'I don't think you'll be seeing me. I won't be coming back to San Diego again. Later on you'll find out why,'" Mr. Higgie said.

The next month, when Al Qaeda attacked New York and Washington, Mr. Higgie remembered the exchange and was shaken, convinced that his friendly neighbor had some advance warning

of the Sept. 11 attacks.

In fact, the F.B.I. had first taken an interest in Mr. Awlaki in 1999, concerned about brushes with militants that to this day remain difficult to interpret. In 1998 and 1999, he was a vice president of a small Islamic charity that an F.B.I. agent later testified was "a front organization to funnel money to terrorists." He had been visited by Ziyad Khaleel, a Qaeda operative who purchased a battery for Osama bin Laden's satellite phone, as well as by an associate of Omar Abdel Rahman, the so-called Blind Sheik, who was serving a life sentence for plotting to blow up New York landmarks.

Still more disturbing was Mr. Awlaki's links to two future Sept. 11 hijackers, Khalid al-Midhar and Nawaq Alhazmi. They prayed at his San Diego mosque and were seen in long conferences with the cleric. Mr. Alhazmi would follow the imam to his new mosque in Virginia, and 9/11 investigators would call Mr. Awlaki Mr. Alhazmi's "spiritual adviser."

The F.B.I., whose agents interviewed Mr. Awlaki four times in the days after the Sept. 11 attacks, concluded that his contacts with the hijackers and other radicals were random, the inevitable consequence of living in the small world of Islam in America. But records of the 9/11 commission at the National Archives make clear that not all investigators agreed.

One detective, whose name has been redacted, told the commission he believed Mr. Awlaki "was at the center of the 9/11 story." An F.B.I. agent, also unidentified, said that "if anyone had knowledge of the plot, it would have been" the cleric, since "someone had to be in the U.S. and keep the hijackers spiritually focused."

The 9/11 commission staff members themselves had sharp arguments about him. "Do I think he played a role in helping the hijackers here, knowing they were up to something?" said one staff member, who would speak only on condition of anonymity. "Yes. Do I think he was sent here for that purpose? I have no evidence for it."

The separate Congressional Joint Inquiry into the attacks suspected that Mr. Awlaki might have been part of a support network for the hijackers, said Eleanor Hill, its director. "There's no smoking gun. But we thought somebody ought to investigate him," Ms. Hill said.

Alarmed about Mr. Awlaki's possible Sept. 11 connections, a State Department investigator, Raymond Fournier, found a circuitous way to charge Mr. Awlaki with passport fraud, based on his false claim after entering the United States in 1990 that he had been born in Yemen.

A warrant was issued, but prosecutors in Colorado rescinded it, concluding that no criminal case could be made. Mr. Awlaki returned from a trip abroad in October 2002 — an act some colleagues say was evidence for his innocence of any 9/11 role — for what would prove to be his

last stay in the United States.

During that trip, he visited Ali al-Timimi, a Virginia cleric later convicted for encouraging Muslims to join the fight against American troops in Afghanistan. Mr. Awlaki "attempted to get al-Timimi to discuss issues related to the recruitment of young Muslims," according to a motion filed in his criminal case. Mr. Timimi wondered if Mr. Awlaki might be trying to entrap him at the F.B.I.'s instigation, his friends say.

But if Mr. Awlaki was cooperating with the government, it would have astonished his associates. As the American authorities rounded up Muslim men after 9/11, he had grown furious.

After raids in March 2002 on Muslim institutions and community leaders in Virginia, Mr. Awlaki led a chorus of outrage, noting that some of the targets were widely viewed as moderates.

"So this is not now a war on terrorism, we need to all be clear about this, this is a war on Muslims!" Mr. Awlaki declared, his voice shaking with anger. "Not only is it happening worldwide, but it's happening right here in America that is claiming to be fighting this war for the sake of freedom."

Around that time, Johari Abdul-Malik, a former Howard University chaplain who was joining the staff at Mr. Awlaki's Virginia mosque, met him at a cafe. Mr. Awlaki said he planned to leave the United States.

"I tried to convince him that the atmosphere was not as bad as he thought, that it was a positive time for outreach," Mr. Abdul-Malik recalled. But Mr. Awlaki was shaken by what he saw as an anti-Muslim backlash. And always fond of the limelight, Mr. Abdul-Malik said, Mr. Awlaki was looking for a bigger platform.

"He said he might have a TV show for the gulf," Mr. Abdul-Malik said. "He might run for Parliament in Yemen. Or he might teach."

### 'Never Trust a Kuffar'

In a bare lecture room in London, where Mr. Awlaki moved after leaving the United States, he addressed his rapt, young followers, urging them never to believe a non-Muslim, or kuffar in Arabic.

"The important lesson to learn here is never, ever trust a kuffar," he said, chopping the air, his lecture caught on video. "Do not trust them!"

The unbelievers are "plotting to kill this religion," he declared. "They're plotting night and day."

If he had the same knowing tone and touches of humor as in earlier sermons, his message was more conspiratorial. You can't believe CNN, the United Nations, or Amnesty International, he told his students, because they, too, were part of the war on Islam.

"We need to wisen up and not be duped," Mr. Awlaki said. "Malcolm X said, 'We've been bamboozled.'"

Many of his young British Muslim listeners, accustomed to preachers with heavy accents and an otherworldly focus, were entranced by his mix of the ancient and the contemporary, his seamless transition from the 29 battles of the Prophet Muhammad to the wars in Afghanistan and Iraq. "He was the main man who translated the jihad into English," said Abu Yahiya, 27, a Bangladeshi-British student of Mr. Awlaki's lectures in 2003.

At a personal level, said Mr. Rahman, one of the students who studied with Mr. Awlaki in 2003, Mr. Awlaki made it clear that they could no longer pretend to be Muslims while going clubbing at night.

"I could not be Mohammed in the morning and 'Mo' in the evening," he said.

Mr. Awlaki's demand that they make a choice, devoting themselves to a harsh, fundamentalist strain of Islam, offered clarity, he said.

"It would hit the audience automatically in their hearts and minds," Mr. Rahman said. When others claimed the popular cleric was brainwashing them, Mr. Rahman said, "When you got a lot of dirt in your brain, you need a washing. I believe he did brainwash me."

Mr. Awlaki's fame grew, his CDs kept selling, and he traveled around Britain lecturing. But he had a hard time supporting himself, according to people who knew him, and in 2004 he had moved to Yemen to preach and study.

In mid-2006, after he intervened in a tribal dispute, Mr. Awlaki was imprisoned for 18 months by the Yemeni authorities. By his later account on his blog, he was in solitary confinement nearly the entire time and used it to study the Koran, to read literature (he enjoyed Dickens but disliked Shakespeare) and eventually, when it was permitted, to study Islamic scholarship.

Notably, he was enraptured by the works of Sayyid Qutb, an Egyptian whose time in the United States helped make him the father of the modern anti-Western jihadist movement in Islam.

"Because of the flowing style of Sayyid I would read between 100 and 150 pages a day," Mr. Awlaki wrote. "I would be so immersed with the author I would feel Sayyid was with me in my cell speaking to me directly."

Two F.B.I. agents questioned him in the Yemeni prison, and Mr. Awlaki blamed the United States for his prolonged incarceration. He was right; John D. Negroponte, then the director of national intelligence, told Yemeni officials that the United States did not object to his detention, according to American and Yemeni sources.

But by the end of 2007, American officials, some of whom were disturbed at the imprisonment without charges of a United States citizen, signaled that they no longer insisted on Mr. Awlaki's incarceration, and he was released.

"He was different after that — harder," said a Yemeni man who knows Mr. Awlaki well.

Mr. Awlaki started his own Web site, reaching a larger audience than ever. But finding that he was constantly followed by Yemeni security in Sana, the capital, he moved to the house of an uncle in Shabwa, the rugged southern province and his tribe's traditional turf.

Last October, friends said, he heard the distant whine of a drone aircraft circling overhead. Worried that he was endangering his relatives, he fled to the mountains. While his role is unclear in Al Qaeda in the Arabian Peninsula, the terrorist network's Yemeni affiliate, American officials believe he has become "operational," plotting, not just inspiring, terrorism against the West.

From his hide-out, Mr. Awlaki sends out the occasional video message. But his reported influence on the Times Square bombing suspect, Mr. Shahzad, suggests that no matter what happens to him, his electronic legacy is secure. His message will endure in hundreds of audio and video clips that his followers have posted to the Web, a mix of religious stories and incitement, awaiting the curious and the troubled.

Mr. Awlaki's transformation has left a trail of bewilderment, apprehension and fury among many people who knew and worshiped with him in the United States. Mr. Siddiqui, his college friend, said he was "surprised and disappointed."

"He's turning his back not only on the country where he was born but on his Muslim brothers and sisters in this country," he said.

Mr. Abdul-Malik said that his former fellow imam at the Virginia mosque "is a terrorist, in my book" and that Mr. Awlaki and his like-thinkers were trying to reduce Islam to a "medieval narrative. It's the Hatfields and the McCoys: you hit me, I hit you."

Some Muslim families have asked whether they should keep Mr. Awlaki's scriptural CDs, Mr. Abdul-Malik said. He tells them it is their decision, but he has advised shops not to carry even

the earlier, benign Awlaki material.

"It becomes," he said, "a gateway for the unsuspecting."

*Scott Shane reported from Washington, and Souad Mekhennet from London. Robert F. Worth contributed reporting from Sana, Yemen.*

Exhibit AB



# Tribe in Yemen Protecting U.S. Cleric Anwar al-Awlaki

**AP Enterprise: U.S. cleric accused of al-Qaida ties is in hiding in Yemen, protected by tribe**

By LEE KEATH

*The Associated Press*

**SAN'A, Yemen**

A radical American-Yemeni Islamic cleric suspected of ties to al-Qaida is in hiding in the remote mountains of Yemen under the protection of his tribe as he seeks to elude a manhunt, relatives and tribesmen say.

Anwar al-Awlaki's run from authorities is the culmination of what U.S. and Yemeni officials say is the charismatic cleric's slide toward terrorists.

They say al-Awlaki, who once preached in mosques in California and northern Virginia and posted fiery English-language Internet sermons urging Muslims to fight in jihad, is now an active participant in al-Qaida's offshoot in his turbulent ancestral homeland.

Al-Awlaki has been connected with the alleged perpetrators of two recent attacks on American soil: the Nov. 5 shooting rampage at the Fort Hood army base in Texas and the attempt to bomb a U.S. passenger jet as it landed in Detroit on Christmas Day.

His family and many members of his powerful Awalik tribe deny the 38-year-old is a member of al-Qaida, depicting him as a victim of Yemeni and U.S. persecution. The Yemeni government is negotiating with tribal leaders, trying to convince them to hand al-Awlaki over to authorities, two prominent Awalik sheiks told The Associated Press.

One sheik said authorities have offered guarantees they would not turn al-Awlaki over to the United States or let American officials question him if he surrenders.

"Anwar is in a safe place, and the tribe is standing behind him because he has nothing to do with al-Qaida," one of the sheiks told AP by telephone from Shabwa province, the rugged region of towering mountains and deep, nearly inaccessible valleys where al-Awlaki is hiding.

The two sheiks spoke on condition of anonymity because of the sensitivity of the talks. Yemeni Foreign Minister Abu Bakr al-Qirbi last week denied any government negotiations with the Awalik tribe.

Al-Awlaki's direct role in al-Qaida — if any — remains unclear.

He rose to prominence as one of the few English-speaking radical clerics able to eloquently explain to young Muslims in America and other Western countries the philosophy of violent jihad and martyrdom against the West and its allied Muslim and Arab governments.

But U.S. intelligence officials believe he has now become an active operative in al-Qaida and has performed activities beyond those of a cleric, senior defense officials in Washington said. They declined to say what those activities were and spoke on condition of anonymity to discuss intelligence matters.

Yemeni security officials said they suspect he is involved in recruiting new members and in dealings between al-Qaida fighters and Yemeni tribes.

In the months before the Fort Hood attack, al-Awlaki exchanged up to 20 e-mails with the alleged shooter, U.S. Maj. Nidal Malik Hasan. Hasan initiated the contacts, drawn by al-Awlaki's Internet sermons, and approached him for religious advice.

Al-Awlaki has said he did not tell Hasan to carry out the shootings, in which 13 people were killed, but later praised Hasan as a "hero" on his Web site for killing American soldiers who would be heading for Afghanistan or Iraq to fight Muslims.

Yemen's government says al-Awlaki also is suspected of contacts with Umar Farouk Abdulmutallab, the accused would-be Christmas plane bomber, who was in Yemen late last year.

Yemeni Deputy Prime Minister Rashad al-Alimi said the cleric may have met in Shabwa with the 23-year-old Nigerian, along with other al-Qaida leaders, in the weeks before the failed bombing. U.S. officials say Abdulmutallab has told FBI investigators that al-Qaida members in Yemen provided him with the explosives and trained him in how to use them.

The deputy prime minister said Al-Awlaki was also believed to be at a gathering of senior al-Qaida figures in the mountains of Shabwa on Dec. 24 — a day before Abdulmutallab tried to blow up the airliner.

Also in attendance were the leader of al-Qaida in Yemen, Naser al-Wahishi, and his Saudi deputy, Saeed al-Shihri, he said.

Before dawn, Yemeni warplanes, using U.S. intelligence help, struck the meeting site — a collection of tents near a farm and water pump tucked in the Rafad valley. However, al-Awlaki, al-Wahishi and al-Shihri are believed to have left the site hours earlier in two vehicles, al-Alimi said. The government says 30 other militants were killed.

The meeting would be the most concrete tie between al-Awlaki and al-Qaida militants.

Awalik tribal leaders insist al-Awlaki was never at such a meeting and say Yemeni authorities have raised the allegations only to please the United States in their increasing security cooperation aimed at uprooting al-Qaida's offshoot here.

"The Yemenis know they have nothing on him. It's the Americans who want him in jail," one of the most prominent Awalik chiefs, Sheik Saleh Farid, told AP.

Since the airstrike, al-Awlaki has been on the run in the region. A prominent Awalik sheik, Awad bin Wazir, told AP that local residents have reported sighting drone aircraft over the area, apparently involved in the hunt for al-

Awlaki or other fugitive al-Qaida suspects. U.S. military officials have refused to comment on whether American surveillance drones are operating in Yemen.

Shabwa's governor, Ali al-Ahmadi, said forces in the area were looking for al-Awlaki — though the military presence here remains thin. Al-Awlaki is moving with a group of al-Qaida elements from Shabwa, including Fahd al-Quso, accused by the U.S. of a role in the 2000 USS Cole bombing off Yemen's coast, al-Ahmadi told the pan-Arab newspaper Sharq al-Awsat.

Al-Wahishi and al-Shihri are with another group of militants, believed to be around the nearby Jebel Kour mountain, he said.

The region — dominated by the Awalik tribe — is one of the most daunting in Yemen: A long, imposing mountain plateau of limestone peaks that rise more than 3,000 feet between the sand dunes of the Rub al-Khali desert to the north and the plains of Yemen's Arabian Sea coast to the south.

The thick belt of mountains is inhospitable, with only occasional hamlets in the creases of valleys and nomads who live in tents. Roads are few, and the military or security forces hardly ever enter the region.

It is a world away from the American suburbs where al-Awlaki first made his name as a radical preacher.

Al-Awlaki was born in 1971 in New Mexico. His father, Nasser al-Awlaki, was in the United States studying agriculture at the time and later returned with his family to Yemen to serve as agriculture minister. The father remains a prominent figure in Yemen, teaching at San'a University.

The younger al-Awlaki returned to the United States in 1991 to study civil engineering at Colorado State University, then education at San Diego State University, followed by doctoral work at George Washington University in Washington, D.C.

While in San Diego, he preached at a local mosque, where in 2000 he met two of the 9/11 hijackers, Khalid al-Midhar and Nawaf al-Hazmi. The U.S. government's 9/11 Commission report says the men "respected al-Awlaki as a religious figure and developed a close relationship with him." They were aboard the plane that crashed into the Pentagon.

He later became a preacher at Dar Al Hijrah Islamic Center in Falls Church, Va. Imam Johari Abdul-Malik, outreach director for the center, has said al-Awlaki never exhibited signs of radicalism in his time there.

"He had an allure. He was charming," Abdul-Malik told reporters soon after the Fort Hood shooting. "To go from that individual to the person that is projecting these words from Yemen is a shock."

"I don't think we read him wrong. I think something happened to him."

Al-Awlaki's recorded sermons are still sold at stores catering to Muslims in Falls Church — though not the ones focused on jihad or politics. At one supermarket, a 22-CD set of his speeches gave long dissertations on religious issues, including descriptions of the afterlife, stories about the Prophet Muhammad and his companions, and dream interpretations.

But sermons posted on the Internet since al-Awlaki returned to the Yemeni capital, San'a, in 2004 have a more political tone.

Yemeni authorities arrested him in 2006 with a group of five Yemenis suspected of kidnapping a Shiite teenager for ransom. Al-Awlaki was accused of being the group's spiritual leader and issuing a religious decree permitting them to kidnap foreigners and rich Yemenis. He was released without trial after a year in prison following the intercession of his tribe.

In a long sermon first posted on YouTube in early 2007 titled "Allah is preparing us for victory," al-Awlaki painted a history of the conflict between Islam and the West — and accused the United States of waging war against Muslims. He described the evolution of jihad by Palestinian militants and suicide bombers as well as in Iraq, Pakistan and Iraq.

"Palestine is what gave to shahada (martyrdom) the importance that it has today. The concept of shahada and istishhad (seeking martyrdom in jihad) started in Palestine," he said.

He dismissed Muslims who say "the way forward for the Umma (Islamic world) is to distance themselves from terrorism" and make progress in business and technology.

"The Rasoul (Prophet Muhammad) says that it is false ... and Allah will dishonor us if we do that. The Rasoul says there is no way out for you unless you go back to your deen (religion)," he said. "Going back to your deen means going back to jihad specifically. So this is the solution."

Canadian Muslims arrested in 2006 for allegedly forming a training camp and plotting bombing attacks in Toronto listened to al-Awlaki's online calls for jihad, according to the case against them in court. An al-Awlaki sermon on jihad was also among the materials — including videos of beheadings — found on the computers of five men convicted in December of plotting attacks on the Fort Dix military base in New Jersey.

In January 2009, al-Awlaki posted on his Web site a tract entitled "44 ways to defend jihad," urging Muslims around the world to support Islamic fighters by raising money or helping their families — and he said those who are able should join the battle.

"Asking Allah to die as a shaheed (martyr) pleases Allah because it shows him that you are willing to give your life for him. But you need to be careful not to be merely paying lip service. A person who truly asks for shahada (martyrdom) would respond to the call of jihad whenever he hears it and would eagerly search for death in the path of Allah," he said.

After his release from prison in San'a, al-Awlaki moved to the Awalik tribal heartland in Shabwa, settling in his family home in Saeed, a tiny hamlet that is little more than a string of houses and fields high in the mountains, said Sheik Farid, the senior Awalik chief, who is a cousin of Anwar al-Awlaki's father.

There he lived quietly, preaching in the local mosque at times, Farid said.

"He is very active as a preacher, including on the Internet," he said. "But he has nothing to do with al-Qaida. I know him very well. He's like one of my own sons."

Farid said authorities contacted him soon after the Fort Hood attack and asked him to persuade al-Awlaki to return to San'a, where the government could keep a closer eye on him.

"I called Anwar and told him, please do it, go to San'a or Aden. But he said, 'I'm not going to let the government tell me where to live,'" Farid said.

The sheik said al-Awlaki fled into the mountains soon afterward, fearing he would be arrested. Farid said he did not know if al-Awlaki was traveling with al-Qaida militants. "But anyone who is scared, who is forced to, will go with the devil if he has to," he said.

Farid said that if the authorities promise not to try to arrest Anwar, "I can convince him to come live with me."

Nasser al-Awlaki, al-Awlaki's father, told CNN last week that "our tribe is protecting him now," and insisted his son is not associated with al-Qaida. "I am now afraid of what they will do to my son. He is not Osama bin Laden, they want to make something out of him that he's not," he said.

"He's been wrongly accused, it's unbelievable. He lived his life in America, he's an all-American boy," he said. "Now he's hiding in the mountains, he doesn't even have safe water to drink."

———————

Associated Press writers Pauline Jelinek in Washington and Matthew Barakat in McLean, Va., contributed to this report.

*Copyright 2010 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.*

Copyright © 2010 ABC News Internet Ventures