IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| NASSER AL-AULAQI, on his own behalf and as next friend acting on behalf of ANWAR AL-AULAQI )<br><br>Plaintiff, )<br><br>v. )<br><br>BARACK H. OBAMA, President of the United States; ROBERT M. GATES, Secretary of Defense; and LEON E. PANETTA, Director of the Central Intelligence Agency, )<br><br>Defendants. ) | Civ. A. No. 10-cv-1469<br>(JDB) |

_____

**OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Defendants Barack H. Obama, President of the United States, Leon E. Panetta, Director of the Central Intelligence, and Robert M. Gates, Secretary of Defense, hereby move to dismiss Plaintiff's complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1), on the grounds that Plaintiff lacks standing and that his claims require the Court to decide non-justiciable political questions. Alternatively, the Court should exercise its equitable discretion not to grant the relief sought. In addition, Plaintiff has no cause of action under the Alien Tort Statute.

To the extent that the foregoing are not sufficient grounds to dismiss this lawsuit, plaintiff's action should be dismissed on the ground that information properly protected by the military and state secrets privilege would be necessary to litigate this action.

Date: September 24, 2010

TONY WEST
Assistant Attorney General, Civil Division

RONALD C. MACHEN, Jr.
United States Attorney

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

DOUGLAS LETTER
Terrorism Litigation Counsel

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

/s/ Anthony J. Coppolino
ANTHONY J. COPPOLINO (D.C. Bar 417323)
Special Litigation Counsel, Federal Programs Branch

/s/ Peter D. Leary
PETER D. LEARY
Trial Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW
Washington, D.C. 20001
(202) 514-3313

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION AND THIS
   ACTION SHOULD BE DISMISSED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.   Plaintiff Lacks Standing in This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     A.    Plaintiff Lacks "Next Friend" Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           1.    Next Friend Standing Has Not Been Recognized Outside
                 of the Habeas Context to a Mentally Competent Adult.. . . . . . . . . . . . . . 12

           2.    Plaintiff Has Not Established That Anwar al-Aulaqi
                 Lacks Access to the Courts or Is Interested in Bringing
                 This Action. .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     B.    Plaintiff Otherwise Lacks Article III Standing.. . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.  Plaintiff's Claims Require the Court to Decide Non-Justiciable Political Questions.. . . 19

     A.    The Relief Sought in this Case Would Require the Court to
           Adjudicate Non-Justiciable Political Questions.. . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     B.    Whether and in What Circumstances the Use of Force In a Particular
           Geographic Location Would be Part of the Armed Conflict Between
           the United States and Al Qaeda and Associated Forces Is Also a
           Non-Justiciable Political Question.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

III. The Court Should Exercise Its Equitable Discretion Not to Grant the Relief Sought.. . . 35

IV.  Plaintiff Has No Cause of Action under the Alien Tort Statute.. . . . . . . . . . . . . . . . . . . . 39

V.   The Protection of Information Subject to the Military and States Secrets Privilege and
     Statutory Protection Forecloses Litigation of Plaintiff's Claims. . . . . . . . . . . . . . . . . . . 43

A.    The State Secrets Privilege Need Not Be Reached in This Case.. . . . . . . . . . . . 43

B.    The State Secrets Privilege Bars the Use of Privileged
      Information in Litigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

C.    The Secretary of Defense, the Director of National Intelligence, and the
      Director of the Central Intelligence Agency Have Properly Invoked the State
      Secrets Privilege in this Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

D.    The Exclusion of the Information Protected by the States Secrets and Statutory
      Privileges Requires Dismissal of this Action.. . . . . . . . . . . . . . . . . . . . . . . . . 50

## INTRODUCTION

Anwar al-Aulaqi is a dual U.S.-Yemeni citizen and a leader of al-Qaeda in the Arabian Peninsula (AQAP), a Yemen-based terrorist group that has claimed responsibility for numerous armed terrorist attacks against American, Saudi Arabian, Korean and Yemeni targets since January 2009.  *See* Public Declaration of James R. Clapper, Director of National Intelligence (DNI), Exhibit 1, ¶ 13.  As set forth by the DNI, Anwar al-Aulaqi has recruited individuals to join AQAP, facilitated training at camps in Yemen in support of acts of terrorism, and helped focus AQAP's attention on attacking U.S. interests.  *Id.* ¶ 14.  In addition, since late 2009, Anwar al-Aulaqi has taken on an increasingly operational role in AQAP, including preparing Umar Farouk Abdulmutallab in his attempt to detonate an explosive device aboard a Northwest Airlines flight from Amsterdam to Detroit on Christmas Day 2009.  *Id.*  The United States has further determined that AQAP is an organized armed group that is either part of al-Qaeda, or is an associated force, or cobelligerent, of al-Qaeda that has directed armed attacks against the United States in the noninternational armed conflict between the United States and al-Qaeda that the Supreme Court recognized in *Hamdan v. Rumsfeld*, 548 U.S. 557, 628-31 (2006).

Plaintiff Nasser al-Aulaqi is a citizen of Yemen and Anwar al-Aulaqi's father.  Plaintiff does not seek to challenge the Government's determination that his son is an operational leader of AQAP and does not seek to categorically stop the United States from using lethal force against his son under all circumstances.  Rather, plaintiff seeks to enjoin the President of the United States, the Secretary of Defense, and the Director of the Central Intelligence Agency, from "intentionally killing U.S. citizen Anwar Al-Aulaqi" outside an armed conflict "unless he is found to present a concrete, specific, and imminent threat to life or physical safety, and there are no means other than lethal force that could reasonably be employed to neutralize the threat[.]"

*See* Proposed Preliminary Injunction at 2.

The injunction plaintiff seeks would be unprecedented, improper, and extraordinarily dangerous, regardless of the truth of his allegations (which the United States does not and cannot confirm or deny).   That requested injunction would necessarily and improperly inject the courts into decisions of the President and his advisors about how to protect the American people from the threat of armed attacks, including imminent threats, posed by a foreign organization against which the political branches have authorized the use of necessary and appropriate force. Plaintiff's motion should be denied and this case dismissed at the outset for several reasons.

First, plaintiff's attempt to invoke the Court's Article III jurisdiction in order to seek an injunction on behalf of his son is unprecedented and unfounded.  The very basis of this lawsuit—the alleged threat of lethal force—does not foreclose Anwar al-Aulaqi's access to the courts: Defendants state that if Anwar al-Aulaqi were to surrender or otherwise present himself to the proper authorities in a peaceful and appropriate manner, legal principles with which the United States has traditionally and uniformly complied would prohibit using lethal force or other violence against him in such circumstances.  Anwar al-Aulaqi would have the choice at that point, as he does now, to seek legal assistance and access to U.S. courts.  This forecloses any grounds for his father to seek standing as a "next friend" in this case.  That Anwar al-Aulaqi may choose not to come forward and seek judicial relief does not mean he lacks access to the courts or that his father should be able to presume his son wishes to invoke the federal courts and therefore to file suit on his son's behalf.

Plaintiff also lacks Article III standing in this action because the relief he seeks is based on unfounded speculation that the Executive Branch is acting or planning to act in a manner inconsistent with the terms of the requested injunction.  Because such allegations are entirely

speculative and hypothetical, plaintiff cannot demonstrate that he faces the sort of real and immediate threat of future injury that is required in order to seek the relief he is requesting. Moreover, the declaratory and injunctive relief plaintiff seeks is extremely abstract and therefore advisory—in effect, simply a command that the United States comply with generalized standards, without regard to any particular set of real or hypothetical facts, and without any realistic means of enforcement as applied to the real-time, heavily fact-dependent decisions made by military and other officials on the basis of complex and sensitive intelligence, tactical analysis and diplomatic considerations.

Third, even if the plaintiff were to have standing, the particular relief he seeks—declaratory and injunctive relief that lethal force not be used unless a threat was imminent and no reasonable alternative existed—would require the resolution of clearly non-justiciable political questions. In particular, plaintiff's requested relief would put at issue the lawfulness of the future use of force overseas that Executive officials might undertake at the direction of the President against a foreign organization as to which the political branches have authorized the use of all necessary and appropriate force. Specific decisions regarding the use of force frequently must be made in the midst of crisis situations that can arise at any time, and that involve the delicate balancing of short- and long-term security, foreign policy, and intelligence equities. The Judiciary is simply not equipped to manage the President and his national security advisors in their discharge of these most critical and sensitive executive functions and prescribe *ex ante* whether, where, or in what circumstances such decisions would be lawful. Whatever the limits of the political question doctrine, this case is at its core.

For example, even assuming for the sake of argument that plaintiff has appropriately described the legal contours of the President's authority to use force in a context of the sort described in the Complaint, the questions he would have the court evaluate—such as whether a threat to life or physical safety may be "concrete," "imminent," or "specific," or whether there are "reasonable alternatives" to force—can only be assessed based upon military and foreign policy considerations, intelligence and other sources of sensitive information, and real-time judgments that the Judiciary is not well-suited to evaluate.  Application of these and other considerations in this setting requires complex and predictive judgments that are the proper purview of the President and Executive branch officials who not only have access to the sensitive intelligence information on which such judgments are necessarily based, but also are best placed to make such judgments.  Enforcing an injunction requiring military and intelligence judgments to conform to such general criteria, as plaintiff would have this court command, would necessarily limit and inhibit the President and his advisors from acting to protect the American people in a manner consistent with the Constitution and all other relevant laws, including the laws of war.  Such judicial interference in fact-intensive decisions concerning how to protect national security could have unforeseen and potentially catastrophic consequences.

More broadly, the Complaint seeks judicial oversight of the President's power to use force overseas to protect the Nation from the threat of attacks by an organization against which the political branches have authorized the use of all necessary and appropriate force, in compliance with applicable domestic and international legal requirements, including the laws of war.  *See* Authorization for Use of Military Force (AUMF), Pub. L. No. 107 40, 115 Stat. 224 (2001) (Joint Resolution of Congress signed by the President).  In addition to the AUMF, there are other legal bases under U.S. and international law for the President to authorize the use of

-4-

force against al-Qaeda and AQAP, including the inherent right to national self-defense recognized in international law (*see, e.g.*, United Nations Charter Article 51).  Plaintiff asks the Court to issue *ex ante* commands to the President and his military and intelligence advisors about how to exercise this authority—judicial commands that could unduly complicate and confuse these officials' daily implementation of lawful commands issued by the President.  Adjudication of plaintiff's challenge to the possible use of lethal force here would thus necessarily require the Court to oversee decisions textually committed to the political Branches, and thus plaintiff's request for relief is barred.

Beyond these jurisdictional barriers, exercise of this Court's equitable discretion to grant plaintiff's request for unprecedented relief against the President and his military and intelligence advisors would be inappropriate here.  Plaintiff's Complaint attaches documents describing some of the information underlying the Government's designation of his son as a terrorist under sanctions regimes based on his role as an operational leader of AQAP who has directed attacks against United States persons.  The Complaint notably does not deny those allegations.  Yet, through this lawsuit, a U.S. citizen engaged in active operational planning to harm U.S. citizens, would come before a U.S. court, through a "next friend," seeking to enjoin the United States Government from acting to protect national security.  Plaintiff seeks relief even though, as Defendants state herein, Anwar al-Aulaqi can choose to present himself to the proper authorities, and thereby moot the threat his father claims he faces.  In these circumstances, injunctive relief that would require this Court to exercise an unprecedented degree of supervision over alleged ongoing military and intelligence operations is plainly unwarranted.

These considerations are more than sufficient to dispose of plaintiff's request for an unprecedented preliminary injunction here, and the Court should deny plaintiff's request for

relief on that basis.  Where there are so many fundamental jurisdictional and justiciability bars to proceeding, the Court need not reach the question of privileged information in this case.  But the military and states secrets privilege, invoked only after substantial deliberation and consistent with the Department of Justice's new Guidelines, *see* Exhibit 2, would also bar disclosure of the evidence necessary to determine plaintiff's standing and to decide whether plaintiff is entitled to any relief and whether the defendants were in compliance with the relief plaintiff seeks.

　　　　For the foregoing reasons, set forth further below, the Court should deny plaintiff's motion for a preliminary injunction and should dismiss the Complaint.

## BACKGROUND

　　　　Anwar al-Aulaqi is a dual U.S.-Yemeni citizen who is believed to be currently in Yemen. *See* Plaintiff's Complaint ¶¶ 17, 26.  As noted above, the United States Intelligence Community has publicly disclosed some information concerning Anwar al-Aulaqi, *see* Public DNI Clapper Decl. ¶¶ 13-15, including that:

*　　　Anwar al-Aulaqi is a leader of AQAP, a Yemen-based terrorist group that has claimed responsibility for numerous terrorist acts against Saudi, Korean, Yemeni, and U.S. targets since January 2009. *Id.* ¶ 13.

*　　　Anwar al-Aulaqi has pledged an oath of loyalty to AQAP emir, Nasir al-Wahishi, and is playing a key role in setting the strategic direction for AQAP. *Id.* ¶ 14.

*　　　Anwar al-Aulaqi has also recruited individuals to join AQAP, facilitated training at camps in Yemen in support of acts of terrorism, and helped focus AQAP's attention on planning attacks on U.S. interests. *Id.* ¶ 14.

*　　　Since late 2009, Anwar al-Aulaqi has taken on an increasingly operational role in the group, including preparing Umar Farouk Abdulmutallab, who received instructions from Anwar Al–Aulaqi to detonate an explosive device aboard a U.S. airplane over U.S. airspace and thereafter attempted to do so aboard a Northwest Airlines flight from Amsterdam to Detroit on Christmas Day 2009, for his operation. *Id.* ¶ 15.

　　　　Based in part on this information, on July 16, 2010, the U.S. Department of the Treasury

issued an order designating Anwar al-Aulaqi a "Specially Designated Global Terrorist" (SDGT) for, *inter alia*, "acting for or on behalf of al-Qaeda in the Arabian Peninsula (AQAP) . . . and for providing financial, material or technological support for, or other services to or in support of, acts of terrorism[.]"  Designation of ANWAR AL–AULAQI Pursuant to Executive Order 13224 and the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594, 75 Fed. Reg. 43233, 43234 (July 23, 2010).[1]  On July 20, 2010, four days after the Treasury Department designated Anwar al-Aulaqi a Global Terrorist, the United Nations' Al-Qaeda and Taliban Sanctions Committee added him to its Consolidated List of individuals and entities associated with al-Qaeda, Osama bin Laden or the Taliban.[2]  This listing was based on Anwar al-Aulaqi's:

> "participating in the financing, planning, facilitating, preparing, or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf of, or in support of", "recruiting for", and "otherwise supporting acts or activities of " Al-Qaeda (QE.4.01) and Al-Qaeda in the Arabian Peninsula (QE.A.129.10).

*See* Press Release, United Nations, QI.A.283.10 ANWAR NASSER ABDULLA AL-AULAQI (July 20, 2010).[3]  The United Nations based its listing of Anwar al-Aulaqi on findings that are

---

[1] This designation was issued pursuant to the President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06.  After the terrorist attacks of September 11, 2001, the President issued Executive Order No. 13224 ("E.O. 13224"), 66 Fed. Reg. 49,079 (2001), effective September 24, 2001, declaring a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States."  *See* E.O. 13224, Preamble.  The Secretary of State previously designated AQAP as a Foreign Terrorist Organization on January 19, 2010, pursuant to her powers under the Antiterrorism and Effective Death Penalty Act, 8 U.S.C. § 1189.  (*See* http://www.state.gov/r/pa/prs/ps/2010/01/135364.htm).

[2] On October 15, 1999, the United Nations Security Council established the Al-Qaeda and Taliban Sanctions Committee ("the Committee").  *See* U.N. Res. 1267 (Oct. 15, 1999) (available at http://daccess-ods.un.org/TMP/7965262.53223419.html).  The Committee previously added al-Qaeda to the Consolidated List on October 6, 2001, and AQAP on January 19, 2010.

[3] Available at http://www.un.org/sc/committees/1267/NSQIA28310E.shtml.

substantially identical to those made by the U.S. Department of the Treasury.  *See id.*  In

connection with the U.N. action, Ambassador Daniel Benjamin, the Department of State's

Coordinator for Counterterrorism explained:

> Today's designation of Anwar al-Aulaqi is in direct response to the operational
> role he plays in AQAP, and most importantly because of the integral part he
> played in planning AQAP's attempted destruction of Northwest Airlines flight
> 253 over the United States.  Anwar al-Aulaqi and AQAP actively engage in
> terrorist plotting with the intent to harm U.S. citizens.  The UN's listing of al-
> Aulaqi highlights the threat al-Aulaqi poses to the international community.

*See* Press Release, U.S. Department of State, Listing of Al-Qaeda in the Arabian Peninsula

(AQAP) (July 20, 2010) (available at http://www.state.gov/r/pa/prs/ps/2010/07/144929.htm).[4]

The Director of the National Counterterrorism Center echoed these sentiments recently,

testifying before Congress that "[d]ual US-Yemeni citizen and Islamic extremist ideologue

Anwar al-Aulaqi played a significant role in the attempted [Christmas 2009] airliner attack . . .

Aulaqi's familiarity with the West and role in AQAP remain key concerns for us."  *See*

September 22, 2010 Statement by Michael Leiter to the Senate Homeland Security and

Governmental Affairs Committee, Exhibit 3 at pg. 5.

      Furthermore, as noted above, the Executive Branch has determined that AQAP is an

organized armed group that is either part of al-Qaeda or, alternatively, is an organized associated

force, or cobelligerent, of al-Qaeda that has directed attacks against the United States in the

noninternational armed conflict between the United States and al-Qaeda that the Supreme Court

has recognized (*see Hamdan*, 548 U.S. at 628-31).  Accordingly, although it would not be

appropriate to make a comprehensive statement as to the circumstances in which he might

---

[4]   The OFAC and UN designations pertain solely to action taken to block assets and impose economic sanctions, and the information relied upon for the designations is set forth solely as publicly available background information.

lawfully do so, it is sufficient to note that, consistent with the AUMF, and other applicable law, including the inherent right to self-defense, the President is authorized to use necessary and appropriate force against AQAP operational leaders, in compliance with applicable domestic and international legal requirements, including the laws of war.

## ARGUMENT

### PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION AND THIS ACTION SHOULD BE DISMISSED.

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 128 S.Ct. 2207, 2219 (2008) (citation and quotation omitted); *see also Sociedad Anonima Vina Santa Rita v. U.S. Dep't of Treasury*, 193 F. Supp. 2d 6, 13 (D.D.C. 2001). Accordingly, the "power to issue a preliminary injunction . . . should be 'sparingly exercised,'" *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969), and such an injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

To prevail in a request for a preliminary injunction, a plaintiff bears the burden of demonstrating that: (1) there is a substantial likelihood of success on the merits; (2) failure to grant the injunction would result in irreparable injury; (3) the requested injunction would not substantially injure other interested parties; and (4) the public interest would be furthered by the injunction. *Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (citation omitted); *Nat'l Head Start Ass'n v. HHS*, 297 F. Supp. 2d 242, 246-47 (D.D.C. 2004) (Bates, J.). Plaintiffs must satisfy all four factors, and the Court must also find that the four factors together justify the drastic intervention of a preliminary injunction. *See CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). Moreover, if a plaintiff has little likelihood of

succeeding on the merits of his claim, the Court need not address the other factors.  *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006).  As set forth below, plaintiff fails to establish a likelihood of success on the merits, and cannot show that the balance of interests of the public interest favor the entry of extraordinary injunctive relief.

## I.      Plaintiff Lacks Standing in This Case.

The power of the federal courts extends only to "Cases" and "Controversies."  *See* U.S. Const. art. III, § 2.   A litigant's standing to sue is "an essential and unchanging part of the case-or-controversy requirement."  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  As the "irreducible constitutional minimum" of standing to sue, a plaintiff must allege (1) a concrete and imminent "injury in fact" that is (2) "fairly traceable" to the challenged conduct and (3) likely to be redressed by a favorable judicial decision.  *Lujan*, 504 U.S. at 560-61.

Prudential limitations on a finding of standing include "the general prohibition on a litigant's raising another person's legal rights [and] the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches."  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  "There are good and sufficient reasons for th[e] prudential limitation on standing when rights of third parties are implicated — the avoidance of the adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them."  *Duke Power Co. v. Carolina Envt'l Study Group, Inc.*, 438 U.S. 59, 80 (1978).  This limitation ensures that a court does not "decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions [.]"  *Warth*, 422 U.S. at 500.

The Court's inquiry into plaintiff's standing must be "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by [another] branch[ ] of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

## A.   Plaintiff Lacks "Next Friend" Standing.

Nasser al-Aulaqi seeks to proceed as "next friend" to assert three claims on his son's behalf: a Fourth Amendment claim to be free from unreasonable seizures; a Fifth Amendment claim not to be deprived of life without due process; and an additional Fifth Amendment claim asserting a right to notice. *See* Compl. ¶¶ 27-29.  The Supreme Court has emphasized that next friend standing—which allows a third person to file a claim on someone else's behalf—is "by no means granted automatically to whomever seeks to pursue an action on behalf of another." *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990).  Rather, consistent with the constitutional limits established by Article III, a litigant who asserts next friend standing bears the burden of "clearly . . . establish[ing] the propriety of his status and thereby justify[ing] the jurisdiction of the court." *Id.* at 164.  To meet this burden, a purported next friend must satisfy "two firmly rooted prerequisites" to have standing:

> First, a "next friend" must provide an adequate explanation-such as inaccessibility, mental incompetence, or other disability-why the real party in interest cannot appear on his own behalf to prosecute the action.  Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a "next friend" must have some significant relationship with the real party in interest.

*Id.* at 163-64.

The next friend does not become a party to the case, "but simply pursues the cause on behalf of the [incompetent or unavailable party], who remains the real party in interest." *Id.* at

-11-

163.  "For that reason, the 'next friend' application has been uncommonly granted[.]"  *Lehman v.*

*Lycoming County Children's Servs. Agency*, 458 U.S. 502, 523 (1982).  "If there were no

restriction on 'next friend' standing in federal courts, the litigant asserting only a generalized

interest in constitutional governance could circumvent the jurisdictional limits of Art. III simply

by assuming the mantle of 'next friend.'"  *Whitmore*, 495 U.S. at 164.

> **1.  Next Friend Standing Has Not Been Recognized Outside of the Habeas Context to a Mentally Competent Adult.**

The only circumstance in which the Supreme Court has accepted next friend standing is

with writs of habeas corpus filed "on behalf of detained prisoners who are unable, usually

because of mental incompetence or inaccessibility, to seek [habeas] relief themselves."

*Whitmore,* 495 U.S. at 162.  Moreover, in *Whitmore*, the Court noted that next friends are

authorized to appear in the habeas corpus context pursuant to federal statute, *see* 28 U.S.C. §

2242 (2010 ed.), and expressly declined to decide whether "a 'next friend' may ever invoke the

jurisdiction of a federal court absent congressional authorization[.]"  *Whitmore*, 495 U.S. at 164.

Given the absence of any applicable statutory authorization here, next friend standing should be

rejected on this ground alone.  In addition, while courts have historically permitted next friends

to prosecute actions on behalf of minors and adult mental incompetents, *see id.* at 163, n.4, and

the Federal Rules of Civil Procedure provide that a "[a] minor or an incompetent person who

does not have a duly appointed representative may sue by a next friend," Fed. R. Civ. Proc.

17(c)(2), Nasser al-Aulaqi seeks to bring a next friend suit on behalf of someone who fits none

of these categories.  Particularly given the nature of plaintiff's suit, this Court should not expand

the concept of next friend standing beyond what any other federal court appears to have accepted

or the Federal Rules of Civil Procedure expressly authorize.

**2.      Plaintiff Has Not Established That Anwar al-Aulaqi Lacks
Access to the Courts or Is Interested in Bringing This Action.**

Assuming, *arguendo*, this Court concludes next friend standing could conceivably be

involved in a case of this sort, plaintiff cannot establish any basis for proceeding as a "next

friend" here.  Plaintiff's assertion that he should be entitled to sue as his son's "next friend"

appears to be predicated on his allegation that his son, Anwar al-Aulaqi, "cannot access legal

assistance or a court without risking his life."  *See* Declaration of Nasser al-Aulaqi ¶ 10.  But this

assertion is not supported by any evidence.  More to the point, as noted above, Defendants state

that if Anwar al-Aulaqi were to surrender or otherwise present himself to the proper authorities

in a peaceful and appropriate manner, legal principles with which the United States has

traditionally and uniformly complied would prohibit using lethal force or other violence against

him in such circumstances.  *See* Geneva Convention Common Article 3(1) (prohibiting violence

to life and person with respect to persons "who have laid down their arms" in an armed conflict

not of an international character); *see also Hamdan*, 548 U.S. at 630-32 (holding that Common

Article 3 applies to the U.S. armed conflict with al-Qaeda); *cf. also* Hague Convention IV,

Annex, art. 23(c), 37 Stat. at 2301-02 ("[I]t is especially forbidden . . . [t]o kill or wound an

enemy who, having laid down his arms, or having no longer means of defence, has surrendered

at his discretion."); *cf.Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (in a domestic law

enforcement context, "[w]here the suspect poses no immediate threat to the officer and no threat

to others, the harm resulting from failing to apprehend him does not justify the use of deadly

force to do so").  Anwar al-Aulaqi would have the choice at that point, as he does now, to seek

legal assistance and access to U.S. courts.  That Anwar al-Aulaqi may not choose to avail

himself of this opportunity[5] does not mean that the courts are inaccessible to him—a prerequisite for his father's next friend standing.

Nor has plaintiff pointed to any other reason to believe that his son has lacked the ability to communicate his desire to access the courts.[6]  According to the Complaint, news sources began reporting in January 2010 that plaintiff's son was allegedly on a list of approved targets. *Id.* at 7.  Yet his son has not taken any steps in the past eight or nine months to seek judicial process.  Plaintiff's unsupported assertion that Anwar al-Aulaqi has been incommunicado for over eight months and unable to communicate his wish to access the court system does not sustain plaintiff's burden—especially not in the face of public information (noted above) indicating that Anwar al-Aulaqi has been able to communicate his views during 2010 and has failed to indicate any desire to file a lawsuit such as this one.

In addition, while courts have held that parents typically satisfy the second requirement of the *Whitmore* test for next friend standing, *see, e.g., Vargas v. Lambert*, 159 F.3d 1161, 1168 (9th Cir. 1998), even where the next friend has a substantial relationship with the absent party,

---

[5] On May 23, 2010, the media arm of AQAP posted a 45-minute video of what is described as an interview with Anwar al-Aulaqi.  *See* Public DNI Clapper Declaration ¶ 16, (transcript available at http://www.memritv.org/clip_transcript/en/2480.htm, video available at http://www.memritv.org/clip/en/2480.htm).  In that video, which the U.S. Intelligence Community assesses is Anwar al-Aulaqi, *see id.*, al-Aulaqi stated that he did not intend to turn himself in to America, *id.* ("I have no intention of turning myself in to [the Americans].  If they want me, let them search for me.")

[6] Even if Anwar al-Aulaqi's access to the courts were somewhat constrained by circumstances not of his own making (which, as we explain, is not the case), that would not suffice to establish next friend standing.  *See, e.g., Coalition of Clergy, Lawyers, & Professors v. Bush*, 310 F.3d 1153, 1160-61 (9th Cir. 2002) (rejecting next friend petitioners' contention that they had satisfied the first *Whitmore* prong because Guantanamo Bay detainees were "totally incommunicado," noting that the detainees had visitors and limited opportunities to write friends and family).

-14-

courts still examine whether they are acting in accord with that party's wishes.[7]  There are good

reasons to doubt that this suit reflects Anwar al-Aulaqi's wishes.  Plaintiff concedes he has had

no contact with his son "since at least January 2010," *see* Compl. at 2, 9, and he does not aver

that his son ever communicated to him a desire to file suit against the United States in federal

court.  His son's public pronouncements indicate that he has no desire to avail himself of

protections afforded by the Constitution and courts of a nation that he deems an enemy deserving

of violent attacks.  *See* Public Clapper Decl. ¶ 16.[8]  Plaintiff should not be permitted to act as a

"next friend" where he has offered this Court no basis on which to conclude that Anwar al-

Aulaqi "want[s] legal representation as a general matter or more specifically by Counsel in the

instant matter."   *Does v. Bush*, No. Civ.A.05 313 CKK, 2006 WL 3096685, *5 (D.D.C. Oct. 31,

2006); *see also id*. at * 6 (next friend's "'good faith basis' that every detainee desires to avail

himself of his right to seek habeas relief through the American legal system is merely her clearly

subjective belief.").

---

[7] *See Idris v. Obama*, 667 F. Supp. 2d 25, 29 (D.D.C. 2009) (brother of a Guantanamo Bay detainee could not be said to be acting in the detainee's "best interests" as defined by *Whitmore*, because he had not met with the detainee since his confinement began); *Hauser v. Moore*, 223 F.3d 1316, 1322 (11th Cir. 2000) (expressing serious "reservations" about whether a prisoner's "biological mother, who gave [him] up for adoption," was truly dedicated to his best interests rather than being "motivated solely by [her] desires to block imposition of the death penalty."); *Davis v. Austin*, 492 F. Supp. 273, 276 (N.D. Ga. 1980) (denying next friend standing to the cousin of a prisoner who "not visited [the prisoner] in over a year and ha[d] had only two contacts with him during that period.").

[8] *See* http://www.memritv.org/clip/en/2480.htm (Interview by AQAP with Anwar al-Aulaqi released May 23, 2010 in which al-Aulaqi states: "My message to the Muslims in general, and to those in the Arabian Peninsula in particular, is that we should participate in this Jihad against America."); *see also id*. (discussing failed 2009 Christmas Day airline bombing, al-Aulaqi states: "[N]o one should even ask about targeting a bunch of Americans who would have been killed in an airplane.  Our unsettled account with America includes, at the very least, one million women and children.  I'm not even talking about the men.  Our unsettled account with America, in women and children alone, has exceeded one million.  Those who would have been killed in the plane are a drop in the ocean.").

### B.     Plaintiff Otherwise Lacks Article III Standing.

Even if the Court found that plaintiff could proceed as a next friend, he would still otherwise lack Article III standing.  To have Article III standing, a plaintiff must seek relief that provides redress for an alleged injury that is "concrete and particularized," and "actual or imminent," not "conjectural," "hypothetical" or "abstract."  *Lujan*, 504 U.S. at 560; *Whitmore*, 495 U.S. at 155; *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983).  Here, the injury plaintiff purports to allege on behalf of his son (and himself) is *not* that his son is being targeted for lethal force by the United States.  Rather, the precise injury is that his son is allegedly being targeted "without regard to whether, at the time lethal force will be used, he presents a concrete, specific, and imminent threat to life, or whether there are reasonable means short of lethal force that could be used to address any such threat."  *Compl.* ¶ 23; *see also id*. ¶¶ 27-29; Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction ("Pls. Mem.") at 6, 31.

Plaintiff cites nothing to support his assumption that the United States would not take account of such considerations as the nature and imminence of an individual's threat, and the feasibility of means short of lethal force to address such threats.  Plaintiff claims that because Anwar al-Aulaqi has allegedly been on a so-called "kill list" for months, the United States must have authorized the use of lethal force against him without regard to whether there was or remains any "imminent" threat of harm to national security, or whether such threats could be addressed through alternative means.  *See* Pls. Mem. at 6.  The mere allegation, however, that time has passed since the government allegedly first considered the use of force against an individual does not support the inference that the government is indifferent to whether there would be an imminent threat if and when the decision whether to use force against that person was specifically contemplated, or to whether a reasonable alternative to force existed.  Plaintiff's

conjecture that the government might in the future act in a certain manner that is alleged to be unlawful, however, is not enough to obtain equitable relief.  *See, e.g., Lyons*, 461 U.S. at 105-06 (mere allegation that police would apply force where it was not necessary "falls far short of the allegations that would be necessary to establish a case or controversy between these parties.").

The declaratory and injunctive relief plaintiff seeks is thus extremely abstract—in effect, simply a command that the United States comply with generalized constitutional standards, untethered to any particular fact situation, and without any basis for assuming that the United States would otherwise disregard applicable legal constraints.  Plaintiff's requested injunction—even assuming *arguendo* it would reflect legal standards that may be applicable in this context—would nowhere indicate how to assess whether a threat may be "imminent" or "concrete," nor whether alternatives to lethal force might be "reasonably" available.  The Court is ill-equipped to evaluate whether such standards are satisfied in any particular circumstance, and may not merely impose them even if it were to agree with plaintiff that they state the law.  A judicial decree may not be entered to provide guidance, but only where necessary in order to change the behavior of the defendant, for it would otherwise constitute a mere advisory opinion.

In analogous circumstances, the Supreme Court in *Gilligan v. Morgan*, 413 U.S. 1 (1973), rejected declaratory and injunctive relief to restrain future operations of the Ohio National Guard after the 1970 shootings at Kent State University.  Plaintiffs sought to enjoin the Governor of Ohio from prematurely ordering the National Guard troops to duty in civil disorders and to restrain National Guard leaders from violating the students' constitutional rights in the future.  The Court found that the requested injunction would be "advisory" because it was not clear that the National Guard or the Governor were then violating applicable legal standards or were likely to do so in the future.  *See* 413 U.S. at 10; *see also id.* at 13 (Blackmun, J.,

concurring) (noting that "respondents' complaint contains nothing suggesting that they are likely to suffer specific injury in the future as a result of the practices they challenge").

*Gilligan* demonstrates that an injunction requiring continuing judicial supervision of the military to ensure that it complies with particular legal norms in these circumstances constitutes an advisory opinion, where, as here, there is no evidence that the alleged constitutional violations are occurring or will occur, and therefore, that entry of an injunction would result in any relief to the plaintiff. Plaintiff's request for declaratory relief likewise must be dismissed for the same reason. *See Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (to constitute "a proper judicial resolution of a 'case or controversy' rather than an advisory opinion," declaratory relief must "affect[] the behavior of the defendant towards the plaintiff").[9] If the court were to enter such relief, urgent and time-sensitive efforts to protect the nation from threats posed by enemy terrorist organizations would proceed under the shadow of imprecise injunctive commands, which could have unforeseen and potentially disastrous consequences—including the loss of life of U.S. forces or U.S. citizens targeted for future terror attacks.[10]

Moreover, and as explained further below, in the circumstances presented here it would be virtually impossible, and inappropriate, for the court to attempt to *enforce* the general standards of the injunction plaintiff seeks, as applied to real-time, heavily fact-dependent decisions made overseas by military and other officials on the basis of complex and sensitive

---

[9] Similarly, the D.C. Circuit has held that "a declaratory judgment is, in a context such as this where federal officers are defendants, the practical equivalent of specific relief such as injunction or mandamus, since it must be presumed that federal officers will adhere to the law as declared by the court." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985).

[10] Indeed, there is question whether the relief plaintiff seeks would meet the specificity requirements of Fed. R. Civ. P. 65(d)(1)(C) to "describe in reasonable detail . . . the act or acts restrained."

intelligence, tactical analysis and diplomatic considerations.  This problem further highlights the advisory nature of the relief sought, and thus the absence of a concrete case or controversy.

## II.    Plaintiff's Claims Require the Court to Decide Non-Justiciable Political Questions.

Even if plaintiff had standing, his claims and the declaratory and injunctive relief he seeks raise fundamentally non-justiciable political questions.  Plaintiff seeks judicial oversight of the Government's decisions with respect to a foreign organization against which the political branches have authorized the use of all necessary and appropriate force.  The particular relief plaintiff seeks would constitute an *ex ante* command to military and intelligence officials that could interfere with lawful commands issued by the President, who is constitutionally designated as Commander-in-Chief of the armed forces and constitutionally responsible for national security.  Moreover, enforcement of such an injunction would insert the Judiciary into an area of decision-making where the courts are particularly ill-equipped to venture, *i.e.*, in assessing whether a particular threat to national security is imminent and whether reasonable alternatives for the defense of the Nation exist to the use of lethal military force.  Courts have neither the authority nor expertise to assume these tasks.

"The political question doctrine is a natural outgrowth of fidelity to the concept of separation of powers."  *Doe v. State of Israel,* 400 F. Supp. 2d 86, 111 (D.D.C. 2005) (Bates, J.); *accord Baker v. Carr*, 369 U.S. 186, 217 (1962).  The doctrine is "based upon respect for the pronouncements of coordinate branches of government that are better equipped and properly intended to consider issues of a distinctly political nature," *Doe,* 400 F. Supp. 2d at 111, and "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the

confines of the Executive Branch," *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221,

230 (1986).   In *Baker*, the Supreme Court "enumerated six situations that constitute political

questions, over which there is no jurisdiction to proceed."   *Doe*, 400 F. Supp. 2d at 111.

> Prominent on the surface of any case held to involve a political
> question is found [1] a textually demonstrable constitutional
> commitment of the issue to a coordinate political department; or
> [2] a lack of judicially discoverable and manageable standards for
> resolving it; or [3] the impossibility of deciding without an initial
> policy determination of a kind clearly for nonjudicial discretion; or
> [4] the impossibility of a court's undertaking independent
> resolution without expressing lack of the respect due coordinate
> branches of government; or [5] an unusual need for unquestioning
> adherence to a political decision already made; or [6] the
> potentiality of embarrassment from multifarious pronouncements
> by various departments on one question.

*Baker*, 369 U.S. at 217.

    "Foreign policy and military affairs figure prominently among the areas in which the

political question doctrine has been implicated." *Aktepe v. USA*, 105 F.3d 1400, 1402-04 (11th

Cir. 1997); *see also El-Shifa Pharm. Indus. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010)

(*en banc*); *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006).   Because such cases

raise issues that "frequently turn on standards that defy judicial application" or "involve the

exercise of a discretion demonstrably committed to the executive or legislature," *Baker*, 369 U.S.

at 211, "[m]atters intimately related to foreign policy and national security are rarely proper

subjects for judicial intervention," *Haig v. Agee*, 453 U.S. 280, 292 (1981).   *See El-Shifa*, 607

F.3d at 841; *see also Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005); *Gonzalez-Vera

v. Kissinger*, 449 F.3d 1260, 1263-64 (D.C. Cir. 2006).   "[T]he political branches of government

are accorded a particularly high degree of deference in the area of military affairs." *Aktepe*, 105

F.3d at 1403 (citing *Owens v. Brown*, 455 F. Supp. 291, 299 (D.D.C. 1978)); *Bancoult*, 445 F.3d

at 429-31.[11]

Of course, "[not] every case or controversy which touches foreign relations lies beyond judicial cognizance," *Baker*, 369 U.S. at 211, and claims based on constitutionally protected interests may sometimes require the court to address the limits on the Executive's exercise of national security powers. *See Abu-Ali v. Ashcroft*, 350 F. Supp. 2d 28, 64-65 (D.D.C. 2004) (Bates, J.); *see also Bancoult*, 445 F.3d at 435, 437. But the mere presence of a constitutional due process claim does not automatically render a case justiciable. Instead, courts must conduct "a discriminating analysis of the particular question posed" in the "specific case." *El-Shifa*, 607 F.3d at 841 (*quoting Baker*, 369 U.S. at 211). Here, that analysis leads inescapably to the conclusion that plaintiff's claims raise non-justiciable political questions.

Plaintiff's Complaint challenges the authority of the President of the United States, as "Commander-in-Chief of the U.S. armed forces" and "Chair of the National Security Council"— as well as the authority of the Secretary of Defense "over the U.S. armed forces worldwide," and the authority of the Director of the Central Intelligence Agency "over CIA operations worldwide"—to utilize lethal force against plaintiff's son, Anwar al-Aulaqi, whom plaintiff avers is hiding in a foreign country (Yemen). *See* Compl. ¶¶ 3, 10-12. Plaintiff's Complaint nowhere challenges the Government's determinations that Anwar al-Aulaqi is a part of AQAP, a terrorist organization responsible for numerous attacks and against which Congress has authorized the use of force, and that he has taken on an operational leadership role in that

---

[11] In *Aktepe*, the court held that tort claims challenging the alleged negligent use of military force in a drill that killed members of the Turkish navy were not justiciable because deciding the claims would require the court to make an initial policy decision reserved to the military as to the necessity to conduct drills that simulate battle conditions. *See* 105 F.3d at 1402-04. In *Bancoult*, the court held that a challenge to the relocation of residents to enable the establishment of a U.S. military base on the island of Diego Garcia was non-justiciable in the face of allegations that this action resulted in extreme mistreatment and hardship to the residents, including threats of death. *See* 445 F.3d at 437 (courts may not bind the Executive's hands on such military matters "whether directly—by restricting what may be done—or indirectly-by restricting how the executive may do it").

organization.  *See* Exh. T to Declaration of Ben Wizner.  Rather, plaintiff challenges the alleged

lethal targeting of Anwar al-Aulaqi on the grounds that "[t]he United States is not at war with

Yemen or within it," *see* Compl. ¶ 3, that therefore any use of lethal force against a person in

Yemen would allegedly be "outside of armed conflict," *see id.* ¶¶ 4, 13, 16, 27-30, and that, in

these circumstances, the Government cannot target al-Aulaqi (or any U.S. citizen) "without

regard to whether, at the time lethal force will be used, he presents a concrete, specific, and

imminent threat to life, or whether there are reasonable means short of lethal force that could be

used to address any such threat."  *See id.* ¶ 23; *see also id.* ¶¶ 27-29.

The extraordinary declaratory and injunctive relief plaintiff seeks here would constitute

*ex ante* commands by the Judicial Branch to the President and officials responsible for military

and intelligence operations against a foreign organization as to which political branches have

authorized the use of all necessary and appropriate force.  Enforcement of such orders would

necessarily require the Court to supervise inherently predictive judgments by the President and

his national security advisors as to when and how to use force overseas against that organization.

Courts are not equipped to superintend such questions.

Apparently conceding that U.S. courts cannot supervise the rules of engagement overseas

with respect to a statutorily covered enemy force in the context of an armed conflict, plaintiff

rests his challenge to the alleged use of lethal force against his son on the theory that he is

physically located in a place where such force could not be used as part of an armed conflict.

But even assuming, as plaintiff does, that his claims would depend upon whether the actions in

question would take place in an armed conflict, the very determination of whether and in what

circumstances the United States' armed conflict with al-Qaeda might extend beyond the borders

of Iraq and Afghanistan is itself a non-justiciable political question.  Moreover, as plaintiff

recognizes, *see* Compl. ¶ 25, any determination of this issue by this Court would necessarily

implicate sensitive foreign policy issues affecting relations with Yemen.

Indeed, resolution of most of the questions plaintiff puts at issue here would require the Court to assess a wide range of highly sensitive military, intelligence, and diplomatic information in order to determine what actions the President and U.S. forces may take against an operational leader of AQAP and to assess after the fact whether Executive actions have satisfied the Court's injunctive standard. But the law is clear that in these circumstances the Judiciary does not have the capacity or expertise to evaluate the array of sensitive and complex information upon which the President and his national security advisors and military personnel regularly rely in making their real-time decisions respecting the use of force abroad, or to second-guess the predictive judgments those officials must make concerning what actions may be in the Nation's best interests.

For these reasons, set forth further below, adjudication of plaintiff's Complaint requires the resolution of non-justiciable political questions.

### A. The Relief Sought in this Case Would Require the Court to Adjudicate Non-Justiciable Political Questions.

There is "no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government." *Schneider*, 412 F.3d at 194. Article I, Section 8 of the Constitution, enumerating powers of the national legislature, is "richly laden with delegation of foreign policy and national security powers." *See Schneider*, 412 F.3d at 194 (*citing* U.S. CONST., Art. I, § 8).[12] Article II also gives the President authority in these areas, and designates that "the President shall be Commander in Chief of the Army and

---

[12] U.S. CONST., Art. I, § 8 includes the power to provide for the Common Defence, *id.,* cl. 1; the power to "define and punish Piracies and Felonies committed on the High Seas and Offenses against the Law of Nations," *id.,* cl. 10; the power to "declare War" and make "Rules concerning Captures on Land and Water," *id.,* cl. 11; the power to "raise and support Armies..." and maintain a Navy, *id.,* cl. 13; and the power to "[t]o provide for calling forth the Militia to... repel Invasions," *id.,* cl. 15.

Navy of the United States." U.S. CONST., Art. II, § 2. As the Supreme Court has noted, the President may act to protect the Nation from imminent attack and "determine what degree of force [a] crisis demands." *The Prize Cases*, 67 U.S. (2 Black) 635, 668, 670 (1863). In contrast, in defining the powers of the judicial branch, Article III "provides no authority for policymaking in the realm of foreign relations or provision of national security." *Schneider*, 412 F.3d at 195; *see also Bancoult*, 445 F.3d at 433-34.

Here, the political branches have exercised their respective constitutional authorities to protect national security. Congress authorized the President to use necessary and appropriate military force against al-Qaeda, the Taliban and associated forces, AUMF, 115 Stat. 224, and the Executive Branch has determined that AQAP is an organization within the scope of this authorization, and that Anwar al-Aulaqi is a senior operational leader of AQAP. In addition to the AUMF, there are other legal bases under U.S. and international law for the President to authorize the use of force against al-Qaeda and AQAP, including the inherent right to national self-defense recognized in international law (*see, e.g.*, United Nations Charter Article 51).

It is inappropriate for a court in such circumstances to adjudicate *ex ante* the permissible scope of particular tactical decisions that the Executive may take against a foreign organization against which the political branches have authorized the use of all necessary and appropriate force. Yet that is precisely what plaintiff asks this Court to do.

1.      To begin with, the very entry of the extraordinary relief plaintiff seeks would establish a judicial command concerning military and intelligence matters abroad in possible tension with commands of the President who is textually designated as Commander- in-Chief of the armed forces, thus giving rise to multifarious pronouncements to officials in the field with respect to the real-time use of force against AQAP. It is not difficult to imagine the resultant confusion and unmanageability that might result if such officials must hazard to guess (on fear of

contempt sanctions) whether compliance with the instructions of the Commander- in-Chief would be in accord with the general and unspecified terms of the injunction plaintiff seeks.  We are unaware of any precedent for the *ex ante* imposition of such judicial commands to military and intelligence officials in such a context.  *See also Hamdi*, 542 U.S. at 534 (distinguishing between the process that is (or is not) due a U.S. citizen "on the battlefield" from the process that would be due "when the determination is made to *continue* to hold those who have been seized," which "meddles little, if at all, in the strategy or conduct of war").

2.      Moreover, the Court could not properly enforce any subsequent alleged non-compliance with the requested injunction without deciding whether the President and U.S. forces acted or planned to act when a threat was "imminent" and whether there was no reasonable alternative to lethal force.  For example, if the court were to issue the requested declaratory or injunctive relief, and a person targeted was later killed by U.S. forces under circumstances the Government believed complied with the Court's order, the Court would be in the difficult position of determining just how concrete and imminent a threat the target at issue posed—a determination that would not only call into question whether the action was justified, *see El-Shifa*, 607 F.3d at 844-45, but could also pit the Judiciary against the Executive in assessing and acting upon sensitive intelligence and diplomatic considerations in matters of national security and foreign policy.  A judicial pronouncement might therefore interfere with the ability to present "a single-voiced statement of the Government's views," *Baker*, 369 U.S. at 211, particularly as it relates to activities inside a foreign nation.  For these reasons, the questions that would have to be decided to enforce the relief plaintiff seeks "turn on standards that defy judicial application."  *El-Shifa*, 607 F.3d at 841.

In order to enforce its injunction, the Court would presumably have to assess whether the United States could use force against a U.S. citizen who may pose an imminent threat to the

United States, what response that threat may warrant, including whether there were "reasonable" alternatives to lethal force, and what the criteria should be for making these determinations—all judgments that are reserved to the President and his military and intelligence advisors.  In particular, whether a threat is "imminent," and whether reasonable alternatives exist to the use of lethal force, may depend upon on a variety of factors, including the existence of highly sensitive U.S. intelligence information concerning that threat, the capabilities of the terrorist operative to carry out a threatened attack, what response would be sufficient to address that threat, possible diplomatic considerations that may bear on such responses, the vulnerability of potential targets the terrorists may strike, the availability of military and non-military options, and the risks to military and nonmilitary personnel in attempting application of non-lethal force.  These are the types of "delicate, complex" judgments that "involve large elements of prophecy" and thus "should be undertaken only by those directly responsible to the people whose welfare they advance or imperil."  *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (*citing Coleman v. Miller*, 307 U.S. 433, 454 (1939); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-21 (1936)).

　　　As the D.C. Circuit stated in *El-Shifa* —a case that involved the President's decision to launch a military strike against a facility in Sudan that the United States believed was associated with Osama bin Laden—"[i]f the political question doctrine means anything in the arena of national security and foreign relations, it means the courts cannot assess the merits of the President's decision to launch an attack on a foreign target." 607 F.3d at 844.  Addressing the *Baker* standards, the Court in *El-Shifa* observed that "whether the terrorist activity of foreign organizations constitute threats to the United States" are "political judgments" vested in the political branches.  *Id*. at 843 (quoting *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22-24 (D.C. Cir. 1999)); *see also Ange v. Bush*, 752 F. Supp. at 514 (courts are ill-

equipped to determine whether hostilities are "imminent" to justify the deployment of forces).

The relief requested by plaintiff puts precisely such a non-justiciable question at issue. Determining whether the Executive complied with the requested injunction in this case would require the court to make at least four complex determinations outside of its expertise and for which no judicially manageable standards exist: (1) whether the activities of the person in question pose a "concrete" threat; (2) whether that threat is "specific"; (3) whether that threat is "imminent"; and (4) whether means other than lethal force could "reasonably" be employed given the panoply of diplomatic and military (operational) constraints.[13]  Each of these terms of plaintiff's proposed relief would be difficult for a court to enforce in the context of military operations, particularly in real time, halfway around the world.

The relief plaintiff seeks here, then, is analogous to that sought in *Gilligan v. Morgan, supra*.  In that case, the Supreme Court held that a constitutional due process claim brought by university students seeking declaratory and injunctive to restrain future operations of the Ohio National Guard after the 1970 shootings at Kent State University presented non-justiciable questions.  *See* 413 U.S. at 11.  The Court rejected the plaintiffs' "broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard."  *Id.* at 5.  The Court went on to explain that the injunction plaintiffs sought would require the district court to establish standards for the training, weapons, and orders of the National Guard, and would require the district court to exercise "continuing judicial surveillance over the Guard" to assure compliance with those standards.  *Id.* at 6.  Because the Constitution vests Congress with the power to provide for the Militia—and because Congress had given the President the authority to prescribe regulations governing the organization and discipline of the National

---

[13] As discussed *infra*, plaintiff's Complaint raises a fifth issue that is beyond the Court's power to determine: whether the action in question would be undertaken as part of an "armed conflict."

Guard—the Court held that such an injunction would impermissibly interfere with the other

Branches' functions.

> [I]t is difficult to conceive of an area of governmental activity in
> which courts have less competence.  The complex, subtle, and
> professional decisions as to the composition, training, and control
> of a military force are essentially professional military judgments,
> subject always to civilian control of the Legislative and Executive
> Branches.

*Id.* at 10.

*Gilligan* requires rejection of the type of relief plaintiff seeks here: broad and abstract

declaratory and injunctive relief that would require judicial supervision of fact-intensive

determinations of how to use force abroad against a foreign terrorist organization.  Moreover,

each of the complex and delicate national security determinations implicated by plaintiff's

request for relief would require careful assessment of highly sensitive and classified information

pertaining to foreign intelligence, military actions, and foreign relations.  As the Supreme Court

has observed, in matters of foreign affairs and national security the President "has the better

opportunity of knowing the conditions which prevail in foreign countries, and especially is this

true in time of war."  *Curtiss-Wright*, 299 U.S. at 319-21.

> [The President] has his confidential sources of information.  He
> has his agents in the form of diplomatic, consular and other
> officials.  Secrecy in respect of information gathered by them may
> be highly necessary, and the premature disclosure of it productive
> of harmful results.

*Id.*; *see also Chicago & Southern Air Lines*, 333 U.S. at 111 ("The President, both as

Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence

services whose reports neither are nor ought to be published to the world").  "It would be

intolerable that courts, without the relevant information, should review and perhaps nullify

actions of the Executive taken on information properly held secret."  *Chicago & Southern Air*

*Lines*, 333 U.S. at 111.  "Judges deficient in military knowledge, lacking vital information upon

which to assess the nature of battlefield decisions, and sitting thousands of miles from the field

of action" cannot reasonably review the lawfulness of a an alleged military or intelligence

operation. *Dacosta*, 471 F.2d at 1155; *see also Schneider v. Kissinger*, 412 F.3d 190, 196 (D.C.

Cir. 2005) ("Unlike the executive, the judiciary has no covert agents, no intelligence sources,

and no policy advisors.  The courts are therefore ill-suited to displace the political branches in

such decision-making.").  That resolution of plaintiff's claims would put at issue the Executive's

confidential military, intelligence, and diplomatic information, including information concerning

the threat posed by a foreign organization against which the political branches have authorized

the use of all necessary and appropriate force, whether that threat is imminent or concrete,

whether there are reasonable alternatives to lethal force, and how such actions may affect

relations with a foreign state, is further evidence that plaintiff raises non-reviewable political

questions.[14]

---

[14] For similar reasons, plaintiff's Fourth Claim for Relief, *see* Complaint  30, and his accompanying request for an order disclosing the alleged "criteria that are used in determining whether the government will carry out the targeted killing of a U.S. citizen," *see id.* at 11, should be dismissed.  Plaintiff argues that the Government must disclose such criteria because "basic notions of fairness would be violated if penalties were visited on individuals who had no reasonable notice that their conduct would result in such penalties."  PI Brief at 32.  However, again without confirming or denying any allegation, plaintiff cannot credibly claim that a person who becomes a senior operational leader of a force associated with al-Qaeda and facilitates attacks against the United States lacks notice that he could expose himself to military-type rules of engagement.  Nor is it true that, "in the absence of clearly stated rules, there is little to restrain the government from acting arbitrarily." *Id.* at 33.  There are many aspects of military and national security operations in which the government does not publicly disclose the criteria that guide its actions, but that hardly means that in all such operations the government acts "arbitrarily."  The President has a constitutional duty to take care that the law is faithfully executed, and he and the other defendants here take that obligation very seriously, endeavoring at all points to comply with all applicable domestic and international laws.  The laws themselves are not secret.  And apart from those laws, the alleged operations here would be guided by fact-intensive military and intelligence determinations involving command and policy judgments in the context of highly context-specific diplomatic and logistical considerations.  Any effort to reduce those judgments to a set of "criteria" to be publicly announced in response to a judicial injunction and subsequently enforced would, for the reasons previously discussed, exceed the bounds of judicial authority.  Even in the context of domestic law enforcement, the government does not disclose operational plans, standards or techniques for enforcement. *See, e.g.*, 5 U.S.C. 552(b)(7)(E) (exempting from mandatory disclosure information that "would disclose techniques

3.     Nor does the presence of constitutional claims (nominally) on behalf of a U.S. citizen establish any means by which the case could be made justiciable.  *See Gilligan*, 413 U.S. at 6 (holding citizens' due process claim non-justiciable).  Plaintiff errs in comparing this case to cases in which individuals (including U.S. citizens) challenge their ongoing detention *after* being seized by the U.S. military on the battlefield.  *See* Pls. Mem. at 21 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004)).  In those cases, the plaintiffs invoked the writ of habeas corpus, a constitutionally guaranteed recourse for persons held in detention within the scope of the writ. The Court in *El-Shifa* observed that "the political question doctrine does not preclude judicial review of prolonged Executive detention predicated on an enemy combatant determination because the Constitution specifically contemplates a judicial role in this area." *Id*. at 848-49 (citing *Boumediene v. Bush*, 553 U.S. 723, 128 S.Ct. 2229, 2247 (2008) ("The [Suspension] Clause protects the rights of the detained by affirming *the duty and authority of the Judiciary* to call the jailer to account.") (original emphasis) and *Hamdi*, 542 U.S. at 535 (discussing the courts' "time-honored and constitutionally mandated roles of reviewing and resolving claims" of citizens challenging their military detention)).  Habeas review is materially different from the relief sought here, particularly because a habeas petition does not ask a court to impose an *ex ante* injunction regulating the future real-time decision-making of executive officials contending with a congressionally identified enemy force—the habeas writ does not, for example, regulate the circumstances in which such officials may make future decisions to apprehend enemy forces.

This Court's decision in *Abu-Ali* is not to the contrary.  There the plaintiff filed a petition for a writ of habeas corpus, and the Court rejected application of the political question doctrine

---

and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law").  *A fortiori* there is no basis for a court to compel the President, the Secretary of Defense or the Director of the CIA to disclose plans or criteria for military or intelligence operations abroad.

to a claim that the "United States has unjustly deprived an American citizen of liberty through acts it has already taken" by facilitating the detention of a U.S. citizen by a foreign country overseas. *See* 350 F. Supp. 2d at 65. But the Court noted that the type of claim at issue there was "precisely what courts are accustomed to assessing," *see id.*, and made the related observation that, unlike in this case, the United States did not contend in *Abu-Ali* that its alleged actions would be undertaken pursuant to the President's war powers. *See id.* at 62 n.33. Not only is this not a case in which the writ of habeas corpus is invoked, but plaintiff asks the Court to superintend sensitive national security decision-making against an organization as to which the political branches have authorized the use of all necessary and appropriate force, and to do so *before* the Executive makes fact-intensive, real-time decisions.

Likewise, the circumstances in which courts have reviewed the merits of claims of U.S. citizens brought under the Due Process Clause in a military setting overseas are markedly different than those presented here. The court of appeals in *El-Shifa*, for example, identified a line of cases in which courts have reviewed whether seizures or destruction of foreign persons' property was a taking for which the government owed just compensation. *El-Shifa*, 607 F.3d at 849. Such takings claims, however, seek compensation after the fact for a seizure of property that has already occurred. This case is fundamentally different in at least two respects. First, the takings cases cited in *El-Shifa* did not challenge the legality of the use of force, nor did they seek to limit *ex ante* the circumstances in which force against an enemy overseas may be used in the future. Instead, the cases cited in *El-Shifa* were based on the Just Compensation Clause, which does not prohibit takings of property and merely requires that they be compensated *after the fact*.[15] Second, the determination of whether compensation is owed for a past taking of property

---

[15] *Cf. Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir. 1992) ("A key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages for their injuries. Damage actions are particularly judicially manageable. By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational

does not require—as enforcement of the injunction here would—a judicial assessment of complex considerations that are beyond the courts' capacity to evaluate, such as whether the Executive Branch's real-time analysis of whether a potential target of lethal force overseas poses an "imminent" or "concrete" threat to U.S. persons, and whether alternative means of addressing such a threat were feasible, were reasonable judgments.  *See Gilligan*, 414 U.S. at 10.[16]

**B.    Whether and in What Circumstances the Use of Force In a Particular Geographic Location Would be Part of the Armed Conflict Between the United States and Al-Qaeda and Associated Forces Is Also a Non-Justiciable Political Question.**

What is more, plaintiff's own legal theories appear to depend, by their terms, on the assertion that any use of force against his son beyond the borders of Iraq and Afghanistan would necessarily occur "outside of armed conflict."  *See* Compl. ¶¶ 27-30; *see also* Pls. Mem. at 2. But even if one were to assume—as plaintiff does—that the scope of the armed conflict is critical to his claims, that question, too, is non-justiciable.  As noted, the Executive Branch has

---

decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions."); *Comer v. Murphy Oil USA*, 585 F.3d 855, 874 (5th Cir. 2009) ("Claims for damages are also considerably less likely to present nonjusticiable political questions, compared with claims for injunctive relief."); *Norwood v. Raytheon Co.*, 455 F. Supp. 2d 597 (W.D. Tex. 2006) ("Unlike the request for injunctive relief in the *Gilligan* case, Plaintiffs' request for damages from defense contractors would in no way require judicial oversight of military decisions."); *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 15-16 (D.D.C. 2005) ("An action for damages arising from the acts of private contractors and not seeking injunctive relief does not involve the courts in 'overseeing the conduct of foreign policy or the use and disposition of military power.'") (*quoting Luftig v. McNamara*, 373 F.2d 664, 666 (D.C. Cir. 1967)), *vacated on other grounds*, *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009).

[16] Likewise, plaintiff's effort to limit *ex ante* the alleged real-time decision-making of military and intelligence officials renders this case distinguishable from *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929 (D.C. Cir. 1988), which involved a suit seeking declaratory and injunctive relief against the funding of the Contras.  The relief requested in *Committee of United States Citizens Living in Nicaragua* required a one-time-only judicial determination whether the provision of funds to the Contras caused a violation of their Fifth Amendment rights.  Unlike the instant case, it would not have required ongoing judicial supervision of Executive Branch determinations whether a potential military or intelligence target poses an "imminent" or "concrete" threat to the United States, and whether alternative means of addressing such a threat were feasible.

determined that AQAP is a part of al-Qaeda—or at a minimum is an organized, associated force or co-belligerent of al-Qaeda in the non-international armed conflict between the United States and al-Qaeda.  Plaintiff contends that "armed conflict" does not extend outside of Iraq and Afghanistan.  But if (as the Complaint appears to argue) the Court must concur in that judgment in order for plaintiff to prevail, then plaintiff's claims are non-justiciable, because whether and in what circumstances the U.S. armed conflict with al-Qaeda and associated forces may extend— now or at some later point—is itself a question that involves predicate foreign policy and national security determinations beyond the purview of the Court.

The scant authority on which plaintiff relies—a law review article, congressional testimony by the author of that article, a U.N. report, and a decision by an international criminal tribunal, *see* Pls. Mem. at 9-10—underscores the non-justiciable nature of the question.  For example, in *Prosecutor v. Tadic*, Case No. IT-94-1-T, Judgment (Int'l Crim. Trib. for the Former Yugoslavia May 7, 1997), the tribunal observed that the existence of a non-international armed conflict turns on "the intensity of the conflict and the organization of the parties to the conflict." ¶ 562; *see also* Report of the Special Rapporteur, Study on Targeted Killings, U.N. Doc. A/HRC/14/24/Add. 6 ¶ 52 (criteria for deciding whether an armed conflict exists includes whether a group has a "[m]inimal level of organization . . . such that armed forces are able to identify" it, and whether it is "[e]ngage[d] . . . in collective, armed, anti-government action," and whether there is "a minimal threshold of intensity and duration").  Even assuming that these criteria were to govern the question, the fact the United States' armed conflict with al-Qaeda exists in one particular location does not mean that it cannot exist outside this geographic area—subject, of course, to applicable international law principles, including sovereignty and neutrality.

Once Congress and the President have mutually decided that a particular foreign

organization may be subject to the use of necessary and appropriate force, it is inappropriate, particularly under the circumstances framed by plaintiff's complaint, for a court to adjudicate *ex ante* the particular scope of the conflict, geographic or otherwise.  For example, in *DaCosta v. Laird*, the court of appeals held that the legality of the President's unilateral decision to mine the harbors of North Vietnam and to bomb targets in that country—and more specifically, whether that action constituted an escalation of the war beyond that authorized by Congress—presented a nonjusticiable political question.  *DaCosta III*, 471 F.2d 1146 (2d Cir. 1973).  The court recognized that courts "cannot reasonably or appropriately determine whether a specific military operation constitutes an 'escalation' of the war or is merely a new tactical approach within a continuing strategic plan." *Id.* at 1155.  Similarly, in *Holtzman v. Schlesinger*, 484 F.2d 1307 (2d Cir. 1973), the court held that an effort to enjoin military activities in Cambodia presented a nonjusticiable political question.  The *Holtzman* plaintiffs argued that the bombing of Cambodia was a "basic change" in the scope of the war—rather than a mere tactical decision—that a court could review to assess whether it was authorized.  The court of appeals disagreed, again emphasizing that it was in no position to gather and interpret diplomatic and military intelligence, and that "the sharing of Presidential and Congressional responsibility particularly at this juncture is a bluntly political and not a judicial question." *Id.* at 1311; *see also Ange v. Bush*, 752 F. Supp. 509, 513 (D.D.C. 1990) (Lamberth, J.), (holding that the President's order deploying a member of the National Guard to the Persian Gulf was not reviewable because the Constitution grants operational powers in foreign affairs only to the two political branches).

Such cases demonstrate that the Judiciary lacks judicially manageable standards, as well as access to the requisite information, to make such determinations concerning the specific scope of an armed conflict.  Accordingly, a judicial decision as to whether or not an "armed conflict" exists where an enemy organization has a significant, organized presence and from which it has

planned and launched attacks against the United States, would intrude on the judgment of the political branches, in consultation with each other and foreign states—an assessment that could fluctuate depending on future events.[17]

\* \* \*

The nonjusticiability of the plaintiff's claims in this Court "does not leave the executive power unbounded." *Schneider*, 412 F.3d at 200.  "The political branches effectively exercise such checks and balances on each other in the area of political questions[,]" and "[i]f the executive in fact has exceeded his appropriate role in the constitutional scheme, Congress enjoys a broad range of authorities with which to exercise restraint and balance." *Id.*  Accordingly, "the allocation of political questions to the political branches is not inconsistent with our constitutional tradition of limited government and balance of powers." *Id.*

### III.    The Court Should Exercise Its Equitable Discretion Not to Grant the Relief Sought.

Even if the Court concludes that plaintiff has standing, and that his claims are otherwise justiciable, the Court should decline to enter the declaratory and injunctive relief plaintiff seeks. "The decision to grant or deny [] injunctive relief is an act of equitable discretion by the district court[.]" *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) ("The exercise of equitable discretion . . . must include the ability to deny as well as grant injunctive relief [.]").  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Id.* at 312; *see also Yakus v. United States*,

---

[17] In analogous circumstances, this Court held that attempting to characterize the nature of the ongoing Israeli-Palestinian conflict in order to resolve various statutory claims brought by Palestinian residents of the West Bank against the State of Israel would require the resolution of "predicate policy determinations" reserved to the political branches, including whether that conflict in the West Bank is either "genocide" or "self-defense."  *Doe v. State of Israel*, 400 F. Supp. 2d at 112.

321 U.S. 414, 440 (1944) (where an injunction will adversely affect a public interest even temporarily, the court may in the public interest withhold relief until a final determination of the rights of the parties).[18]  The Court should exercise its equitable discretion to reject the declaratory and injunctive relief sought here based on many of the same concerns identified above.

Plaintiff does not dispute the Government's public determination that his son plays an operational role in AQAP planning terrorist attacks against the United States.  The imposition of declaratory and injunctive relief that would restrict the manner in which the President and other Government officials may act to protect the national security of the United States would be plainly improper where Anwar al-Aulaqi would remain free to plot terrorist attacks against the United States.  As discussed above, Anwar al-Aulaqi may peacefully present himself to U.S. officials, which would eliminate any hypothetical possibility that he would be subjected to lethal force that has prompted plaintiff to file this lawsuit.  The Court should not allow a "next friend" plaintiff to use the judicial process to seek such relief.

In addition, as set forth above—and again without confirming or denying any allegation—plaintiff simply speculates that, if lethal force has been authorized against his son, such an authorization necessarily has been made "without regard to whether, at the time lethal force will be used, he presents a concrete, specific, and imminent threat to life, or whether there are reasonable means short of lethal force that could be used to address any such threat."  *See* Pls. Mem. at 6; *see also id*. at 31.  Plaintiff cites nothing to support this proposition, but infers that this must be true based on an assumption that Anwar al-Aulaqi has been on a so-called "kill list" for months and, as a result, that there could be no "imminent" threat of harm to national security at stake and any lethal targeting could not be a last resort.  *See id.* at 6.  Plaintiff, who

---

[18]  Again, where prudential considerations would preclude an injunction, they also preclude declaratory judgment.  *See Samuels v. Mackell*, 401 U.S. 66, 69-74 (1971).

concedes he has not even spoken to his son for eight months, cannot possibly know the facts and circumstances that may be at issue and seeks extraordinary injunctive relief based on sheer unsupported conjecture.  Thus, even if plaintiff could demonstrate his standing to seek declaratory and injunctive relief, equitable considerations should still foreclose its entry.  *See Lyons*, 461 U.S. at 103 ("[c]ase or controversy considerations 'obviously shade into those determining whether the complaint states a sound basis for equitable relief'") (*quoting O'Shea*, 414 U.S. 488, 499 (1974)).

Article III courts should generally refrain from directing the President to take any official presidential act or not to take any such act.  *See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion) (*quoting Mississippi v. Johnson*, 71 U.S. (4 Wall) 475, 501 (1866)); *see also Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923); *Clinton v. Jones*, 520 U.S. 681, 718-19 (1997) (Breyer, J., concurring) (acknowledging "the apparently unbroken historical tradition . . . implicit in the separation of powers that a President may not be ordered by the Judiciary to perform particular Executive acts") (*quoting Franklin*, 505 U.S. at 802-03)); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) (noting that the Supreme Court has issued a "stern admonition" that injunctive relief against the President personally is an "extraordinary measure"); *Newdow v. Bush*, 391 F. Supp. 2d 95, 105 (D.D.C. 2005) (Bates, J.); *Swan*, 100 F.3d at 977 n.1; *see also Franklin*, 505 U.S. at 827-28 (Scalia, J., concurring) ("Permitting declaratory or injunctive relief against the President . . . would produce needless head-on confrontations between district judges and the Chief Executive.") (*quoting Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (internal footnote omitted).[19]  Thus, the Court should exercise its equitable discretion not to issue any injunction against the President in this case, particularly as to the exercise of his

---

[19]  Plaintiff also attempts to invoke the Court's jurisdiction pursuant to Section 702 of the APA, 5 U.S.C. § 702, *see* Complaint ¶ 7, but the President is not an agency within the meaning of the APA whose actions are subject to APA review.  *Franklin*, 505 U.S. at 796.

authority as Commander-in-Chief.

Moreover, because the imposition of any injunctive relief on the Secretary of Defense and CIA Director would also necessarily enjoin the authority of the President, no such relief should be entered against these officials as well. The Secretary of Defense is "the principal assistant to the President in all matters relating to the Department of Defense" and his authority is expressly "[s]ubject to the direction of the President." 10 U.S.C. § 113(b); *see also* Public Declaration of Robert M. Gates, Secretary of Defense, Exhibit 4, ¶ 1. The CIA Director performs such intelligence functions and duties "as the President . . . may direct." 50 U.S.C. § 403-4a(d)(4). Thus, any action taken by these subordinate officials in the context of this case necessarily implicates the President's own authority and discretion in directing the use of force.

Indeed, in *Mississippi v. Johnson* itself, the Supreme Court denied a request to enjoin not only President Andrew Johnson from executing and carrying out the post-Civil War Reconstruction Acts, but the military commander assigned to the State of Mississippi as well. *See* 71 U.S. (4 Wall) at 475 (describing bill to enjoin). The Supreme Court noted that one of the Reconstruction Acts imposed duties "on the several commanding generals," and observed that "these duties must necessarily be performed under the supervision of the President as commander-in-chief." *Id*. at 499. Discussing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), the Court in *Johnson* went on to observe that the duty imposed by the Reconstruction Act "on the President is in no just sense ministerial. It is purely executive and political." *Johnson*, 71 U.S. (4 Wall) at 499. *Marbury* itself explains that "the President is invested with certain important political powers" under the Constitution for which he is accountable only politically, and in that context, he is authorized to appoint officers "who act by his authority and in conformity with his orders." 5 U.S. (1 Cranch) at 165-66. "In such cases, their acts are his acts," and courts have "no power to control that discretion." *Id.* at 166.

The allegations of this case do not concern a mere ministerial act by the President or his subordinate officials, but instead fundamentally challenge the scope of the authority of the President, acting through two of his principal Executive officers for national defense and intelligence, to protect the national security from a terrorist threat overseas posed by an organization against which the political branches have authorized the use of necessary and appropriate force.  In these circumstances, any injunction against principal military and intelligence officers and assistants to the President would as a practical matter impose an immediate and direct injunction on the President himself.  The court should not exercise its equitable discretion to bring about such an unprecedented result.  *See Sanchez-Espinoza*, 770 F.2d at 208 (holding, in a case where plaintiffs sought, *inter alia*, declaratory and injunctive relief with respect to U.S. support for the Nicaraguan Contras, that "the support for military operations that we are asked to terminate has, if the allegations in the complaint are accepted as true, received the attention and approval of the President . . . the Secretary of Defense, and the Director of the CIA, and involves the conduct of our diplomatic relations with [a] foreign state," and "whether or not this is . . . a matter so entirely committed to the care of the political branches as to preclude our considering the issue at all, we think it at least requires the withholding of discretionary relief").

For the foregoing reasons, the balance of interests at stake and the public interest, weighs heavily against the entry of injunctive relief sought by plaintiff.

### IV.    Plaintiff Has No Cause of Action under the Alien Tort Statute.

Plaintiff lacks a common law cause of action based on the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  The "torts" cognizable under the ATS include "three primary offenses,"

namely, "violation of safe conducts, infringements of the rights of ambassadors, and piracy."

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004). Beyond those, courts in certain

circumstances may create a federal common law cause of action for an additional offense that

would incorporate an international law standard. At a minimum, any such cause of action would

have to be based on an offense that is no "less definite content and acceptance among civilized

nations than the historical paradigms familiar when § 1350 was enacted" in 1789. *Id.* at 732. In

addition, the Supreme Court has stated that the courts must exercise "great caution in adapting

the law of nations to private rights," *id.* at 728, and enumerated reasons why the courts must

engage in "vigilant doorkeeping" in recognizing a "narrow class of international norms today,"

*id.* at 729.

This Court should not recognize the novel ATS cause of action plaintiff seeks to assert

for the alleged "arbitrary killing" of his son, Pls. Mem. at 24, for two separate reasons. First,

plaintiff asks this court to use its restricted power to create federal common law to fashion a

cause of action for injunctive and declaratory relief against the President, the Secretary of

Defense, and the Director of the CIA with respect to military and intelligence operations abroad.

This would be an extraordinary exercise of lawmaking power by the Judiciary that is nowhere

suggested in the text or origins of the ATS, and that would be manifestly contrary to the

Supreme Court's instruction that a court must exercise "great caution" in recognizing new causes

of action under the ATS. *Sosa*, 542 U.S. at 727-28.

Indeed, fashioning a common law cause of action under the ATS for the purely injunctive

and declaratory relief that plaintiff seeks here would be especially improper. Because "[t]he

Alien Tort Statute itself is not a waiver of sovereign immunity," *Sanchez-Espinoza*, 770 F.2d at

207 (Scalia, J.); *see El-Shifa*, 607 F.3d at 857-58 (Kavanaugh, J., concurring), plaintiff must rely

on the APA for a waiver of sovereign immunity. But the APA's waiver does not apply to the

President, *Franklin*, 505 U.S. at 800-01 (President is not an "agency" under the APA); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991), and does not displace a court's authority and responsibility to "deny relief on . . . any other appropriate legal or equitable ground." 5 U.S.C. § 702. Courts have held that "it would be an abuse of [the court's] discretion to provide discretionary relief" under the APA where a case involves "military operations that [the court is] asked to terminate," and where "the allegations in the complaint" are that those military operations "received the attention and approval of the President . . . the Secretary of Defense, and the Director of the CIA, and involve[] the conduct of our diplomatic relations with [a] foreign state[.]" *Sanchez-Espinoza*, 770 F.2d at 208. It would thus be improper for a court to use its limited authority to fashion federal common law under the ATS to create a cause of action limited to precisely the type of discretionary relief that courts should not award under the APA.

Moreover, the APA also specifies that "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Federal Tort Claims Act ("FTCA") comprehensively addresses "civil actions on claims against the United States" for "personal injury or death" or other torts "caused by . . . wrongful act or omission of any employee of the Government" but provides only "for money damages," 28 U.S.C. § 1346(b)(1), which by implication precludes any injunctive relief, *Moon v. Takisaki*, 501 F.2d 389, 390 (9th Cir. 1974). The jurisdictional grant in the ATS should not be combined with the APA waiver of immunity to create an injunctive or declaratory tort remedy (which is the only relief plaintiff requests) where the FTCA provides only for damages.

Second, plaintiff's ATS claim should be dismissed because he asserts a cause of action for a tort that it is not even universally recognized under domestic law, let alone under international law. Plaintiff predicates his claim on the theory that, if his son were "arbitrarily

killed," then he (as the father) would suffer as a bystander from an alleged intentional infliction of emotional distress.  Plaintiff has not alleged and cannot show that established international law protects bystanders from intentional infliction of emotional distress, and that such a norm has the same definite content and acceptance among civilized nations as the historical paradigms familiar when § 1350 was enacted in 1789.  *Sosa*, 542 U.S. at 731.

The tort of emotional distress, as a general matter, is not universally recognized even in this Nation.  *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 545 n.3 (1994).  And it is even less commonly accepted where, as here, plaintiff's alleged emotional distress does not arise from an actual physical injury already inflicted on his son, but from the alleged threat of a future injury to his son.   In addition, when a claimant asserts bystander emotional distress based on conduct directed at someone else – such as when "a husband is murdered in the presence of his wife" – the tort is normally limited "to plaintiffs who were present at the time."  Restatement (Second) of Torts § 46, cmt. l.  The only tort that plaintiff himself could assert – something akin to bystander intentional infliction of emotional distress in the absence of any physical injury or presence in the zone of danger – thus does not meet the accepted requirements of many jurisdictions in this Nation.  Nor does it separately meet *Sosa*'s requirement to have a "content and acceptance among civilized nations" that is similar to the "historical paradigm" of offenses against the laws of nations recognized in 1789.  542 U.S. at 731.  Accordingly, this Court should decline to recognize a new cause of action under the ATS of the sort that plaintiff seeks.

V.    **The Protection of Information Subject to the Military and States Secrets Privilege and Statutory Protection Forecloses Litigation of Plaintiff's Claims.**

    A.    **The State Secrets Privilege Need Not Be Reached In This Case.**

The foregoing threshold legal obstacles supply multiple grounds on which the Court should deny the motion for a preliminary injunction and dismiss the case. The Court therefore need not reach a final reason why this case must be dismissed: information protected by the military and state secrets privilege and related statutory protections is necessary to litigate plaintiff's claims. Consistent with the judicial admonition that the state secrets privilege be "invoked no more often or extensively than necessary," *Mohamed v. Jeppesen Dataplan, Inc.*, --- F.3d ---, 2010 WL 3489913 at *10 (9th Cir. Sept. 8, 2010) (en banc), the Court should not reach the privilege issue if the case can be resolved on the preceding grounds—particularly given the extraordinary posture of this case. However, were the Court inclined to allow the case to proceed after considering the government's other arguments, the Court should find that plaintiff cannot establish a likelihood of success on the merits, and should dismiss the case, because specific categories of information properly protected against disclosure by the privilege would be necessary to litigate each of plaintiff's claims and the case therefore cannot proceed without significant harm to the national security of the United States. [20]

The government does not invoke the protections of the state secrets privilege lightly. Pursuant to a policy announced by the Attorney General on September 23, 2009, the U.S.

---

[20] At a status conference on September 3, 2010, the Court directed that the Government present all of its arguments in opposition to the motion for a preliminary injunction in a single brief by this date. The Court declined the Government's suggestion that the briefing be sequenced to address the foregoing threshold legal issues first and reserve consideration of the state secrets privilege for a later stage.

Department of Justice will defend an assertion of the state secrets privilege in litigation, and seek dismissal of a claim on that basis, only when "necessary to protect against the risk of significant harm to national security." *See* Exhibit 2 (State Secrets Policy). Moreover, "[t]he Department will not defend an invocation of the privilege in order to: (i) conceal violations of the law, inefficiency, or administrative error; (ii) prevent embarrassment to a person, organization, or agency of the United States government; (iii) restrain competition; or (iv) prevent or delay the release of information the release of which would not reasonably be expected to cause significant harm to national security." *Id.* at 2. The Attorney General also established detailed procedures— followed in this case—for review of a proposed assertion of the state secrets privilege in a particular case. Those procedures require submissions by the relevant government departments or agencies specifying "(i) the nature of the information that must be protected from unauthorized disclosure; (ii) the significant harm to national security that disclosure can reasonably be expected to cause; [and] (iii) the reason why unauthorized disclosure is reasonably likely to cause such harm." *Id.* In addition, the Department will only defend an assertion of the privilege in court with the personal approval of the Attorney General following review and recommendations from senior Department officials. *Id.* at 3.

The state secrets privilege should be invoked only rarely, but its assertion in this case is proper and entirely consistent with the Attorney General's Policy. Without admitting or denying plaintiff's allegations (and indeed regardless of whether any particular allegations are true), the Complaint puts directly at issue the existence and operational details of alleged military and intelligence activities directed at combating the terrorist threat to the United States. Notably, plaintiff demands the disclosure of any "secret" criteria governing the use of lethal force against operational leaders of enemy forces overseas. *See* Compl. ¶ 30 (Fourth Claim for Relief).

-44-

Plaintiff also repeatedly concedes that resolution of his other claims on the merits would require discovery into the "totality" of the factual circumstances concerning whether or not and, if so, how the United States may plan to use lethal force, including whether, when and how the Government evaluates if a threat to national security is imminent, whether such force would be a last resort, and what the government is or is not actually doing to counter the ongoing and dangerous threat posed by al Qa'ida and its associated forces.  It should therefore be apparent that to litigate any aspect of this case, starting with the threshold question of whether plaintiff has in fact suffered any cognizable injury that could be remedied by the requested relief, would require the disclosure of highly sensitive national security information concerning alleged military and intelligence actions overseas.  For this reason, the Secretary of Defense, the Director of National Intelligence, and the Director of the CIA have all invoked both the military and state secrets privilege, and related statutory protections, to prevent disclosures of information that reasonably could be expected to harm national security.  Absent the privileged information, the case cannot proceed.

"The Supreme Court has long recognized that in exceptional circumstances courts must act in the interest of the country's national security to prevent disclosure of state secrets, even to the point of dismissing a case entirely." *Jeppesen*, --- F.3d ---, 2010 WL 3489913 at *6; *see also id*. at *23 (Hawkins, J., dissenting) ("Within the *Reynolds* framework, dismissal is justified if and only if specific privileged evidence is itself indispensable to establishing either the truth of the plaintiffs' allegations or a valid defense that would otherwise be available to the defendant."). But precisely because this result is extraordinary, courts have an important role to play in conducting an independent review of whether the information is privileged.  To that end, the government has submitted (*ex parte*, *in camera*) robust classified declarations for the Court's

review from the Secretary of Defense, the DNI, and the CIA Director setting forth the specific categories of information that must be protected to prevent significant harm to national security and the reasons why such harm would result from disclosure of the privileged information. When each of plaintiff's claims is considered in light of the privileged information, it should be apparent that this case cannot be litigated without creating an unacceptable risk of disclosing privileged information.

**B.      The State Secrets Privilege Bars the Use of Privileged Information in Litigation.**

The military and state secrets privilege protects information from disclosure in litigation where there is a reasonable danger that disclosure would "expose military matters which, in the interests of national security, should not be divulged." *United States v. Reynolds*, 345 U.S. 1, 10 (1953); Halkin v. *Helms*, 598 F.2d 1, 8-9 (D.C. Cir. 1978) ("*Halkin I*"); *see also In re Sealed Case* (*Horn*), 494 F.3d 139, 142 (D.C. Cir. 2007). The ability of the Executive to protect state secrets from disclosure in litigation has been recognized from the earliest days of the Republic. *Totten v. United States*, 92 U.S. 105 (1875) (citing the proceedings against Aaron Burr, *United States v. Burr*, 25 F. Cas. 30 (C.C.D. Va. 1807)); *see Reynolds*, 345 U.S. at 7-9; *see also Jeppesen*, --- F.3d ---, 2010 WL 3489913 at *6. The privilege "performs a function of constitutional significance" by allowing the Executive "to protect information whose secrecy is necessary to its military and foreign-affairs responsibilities." *El-Masri v. United States*, 479 F.3d 296, 303 (4th Cir.) (citing and discussing *United States v. Nixon*, 418 U.S. 683, 710 (1974)), *cert. denied*, 128 S. Ct. 373 (2007). The privilege protects a broad range of information, including disclosures that could reasonably be expected to lead to the "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and

disruption of diplomatic relations with foreign governments." *Ellsberg v. Mitchell*, 709 F.2d 51,

57 (D.C. Cir. 1983). The privilege also protects information that may appear innocuous on its

face, but which in a larger context could reveal sensitive classified information. *Id.* at 57 n.31;

*Halkin v. Helms*, 690 F.2d 977, 993 & n.57 (D.C. Cir. 1982) ("*Halkin II*").

"[T]he state secrets doctrine does not represent a surrender of judicial control over access

to the courts." *El-Masri*, 479 F.3d at 312; *Jeppesen*, --- F.3d ---, 2010 WL 3489913 at *12. "To

ensure that the state secrets privilege is asserted no more frequently and sweepingly than

necessary, it is essential that the courts continue critically to examine instances of its

invocation." *Ellsberg*, 709 F.2d at 58. At the same time, "[c]ourts should accord the 'utmost

deference' to executive assertions of privilege upon grounds of military or diplomatic secrets,"

*Halkin I*, 598 F.2d at 9,[21] in determining whether "there is a reasonable danger that compulsion

of the evidence will expose military matters which, in the interest of national security, should not

be divulged," *id.* (quoting *Reynolds*, 345 U.S. at 10); *see also In re Sealed Case (Horn)*, 494 F.3d

at 144 (a "reasonable danger of divulging too much" is sufficient).

The privilege can be invoked at any stage in the process, including the pleading stage.

*See Jeppesen*, --- F.3d ---, 2010 WL 3489913 at *10-11; *Ellsberg*, 709 F.2d at 54 & n.6. Once

the court determines that the privilege has been properly invoked, it "is absolute and cannot be

compromised by any showing of need on the part of the party seeking the information." *Halkin I*,

---

[21] *See also Halkin I*, 598 F.2d at 9 ("'[C]ourts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications in that area.'") (quoting *United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir. 1972)); *Al-Haramain Islamic Found. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007) ("[W]e acknowledge the need to defer to the Executive on matters of foreign policy and national security and surely cannot legitimately find ourselves second guessing the Executive in this arena.").

598 F.2d at 7.  "[E]ven the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake."  *Reynolds*, 345 U.S. at 11; *see also Ellsberg*, 709 F.2d at 57.

### C.  The Secretary of Defense, the Director of National Intelligence, and the Director of the Central Intelligence Agency Have Properly Invoked the State Secrets Privilege in this Case.

To invoke the state secrets privilege, the government must satisfy three procedural requirements: (1) there must be a "formal claim of privilege"; (2) the claim must be "lodged by the head of the department which has control over the matter"; and (3) the claim must be made "after actual personal consideration by that officer."  *Reynolds*, 345 U.S. at 7-8; *see Edmonds v. U.S. Dep't of Justice*, 323 F. Supp.2d 65; *see also Jeppesen*, --- F.3d ---, 2010 WL 3489913 at *10.  These requirements have been satisfied here.  The Secretary of Defense, the DNI, and the CIA Director have each made formal claims of privilege protecting various categories of information implicated by the allegations in this case.  *See* Public Declarations of Robert M. Gates, Secretary of Defense; James R. Clapper, Director of National Intelligence; and Leon E. Panetta, Director of the Central Intelligence Agency asserting formal claim of military and state secrets privilege.[22]

Summarized in necessarily general and unclassified terms (and again without confirming or denying any allegation in the Complaint), the privilege assertions encompass not only whether or not the United States plans the use of lethal force against particular terrorist adversaries

---

[22] The Secretary of Defense is the head of a department (namely, the Department of Defense) having control over the matter.  *See* 10 U.S.C. § 113(a).  Likewise, the DNI is head of the United States Intelligence Community, *see* 50 U.S.C. § 403(b)(1), with authority to protect intelligence sources and methods, *see id.* § 403-1(i)(1).  The DCIA is the head of the CIA pursuant to the National Security Act of 1947, 50 U.S.C. § 403-4a.

overseas but, if so, pursuant to what information and procedures.  This would include, for example, (i) intelligence information that would reveal the Government's knowledge as to the imminence of any threat posed by AQAP or Anwar al-Aulaqi, and the sources and methods by which such intelligence was obtained, *see* Gates Public  Decl. ¶ 6; Clapper Public Decl. ¶¶ 18-19; (ii) information concerning possible operations in Yemen and any criteria or procedures that may be utilized in connection with such operations; *see* Public Gates Decl. ¶ 7; (iii) information concerning security, military, or intelligence relations between the United States and Yemen.  *See* Gates Public Decl. ¶ 8; (iv) and any other information that would tend to confirm or deny any allegations in the Complaint pertaining to the CIA, including information that would tend to expose intelligence sources and methods, *see* Public Panetta Decl. ¶ 3.[23]

The disclosure of such information reasonably could be expected to harm the national security of the United States.  *See* Gates Public  Decl. ¶¶ 6-8; Clapper Public Decl. ¶¶ 20; Public Panetta Decl. ¶ 3.  For obvious reasons, revealing to a terrorist organization what the United States may know of their plans, and thereby risking disclosure of any sources and methods at

---

[23] Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 10-458, 118 Stat. 3638 (Dec. 17, 2004) (codified at 50 U.S.C. § 403-1(i)(1)), requires the DNI to protect intelligence sources and methods from unauthorized disclosure.  *See CIA v. Sims*, 471 U.S. 159, 180 (1985) ("[I]t is the responsibility of the [Director of National Intelligence], not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process.").  The information protected by this statutory privilege is at least co-extensive with the assertion of the state secrets privilege by the DNI.  *See* Clapper Public Decl. ¶¶ 8, 19.  Section 102A(i)(1) of the National Security Act of 1947, as amended, and section 6 of the CIA Act of 1949, as amended also require the CIA Director to protect intelligence sources and methods.  *See* Public Panetta Decl. ¶ 3.  These statutory protections underscore that the protection of intelligence sources and methods is not only supported by the judgment of the Executive branch, but pursuant to congressional authority as well.  *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

issue, would provide a treasure trove of vital information enabling that organization to alter their

plans and conceal their plotting.  *See* Gates Public  Decl. ¶ 6; Clapper Public Decl. ¶ 20.

Similarly, disclosure of whether or not lethal force has been authorized to combat a terrorist

organization overseas, and, if so, the specific targets of such action and any criteria and

procedures used to determine whether or not to take action, would again enable that organization

to determine whether or not, when, how, or under what circumstances, the United States may

utilize lethal force overseas—critical information needed to evade hostile action.  *See* Gates

Public  Decl. ¶ 7.  Similarly, and as again should be apparent, the disclosure of classified

information concerning military or intelligence relations with a foreign state would pose the risk

of serious harm to those relations as well as foreign relations generally and, as a result, to U.S.

national security.  *See* Gates Public Decl. ¶ 8.  The particular harms at issue in this case are

addressed further in the classified declarations provided for the Court's *in camera*, *ex parte*

review.

> **D.      The Exclusion of the Information Protected by the States Secrets and
> Statutory Privileges Requires Dismissal of this Action.**

After information protected by the military and state secrets privilege has been excluded

from a case, a court must then determine what impact that exclusion has on the adjudication of

plaintiff's claims.  *In re Sealed Case (Horn)*, 494 F.3d at 144.  In some cases, it may be possible

for the court to exclude the privileged information but proceed to decide the merits of the

plaintiff's claim on the basis of other available evidence.  Indeed, under the "narrow tailoring"

provision of the Attorney General's Policy, the Department considers whether such an approach

short of dismissal of the case is possible.  *See* Ex. 1 at 1.  On the other hand, courts have

recognized that "[i]n some instances, . . . application of the privilege may require dismissal of

the action." *Jeppesen*, --- F.3d ---, 2010 WL 3489913 at *13.  In particular, if the plaintiff is "manifestly unable to make out a prima facie case without the [privileged] information," then "dismissal of the relevant portion of the suit would be proper."  *Horn*, 494 F.3d at 145. Similarly, where the "defendant will be deprived of a valid defense based on the privileged materials," then the court "may properly dismiss the complaint."  *Id.* at 149.  Finally, "even if the claims and defenses might theoretically be established without relying on privileged evidence, it may be impossible to proceed with the litigation because—privileged evidence being inseparable from nonprivileged information that will be necessary to the claims or defenses—litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets." *Jeppesen*, --- F.3d ---, 2010 WL 3489913 at * 13.

        This case is a paradigmatic example of one in which no part of the case can be litigated on the merits without immediately and irreparably risking disclosure of highly sensitive and classified national security information.  The purpose of this lawsuit is to adjudicate the existence and lawfulness of alleged targeting decisions and to compel the disclosure of any "secret criteria" used to make those alleged determinations.  Plaintiff's complaint alleges (i) that the United States has carried out "targeted killings" outside of Iraq and Afghanistan, Compl. ¶ 13, (ii) and has specifically targeted Anwar al-Aulaqi, Compl. ¶¶ 19-21, and, in particular, (iii) that Anwar al-Aulaqi is allegedly subject to the use of lethal force "without regard to whether, at the time lethal force will be used, he presents a concrete, specific, and imminent threat to life, or whether there are reasonable means short of lethal force that could be used to address any such threat."  Compl. ¶ 23.  At every turn, litigation of plaintiff's claims would risk or require the disclosure of highly sensitive and properly protected information to respond to allegations regarding purported secret operations and decision criteria.  Even if some aspect of

the underlying facts at issue had previously been officially disclosed, the Government's privilege assertions demonstrate that properly protected state secrets would remain intertwined in every step of the case, starting with an adjudication of the threshold issue of plaintiff's standing (*i.e.*, whether or not there is an alleged "target list" which includes plaintiff's son, and whether he is being subjected to the threat of lethal force absent an imminent threat or a reasonable alternative to force), and the inherent risk of disclosures that would harm national security should be apparent from the outset.  As the Ninth Circuit in *Jeppesen* most recently observed, where "the claims and possible defenses are so infused with state secrets that the risk of disclosing them is both apparent and inevitable," dismissal is required.  *Jeppesen*, --- F.3d ---, 2010 WL 3489913 at *19.

As a starting point, even if the complaint sufficiently alleged an injury that could give rise to Article III standing (which the Government disputes), plaintiff would still have to prove the factual basis for his alleged injury were the case to proceed.[24]  Assuming he may proceed as a next friend, plaintiff would have to prove, at a minimum, whether or not his son has in fact been targeted for lethal force in the circumstances alleged.  Plaintiff concedes that the existence of the injury alleged—targeting for lethal force without compliance with the asserted imminence and last resort limitations—is a fact question, and yet fails to cite any competent evidence that

---

[24]    To establish Article III standing, a plaintiff must demonstrate an "injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling."  *Horne v. Flores*, 129 S. Ct. 2579, 2592 (2009).  Because the plaintiff is the party asserting federal jurisdiction, he bears the burden of establishing Article III standing, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006), and must not merely allege these three elements, but must at the appropriate point prove them as well, *Lujan*, 504 U.S. at 560-61.  Plaintiff cannot rest on general allegations in his Complaint, but must set forth specific facts that establish his standing to obtain the relief sought.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan*, 504 U.S. at 561).

remotely confirms these facts.  Rather, as discussed above, plaintiff attempts to infer that there could be no imminent threat, and that the U.S. has authorized the use of lethal force even where it is not necessary to interdict any imminent threat, from the mere existence of an alleged "standing order" to kill.  But even if that unsupported speculation is a sufficient allegation as a matter of pleading, the determination of whether or not the Government has in fact targeted Anwar al-Aulaqi for lethal force, and, if so, whether it has done so without regard to "imminence" and "reasonable alternative" limitations, and, if those criteria do apply, whether or not Anwar al-Aulaqi "is found to present" a concrete, specific, and imminent threat and there are no reasonable alternatives to lethal force, *see* Proposed Preliminary Injunction at 2, are *all* fact questions for which the privileged information would be necessary to determine.   Indeed, it would be extraordinary for the Government to be required to confirm or deny such matters in a lawsuit brought by the father of an operational terrorist who remains free to plan attacks against the United States.[25]

The privilege assertions similarly protect information essential to litigate the merits of each of plaintiff's claims.  The first claim is that the alleged use of lethal force by the Government violates the Fourth Amendment by authorizing the "seizure" of plaintiff's son "in circumstances [that] do not present [a] concrete, specific, and imminent threat[] to life or physical safety, and where there are means other than lethal force that could reasonably be

---

[25] *See Halkin II*, 690 F.2d at 991-94, 997 (where evidence concerning whether or not plaintiffs were in fact targeted by government surveillance program was protected by the state secrets privilege, plaintiffs were "incapable of demonstrating that they have standing to challenge that practice" and their claims must be dismissed); *see also Ellsberg*, 709 F.2d at 52-53, 59, 65 (same);  *ACLU* v. *NSA*, 493 F.3d 644, 653-56 (6th Cir. 2007) (same); *Al-Haramain*, 507 F.3d at 1205 (same).

employed to neutralize any such threat." Compl.¶ 27.[26]  On its face, the complaint concedes that

there *are* circumstances where the use of lethal force as a "seizure" *would* be entirely consistent

with the Fourth Amendment.  Likewise, plaintiff concedes that his son's targeting would be

constitutional if "at the time lethal force is employed, the citizen poses an imminent threat of

death or serious physical injury and there are no non-lethal means that could reasonably be used

to neutralize the threat."  Pls. Mem. at 11.  Plaintiff agrees that "[w]hether a seizure is justified

requires consideration of the 'totality of the circumstances.'"  Pl. Mem. at 11; *see also* Pls. Mem.

at 15 ("To be sure, the Fourth Amendment's reasonableness inquiry is context-specific.").

Resolution of plaintiff's claim therefore would require the Court to answer a range of questions,

even apart from the question of whether the plaintiff's son been targeted: What kind of threat, if

any, does plaintiff's son pose?  If there is a threat, how imminent is it, and how continuing is it?

How many innocent people are threatened by the danger plaintiff's son might pose?  In the

totality of the circumstances does the United States have the capability and access to capture

plaintiff's son safely?  In trying to capture him, how many innocent people or military personnel

would likely be killed or injured in the process?  It is self-evident that all the above questions

(and more) directly implicate information protected by the military and state secrets privilege, at

a minimum because those facts would require the examination of any available and pertinent

classified intelligence that might exist on the subject, as well as the sources or methods for

gathering that intelligence, and any related information concerning foreign relations and

diplomatic communications.

---

[26]  Plaintiff's Fifth Amendment claim would require the same fact-specific analysis of the very evidence made unavailable under the state secrets privilege and related statutory protections. *See* Pls. Mem. at 16 (Fifth Amendment claims virtually identical to Fourth Amendment claim).

Likewise, plaintiff's third claim, alleging that the alleged targeting of his son "violates treaty and international law," Compl. ¶ 29, raises identical fact issues.  Plaintiff again concedes that the alleged use of lethal force could be lawful under international law in certain circumstances.  Pls. Mem. at 27 ("[U]nder the body of international law . . . a state may intentionally deprive an individual of life" if it "meets certain stringent criteria.").  Even assuming plaintiff has correctly stated the international law requirements for the use of force in self defense, the criteria plaintiff believes the Court would have to apply—"proportionality," "necessity," and "precaution," Pls. Mem. at 27— are just as fact-specific as the inquiry he concedes is required in the Fourth and Fifth Amendment contexts.  *See* Pls. Mem. at 27-29.

Notably, plaintiff contends that the lawfulness of the alleged targeting of his son under international law would depend on whether the government could show either that Yemen has consented to the use of lethal force in its nation or that Yemen is unwilling or unable to stop any threat posed by plaintiff's son.  *Id.* at 30.  Any evidence that might exist as to either proposition, however, would plainly implicate sensitive diplomatic relations between the United States and Yemen and would thus also be covered by the state secrets privilege.  *See* Public Gates Decl. ¶ 8; *see also Ellsberg*, 709 F.2d at 57 (state secrets privilege prevents harms including "disruption of diplomatic relations with foreign governments").

Finally, plaintiff also raises a claim under the Fifth Amendment that expressly seeks disclosure of alleged secret criteria governing the targeting of U.S. citizens engaged in terrorist activities with lethal force.  Such a disclosure would reveal not only whether such targeting has occurred or been considered in any given case but would disclose to the plaintiff and any potential target the criteria utilized by the Government to make this determination.  It strains credulity to argue that the Due Process Clause requires the Government to disclose to Anwar al-

-55-

Aulaqi, an operational leader of AQAP, whatever criteria it may be applying to respond to his

activities.  Plaintiff does not and cannot point to a single precedent of any court holding that the

Due Process Clause requires advance notice of the criteria used to inform the Executive's

decision-making process for determining what, if any, targets might be struck in this context.  In

any event, disclosure of any such criteria would arm al-Aulaqi and all other AQAP leaders with

vital information for ascertaining whether, when, and how they may be subject to lethal force.

Plaintiff's contention that the Government has already conceded the operative facts, *see*

Compl. ¶¶ 15, 20; Pls. Mem. at 3-4, is meritless.  The public statements made by U.S.

Government officials cited by plaintiff do not establish plaintiff's standing or the information

needed to decide the merits of plaintiff's claims.  For example, then-DNI Blair specifically did

*not* confirm that Anwar al-Aulaqi is subject to lethal targeting.  *See* Exh. G to Declaration of Ben

Wizner.  Similarly, Deputy National Security Advisor John Brennan did not specifically discuss

Anwar al-Aulaqi or the use of lethal force at all, but indicated that an American Citizen overseas

trying to carry out terrorist attacks could face the "full brunt" of a U.S. response in "many

forms."  *See* Exh. I to Wizner Declaration.  Likewise, CIA Director Leon Panetta's statement

that Anwar al-Aulaqi is "someone we're looking for" and "focusing on" does not remotely

confirm plaintiff's standing.  *See* Exh. J to Wizner Declaration.  Plaintiff's citation to a statement

by the White House Press Secretary that Anwar al-Aulaqi has "cast his lot" with al Qa'ida, *see*

Exh. K to Wizner Declaration, also fails to demonstrate any standing here.  The Treasury

Department's Designation of Anwar al-Aulaqi as a Specially Designated Global Terrorist, and

related statement by Treasury Undersecretary Stuart Levey, also relied upon by plaintiff, *see*

Exhibit T to Wizner Declaration, says nothing at all about alleged lethal targeting.

Beyond this, many of the newspaper reports on which plaintiff relies contain a mix of unnamed, anonymous sources,[27] or have no source at all for its discussion of the facts alleged in plaintiff's complaint.[28]   "[W]idespread media and public speculation" does not amount to an official public acknowledgment by the government of the allegations made in the complaint, and it is often the case (as it is here) that only an "official acknowledgment" of a particular allegation "would cause damage to the national security."   *Afshar v. Dep't of State*, 702 F.2d 1125, 1130-31 (D.C. Cir. 1983) (FOIA context).   Moreover, the media reports conflict with each other and vary from allegations in the complaint: some make no mention of any operations in Yemen;[29] some make no mention of Anwar Al-Aulaqi as an alleged target[30] or expressly *decline* to say whether

---

[27] *See, e.g.,* Wizner Decl. Exh. A ("senior government officials," "current and former officials," "a senior law enforcement official"); Exh. B ("administrations officials"); Exh. C ("Bush administration officials," "the administration"); Exh. E ("current and former U.S. officials," "a U.S. counter-terrorism official"); Exh. F ("senior administration officials," "military officials," "military and intelligence officials," "an intelligence official"); Exh. H ("intelligence and counterterrorism officials," "an American official,"); Exh. J ("senior intelligence official"); Exh. L ("a U.S. official"); Exh. M ("officials"); Exh. N ("senior intelligence official"); Exh. P ("counterterrorism officials," "[f]ormer C.I.A. officials"); Exh. Q ("some US media reported alleged statements by unnamed US government sources"); Exh. R ("American officials"); Exh. S ("intelligence officials," "[i]ntelligence sources"); Exh. Y ("U.S. officials").

[28] *Id*. Exhs. U, V, AA.

[29] *Id.* Exhs. N, O, P; *see* Exh. G (former DNI acknowledged targeting U.S. citizens "abroad" without mentioning Yemen), Exh. AB ("U.S. military officials have refused to comment on whether American surveillance drones are operating in Yemen").

[30] *Id.* Exhs. A, B, C, O, P, Q, R, W, X, Z, AB.

he is a target;[31] others make only vague statements,[32] or refuse to acknowledge any details about the alleged activities.[33]  And, of course, these media reports are devoid of any substantive discussion of the imminence of a threat in making an alleged targeting decision; whether Anwar al-Aulaqi poses any imminent threat; whether lethal force would be a last resort; or any operational details for implementing alleged lethal force or carrying out the alleged targeting of al-Aulaqi.  *Northrop Corp.* v. *McDonnell Douglas*, 751 F.2d 395, 402 n.9 (D.C. Cir. 1984) (emphasis added) ("it is irrelevant" if the government previously disclosed *this* information which "cover[s] matters *related to* those over which [the government] claims the state secrets privilege," because "though related, the nature of the precise information contained in the revealed documents is different from that contained in the privileged documents and justifies different treatment") (emphasis added); *see also Jeppesen*, --- F.3d ---, 2010 WL 3489913 at *19 (partial disclosure of some aspects of the alleged activity does not preclude other details from remaining state secrets if their disclosure would risk grave harm to national security); *Al-*

---

[31] *Id.* Exh. G (former DNI Blair "did not specifically refer to the targeting of Aulaqi"), Exh. H (former DNI "did not name Ar. Awlaki as a target"), Exh. I (John O. Brennan, deputy White House national security advisor "said he would not talk about lists of targeted American terrorists" ), Exh. K at 9-10 (Press Secretary Robert Gibbs expressly declines to acknowledge whether al-Aulaqi is a target).

[32] *Id.* Exh. J (Al-Aulaqi is "someone that we're looking for" and is "one of the individuals that we're focusing on"), Exh. M (al-Aulaqi "is in the sights" of Yemeni officials with the U.S. "helping them," and "Americans who are trying to attack our country * * * we will definitely pursue [and] are targets"), Exh. R (America will rely on the "scalpel" rather than "the hammer"); Exh. V (U.S. is "actively trying to find" al-Aulaqi and "will continue to take action directly at terrorists like Awlaki").

[33] *Id.* Exh. I ("would not comment on the details of lethal operations or the procedure for targeting Americans"), Exh. K at 12-13 ("There's a process in place that I'm not at liberty to discuss" and "I'm just not at liberty to discuss intelligence matters."), Exh. L (there are "careful procedures" in place), Exh. N (refused to directly address the matter of drone strikes); Exh. P ("the United States refuses to officially acknowledge the attacks").

*Haramain*, 507 F.3d at 1203 (undisclosed details of officially acknowledged wiretapping program protected by state secrets privilege).

To turn unconfirmed statements, speculation, and hearsay into admissible evidence, the underlying allegations at issue here would have to be probed at length in discovery and the actual facts ascertained under the rules of evidence, including by obtaining and cross-examining sworn testimony.

> Adversarial litigation, including pretrial discovery of documents and witnesses and the presentation of documents and testimony at trial, is inherently complex and unpredictable. Although district courts are well equipped to wall off isolated secrets from disclosure, the challenge is exponentially greater in exceptional cases like this one, where the relevant secrets are difficult or impossible to isolate and even efforts to define a boundary between privileged and unprivileged evidence would risk disclosure by implication.

*Jeppesen*, --- F.3d ---, 2010 WL 3489913 at *18.  It is this intrusive and exacting process that would plainly risk or require the disclosure of specific privileged information, including intelligence sources and methods.

For the foregoing reasons, should the Court decline to dismiss this case on the numerous jurisdictional grounds outlined above, it should nonetheless find that the information needed to litigate this case, from standing forward, is properly protected by the Government's privilege assertion and that this requires dismissal as well.

## **CONCLUSION**

For the foregoing reasons, plaintiff's motion for a preliminary injunction should be denied and the plaintiff's complaint should be dismissed.

Date: September 24, 2010

TONY WEST
Assistant Attorney General, Civil Division

RONALD C. MACHEN, Jr.
United States Attorney

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

DOUGLAS LETTER
Terrorism Litigation Counsel

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

/s/ Anthony J. Coppolino
ANTHONY J. COPPOLINO (D.C. Bar 417323)
Special Litigation Counsel, Federal Programs Branch

/s/ Peter D. Leary
PETER D. LEARY
Trial Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW
Washington, D.C. 20001
(202) 514-3313