IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Nasser al-Aulaqi,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>Barack H. Obama, et al.,<br><br>　　　　Defendants. | CASE NO. 1:10-cv-01469-JDB |

BRIEF OF
THE VETERANS OF FOREIGN WARS OF THE UNITED STATES
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS AND DISMISSAL

Larry Maher
Quartermaster General

The Veterans of Foreign Wars
of the United States
406 W. 34th Street
Kansas City, MO  64111
(816) 968-1140

Herbert L. Fenster (D.C. Bar No. 153825)
Phillip E. Carter

MCKENNA LONG & ALDRIDGE LLP
1900 K Street NW
Washington, DC 20006
(202) 496-7500

Attorneys for *Amicus Curiae*
The Veterans of Foreign Wars of the United States

## TABLE OF CONTENTS

Page

INTEREST OF THE AMICUS CURIAE ................................................................................... 1

SUMMARY OF ARGUMENT ..................................................................................................... 2

ARGUMENT .................................................................................................................................. 3

ALLOWING THIS TYPE OF SUIT TO PROCEED WOULD SERIOUSLY IMPAIR
NATIONAL SECURITY AND U.S. MILITARY OPERATIONS OVERSEAS ......................... 3

    A.    Adjudication Of This Case Would Compromise The Military Principle Of
          "Unity Of Command," And Undermine The Chain Of Command ....................... 3

    B.    Adjudication Also Would Adversely Affect Unit Cohesion ................................. 7

    C.    Military Leadership And Decisionmaking Would Suffer..................................... 10

    D.    Special Operations Require Protection From This Type of Suit ......................... 12

CONCLUSION............................................................................................................................ 14

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Application of Yamashita*, 327 U.S. 1 (1946) ................................................................................4

*Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009)................................................................................5

*Department of Navy v. Egan,* 484 U.S. 518 (1988) ........................................................................3

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .....................................................................................6

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) .......................................................................................3

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952) ....................................................3

**TREATIES**

Annex to the Convention, Hague Convention No. IV Respecting the Laws and Customs of War on Land, *signed* Oct. 18, 1907, 36 Stat. 2277, 205 Consol. T.S. 277............................5

The Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, T.I.A.S. No. 3364 ……………………….............................................5

**STATUTES AND PUBLIC LAWS**

36 U.S.C. § 230101..........................................................................................................................1

36 U.S.C. § 230102..........................................................................................................................1

Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, 115 Stat. 224 (2001)......................................................................................................................6

**OTHER AUTHORITIES**

Army Field Manual 3-0, *Operations* (2008)...........................................................................10, 11

Army Field Manual 3-07, *Stability Operations* (2008) .................................................................11

Army Field Manual 6-22.5, *Combat and Operational Stress Control Manual for Leaders and Soldiers* (2009)................................................................................................................8

Army Field Manual 22-51, *Leaders' Manual for Combat Stress Control* (1994).........................9

Army Field Manual 27-10, *The Law of Land Warfare* (1956) ......................................................4

Franks, Jr., Gen. Frederick M., *Battle Command: A Commander's Perspective*, Military Review,  May-June 1996 .......................................................................................................11

Henderson, William Darryl, *Cohesion: The Human Element in Combat* (1985) ........................... 7

Henderson, William Darryl, *Why the Vietcong Fought: A Study of Motivation and Control in a Modern Army in Combat* (1979) ............................................................................ 8

Letter from Attorney General Eric H. Holder, Jr. to Sen. Mitch McConnell, February 3, 2010 ............................................................................................................................. 6

Holmes, Richard, *Acts of War* (1986) ........................................................................................... 7

MacPherson, James, *For Cause and Comrades* (1997) ................................................................. 7

Marshall, S.L.A., *Men Against Fire* (1947) ................................................................................... 8

Moskos, Jr., Charles C., *The American Enlisted Man: The Rank and File in Today's Military* (1970) .................................................................................................................................. 7

O'Brien, Tim, *The Things They Carried* (1990) ............................................................................ 5

Remarks of the President on National Security, May 21, 2009 ...................................................... 6

Rolbant, Samuel, *The Israeli Soldier: Profile of an Army* (1970) ................................................. 8

Sherman, Nancy, The Untold War (2010) ...................................................................................... 7

Shils, Edward A. and Janowitz, Morris, "Cohesion and Disintegration in the Wehrmacht in World War II," Public *Opinion Quarterly* 12 (Summer 1948) .......................... 7

Schnabel, James F., *History of the Joints Chiefs of Staff, Vol. 1* (1996) ........................................ 3

U.S. Joint Chiefs of Staff, Joint Pub. 1, *Doctrine for the Armed Forces of the United States* (2007) ...................................................................................................................... 6, 7

U.S. Joint Chiefs of Staff, Joint Pub. 3-0, *Joint Operations* (2010) ................................................ 4

U.S. Joint Chiefs of Staff, Joint Pub. 3-05, *Doctrine for Joint Special Operations* (2003) .... 12, 13

von Clausewitz, Carl, *On War*, trans. and ed. Howard, Michael and Paret, Peter (1976) ..... 3, 4, 10

Weigley, Russell F., History of the United States Army (1984) ..................................................... 3

Wong, Leonard, "Combat Motivation in Today's Soldiers," 32 Armed Forces & Soc. No. 4 (2006) ................................................................................................................ 8

## INTEREST OF THE *AMICUS CURIAE*

Founded in 1899, the Veterans of Foreign Wars of the United States ("the VFW") is the oldest veterans organization in the United States, and the largest organization of combat veterans. The VFW is a federally chartered corporation. *See* 36 U.S.C. § 230101. Its 8,000 posts include more than 1.5 million members. The VFW's members have served honorably in our nation's armed forces in conflicts on foreign soil. They include past and current members of the U.S. armed forces who have fought in all of this nation's wars, from World Wars I and II to the current wars in Iraq and Afghanistan, and the armed conflict against Al Qaeda. The VFW has a statutory mandate to, *inter alia*, "assist worthy comrades," "maintain and extend the institutions of American freedom," and "preserve and defend the United States from all enemies." 36 U.S.C. § 230102. Today, the VFW's core mission is to "honor the dead by helping the living," through veterans' service, community service, national security, and a strong national defense.

As a member organization comprised of individual veterans who have served this nation in war, and who continue to do so around the world, the VFW has a strong interest in protecting the operations of the U.S. armed forces from unwarranted or inappropriate judicial intrusion, as it believes is the case here. Such judicial interference with the Executive Branch and its constitutional war powers has dangerous implications for national security and our armed forces. Litigation over combat activities would undermine unit cohesion, the core of combat effectiveness at the small unit level. Judicial scrutiny of combat decision making—including strategic, operational and tactical decisions—would induce risk aversion and second-guessing among America's military leaders, degrading their effectiveness. And, in the sensitive field of

1

special operations, cases such as this may compromise the sources and methods used by America's elite warriors, potentially threatening both their mission and their safety.

Because of the importance of these issues, and the serious threat that this suit and similar litigation pose to national defense, the VFW is submitting this *amicus curiae* brief in order to share with the Court its perspective on the reasons why this action should be dismissed for lack of subject-matter jurisdiction.

## SUMMARY OF ARGUMENT

The VFW agrees with the Government's arguments regarding why this suit is barred, including by the political question doctrine. Rather than repeating those arguments, this *amicus* brief seeks to add perspective to the reasons why suits like the present action would threaten national security by interfering with ongoing military operations. Allowing this case to proceed would contravene the core military principle of "unity of command," and undermine the military's chain of command, creating uncertainty for subordinate leaders and soldiers. Such litigation also would adversely affect unit cohesion, the glue which binds small units together in the heat of battle, and enables them to survive and accomplish their missions. Further, litigation of cases such as this would undermine battlefield decisionmaking by subjecting tactical, operational and strategic decisions to second-guessing by courts far removed from the battlefield. And, to the extent this case will involve the activities of special operations forces, the VFW urges the Court to tread with particular caution, because of the need to protect the extremely sensitive sources and methods utilized by our nation's elite forces.

2

# ARGUMENT

## ALLOWING THIS TYPE OF SUIT TO PROCEED WOULD SERIOUSLY IMPAIR NATIONAL SECURITY AND U.S. MILITARY OPERATIONS OVERSEAS

"Without doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." *Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004), *citing Department of Navy v. Egan,* 484 U.S. 518, 530 (1988); *see also Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587 (1952) (acknowledging "broad powers in military commanders engaged in day-to-day fighting in a theater of war"). As veterans of this nation's wars, the VFW's members urge this Court to leave such matters in the hands of the President and Congress, because allowing this suit to proceed would undermine core military institutions such as the chain of command and unit cohesion.

### A.   Adjudication Of This Case Would Compromise The Military Principle Of "Unity Of Command," And Undermine The Chain Of Command

"Unity of command," and its corollary, "unity of effort," are fundamental principles of warfare which are central to the effectiveness of Western militaries. *See* Carl von Clausewitz, *On War* 200-210 (Michael Howard & Peter Paret, ed. and trans., Princeton University Press 1976) (1832) (hereinafter "Clausewitz"). There "is no higher and simpler law of strategy" than to apply this principle in order to concentrate a nation's military power its adversaries' "center of gravity." *Id*. at 204. This principle was first embraced by the American military during the 19th Century, and has subsequently shaped the organizational structure of American warfighting through two world wars and countless other conflicts. *See* James F. Schnabel, *History of the Joints Chiefs of Staff*, *Vol. 1* at 80-87 (1996); Russell F. Weigley, *History of the United States Army* at 422-423 (Bloomington: Indiana University Press, 1984). Unity of command requires

3

the integration of all combat functions into a single organizational element, with command authority vested in a single individual. *See* U.S. Joint Chiefs of Staff, Joint Pub. 3-0, *Joint Operations* at Appx. A, p. A-2 (2010), *available at* http://www.dtic.mil/doctrine/new_pubs/jp3_0.pdf.

The U.S. military implements "unity of command" through its chain of command—a hierarchical organizational structure which transmits command authority from the President through the Secretary of Defense, through subordinate military officers, down to the lowest ranking soldier, sailor, airman or Marine on the frontlines of America's armed conflicts. This chain of command serves important organizational purposes, by vesting command authority in individual officers who are responsible for specific missions, and are empowered to command their personnel to achieve those missions. The chain of command also supports important normative and legal policy purposes, such as the doctrine of "command responsibility," which renders battlefield commanders responsible for all their units do or fail to do, whether they knew about such conduct, or should have known about it. *See Application of Yamashita*, 327 U.S. 1, 14-16 (1946); *see also* Army Field Manual 27-10, *The Law of Land Warfare* at ¶ 501 (1956) (stating U.S. Army doctrine on "command responsibility").

"Everything in war is very simple," Clausewitz noted, "but the simplest thing is difficult." Clausewitz at 119. The dangers of war, the fatigue of close combat, and the uncertainty which lurks within the fog of war, all combine to create a kind of "friction" which impedes the progress of armies. *Id.* A more contemporary author and veteran describes this fog:

> For the common soldier, at least, war has the feel, the spiritual texture, of a great ghostly fog, thick and permanent. There is no clarity. Everything swirls. The old rules are no longer binding, the old truths no longer true. Right spills over into wrong. Order

> blends into chaos, love into hate, ugliness into beauty, law into anarchy, civility into savagery. The vapor sucks you in. You can't tell where you are, or why you're there, and the only certainty is overwhelming ambiguity . . . . You lose your sense of the definite, hence your sense of truth itself.

Tim O'Brien, *The Things They Carried* 88 (1990).

The military chain of command is designed to counteract this fog and friction of war, by providing clarity of orders and purpose to individual soldiers and their units.  Similarly, this organizational structure exists to impose some order on the behavior and actions of soldiers and units, aligning their conduct with national goals, framing their actions in the context of strategic and operational campaigns, and focusing their efforts on the missions which support these broader endeavors.  It is this structure which differentiates the armed forces of a nation from an armed group of thugs, and which ensures that national armed forces conduct themselves in accordance with the laws of armed conflict.  *Cf.* Annex to the Convention, Hague Convention No. IV Respecting the Laws and Customs of War on Land, art. 1, Oct. 18, 1907, 36 Stat. 2277, 205 Consol. T.S. 277; Geneva Convention (III) Relative to the Treatment of Prisoners of War, art. 4, Aug. 12, 1949, 6 U.S.T. 3316, T.I.A.S. No. 3364.

Our nation's military personnel depend on their chain of command to provide them with certainty, clarity and authority in the heat of battle.  Into this ordered system, Plaintiff wishes to inject the uncertainty of the American adversarial litigation process, by seeking, *inter alia*, that this Court declare there is no armed conflict in Yemen, and that orders issued by the President in response to that conflict should be enjoined.  Not only would this force the court to go far beyond the "limited institutional competence of the judiciary" by involving it in sensitive matters of national security, *cf. Arar v. Ashcroft*, 585 F.3d 559, 576 (2d Cir. 2009) (citations omitted), but this also would undermine the chain of command by literally interposing this Court between

the President and his subordinate officers, thereby contravening the core doctrinal principle of "unity of command," which has served American military forces in good stead since the Civil War.

In asking the Court to hear this case, and to entertain the extraordinary remedy of injunctive relief against the President and his cabinet, the Plaintiff is asking the court to overturn the political judgment of the President and Congress that the nation is at war; that this war is an armed conflict against Al Qaeda; and that it is appropriate to use a blend of military, intelligence and diplomatic force to wage this war.  All three branches of Government have decided that "[w]e are [] at war with al Qaeda and its affiliates." Remarks of the President on National Security, May 21, 2009; *see also* Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001); *Hamdan v. Rumsfeld*, 548 U.S. 557, 628-31 (2006). Political leaders from both political parties, over the course of two presidencies and five elected Congresses, have agreed upon, authorized, and appropriated funds for this war against Al Qaeda.

It is a fundamental axiom among American strategists that, "[a]s a nation, the United States wages war employing all instruments of national power – diplomatic, informational, military, and economic." U.S. Joint Chiefs of Staff, Joint Pub. 1, *Doctrine for the Armed Forces of the United States* at I-1 (2009), *available at* http://www.dtic.mil/doctrine/new_pubs/jp1.pdf. Plaintiff would seek to overturn the considered judgment of this nation's political leaders in choosing the national strategy for this war, including the Attorney General of the United States, who has written that, in this war against Al Qaeda, "we must use every weapon at our disposal . . . [including] *direct military action*, military justice, intelligence, diplomacy, and civilian law enforcement." *See* Letter from Attorney General Eric H. Holder, Jr. to Sen. Mitch McConnell, February 3, 2010 (emphasis added). The relief requested by plaintiff is both extraordinary and

inappropriate, and completely inconsistent with the strategic imperative for "unified action [which] ensures unity of effort focused on [national] objectives and leading to the conclusion of operations on terms favorable to the United States." *See* Joint Pub. 1 at I-1.

### B.   Adjudication Also Would Adversely Affect Unit Cohesion

Throughout military history, from the Spartan warriors at Thermopylae to today's American infantrymen in Afghanistan, soldiers have been motivated by comradeship and unit cohesion to sacrifice, persevere, and fight. *See generally* Richard Holmes, *Acts of War* (1986) (describing role of unit cohesion in mitigating fear and combat stress in World Wars I and II); James MacPherson, *For Cause and Comrades* (1997) (chronicling the motivations of American soldiers during the Civil War); Nancy Sherman, *The Untold War* (2010) (describing the emotional landscape of soldiering in Iraq and Afghanistan)  Although war brings many emotions to the surface, unit cohesion matters more than any other motivating factor in the heat of battle. "[Unit] cohesion exists in a unit when the primary day-to-day goals of the individual soldier, of the small group with which he identifies, and of unit leaders, are congruent--with each giving his primary loyalty to the group so that it trains and fights as a unit with all members willing to risk death and achieve a common objective."   William Darryl Henderson, *Cohesion: The Human Element in Combat*, (1985), *available at* http://www.au.af.mil/au/awc/awcgate/ndu/cohesion/.

Studies of wars throughout the 20th Century have shown unit cohesion to be *the* critical ingredient for the success or failure of small units.  *See* Edward A. Shils and Morris Janowitz, "Cohesion and Disintegration in the Wehrmacht in World War II," Public *Opinion Quarterly* 12 (Summer 1948) 280-315 (finding that unit cohesion translated into higher battlefield effectiveness, survivability and hardiness); Charles C. Moskos, Jr., *The American Enlisted Man: The Rank and File in Today's Military* 144-46 (1970) (finding that close bonds between soldiers

7

played a key role in determining unit effectiveness and survival in the Vietnam War); Samuel Rolbant, *The Israeli Soldier: Profile of an Army* 200-210 (1970) (finding that Israeli soldiers had "a very strong sense of mutual affection and attraction among unit members," and that this cohesion contributed significantly to their exemplary combat performance); William Darryl Henderson, *Why the Vietcong Fought: A Study of Motivation and Control in a Modern Army in Combat* 107-118 (1979) (finding that a combination of "very strong cohesion" and simple logistics enabled the North Vietnamese Army to persevere against overwhelming firepower); Leonard Wong, "Combat Motivation in Today's Soldiers," 32 Armed Forces & Soc. No. 4, 659-663 (2006) (concluding that, in Iraq and Afghanistan, American soldiers are primarily motivated by unit cohesion and comradeship, among other factors); Army Field Manual 6-22.5, *Combat and Operational Stress Control Manual for Leaders and Soldiers*, at ¶ 2-3 (2009) ("Unit cohesion and morale is the best predictor of combat resiliency within a unit or organization. Units with high cohesion tend to experience a lower rate of [combat stress] casualties than units with low cohesion and morale.). "I hold it to be one of the simplest truths of war that the thing which enables an infantry soldier to keep going with his weapons is the near presence or the presumed presence of a comrade." S.L.A. Marshall, *Men Against Fire* 42 (1947).

In this lawsuit, Plaintiff asks this Court to declare that the U.S. Government is not engaged in an armed conflict in Yemen, and that U.S. personnel may not therefore use lethal force against individuals in Yemen absent "circumstances in which they present concrete, specific, and imminent threats to life or physical safety, and there are no means other than lethal force that could reasonably be employed to neutralize the threats." Further, plaintiff seeks disclosure of the allegedly classified criteria used to designate U.S. citizens for targeting. And,

in this suit's most extraordinary request, Plaintiff asks this Court to enjoin the President, his advisers, and his generals, from conducting certain parts of the nation's war against Al Qaeda.

As described above, judicial action of the sort requested by Plaintiff would have a deleterious effect on the chain of command. Judicial action also would, necessarily, affect unit cohesion by undermining both the vertical bonds among leaders and followers, and the horizontal bonds among comrades. These bonds depend on the clarity of orders and authorities which are the *sine qua non* of the military organizational structure. A judicial order on the lawfulness of the armed conflict in Yemen, or the appropriateness of U.S. military actions there, would cast doubt upon the orders of the President and his subordinate military officers, and introduce uncertainty into the military structure. Further, should this suit be allowed to proceed, it may eventually result in litigation relating to actions taken by military forces in Yemen. Such litigation may require units and soldiers to participate in the production of documents, interrogation of witnesses, and presentation of evidence at trial in an adversarial proceeding. Such litigation would rip apart the military units it touched, by pitting comrades against each other as potential witnesses, and creating the risk that every uttered or written word could eventually be used in a future courtroom, making every battlefield act susceptible to second-guessing and criticism. At its core, unit cohesion reflects a core trust among comrades so powerful that it would motivate a soldier to sacrifice his or her life for another, such that "[c]ombat soldiers describe the bond, hesitantly or openly, as love." *See* Army Field Manual 22-51, *Leaders' Manual for Combat Stress Control*, at ¶ 3-7 (1994). Judicial intervention in this matter would erode that bond for the units touched by this process, undermining their effectiveness and our national security.

C.     **Military Leadership And Decisionmaking Would Suffer**

War is the province of chance. "If we now consider briefly the subjective nature of war—the means by which war has to be fought—it will look more than ever like a gamble . . . [i]n the whole range of human activities, war most closely resembles a game of cards." Clausewitz, 86-87. Within this field of human endeavor, the most successful armies are those led by decisive commanders who visualize the operational environment and make rapid, sound decisions. Combat leadership involves the motivation of others to risk their lives, and only the most decisive and confident leaders can inspire this kind of self-sacrifice.

> Leadership is the multiplying and unifying element of combat power. Confident, competent, and informed leadership intensifies the effectiveness of all other elements of combat power by formulating sound operational ideas and assuring discipline and motivation in the force . . . Leadership in today's operational environment is often the difference between success and failure.

Dept. of the Army, Field Manual 3-0, *Operations,* at ¶¶ 4-6 - 4-8 (2008), *available at* http://www.army.mil/fm3-0/fm3-0.pdf.

Battle command is a subset of combat leadership—it is how wartime leaders operationalize their intent and transmit their guidance to subordinate units.

> Battle command is the art and science of understanding, visualizing, describing, directing, leading, and assessing forces to impose the commander's will on a hostile, thinking, and adaptive enemy. Battle command applies leadership to translate decisions into actions—by synchronizing forces and warfighting functions in time, space, and purpose—to accomplish missions. Battle command is guided by professional judgment gained from experience, knowledge, education, intelligence, and intuition. It is driven by commanders.

*Id.* at ¶ 5-9. Battlefield decisionmaking involves the visualization of the battlefield and all its components, the deliberate assessment of operational risk, and the selection of a course of action which accepts certain risks in order to achieve tactical, operational or strategic success. *Id.* at ¶

5-10; *see* also Gen. Frederick M. Franks, Jr., *Battle Command: A Commander's Perspective*, Military Review, May-June 1996, at 120-121. "Given the inherently uncertain nature of war, the object of planning is not to eliminate or minimize uncertainty but to foster decisive and effective action in the midst of such uncertainty." Army Field Manual 3-07, *Stability Operations*, at ¶ 4-4 (2008), *available at* http://usacac.army.mil/cac2/repository/FM307/FM3-07.pdf.

In bringing this case, Plaintiff asks this Court to substitute itself as the battlefield commander, and to second-guess the strategic, operational and tactical decisions made by this nation's military chain of command in the campaign against Al Qaeda. Judicial decisionmaking is incompatible with military decisionmaking. Rather than produce rapid, confident, decisive actions, judicial resolution of this matter would produce deliberate and measured decisions which are the product of adversarial process, and which would reflect judicial considerations, not strategic or tactical ones.

Also, judicial involvement may induce risk aversion among commanders, who would worry about how their actions might be judged in courtrooms far removed from the battlefield, and thus hedge their battlefield decisions in order to protect themselves and their units from future judicial scrutiny. This is particularly true of Plaintiff's prayer for relief, which calls upon the Court to enjoin the Government from using lethal force "except in circumstances in which they present concrete, specific, and imminent threats to life or physical safety, and there are no means other than lethal force that could reasonably be employed to neutralize the threats." Such decisions about the use of force can often be made by soldiers in a split-second, on the basis of intuition and training. The specter of judicial involvement will affect the way soldiers and

11

leaders approach these decisions, potentially complicating and slowing their decisions by injecting judicial considerations which have no place on the battlefield.

### D. Special Operations Require Protection From This Type of Suit

Finally, the VFW's membership includes many current and former members of the U.S. armed forces' elite special operations forces—Army Rangers and Special Forces, Navy SEALs, Air Force parajumpers and combat controllers, and Marine Corps Force Reconnaissance personnel, among others. These elite warriors conduct highly dangerous missions today in Iraq, Afghanistan, and other countries around the world. By definition, special operations "are operations conducted in hostile, denied, or politically sensitive environments to achieve military, diplomatic, informational, and/or economic objectives employing military capabilities for which there is no broad conventional force requirement. These operations often require covert, clandestine, or low-visibility capabilities." U.S. Joint Chiefs of Staff, Joint Pub. 3-05, *Doctrine for Joint Special Operations*, at I-1 (2003), *available at* http://www.dtic.mil/doctrine/new_pubs/jp3_05.pdf.

Special operations are differentiated from conventional operations in many ways, but foremost among these are their "degree of physical and political risk, operational techniques, mode of employment, independence from friendly support, and dependence on detailed operational intelligence and indigenous assets." *Id*. "Surprise is often the most important principle in the conduct of successful [special operations] and the survivability of employed [special operations forces]," and the very nature of special operations requires "high levels of security . . . to protect the clandestine/covert nature of missions." *Id*. at I-6. More than mission accomplishment is at stake—"[g]iven their operating size, [special operations teams] are more vulnerable to potential hostile reaction to their presence than larger conventional units," and

therefore the protection of sources and methods is essential for the survival of special operations forces.  *Id*.  To preserve this element of surprise, special operations forces must broadly conceal their tactics, techniques and procedures, including information about unit locations and movements, targeting decisions, and operational plans for future missions.  Disclosure of this information would allow this nation's adversaries to defend themselves more effectively, potentially inflicting more casualties upon U.S. special operations forces.  Such disclosure would also provide information about how the U.S. military gathers information about its adversaries, enabling terrorist groups like Al Qaeda to alter its communications and activities in order to evade future detection and action by the U.S. Government.  Such harm would not be limited to just this instance or terrorist group group; these disclosures would also provide future terrorist adversaries and military adversaries with insight into U.S. special operations capabilities which would enable them to counter such capabilities in future conflicts.  *Cf.* Public Declaration of Robert M. Gates, Secretary of Defense, Govt. Exhibit 4, September 23, 2010, at ¶¶ 6-7.

In this matter, the Plaintiff asks the Court to pull back the veil on the U.S. special operations community, exposing special operations sources and methods to the public, including this nation's enemies.  This would do tremendous harm to current special operations personnel, including VFW members, who are operating abroad in Iraq, Afghanistan, and elsewhere, and who depend on stealth, security and surprise for their survival and mission accomplishment.  Further, in his prayer for relief, Plaintiff asks the Court to order the disclosure of  "the criteria that are used in determining whether the government will carry out the targeted killing of a U.S. citizen."  As Secretary Gates states in his public declaration filed by the Government, without confirming or denying any allegation made by Plaintiff, this type of information "constitutes highly sensitive and classified military information that cannot be disclosed without causing

serious harm to the national security of the United States." *Id.* at ¶ 5. These criteria necessarily reflect the sources, methods and analytic processes used to produce them, and would tend to reveal other information about military sources and methods which are essential to the success and survival of special operations personnel.

## CONCLUSION

For the foregoing reasons, the VFW urges this court to dismiss this action on the ground that it is nonjusticiable.

Respectfully submitted,

_____
Herbert L. Fenster (D.C. Bar No. 153825)
Phillip E. Carter

MCKENNA LONG & ALDRIDGE LLP
1900 K Street NW
Washington, DC 20006
(202) 496-7500

Attorneys for *Amicus Curiae*
The Veterans of Foreign Wars of the United States