# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**NASSER AL-AULAQI,** on his own behalf )
and as next friend acting on behalf of )
Anwar Al-Aulaqi, )
)
Plaintiff, )
)
v. )    CA No. 1:10cv01469 (JDB)
)    Judge Bates
**BARACK H. OBAMA,** President of the United )
States; **ROBERT M. GATES,** Secretary of )
Defense; and **LEON E. PANETTA**, Director of )
the Central Intelligence Agency, )
)
Defendants. )
_____ )

**BRIEF OF JACK W. KLIMP, Lt. General, U.S. Marine Corps (Ret.),**
**JOHN D. ALTENBURG, Major General, U.S. Army (Ret.),**
**JAMES J. CAREY, Rear Admiral, U.S. Navy (Ret.),**
**STEVEN B. KANTROWITZ, Rear Admiral, U.S. Navy (Ret.),**
**NORMAN T. SAUNDERS, Rear Admiral, U.S. Coast Guard (Ret.),**
**THOMAS L. HEMINGWAY, Brigadier General, U.S. Air Force (Ret.),**
**ALFRED L. MICHAUD, Colonel, U.S. Army (Ret.)**
**WILLIAM D. PIVARNIK, Captain, U.S. Navy (Ret.),**
**ERIC ROJO, Colonel, U.S. Army (Ret.),**
**PETER J. REYNIERSE, Commander, U.S. Navy (Ret.),**
**THOMAS A. SMITH, Lt. Colonel, U.S. Army (Ret.),**
**ADRIAN CRONAUER, WASHINGTON LEGAL FOUNDATION,**
**NATIONAL DEFENSE COMMITTEE, AND ALLIED EDUCATIONAL FOUNDATION**
**AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Daniel J. Popeo
Richard A. Samp
   (D.C. Bar No. 367194)
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave, NW
Washington, DC 20036
(202) 588-0302

Dated: October 4, 2010                Counsel for *Amicus Curiae*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTERESTS OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    THE COURT CAN AND SHOULD ADDRESS THE POLITICAL QUESTION
      AND STATE SECRET DOCTRINES BEFORE DETERMINING WHETHER
      THE PLAINTIFF HAS STANDING TO SUE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    Both the Political Question Doctrine and the State Secrets Doctrine
            Are Jurisdictional in Character  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    Dismissal of This Suit on Standing Grounds Alone Would Not
            Serve the Public Interest Because It Would Leave Unresolved
            Whether Litigation of This Sort Is Ever Appropriate  . . . . . . . . . . . . . . . . . . . 13

II.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT RAISES
      NONJUSTICIABLE POLITICAL QUESTIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Al-Haramain Islamic Found. v. Bush*, 507 F.3d 1190 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . 12

\* *Baker v. Carr*, 369 U.S. 186 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 21

*Bancoult v. McNamara*, 445 F.3d 427 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 8, 17, 18

*Boumediene v. Bush,* 553 U.S. 723 (2008)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21

*Doe v. Exxon Mobil Corp.,* 473 F.3d 345 (D.C. Cir. 2007),
   *cert. denied*, 128 S. Ct. 2931 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

\* *El-Shifa Pharm. Industries Co. v. United States,* 607 F.3d 836 (D.C. Cir. 2010) . . . . 18, 19, 21

*Gilligan v. Morgan*, 413 U.S. 1 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Haig v. Agee*, 438 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16

*Hamdi v. Rumsfeld,* 542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

\* *Hwang Geum Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . 7, 10, 11, 13

*In re Papandreou*, 139 F.3d 247 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Luftig v. McNamara*, 373 F.2d 664 (D.C. Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Mohamed v. Jeppesen Dataplan, Inc.*, ___ F.3d ___, 2010 U.S. App. LEXIS 18746
   (9th Cir., Sept. 8, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) . . . . . . . . . . . . . . . . . 11

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.*, 549 U.S. 422 (2007) . . . . . . . . . . . . . . . . 13

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ii

Page(s)

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) . . . . . . . . . . . . . 8, 11, 12, 13

*Tenet v. Doe*, 544 U.S. 1 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 13

*Toca Producers v. FERC*, 411 F.3d 262 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Reynolds*, 345 U.S. 1 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*United States v. Totten*, 92 U.S. 105 (1875) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14

**Statutes and Constitutional Provisions:**

U.S. Const., art. i, § 9, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S. Const., art. iii, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Alien Tort Statute (ATS), 28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 22

Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1601 *et seq.* . . . . . . . . . . . . . . . . . . . 10

8 U.S.C. § 1189 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

8 U.S.C. § 1189(a)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Miscellaneous:**

Harold Koh, Address at the Annual Meeting of the American Society of International Law
 (Mar. 25, 2010), *available at* http://www.state.gov/s/l/releases/remarks/139119.htm . . . . . . 24

Cases principally relied on are marked with an asterisk.

## INTERESTS OF *AMICI CURIAE*

*Amici curiae* are 11 retired officers in the U.S. armed forces, and several organizations with an interest in national security issues. Their interests are set forth more fully in the accompanying motion for leave to file this brief.

Lt. General Jack W. Klimp, U.S. Marine Corps (Ret.), began his career in 1968 as a rifle platoon commander and company commander in Vietnam. During the course of 33 years of service in the military, he participated in Operation Desert Shield/Desert Storm as the director of General Norman Schwarzkopf's joint operation center and was later commander of Task Force Mogadishu during operation Restore Hope in Somalia.

Major General John D. Altenburg, U.S. Army (Ret.), served two years as an enlisted man and 28 years as an Army lawyer. His Military Justice and Combat Operations and Peacekeeping Law experience included service or legal oversight in Vietnam, Special Operations, Operation Desert Storm-Kuwait/Iraq, Operation Restore Hope-Somalia, Operation Uphold Democracy-Haiti, Operation Joint Endeavor/Guard-Bosnia, and Joint Guardian-Kosovo, followed by four years as the Deputy Judge Advocate General (1997-2001). He served as the Appointing Authority for Military Commissions from 2004 to 2006.

Rear Admiral James J. Carey, U.S. Navy (Ret.), served 33 years in the U.S. Navy and Naval Reserve, including service in Vietnam. He is a former Chairman of the U.S. Federal Maritime Commission and current Chairman of the National Defense Committee (NDC), which is also joining in this brief. The NDC is a grass roots pro-military organization supporting a larger and stronger military and the election of more veterans to the U.S. Congress.

Rear Admiral Steven B. Kantrowitz, U.S. Navy (Ret.), served on active duty and in the Reserve of the U.S. Navy from 1974 through 2005. He retired as a Rear Admiral in the Judge

Advocate General's Corps.  During active duty, he served as a judge advocate performing duties involving the full reach of military law practice.  This includes service for three years as Special Assistant and Aide to the Judge Advocate General of the Navy. As a Flag officer, he served as the Assistant Deputy Advocate General of the Navy and Deputy Commander, Naval Legal Service Command.

Rear Admiral Norman T. Saunders, U.S. Coast Guard (Ret.), served on active duty for 35 years, including service in the Vietnam War.  At the time of his retirement he was the Commander of the 7th Coast Guard District in Miami.  He previously served as Commander of the Coast Guard Military Personnel Command.

Brigadier General Thomas L. Hemingway, U.S. Air Force (Ret.), served at the time of his retirement in May 2007 as the Legal Advisor to the Convening Authority in the Department of Defense Office of Military Commissions.  He was commissioned as a second lieutenant in 1962 and entered active service in 1965 after obtaining a law degree.  He has served as a staff judge advocate at the group, wing, numbered air force, major command, and unified command level. He was also an associate professor of law at the U.S. Air Force Academy and a senior judge on the Air Force Court of Military Review.

Colonel Alfred L. Michaud, U.S. Army (Ret.), served as an enlisted man in the 45th Infantry Division in Korea from 1950 to 1952.  Thereafter, he was commissioned a Second Lieutenant and served in active and reserve status until his retirement from the Army in 1976. His various assignments included service as Battalion Executive Officer and Commander Officer of the 344th Field Artillery Battalion and as Training Officer for South Texas.

Captain William D. Pivarnik, U.S. Navy (Ret.), served in the Navy for 26-½ years

2

following graduation from the U.S. Naval Academy in 1958. His active duty assignments included service in Vietnam and the command of two ships. Since 1986 he has been an ordained Deacon in the Catholic Church.

Colonel Eric Rojo, U.S. Army (Ret.), served for 31 years in the U.S. Army, including service in Vietnam as a helicopter pilot. His military assignments included work as a counter-terrorism officer, including serving as first Reserve Advisor to the Commanding General of the Venezuelan Army.

Commander Peter J. Reynierse, U.S. Navy (Ret.), served in the U.S. Navy for more than 26 years as both an enlisted man and officer. He served on the staff of both the Chief of Naval Operations and the Under Secretary of the Navy and retired from active service in 1998.

Lt. Colonel Thomas A. Smith, U.S. Army (Ret.), served in the U.S. Marine Corps for seven years and in the U.S. Army for 25 years. Before his retirement in 2005, he served during military actions in Grenada, Haiti, Panama, and Iraq (Desert Storm).

Adrian Cronauer served in the U.S. Air Force beginning in 1962 and was honorably discharged at the rank of Sergeant E-4 in 1968. He co-authored the original script of *Good Morning Vietnam*, a movie loosely based on his service in Vietnam. He later received a law degree, and from 2001 to 2009 he worked under the Office of the Secretary of Defense as Special Assistant to the Director of the POW/MIA Office.

The Washington Legal Foundation (WLF) is a non-profit public interest law and policy center with supporters in all 50 states. WLF devotes a substantial portion of its resources to promoting America's national security. To that end, WLF has appeared in this and numerous other federal courts to ensure that the U.S. government is not deprived of the tools necessary to

protect this country from those who would seek to destroy it and/or harm its citizens.  *See, e.g.,* *Boumediene v. Bush,* 553 U.S. 723 (2008); *Hamdi v. Rumsfeld,* 542 U.S. 507 (2004).

The Allied Educational Foundation (AEF) is a non-profit charitable foundation based in Englewood, New Jersey.  Founded in 1964, AEF is dedicated to promoting education in diverse areas of study, such as law and public policy, and has appeared on a number of occasions in cases raising national security issues.

*Amici* are concerned that the ability of the American military to carry out its mission will be compromised if federal courts are placed in a position of second-guessing the operational decisions of military commanders.  *Amici* concur with Defendants that Nassar Al-Aulaqi may lack standing to file suit based on injuries allegedly incurred (or likely to be incurred) by his son. *Amici* are filing separately to urge the Court to dismiss the case on grounds that have wider application – either that claims of this sort raise non-justiciable political questions or that the state secrets doctrine bars adjudication of the claims.  Dismissing the case on standing grounds would do nothing to resolve the issues raised herein; it would simply cause Plaintiff's attorneys to re-file similar claims on behalf of other plaintiffs with arguably stronger bases for asserting standing.  Moreover, the Court is not required to address standing first.  Rather, even when a court may lack subject matter jurisdiction because the plaintiff's standing is subject to question, a federal court is entitled to initially consider whether to dismiss the case on the basis of *any other* jurisdictional deficiency.

## STATEMENT OF THE CASE

Plaintiff alleges that the United States government has authorized the "targeted killing" of his son, Anwar Al-Aulaqi, and that the Defendants – President Barack Obama, CIA Director

4

Leon Panetta, and Defense Secretary Robert Gates – had direct involvement in the authorization process. Complaint, ¶¶ 20-21. He alleges that: (1) Al-Aulaqi is living in hiding in Yemen, outside of the areas in which the United States is involved in armed conflict with al-Qaeda, *id.* ¶ 26; (2) the CIA and the Joint Special Operations Command (JSOC) have been authorized to kill Al-Aulaqi "without regard to whether, at the time lethal force will be used, he presents a concrete, specific, and imminent threat to life, or whether there are reasonable means short of lethal force that could be used to address any such threat," *id.* ¶ 23; and (3) although the U.S. has labeled Al-Aulaqi a terrorist, it has not "publicly indicted" him "for any terrorism related crime." *Id.* ¶ 24.

The complaint seeks a declaration that the U.S. Constitution and international law prohibit Defendants from carrying out the targeted killing of U.S. citizens, including Al-Aulaqi, except in the context of armed conflict, or in circumstances in which a targeted citizen presents a concrete, specific, and imminent threat to life or physical safety and there are no means other than lethal force that could reasonably be employed to neutralize the threat. The complaint also seeks an injunction against efforts to kill Al-Aulaqi except under the circumstances outlined above. Finally, it seeks an order requiring Defendants to disclose the criteria that are used in determining whether the government will authorize the targeted killing of a U.S. citizen. Complaint at 11.

On September 25, 2010, Defendants filed a motion to dismiss the complaint. They allege: (1) Al-Aulaqi's father lacks standing to assert the son's claims; (2) the case raises nonjusticiable political questions; (3) the Court should exercise its equitable discretion not to grant the relief sought; (4) Plaintiff lacks a cause of action under the Alien Tort Statute (ATS), 28

5

U.S.C. § 1350; and (5) the "state secrets" doctrine forecloses litigation of Plaintiff's claims. Defendants explicitly request that the Court avoid addressing the state secrets doctrine unless it determines that dismissal of the case is not warranted based on one or more of the other defenses raised in their motion.  Defts Mot. to Dismiss at 43-44.

## SUMMARY OF ARGUMENT

Defendants very likely are correct that Plaintiff Nasser Al-Aulaqi lacks standing to bring this lawsuit.  He is suing as "next friend" of his son Anwar, based on the theory that Anwar is not in a position to come to federal court to assert his own rights.   As Defendants point out, however, there is reason to doubt both that this lawsuit reflects Anwar's wishes and that Congress has authorized the invocation of federal court jurisdiction based on "next friend" status in cases arising outside the habeas corpus context.

If Plaintiff lacks standing, the Court lacks jurisdiction to hear this case and must dismiss it without reaching the merits of Plaintiff's constitutional and international law claims.  *Amici* urge the Court, however, not to reach the standing issue until after it has decided the other "jurisdictional" issues raised by the motion to dismiss:  whether the case raises nonjusticiable political questions, and whether dismissal is required under the "state secrets" doctrine. Dismissal based on a ruling that Al-Aulaqi's father lacks standing would resolve this particular case, but it would provide little or no guidance for other lawsuits that are sure to follow.  The ACLU and other legal organizations have made clear their belief that the Constitution and international law prohibit, under most circumstances, targeted killing of American citizens outside of an active war zone.  A dismissal on standing grounds likely would lead those organizations to file yet another suit on behalf of another individual with stronger standing

6

claims.  Accordingly, in the interests of preserving judicial resources, it makes sense for the Court to address the broader jurisdictional issues first:  even assuming that a plaintiff challenging government "targeted killing" policy has standing, are federal courts jurisdictionally barred from hearing those claims – either because such a challenge raises nonjusticiable political questions or because jurisdiction is barred under the "state secrets" doctrine.

The U.S. Court of Appeals for the District of Columbia Circuit has held unequivocally that the political question doctrine raises issues that are jurisdictional in nature and thus that may be decided in advance of other jurisdictional issues.  *Hwang Geum Joo v. Japan*, 413 F.3d 45, 47-48 (D.C. Cir. 2005).  *Hwang Geum Joo* also endorsed deciding issues arising under the state secrets doctrine in advance of other jurisdictional issues, at least in those instances where (as here) the federal government is asserting that the state secrets doctrine prevents adjudication of any portion of the plaintiff's claims.  *Id.* at 48 (citing *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005)).  Defendants express reluctance to have the case decided on state secrets grounds because of their belief that the defense should be invoked by the Executive Branch no more often or extensively than necessary.  Mot. to Dismiss at 43.  But the fact remains that Defendants have decided that this is one of the unusual instances in which the state secrets doctrine does, indeed, require dismissal of the lawsuit.  Now that the appropriate high-level Executive Branch officials have determined that  invocation of the doctrine is appropriate, there is no reason for the Court to shy away from deciding the issue.

*Amici* respectfully submit that this case raises nonjusticiable political questions and urge the Court to so hold.  Based on their extensive military experience, the individual *amici* agree with Defendants that allowing federal courts to second-guess the operational decisions of military

leaders will seriously undercut military effectiveness. Following receipt of information that a potential target has been located, the military rarely has more than a brief period of time within which to determine whether to attack the target. The deadline almost surely could not be met if the military, before being allowed to take action, could be required to explain to a federal court (as demanded by Plaintiff) why the targeted individual presented a "concrete specific, and imminent threat to life or human safety," as well as the basis for its conclusion that "there are no means other than lethal force that could reasonably be employed to neutralize the threat."

The political question doctrine bars judicial resolution of issues whose resolution has been committed by the Constitution to the political branches of government. The Constitution places into the hands of the President and Congress control of national security and foreign relations issues. Indeed, they "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Haig v. Agee*, 438 U.S. 280, 292 (1981). Plaintiff has cited no cases in which a federal court has been willing to second-guess the operational decisions of the American military. If, as Plaintiff contends, military leaders have determined that national security requires that his son be targeted for killing, the Constitution does not permit the courts to re-examine that national security assessment. Moreover, courts lack both the tools and expertise to undertake such a re-examination.

*Amici* do not mean to suggest that American citizens such as Al-Aulaqi are not entitled to the protections afforded by the U.S. Constitution. They most certainly are entitled to such protections. But under the Constitution, it is the province of the political branches of government, not the federal courts, both to determine the extent of those constitutional rights and

8

to ensure that those rights are protected.

## ARGUMENT

**I.     THE COURT CAN AND SHOULD ADDRESS THE POLITICAL QUESTION AND STATE SECRET DOCTRINES BEFORE DETERMINING WHETHER THE PLAINTIFF HAS STANDING TO SUE**

The "first and fundamental question" that a court is "bound to ask and answer" is whether it has jurisdiction to decide the case before it.  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998).  "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible without exception."  *Id*. at 94-95 (quoted in *Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006)).[1]

Accordingly, the Court may not reach the *merits* of Plaintiff's claims without first satisfying itself that Plaintiff has standing, because Article III, § 2 of the Constitution prohibits a federal court from exercising jurisdiction over a case in which the plaintiff lacks standing to sue. *Id.* at 102.  But *Steel Co.* does not require a federal court to address standing questions before all other questions.  Rather, a federal court is free to address non-merits based issues in any order it deems appropriate.  Although Defendants' motion to dismiss addresses the standing issue first, the Court is free to address the other two non-merits-based issues raised by the motion – whether the case raises nonjusticiable political issues and whether consideration of Plaintiff's claims is barred by the state secrets doctrine – before determining whether Plaintiff possesses Article III

---

[1]  The Court held in *Steel Co.* that it lacked jurisdiction to hear the case (because the plaintiff lacked Article III standing) and thus could not address the issue on which it had granted review: whether the complaint stated a cause of action.  *Id.* at 109-110.

standing.[2]  *Amici* respectfully suggest, both in light of the public importance of those other two issues and because the political question issue is more easily decided than the standing issue, that the Court defer decision on the standing issue until after it has addressed one or both of the other two issues.

### A.    Both the Political Question Doctrine and the State Secrets Doctrine Are Jurisdictional in Character

The jurisdictional character of the political question doctrine is well established.  The issue is somewhat murkier with respect to the state secrets doctrine; but the nature of the state secrets claim asserted by Defendants indicates that that claim is also properly classified as jurisdictional.

In a recent decision, the D.C. Circuit explicitly rejected an assertion that a claim that a lawsuit raised nonjusticiable political questions could not be addressed until after the court satisfied itself that the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1601 *et seq.*, did not bar the exercise of jurisdiction against a foreign country.  *Hwang Geum Joo v. Japan*, 413 F.3d 34 (2005).  The appeals court explained:

> The appellants apparently assume, but point to no authority suggesting, a dismissal under the political question doctrine is an adjudication on the merits.  That is not how the Supreme Court sees the matter:
>
>> The concept of justiciability, which expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art. III,

---

[2]  The other two claims raised by the motion to dismiss – that the court should exercise its equitable discretion not to grant the relief sought and that Plaintiff has not stated a cause of action under the Alien Tort Statute (ATS) – are not jurisdictional in nature and thus may not be addressed unless the Court rules in Plaintiffs' favor on the three jurisdictional issues.  In pressing those two claims, Defendants do not assert that the Court lacks *jurisdiction* to hear Plaintiff's ATS claims or to grant the requested relief, but rather assert only that the ATS claims and the requested relief should be denied on the merits.

> embodies . . . the . . . political question doctrine[ ] . . . The presence of a political question [thus] suffices to prevent the power of the federal judiciary from being invoked by the complaining party.

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974).

> Moreover, *Steel Co.* "does not dictate a sequencing of jurisdictional issues." *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574 (1999) (within court's discretion to address personal jurisdiction before subject matter jurisdiction); *See also Toca Producers v. FERC*, 411 F.3d 262, 265 n.* (D.C. Cir. 2005) (addressing ripeness before standing).  Rather, as this court held in *In re Papandreou*, "a court that dismisses on other non-merits grounds such as *forum non conveniens* and personal jurisdiction, before finding subject matter jurisdiction, makes no assumption of law-declaring power that violates the separation of powers principles underlying . . . *Steel Company*."  139 F.3d 247, 255 (1998).

*Hwang Geum Joo*, 413 F.3d at 47-48.  Accordingly, Defendants' assertion that Plaintiff lacks standing does not require the Court to address that issue before considering whether the case raises nonjusticiable political questions.

Defendants' state secrets claim is similarly jurisdictional in character.  The analysis here is complicated somewhat by the existence of two distinct branches of the state secrets doctrine. One branch involves cases in which "the very subject matter of the action" is "a matter of state secret." *Tenet v. Doe*, 544 U.S. 1, 9 (2005).[3]  Such cases are "to be 'dismissed on the pleadings without ever reaching the question of evidence, since it [is] so obvious that the action should never prevail over the privilege.'" *Id.* (quoting *United States v. Reynolds*, 345 U.S. 1, 11 n.26 (1953)).  Whether a case should be dismissed because the very subject matter of the action is a state secret is deemed a jurisdictional issue and thus may be addressed at the outset of a case regardless whether there exist other obstacles to exercise of a court's jurisdiction.  *Id.* at 6 n.4. *See also Hwang Geum Joo*, 413 F.3d at 48 (citing *Tenet*).

---

[3]  This branch of the state secrets doctrine is often referred to as "the *Totten* bar," after the Supreme Court case from which it originates, *United States v. Totten*, 92 U.S. 105 (1875).

The second branch of the state secrets doctrine involves cases in which the federal government does not object that the very subject matter of the case is a state secret but rather asserts an evidentiary privilege. It asserts that specific evidence sought to be introduced by a party must be excluded because the evidence is a state secret, *i.e.*, "there is a reasonable danger" that disclosure of the evidence "will expose military matters which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10. But exclusion of the "state secret" evidence does not necessarily deprive the court of jurisdiction to hear the case; *i.e.*, the case may go forward provided that the exclusion does not prevent the plaintiff from establishing a *prima facie* case or deprive the defendant of the opportunity to assert an otherwise valid defense. *Al-Haramain Islamic Found. v. Bush*, 507 F.3d 1190, 1204 (9th Cir. 2007); *Mohamed v. Jeppesen Dataplan, Inc.,* 2010 U.S. App. LEXIS 18746 (9th Cir., Sept. 8, 2010) at *33-*34. In those instances where application of the evidentiary privilege requires dismissal of the action, "the *Reynolds* privilege converges with the *Totten* bar." *Id.* at *33.

The government's motion to dismiss cites both *Totten* and *Reynolds* and does not state explicitly which branch of the state secrets doctrine it seeks to invoke. The motion nonetheless makes clear that the case cannot proceed in any fashion without creating an unacceptable risk of the disclosure of state secrets:

> This case is a paradigmatic example of one in which no part of the case can be litigated on the merits without immediately and irreparably risking disclosure of highly sensitive and classified national security information. The purpose of this lawsuit is to adjudicate the existence and lawfulness of alleged targeting decisions and to compel the disclosure of any "secret criteria" used to make those alleged determinations.

Defts. Mot. To Dismiss at 51. In other words, Defendants are not merely asking the Court to exclude specific evidence and then to evaluate the remaining evidence to determine whether the

case can still proceed to trial.  Rather, they are asking the Court to rule that the very subject matter of the lawsuit (*e.g.,* "the existence and lawfulness of alleged targeting decisions" and the content of "secret criteria" used in making those decisions) is itself a state secret.  When, as here, a defendant asks the court to dismiss the case on grounds that do not touch upon the merits of the plaintiff's case, the court may rule on the issue without making an "assumption of law-declaring power that violates the separation of powers principles underlying . . . *Steel Company.*"  *Hwang Geum Joo*, 413 F.3d at 48; *Tenet*, 544 U.S. at 6 n.4.  As the Supreme Court recently explained, "Jurisdiction is vital only if the court proposes to issue a judgment on the merits."  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (citation omitted).  Accordingly, *Steel Co.* does not preclude the Court from considering Defendants' state secrets claim before it determines whether Plaintiff has standing.

B.    **Dismissal of This Suit on Standing Grounds Alone Would Not Serve the Public Interest Because It Would Leave Unresolved Whether Litigation of This Sort Is Ever Appropriate**

*Amici* agree with Defendants that Plaintiffs standing to maintain this lawsuit is subject to serious question.  Plaintiff is suing as "next friend" of his son Anwar Al-Aulaqi, based on the theory that Anwar is not in a position to come to federal court to assert his own rights.   As Defendants point out, however, there is reason to doubt both that this lawsuit reflects Anwar's wishes and that Congress has authorized the invocation of federal court jurisdiction based on "next friend" status in cases arising outside the habeas corpus context.

*Amici* urge the Court not to decide the standing issue without also deciding whether the case raises nonjusticiable political questions and whether dismissal is required under the state secrets doctrine.  Dismissal based on a ruling that Al-Aulaqi's father lacks standing would

resolve this particular case, but it would provide little or no guidance for other lawsuits that are sure to follow. The ACLU and other legal organizations have made clear their belief that the Constitution and international law prohibit, under most circumstances, targeted killing of American citizens outside of an active war zone. A dismissal on standing grounds likely would lead those organizations to file yet another suit on behalf of another individual with stronger standing claims.

In contrast, a ruling on Defendants' political questions claim would be much more broadly applicable. If this complaint raises nonjusticiable political questions, then so would a complaint filed by Anwar Al-Aulaqi or by any other individual with reason to believe that his targeted killing has been improperly authorized by the United States. Thus, a ruling on the political question claim would provide valuable guidance to other courts hearing similar complaints and (if the ruling favored the government) would likely preserve judicial resources by leading to a reduction in the number of such suits. A ruling that the *Totten* bar applies because "the very subject matter" of any lawsuit challenging targeted killings by the U.S. government is a state secret would have similarly broad applicability.

Deciding Defendants' political question claim before deciding the standing claim makes sense for the additional reason that its resolution is more clear-cut. For the reasons set forth in Section II. below, *amici* submit that there is little basis for contesting Defendants' assertion that the complaint raises nonjusticiable political questions.[4]  In contrast, while Plaintiff's standing

---

[4]  Because *amici* do not have access to the confidential materials submitted by Defendants to the court, we do not express any view regarding the relative strength of Defendants' state secrets claim.

claim is open to serious question, it is not frivolous.[5]  Dismissing the case on political question

grounds would make it unnecessary for the Court to resolve the somewhat more difficult

standing issue.

Amici note that although Defendants seek dismissal on the basis of the state secrets

doctrine, Defendants express reluctance in doing so and urge the Court to reach the issue only if

it determines that dismissal is unwarranted on any of the other grounds they raise.  Mot. to

Dismiss at 43-46.  They contend that deferring consideration of the state secrets claim until last is

"[c]onsistent with the judicial admonition that the state secrets privilege should be 'invoked no

more often or extensively than necessary.'"  Id. at 43 (quoting Jeppesen Dataplan, 2010 U.S.

App. LEXIS 18746 at * 25).  Amici respectfully disagree that deferring consideration of the state

secrets claim can be justified in this manner.  While it is undoubtedly true that state secrets

claims should be raised by the Executive Branch no more often or extensively than necessary, the

United States did, in fact, determine that this is one of the unusual cases in which the state secrets

doctrine mandates dismissal of the lawsuit.  Now that the appropriate high-level Executive

Branch officials have determined that  invocation of the doctrine is appropriate, there is no

reason for the Court to shy away from deciding the issue.  The judicial admonition that the state

secrets doctrine should be invoked no more often or extensively than necessary is intended to

---

[5]  His complaint asserts that Anwar Al-Aulaqi has survived repeated attempts to kill
him and, as a result, is in hiding and "cannot access counsel or the courts to assert his
constitutional rights without disclosing his whereabouts and exposing himself to possible
attack."  Complaint ¶ 9.  The factual allegations of ¶ 9 must be accepted as true to the extent
they are plausible.  Defendants contest those allegations and insist that they would not use
violence against Anwar if he were to turn himself in.  Mot. to Dismiss at 13.  Regardless
whether the allegations of ¶ 9 are sufficient to support Plaintiff's standing claim, they provide
some support for Plaintiff's assertion that Anwar is not in a position to contact counsel on his
own for the purpose of authorizing a lawsuit.

prevent its invocation in instances where it is not necessary, not to impose a cap on the number of

occasions per year where the Executive Branch is entitled to invoke it.  Where the state secrets

doctrine requires dismissal of a lawsuit, the courts would be shirking their responsibilities were

they to duck the issue for fear that critics of the doctrine would object that the doctrine is being

invoked too frequently.

## II.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT RAISES NONJUSTICIABLE POLITICAL QUESTIONS

Plaintiff cannot seriously contest that a lawsuit (as here) challenging the use and

disposition of American military power has the potential to adversely affect national security.

Such cases raise sensitive separation-of-powers concerns – the courts are being asked to enjoin

the use of military power, notwithstanding that the Constitution assigns the political branches of

government primary authority over the foreign policy and national security of the United States.

*See, e.g., Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy

and national security are rarely proper subjects for judicial intervention."); *Harisiades v.

Shaughnessy*, 342 U.S. 580, 589 (1952) (Matters relating to "the conduct of foreign relations, the

war power, and the maintenance of a republic form of government . . . are so exclusively

entrusted to the political branches of government as to be largely immune from judicial inquiry

or interference.").  In recognition of those separation-of-powers concerns, courts often conclude

that a lawsuit raises nonjusticiable political questions when consideration or resolution of those

questions could adversely affect U.S. foreign policy.  *Baker v. Carr*, 369 U.S. 186, 211 (1962).

*Baker* identified six factors that can render a case nonjusticiable because it raises a

political question:

> Prominent on the surface of any case held to involve a political question is found:  [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker,* 369 U.S. at 217.  If any "one of these formulations is inextricable from the case," the Court must dismiss the case as nonjusticiable.  *Id.*  At least three of the six *Baker* factors (the first, second, and third) are implicated by this lawsuit.

Plaintiff cites no federal court decision that has upheld a challenge to the operational decisions of the American military.  Numerous court decisions have stated that such challenges raise political questions that are never justiciable.  *See, e.g., Bancoult*, 445 F.3d at 433 (stating that "the fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matters are plainly the exclusive province of Congress and the Executive.") (quoting *Luftig v. McNamara*, 373 F.2d 664, 665-66 (D.C. Cir. 1967)).  The Supreme Court explained, when it invoked the political question doctrine to dismiss a lawsuit seeking an injunction against premature deployment of the Ohio National Guard (based on a claim that such deployment was likely to violate the plaintiffs' constitutional rights):

> It would be difficult to think of a clearer example of the type of governmental action that was intended to be left to the political branches directly responsible – as the Judicial Branch is not – to the electoral process.  Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence.  The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.  The ultimate responsibility for these

17

decisions is appropriately vested in branches of the government which are periodically
subject to electoral accountability.  It is this power of oversight and control by elected
representatives and officials which underlies our entire constitutional system.

*Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (emphasis in original).

*Baker* recognized that not "every case or controversy which touches foreign relations lies

beyond judicial cognizance." 369 U.S. at 211.  Indeed, the D.C. Circuit has recognized that

"[e]ven in the context of military action, the courts may sometimes have a role." *El-Shifa*

*Pharmaceutical Industries Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (citing

*Gilligan*, 413 U.S. at 11-12).  But in light of the language cited above from *Bancoult*, *Luftig* , and

*Gilligan,* a court hearing a challenge to the use and disposition of American military power must

start with a very strong presumption that the challenge raises nonjusticiable political questions.

The D.C. Circuit in *El-Shifa* attempted to draw a line to distinguish between, on the one

hand, the small minority of cases touching upon foreign relations and national security that are

nonetheless subject to adjudication in the federal courts and, on the other hand, the great mass of

cases raising foreign relations issues that are deemed to raise nonjusticiable political questions.[6]

The court concluded that suits seeking resolution of a "purely legal issue" (such as whether the

government has legal authority to act or whether the government's conduct is prohibited by a

statute or constitutional provision) generally should not be deemed to raise nonjusticiable

---

[6]  *El-Shifa* involved monetary claims against the United States by the owners of a
Sudanese pharmaceutical plant destroyed by a 1998 American missile attack.  The United States
asserted that it attacked the plant because it was associated with al-Qaeda and was involved in
the production of materials for chemical weapons.  The plaintiffs argued that the American
military acted negligently in carrying out the attack and that they were associated with neither
Osama bin Laden nor any chemical weapons production.  *El-Shifa*, 607 F.3d at 838-40.  The
appeals court affirmed dismissal of the complaint, on the ground that the case raised
nonjusticiable political questions.  *Id.* at 844.

18

political questions, even though they touch upon foreign policy or national security issues. *El-Shifa*, 607 F.3d at 841-42. But the court explained that such suits should be deemed to raise nonjusticiable political questions to the extent that they challenge the wisdom of government action or the government's evaluation of the level of the threat giving rise to the decision to use military power. *Id.* at 842-43.[7]

As an example of the distinction it was attempting to draw, *El-Shifa* cited judicial review of decisions by the Secretary of State to designate groups as "foreign terrorist organizations" under 8 U.S.C. §1189. In outlining the permissible scope of such review, the appeals court explained:

> [W]e may decide whether the government has followed the proper procedures, whether the organization is foreign, and whether it has engaged in terrorist activity. But we may not determine whether "the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States." [8 U.S.C.] § 1189(a)(1)(C). . . . Whether this last criterion has been met presents a nonjusticiable question because the Secretary's assessments of whether the terrorist activities of foreign organizations constitute threats to the United States are political judgments, decisions of a kind for which the Judiciary has neither aptitude, facilities, nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*El-Shifa*, 607 F.3d at 843 (citations omitted).

Under the analytical framework established by *El-Shifa*, there can be little doubt that

---

[7] The appeals court made clear that it deemed any challenge to offensive military actions to fall on the political question side of the line:

> Whether an attack on a foreign target is justified – that is, whether it is warranted or well-grounded – is a quintessential policy choice and value determination constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.

*Id.* at 844-45 (citation omitted).

Plaintiff's claims fall on the political question side of the line.  Plaintiff is not asking the court to decide a "pure legal issue" regarding the meaning of the due process clause.  Rather, his due process claim will require the court to evaluate the wisdom and accuracy of a series of policy decisions allegedly undertaken by Defendants in connection with the alleged decision to place Al-Aulaqi on a "targeted killing" list.  Plaintiff concedes that the targeted killing of his son by the American military would be unobjectionable if:  (1) it takes place in connection with armed conflict in a war zone; or (2) at the time lethal force will be used, Al-Aulaqi presents a concrete, specific, and imminent threat to life, and there are no means other than lethal force that could reasonably be employed to neutralize the threat.  In light of those concessions, Plaintiff can prevail in this action only if the Court finds that Defendants erred in determining that: (1) the war zone for the United States's ongoing armed conflict with al-Qaeda and affiliated organizations extends to the Yemen-based operations centers of Al-Aulaqi's organization, al-Qaeda in the Arabian Peninsula (AQAP); (2) Al-Aulaqi presents a threat to life that is "concrete," "specific," and "imminent"; and (3) that threat cannot be neutralized by means other than lethal force.  But *El-Shifa* makes clear that issues of that sort (*i.e.*, whether the government erred in its threat evaluations) are precisely the sort of political questions that are nonjusticiable because the Constitution assigns them to the political branches for resolution.  Just as the Secretary of State's decision that the terrorist activities of a foreign organization constitute threats to the United States is a nonjusticiable "political judgment" not subject to review in the courts, *id.* at 843, any Executive Branch decision that Al-Aulaqi represents an imminent threat to lives is similarly a nonjusticiable political judgment.

For similar reasons, Plaintiffs' claims should also be deemed nonjusticiable political

questions under the second *Baker* factor ("a lack of judicially discoverable and manageable standards for resolving [the claims]"). *Baker*, 369 U.S. at 217. As *El-Shifa* explained, an evaluation of the threat to national security posed by individuals or groups calls for a "political judgment," an evaluation of a kind for which the judiciary lacks both "aptitude" and "facilities." *El-Shifa*, 607 F.3d at 843. The appeals court observed, "In military matters in particular, the courts lack the competence to assess the strategic decision to deploy force or to create standards to determine whether the use of force was justified or well-founded." *Id.* at 844. Because courts lack institutional competence to evaluate a decision by the military that an individual affiliated with al-Qaeda represents an imminent threat to life, Plaintiff's claims must be deemed nonjusticiable political questions under the second *Baker* factor.

There are a few limited instances involving national security issues in which judicial involvement is warranted, in light of specific constitutional provisions providing a role for the judiciary. For example, in light of the centuries-long recognition of the writ of habeas corpus in Anglo-American law and the Constitution's explicit protection of the writ (U.S. Const., Art. I, § 9, cl. 2), the judiciary is entitled to review decisions by the U.S. military to detain enemy combatants – if they are U.S. citizens, *Hamdi v. Rumsfeld,* 542 U.S. 507 (2004), or are being detained at a location over which the U.S. exercises *de facto* sovereignty. *Boumediene v. Bush*, 553 U.S. 723 (2008). But there is no similar tradition of judicial review of the use of military force, nor is there a constitutional provision authorizing such review.

The Executive Branch's determination that this case raises nonjusticiable political questions should weigh heavily in favor of a finding by the court that the case is, indeed, nonjusticiable. When the Executive Branch tells a court that permitting a case to proceed would

have adverse foreign policy and national security implications, its views are entitled to significant

deference.  For example, the Supreme Court stated in *Republic of Austria v. Altmann*, 541 U.S.

677 (2004), that considerable deference would be due the State Department's views regarding the

practical foreign policy implications of adjudicating a particular set of claims against foreign

countries:  "Should the State Department choose to express its opinion on the implications of

exercising jurisdiction over particular petitioners in connection with their alleged conduct, that

opinion might well be entitled to deference as the considered judgment of the Executive on a

particular question of foreign policy."  *Id.* at 702.  Similarly, the Court stated in *Sosa v. Alvarez-*

*Machain*, 542 U.S. 692, 733 n.21 (2004), that in deciding whether to recognize a federal

common law cause of action under the Alien Tort Statute, courts should consider deferring to the

views of the Executive Branch regarding the foreign policy implications of such recognition.  *See*

*also Doe v. Exxon Mobil Corp.,* 473 F.3d 345, 364 (D.C. Cir. 2007) (Kavanaugh, J., dissenting)

(arguing that case should be dismissed as a nonjusticiable political question based on "the State

Department's reasonable explanation of how this litigation would harm U.S. foreign policy

interests. . . . [C]ourts defer to the Executive Branch's reasonable explanation that a case would

harm U.S. interests even if the harm is something less than, for example, a negative impact on

the war against al Qaeda."), *cert. denied*, 128 S. Ct. 2931 (2008).

        Based on their extensive military experience, the individual *amici* agree with Defendants

that allowing federal courts to second-guess the operational decisions of military leaders will

seriously undercut military effectiveness.  Following receipt of information that a potential target

has been located, the military rarely has more than a brief period of time within which to

determine whether to attack the target.  The deadline almost surely could not be met if the

military, before being allowed to take action, could be required to explain to a federal court (as demanded by Plaintiff) why the targeted individual presented a "concrete specific, and imminent threat to life or human safety," as well as the basis for its conclusion that "there are no means other than lethal force that could reasonably be employed to neutralize the threat." *Amici* are also very troubled by an implication of Plaintiff's lawsuit – that combatants engaged in an armed conflict are entitled to declare a "time out" from fighting by hiding in a spot removed from the principal battle zone. Such a claim to a safe haven finds no support in the law of war and cuts against a major premise of military strategy – the doctrine of initiative. That doctrine posits that a combatant must be able to assert the initiative at all times during armed conflict. Otherwise, his opponent will be able to absent himself from the field of battle and then resume the fighting at a time and place of his choosing. Plaintiff does not contest the United States's determination that Al-Aulaqi is a leader of AQAP, an affiliate of al Qaeda, and thus that he is aligned with the enemy in the armed conflict in which the United States is engaged. To interfere with the military's authority to attack Al-Aulaqi while he is in hiding in Yemen is to prevent the military from maintaining the initiative, and to give the initiative instead to our enemies.

*Amici* do not mean to suggest that American citizens such as Al-Aulaqi are not entitled to the protections afforded by the U.S. Constitution. They most certainly are entitled to such protections. But under the Constitution, it is the province of the political branches of government, not the federal courts, both to determine the extent of those constitutional rights and to ensure that those rights are protected. There is every reason to believe that Executive Branch officials take seriously their responsibility to ensure that the constitutional rights of all American citizens are respected. As Harold Koh, Legal Advisor for the State Department, explained in a

23

recent speech addressing the practice of targeted killing:

> Our procedures and practices for identifying lawful targets are extremely robust, and advanced technologies have helped to make our targeting even more precise.  In my experience, the principles of distinction and proportionality that the United States applies are not just recited at meetings.  They are implemented rigorously throughout the planning and execution of lethal operations to ensure that such operations are conducted in accordance with all applicable law. . . .  [T]his Administration is committed to ensuring that the targeting practices that I have described are lawful.

Harold Koh, Address at the Annual Meeting of the American Society of International Law (Mar. 25, 2010), *available at* http://www.state.gov/s/l/releases/remarks/139119.htm.

In sum, the case should be dismissed because it raises nonjusticiable political questions.

## CONCLUSION

*Amici curiae* Jack W. Klimp, *et al.*, respectfully request that the Court grant Defendants' motion to dismiss the case.

Respectfully submitted,


  /s/ Richard A. Samp
Daniel J. Popeo
Richard A. Samp (D.C. Bar No. 367194)
  (Counsel of Record)
Washington Legal Foundation
2009 Massachusetts Ave., N.W.
Washington, DC 20036
Tel.: (202) 588-0302
Fax: (202) 588-0386
Email: rsamp@wlf.org

Dated:  October 4, 2010                Attorneys for *Amici curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of October, 2010, I deposited copies of the foregoing

*amicus curiae* brief of Jack W. Klimp, *et al.*, in the U.S. Mail, addressed as follows:

Peter D. Leary
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, NW
Washington, DC 20001

Arthur B. Spitzer
ACLU of the Nation's Capital
1400 20th Street, NW, Suite 119
Washington, DC 20036

Jameel Jaffer
ACLU Foundation
125 Broad Street, 18th Floor
New New York, NY 10004

I further certify that I sent copies of the brief to the above counsel by email.


   /s/ Richard A. Samp
Richard A. Samp