IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

NASSER AL-AULAQI, on his own behalf and as next )
    friend acting on behalf of ANWAR AL-AULAQI )

            Plaintiff,           )   Civ. A. No. 10-cv-1469

                  )        (JDB)

    v.                  )

BARACK H. OBAMA, President of the United States; )
ROBERT M. GATES, Secretary of Defense; and )
LEON E. PANETTA, Director of the Central Intelligence Agency, )

            Defendants.        )

_____

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Respectfully Submitted

TONY WEST
Assistant Attorney General, Civil Division
RONALD C. MACHEN, Jr.
United States Attorney
IAN HEATH GERSHENGORN
Deputy Assistant Attorney General
DOUGLAS LETTER
Terrorism Litigation Counsel
JOSEPH H. HUNT
Director, Federal Programs Branch
VINCENT M. GARVEY
Deputy Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Special Litigation Counsel, Federal Programs Branch
PETER D. LEARY
Trial Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW
Washington, D.C. 20001
(202) 514-3313

# **TABLE OF CONTENTS**

 **PAGE**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      PLAINTIFF LACKS STANDING UNDER ANY THEORY. . . . . . . . . . . . . . . . . . . . . . . 3

      A.      Plaintiff Has Not Demonstrated Next Friend Standing. . . . . . . . . . . . . . . . . . . . . 3

      B.      Plaintiff Has Not Demonstrated Third Party Standing. . . . . . . . . . . . . . . . . . . . . 5

      C.      Plaintiff Otherwise Lacks Article III Standing.. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.     PLAINTIFF'S REQUESTS FOR RELIEF ARE NOT JUSTICIABLE. . . . . . . . . . . . . . 12

      A.      *Gilligan v. Morgan* Strongly Supports Non-Justiciability Here . . . . . . . . . . . . . . 15

      B.      Whether "Armed Conflict" Exists Against AQAP Is Non-Justiciable. . . . . . . . . 16

III.    THE COURT SHOULD EXERCISE ITS DISCRETION NOT TO ENTER
      THE REQUESTED EQUITABLE RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV.     PLAINTIFF HAS NO CLAIM UNDER THE ALIEN TORT STATUTE. . . . . . . . . . . 19

V.      THE STATE SECRETS PRIVILEGE NEED NOT BE REACHED, BUT
      WOULD PROPERLY FORECLOSE LITIGATION OF THIS CASE. . . . . . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## **INTRODUCTION**

Plaintiff's opposition fails to demonstrate that there is any basis on which this Court may appropriately grant the declaratory and injunctive relief he seeks.  As an initial matter, plaintiff fails to demonstrate that he has met the constitutional requirements for standing to bring this suit on behalf of his son, Anwar al-Aulaqi.  Plaintiff offers no meaningful response to the fact that his son—an operational leader of al-Qaeda in the Arabian Peninsula (AQAP)—could avoid the alleged threat of lethal force at issue in this case by coming forward peacefully.  Plaintiff's argument boils down to an assertion that Anwar al-Aulaqi should be entitled to the benefits of the justice system without making any effort to access the courts on his own behalf.  Article III standing requirements foreclose this assertion under any theory of standing plaintiff advances, including his new (and erroneous) assertion of "third party" standing.

Plaintiff's allegation of injury, which is based on sheer speculation, is also insufficient for Article III standing.  Plaintiff's alleged injury is *not* that his son may be killed; indeed, plaintiff concedes that the Government could target his son in certain circumstances.  Instead, the entire premise of plaintiff's suit is that the Government is allegedly targeting his son without regard to legal standards that plaintiff claims would apply to such force—in particular, that his son must pose an imminent threat and there are no reasonable alternatives to lethal force.  But, without confirming or denying any of plaintiff's allegations, there is no basis for assuming Executive officials have authorized the use of force in violation of the legal standard plaintiff seeks and, thus, no basis for granting the injunctive and declaratory relief that he requests.

Plaintiff's Complaint must also be dismissed because there simply is no basis in law, logic, or history that would permit courts to issue binding directives to the President or his senior military and intelligence officers *before* military or intelligence action overseas is undertaken,

when complex and time-sensitive determinations concerning the imminence of a terrorist threat and the necessity of action are at issue. Plaintiff's attempt to impose this *ex ante* and continuing judicial oversight of sensitive and fact-intensive military and intelligence judgments is both unprecedented and unwarranted.

Plaintiff mischaracterizes defendants' argument to be that "[n]o court should have any role in establishing or enforcing legal limitations on the Executive's authority to use lethal force against U.S. citizens whom the Executive has unilaterally determined to pose a threat to the nation." *See* Opp. (Dkt. 24) at 1. This case does not raise any such broad question. To the contrary, defendants have carefully tailored their argument to the particular circumstances and specific claims raised in this lawsuit. Defendants do not assert the "unchecked" right to impose an "extrajudicial death sentence" against any U.S. citizen whom the Government deems to "pose a threat to the nation." *See id.* at 1. Rather, defendants contend it would be inappropriate for this Court to issue the *ex ante* declaratory and injunctive relief sought against the President or his senior military and intelligence officials with respect to the possible use of force overseas against a terrorist organization as to which the political branches have authorized the use of necessary and appropriate force. The Court should dismiss plaintiff's request for such unprecedented relief as a non-justiciable political question. At the very least, the Court should exercise its discretion not to enter the relief sought.

Finally, as set forth below, plaintiff fails to demonstrate that he may proceed in his own right pursuant to the Alien Tort Statute. In addition, while the Court need not reach the Government's assertion of the state secrets privilege, plaintiff's challenge to the privilege assertion in the circumstances of this case is without merit.

# I.   PLAINTIFF LACKS STANDING UNDER ANY THEORY.

## A.   Plaintiff Has Not Demonstrated Next Friend Standing.

Plaintiff's opposition fails to establish two prerequisites for next friend standing: that Anwar al-Aulaqi lacks access to the courts, and that he is interested in bringing this legal action. As defendants have stated, without confirming or denying any allegation, plaintiff's son could access the courts on his own behalf—indeed, he could foreclose the alleged threat of lethal force against him—if he surrenders or otherwise presents himself to the proper authorities in a peaceful and appropriate manner.  Plaintiff incorrectly contends that such a course is tied up in a merits dispute as to whether an "armed conflict" exists in Yemen, or whether Anwar al-Aulaqi has been indicted for a crime.  Neither issue is relevant to the question of whether plaintiff can assert standing on his son's behalf.   Rather, to address (and moot) the claims raised *in this lawsuit*—the alleged use of lethal force—plaintiff's son can come forward.

Plaintiff raises a new and broader objection not at issue in this case: that his son cannot access the courts because he might be *detained* if he comes forward.  *See* Opp. at 14.  That Anwar al-Aulaqi, an operational leader of AQAP, may wish to avoid possible legal consequences of coming forward is his own choice,[1] but he does not lack access to the courts to challenge the alleged threat of lethal force here, and he should not be free to avail himself of the benefits of the U.S. courts without accessing them himself.  The test for next friend standing is not, as plaintiff

---

[1] Anwar al-Aulaqi has stated in a videotaped interview distributed by AQAP in May 2010 that "[t]here were negotiations in the past with the Yemeni government about turning myself in, but I categorically rejected this . . . . The same goes for the Americans. I have no intention of turning myself in to them.  If they want me, let them search for me."  *See* Public DNI Clapper Decl.  (Dkt. 15-2) ¶ 16, (transcript available at http://www.memritv.org/ clip_transcript /en/2480.htm, video available at http://www.memritv.org/clip/en/2480.htm).

states, merely whether "some impediment" exists to a party's bringing a suit, Opp. at 8, but whether "the real party in interest is *unable* to litigate his own cause." *Whitmore v. Arkansas*, 495 U.S. 149, 150 (1990) (emphasis added). Anwar al-Aulaqi is able to litigate his own cause but chooses not to do so, and therefore his father lacks next friend standing to act on his behalf.[2]

Plaintiff also fails to demonstrate that he is acting in his son's interests. Indeed, since the Government's opening brief, the media arm of AQAP, al-Malahim Media Production, has published another lengthy statement written by Anwar al-Aulaqi. In that article, which appears in the October 2010 edition of the AQAP publication "*Inspire*" (but was purportedly written in April 2010), Anwar al-Aulaqi asserts that international and civil law, including the rulings of civil courts, do not bind Muslims.[3] This further publication of Anwar al-Aulaqi's statements by AQAP, coupled with the videotaped interview that AQAP released in May 2010, *see* Public DNI Clapper Decl. ¶ 16, and an article written by Anwar al-Aulaqi for the July 2010 issue of *Inspire*, *see* Exhibit 2 hereto, casts serious doubt on plaintiff's assertion that his son is unable to communicate his wish to file a lawsuit against the United States (or to communicate that he wishes to present himself peacefully to authorities),[4] and, thus, on whether plaintiff is acting in

---

[2] Moreover, as defendants have explained, next friend standing has not been recognized outside of the habeas context with respect to a mentally competent adult. *See* Defs. Mem. at 12. Plaintiff fails to cite a single case where next friend standing has been recognized on behalf of a real party who was not detained, a minor, or mentally incompetent.

[3] *See* Exhibit 1 hereto, Excerpt from the Fall Issue of *Inspire*; *see also* Steven Stalinsky, Middle East Media Research Institute, Inquiry & Analysis Series Report No. 638: Second Issue of Al-Qaeda in the Arabian Peninsula's (AQAP) "Inspire" Magazine: A General Review (Oct. 13, 2010), http://www.memri.org/report/en /0/0/0/0/0/0/4670.htm (last visited Oct. 17, 2010).

[4] Indeed, the July 2010 article, which calls for the death of an American cartoonist, concludes that people "may contact Shaykh Anwar through any of the emails listed on the contact page." *See* Exhibit 2 hereto, Excerpt from the Summer Issue of *Inspire*.

-4-

his son's interests.  Plaintiff's contention that Anwar al-Aulaqi's "public silence with respect to the present lawsuit supports an inference in his favor," Opp. at 10, stands plaintiff's burden on its head.  A next friend does not have standing to pursue a lawsuit so long as the real party in interest remains silent about the case (or issues no statement "disavowing or condemning" it).  Rather, a next friend is required to establish affirmatively that the real party lacks access to the courts and would support the action filed on his behalf.  Mere silence does not carry that burden.

### B.    Plaintiff Has Not Demonstrated Third Party Standing.

Plaintiff seeks to circumvent the requirements of next friend standing by belatedly asserting that he has third party standing to pursue claims on his son's behalf.[5]  This contention is meritless.  A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (quotation omitted).  This restriction "arises from the understanding that the third-party rightholder may not, in fact, wish to assert the claim in question, as well as from the belief that 'third parties themselves usually will be the best proponents of their rights.'"  *Miller v. Albright*, 523 U.S. 420, 446 (1998)  (O'Connor, J., concurring) (*quoting Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976) (opinion of Blackmun, J.)).  The Supreme Court has stated that "this fundamental restriction on judicial authority admits of certain, limited exceptions" that apply, unlike here, where a plaintiff has independent standing to sue and special considerations counsel in favor of allowing the plaintiff to also assert the rights of third parties with the same interests.  *Edmonson*

---

[5] Notably, plaintiff did not mention third party standing prior to filing his opposition brief. His complaint avers plaintiff acts "as next friend to his son," Compl. ¶ 9, and states he pursues Claims 1, 2 and 4 "as next friend for his son," Compl.  ¶¶ 27, 28, 30.  Plaintiff's declaration declares: "I act on my own behalf and as next friend to my son."  Nasser al-Aulaqi Decl. ¶ 1.

*v. Leesville Concrete Co.*, 500 U.S. 614, 629 (1991) (citation omitted); *see also Powers v. Ohio*, 499 U.S. 400, 411 (1991) (criminal defendant may assert rights of jurors under third party standing principles where discriminatory peremptory challenges causes him "cognizable injury" that he is independently entitled to redress).

Specifically, "a litigant may raise a claim on behalf of a third party if the litigant can demonstrate that he or she has suffered a concrete, redressable injury" – *i.e.*, that the litigant has independent standing to sue—and also "that he or she has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his or her own interests." *Edmonson*, 500 U.S. at 629.  Because the third party standing doctrine of *Edmonson* and *Powers* applies only where a litigant also has independent standing to sue, it is significantly different from next friend standing and cannot be invoked solely as an attempt to loosen the "access to court" requirement of next friend standing.

Plaintiff cannot establish third party standing because he neither alleges nor argues that he has an independent constitutional claim, and (as set forth below) he has no valid cause of action pursuant to the sole statutory claim he raises on his own behalf under the Alien Tort Statute (ATS).  Conflating next friend and third party standing, plaintiff focuses solely on whether the alleged threat to his son and deprivation of his son's companionship establish the kind of injury that would give him a concrete interest in the outcome of this case.  *See* Opp. at 11-12.  But the threshold question for third party standing is not simply whether plaintiff's interests are aligned with those of his son, but whether his own alleged injuries are independently "redressable."

*Edmonson*, 500 U.S. at 629.[6]  Plaintiff cannot satisfy this threshold requirement because he

brings the constitutional claims at issue here solely in a representative capacity.[7]

     The Supreme Court has also recognized third party standing when a law directly and

deliberately interferes with a relationship between the litigant and third party, such as in the

privacy context, where doctors can assert the rights of their patients.  *See, e.g.*, *Singleton*, 428

U.S. at 117-18.[8]  In this narrow class of cases, the requisite injury to the third party exists because

the governmental program or action that has been challenged specifically targets a protected

_____

     [6] *See also Sec'y of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984) (where plaintiff raises facial overbreadth challenge on behalf of non-parties, the "crucial issue[]" is whether plaintiff has established his own injury-in-fact first).

     [7] Moreover, under the law of this circuit, as an alien residing in Yemen, Nasser al-Aulaqi would not have a liberty interest under the Constitution that could support the third party standing argument he seeks to pursue.  *See, e.g., 32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002); *see also Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004).  In any event, the D.C. Circuit has clearly held that "a parent does not have a constitutionally-protected liberty interest in the companionship of a child who is past minority and independent." *Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001) ("[W]e hold that a parent-child relationship between two independent adults does not invoke constitutional 'companionship' interests[.]"); *see also McCurdy v. Dodd*, 352 F.3d 820, 829 (3d Cir. 2003) (same); *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir. 1986) (same).  In so concluding, the D.C. Circuit has stated that childhood and adulthood are markedly distinct, thus requiring "sharply different constitutional treatment."  *Franz v. United States*, 712 F.2d 1428, 1432 (D.C. Cir. 1983).  Plaintiff ignores this distinction in citing various cases where courts found injury arising from the deprivation of or interference with a relationship between a parent and a *minor* child.  *See Jones v. Prince George's County*, 348 F.3d 1014 (D.C. Cir. 2003) (infant daughter); *Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53 (D.D.C. 2006) (six-year-old son); *Yaman v. U.S. Dep't of State*, 709 F. Supp. 2d 85 (D.D.C. 2010) (Bates, J.) (six and eight-year-old daughters).  Plaintiff's son is a 39-year-old adult.  Nasser al-Aulaqi Decl. ¶ 4.  By plaintiff's own account, Anwar al-Aulaqi has lived independently from his parents for at least the last 19 years, is married, and has three children of his own.  *Id.*  Accordingly, Nasser al-Aulaqi cannot establish any Article III injury based on a liberty interest in the companionship of his adult child.

     [8] As the D.C. Circuit noted in *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 810 (D.C. Cir. 1987), in *Singleton* "[t]he decisive vote was cast by Justice Stevens, who found third party standing only because the physicians had first party standing."

relationship between the litigant and the third party. *See Haitian Refugee Ctr.*, 809 F.2d at 810

(explaining that the doctors in *Singleton* had standing to challenge a law that prohibited Medicaid

payments for abortions that were not "medically indicated" because the statute was "specifically

intended to burden the third-party patients' relationship with their physicians"). In contrast, third

party standing is not appropriate where a challenged governmental action is not specifically

intended to interfere with the relationship between a third party and a litigant who is attempting

to assert the third party's rights, and impeding contact between the two parties is but "an

unintended side effect of a program with other purposes." *See id.* (rejecting third party standing

because impeding contact between Haitians and the litigants who were trying to help them was

only an indirect effect of the Government's interdiction program). Here, no statutory provision

or governmental action is alleged to be at issue that is specifically intended to interfere with a

third party relationship. Notably, the D.C. Circuit has held that "a litigant may not be given third

party standing to assert constitutional rights of third parties that do not protect a relationship,

such as procedural due process rights. A litigant therefore could never have standing to

challenge a statute solely on the ground that it failed to provide due process to third parties not

before the court." *Id.* at 809.[9]

---

[9] Plaintiff cites *Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279 (D.C. Cir. 2007), for the
proposition that the threat of "death, physical injuries, and property damage" could constitute an
injury in fact where an increased "risk of harm" results from the Government's failure to act.
However, *Public Citizen* was not a third party standing case, but an organizational standing case.
"An organization has standing to sue on behalf of its members when, among other things, its
members would otherwise have standing to sue in their own right. Accordingly, an organization
must show . . . that at least one member has suffered injury in fact." *Id.* at 1289 (citations and
quotations omitted). In other words, a concrete, particularized threat of injury to a member of an
organization necessarily constitutes a concrete, particularized threat of injury to the organization
itself. This authority is obviously inapposite here.

Because plaintiff has not demonstrated his own redressable injury-in-fact, he fails to establish the constitutional prerequisite to third party standing. Assuming the Court considers the remaining prudential elements for such standing, and even assuming that plaintiff has a close relation with his son, plaintiff fails to demonstrate that his son is unable "to advance his own rights," *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989), because of a "genuine obstacle" that rises to the level of a hindrance, *Singleton*, 428 U.S. at 116. As set forth above, the notion that "some hindrance" exists to Anwar al-Aulaqi's ability to protect his own rights should be rejected because Anwar al-Aulaqi may choose to come forward peacefully and access the judicial process. Plaintiff should not be permitted to evade the requirements of next friend standing—which he cannot meet—through the backdoor of third party standing.

### C.   Plaintiff Otherwise Lacks Article III Standing.

Even if plaintiff could assert next friend or third party standing, he would still lack Article III standing for another reason: plaintiff's claim of injury rests on conjecture as to the nature of the alleged practices challenged. *See* Defs. Mem. at 16. Plaintiff's attempt to rehabilitate his allegation of injury is meritless—indeed, it confirms this standing problem.

Plaintiff first attempts to retreat from the injury alleged in the Complaint, stating in his opposition brief that "[h]e asserts an injury—his son's death" that would allegedly be caused by the Government's conduct, "specifically, its decision to authorize the use of lethal force." *See* Opp. at 3; *see also id*. at 15 ("Plaintiff seeks to prevent the government from killing his son."). But the Complaint does *not* seek to prohibit the United States from using any and all lethal force against Anwar al-Aulaqi (or any other U.S. citizen). Rather, plaintiff alleges that his son is being targeted "without regard to whether, at the time lethal force will be used, he presents a concrete,

-9-

specific, and imminent threat to life, or whether there are reasonable means short of lethal force that could be used to address any such threat." Compl. ¶¶ 23, 27-29 & Prayer for Relief.  It is only the alleged failure of the Government to act in accord with these standards that establishes plaintiff's theory of the injury at issue in this case.  But plaintiff's contention that the Government would not follow the criteria he seeks to impose is sheer speculation.

Article III standing requirements do not permit a plaintiff to seek equitable relief based on conjecture that the Government might act in a certain manner alleged to be unlawful, *see* Defs. Mem. at 16-17 (*citing City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983)), while the plaintiff offers nothing to establish that the allegation is more than conjecture.  Plaintiff argues that he should be permitted to "assume" the Government will, absent an injunction, apply a standard different from the one that plaintiff believes should apply.  *See* Opp. at 16.  This plea just highlights that plaintiff is speculating that the Government is not acting (or would not act) in compliance with the standard plaintiff argues should be applied here.  *See, e.g., Haitian Refugee Ctr.*, 809 F.2d at 799 n.2 ("It is well established that a bare assertion that the government is engaging in illegal or unconstitutional activity does not allege injury sufficient to confer standing.").  Indeed, plaintiff confirms he is speculating as to whether the Government adheres to the criteria he claims must apply to the alleged use of lethal force.  He argues that the Government's references to the law of war confirm the "possibility" of non-adherence to those criteria, Opp. at 5, and then demands that the Court order disclosure of any criteria the Government allegedly utilizes, so that he can determine "*[i]f* the government's standards are the same as those plaintiff contends should apply*,*" and, if not, his "targeted killing claims can be dismissed."  *Id.* at 6 n.4 (emphasis added).  Such conjecture about what the Government might be

doing is inadequate to establish any legally cognizable injury "that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).[10]

Plaintiff's reliance on anonymous sources in media reports likewise does not establish his standing. Based on such reports, plaintiff alleges that the Government maintains "lists" of individuals being targeted, that individuals remain on the "lists" for months at a time, that placement on the "lists" creates a standing authorization for use of lethal force, and that Anwar al-Aulaqi has been added to the "lists." *See* Opp. at 4. This information, plaintiff argues, "show[s] not only a realistic danger that the government will kill Plaintiff's son, but a realistic danger that the government will kill him without compliance with constitutional and human rights standards." *Id*. at 4-5 (*citing Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). But even taking these allegations at face value, they do not support a reasonable inference that Government officials have authorized the use of such force without compliance with the standards plaintiff contends are necessary for the alleged use of force to be lawful. *See* Defs. Mem. at 16. Moreover, the Government does not contend here that the alleged injury must be demonstrated "with certainty," as plaintiff asserts (*see* Opp. at 4)—only that the alleged harm cannot be based on conjecture, which it surely is in this instance.[11]

---

[10] The Supreme Court has recently made clear that allegations must set forth "more than a sheer possibility" of alleged misconduct. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009) (*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (*quoting Twombly*, 550 U.S. at 557).

[11] *Babbitt* does not support plaintiff's theory of standing. That case concerned pre-enforcement standing to bring a facial challenge to a statute based on "a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement." 442 U.S. at 298.

**II.    PLAINTIFF'S REQUESTS FOR RELIEF ARE NOT JUSTICIABLE.**

Plaintiff's contention that his requests for relief are justiciable misrepresents the

defendants' position.  Defendants do not "argue broadly that the judiciary cannot interfere in

decision-making in the areas of foreign policy and national security."  Opp. at 24.  Rather,

defendants have focused on the specific claims and requests for relief in this case and argued that

courts cannot (i) issue *ex ante* injunctions against the President or his senior military and

intelligence officers with respect to (ii) the alleged use of lethal force (iii) purportedly to be

undertaken abroad (iv) against an operational leader of (v) an organization with respect to which

the political branches have authorized the use of necessary and appropriate force, and (vi) where

granting and enforcing the specific relief sought would necessarily involve complex judgments

reserved to the Executive, dependent on intelligence assessments, as to whether an alleged target

poses a "concrete," "specific," or "imminent" threat, and whether means other than lethal force

could be "reasonably" employed.  *See* Defs. Mem. at 3-5; 19-27.

The political question doctrine requires the Court to conduct "a discriminating analysis of

the particular question posed" in the "specific case," *Baker v. Carr*, 369 U.S. 186, 211 (1962),

and the particular claim in *this* lawsuit is for *ex ante* declaratory and injunctive relief—not

damages or some other after-the-fact remedy.  Plaintiff challenges the authority of the President,

*see* Compl. ¶ 10, and seeks review of the alleged future use of force overseas against an

---

Such standing applies only where there is a threat of enforcement of a specific proscription that
demonstrably applies to a plaintiff's actions.  Notably, in *Babbitt* the Court rejected standing to
challenge statutory provisions that did not impose certain requirements on employers (to grant
access to facilities for communicating with employees) on the ground that the Court could "only
hypothesize" that an injury would occur absent a "palpable basis for believing that access will be
refused."  *See id.* at 304.  *Babbitt* thus shows that standing will not be found based on conjecture
as to an alleged harm.

operational leader of a foreign terrorist organization that has planned attacks against the United

States and with respect to which the political branches have authorized the use of necessary and

appropriate force.  *See* Defs. Mem. at 23-25.  It is not the Government's contention here that any

matter touching on foreign policy, national security, military, or intelligence affairs is

non-justiciable, or that any overseas action—including the use of force—would be exempt from

judicial review.  Rather, it is the requests for declaratory and injunctive relief in this case that

defendants contend are non-justiciable.  The Court need not decide the issue for any other setting.

Plaintiff's primary argument in response—that courts have reviewed constitutional

claims in the context of habeas detention proceedings and property disputes, *see* Opp. at 25-27,

does not render this very different case justiciable, as defendants have previously explained.  *See*

Defs. Mem. at 30-31; *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 534 (2004) (distinguishing

between process due a U.S. citizen "on the battlefield" for assessing the legality of their detention

from process that is due "when the determination is made to *continue* to hold those who have

been seized," which "meddles little, if at all, in the strategy or conduct of war").[12]

---

[12] Plaintiff appears to argue that this Court should adjudicate whether the Authorization
for the Use of Military Force (AUMF) authorizes the use of force against AQAP.  *See* Opp. at 33.
But the AUMF cases on which plaintiff relies concern a very different context: namely, a court's
historical review of the facts in habeas proceedings that concern whether the continued detention
of a particular individual is authorized.  *See* Opp. at 33 (citing *Hamdi*, 542 U.S. 507; *Padilla v.
Hanft*, 423 F.3d 386 (4th Cir. 2005); *Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009)
(Bates, J.)); *see also id*. at 18 (*citing Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008); *Khan v.
Obama*, --- F. Supp. 2d ---, No. 08-CV-1101, 2010 WL 3833917, at *2-3 (D.D.C. Sept. 3, 2010)
(Bates, J.)).  Here, in contrast, plaintiff seeks judicial review of the Executive's judgment that
force is authorized against a particular organization before the President may act to protect the
nation against that organization.  There is no precedent for the proposition that a federal court
may determine before-the-fact whether the President has authority to target a particular enemy he
has determined falls within the law.  In addition, the Executive's judgment as to whether force is
authorized against AQAP or any other organization is informed by changing circumstances and
sensitive intelligence that cannot be disclosed in a case such as this.  Indeed, any judicial

In addition, plaintiff now concedes that the Court cannot review *ex ante* "real-time"

determinations by the President or his senior military and intelligence officers that lethal force

may be required in response to an imminent threat. *See* Opp. at 30. But he nonetheless seeks

declaratory and injunctive relief in order to set the stage for after-the-fact adjudication of

precisely such questions. Rather than salvaging his argument that the relief sought is justiciable,

this concession undercuts the basis for judicial action even further. Defendants are not aware of

any historical precedent for the judiciary issuing directives to the Executive before the United

States may take lethal action overseas and thereby threatening officials with the prospect of

contempt sanctions if they are unable, after the fact, to persuade a court that their real-time

assessments of imminence and necessity, based on complex military, intelligence, and foreign

policy judgments, were reasonable. *See* Defs. Mem. at 26.

---

direction based on current circumstances could quickly become obsolete when the Executive
obtains new intelligence; thus, an injunction would necessarily impede the Executive's ongoing,
real-time national security judgments. The Government has made limited public statements
concerning the connection between AQAP and Al-Qaeda, *see* Exh. 3 (Dkt. 15-4) but, in the
context of the relief sought in this case, the Government's state secrets privilege assertion
necessarily encompasses additional intelligence information related to these organizations that
would be necessary to adjudicate the issue as plaintiff requests. In any event, plaintiff ignores the
critical distinction that the D.C. Circuit identified in *El-Shifa Pharmaceutical Industries Co. v.
United States*, 607 F.3d 836, 848-49 (D.C. Cir. 2010) (*en banc*), that "the political question
doctrine does not preclude judicial review of prolonged Executive detention predicated on an
enemy combatant determination because the Constitution specifically contemplates a judicial role
in this area." Likewise, plaintiff's attempt to distinguish *DaCosta v. Laird*, 471 F.2d 1146 (2d
Cir. 1973) and *Holtzman v. Schlesinger*, 484 F.2d 1307 (2d Cir. 1973), *see* Opp. at 36-37, is
unpersuasive. Both decisions are broad rejections of the notion that courts may review the scope
of a mutual decision by the political branches to authorize the use of force overseas and do not
rest on the notion that only a "tactical" decision was non-justiciable. *See DeCosta*, 471 F.2d
at1155; *Holtzman*, 484 F.2d at 1310. Similarly, the Second Circuit's decision in *Orlando v.
Laird*, 443 F.2d 1039 (2d Cir. 1971), ultimately held that "'decisions regarding the form and
substance of congressional enactments authorizing hostilities'" are political questions because
they "are determined by highly complex considerations of diplomacy, foreign policy and military
strategy inappropriate to judicial inquiry.'" *Id*. at 1043.

A.    *Gilligan v. Morgan* **Strongly Supports Non-Justiciability Here.**

Plaintiff's effort to distinguish *Gilligan v. Morgan*, 413 U.S. 1 (1973), is unavailing.

*Gilligan* presented remarkably similar issues and weighs heavily against finding the claims at

issue here to be justiciable.  Indeed, *Gilligan* arguably involved a lesser intrusion on the political

branches—the regulation of future lethal force in domestic civil disorders by the National

Guard—as opposed to an injunction on the President with respect to possible uses of force

overseas against terrorist entities as to which the political branches have authorized such force.[13]

First, while it is true that *Gilligan* involved more than one jurisdictional concern,

including mootness issues, *see* 413 U.S. at 5, the Supreme Court made clear that it was "not

prepared to resolve the case on that basis and therefore turn[ed] to the important question [of]

whether the claims alleged in the complaint, as narrowed by the Court of Appeals' remand, are

justiciable."  *Id.*  The question remanded by the Court of Appeals, and which the Supreme Court

considered to be non-justiciable, concerned whether there was any basis for believing that the

future use of lethal force would violate relevant legal norms:

> Was there and is there a pattern of training, weaponry and orders in
> the Ohio National Guard which singly or together require or make
> inevitable the use of fatal force in suppressing civilian disorders
> when the total circumstances at the critical time are such that
> nonlethal force would suffice to restore order and the use of lethal
> force is not reasonably necessary?

*Id.* at 4.  As to that question, the Supreme Court held that judicial evaluation of the training,

weapons, and scope of orders to control the use of lethal force would plainly intrude on textually

---

[13] *Gilligan*, which rejected a due process claim in part on justiciability grounds, also
disposes of plaintiff's suggestion that any Fourth or Fifth Amendment claim is *per se* justiciable
because the adjudication of these rights is "textually committed" to the judicial branch.  *See* Opp.
at 24; *see Gilligan*, 413 U.S. at 6.

committed authority of the President and Congress.  *See id*. at 6-7.

Second, while *Gilligan* was not "an action seeking a restraining order against some specified and imminently threatened unlawful action," *see id*. at 5, the Supreme Court did not hold that such a claim would necessarily be justiciable (particularly in the circumstances presented here).  And, in any event, the relief sought in this case does entail a "broad call on judicial power to assume continuing regulatory jurisdiction over the activities of" the President, armed forces, and intelligence services, *id.*, precisely in order to support "continuing judicial surveillance . . . to assure compliance" with the law.  *Id*. at 6.  *See* Compl. at 11, Prayer for Relief (seeking declaratory and injunctive relief regarding the use of lethal force as to all U.S. citizens, including plaintiff); Opp. at 17 (seeking enforcement of requested relief through after-the-fact remedies).  Plaintiff seeks the imposition of legal standards governing future conduct closely akin to the specific question at issue in *Gilligan*: whether the Government has a "pattern of . . . orders . . . which singly or together require or make inevitable the use of fatal force . . . when the total circumstances at the critical time are such that nonlethal force would suffice . . . and the use of lethal force is not reasonably necessary."  413 U.S. at 4.  *Gilligan* thus firmly supports the conclusion that plaintiff's claims are non-justiciable.

### B.      Whether "Armed Conflict" Exists Against AQAP Is Non-Justiciable.

Finally, the Court should disregard plaintiff's extended argument that "armed conflict" does not exist in Yemen as a matter of international law.  *See* Opp. at 32-35.  Plaintiff—not the Government—injects this issue into the case, arguing that all of his claims depend upon the absence of such an armed conflict.  But even assuming the "armed conflict" issue were relevant here, that issue would also be non-justiciable in the context of this case—where *ex ante*

declaratory and injunctive relief is sought to regulate the future use of force overseas by the President and his senior military and intelligence officers against an entity as to which the political branches have authorized the use of necessary and appropriate force.

Plaintiff's argument that any use of lethal force against Anwar al-Aulaqi in Yemen would not be as part of an ongoing armed conflict is based on assertions by plaintiff's declarants that AQAP is incapable of engaging in armed conflict because it is, *inter alia,* fragmented, small, lacks an organization chart, has an amateurish online operation, has dubious relationships with the Government of Yemen, and has engaged in only a small number of attacks that render it an "irritant." *See* Decl. of Bernard Haykel ¶¶ 7-13; *see also* Decl. of Prof. Mary Ellen O'Connell. With due respect, even assuming the standards plaintiff advances for determining whether AQAP could be a participant in an armed conflict were correct as a matter of international law, the Government is aware of no instance where a court has reviewed *ex ante*, based on opinion testimony, the Executive's determination that an organization is sufficiently organized as to be engaged in armed conflict.  In these circumstances, the President's judgment, based largely on intelligence information addressing the manner in which AQAP is organized, the nature and scope of its activities, and its relationship to al-Qaeda, is not subject to review.[14]

## III.    THE COURT SHOULD EXERCISE ITS DISCRETION NOT TO ENTER THE REQUESTED EQUITABLE RELIEF.

Even if the Court were to conclude that plaintiff's claims here are justiciable, it should nonetheless exercise its equitable discretion to deny the declaratory and injunctive relief sought. *See* Defs. Mem at 35-39.  The question under the equitable discretion doctrine is not only

---

[14] Plaintiff does not dispute that the United States is engaged in an armed conflict with al-Qaeda.  *See Hamdan v. Rumsfeld*, 548 U.S. 557, 628-31 (2006).

whether the Court has "authority" to act, *see* Opp. at 15, but whether it *should* exercise any such authority to grant the relief sought. For all of the reasons previously set forth, the Court should decline to do so in this case. *See* Defs. Mem. at 35-39.

Plaintiff dismisses long-standing precedent that courts should not impose injunctive relief on the President, *see* Defs. Mem. at 37-38; Opp. at 20-21—an equitable principle that, in the unusual circumstances of this case, should also necessarily apply to the President's top military and intelligence officers who carry out the President's orders. *See* Defs. Mem. at 38 (*citing Mississippi v. Johnson*, 71 U.S. (4 Wall) 475, 499 (1866)). This case does not concern governmental actions unmoored from core presidential powers as to which lower level officials may be enjoined—such as the submission of reapportionment data by the Secretary of Commerce, or the termination of an employee of the National Credit Union Administration. *See* Opp. at 21 (*citing, inter alia, Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992); *Swan v. Clinton*, 100 F.3d 973, 979 (D.C. Cir. 1996)). The relief plaintiff seeks puts directly at issue the President's core constitutional and statutory authority to act overseas through his senior military and intelligence officers against a foreign terrorist organization.

Plaintiff further contends that the declaratory and injunctive relief at issue would not be any more "abstract" than the "command" issued by the Supreme Court in *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment" considering the "totality" of the circumstances. *See* Opp. at 17. Leaving aside that these are inherently fact-specific judgments, the lawsuit in *Garner* adjudicated the legality of a particular use of force *after the fact*, and the notion that its "command" should be properly imposed *ex ante* on the President's authority to use

force overseas against a particular foreign terrorist organization is profoundly wrong.  Even if the

constitutional principles set forth in *Garner* were applicable in the alleged context, imposing

them *ex ante* by declaratory or injunctive relief to the circumstances at issue here would

necessarily interfere with the judgments of the President and senior defense and intelligence

officials as they face changing, fact-intensive decisions concerning how to protect national

security and, thus, could have unforeseen and potentially catastrophic consequences.  These are

precisely the kind of delicate national security and foreign policy matters in which courts should

decline to intrude.  *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985).

**IV.     PLAINTIFF HAS NO CLAIM UNDER THE ALIEN TORT STATUTE**.

In accordance with the Supreme Court's emphasis in *Sosa v. Alvarez-Machain*, 542 U.S.

692, 729 (2004), that courts must engage in "vigilant doorkeeping" in recognizing a "narrow

class" of actions under the ATS, 28 U.S.C. § 1350, this Court should not create the novel claim

for relief under the ATS that plaintiff seeks in this case.  Plaintiff is asserting a claim *in his own

name* under the ATS, not as next friend to his son.  Compl. ¶ 29.[15]  It follows that his claim must

be for an injury *to himself* and not for an injury to anyone else, including his son.[16]  But there is

_____

[15] Plaintiff's son cannot bring an ATS action in his own name (he is a U.S. citizen, and the ATS applies only to a "civil action by an alien," 28 U.S.C. § 1350).  Moreover, if Nasser al-Aulaqi brought an ATS damages action on behalf of his son's estate, the estate would likely share his son's U.S. nationality (and plaintiff has not shown otherwise), *cf.* 28 U.S.C. § 1332(c)(2) ("the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent"), and thus would be precluded from raising an ATS claim, which permits only a "civil action *by an alien*," 28 U.S.C. § 1350 (emphasis added).

[16] This is true under both federal law, *see Whitmore,* 495 U.S. at 155 ("complainant must allege an injury *to himself*") (emphasis added); *Allen v. Wright*, 468 U.S. 737, 751 (1984) (noting the "general prohibition on a litigant's raising another person's legal rights"), as well as under international law, *see*, *e.g.*, U.S.-German Mixed Claims Commission, Opinion in the Lusitania Cases, Nov. 1, 1923, 7 U.N.R.I.A.A. 32, 35.

nothing in the Complaint to support an allegation that plaintiff would be subjected to an extrajudicial killing. Thus, whatever he may attempt to plead, the only kind of injury plaintiff can assert on his own behalf under the ATS claim is something akin to anticipated intentional infliction of emotional distress against a bystander. And for reasons the Government has already explained (Defs. Mem. at 41-42), plaintiff has not demonstrated that any such claim would be recognized even under domestic U.S. tort laws. Nor can he show—as required by *Sosa*, 542 U.S. at 732—that established international law protects bystanders from intentional infliction of emotional distress, let alone that such a norm has no "less definite content and acceptance among civilized nations than the historical paradigms familiar" when the ATS was enacted in 1789.

Plaintiff fails to grapple with who, exactly, is bringing the ATS claim (the father, not the son) and what alleged injury *that* plaintiff might suffer (emotional distress, not a killing). Plaintiff simply asserts, without support, that he may bring a claim *in his own name* to enjoin an alleged tort of extrajudicial killing that might, in the future, be inflicted *on someone else*. Opp. at 39-40. Plaintiff asserts that if his son were killed, he could bring an ATS action for damages. Opp. at 40 n.33. But he has made no showing that such a damages claim for an extrajudicial killing of his son would be anything more than a suit *in the son's name*, with the father acting only as legal representative of the deceased. *Cf.* Torture Victim Protection Act, 28 U.S.C. § 1350 note (an individual who subjects another individual to extrajudicial killing shall "be liable for damages to the individual's legal representative"). The assertion thus sheds no light on whether plaintiff can bring an ATS claim for injunctive relief *in his own name* for an extrajudicial killing that supposedly will be inflicted *on another person* in the future.

Moreover, plaintiff's claim (Opp. at 40) that "there is nothing new" about the injunctive

-20-

relief he seeks is incorrect. Plaintiff asks this court to use its restricted power to create federal common law to fashion an extraordinary cause of action under the ATS for injunctive and declaratory relief – at the behest of an alien outside the United States – against the President, the Secretary of Defense, and the CIA Director with respect to alleged military and intelligence operations abroad. And he seeks such a claim based on speculation about an injury that has not yet occurred and that, if it did occur, would be inflicted not on himself but on his son, who is not entitled to bring an ATS action. Plaintiff cannot point to a single ATS case recognizing a claim remotely similar to the one he seeks

Relatedly, the D.C. Circuit has held that courts should not fashion a cause of action for damages under *Bivens* against U.S. officials based on alleged constitutional violations arising out of military operations abroad. *Rasul v. Meyers*, 563 F.3d 527 (D.C. Cir. 2009), *cert. denied*, 130 S. Ct. 1013 (2009). *A fortiori* a court should not fashion a federal common law cause of action for injunctive and declaratory relief under the ATS that would restrain the President and his top military and intelligence officers in the conduct of such foreign operations. Indeed, plaintiff cites only two ATS cases recognizing *any kind* of injunctive relief. *See* Opp. at 40-41. But both cases pre-date the Court's warning in *Sosa*, 542 U.S. at 728, to use "great caution" in exercising common-law authority under the ATS. And neither case is remotely comparable to the novel and extraordinary relief sought here against the President and his highest advisors and officers.[17]

_____

[17] One case involved injunctive relief against a fugitive indicted foreign war criminal. *See Kadic v. Karadzic*, Opp. at 41 n.36. The other case, *Von Dardel v. USSR*, 623 F. Supp. 246 (D.D.C. 1985), *vacated*, 736 F. Supp. 1 (D.D.C. 1990), is a *vacated* district court decision based on a *default* judgment in which the defendant did not respond or present any kind of argument to the court on the ATS, and involved injunctive relief against the Soviet Union that simply required it (in plaintiff's words) to "account for" a person's "whereabouts," Opp. at 41.

Furthermore, as explained in the United States' opening brief (Defs. Mem. at 40-41), the Government has not waived its sovereign immunity for plaintiff's claim under the ATS. Plaintiff cannot dispute that "[t]he Alien Tort Statute itself is not a waiver of sovereign immunity," *Sanchez-Espinoza*, 770 F.2d at 207 (Scalia, J.), and concedes that the APA does not permit a suit for injunctive relief *against the President*. Opp. at 43. Even if the APA waives sovereign immunity for injunctive relief against subordinate federal officers, Opp. at 43, the APA does not displace a court's authority and responsibility to "deny relief on . . . any other appropriate legal or equitable ground." 5 U.S.C. § 702. And as defendants previously explained (Defs. Mem. at 41), courts have held that "it would be an abuse of [] discretion to provide discretionary relief" under the APA where a case involves "military operations that [the court is] asked to terminate," and where "the allegations in the complaint" are that those military operations "received the attention and approval of the President . . . the Secretary of Defense, and the Director of the CIA, and involve[] the conduct of our diplomatic relations with [a] foreign state[]." *Sanchez-Espinoza*, 770 F.2d at 208. That is exactly the case alleged by plaintiff's complaint.

Contrary to plaintiff's suggestion, Opp. at 44 n.38, the discretionary relief sought under the APA in *Sanchez-Espinoza* was not meaningfully different from the discretionary APA relief sought here. To be sure, some plaintiffs in *Sanchez-Espinoza* did seek different relief, *see* 770 F.2d at 205, not under the APA but under different federal and state law, *see id.* at 210. But as to the relief sought *under the APA*, the D.C. Circuit was clear about the nature of the requested relief – namely, that the court was "asked to terminate" certain alleged "military operations" approved by the President and senior officials, involving "the conduct of our diplomatic relations with [a] foreign state[]," *see id.* at 208. The court was equally clear that "it would be an abuse of

-22-

our discretion to provide discretionary relief" in such a case, *ibid.*  Neither the relief requested here nor the result under the APA differs from that in *Sanchez-Espinoza.*

Finally, plaintiff argues (Opp. at 41-43) that immunity is waived under the so-called *Larson-Dugan* exception to sovereign immunity, which "holds that sovereign immunity does not apply as a bar to suits alleging that an officer's actions were unconstitutional or beyond statutory authority, on the ground that 'where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign acts.'"  *Swan*, 100 F.3d at 981.  But in *Sanchez-Espinoza*, the D.C. Circuit, after citing *Larson* and noting that injunctive relief might be available against federal officers "when the officer's action is unauthorized because contrary to statutory or constitutional prescription," nonetheless held that the exception "can have no application" to an ATS claim brought against federal officers.  770 F.2d at 207.

## V.    THE STATE SECRETS PRIVILEGE NEED NOT BE REACHED, BUT WOULD PROPERLY FORECLOSE LITIGATION OF THIS CASE.

The Government has made clear that its final ground for dismissal—the state secrets privilege—need not be reached because the foregoing grounds for dismissal are more than sufficient.  *See* Defs. Mem. at 43-44.  But it is also evident that this lawsuit seeks to probe into alleged military and intelligence activities, and that specific categories of national security information properly protected by the privilege assertion would be necessary to litigate the case.

Plaintiff first appears to contend that the privilege assertion should not be upheld because of the nature of his claims involving alleged lethal force against a U.S. citizen (*see* Opp. at 46-47)—without regard to whether litigation would necessarily risk or require disclosure of information that would harm national security.  But it is not the nature of the claim, standing

-23-

alone, that determines the applicability of the privilege or whether further proceedings in a case reasonably could be expected to harm the national security of the United States. The state secrets doctrine clearly applies to the allegations in this case.

Plaintiff further contends that media speculation and some public disclosures concerning Anwar al-Aulaqi warrant rejection of the privilege assertion. *See* Opp. at 45-47. The Government addressed plaintiff's concern at length in its prior submissions to the Court, *see* Defs. Mem. at 56-59, and has set forth for the Court's *ex parte, in camera* review specific privileged information implicated by the allegations in this case and why its disclosure reasonably could be expected to harm national security. In unclassified terms, this includes information needed to address whether or not, or under what circumstances, the United States may target a particular foreign terrorist organization and its senior leadership, the specific threat posed by al-Qaeda, AQAP, or Anwar al-Aulaqi, and other matters that plaintiff has put at issue, including any criteria governing the use of lethal force. *See id*. at 48-49.[18] The Secretary of Defense, the CIA Director, and Director of National Intelligence have demonstrated that the unauthorized disclosure of certain information needed to litigate the case reasonably could be expected to cause significant harm to national security. *See id*. at 49-50.

---

[18] The Government has not asserted the state secrets privilege over the information contained in the Department of Defense (DoD) slides released to plaintiff's counsel through a Freedom of Information Act request. *See* Jonathan Manes Decl. (Dkt. 24-3), Exh. A thereto. Those slides concern DoD military targeting and force actions in general and do not concern or reveal anything as to alleged military operations in Yemen, including those alleged to be at issue in this case. *See, e.g.*, Slide 8 (Dkt. 24-3 at ECF page 11 of 52) (any application of targeting process involves applicable commander's objectives and guidance). The disclosure of certain DoD information implicated by the allegations in this case is precluded by the military and state secrets privilege. *See* Public Sec'y Gates Decl. (Dkt. 15-5). Far from undercutting defendants' position, the release of these slides underscores the Government's effort to publicly release information consistent with its obligation to protect national security.

## **CONCLUSION**

For the foregoing reasons, the Court should grant defendants' motion to dismiss.

<u>Date</u>: October 18, 2010                Respectfully Submitted,

TONY WEST
Assistant Attorney General, Civil Division

RONALD C. MACHEN, Jr.
United States Attorney

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

DOUGLAS LETTER
Terrorism Litigation Counsel

JOSEPH H. HUNT
Director, Federal Programs Branch

VINCENT M. GARVEY
Deputy Director, Federal Programs Branch

/s/ Anthony J. Coppolino
ANTHONY J. COPPOLINO
Special Litigation Counsel, Federal Programs Branch

/s/ Peter D. Leary
PETER D. LEARY
Trial Attorney, Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW
Washington, D.C. 20001
(202) 514-3313