UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NASSER AL-AULAQI,                .
                                .
        Plaintiff,              .
                                .  CA No. 10-1469 (JDB)
    v.                          .
                                .
BARACK H. OBAMA, et al.,        .  Washington, D.C.
                                .  Monday, November 8, 2010
        Defendants.            .  2:00 p.m.
                                .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:              JAMEEL JAFFER, ESQ.
                                American Civil Liberties Union
                                125 Broad Street
                                17th Floor
                                New York, NY 10004
                                212-519-7814

                                PARDISS KEBRIAEI, ESQ.
                                Center For Constitutional Rights
                                666 Broadway
                                7th Floor
                                New York, NY 10012
                                212-614-6452

For the Defendants:             DOUGLAS LETTER, ESQ.
                                U.S. Department of Justice
                                Civil Division
                                950 Pennsylvania Avenue, NW
                                Room 7513
                                Washington, D.C. 20530
                                202-514-36902

Court Reporter:                 BRYAN A. WAYNE, RPR, CRR
                                Official Court Reporter
                                U.S. Courthouse, Room 6714
                                333 Constitution Avenue, NW
                                Washington, D.C. 20001
                                202-354-3186

```
 1                    P R O C E E D I N G S
```

 2          THE DEPUTY CLERK:  Your Honor, we have civil action

 3   10-1469, Nasser Al-Aulaqi versus Barack Obama et al.  I would

 4   ask counsel to please approach the lectern and identify

 5   yourself, starting with the plaintiffs.

 6          MR. JAFFER:  Good afternoon, Your Honor.  I'm Jameel

 7   Jaffer representing the plaintiffs.  Could I introduce my

 8   co-counsel, or would you like them to approach individually?

 9          THE COURT:  Why don't you do it.

10          MR. JAFFER:  I'm here with Pardiss Kebriaei and Maria

11   LaHood from the Center for Constitutional Rights, Ben Wizner

12   from my own office, and Art Spitzer from the ACLU of the

13   National Capital Area.

14          THE COURT:  Thank you, Mr. Jaffer.

15          MR. LETTER:  May it please the Court, Douglas Letter

16   from the United States Department of Justice.  With me today,

17   all from the civil division, we have Mr. Vincent Garvey, Deputy

18   Assistant Attorney General Ian Gershengorn, Peter Leary, Tony

19   Coppolino, and Assistant Attorney General Tony West.

20          THE COURT:  And good afternoon to all of you.  All

21   right.  We're here on two motions, a motion to dismiss by the

22   defendants and a motion for preliminary injunction by the

23   plaintiff.

24      Let me just give a little bit of background.  The

25   plaintiff, Anwar Al-Aulaqi, his father has brought this suit

1    challenging his son's alleged designation for targeting or

2    extrajudicial killing by the United States.  There are four

3    claims:  That the target killing of U.S. citizens -- which Anwar

4    Al-Aulaqi is -- outside of armed conflict and without meeting

5    certain criteria involving imminent threats and the absence of

6    any other reasonable means to neutralize those threats violates

7    the son's Fourth Amendment right to be free from unreasonable

8    seizures, his Fifth Amendment right not to be deprived of life

9    without due process, and violates the alien tort statute,

10   basically because it violates customary international law.

11        Plaintiff also claims that the failure of the United States

12   to disclose the criteria by which the United States designates a

13   U.S. citizen abroad for targeted killing violates Anwar

14   Al-Aulaqi's Fifth Amendment due process notice rights.

15        We have a request for a preliminary injunction by the

16   plaintiff, which would include declaratory and injunctive

17   relief, to prevent the targeted killing of U.S. citizens,

18   including Anwar Al-Aulaqi.  There actually is a claim to prevent

19   all targeted killings as well, except pursuant to specific

20   limited criteria requiring an imminent threat to life and no

21   means to prevent that threat short of lethal force.

22        There are several issues that the defendants have raised.

23   They are threshold issues, essentially that the plaintiff lacks

24   standing, either next friend or third party standing, that the

25   case raises nonjusticiable political questions, and that the

1    case can't proceed in light of the government's invocation of

2    the state secrets privilege, through both public and classified

3    declarations of director of national intelligence Clapper,

4    Secretary of Defense Gates and director of the CIA, Panetta.

5    And therefore, the defendants assert that the merits of

6    plaintiff's claims should not be reached.

7         The reason I've gone through this backdrop is to say that

8    counsel can address the issues as they wish, in the order that

9    they wish, focusing on what they choose to focus on.

10        You should assume I'm very familiar with your filings and

11   with the issues.  And each side has an hour to address the

12   issues, although I'm not keeping a clock on myself, and

13   therefore probably not on you either.  I do expect that most of

14   the hearing will focus on the threshold issues, and therefore I

15   will say this.  If I decide to deny the government's motion to

16   dismiss, I do expect or at least believe that I might have a

17   further hearing on the merits of the claims.

18        So I don't want the plaintiffs especially to feel that they

19   have to take all their time on the merits issues.  If we wind up

20   in a situation where the government's motion to dismiss has been

21   denied, I may well schedule, quickly, another focused hearing to

22   address the, what I'll call the merits issues.

23        I've decided that I'm going to hear first from the

24   government, then from the plaintiff, and then I will give both

25   the government and the plaintiff a chance to offer some rebuttal

1    or reply.  With that, Mr. Letter.

2         MR. LETTER:  Thank you, Your Honor.  What I'd like to

3    do, with Your Honor's permission, is to reserve 20 minutes of

4    time for rebuttal, but obviously my main desire is to answer

5    your questions.

6         Your Honor has already summarized the background facts and

7    the issues, but I wanted to do a couple of things right up

8    front.  First, to make clear that in this action the

9    United States does not confirm or deny any of the claims in the

10   plaintiff's complaint or their papers, particularly about

11   whether there is an alleged kill list and how it's prepared and

12   maintained and who might or might not be on it.

13        THE COURT:  To what extent then do I have to assume

14   the truth of the allegations in the plaintiff's papers?

15        MR. LETTER:  Well, for purposes of the motion to

16   dismiss, the allegations I think would be taken as true except,

17   as we point out in our papers, there are many of the allegations

18   that you should not accept, such as the key one that goes to the

19   next friend standing argument, where they have said that

20   Al-Aulaqi, the son, cannot communicate, and as we pointed out,

21   there are very serious questions about whether that's true and

22   therefore whether the plaintiff has met his burden.

23        THE COURT:  So which allegations do I, under the law,

24   have to accept and which don't I?

25        MR. LETTER:  All I'm saying, Your Honor, is as far as

1   the allegations that there is a kill list, et cetera, we're not

2   confirming or denying.  So for your purposes, I think you accept

3   that this is what they have alleged.  And I think Your Honor is

4   obviously very familiar and comfortable with doing this, such as

5   in the Abu-Ali case.  You went through what the plaintiffs had

6   alleged there, recognizing obviously that these are things that

7   would remain to be proven if the case ever moved forward.

8            THE COURT:  Didn't necessarily end up at a point where

9   you would like me to end up in this case.  In that case I

10  ordered jurisdictional estoppel.

11           MR. LETTER:  That's exactly correct, Your Honor.  And

12  I'll be happy to explain why that case is quite different from

13  this one.  The other thing I just wanted to point out up front

14  is that this is truly an unprecedented and extraordinary suit.

15  You're being asked to issue an injunction against the President

16  of the United States and his top military and intelligence

17  officers, concerning military and intelligence operations

18  abroad.

19       At bottom, the suit is fundamentally inconsistent with the

20  constitutional structure, by trying to put this court in a

21  position of either looking over the shoulder or standing next to

22  the President as he is attempting to make determinations of a

23  military, national security, intelligence nature, overseas.

24       What's even more unusual is this is done in the context

25  where the President is acting pursuant to congressional

1    authorization.  So we have a situation where both political

2    branches are united on this.

3          THE COURT:  You're right, there's no doubt that it's

4    an extraordinary and unique case.  It's unique from the other

5    perspective, too.  Or I'll ask you if it's unique.  Is there any

6    case in which a court has refused on political question doctrine

7    grounds to hear a U.S. citizen's claim that his personal

8    constitutional rights to life or liberty have been violated as a

9    result of U.S. government action taken abroad?  Is there any

10   such case?

11         MR. LETTER:  Your Honor, I'm not aware of any case

12   that is like this --

13         THE COURT:  Any case in which state secrets has been

14   invoked to deny judicial scrutiny of such a claim?

15         MR. LETTER:  No cases that I know of directly on

16   point.  There are cases, however, where constitutional claims

17   have been made.  And in those circumstances -- very serious

18   constitutional claims, and yet courts have found matters not

19   justiciable and dismissed, or under state secrets found that the

20   case cannot proceed.

21         THE COURT:  And there's some that go the other way

22   too.

23         MR. LETTER:  There are.  However, I don't think any of

24   them are in any way like this.  I'm not aware of a single

25   instance where somebody sitting in your position has issued an

```
1    injunction against the President of the United States with

2    regard to military or intelligence actions abroad.  And the

3    plaintiff has not cited a single one.  This truly -- they are

4    asking you to go way, way out on a limb here.  This would be

5    something unprecedented in the annals of our judicial history.

6              THE COURT:  In addition to it being unprecedented,

7    what are the legal reasons that I shouldn't?

8              MR. LETTER:  Well, I thought I would just sit down

9    then.

10        (Laughter)

11        In addition, the other thing I wanted to point out is this

12   is being done in a circumstance when the son is somebody who is

13   a leader of an organization.  The son has been formally

14   designated as a specially designated terrorist.  The

15   organization, the AQAP, the al-Qaeda in the Arabian Peninsula,

16   is a terrorist organization.  The United States government has

17   indicated it's linked to al-Qaeda, it's an associated force or

18   cobelligerent with al-Qaeda.  And if an injunction is issued

19   here, what it does is it provides a leader of the organization

20   with some sort of ability to continue operational planning for

21   an organization that, as we know, very recently is trying to

22   carry out terrorist acts to kill Americans.

23        So that's the context in which we are talking here, is

24   seeking an injunction against the President, protecting both

25   national security and the security of U.S. nationals.
```

1          Now, despite all of that that makes this case sound

2     extremely important, what we offer you right up front is what we

3     think is a very narrow and easy and not controversial way to

4     dismiss this case.  And by the way, I should have said up front,

5     as you know, we're moving for you to dismiss.  If you deny that,

6     we nevertheless think you should deny the preliminary

7     injunction, but I heard what you had said before.

8          So let's get right to this next friend standing argument.

9     The plaintiff is saying that he can bring this suit on behalf of

10    his competent, adult son.  There is again yet another way that

11    this case is so bizarre.  There is no precedent to suggest that

12    that would be appropriate.  We have cases, and indeed we have

13    statutes and rules that provide for next friend status when we

14    have somebody in detention or an adult who is incompetent or a

15    minor.

16          THE COURT:  But in the leading Supreme Court case -- I

17    know you're focusing on habeas situations and habeas statutes,

18    but in the leading Supreme Court case, the Court declined to

19    reach the issue of whether next friend could extend beyond those

20    situations.

21          MR. LETTER:  Yes, Your Honor, Whitmore left that open.

22    But once again, this fits in with my point about this is

23    something that they're asking you to do that has no precedent,

24    not even close to the precedent that this has.  But also -- and

25    remember also that all of this is an exception to the normal

1    Article III rules; overwhelmingly cases get litigated in the

2    United States where there's a case or controversy, and part of

3    that is the individual who is injured is the one who sues.

4         THE COURT:  I'm interested in all of this, but I'm

5    interested in this question right now.  Part of your state

6    secrets argument relates to there being a necessity to look into

7    facts, even relating to standing, that would be sensitive and

8    shouldn't be looked into by the judiciary.  Does that mean that

9    state secrets prevents me from deciding the standing issues, or

10   does it only prevent me, I think the way you cast it, from

11   deciding the standing issues in favor of the plaintiff?

12        MR. LETTER:  I love that answer, yes.

13        (Laughter)

14        THE COURT:  But isn't that your position?

15        MR. LETTER:  State secrets means they can't win.

16   Your Honor, obviously the first point I do need to make is I

17   want to be absolutely clear on this, as we were in our briefs.

18   We do not think, we urge you not to reach state secrets --

19        THE COURT:  I understand that, and I think that's a

20   sound position for you to take.

21        MR. LETTER:  Thank you very much, Your Honor.  But

22   since you have asked about it, yes, we have said that the

23   plaintiff here, certain things that the plaintiff would have to

24   show, and that in order to demonstrate standing the plaintiff

25   would have to show that there is this asserted kill list, and

1   they'd have to show how it's maintained, but most importantly,

2   at some point the plaintiff would have to show that his son is

3   on that list.  After all, because if his son is not on the list,

4   there's clearly no injury.

5       And even then it's highly questionable that there's any

6   injury just from being on the list, but that would be at an

7   absolute minimum.  I repeat, we will not confirm or deny --

8           THE COURT:  But it's almost a situation as if you hold

9   all the cards, and you'll reveal what you want to reveal for me

10  to be able to decide standing.  But if they want to win on

11  standing, then they have to get into things that shouldn't be

12  revealed.  For instance, what's the answer to this question?  If

13  I were to agree with you, as you assert, that Anwar Al-Aulaqi

14  can emerge from his hiding in Yemen to seek judicial relief and

15  he will not be killed, doesn't even getting into that and my

16  accepting that and reaching that conclusion imply some judgment

17  with respect to the criteria that are being followed by the U.S.

18  government in making any targeted killing decisions, and how the

19  U.S. government is carrying out those decisions, and what it's

20  going to do in what situation?

21      Aren't you bringing me, by saying that and asking me to

22  accept it, aren't you bringing me into just the kinds of things

23  that you don't think the judiciary should get into?  Can I make

24  that kind of determination?  Can I accept what you say with

25  respect to that particular aspect of any alleged targeted

1    killing approach, without encroaching on state secrets?

2            MR. LETTER:  I think the answers were no, yes, yes and

3    no.

4            THE COURT:  I think you missed one in there.  Now

5    you've thrown me off.

6            MR. LETTER:  Your Honor, it's clear -- remember that

7    the state secrets privilege removes evidence from the case.

8    It's not that the --

9            THE COURT:  It depends.  You're not asserting state

10   secrets under Totten.  So yes, under Reynolds, it removes

11   evidence.

12           MR. LETTER:  Right, exactly.  And Your Honor, I'll

13   point out, I know you're familiar with it, but I'll point it out

14   anyway, the D.C. Circuit in the Molerio case where the Court

15   asserted state secrets and the D.C. Circuit --

16           THE COURT:  The Court didn't assert it, but go ahead.

17           MR. LETTER:  I'm sorry.  The government asserted state

18   secrets privilege, the D.C. Circuit accepted that, and then

19   actually peeked at the material and said, in any event, the

20   government wins on the merits.  But that's very much not the

21   norm.

22       So when the government properly asserts the privilege, and

23   we think there's no question here that it has, it removes that

24   material from the case.  So what we have said -- and by the way,

25   for example, a situation where this resulted properly in a

dismissal is the ACLU case in the Sixth Circuit involving the terrorist surveillance program, the government asserted state secrets privilege, said that that meant that the plaintiffs would not be able to show that they had ever been subject to the surveillance policy that they claim.  If they couldn't make that showing, they would never be able to assert standing.

And so here too, if plaintiffs say well, we could just stick that in the complaint -- but the precedent is clear.  At some point you have to prove that.  You have to prove that Al-Aulaqi is on some sort of list for lethal targeting.  If that's something that the government asserts state secrets privilege over, it takes that out of the case, it is impossible for the plaintiff to ever demonstrate standing under those circumstances.

So it's not -- we're not asking you to peek at the classified material in order to rule for us on any of the grounds.

THE COURT:  No, no.  I hadn't assumed that you had.

MR. LETTER:  But for that very narrow state secrets argument, all we're saying is they will not be able to prove standing.  And with it, also, as we point out, there are a host of reasons, which I won't go into here, why the case cannot be litigated.

But with Your Honor's permission, shifting back to the non-state secrets claim, on next friend, unless you've heard

1    enough on that, I was going to continue.

2         THE COURT:  I'd move on quickly to third party, but if

3    you have something more to say on next friend, you certainly can

4    say it.  The only question I would have is what if Anwar

5    Al-Aulaqi did somehow, through an article in *Inspire* or in some

6    other means, say, look, I'm in hiding, I'm scared for my life, I

7    can't come out of hiding, and I authorize my father to bring

8    this suit.  Is there next friend standing then?

9         MR. LETTER:  No, Your Honor, because, as we've pointed

10   out, there is an alternative, which is -- there are two

11   questions.  One, it's not just that he would be in hiding.

12   Remember, it's that he is unable to bring the suit himself.  In

13   today's world there are all sorts of ways of communicating.

14   There's no -- Mr. Al-Aulaqi would not have to be in court

15   himself.  If he is able, for example, to communicate with the

16   world through *Inspire* magazine, then he should be able to

17   communicate -- and through videotapes, he should be able to

18   communicate with attorneys, and therefore he is able to pursue

19   an action.  And the burden is on the plaintiff --

20        THE COURT:  Can he pursue that action from Yemen in

21   hiding in his own name?

22        MR. LETTER:  Certainly, Your Honor.  In a civil case

23   there's no requirement that the plaintiff be present in the

24   United States.  Obviously, if there were going to be discovery

25   or something like that, that would raise issues, but otherwise,

1  of course, Your Honor.

2       And in addition, though, the question would still be, as

3  we've pointed out, and Your Honor clearly understands, he has

4  the key to his own safety.  He can present himself in an

5  appropriate way to authorities, and then we have made absolutely

6  clear, there should be no question about this at all, that if he

7  does present himself, he is under no danger of the United States

8  government using lethal force.  He would be protected under any

9  applicable laws.

10      And so not just does that undermine the ability of the

11  plaintiff to bring this next friend standing case, but it should

12  eliminate any possible argument about irreparable injury.  He

13  can make this irreparable by presenting himself appropriately.

14      THE COURT:  What about third party standing, which

15  actually has some slightly different requirements, and indeed in

16  one sense the hindrance requirement may be a little lesser

17  requirement than is true for next friend.

18      MR. LETTER:  You're right, Your Honor.  The courts

19  have stated slightly different tests.  One is the inability and

20  the other is hindrance.  On that, first of all, Your Honor, I'd

21  like to point out, it's certainly not appropriate to use third

22  party standing as a way to get around the limitations and

23  restrictions on next friend standing.  And that really --

24      THE COURT:  So what should I do, say you can't do it

25  because you don't have next friend standing?

1          MR. LETTER:  What I'm thinking is if he doesn't have

2     next friend standing, it's not just a question of saying oh,

3     great, we could just slide over into third party.

4          THE COURT:  Well, there are certain requirements, but

5     if he met those requirements, then why not?

6          MR. LETTER:  Yes.  That is correct, Your Honor.  But

7     he does not meet those requirements.  The very first requirement

8     is, for third party standing, not surprisingly, because this is

9     not some free-for-all way to avoid Article III, he has to have

10    standing in his own right.

11         THE COURT:  Standing in his own right meaning what?

12         MR. LETTER:  He must have standing to bring an action

13    against these defendants.

14         THE COURT:  To some claim.  So if he has standing on

15    some claim, then he can bring other claims on behalf of a third

16    party.

17         MR. LETTER:  No, Your Honor.  There has to be some

18    sort of relationship.

19         THE COURT:  Let's assume there's some sort of

20    relationship.  They involve the same core events.

21         MR. LETTER:  Right.  And there would have to be a

22    showing that the other party is, the first party -- which is the

23    third party here? -- the first party is hindered, Al-Aulaqi is

24    the first party.  But in addition, and this is a very key thing,

25    and the D.C. Circuit set this out in the Haitian Refugee case,

1    for there to be third party standing, for this to work, you have

2    to show that the government has somehow directed its action

3    against the relationship.

4         THE COURT:  I don't think that's right.  That's what

5    Haitian Refugee said, but then there's the Supreme Court line

6    under Powers that doesn't use that.  And it seems to me that

7    even the D.C. Circuit has said that there are sort of these two

8    different ways.  That's the way the D.C. Circuit seems to have

9    reconciled those different strains of third party standing,

10   which is to a certain extent a mess, but the D.C. Circuit has

11   reconciled it by saying there are these two different

12   approaches.

13      So I don't think you necessarily -- there are lots of cases

14   in which the Supreme Court has allowed third party standing that

15   don't meet the Haitian Refugee test.

16        MR. LETTER:  That did not discuss that.  That is

17   right, Your Honor.  However, they still don't change the nature

18   of the relationship.  And so if we look at some of the cases

19   where there's been third party standing allowed, it's for

20   instance when there's a doctor-patient situation and the

21   government has acted in a way that directly affects that

22   relationship.

23      Now, here the government hasn't acted about this

24   father-adult son relationship.  Obviously, again, I'm not

25   confirming or denying, but if the government has in some way

1    placed Al-Aulaqi on a target list for lethal force, that is

2    clearly in no way related --

3             THE COURT:  That's an incidental effect.

4             MR. LETTER:  Precisely.

5             THE COURT:  Stay on injury in fact for a moment.

6    Well, let me ask this.  So as I understand your position, if

7    Anwar Al-Aulaqi emerged from hiding, this case would become

8    moot, wouldn't it?

9             MR. LETTER:  Yes, because as I say, there would be no

10   threat of lethal force.

11            THE COURT:  He'd be in the U.S. custody, and according

12   to what you've represented, there would be no threat of

13   extrajudicial killing.

14            MR. LETTER:  That's right.

15            THE COURT:  So in that situation, Anwar Al-Aulaqi, he

16   couldn't sue to vindicate his own rights, because there would be

17   no threat and it would be moot.

18            MR. LETTER:  Could he sue at that point?  Obviously,

19   it would be much -- this case is much easier for the government

20   than that would be.  He would still have the same problem of

21   demonstrating standing.  He'd still have, I think, most of the

22   arguments --

23            THE COURT:  I think he'd run up against mootness,

24   wouldn't he?  Isn't that what you would be arguing, because

25   there's no case or controversy, there's no intent by the

1    government -- you would then say, we have no intent to kill him.

2         MR. LETTER:  Exactly.  And so if he said, ah, but I'm

3    on a list, this would get right to, well, just being on a list

4    most of the time is not injury.  You'd have to show that there

5    is something flowing from that.  And as you've correctly

6    identified, we would say there's nothing flowing from that.

7         THE COURT:  So if he can't sue if he turns himself in,

8    and if he's killed, I think you would also say that the case is

9    moot.

10        MR. LETTER:  I think that would be true.

11        THE COURT:  And you say that the father can't sue.

12   This means that this is -- this challenge to a threatened

13   extrajudicial killing is free from judicial scrutiny.  No one

14   has standing to bring the case, correct?

15        MR. LETTER:  That's right, but the reason is because

16   there would be no injury.  That's like saying I'd like to be

17   able to sue if somebody hits my car, and yes, you can sue if

18   somebody hits your car, but if nobody hits your car, you have no

19   injury, so nobody can sue.  So this gets to the most --

20        THE COURT:  In some circumstances threatened injury

21   can be the basis of a suit.

22        MR. LETTER:  Yes.  But we, as I say, we are making

23   absolutely clear, absolutely clear there would be no threat of

24   injury in that circumstance.  There would be no realistic threat

25   of extrajudicial killing, and therefore this would fall under

1    any of the standards for standing.

2         THE COURT:  And on injury in fact, does the plaintiff

3    have to show an independent constitutional claim here, or that

4    he has a cause of action under the alien tort statute, or

5    instead is all he has to show is the invasion of a legally

6    protected interest, and might that be less than actually having

7    a claim to bring?

8         MR. LETTER:  Well, several answers, Your Honor.  As he

9    has stated --

10        THE COURT:  Do I get to pick which one?

11        MR. LETTER:  I'll start with whichever one you want.

12   Let's start with the direct claim that he makes.  He claims that

13   he is bringing an action, the plaintiff, when I say "he" -- and

14   by the way, what I'm doing is I'm calling Al-Aulaqi the son and

15   the father the plaintiff.  The plaintiff says he's suing under

16   the alien tort statute in his own right, and so that doesn't

17   involve third party standing.

18        THE COURT:  We'll get to that in a moment, but we're

19   not sure exactly what he's saying.

20        MR. LETTER:  I thought that's what he was alleging.

21        THE COURT:  I thought that originally, but in the

22   reply brief I'm not so sure that's what he's saying.

23        MR. LETTER:  Well, if he is suing in his own right

24   under the alien tort statute, again, this is yet another

25   instance when the plaintiff is asking you to go very far out on

```
1    a limb.  In light of Sosa, the Supreme Court's decision about

2    the alien tort statute, it makes clear that that statute does

3    provide for jurisdiction, but only in a very limited set of

4    circumstances.  And the claim here, I suppose -- all we've been

5    able to think of that the father would have is something like

6    intentional infliction of emotional distress.

7         THE COURT:  I think in the reply papers they disavow

8    that, but we'll get to that in a moment.

9         MR. LETTER:  Then we can't think of what claim they

10   would have.  The D.C. Circuit had has made clear there is no

11   constitutionally protected right --

12        THE COURT:  Maybe they think they have a third party

13   standing context that they can assert there as well.

14        MR. LETTER:  If my friends here make that argument, I

15   welcome that, because Al-Aulaqi can't bring an alien tort

16   statute suit; he's a citizen, he's a U.S. citizen.  He's not an

17   alien.  A next friend suit or third party suit, you're suing,

18   bringing the rights of the third party, under the alien tort

19   statute, there are none.

20        THE COURT:  So back to the question.  There is no

21   claim that can be brought, no cause of action, not even a legal

22   ly protected interest with respect to the alien tort statute.

23        MR. LETTER:  That's right.  That's right.

24        THE COURT:  And what about with respect to the

25   constitutional claims and perhaps some interest deriving from
```

```
1    the parent-child relationship?  That may be less than a cause of
2    action, but it may be a legally protected interest.
3              MR. LETTER:  I believe, Your Honor, that the D.C.
4    Circuit has cast very serious -- I was going to say very serious
5    doubt, but I think it's more than that.
6              THE COURT:  They said there's no 1983 claim.
7              MR. LETTER:  Right.  Which would be therefore based on
8    a constitutional claim, and the D.C. Circuit said with an adult
9    child and a parent, there isn't any constitutionally protected
10   relationship.  And obviously a competent child, adult child.
11       So it's very difficult to see what constitutional claim
12   there would be for the plaintiff, in addition to which,
13   Your Honor, remember, the plaintiff is an alien outside the
14   United States with no apparent substantial connection to the
15   United States.  So under the precedent of this circuit, the
16   plaintiff has no claims under the Constitution anyway.  So
17   that's not something that the plaintiff can bring.
18             THE COURT:  But at some point the father could have
19   a -- depending upon how things play out, could have a wrongful
20   death claim, correct?  A few things would have to happen.
21             MR. LETTER:  If he were representing the son's estate.
22             THE COURT:  That's what he would have to have happen.
23             MR. LETTER:  Right.  And there's several problems with
24   that, Your Honor, is one, if we're talking alien tort statute,
25   the son's estate would undoubtedly be based on the son's status
```

when he was killed, and the son, as I say, he is a U.S. citizen.
So the alien tort statute is out.

As far as constitutional claims, it's very difficult to
figure out what at that point -- we would be dealing with a
totally different lawsuit because the son would be deceased.

THE COURT:  This is a question in third party
standing.  In third party standing is it your position that the
plaintiff has to show injury in fact as to the claim that third
party standing relates to?  Or can the plaintiff show simply a
legally protected interest that may not be that claim?  But it
has to be, as you said, related, deriving out of the same core
events.

MR. LETTER:  Your Honor, as I and my colleagues read
the case law, it's that the plaintiff has to have standing in
his own right to sue.

THE COURT:  Then what's third party standing mean, if
the plaintiff has to have standing anyway?

MR. LETTER:  Because what it does, Your Honor, is it
allows the plaintiff to raise related claims that other people,
such as a doctor being able to raise a patient's claim.

THE COURT:  Why isn't that the situation here?  But
you're saying the doctor in that situation has to have an injury
in fact with respect to one of the claims being raised on behalf
of the patients?  I don't think that's right.

MR. LETTER:  And I'm not saying that, Your Honor.

1          THE COURT:  I think the doctor only has to have a

2    legally protected interest, some cognizable interest, and it

3    doesn't have to be in that claim that is being brought on behalf

4    of the patient.

5          MR. LETTER:  I may not be being clear, but let me try.

6    My understanding of the case is the doctor has to have standing

7    in his own right to sue.  If he has that, then he also can raise

8    related claims --

9          THE COURT:  That's where I was at the beginning.

10          MR. LETTER:  Okay.  But he still has to have that

11    initial Article III standing --

12          THE COURT:  And that Article III standing doesn't

13    require a cause of action; it only requires some kind of legally

14    protected interest, which may be slightly different from or less

15    than a cause of action.

16          MR. LETTER:  I would rephrase it slightly, Your Honor.

17    I would say a legally cognizable interest would be --

18          THE COURT:  That's fine.

19          MR. LETTER:  As I say, it's very difficult to see that

20    the father has any legally cognizable interest here, because

21    again --

22          THE COURT:  What if there were a wrongful death

23    statute in D.C. that said parents can sue for the wrongful death

24    of their children regardless of the child's age, because the

25    parent, under our D.C. statute, has a legally cognizable

1    interest in maintaining a relationship with the child?  Would

2    that be sufficient?

3            MR. LETTER:  I could see several problems with that.

4    First, as you know, that's not this case.  We wouldn't be here

5    for injunctive relief, et cetera.  So very different.

6            THE COURT:  But I am free to ask hypotheticals,

7    Mr. Letter.  So please go ahead.

8            MR. LETTER:  Yes.  And as Justice Scalia said, I'm

9    free to look at my cuff and say that is not this case.  And then

10   you can yell at me.  And obviously there the plaintiff has some

11   sort of -- there would be an appropriate venue and the plaintiff

12   would be covered by that statute.  In order to bring a wrongful

13   death action, there would have to be a waiver of sovereign

14   immunity also.  And so it would have to be some sort of statute

15   by Congress that would waive immunity in order to sue the

16   President --

17           THE COURT:  This is where I disagree with you.  If

18   there is that legally cognizable interest, it doesn't matter if

19   it can be brought in federal court as a constitutional claim.

20   It's still a legally cognizable interest that then may give

21   rise, because that gives injury in fact to third party standing,

22   to raise constitutional claims on behalf of the son.

23           MR. LETTER:  So let me -- I'm trying to work this out.

24           THE COURT:  Now, it's all hypothetical because we

25   don't have such a statute.  But that's how I think this all fits

1   together if there is a legally cognizable interest in the

2   father.

3           MR. LETTER:  So if Al-Aulaqi -- we're positing a

4   situation where Al-Aulaqi is now deceased, and the father is now

5   saying I would like to bring a suit.  I'm not sure why it would

6   be third party standing at that point.  If there were some

7   statute under which he could sue, then he would bring a first

8   party claim.  If instead it were a third party claim, it would

9   be, what, on behalf of the estate?  And again, it might very

10  well be that if Al-Aulaqi is deceased, then maybe the father or

11  somebody else could bring a claim on behalf of the estate.

12      But at some point somebody's going to have to demonstrate a

13  waiver of sovereign immunity in order to be able to sue these

14  defendants, the President and the Secretary of Defense and the

15  director of the CIA.

16          THE COURT:  You don't have to demonstrate the waiver

17  of sovereign immunity necessarily for a wrongful death claim.

18  He may not be bringing the wrongful death claim, even if he has

19  a legally cognizable interest.

20      But in any event, I think we've beaten the injury in fact

21  issue to a pulp.  Why don't you tell me, if there is injury in

22  fact on the part of the father, the plaintiff, are there

23  nonetheless prudential reasons for not allowing third party

24  standing?

25          MR. LETTER:  Most definitely, Your Honor.  And these

1   very much overlap with each other.  And when you say prudential,

2   they are things that go to the justiciability of the dispute.

3   One would be, as we've argued, equitable discretion, that as

4   Your Honor knows well, the courts have made clear that an

5   injunction against the President for anything that involves any

6   kind of discretion, et cetera, is not permitted.

7          THE COURT:  There is this concept out there, and what

8   cases do you rely on in which a court has, number one, found

9   third party standing but nonetheless exercised equitable

10  discretion not to consider the case, or, the next situation,

11  found that the case is not barred by the political question

12  doctrine, but found nonetheless, because of equitable

13  discretion, that the case should not be heard?  Are there cases

14  that do either of those two things?

15         MR. LETTER:  On the first question, no, I'm having

16  trouble -- I'm running in my mind through the third party

17  standing cases that I can remember, and I can't recall that any

18  of them are against the President of the United States.

19      As far as whether, once a court has found there is no

20  political question --

21         THE COURT:  It seems to me to be an odd position that

22  the government is taking here with respect to political

23  question, and I think you are taking this position, that even if

24  I were to conclude that the political question doctrine does not

25  bar this case, I nonetheless, because of the concept of

1    equitable discretion, should decide that the Court shouldn't

2    hear this case.  That seems to me to be an odd posture, and I

3    don't think there's any case that has ever done that.

4           MR. LETTER:  Your Honor, what I would instead ask you

5    to do, and giving you a direct answer, I'm having trouble

6    thinking of any also.  What I would ask you to do though instead

7    is, instead of pulling these doctrines apart, is to view them as

8    interrelated.  I think that is the strength of our argument.

9        As we know, Mississippi v. Johnson, the Supreme Court said

10   we don't issue injunctions against the President in situations

11   like this.  Now, there's some case law saying, that the

12   plaintiff has raised, you can issue an injunction against lower

13   level executive branch officials.  I don't think any of those,

14   though, are situations like this.  Not I don't think.  I know

15   none of them is like this, where we're going to the very core

16   powers of the President as commander in chief and the person

17   responsible for, most responsible for protecting national

18   security.

19       So this is something that goes right to the heart of the

20   presidency and the commander in chief powers.  There is no

21   case --

22           THE COURT:  If so, you would think the political

23   question would bar it, but you would say even if it doesn't, I

24   should nonetheless erect this other doctrine to bar it.

25           MR. LETTER:  I'm not asking you to erect it.  It's

1    there already, but let's put them together, Your Honor.  Let's

2    put them together.  Political question doctrine --

3         THE COURT:  We've moved off of third party standing.

4    If you have nothing further to say on third party standing, then

5    I'm comfortable with you moving to the next issue.

6         MR. LETTER:  It sounds to me like Your Honor has

7    probably a better grasp of third party standing than I do, so I

8    don't think there's more for me to --

9         THE COURT:  That will get you nowhere, Mr. Letter.

10        (Laughter)

11        MR. LETTER:  So as far as -- before we even get to

12   these justiciability doctrines, I did want to toss in, there is

13   nevertheless the Article III problem of you can't just sue and

14   say I think something unconstitutional may happen here.

15        THE COURT:  The speculative nature of this.

16        MR. LETTER:  Exactly.  Exactly.  And this gets into

17   the Supreme Court's decision in Lyons where here there is no

18   indication, none, that the executive would use lethal force or

19   target somebody for lethal force inconsistently with the

20   Constitution.  The only indications are --

21        THE COURT:  There's some indication that the executive

22   might target someone for lethal force in this situation.

23        MR. LETTER:  Yes.  And the legal advisor, Dean Koh,

24   has spoken on this publicly and for attribution, and he made

25   clear, though, and this is key, because what he said is that

"U.S. targeting practices" -- I'm quoting very briefly --
"including lethal operations conducted with the use of unmanned
aerial vehicles comply with all applicable law, including the
laws of war."

So this official statement is that if we're going to use
lethal force, we do so consistent with all applicable laws.

And so the plaintiff has said, ah, but we think there's
information that Al-Aulaqi has been on some sort of lethal force
list, or can be on a lethal force list for an extended period.
But that doesn't show anything.  There obviously can still be a
threat of imminent harm.

THE COURT:  But how firm does this threat have to be?
How certain does the impending injury have to be?  We do have
cases in the Steffel v. Thompson line of cases that certainly
say even though it's somewhat speculative and not certain,
that's still sufficient.

MR. LETTER:  Right.

THE COURT:  Particularly when constitutional issues
are at play, although there we're talking about the First
Amendment.

MR. LETTER:  Your Honor's exactly right.  I can't
stand here and say it's a clear line and here's where it is.
The Supreme Court and the courts of appeals have not given us
the clear line.  What we do know -- and so there are decisions
like Babbitt, where there, I think if you parse the decision

closely, the Supreme Court there said certain things were

actionable and certain things were not.  And the parts that

seemed conjectural is where the Court dismissed.  The parts that

instead, where the plaintiffs there had acted in a way that

would bring the power of the statute down on the man, they

announced they would like to do that in the future, the Court

found standing.

    And added to this obviously is the Supreme Court's decision

of a couple of terms ago in Iqbal that I think helped guide the

lower courts in at least the range of conjecture that is

inappropriate.  And once again, I think Lyons is our best case

on that.

        THE COURT:  All right.  Let's go beyond standing.

Where do you want to go now, alien tort statute or political

question?

        MR. LETTER:  I'd like to go to political question.

I've got a little more to say on alien tort statute, but I think

we've largely covered it.

        THE COURT:  Then let's stick to that for a second.

Why hasn't the government raised the standing argument here on

alien tort statute?

        MR. LETTER:  Well --

        THE COURT:  Is it because of what you said earlier,

that if this is a third party standing situation, then it

doesn't make any sense because Anwar Al-Aulaqi can't bring an

1    ATS claim?

2         MR. LETTER:  Precisely right.  The father can bring an

3    alien tort statute claim, but Sosa makes absolutely clear that

4    some sort of odd notion that isn't even recognized in all the

5    states in the United States, it's certainly not part of the

6    recognized law of nations.  Some sort of bystander intentional

7    infliction of emotional distress is obviously so different from

8    the types of causes of action that have been recognized under

9    the alien tort statute.  And again, he clearly cannot sue as the

10   son.

11        THE COURT:  Is it the United States' position that an

12   alien tort statute claim cannot be brought against the

13   United States?

14        MR. LETTER:  Yes, Your Honor.  We do not believe that

15   there is any proper waiver of sovereign immunity.

16        THE COURT:  Either an injunctive claim or a damages

17   claim?

18        MR. LETTER:  Right.  And on injunctive claim,

19   Your Honor, the plaintiff cites two decisions, Von Dardel which

20   was reversed, and the other is a district court decision in the

21   Kadic case, Karadzic.  Both of those precede Sosa.  It is very,

22   very difficult to see that the principle there would survive the

23   Supreme Court's instructions in Sosa.

24        THE COURT:  So in 1789 you think the Congress of the

25   United States was creating a statute -- it's an odd statute, we

1    all know.

2            MR. LETTER:  It is.

3            THE COURT:  But was creating a statute to give

4    jurisdiction only to an alien to sue a foreign government, for

5    instance, for seizing property on the high seas, not to allow an

6    alien to sue the United States for seizure on the high seas.

7            MR. LETTER:  Right.  I have one quibble with what you

8    just said, Your Honor.  It was providing that a plaintiff alien

9    could sue somebody else.

10           THE COURT:  But not the United States.

11           MR. LETTER:  Correct.  So piracy, for example, is not

12   going to be carried out by a foreign state, but instead by

13   individuals.  But that's exactly right, Your Honor.  And the

14   D.C. Circuit, I think then-Judge Scalia in Sanchez-Espinoza, I

15   believe, makes this clear, that the precedent of this circuit at

16   least is this type of suit cannot be brought against the

17   United States.  It's hard to see again how it would be brought

18   against the President of the United States.

19           THE COURT:  Political question.

20           MR. LETTER:  Political question, Your Honor.  What

21   we've argued here is the types of matters that Your Honor would

22   have to look into, and then most importantly the judgment that

23   plaintiffs would be asking you to enter, particularly either an

24   injunction against the President or a declaratory judgment that

25   is designed to limit actions by the President -- after all, why

1   would you issue a declaratory judgment if the plaintiffs and you

2   didn't think it was going to have an impact on the President?

3          THE COURT:  Let me ask you this hypothetical question.

4   Would the United States claim political question as to an

5   after-the-fact challenge to the extrajudicial killing of Anwar

6   Al-Aulaqi?

7          MR. LETTER:  Your Honor, it might do so.  For example,

8   the Aktepe case from the 11th Circuit.

9          THE COURT:  If the case involved looking into the

10  criteria, whether the United States abided by the Constitution

11  in killing him, wouldn't you claim political question as to

12  that?

13         MR. LETTER:  I believe we would, Your Honor.  Because

14  you would be asked to make the same kinds of determinations post

15  as you would prior.  Now, obviously, though, the prior is even

16  more problematic.  An ex ante injunction or declaratory judgment

17  against the President in military and intelligence sort of

18  matters is very difficult to contemplate, and as we started out

19  with, I'm not aware of a single instance when it's ever been

20  done.

21         THE COURT:  Let me ask the question that plaintiff has

22  asked.  Slightly modified.  How is it that judicial scrutiny is

23  required when the United States decides to target a U.S. citizen

24  overseas for electronic surveillance, and judicial scrutiny is

25  permitted when the United States takes the property of U.S.

citizens overseas, but judicial scrutiny is prohibited, in your

view, on the political question doctrine, when the United States

decides to target a U.S. citizen overseas for death?  How does

that all make sense?

        MR. LETTER:  Okay.  The first question, as we know --

and again, you know better than I do, Congress has by statute

provided that under certain circumstances, we need the -- some

sort of order is needed before surveillance can be targeted

against a U.S. citizen.  So Congress has provided that by

statute.  As far as taking of property of a U.S. citizen

overseas --

        THE COURT:  That's basically D.C. Circuit cases that

reject political question.

        MR. LETTER:  Yes.  The difference is there you're not

being asked to stand at the shoulder of the President as the

President is trying to decide is there an imminent threat to the

security of U.S. nationals posed by the leader of a highly

active terrorist organization.

        THE COURT:  That's why I asked you the question in the

first instance whether you would assert political question even

after the fact, and you said you would.

        MR. LETTER:  I think we would.  Now, obviously -- I

think Mr. West rather than me would make the decision about

whether we would, but I think all indications are that it would

normally fall within that.  So yes, Your Honor.

1        But also, as I say, it's the direct military aspect of it

2   that I think is central and is such a principal part of our case

3   here that any hypotheticals that move into different --

4        THE COURT:  As opposed to the intelligence aspect of

5   listening to someone, electronic surveillance?  What's the

6   difference between intelligence and military in the context of

7   political question?  I don't think there is any, is there?

8        MR. LETTER:  Here, Your Honor, obviously because of

9   the defendants, the military and the intelligence aspects are

10  all pulled together into -- and because the President is the

11  defendant.  In the situation you raised, though, again I would

12  fall back on the Congress --

13        THE COURT:  Congress has said so.

14        MR. LETTER:  That's right.  And the key thing here

15  is --

16        THE COURT:  By the way, do you assert the political

17  question with respect to the alien tort statute claim?

18        MR. LETTER:  We haven't done so specifically.  I think

19  in part because we felt we didn't need to because it was so

20  obvious.

21        THE COURT:  Well, assume you need to.

22        MR. LETTER:  If we need to, yes, the same factors

23  would enter --

24        THE COURT:  Even though it's a statutory claim.  The

25  concurrences in El-Shifa would say no, no, no, political

1   question isn't available with respect to a statutory claim.

2        MR. LETTER:  Right.  But the majority went the way the

3   government argued, so it rejected that argument.  So yes, the

4   alien tort statute claim would also be subject to political

5   question, especially to the extent that -- well, as we know,

6   plaintiffs here are not asking for damages.  They're asking for

7   injunctive relief, and so that wouldn't change one iota.

8        And we covered equitable discretion.  I don't think there's

9   anything more -- oh, the one other thing I wanted to bring to

10  Your Honor's attention, I know we did it in the briefs, is I

11  think the very strongest case that we have for us is Gilligan v.

12  Morgan, where what the plaintiffs there were seeking is

13  something very similar to what is being sought here.  The Court

14  to --

15        THE COURT:  Political question was not the only

16  argument there.

17        MR. LETTER:  Correct.  Although there, as I recall,

18  the Supreme Court said that aspects of mootness entered into it,

19  but the Court, as I recall, I think it was Chief Justice Burger

20  did not rely on mootness, and instead the Court went beyond that

21  and said this is just clearly not justiciable; for the judiciary

22  to get involved with an ex ante order to the military --

23        THE COURT:  Although, the Court in Gilligan said that

24  it would have been a different case if that case involved an

25  action seeking a restraining order against some specified and

1    imminently threatened unlawful action.  Why isn't that just what

2    we have here?

3            MR. LETTER:  Your Honor, I think what the Court there

4    was saying, though, was it wasn't necessarily focusing on one

5    specific act, because here you wouldn't be focusing on one act.

6    You would have to be looking at a range of things.  You would

7    have to be examining, is Al-Aulaqi an imminent threat to the

8    United States and the safety of its citizens?  What is the role

9    of AQAP?  AQAP and al-Qaeda, are they indeed tied together and

10   how closely?  Are there alternatives?  What's the relationship

11   currently?  At any moment between the United States and Yemen,

12   would the United States be able to carry out something, an

13   activity like this?  Does the United States have alternatives

14   such as the plaintiffs have said?  All of those would factor in.

15   And I think the breadth of those makes it much more like the

16   Gilligan decision.

17           THE COURT:  The reference to Gilligan brings to mind

18   the fact that, except for that case that really has no

19   application here, I don't think, the Walter Nixon case, Gilligan

20   is the only case in which the Supreme Court has applied

21   political question since Baker v. Carr, I think, except for

22   Walter Nixon.  Those two cases.

23           MR. LETTER:  I'd like you to go back to the Walter

24   Nixon case, because I litigated that.

25           THE COURT:  So as I said, it has no relevance here.

1           (Laughter)

2               MR. LETTER:  But the reason <u>Nixon</u> is relevant is

3       because that was a clear constitutional claim, so we can't say

4       oh, if it's a constitutional claim, it's outside political

5       question.

6               THE COURT:  But what should I take from the fact that

7       political question is applied by the Supreme Court so

8       infrequently?

9               MR. LETTER:  Very interesting question, Your Honor,

10      but here is what I think is very important.  Notice that the

11      D.C. Circuit and its sister circuits have issued a number of

12      political question decisions where they have dismissed actions.

13      The Supreme Court has taken cert in none of these.  So it's not

14      as if the Supreme Court has rejected political question

15      arguments regularly.  Far from it.

16              THE COURT:  Although a lot of academics and even

17      judges say that it's a doctrine with no real foundation that

18      really winds up just being an ad hoc application to various

19      factual circumstances.

20              MR. LETTER:  In one sense it's ad hoc, but that's the

21      way it's supposed to be.  It's supposed to be the Court looking

22      at the very specifics of the situation.  We are not arguing for

23      a very broad doctrine; we're arguing that political question

24      does require a very ad hoc analysis.

25          But I repeat, I think maybe one of the best explanations

1    for this is the Supreme Court really hasn't had to use the

2    political question doctrine, because the courts of appeals are

3    applying it and doing so appropriately, but -- such as both

4    El-Shifa cases, the D.C. Circuit and the prior federal circuit

5    one that was so heavily relied upon by the D.C. Circuit, and if

6    anything the prior case is so closely on point here, an attempt

7    to get judicial review of a military action by the President of

8    the United States.

9            THE COURT:  My last question I think on political

10   question is this.  There is a second prong of Baker v. Carr,

11   which is the judicially manageable standards.  It isn't that

12   different from the first prong or the first factor.  But I guess

13   my question is, if it's your view that the courts are

14   ill-equipped to evaluate the array of sensitive and complex

15   information upon which the President and his advisors in the

16   national security arena and its military advisors would rely on,

17   and I think that is your position --

18           MR. LETTER:  Yes.

19           THE COURT:  -- how is it that courts post Boumediene

20   routinely assess the merits of executive detentions for national

21   security reasons, looking at those detentions and whether they

22   comport with the national security reasons that the executive is

23   articulating, based indeed on, in many of them, on the al-Qaeda

24   connections of the individual detainee in those habeas actions?

25   And how is it that -- and they do so through, I think some would

argue, but they do so through what the courts at least have

decided are judicially manageable standards.  The Supreme Court

left it to the district courts to develop those.

     And how is it that the courts also, a specialized court

nonetheless, in applications for authorization of electronic

surveillance of a U.S. person, under the Foreign Intelligence

Surveillance Act, a judge often decides whether there's probable

cause to conclude that the target is an agent of al-Qaeda?

Those are the same kinds of determinations that you're saying

the courts aren't equipped to make here.  So how is it that they

can be making them in those contexts, but somehow they're not

equipped to make them here?

          MR. LETTER:  Because let's look, Your Honor, there's

some very important differences.  One is, especially with regard

to the detention cases, the habeas cases, there's the ex ante

aspect to it.  In the detention cases the question is is

somebody going to continue to be held in long-term detention,

and that obviously is very different from an injunction --

          THE COURT:  Why is the judicially manageable standard

issue any different?  You're still looking essentially at

factual and legal questions relating to whether the individual

is part of al-Qaeda.

          MR. LETTER:  Because, Your Honor, for example, the

kinds of things that I think you wouldn't be taking account --

looking closely at in that context is exactly what El-Shifa, for

1    instance, and Aktepe, both El-Shifa decisions and Aktepe noted,

2    you would have to look at, first of all, if you were going to

3    look at the imminence of the threat, that may be constantly

4    changing, whereas in the detention cases, things aren't

5    changing.  It's a question of when the person was arrested or

6    captured and whether they should continue to be detained.

7    Your Honor and your fellow judges have been looking at what were

8    the facts at the time of the capture.

9        That obviously is totally different from a situation where,

10    as I say, what the plaintiffs would want you to do --

11        THE COURT:  Well, if they brought someone to

12    Guantánamo -- and I'm not saying that anyone is going to do

13    this, but if they brought someone to Guantánamo who was captured

14    last week, then the courts, under the existing case law, would

15    be looking at the situation as of last week.

16        MR. LETTER:  As of last week, but remember, what the

17    plaintiffs want you to do, by issuing an injunction, I guess we

18    would be in a situation where the President might be calling you

19    at 2 in the morning saying you issued this injunction, but

20    here's the intelligence that I just got, and I would like to act

21    on this, may I?  There's no parallel in the detention situation.

22        THE COURT:  So it is the ex ante context that is

23    fundamentally important here.

24        MR. LETTER:  Very key part of it, but also --

25        THE COURT:  Although that doesn't apply in the

1    electronic surveillance context.

2            MR. LETTER:  Yes.  I was going to get to that.  Thank

3    you, Your Honor.  But the other point that, as you know, you

4    don't really focus on in the detention situation is what's the

5    current relationship, not just with the country where the person

6    is, the target is; there is also the question of what's the

7    capability of the United States?  Because if we assume, if we

8    assume that one of the factors -- and again, this is something

9    that Dean Koh did discuss -- if one of the factors is

10   alternatives --

11           THE COURT:  And that's what they, the plaintiff here,

12   would say is one of the parts of the test.

13           MR. LETTER:  So if you were going to look at

14   alternatives, then again that's something that would have to be

15   weighed right at that moment.  And again, this has absolutely no

16   relationship to the detention situation.

17           THE COURT:  I've kept you long beyond the 40 minutes

18   that you wanted to spend, so I do want to give you a chance to

19   say anything that you wish to say with respect to state secrets.

20           MR. LETTER:  Your Honor, actually, all I'd like to do

21   on state secrets, if Your Honor has questions, I'm happy to

22   answer them.  Otherwise, I simply want to reiterate that we

23   believe we've provided Your Honor with a variety of ways of

24   dismissing this case, and that you do not have to, and therefore

25   we urge you not to reach state secrets.  As I say, if you have

1    questions, I'll answer them, but otherwise we just don't think

2    that it's something that should be --

3         THE COURT:  And the reason I shouldn't do that, the

4    reason that in my order dealing with justiciability and other

5    issues, that should come at the end, is?

6         MR. LETTER:  The Attorney General has announced and

7    implemented a policy that indicates that the state secrets

8    doctrine, particularly for dismissal, is something that the

9    executive will only use and the courts really then should

10   address only as necessary.  Part of that, in a case like this,

11   it's not -- what's necessary may vary from case to case, but in

12   a case like this one, where there are what we think are quite

13   strong and obvious grounds for -- alternative grounds for

14   dismissal, that necessary, again, in this case would only be if

15   you have rejected those.  If you have rejected those, we think

16   the state secrets argument is airtight.

17        THE COURT:  Let me ask one question.  It's probably

18   going to be one of my long, multipart questions, and it's

19   similar to what I've already asked you in another context.  If I

20   were to reach the merits, would I need to determine whether

21   al-Qaeda in the Arabian Peninsula -- AQAP we'll call it -- is

22   within the scope of the AUMF?  To use the Washington acronyms to

23   the maximum extent possible.  Is that an issue that I would have

24   to reach, and would that issue require examination of the

25   relationship between AQAP and what has traditionally been

1  thought of as the core or central al-Qaeda?  And can I undertake

2  that without getting into state secrets?  In other words, can I

3  undertake that assessment based on the growing volume of

4  publicly available material, or do I have to look at state

5  secrets?

6        MR. LETTER:  Your Honor, I would like to consult with

7  my colleagues for just one moment if you please.

8      (Counsel conferring.)

9        MR. LETTER:  Your Honor, I apologize.

10        THE COURT:  Quite all right.

11        MR. LETTER:  As you know, we have asserted the state

12  secrets privilege over the relationship between those.  Now,

13  there is public information about that.  In fact, we have stated

14  public --

15        THE COURT:  There's a lot of public information.

16        MR. LETTER:  Yes.  However, part of the privilege

17  assertion is there undoubtedly would be more information on that

18  very issue that would be covered by state secrets, and therefore

19  would be taken out of the case.  And if I may, I know you're

20  aware of this, but I'll say it anyway.  Remember that we have

21  also asserted that the relationship between those two is the

22  President has made a determination, and that too is a political

23  question.

24        THE COURT:  But isn't that just -- again, to say

25  something that I've sort of already said before, isn't that just

the kind of inquiry, dealing with the relationship of an

individual or an entity to al-Qaeda, precisely what all the D.C.

district judges are undertaking with respect to the Guantánamo

detainees?  If you look just at that inquiry, that's exactly

what they're doing.

MR. LETTER:  Right.  Except, Your Honor --

THE COURT:  And it's essentially, because it involves

the AUMF, a question of statutory interpretation, which is what

the courts are used to doing.

MR. LETTER:  Your Honor, you make a very fair point.

However, it's still a political question because we don't

think --

THE COURT:  We're into state secrets now.

MR. LETTER:  Okay.  I'm sorry.  It's definitely still

within the state secrets privilege because, as we said, there

would be additional information that we would not be relying on

for the merits.  Remember that.  This is something that is often

a major mistake that a lot of people make as far as state

secrets.  The government doesn't assert state secrets and then

say see, Your Honor, you looked at the material, you see we're

right.  That's not our argument.

And therefore, if it were -- it goes back to what you said

before.  You could rule for the government, despite the

assertion of the privilege, but you couldn't rule against it.

Because if you said, well, based on the public information I

find that the President has correctly determined that there is a

relationship and therefore it is covered by the AUMF.  But you

wouldn't be able to disagree, because that would require you to

get into the information that would be covered by the privilege,

and that again would be taken out of the case.

THE COURT:  All right.

MR. LETTER:  I hope that answers the question.

THE COURT:  All right.  Let's give someone else a

chance.  You'll still have some time in rebuttal.

MR. LETTER:  Thank you, Your Honor.

THE COURT:  Mr. Jaffer, will it be you first?

MR. JAFFER:  Yes, Your Honor.  Thank you.  Your Honor,

if it's okay with you, I'm going to begin with standing and

state secrets, but my colleague is going to address issues

relating to the political question doctrine and the ATS claim.

And I hope we'll be able to cover your questions between us.

We would frame this case very differently than Mr. Letter

has.  In our view, this is a case concerning the government's

authority to carry out the targeted killing of an American

citizen whom the executive branch has unilaterally labeled an

enemy of the state.  And the question is whether the courts have

any role whatsoever to play in articulating the scope of that

authority or policing its exercise.

The government, obviously, says no.  But if the Fourth and

Fifth Amendments mean anything at all, surely they mean there

are limits to the circumstances in which the government can use
lethal force against one of its own citizens.  And again, the
courts have a role to play in delineating those limits and
ensuring that they're complied with.

So again, Your Honor, I do want to address standing, but I
would like to just make three broader points about the
government's arguments just now.

First, the government repeatedly insisted that the Court
should defer to the political branches.  And I think that it's
important to be clear here that this isn't a situation in which
everybody agrees that Congress and the President have spoken
with one voice.  This isn't a situation like that at all.  The
allegation here is that the President is exercising authority
beyond what Congress has granted him.  And as the Supreme Court
said in Youngstown, that's a situation in which, again, if you
assume that we are right about the President's actions in
relation to the AUMF, the President's powers are at their lowest
ebb.

And if the Court simply defers to the President's
construction of the AUMF in this context, it's not deferring to
the political branches, it's deferring to the President.

THE COURT:  Well, in deciding on standing or political
question, or state secrets, I wouldn't be deferring to their
construction of the AUMF in any of those situations, would I?
They're all independent reasons not to reach the claims.  It's

1    not a situation where I would be deferring to their assessment

2    under the AUMF.

3         MR. JAFFER:  I think that's exactly how you should

4    approach the question.  The reason I bring it up, though, is

5    because both in its briefs and in Mr. Letter's oral argument,

6    the government has insisted many times that this is a context in

7    which Congress -- in which the political branches have spoken

8    together.  And I just think it's important, even as a kind of

9    atmospheric matter, to get that cleared up.

10        THE COURT:  So if the political branches don't speak

11   together or clearly, that means the Court should be more willing

12   to dive in to resolve it?

13        MR. JAFFER:  Well, it's not so much a question of

14   clearly, Your Honor, it's a question of whether there is an

15   allegation that -- a colorable claim that the President has --

16        THE COURT:  It seems to me that the situation where

17   the political branches are quarrelling and aren't seeing eye to

18   eye is exactly the situation where the courts should stay out of

19   it.

20        MR. JAFFER:  No.  I don't think that's right at all,

21   Your Honor.  I think if you were to stay out of it in that kind

22   of context, you would be depriving Congress of the ability to

23   meaningfully limit the President's use of military force.  And

24   this is a situation where the government is relying on the AUMF,

25   and almost entirely on the AUMF.  They're pointing to the AUMF

1    as the authority, as the statute that gives them the authority

2    to carry out -- well, to use all necessary and appropriate

3    force.

4              THE COURT:  I don't think they're relying only on the

5    AUMF.  I think they're also relying on the principles of

6    self-defense and Article II power.

7              MR. JAFFER:  Right.  And that's why I said almost

8    entirely, because you're right, they do invoke self-defense as

9    well.  But insofar as they rely on the AUMF, the AUMF is

10   something that Congress obviously has enacted.  It has limits to

11   it.  And if Congress is going to be able to limit the

12   President's use of military force -- and the government hasn't

13   contended that Congress can't do that -- then Congress -- then

14   you have to enforce those limits.

15             THE COURT:  But it seems to me that you're painting a

16   path where either you or I step in in the place of Congress,

17   because you think Congress hasn't limited or is somehow

18   constrained in its ability to limit, and therefore I should jump

19   in, or you should pull me in.

20             MR. JAFFER:  I didn't mean to make an argument that

21   broad, Your Honor.  This is a situation in which we are

22   asserting the individual rights of a U.S. citizen.  I think

23   that's what makes this case a case in which the Court has not

24   just the authority but the responsibility to step in.

25             I didn't mean to suggest that any time there's a

1   disagreement between Congress and the executive branch, the

2   Court has an obligation or even the authority.  It's a narrower

3   point than that.  Again, it's a more general point relating to

4   the entire brief.  I don't want to get completely distracted by

5   it.

6           THE COURT:  Nor will I.

7           MR. JAFFER:  Two other more general points,

8   Your Honor.

9           THE COURT:  Other opportunities for me to get

10  distracted, but go ahead.

11      (Laughter)

12          MR. JAFFER:  All right.  One is about the claim that

13  we are asking the Court to stand at the shoulder of the

14  President and oversee the President's targeting decisions.  And

15  I just want to make sure that there's no lack of clarity about

16  what it is that we're asking the Court to do.  So we haven't

17  proposed that the Court oversee the President's real-time

18  targeting decisions.  We are not asking for something akin to a

19  prior warrant requirement where the government goes to the court

20  with evidence of an imminent threat, evidence that there are no

21  means short of lethal force that can be used to address the

22  threat.  We are not asking for the Court to get involved at that

23  point at all with those kinds of targeting decisions.

24      What we are asking for, though, is that the Court be

25  involved in setting the general limits under which lethal force

1    can be used.

2            THE COURT:  Well, you're asking for more than that.

3    You're asking for the Court to set those general limits and then

4    to be prepared to enforce them --

5            MR. JAFFER:  Ex post.

6            THE COURT:  -- ex post.  If the President decides to

7    take some military action, I would then, I or my colleagues on

8    the bench would then be in a position to enforce the view that

9    the courts had come up with through contempt proceedings or

10   damages actions, against the President and the senior military

11   and defense officials of the United States.  That does seem like

12   a fairly unusual construct.

13           MR. JAFFER:  Well, Your Honor, I don't think it's as

14   unusual as the government makes it out to be.  I'll tell you two

15   reasons why.  One is that the courts routinely consider the

16   question of whether executive officers use excessive force.

17   Now, those cases are domestic, but they happen all the time, and

18   the question of whether force was excessive or not is something

19   that the courts consider all the time.

20           THE COURT:  It's a pretty -- without any slight to

21   them, but it's pretty low-level executive officials if it is the

22   federal government involved.  It's federal police officers

23   basically you're talking about.

24           MR. JAFFER:  Your Honor, if I can, I'd like to

25   separate the question of the inquiry from the question of the

1    defendants, if that's the right way to put it, because I think

2    the government makes both points.  One is that the inquiry is

3    something that the courts aren't capable of handling, and the

4    other is that you can't enjoin the President in this kind of

5    context.

6         But just to stick on the first point if I can for a second,

7    in the domestic context, those kinds of excessive force cases

8    are routine.  The Supreme Court has handled half a dozen of

9    them, including Tennessee v. Garner, in which it set out a rule

10   not only for the case that it had just adjudicated, but a rule

11   that the courts have applied going forward.

12        THE COURT:  Those are all after-the-fact -- although

13   they might be rules that apply going forward, the case is an

14   after-the-fact case.

15        MR. JAFFER:  That's right, Your Honor.  But the caveat

16   you just drew is an important one, which is that although they

17   are ex post cases, they often set up rules that are applied

18   going forward.  Now, to be fair, the government isn't held in

19   contempt when it violates those rules, but damage actions

20   succeed when the government violates those rules.

21        So I don't think that the distinction between ex post

22   and -- I think there is a distinction between ex ante and

23   ex post, but the distinction is actually not as clear as the

24   government makes it out to be.  So that's one point.

25        And the other thing I'd point Your Honor to with respect to

the question of whether courts can look over the government's

shoulder ex post, which is what we're proposing here, are the

Guantánamo cases, the Guantánamo detention cases.  And those are

all cases involving noncitizens who were seized on an actual

battlefield and are threatened with continued detention.

And here we're talking about a citizen who is threatened

with death far away from any actual battlefield.  And the same

inquiry that the courts engage in all the time in the Guantánamo

detention cases, is an inquiry that the government says is off

limits to the Court here.

THE COURT:  And there are differences between the two

situations, one of which is, if we're talking about political

question, that the Guantánamo cases arise in the habeas context

where there's a specific constitutional reference to the courts

through the suspension clause.  And here we have a slightly

different situation, where, to the extent the Constitution says

anything about military affairs, foreign affairs, and

intelligence, it's all, to put it in the hands of the political

branches, not in the hands of --

MR. JAFFER:  But Your Honor, we also have the Fifth

Amendment, which says the government shall not deprive a person

of life without due process.

THE COURT:  You're absolutely right, but if that were

the answer, then no political question case would ever apply the

doctrine because all of those cases, or a lot of them, involve

constitutional claims.  So you can't look at the fact that it's

a constitutional claim, whether it be under the Fourth Amendment

or Fifth Amendment or whatever amendment.  You have to look at

what the issues are, what they involve.  And here what they

involve are military intelligence and foreign affairs.

            MR. JAFFER:  Your Honor, I don't take any general

disagreement with what you just said.  My co-counsel will

address the political question point in more detail.  But even

if you don't think the mere fact that we are asserting

constitutional claims is enough to make the political question

doctrine irrelevant -- and we don't actually suggest that it

is -- it's surely a relevant factor that we are asserting

constitutional claims on behalf of a U.S. citizen and asserting

a right --

            THE COURT:  Well, some judges of the D.C. Circuit

would say that political question doesn't even apply unless

there are constitutional claims being asserted.

            MR. JAFFER:  That's true, but those judges don't say

that the political question doctrine applies if there are

constitutional claims being asserted.

            THE COURT:  You're right there.  That isn't

necessarily good for you, but you're right there.

            MR. JAFFER:  I've got through two of my general

points.  The third one, and then I will get to standing, the

third one is that the government in its brief has said that this

1    is -- it's tried to cast the case narrowly as a case about what

2    kind of judicial review is available at this particular

3    juncture.  But I just want to underscore what I think Mr. Letter

4    has just conceded.  And I think this is actually evident in

5    their brief, although not stated as clearly.

6         They are not just arguing that the Court has no role to

7    play now.  They're arguing that the Court has no role to play,

8    period.  They're arguing that the question whether the President

9    can target a U.S. citizen for death is a question that is

10   committed to the executive branch now and committed to the

11   executive branch alone in the future; that the courts have no

12   role to play.  And it's not again a situation where the

13   government can fairly say, well, Congress has authorized us to

14   do this, because that is precisely what is at issue in this

15   case.  That's what we have challenged in this case.

16        We don't think that the AUMF extends to the extent that

17   they propose it does.  And we're happy to save that sort of

18   merits argument, if that's the right way of characterizing it,

19   for another time.  But we've spelled it out in the brief.

20             THE COURT:  Now let's deal with the "we" that have

21   brought the case, or actually the plaintiff.

22             MR. JAFFER:  Sure, Your Honor.  So we, as you know,

23   have asserted standing on two different grounds.  One is next

24   friend and the other is third party.

25             THE COURT:  The government seems to think that third

1    party -- which did come late in the case, concededly -- that

2    third party shouldn't be really looked at because it's simply a

3    means that you're trying to employ to get around the fact that

4    you don't have next friend standing.

5         MR. JAFFER:  Your Honor, with respect, I think there

6    are many hard questions in this case.  I don't think that's one

7    of them.  I think the cases are pretty clear, both from the D.C.

8    Circuit and the Supreme Court, that these are two different

9    lines, that you can establish standing as a next friend --

10        THE COURT:  Any case that assesses in a single case

11   whether a particular plaintiff has either next friend or third

12   party?

13        MR. JAFFER:  Yes.  I believe Coalition of Clergy,

14   which is a case out of the Ninth Circuit, assessed both of those

15   things.  And while we're on this point, Your Honor, the long

16   discussion you had with Mr. Letter about whether in the third

17   party context, plaintiffs have to establish that -- the litigant

18   has to establish an independent constitutional claim, I think

19   that too is easily cleared up by looking at cases like, well,

20   Your Honor's own case in Yaman, which was a passport case.

21   There was a mother who was complaining about the way her kids'

22   passports had been processed.  Or looking at the Supreme Court's

23   decision in Craig v. Boren or the D.C. Circuit's decision in

24   Lepelletier.

25        Those are all cases in which the litigant was permitted to

1  raise third party standing even though the litigant not only had

2  no constitutional claim of his own or her own, but had no claim

3  of his own or her own.  All they established was some injury.

4  Some injury.  That was the only requirement.  And I believe

5  that's the way -- "some concrete interest" is the phrase that

6  the Supreme Court used.

7         THE COURT:  So what's the -- well, that's really a

8  third party question.  Deal with next friend first.

9         MR. JAFFER:  Sure, Your Honor.  The government argues

10  first that the next friend standing is available only in the

11  context of individuals who are detained minors and mentally

12  incompetent -- or mentally incompetent.  They are right that the

13  cases that have recognized next friend standing have fallen into

14  those boxes, but I don't think it's a fair reading of the cases

15  to find that you have to fall into one of those boxes in order

16  to establish next friend standing.

17         THE COURT:  Assume that you don't.  Assume that you

18  don't.  How is it that you have next friend standing here?

19         MR. JAFFER:  Well, there are two requirements, right?

20  One is that the next friend has to be dedicated to the best

21  interests of the real party at interest.  I think that the

22  government hasn't spent a lot of time in its brief taking issue

23  with our plaintiff's concern, his earnest concern for his son's

24  well-being.  It's really the second point that the government

25  argues with, and that's --

```
 1          THE COURT:  But the issue there is not just the

 2    plaintiff's earnest concern, but whether it is the same, whether

 3    there's an identity of interest with Anwar Al-Aulaqi.

 4          MR. JAFFER:  Well, Your Honor, there are two things I

 5    would say to that.

 6          THE COURT:  It's a best interest type of issue, and

 7    it's a similarity of interest, and I think it boils down to you

 8    want sort of official public silence by Anwar Al-Aulaqi to work

 9    in favor of the plaintiff here, and the government wants that

10    official narrow public silence on this suit, but a lot of

11    comments that are negative to the U.S. justice system, et

12    cetera, to work against you.

13          MR. JAFFER:  Right.

14          THE COURT:  Why shouldn't I look at that and conclude

15    that in light of the public statements that Anwar Al-Aulaqi has

16    made about not being bound by international law or the laws of

17    the civil state, why shouldn't I conclude that he has no desire

18    to bring this case?  None whatsoever.  What is it that should

19    lead me to believe that he desires to bring the case as opposed

20    to his father desiring to bring the case?

21          MR. JAFFER:  Your Honor, some variant of silence is

22    present in every next friend case.  The reason you have the next

23    friend before the court is because you don't have the real party

24    at interest available --

25          THE COURT:  That's not necessarily true with death
```

1   penalty cases, but go ahead.

2           MR. JAFFER:  Well, I guess that -- I mean you might be

3   right that that's an exception, but --

4           THE COURT:  Parents are not permitted to bring

5   challenges where the individual subject to the death penalty has

6   decided not to challenge it.

7           MR. JAFFER:  Well, right.  I didn't mean to suggest

8   that, Your Honor.  I just meant to say that -- I guess the only

9   thing that's important for my argument is that in many next

10  friend situations you have silence on the part of the real party

11  in interest, and the question is what to do with that silence.

12  So all I'm trying to say is it's not a unique situation.

13      Now, the government does point to something other than

14  silence on the part of Anwar Al-Aulaqi.  And it's true, he said

15  many things and many statements have been attributed to him, and

16  some of those things are quite nasty and are quite negative

17  about the United States at least.

18      And the question for you, Your Honor, is not whether -- the

19  question isn't whether Anwar Al-Aulaqi has said negative things

20  about the United States.  The question is whether he has

21  asserted some unwillingness or he has disavowed the lawsuit that

22  we've brought.  And if you look at the cases that the government

23  relies on, they are all cases like that, in which the real party

24  in interest has either disavowed the suit or the real party in

25  interest had no relationship whatsoever to the litigant before

the court, and in some cases the litigant didn't even know the
names of the real parties in interest and asserted a next friend
standing.  There are no cases in which --

THE COURT:  But it's your burden, is it not, to show
that the plaintiff is acting in accordance with Anwar
Al-Aulaqi's best interests?

MR. JAFFER:  As a general matter, yes, but it's not a
situation where every decision that's made in the context of the
case has to be consistent with the best interests.  The whole
point of next friend standing is to put somebody in the shoes of
the plaintiff, because the real party in interest isn't
available to give us his or her desires with respect to the
litigation.

So it's our burden to show that our client is dedicated to
his son's best interest.  And that in most circuits has been
considered a kind of per se or almost per se rule.  I think we
cite one case, Vargas, from the Ninth Circuit, which says it is
a per se rule, that a father is dedicated to his son's best
interest.

So the question is whether the Court should reject what in
other contexts has been thought of as a per se rule.  And the
government's justification here, the government's argument for
rejecting it is that our client's son has said many nasty things
about the United States.

THE COURT:  Well, it's more than just nasty about the

1  United States.  I think it reasonably can be taken as disavowing

2  any interest in using the U.S. court system to vindicate any

3  rights.  He doesn't respect the U.S. court system.  He doesn't

4  think it has any jurisdiction over a Muslim.  How can one

5  conclude that he would believe that the U.S. court system should

6  be a vehicle for assessing his rights?  How can one conclude

7  that based on his public statements?

8          MR. JAFFER:  So, Your Honor, I think it's important to

9  distinguish between the statements that the government makes in

10  its brief about what Anwar Al-Aulaqi has said and what the

11  government says in its affidavits that Anwar Al-Aulaqi has said.

12  Because in its brief the government says that Anwar Al-Aulaqi

13  has expressed a desire to waive his constitutional rights, but

14  the paragraph to which they cite in the Clapper declaration

15  doesn't say that.  It says something much narrower than that.

16      It says that Anwar Al-Aulaqi has -- I can't remember the

17  exact words, but essentially criticized the United States.  And

18  I think the distinction between those two things is an important

19  one.

20      I don't think that we would have the right to be here if

21  Anwar Al-Aulaqi clearly disavowed the lawsuit, and we wouldn't

22  be asserting the right to be here.  But in a situation where the

23  best representative of his interests is before the Court, and

24  the only statements that the government is pointing to -- and we

25  have no way of independently verifying these statements.  We

1    have no way of telling which statements that have been

2    attributed to him are actually his statements and which ones

3    aren't.  But even assuming that the ones that have been

4    attributed are his statements, we don't think that they go as

5    far as disavowing -- waiving his constitutional rights or

6    disavowing any interest in --

7            THE COURT:  What about the question of access to the

8    courts, which is the other part of the government's argument?

9    Why can't Al-Aulaqi simply emerge from hiding and have full

10   access to the courts?

11           MR. JAFFER:  Right.  So Your Honor, I think there are

12   a couple of answers to that question.  One is that insofar as

13   it's our obligation to show that there is some obstacle or some

14   hurdle --

15           THE COURT:  It's more than some hindrance.  That's

16   relevant to the third party standing.  That's the test there.

17   It's more than that.  It's a lack of access to the courts.

18           MR. JAFFER:  You're right, Your Honor, under next

19   friend.  But our argument is the same with respect to both of

20   those things.  This is a situation where the real party in

21   interest is under a death threat.  There is evidence in the

22   record that has not been -- that the government has not rejected

23   or opposed, that Anwar Al-Aulaqi has been in hiding because of

24   that death threat, or at least in part because of that death

25   threat.  He's not been communicating even with his closest

1    family members.

2         And in that situation we think the real party in interest

3    is unable, within the meaning of the next friend cases, to

4    assert his own rights.  And he certainly faces some hindrance.

5    All of those things together constitute some hindrance to his

6    ability to assert his rights.

7         Now, the government's argument, the one they spend a lot of

8    space on is the argument that Anwar Al-Aulaqi could turn himself

9    in, could surrender to the proper authorities.  That's the

10   phrase that they use in their brief.  But the prospect of

11   indefinite detention without charge or trial is itself a

12   hindrance that satisfies the Whitmore standard.  And the

13   government has made clear, I think, in its brief that it asserts

14   the --

15            THE COURT:  What cases say that?

16            MR. JAFFER:  Sorry, I didn't hear the question.

17            THE COURT:  What cases say that, that the prospect of

18   indefinite detention is sufficient to establish lack of access

19   to the courts for purposes of next friend standing?

20            MR. JAFFER:  Well, we can't point to a case that says

21   that, Your Honor, but we can point to many cases in which

22   smaller hindrances have been found sufficient.

23            THE COURT:  In the next friend context?

24            MR. JAFFER:  Well, I was actually thinking of the

25   third party standing context.

```
 1          THE COURT:  We're in next friend right now, and I
 2     think the bar is higher.
 3          MR. JAFFER:  You're right, Your Honor, the bar is
 4     higher.  But even if you look at a case like the one I mentioned
 5     earlier, Coalition of Clergy, which actually didn't decide this
 6     question but spends a lot of time on how impeded the detainees
 7     held at Guantánamo were from asserting their own rights, I think
 8     you can analogize the situation of the detainees in that
 9     context.  I'm not saying it's exactly the same, but you can --
10          THE COURT:  Most of the cases that have dealt with the
11     detainees at Guantánamo have not allowed next friend standing.
12     Indeed, is there any case that has?
13          MR. JAFFER:  I don't know the answer to that question,
14     Your Honor.  But --
15          THE COURT:  I think I do.  But go ahead.
16          MR. JAFFER:  Well, I'm not suggesting, Your Honor,
17     that detainees held -- I don't think it actually matters.  The
18     point I'm trying to make is just that the court in Coalition of
19     Clergy, which is the one that has addressed this question at the
20     greatest length I think, in the context of the Guantánamo
21     detainees, did find that detainees held far away from the
22     United States in a relatively isolated environment, they
23     rejected the claim that the detainees were held incommunicado.
24          THE COURT:  You can look at cases like the Padilla
25     case in the Supreme Court or the Hamdi case in the Fourth
```

Circuit and say next friend standing has been found.  But in
both of those cases the reason is the holding by the government
of the individual incommunicado, no access to lawyers, no access
to relatives, et cetera.  That's not the situation here.

MR. JAFFER:  Well, Your Honor, it's not the situation
here, but it does bear some similarities.  Unless you accept on
the merits -- I understand that the government's position on the
merits is that they have the right to do everything that they've
done thus far, right?  But that's contested.  It's contested
whether the government has the right to use the AUMF in the way
it's using it.

But if you accept our view that the AUMF is not justifiably
used in this way, then indefinite detention without charge or
trial is in fact a hindrance that -- not just a hindrance but
something that prevents our client's son from asserting his own
rights.

Now, from our perspective, it doesn't really matter whether
we have standing under next friend, on the next friend doctrine
or under the third party doctrine.  As long as we have standing
under one.

THE COURT:  I think you're right.  If you have
standing under one, then you're home free.  So you want to move
on to third party?

MR. JAFFER:  Sure, Your Honor.  So again, some of our
arguments are the same with respect to third party as they are

1    with respect to next friend.  But I did want to point out a few

2    cases in which the courts have found relatively small hindrances

3    to be sufficient to meet the third party standing.

4           THE COURT:  There are a lot of cases, and indeed, some

5    of the cases, including Supreme Court cases, seem to have paid

6    no attention to the hindrance issue at all.

7           MR. JAFFER:  Right.  I think it's a low bar.

8           THE COURT:  It's either a low bar or no bar.

9           MR. JAFFER:  Well, no bar is even better.

10          THE COURT:  For you.  Right.  What about the injury in

11   fact issue, though?  Isn't there a problem for you there, even

12   viewing it not as a cause of action but instead as a legally

13   protected interest or legally cognizable interest?  Isn't there

14   a problem here?  What is that for a father?  What is the injury

15   in fact?

16          MR. JAFFER:  Well, there are several different things

17   I'd point to.  One is we think that he has an interest in his

18   relationship with his son, that a father --

19          THE COURT:  The D.C. Circuit doesn't seem to have

20   bought that in Butera, and in the underlying Franz case.

21          MR. JAFFER:  I think the government is overreading

22   those cases.  Those cases are about whether there is a

23   constitutionally protected right that is invaded.  And we're not

24   alleging that -- it doesn't matter to us whether it's

25   constitutionally protected.

1          THE COURT:  But the cases also stand more for the

2     general proposition that when you're dealing with independent

3     adult children, there is no relationship that gives rise to some

4     legally protected or cognizable interest.  I think that's what

5     the cases in general stand for, including those D.C. Circuit

6     cases.  What case do you think goes the other way on that

7     question, when you have an independent, competent adult as the

8     child, as opposed to a minor?

9          MR. JAFFER:  Your Honor, I don't think that even to

10     say that it has to be a legally protected interest is a fair --

11          THE COURT:  Now we're going to go even below that, to

12     what?

13          MR. JAFFER:  I'm going to use the language that you

14     did, Your Honor, in Yaman, and that the Supreme Court did in I

15     think Whitmore.  It said --

16          THE COURT:  Yaman is a case of minors, but go ahead.

17          MR. JAFFER:  Right.  But I'm just talking about the

18     test, though.  The test was some sufficiently concrete interest

19     in dispute.  That's the test.  It's not a question of -- all of

20     this is prudential, right?  Because the standing, the

21     constitutional standing --

22          THE COURT:  This is not prudential.  This is the

23     question of injury in fact.  It is an Article III requirement.

24     It is not prudential.

25          MR. JAFFER:  Well, Your Honor, the injury in fact I

1    think is provided by the real party in interest; that that real

2    party in interest has to have an injury in fact that meets

3    constitutional --

4          THE COURT:  I don't think you're right.  I think the

5    case law is that the injury in fact applies to the plaintiff.

6    The plaintiff has to show an injury in fact, which is an Article

7    III constitutional requirement.  And then there are the

8    prudential requirements of hindrance, et cetera.

9          MR. JAFFER:  I don't want to get -- I think I am

10    right, Your Honor, but I don't want to get distracted by it,

11    because I don't think anything turns on it.  Because whether the

12    requirement is an injury in fact and whether it's a

13    constitutional requirement or not, we believe that we meet it,

14    because in our view our client has a legal interest or a legally

15    cognizable interest in his relationship with his son, and he has

16    a legally cognizable interest --

17          THE COURT:  What case would you rely on for that

18    proposition?  What's your best case?  Butera is probably your

19    worst case, but there are others as well.  What is your best

20    case?

21          MR. JAFFER:  I don't know, Your Honor.  I have to

22    think about that.  But the cases I was going to cite to you

23    before you raised this very specific issue are cases like Yaman

24    and Craig v. Boren, Lepelletier v. FDIC, which are all cases in

25    which the real party in interest had claims, the litigant didn't

1      have independent claims at all.  I'm just thinking through it

2      right now.  I'm not sure that the mother in <u>Yaman</u> had any

3      protected interest at all.  It's true, it's minor children.

4              THE COURT:  The relationship gave rise to it.  And

5      isn't one of the problems with this argument where it goes?

6      Because if there's a legally protected interest here, why isn't

7      there also a legally protected interest in the context where a

8      father would raise third party claims on behalf of an adult son

9      who was wrongfully incarcerated?  Why isn't that also a context

10     where there would be third party standing?  Or where the father

11     raised claims that a son was wrongfully terminated and so had to

12     go get a job on the other side of the country, far away from the

13     father?

14         Why aren't those situations that in your rationale would

15     lead to third party standing?  Aren't we opening a very wide

16     door to the courts?

17              MR. JAFFER:  No, we're not, Your Honor, because the

18     other requirements of third party standing would serve a

19     limiting function.  You still need to show that there's some

20     hindrance to --

21              THE COURT:  Why isn't being incarcerated -- you said a

22     moment ago that detention was a hindrance.  Why isn't it a

23     hindrance here as well?

24              MR. JAFFER:  Your Honor, I didn't mean to suggest that

25     detention was always a sufficient hindrance.  In the Guantánamo

```
 1    cases it turned --

 2              THE COURT:  Okay.  Then how about a parent who is

 3    suing on behalf of a child who's charged with a capital crime

 4    and therefore is held in solitary lock-down?  Is that a

 5    sufficient hindrance so a parent can always bring that case

 6    under third party standing?  I doubt that.

 7              MR. JAFFER:  Well, I think it would be a much closer

 8    case, because if you do have some hindrance, and you have a

 9    close relationship between the parent and the son, so long as

10    the parent has some concrete interest, if the parent is --

11              THE COURT:  But it's the relationship that gives rise

12    to the concrete interest in your view.  The simple parent-child

13    relationship.  Even though it's an adult child.

14              MR. JAFFER:  I'm not sure that it's that alone.  We've

15    alleged more than that in this case.  We've alleged that -- I

16    think it's clear from the affidavit, I don't have it in front of

17    me, but it's clear from the affidavit that Dr. Al-Aulaqi filed

18    that a pre-existing relationship with his son has been

19    interfered with by the government's actions.  I'm reading now

20    from paragraph 11.  He says, "As Anwar's father I only want to

21    do what is in his best interest.  I believe taking legal action

22    to stop the U.S. from killing him is in his best interest."

23         That ordinarily would not be an assertion that anyone would

24    question --

25              THE COURT:  Why don't you just substitute in there,
```

1   instead of killing, locking him up for life?

2           MR. JAFFER:  Your Honor, the government hasn't

3   actually --

4           THE COURT:  Or locking him up for 10 years?

5           MR. JAFFER:  The government hasn't filed an affidavit

6   in opposition here.  There's no affidavit that says that

7   Dr. Al-Aulaqi is not asserting his son's best interest.  There

8   are just no facts in the record on the other side.  So I think

9   that procedurally this is an affidavit that the Court has to

10  accept as true.  If the government wants to contest it, it can

11  file an affidavit saying that Dr. Al-Aulaqi is not representing

12  his son's best interest, or something along those lines.  But I

13  don't think that the government has done anything sufficient in

14  this case.

15          THE COURT:  And how do you deal with the parents of

16  death row inmates situation?  Those parents are not permitted to

17  bring third party standing actions.

18          MR. JAFFER:  Ordinarily, Your Honor -- I can't claim

19  this is a hypothetical I've thought through already, but

20  ordinarily I imagine that those prisoners are in a situation in

21  which they can get counsel themselves, and there is no real bar

22  to their filing -- to their asserting their own interest.

23      I think we're in a very different situation here.  We've

24  got -- every newspaper in the world has reported that the

25  government, the U.S. government is trying to kill our client's

1   son.  They have asserted in their own brief that they have the

2   authority under the AUMF to use all necessary and appropriate

3   force against leaders of AQAP.  And they have asserted that our

4   client's son is a leader of AQAP.  So this is not a situation

5   like the one that Your Honor's describing.

6        And again, Your Honor, if you look at the cases like

7   Lepelletier and Craig and Yaman, those are cases in which the

8   courts have -- I think that to the extent they're lower court

9   cases, they've applied this rule consistent with the Supreme

10  Court doctrine.  But they are cases in which they have had a

11  very low bar, not only on the question of --

12            THE COURT:  It's on the hindrance question.

13            MR. JAFFER:  Not only on the question of hindrance,

14  but even on the question of when it comes to a family member

15  asserting rights that relate to their relationship with their

16  family member, the courts have usually accepted the family

17  member's assertions that they're acting in the best interest.

18  In fact, in Coalition of Clergy, the real question there was

19  whether these people had any relationship at all with the people

20  whose interests they claimed to be asserting.

21       Your Honor, I want to say just one more point about the

22  government's argument that he can avoid targeted killing by

23  surrendering himself to the appropriate authorities.  Again, I

24  do think that the prospect of indefinite detention without

25  charge or trial, even if it doesn't meet the next friend hurdle,

1    certainly meets the third party standing hurdle.

2              THE COURT:  In terms of hindrance.

3              MR. JAFFER:  Yes, Your Honor.  But I want to be clear

4    about one thing.  We're not asserting that anyone has the right

5    to be a fugitive from the law.  That's not the argument we're

6    making.  But so far the government hasn't charged our client's

7    son with any crime.  And I guess more to the point, the

8    government doesn't have the right to put fugitives to this

9    choice between turning themselves in and subjecting themselves

10   to the possibility of targeted killing.

11        So I want to say just a few points about state secrets.

12   First, Your Honor, I think that you need to look at this

13   question against the background of the government's statements

14   over the last few months.  Government officials have spoken

15   quite freely to the press about the three categories of

16   information that they now say are protected.  They've spoken

17   freely to the press about al-Qaeda, about AQAP and about

18   plaintiff's son.  In other words, they've spoken about the very

19   information they say is now protected.

20             THE COURT:  Certainly according to the press they

21   have.

22             MR. JAFFER:  Well, some of the statements, not all of

23   them.  Some of the statements are attributed to senior

24   government officials.  So the information they're talking about

25   is apparently too sensitive for the courtroom, but it is not

1    necessarily too sensitive to the press.  And I think that --

2         THE COURT:  How is this case then any different than

3    the Jeppesen case in that regard?  Isn't this the same

4    situation?  And there the *en banc* Ninth Circuit, a closely

5    divided *en banc* case, although it isn't that the dissenting

6    judges were saying state secrets does not apply; they were just

7    saying let's wait and apply it later if it does apply.

8         But in that situation, the Court explained that the partial

9    disclosure of the existence and even some aspects of what was at

10   issue there, which was extraordinary rendition, doesn't preclude

11   the government asserting state secrets with respect to the

12   remaining facts with respect to the particular matter at issue,

13   because those would risk grave harm to the national security.

14        Why is this case any different than what the Ninth Circuit

15   had before it and what the Ninth Circuit said in that case

16   should also be said by me here?

17        MR. JAFFER:  I think that the answer, Your Honor, is

18   different for standing than it is for the merits.  So on

19   standing here, we can establish standing on the basis of

20   information --

21        THE COURT:  Well, we're discussing neither standing

22   nor the merits.  We're talking about state secrets right now.

23   That's what Jeppesen decided, and that's what I thought you were

24   discussing.

25        MR. JAFFER:  I am, Your Honor, but the question is

1    what information is it that is covered by the state secrets

2    privilege?  Is it information that the government thinks we need

3    for standing, or is it information the government thinks we need

4    for the merits, or is it something else altogether?

5          THE COURT:  The proposition I'm drawing from _Jeppesen_

6    is that just because the government, through the press or

7    otherwise, has disclosed some facts, about extraordinary

8    rendition there, here targeted killing, that doesn't mean that

9    the government can't properly assert state secrets with respect

10   to the disclosure of other facts if they would risk grave harm

11   to the national security.  That's what that case decided, and

12   why isn't that proposition just as true here?

13         MR. JAFFER:  Your Honor, let me just finish what I was

14   trying to say earlier but not -- I didn't say it very well.  I

15   think that that argument doesn't actually go to the information

16   we need for standing.  For standing it's enough for us to

17   establish a credible threat of injury.  You can analogize this

18   to a preenforcement challenge.  This is like a preenforcement

19   challenge in which the government has said not only that it has

20   the authority to prosecute the plaintiff or people like the

21   plaintiff, but it has the authority to prosecute the plaintiff

22   specifically.

23         It's like that kind of preenforcement challenge.  We don't

24   have to show with certainty that our client's son will actually

25   be killed or that the government -- even with certainty that the

1    government intends to kill him.  We just have to show a credible

2    threat of injury.  That's why I say that the relevance of the

3    state secrets doctrine to the standing inquiry is, well, not

4    even limited but is irrelevant to the standing inquiry.  We're

5    relying only on information that's already in the public domain,

6    not just the news stories but more importantly the government's

7    own brief.  Because it's in the government's brief that they

8    assert the authority to use the AUMF.

9         THE COURT:  All right.  I'll accept that for the

10   moment, that it's your position, and you may be right, that I

11   can decide standing either way based on the record before me,

12   without intruding on the state secrets privilege assertion by

13   the government.  So I could decide standing, but can I go

14   further into the merits of the case, which is really where the

15   state secrets assertion would have its real meat.

16        Can I get into the merits of the case and do what you're

17   asking me to do in terms of the assessments and the rulings that

18   you're asking for, without getting into state secrets?

19        MR. JAFFER:  You can, Your Honor.  And in fact, I

20   would just point out that the government's invocation of the

21   privilege in this kind of context really is unprecedented.

22   There is no case out there in which the courts have accepted the

23   state secrets privilege where an individual's life or liberty

24   was at stake.  There are cases like Jeppesen where it's a kind

25   of --

1          THE COURT:  That's the same as the question I asked

2     with respect to political question.  Where you're dealing with a

3     U.S. citizen, there's no case that you're aware of, and I don't

4     think the government has referred me to one yet, where either

5     political question, the political question doctrine or the state

6     secrets privilege has been accepted by the courts as a reason

7     not to reach the claims of a U.S. citizen that he is being

8     denied rights to life or liberty.

9          MR. JAFFER:  I am not aware of any such case,

10    Your Honor.  So that's an argument for rejecting --

11         THE COURT:  But there's always a first time, isn't

12    there?

13         MR. JAFFER:  Yeah, I hope it will not be in this case,

14    Your Honor.  But --

15         THE COURT:  Just because there isn't a case, why isn't

16    this the case that state secrets would properly apply in?  It

17    seems to me that when you look at the kinds of issues in which

18    state secrets has been asserted, why is extraordinary rendition

19    a more appropriate context for state secrets than the military

20    targeting of someone that's at issue in this context?  Why state

21    secrets in the former but not in the latter?

22         MR. JAFFER:  Well, Your Honor, the appropriateness,

23    the sort of moral and ethical appropriateness of this

24    distinction is sort of beyond the parameters of this case.  But

25    as a legal matter, as a purely legal matter, the courts

1    routinely draw distinctions between U.S. citizens and

2    noncitizens, routinely draw distinctions between damages cases

3    and cases involving life and liberty.  And so I think there are

4    easy ways to draw distinctions between the cases in which state

5    secrets have been accepted --

6              THE COURT:  What case says that the fact that a U.S.

7    citizen is involved, what case actually says that the fact that

8    a U.S. citizen's rights are involved means that the state

9    secrets privilege has less force?  Any case say that?

10             MR. JAFFER:  Your Honor, that's not the argument I'm

11   trying to make here.  The argument I'm trying to make is in a

12   case involving the life or liberty of a U.S. citizen, there is

13   no court that has accepted invocation of state secrets --

14             THE COURT:  I think you're right.  Is there any court

15   that has said that in that context the state secrets privilege

16   has less force?

17             MR. JAFFER:  I don't think that there's a case that

18   says it in those words, Your Honor --

19             THE COURT:  Why, on the theories and the principles

20   that are relevant to state secrets, why should it have less

21   force?

22             MR. JAFFER:  Well, Your Honor, the question is when

23   the government is --

24             THE COURT:  State secrets isn't a balancing test.  If

25   it were a balancing test and you looked at the force of the

1    rights involved and who held the rights, maybe you'd reach a

2    conclusion that state secrets would have less force.  But it's

3    plain as day that state secrets is not subject to a balancing

4    test; it's absolute.  So why should it have less force just

5    because a U.S. citizen is involved or just because life or

6    liberty is involved?

7         MR. JAFFER:  Your Honor, you're right, it's not a

8    balancing test, but the courts have been very careful about what

9    consequences flow from accepting the state secrets invocation

10   when there are serious claims relating not just to life or

11   liberty, but individual liberties more generally.  And if you

12   look at cases like In Re: Sealed Case or In Re: United States

13   where there are D.C. Circuit cases involving the state secrets

14   privilege, you see they very carefully go through -- they don't

15   address the question generally, are state secrets at issue in

16   this case.

17        They ask the question, well, what information is it that's

18   covered by the privilege, and what consequences flow from

19   withdrawing that specific information from the case, and is it

20   necessary to reach this question now or can we deal with it when

21   we come to a discovery request that asks for that kind of

22   information?

23        THE COURT:  How would I, on your urging, resolve the

24   question with respect to whether AQAP is within the scope of the

25   AUMF and whether this particular individual is an operational

1    part of AQAP and therefore part of al-Qaeda?  How would I

2    resolve that without looking at all the intelligence that the

3    United States possesses relevant to that issue?  How could I do

4    it?

5            MR. JAFFER:  Well, Your Honor, we have put evidence

6    before the Court on the issue of the association already, the

7    association between AQAP and al-Qaeda.  We have submitted the --

8            THE COURT:  But state secrets is just as relevant if

9    it bars a defense.

10           MR. JAFFER:  Right.

11           THE COURT:  How could I do it without assessing all

12   the intelligence that exists in the government's control?

13           MR. JAFFER:  I think you would have to, you absolutely

14   would have to assess that intelligence, and it's intelligence --

15   it's the kind of intelligence that this court has already

16   assessed in the context of the Khan case, which involved the

17   association between HIG and the Taliban.  It's the kind of

18   evidence that the D.C. Circuit looked at in Parhat, which

19   involved the alleged association between ETIM and the Taliban.

20           THE COURT:  Those are after-the-fact assessments, not

21   assessments of the current evolving situation.

22           MR. JAFFER:  Right.  But if the question is how

23   sensitive is this information and is it too sensitive for a

24   court, then it doesn't really matter whether it's ex post or

25   ex ante.  It's the same information.  And Your Honor, I just

1    want to make one thing clear.  Under any paradigm, the

2    government is going to retain the authority to use lethal force

3    against people who present an imminent threat to life or

4    physical safety, under any paradigm.  Nobody is proposing that

5    the government shouldn't have that power or doesn't have that

6    power.

7         So the question of whether AQAP is associated with

8    al-Qaeda, that kind of question is relevant not to whether the

9    government has the authority to use lethal force, but whether it

10   has more authority than the authority I just spelled out.  So

11   it's a limited question.

12             THE COURT:  Mr. Jaffer, I think you've left your

13   colleague, Ms. Kebriaei, with only 20 seconds to do her

14   argument.

15             MR. JAFFER:  I hope you will give her more than that.

16             THE COURT:  So maybe we ought to turn to her.

17             MR. JAFFER:  Okay.  Thank you.

18             THE COURT:  And I accept equal responsibility for

19   that.

20             MS. KEBRIAEI:  20 seconds would be just fine,

21   Your Honor.

22        (Laughter)

23             THE COURT:  Well, it won't be that bad.

24             MS. KEBRIAEI:  Good afternoon.

25             THE COURT:  Good afternoon.

1          MS. KEBRIAEI:  I wanted to be in with just a few

2     points to frame our response to the government's political

3     question arguments, and then I can address any of Your Honor's

4     questions about political question or about the ATS claim.

5          To begin, the particular question, as my colleague said,

6     that plaintiff poses in this case, which is the starting inquiry

7     in a political question analysis, is whether the targeting for

8     death of a U.S. citizen outside the standards we've set forth

9     violates the Constitution's prohibition on the deprivation of

10    life without due process.

11         The inquiry doesn't stop there.  But the government's

12    position that the political question doctrine bars the Court

13    from any role at all in adjudicating that question --

14         THE COURT:  But if the question whether an

15    organization's alleged terrorist activity threatens the national

16    security of the United States is a nonjusticiable political

17    question, then why isn't this question also a nonjusticiable

18    political question?  And of course, we know that the first

19    question is nonjusticiable under the D.C. Circuit's decision in

20    People's Mojahedin Organization of Iran, et cetera, et cetera.

21    One of those many cases with the same name.

22         MS. KEBRIAEI:  Your Honor, I think with respect to a

23    question of the deprivation of life or liberty without due

24    process, I don't see how the question of assessing the terrorist

25    allegations of a foreign organization are any different than

necessarily what the Court is doing in the habeas context.  The
question of whether AQAP --

THE COURT:  There political question has less force
because if you look at the Baker criteria and the first factor,
there is at least an argument that there's a specific reference
in the Constitution that puts that in the hands of the judiciary
through the suspension clause.

MS. KEBRIAEI:  That's right, Your Honor.

THE COURT:  There isn't anything like that here, other
than the general Fourth and Fifth Amendment proposition.

MS. KEBRIAEI:  Which is not nothing.

THE COURT:  It's not nothing.  I agree with you.

MS. KEBRIAEI:  As the D.C. Circuit said and as
Your Honor said in Abu Ali, in the face of such fundamental
rights, the political question doctrine at least wanes, and I
think the fact that Your Honor pointed out, that the doctrine
has been accepted by the Supreme Court two times in 50 years,
says something about how the courts look upon it, especially
when questions of fundamental life and liberty are at stake.

THE COURT:  But we don't know off the top of our heads
what the history of attempts to get certiorari, as Mr. Letter
gave his off-the-cuff assessment of it, but we don't know what's
been presented to the Supreme Court through petitions for
certiorari in cases where political question was denied or in
cases where political question was accepted.  All we know is

1    that the Supreme Court has not had occasion to apply political

2    question, except in two instances where they did.  Have there

3    been any cases in the last 50 years where the Supreme Court

4    rejected political question?

5              MS. KEBRIAEI:  Your Honor, I don't know the answer to

6    that question, but I think we can look at the question -- at the

7    cases where the government has presented the political question

8    doctrine or separation of powers concerns, for example in Hamdi,

9    in Rasul, in Boumediene, in the string of cases since 9/11, and

10   the courts have repeatedly rejected the proposition that when

11   core constitutional rights are at stake, particularly of a U.S.

12   citizen -- and those cases were in the context, for example,

13   Boumediene was in the context of noncitizens -- when those kinds

14   of questions are at stake, there can be no political question.

15             THE COURT:  Well, you're drawing that proposition from

16   the cases.  I think the cases also stand for the more limited

17   proposition that where it's habeas and there's a specific

18   constitutional reference to the judiciary, political question

19   doesn't prohibit the courts from reviewing detention in those

20   cases.  Or if you move into the property cases, the D.C. Circuit

21   in particular has decided that in those cases the -- I think

22   there are two of them, one in Nicaragua and then the Ramirez

23   case, in those cases you're dealing with what the courts have

24   said is a pretty specific after-the-fact determination that the

25   courts are very used to making.  So arguably, that can be

distinguished from this setting.

MS. KEBRIAEI:  Your Honor --

THE COURT:  At least arguably.

MS. KEBRIAEI:  I accept what you're saying.  I would point, one, to, for example, Justice O'Connor's concern in Hamdi about an unchecked system of detention, and a situation where power was being consolidated within the executive branch, which cuts completely against the idea of separation of powers.  I would also point, as Your Honor said, to cases like Ramirez and the Nicaragua case, where the political question doctrine was rejected, and those cases did not have to do with habeas, they had to do with Fifth Amendment due process rights.

THE COURT:  Other than in El-Shifa -- other than the fact that this is a U.S. citizen, how do you distinguish El-Shifa?

MS. KEBRIAEI:  I think the U.S. citizenship aspect is key.  El-Shifa was about a foreign target, a pharmaceutical plant, not a human being, and an after-the-fact damages case, or an after-the-fact defamation case that the circuit did not find constituted a constitutional deprivation, the circuit court opinion that the government relies upon.  And the court specifically distinguished, in responding to the plaintiff's claims, that their inquiry was no different than habeas.

The court's concern seemed to be about the fact that there was no constitutional deprivation of liberty at issue, and the

court also cited to cases like Bancoult, which did not address
the question, you know, we want to use the case for in our
position, but Bancoult cited to cases like Ramirez and the
Nicaragua case for the proposition that when you have
fundamental Fifth Amendment rights at issue, the political
question doctrine does not apply.  And that's what the circuit
found in those cases.

THE COURT:  Well, has the political question been
applied by the circuit in situations where constitutional rights
were at issue?

MS. KEBRIAEI:  Your Honor, I'm not aware of any off
the top of my head where the circuit court has found a situation
where you have an impending deprivation of life --

THE COURT:  I didn't say life or liberty.  I didn't
limit it that way.  I've already asked that question of the
government and I don't think they came up with any case.  But
I'm asking whether political question has been applied in
situations where the claims were constitutionally based, even if
not life or liberty claims.

MS. KEBRIAEI:  I can't respond to your question
directly.  I know that when, in the Ramirez case and the
Nicaragua cases that had to do with Fifth Amendment nonliberty
situations, the political question doctrine was rejected, and
certainly -- which again is the case that we are talking about
here, when a deprivation of life or liberty is at stake, it

1   would be an extreme position, which is what the government is

2   taking, to deny any role at all.  And that's what we're talking

3   about here.

4           THE COURT:  What do you make of the Harbury case?

5           MS. KEBRIAEI:  Your Honor, I think, again, the

6   circumstances of this case are unique.  We're talking about a

7   U.S. citizen with respect to his own government, facing an

8   impending deprivation of life without due process.  And the

9   government here is asserting that the Court should have

10  absolutely no role in reviewing the government's claimed

11  authority.  That's an extreme position, it's a terrifying

12  position, and it cuts against the jurisprudence of the Supreme

13  Court, the D.C. Circuit and this court.

14          THE COURT:  What's the best case that you have for the

15  proposition that a court should get involved ex ante in setting

16  the standards for the executive branch to operate under in

17  military, intelligence and foreign affairs arenas, or that the

18  courts should be in a position to set those standards and then

19  enforce that through contempt or damages?  What's the best case

20  that I should look to to support your position that that is

21  something that the Court should do?

22          MS. KEBRIAEI:  Your Honor, with respect to the context

23  at least that the government claims that we are in, which is

24  wartime, which we take issue with, and with respect to the

25  powers that are being asserted here, both under the AUMF and

presumably under Article II, and with respect to ex ante relief,

and in the context of what the President and the executive

branch assume to be, deem to be a dire immediate threat, I think

Youngstown is a strong case on point, where in the face of all

of those concerns and in circumstances that in many respects are

parallel to the one here, the Court did issue injunctive relief.

    To the extent that there is no precise case on point, I

think again in many respects this case is unprecedented, and the

fact that there is no specific precedent on point should not

mean that the Court is incompetent to address the very legal and

constitutional issues that we've presented here.

    THE COURT:  There's some language in El-Shifa that is

troublesome, I think, for you, is there not, including the

language that, where the Court says, "If the political question

doctrine means anything in the arena of national security and

foreign relations, it means the courts cannot assess the merits

of the President's decision to launch an attack on a foreign

target, and plaintiffs ask us to do just that."  How do you get

out from under that language?

    MS. KEBRIAEI:  I think we get out from under it by

virtue of the U.S. citizen being the target here, and a

pharmaceutical plant in the Sudan being the target there.  And

the Court made pretty clear that its analysis would have been

affected if there had been a constitutional issue at stake, and

certainly one relating to the deprivation of liberty, at least,

1   in citing the habeas cases.

2       Going back to the points I was starting with.  With respect

3   to relief, which the government seems to focus on in their

4   reply, our position is the relief plaintiff seeks is not beyond

5   the competence of this court, and to the extent the government

6   argues that it is, their arguments are based on misconstruing

7   the relief that we're seeking and ignoring, as Your Honor

8   pointed out, the established experience of this court, in

9   particular this district court in particular, in dealing with

10  very complex and sensitive issues of national security in the

11  context of the Guantánamo litigation.

12      And as we've made clear, what we are asking the Court to do

13  is adjudicate the legal standard that would apply and issue an

14  injunction with respect to one individual.  That would not bar

15  the Court --

16      THE COURT:  You actually do ask for an injunction

17  that's broader than the one individual.  You ask for an

18  injunction that would cover all U.S. citizens, and you even, I

19  think, ask for an injunction that would cover all targeted

20  killings.  Are you narrowing that now and saying you're not

21  seeking that relief?

22      MS. KEBRIAEI:  Your Honor, I believe the injunction

23  that we are asking for is with respect to one person.  The

24  predicate finding that Your Honor would need to make in order to

25  find the standard that we've set forth applies is broader, but

1    that is -- that's the declaratory part of the relief that we're

2    seeking, not the injunctive part.

3           THE COURT:  There's not much difference between a

4    declaratory judgment and an injunction in that context.

5           MS. KEBRIAEI:  The President would not be subject to

6    contempt sanctions with respect to declaratory relief.  And we

7    are talking again about not enjoining military operations, not

8    enjoining action, but setting the standard that should govern

9    that action.  And that is squarely within the realm of the

10   Court.

11       And third, with respect to the context in which this

12   targeting would occur, the government in their reply argues that

13   that too is a question outside the competence of the Court.

14   What we're talking about there is simply what legal framework

15   would apply.  What is the applicable law here?  That question is

16   related to the question of armed conflict, but determining that

17   question is not one that courts have been incapable of

18   determining, contrary to the government's contention.

19       But more importantly, to the extent that the government

20   relies on the AUMF, as Your Honor said, that is simply a matter

21   of statutory interpretation, which is quintessentially a

22   judicial task, and one that courts have undertaken repeatedly

23   since 9/11.

24           THE COURT:  We better talk a little bit about the

25   alien tort statute.

```
 1              MS. KEBRIAEI:  Okay.  I can respond to Your Honor's
 2      questions --
 3              THE COURT:  Let's start with this question.  Is there
 4      any case that recognizes a cause of action to prevent a
 5      threatened future extrajudicial killing?
 6              MS. KEBRIAEI:  Your Honor, again, there is no specific
 7      case on point here --
 8              THE COURT:  Then that seems to me to be a problem,
 9      because Sosa says you look to what is established under
10      customary international law norms.  And if there is no such
11      case, how can you possibly say that you meet that high bar under
12      Sosa?
13              MS. KEBRIAEI:  Your Honor, I want to be clear that the
14      claim plaintiff is bringing is based on one of the most
15      established international norms that exist.  It's a claim based
16      on the prohibition of extrajudicial killing.  He is bringing the
17      claim in his own name for the injury --
18              THE COURT:  He's bringing it in his own name, for what
19      injury?
20              MS. KEBRIAEI:  For the harm that he would suffer by
21      virtue of the death of his son.
22              THE COURT:  What kind of harm is that?
23              MS. KEBRIAEI:  That is emotional distress, which the
24      government --
25              THE COURT:  So has any court recognized that kind of
```

1    emotional distress cause of action so that we would reach this

2    high bar under Sosa of a customary international law norm?

3              MS. KEBRIAEI:  Your Honor --

4              THE COURT:  There's dispute within the United States

5    courts as to whether you can have that kind of intentional

6    infliction of emotional distress when the plaintiff is not even

7    present.

8              MS. KEBRIAEI:  The claim that we're bringing I think

9    is analogous to a wrongful death claim, where a claimant can

10   bring an action for the wrongful death of another individual,

11   for harm that that claimant herself has suffered.  That is the

12   analogy here.  It doesn't change the nature of the claim itself,

13   which is --

14             THE COURT:  I have to say I've become a little

15   confused.  Maybe you're clarifying it now.  It did seem to me

16   that you started out purporting to bring the alien tort statute

17   claim in the plaintiff's own right, to prevent an injury that he

18   would suffer.  But then in your reply brief you disavowed, I

19   thought very clearly, any reliance on intentional infliction of

20   emotional distress, loss of consortium or any other tort that a

21   parent might suffer as the result of a child's unlawful killing.

22   That would include wrongful death, too.

23        But now you're going back to your initial position of

24   saying no, no, no, this isn't a third party standing situation;

25   this is a direct injury to the plaintiff.  I do feel that you've

1    led me up and around here.

2           MS. KEBRIAEI:  Well, we apologize for that.  We were

3    trying to be as clear as possible.  Our intention was not at all

4    to take the focus away from the fact that what we are talking

5    about here is a claim for extrajudicial killing.  The nature of

6    the damages --

7           THE COURT:  No, no, the threat of extrajudicial

8    killing.

9           MS. KEBRIAEI:  Yes.  Excuse me.  A threat of --

10           THE COURT:  Extrajudicial killing you have a little

11    stronger footing for a customary international law norm by

12    virtue of the TVPA if nothing else.

13           MS. KEBRIAEI:  That's right.  In fact, EJK claims are,

14    that's one of two torts that are recognized under the TVPA.

15    Extrajudicial killing claims are long established, the cogent

16    norm.  But the claim we are bringing is on that basis.  It's on

17    the basis of that international norm that is very well

18    recognized.  It's recognized under Sosa.  It's recognized under

19    statutes of the United States.

20           THE COURT:  Not for the threat of an extrajudicial

21    killing, for a future extrajudicial killing.  There's no such

22    recognition.

23           MS. KEBRIAEI:  To the extent we're talking about the

24    injunctive relief here, there have been two cases at least that

25    have recognized that injunctive relief is at least possible in

1    the ATS context.  Regardless of the fact that the circumstances

2    of those cases differed, or the issue that the government takes

3    with --

4              THE COURT:  Right now I'm not into sovereign immunity.

5    I'm into cause of action.  I just don't see under <u>Sosa</u> how you

6    can satisfy that high bar.  The Supreme Court has instructed

7    that courts should be very cautious about creating new torts in

8    this context.  How in the world does this one satisfy the

9    Supreme Court's requirement for a customary international law

10   norm when no court has ever recognized it?

11             MS. KEBRIAEI:  Your Honor, because the customary

12   international law norm is no different than what has long been

13   recognized.

14             THE COURT:  Oh, it's no different to say a threat of a

15   future extrajudicial killing versus an actual extrajudicial

16   killing?  I think I would have to disagree with you and say that

17   there is a difference.

18             MS. KEBRIAEI:  I think that the difference is -- my

19   understanding of it is the difference is the nature of the

20   relief that we are seeking.

21             THE COURT:  The difference is in the nature of the

22   injury.  The injury is an emotional type of injury.  That's what

23   hasn't been recognized as a cause of action.

24             MS. KEBRIAEI:  But the claim, the tort that would be

25   occurring, that would be resulting in the injury to plaintiff

would be a violation of the norm of extrajudicial killing.  That

is the basis of the claim.  It's no different than wrongful

death actions where plaintiffs bring a claim based on the

wrongful death itself, but the injury is of a different nature.

And that is what we're talking about here.

     And again, to the extent that we're talking about the

injunctive piece of the claim, again, injunctive relief has been

recognized in the context of ATS.

          THE COURT:  Before we get to the injunctive relief and

the sovereign immunity, and it's the same kind of concern I

expressed with Mr. Jaffer in a slightly different context, but

it seems to me that the kind of cause of action that you're

saying rises to the level of a customary international law norm

would open a very wide door, because it would mean that suits by

lots of people fearing some contemplated government action could

be brought under the ATS, where there's been no recognition of

such suits in any legal environment, international or domestic.

          MS. KEBRIAEI:  I think if the threatened harm -- the

threatened harm were one that had been recognized to the extent

that extrajudicial killing has been recognized in customary

international law, those claims might be possible.  And again,

that is the claim that we are talking about.  There would be no

injury to plaintiff but for that potential killing.

          THE COURT:  All right.  So let's go to sovereign

immunity for a second.  We've got Sanchez-Espinoza and we've got

1    the D.C. Circuit saying this waiver of sovereign immunity under

2    the APA might arguably be available, and we can discuss that,

3    but that in any event it would be an abuse of discretion to

4    apply that and provide discretionary relief against the

5    United States, where you're talking about sensitive foreign

6    affairs matters, and the statutes that you're talking about are

7    no more specific than the alien tort statute and the APA, which

8    is exactly what we're dealing with here.

9         How do I get around -- how do you get around or lead me

10   around that language from Sanchez-Espinoza?  And I hope you're

11   not going to say, well, this is a U.S. citizen.

12        MS. KEBRIAEI:  Well, I do think the facts of this

13   case --

14        THE COURT:  Well, you're not going to say that in the

15   alien tort statute context, because a U.S. citizen can't bring

16   such a case.

17        MS. KEBRIAEI:  Well, that's right, but I do think that

18   in evaluating, in deciding whether to award equitable relief and

19   making decisions about discretion, those decisions should be

20   made in light of the particular facts of the case.  And the

21   facts of the case of the Sanchez-Espinoza decision were

22   radically different.  Those had to do with alleged harm that was

23   being alleged by a nonresident, noncitizens, with respect to

24   injury that they were suffering by virtue of the U.S.'s actions

25   in another state.

1          We're talking here about the United States with respect to

2     a U.S. citizen, and again a deprivation of life.  And the

3     deprivations in Sanchez-Espinoza were severe, but I think again,

4     when we're talking about the facts at issue here, Sanchez can be

5     distinguished.

6          THE COURT:  We sort of wind up with no rules at all if

7     the way rules are set is just look and see how serious the

8     claims are, and if the claims are serious enough, then forget

9     about any of the constraints on bringing cases, either

10    jurisdiction or standing or any of these other propositions.  I

11    understand the instinct that leads one in that direction, but it

12    does lead to sort of an unprincipled landscape where you just

13    sort of look and see, oh, this is a serious enough claim,

14    therefore forget about the rules relating to standing or forget

15    about the rules relating to sovereign immunity or to cause of

16    action, and proceed.

17         MS. KEBRIAEI:  Well, Your Honor, to the extent we're

18    talking about discretion, Your Honor's discretion, I think

19    concerns about the burden -- about the unique circumstances of

20    the case, the burden to the government, the parties involved,

21    all of those things are factors that the Court would take into

22    consideration.  And again, when you consider Sanchez-Espinoza,

23    the relief that was being sought there was also much broader

24    than what we're seeking here.

25         THE COURT:  Let's turn to the point that I asked

1    Mr. Letter about.  Is there any case that you're aware of that

2    has allowed a claim under the alien tort statute against the

3    United States or its officials for nonmonetary relief?

4        MS. KEBRIAEI:  Your Honor, one moment, please.  I'm

5    sorry.

6        (Counsel conferring.)

7        MS. KEBRIAEI:  Your Honor, that didn't help me much.

8        (Laughter)

9    We're not aware of any, no.

10       THE COURT:  The only case I'm aware of is the Rosner

11   case in the Southern District of Florida, which might fit in

12   that category, but the problem with that case in terms of

13   whether it fits in that category is that it very much based its

14   decision on the fact that the conduct complained of, even though

15   it might be exercised by military personnel, was really

16   nonmilitary activity, and that's not what we have here.

17       MS. KEBRIAEI:  Well, I think that --

18       THE COURT:  So I've given you the opening.  Now you're

19   going to run it, right?

20       MS. KEBRIAEI:  Well, you say nonmilitary.  I think the

21   context in which we're operating is relevant, and it's in

22   dispute.  And the government certainly assumes the conclusion of

23   the appropriate context and the appropriate legal framework, and

24   again, those are issues that we disagree with.

25       THE COURT:  Now, you also contend that the

1    Larson-Dugan exception applies here.  If that's your position,

2    how do you get around the D.C. Circuit's decision in

3    Sanchez-Espinoza that says in this context, the kind of context

4    that we have here, Larson-Dugan doesn't apply at all?

5            MS. KEBRIAEI:  Well, Your Honor, I think that with

6    respect to the Larson-Dugan exception we have a second pillar of

7    our argument, which is that the APA waiver does apply here with

8    respect to at least Defendant Panetta and Gates, if it does not

9    apply to the President.  So under the APA's waiver, sovereign

10   immunity would be addressed, even if we put aside concerns about

11   Larson-Dugan.  And the government does not dispute that --

12           THE COURT:  But nonetheless, we're not aware of any

13   case under the alien tort statute that proceeded with even

14   nondamages relief against officials of the United States?

15           MS. KEBRIAEI:  We're not, Your Honor.  But again, with

16   respect to sovereign immunity and whether it would be waived

17   under the APA with respect to two of our three defendants, the

18   government does not dispute that the APA waiver would apply to

19   Defendants Panetta and Gates, and they turn then to an argument

20   about discretion, equitable discretion, but that is not about

21   sovereign immunity.  So to the extent -- with respect to

22   sovereign immunity, we do believe the APA waiver applies with

23   respect to the majority of the defendants.

24           THE COURT:  All right.  I'm going to let Mr. Letter

25   have the lectern unless you have something you want to say in

1    conclusion.

2              MS. KEBRIAEI:  Thank you, Your Honor.

3              THE COURT:  And I'm going to give each side a chance

4    to say some final words.  Obviously, they should be directed to

5    what the other side has argued most recently.

6              MR. LETTER:  Thank you.  If it's okay with you, I

7    would like to direct an answer to something that you asked,

8    though.  You asked about political question and constitutional

9    claims.  The most obvious one is -- and talk about core

10   constitutional claims, it's again the Walter Nixon case.  He

11   said he was being impeached improperly under the Constitution.

12   He cited a direct provision in the Constitution about whether

13   he's entitled to the Senate sitting as a jury, and the Supreme

14   Court -- I was going to say unanimously but I'm not positive --

15   said it was a political question.

16        In addition, Your Honor --

17              THE COURT:  Well, you have the two Supreme Court cases

18   of Gilligan and Walter Nixon.  Are they both constitutional

19   cases?

20              MR. LETTER:  Yes.

21              THE COURT:  But neither involves life or liberty.

22              MR. LETTER:  Correct.  Correct.  The one other thing I

23   wanted to point out, though, is you were asking Ms. Kebriaei

24   about El-Shifa.  Remember, the federal circuit decision in

25   El-Shifa, which the D.C. Circuit cited and heavily relied on,

1    there one of the arguments we made was that because the

2    plaintiff was not a U.S. citizen, couldn't bring the claim there

3    for just compensation, the constitutional claim, the federal

4    circuit declined that argument, and instead it treated it as if

5    it was a citizen because some old claims court precedent that --

6              THE COURT:  The actual decision in the federal circuit

7    is of what relevance here?

8              MR. LETTER:  It held that it is a political question.

9    Ms. Kebriaei responded to you that, well, El-Shifa didn't

10   involve a U.S. citizen.  What I'm pointing out is that the

11   federal circuit decision said it's a political --

12             THE COURT:  Assuming that.

13             MR. LETTER:  Exactly.  That the right was there.

14   Couple of points that my friends here and supervisors have

15   pointed out to me.

16             THE COURT:  Uh-oh.  This means you're not taking

17   credit or responsibility for any of it.

18        (Laughter)

19        Sounds to me like you're running far away from these.

20             MR. LETTER:  No.  These are all really good points.

21        (Laughter)

22        First, you asked me if there are any cases where the Court

23   said it's not a political question but still denied relief,

24   equitable discretion, and the answer is yes, Sanchez-Espinoza,

25   770 F.2d at, I think it was 208.  The court there specifically

1    addressed that, said it wasn't a political question, but

2    nevertheless said no relief because of the equitable discretion

3    doctrine.

4         Then the -- oh.  You had asked me about the differences

5    between the case here and the Guantánamo cases.  I think I

6    hinted a little bit about this but didn't say it nearly as

7    clearly as I should have.  As you well know, in those cases

8    you're not determining threat, that is not something that

9    factors into your considering as you're making the habeas

10   determination.  You're determining whether the person was

11   properly captured and detained.  And we don't come to you and

12   argue that whether they were or weren't, they're a threat.

13        And that obviously is a key aspect of this case.  So it's

14   another way that this is -- what you would be asked to examine

15   here is very different from what you're asked to examine in the

16   detainee cases.

17             THE COURT:  Even accepting what you say, how does that

18   make a real difference in terms of what the Court is engaged in

19   doing?

20             MR. LETTER:  Because the important thing that you

21   would have to do in order to rule on this case, one of the

22   various things, you would have to determine is the President

23   properly weighing the imminence of the threat posed by

24   Al-Aulaqi.  And that's not something that you ever have to do in

25   the Guantánamo detainee habeas context.  You don't get into that

1    ever.

2          THE COURT:  So you think that -- you don't think that

3    the courts, in looking at whether someone is a part of al-Qaeda,

4    are in part at least assessing how significant a part and how

5    significant a threat that involvement in al-Qaeda constituted,

6    because it's looking in the past rather than the future or the

7    present.

8          MR. LETTER:  Yeah.  I think that you do, yes, you do

9    get into how significant a part they were.  I believe that you

10   do get into that, but the question of current threat, you don't.

11         THE COURT:  Current threat, certainly not.

12         MR. LETTER:  And that, you would absolutely have to do

13   here.  You and the President, if you issued an injunction, you

14   and the President would have to talk to each other.

15         THE COURT:  Well, let's stop for a second.  Is it

16   really true that in those cases -- and I don't want to dwell too

17   long on those cases, we could spend the rest of the day -- but

18   in those cases, that the courts are not looking at the threat?

19   I mean, there are fairly recent cases from the D.C. Circuit

20   where a part of the analysis really is whether someone,

21   notwithstanding earlier involvement, withdrew that involvement

22   and whether, based on that withdrawal, there really is a

23   continuing threat or involvement.  Why is that so different?

24         MR. LETTER:  Your Honor, my understanding of that

25   specific case that you're referencing is it was a question of

1    had he withdrawn from al-Qaeda by the time he was captured.  I

2    don't think that there was any discussion about whether he is

3    currently a threat.

4            THE COURT:  Well, you know, most of those detainees

5    over the last eight years have not been too actively involved in

6    al-Qaeda.

7            MR. LETTER:  That's exactly right.  Then this next

8    point ties in with this, which is if somebody's at large, then

9    obviously the evidence can be constantly shifting and changing,

10   and so that is something that again the President and his

11   advisors -- and if plaintiffs are correct, you would be sitting

12   in with them, trying to figure out and sort all of this

13   evidence, and you would need to be available I think 24 hours a

14   day so that you could do that.

15           THE COURT:  Then it's clear what way I'm going to

16   decide based on that.

17       (Laughter)

18           MR. LETTER:  You had asked about the question about

19   can it be a political question even when there is a specific

20   statutory claim.  And El-Shifa mentioned that, but also I'm

21   reminded that the second Kissinger case in the D.C. Circuit,

22   Gonzalez-Vera, the Court specifically held that even if there is

23   a statutory claim -- there it was a TVPA -- you can have a

24   political question.

25       Then -- my friend Mr. Jaffer was making the point that the

1    U.S. government should not put somebody to this choice of coming

2    forward, presenting himself, and thereby avoiding the threat of

3    lethal force.  But our point exactly is that this is within the

4    control of the real party in interest here.  It's totally within

5    the control of Al-Aulaqi whether he is going to be under the

6    threat of force or not.  He can avoid that by presenting

7    himself.

8         One point that really struck me was that, this question

9    about, well, maybe we don't want an injunction, we could have a

10   declaratory judgment or something, we would be seeking damages

11   later.  If what plaintiff is really interested in is the

12   possibility that if his son is subject to lethal force he be

13   able to bring a damages action later, we don't need this

14   lawsuit.  If he wants to bring a damage action later, he can

15   file that action.  It might or might not be justiciable, but we

16   don't need a suit here today for an ex ante declaratory judgment

17   or injunction so that plaintiff can later bring a damages action

18   should he be able to do so.

19        THE COURT:  Seems to me that he's also arguing that he

20   would like to keep his son alive.

21        MR. LETTER:  Well, of course, except, remember, this

22   also is I think one of the more bizarre aspects of this case.

23   Remember that the plaintiff is saying we can kill his son.  He's

24   saying we can do it --

25        THE COURT:  Under the right set of criteria.

1           MR. LETTER:  Exactly.  Exactly.  And that goes to this

2     whole question about is he litigating in the best interests of

3     his son.  That does raise a very odd inquiry, it seems to me.

4           On Youngstown, remember, there they -- two differences.

5     One is the Youngstown situation itself fit within what Justice

6     Jackson's concurring opinion later said is the third category,

7     which is when the President is acting solely on his own

8     authority inconsistently with Congress, because Congress had

9     passed the Taft-Hartley Act, and President Truman was not

10    following it.  Here, as we have said, the President is acting at

11    the apex of his authority.  In addition, Youngstown did not

12    involve --

13          THE COURT:  The apex?  When it's totally reserved to

14    the President?

15          MR. LETTER:  Well, here, remember, the President is

16    acting as commander in chief and with the power given him under

17    the AUMF.  So it is both political branches --

18          THE COURT:  But that means it's not totally reserved

19    to the President.

20          MR. LETTER:  That's right.  Remember, if I'm getting

21    the three-part test that Justice Jackson set out, or three

22    different situations, the apex is when the President has his own

23    authority, and --

24          THE COURT:  Congress has it.

25          MR. LETTER:  Precisely.  And in addition, Youngstown

1    did not involve a specific situation where the question was

2    would lethal force be used in a particular situation.  It was

3    obviously a much broader issue that was primarily domestic.  And

4    so that's really quite different.

5        And then the last two points I wanted to make, this would

6    go to the declaratory judgment point.  That still really is no

7    good from the government's perspective, because the President

8    obviously wishes to know, if there's a declaratory judgment out

9    there, is he acting contrary to what the Court has ordered?  And

10   so this would put the President in an extremely awkward

11   position, if there's either an injunction or a declaratory

12   judgment, and the President has to be thinking in terms of can

13   I, should I order this use of lethal force.  I might not be able

14   to convince Judge Bates that it was appropriate or

15   inappropriate.  So that's the problem with the declaratory

16   judgment hanging over his head.

17       And then the last point is that, also going to the very

18   strangeness of this suit, we have a situation here where

19   Al-Aulaqi is urging people to die in an effort to kill

20   Americans, and yet -- and at the same time is repudiating the

21   power of the U.S. courts, and yet his father is here trying to

22   use the U.S. courts in a way that would allow Al-Aulaqi to

23   continue acting as a leader of an organization that is actively

24   engaged in trying to kill Americans.

25               THE COURT:  Might or might not, depending upon whether

1    the United States is actually applying criteria along the lines

2    of what the plaintiff is suggesting are required.

3              MR. LETTER:  That is true, Your Honor.  I have nothing

4    further, Your Honor.

5              THE COURT:  All right.

6              MR. LETTER:  Thank you very much.

7              THE COURT:  For the plaintiff, whoever wants to get

8    up.  Only one of you.

9              MR. JAFFER:  Your Honor, can I have five minutes?  Is

10   that too much to ask?

11             THE COURT:  Let's see where you go.

12             MR. JAFFER:  All right.  A few points that I'll make

13   very quickly.  So you asked, Your Honor, on third party standing

14   what the interest is.  And I just want to articulate the

15   interest as clearly as I can and then move on.  One is that the

16   actions of the United States with respect to Anwar Al-Aulaqi

17   already prevent our client from speaking to his son, from

18   meeting with his son; they threaten to prevent him ever from

19   seeing or meeting with his son, because obviously the threat is

20   to kill him.  And as Your Honor mentioned at one point --

21             THE COURT:  That's an interest that it's disruptive of

22   the parent-child communication as part of that relationship.

23             MR. JAFFER:  That's right, Your Honor.  And then the

24   other thing is in some jurisdictions -- and if anything turns on

25   this, we'd be happy to research which jurisdictions, but in some

1    jurisdictions our clients would have a legally recognized right

2    to bring, for example, a wrongful death action if his son were

3    killed.  So that too I think is a recognition of an interest

4    that our client has in his son's life.  So that's the interest

5    that we're arguing is sufficient for third party standing.

6         THE COURT:  In some U.S. jurisdictions, you're saying

7    it's your belief that he would have a legally recognized right

8    to bring a wrongful death action without anything further

9    happening?  Wrongful death action is really brought on behalf of

10   the estate by an appointment, generally.

11        MR. JAFFER:  Right.  Actually, I was relying on

12   Your Honor's hypothetical, which I recognize was a hypothetical.

13   I don't know the answer to this question, whether our client

14   would have the ability to bring a direct action on his own

15   behalf in the case of his son's death.

16        THE COURT:  Seems to me the Butera case in the D.C.

17   Circuit raises some doubt whether he would have that right in

18   this jurisdiction.

19        MR. JAFFER:  Your Honor, I don't want to -- I'm not

20   sure it matters whether this jurisdiction recognizes his right,

21   because he's not asserting the right.  He's not asserting --

22   this isn't a wrongful death action and he's not asserting rights

23   with respect to his son's wrongful death.  It's just a way of

24   saying that the interest that a parent has in the life of his

25   adult child is recognized by the law in some places, and that is

1  in our view sufficient to support the injury requirement of

2  third party standing.

3      And as to the floodgates concern Your Honor raised earlier,

4  I just want to reiterate that the other two requirements do some

5  work, the close relationship requirement and the some hindrance

6  requirement.

7          THE COURT:  But my floodgates concern was premised on

8  a close relationship, and in the two situations I raised, it

9  seems to me there would be some hindrance, which is a lower bar

10 than a complete denial of access to the courts, hindrance either

11 from some serious form of incarceration, or -- and I'm sure you

12 would make the argument that it was a hindrance -- or even in an

13 employment situation, from the result being that a child was

14 sent 3,000 miles across the country to find work.

15         MR. JAFFER:  Yeah.  Your Honor, on this --

16         THE COURT:  I know a lot of parents who tell their

17 children they can't even apply to colleges on the other side of

18 the country.

19         MR. JAFFER:  Right.  But Your Honor, I don't think

20 it's true that detention is in itself some hindrance.  I think

21 it would depend on the context.  And I don't think that that in

22 itself presents a floodgates problem.  But I feel like I've

23 given you my best answer to this question.

24      On Gilligan, which neither I nor my co-counsel addressed,

25 but Mr. Letter brought up, very quickly, Your Honor, we think

that the government's reliance on that case is misplaced.  As

Your Honor pointed out, the Court expressly distinguishes

between what it called a broad call on judicial power to assume

supervision over the National Guard.  It expressly distinguished

that kind of case from an action seeking a restraining order

against, quote, "some specified and imminently threatened

unlawful action."  And that's exactly the kind of case we're

bringing here.

The other thing to note about Gilligan, Your Honor, is that

that was a case in which the plaintiffs didn't allege that the

government was applying rules that were unlawful.  Everybody

agreed that the rules that the government had adopted were

lawful.  The only question was whether the Court would

continually supervise the government's compliance with rules

that everybody agreed were the right rules to remain in place.

And that's not the situation we have here.  Obviously there's a

dispute about which rules actually apply.

Your Honor also asked about whether there is precedent for

the Court's imposing ex ante rules on the executive branch in

wartime.  And I think my co-counsel pointed out Youngstown, but

the other thing to say about that is that the question assumes a

conclusion that we dispute.  This isn't in our view a wartime --

THE COURT:  I don't think I used the term "wartime."

MR. JAFFER:  I think Mr. Letter used some version of

wartime.  But I just wanted to point the Court to three cases in

1    which the courts actually did impose those kinds of rules

2    outside wartime.  One is National Treasury Employees Union.  The

3    cite is 918 F.2d 968.  That's a case in which the D.C. Circuit

4    enjoined a federal agency from drug testing its employees

5    without reasonable suspicion.  It was before the fact, an

6    ex ante rule.

7         Another is a Ninth Circuit case called LaDuke, 762 F.2d

8    1318.  The Ninth Circuit enjoined the INS from conducting

9    suspicionless searches of farm dwellings except in exigent

10   circumstances.  And that actually sort of maps onto the kind of

11   rule we're proposing here.

12        The last one is another D.C. Circuit case called Tatum v.

13   Morton, 562 F.2d 1279.  The D.C. Circuit enjoined the District

14   of Columbia from conducting strip searches on parking and

15   traffic arrestees without probable cause to suspect hidden

16   weapons.

17        A couple very quick points on state secrets.

18             THE COURT:  You think those cases help you in

19   responding to the concern raised by Mr. Letter that no court has

20   ever imposed such restrictions on the President and the senior

21   officials of the United States in the context of military,

22   foreign or intelligence affairs?

23             MR. JAFFER:  Your Honor, I think that this is true

24   throughout the government's arguments, that it mistakes the

25   chicken for the egg.  The question here is whether we are --

1           THE COURT:  Which comes first?

2           MR. JAFFER:  Well, I just think the question is

3    whether we are in the military context or the wartime context or

4    the battlefield context.  That is the question that's in

5    dispute.

6        But even if we were in that context, there are cases in

7    which the courts order senior government officials to act in

8    particular ways during wartime.  Youngstown was one, but all the

9    Guantánamo cases are cases like that too, in which the courts

10   order the government to release prisoners who are held by the

11   executive branch.  And in some cases those are prisoners that

12   the government has argued are dangerous terrorists.  So it

13   wouldn't be unprecedented at all.

14          THE COURT:  And it's where the authority of the

15   United States derives from the AUMF, which is to some extent a

16   wartime provision.

17          MR. JAFFER:  Right, Your Honor.  On state secrets,

18   just a few points, very quickly.  One is Your Honor asked about

19   why it is that this circumstance is different, sort of -- why is

20   it that in the context of cases involving life and liberty the

21   courts haven't accepted the state secrets doctrine.

22       I just want to point you to a passage in Reynolds in which

23   the Supreme Court discusses precisely that question.  And what

24   the Court says is -- now I'm paraphrasing, except for the word

25   "unconscionable" which actually is in the decision.  It would be

1    unconscionable to allow state power to be brought to bear on an

2    individual, but then to allow the state to prevent that

3    individual from having access to information or to defend

4    himself.

5         That is precisely what is going on here.  If the government

6    were to charge Anwar Al-Aulaqi with a capital offense, it

7    wouldn't be able to rely on the state secrets privilege in the

8    context of the prosecution.  Here what the government is doing

9    is essentially imposing the death penalty without trial, but

10   relying on a privilege that wouldn't be available to it even

11   with trial.

12        The other point on state secrets, Your Honor, is that I

13   think it's clear, but I think it's worth underscoring, that not

14   everything within the three categories that the government has

15   identified is actually a secret.  For one thing, we wouldn't be

16   in court today were it not for the government's disclosures to

17   national newspapers that our client had been -- our client's son

18   had been targeted under this program.

19        The second is in court today the government has reiterated

20   something in its brief, which is that if Anwar Al-Aulaqi were to

21   come forward, the government wouldn't target him in that

22   context.  And that does disclose something about their targeting

23   criteria.

24        The other thing, Your Honor, is their brief discloses

25   something about their targeting criteria because it discloses

1    that they draw authority for the use of necessary and

2    appropriate force against people like Anwar Al-Aulaqi from the

3    AUMF.  So they've disclosed several different things about the

4    authority at issue here.

5              THE COURT:  It seems to me that can cut either way.

6    The government could say, see, this is really hard to litigate

7    this case without disclosing sensitive information that, if not

8    state secrets, borders on state secrets.  And that's why the

9    Court should not get into it.  You've only put your toe in the

10   water, Judge, and already the plaintiffs are saying that the

11   government is disclosing things that are within the category

12   that it is claiming are subject to state secrets.  Imagine when

13   you dive in completely, Judge.  State secrets are going to be

14   disclosed left and right if we try to litigate this case.

15             MR. JAFFER:  Your Honor, if they were to detain Anwar

16   Al-Aulaqi, then tomorrow Anwar Al-Aulaqi's lawyers would be in

17   court contesting or challenging the detention, and the

18   government would be required to disclose the very --

19             THE COURT:  Maybe, maybe not.  But they could be.

20   They could be.

21             MR. JAFFER:  I think, if the Guantánamo cases are any

22   guide, the government would be required to disclose the very

23   information that it is now saying it can't disclose.  So I think

24   from our --

25             THE COURT:  Required under what?

1          MR. JAFFER:  I think if there were an allegation in

2     the context of a habeas case that --

3          THE COURT:  That would only be true if they took him

4     to Guantánamo.  It wouldn't be true if they took him somewhere

5     else outside the United States.

6          MR. JAFFER:  I think it would, Your Honor, because

7     he's a U.S. citizen.  I think that there's no question that a

8     U.S. citizen, even held at Guantánamo --

9          THE COURT:  Perhaps you're right.  You may be right.

10         MR. JAFFER:  So, Your Honor, two final points.  On

11    that one, it's just, the way we see it is the government is

12    using secrecy opportunistically.  That it discloses information

13    when it is useful to the case, and withholds it when it

14    undermines its own legal arguments.  And I don't mean to suggest

15    bad faith on the part of the government, but I do think that if

16    you look at the information that's been disclosed, it's

17    precisely the information that the government says is -- it is

18    information that is within the categories the government says

19    are protected by the state secrets privilege.

20       Last point.

21         THE COURT:  Last point is right.

22         MR. JAFFER:  Last point.  I just wanted to step back

23    from the weeds once more and point out the consequence of

24    accepting the government's arguments here.  If Your Honor

25    accepts the government's arguments, then the President will have

1    the unreviewable authority to order the assassination of any

2    American whom he labels an enemy of the state, and there will be

3    no judicial review ex ante, and there will be no judicial review

4    ex post.  And even the legal framework under which the

5    government uses legal force will be for the President alone to

6    decide.  And that is something --

7              THE COURT:  Do you think it's that broad, that it's

8    the power to assassinate any United States citizen?

9              MR. JAFFER:  In this sense, Your Honor.  The question

10   of whether an American falls within the category of people who

11   can be assassinated is a question that the President alone will

12   decide.  I am again not suggesting that the current president is

13   acting in bad faith, that there has been a decision to -- that

14   the President is using the AUMF in a way that the President

15   understands is beyond the scope of what Congress authorized.

16       But I think there are larger institutional and separation

17   of powers concerns here.  And if you invest in the presidency

18   the authority to decide which Americans should be killed and

19   which -- or which Americans should be killed, and you leave it

20   to the President, both ex ante to make that decision, and

21   ex post to decide whether it was the right decision, then you've

22   done something that is inconsistent with the Fourth and Fifth

23   Amendments, and I think inconsistent with the principle of

24   separation of powers.

25             THE COURT:  All right.  Thank you, Mr. Jaffer.

1        MR. JAFFER:  Thank you, Your Honor.

2        THE COURT:  Mr. Letter, do you want to respond to the

3   last point?  There's a concern that's raised by Mr. Jaffer, that

4   to go with the government here and say that this suit for one

5   reason or another cannot proceed, is effectively to give carte

6   blanche to the President to assassinate any United States

7   citizen without judicial scrutiny ever being available.

8        MR. LETTER:  That is incorrect, Your Honor.  In our

9   reply brief we address this specifically, because Mr. Jaffer and

10  Ms. Kebriaei made this, as I recall, the opening sentence of

11  their reply.  We are making a far more limited argument.  We are

12  saying this is a -- well, obviously the next friend and third

13  party standing, those arguments are valid no matter what.  But

14  as far as things like the justiciability and political question

15  argument, we have made them --

16       THE COURT:  And state secrets.

17       MR. LETTER:  Exactly.  All of those are arguments that

18  depend on the specific situation that confronts the Court, and

19  that's why -- you used the word "ad hoc" and I said that's

20  right.  The political question doctrine is often very much

21  ad hoc, and the state secrets doctrine, whether something is to

22  be dismissed under state secrets, is absolutely ad hoc.  It

23  depends entirely on the specific situation that is involved.

24       So here, just to tick off a couple of them.  We have said

25  this involves a situation where -- claims of targeting, but when

1   there is a congressional authorization over -- use of force

2   overseas by the President as part of the President's commander

3   in chief authority to conduct military and related intelligence

4   gathering, et cetera, operations against somebody who is -- and

5   as we know here, there's been no refutation of this in any of

6   their papers -- somebody who's been formally and officially

7   designated as a specially designated global terrorist because of

8   his operational leadership of an organization that has also been

9   designated as terrorist, that is attempting to carry out

10  operations continually in order to kill Americans.

11      So we've made our justiciability arguments, again except

12  for next friend, et cetera, in this quite narrow context.  I

13  think it's -- I'm going to use the word it's ridiculous to say

14  that our argument leads to the conclusion that the President can

15  assassinate anybody he wants and there's no judicial -- nothing

16  that the judiciary can do about that.  That's just absurd.

17          THE COURT:  All right.  Thank you all for the lengthy

18  arguments and the lengthy briefs as well.  And I will consider

19  all of them as expeditiously as I can, and will decide, to begin

20  with, the issues presented in the government's motion to

21  dismiss.  If I decide to deny that motion, then you will hear

22  from me about further proceedings.  If I decide for one reason

23  or another to grant that motion, then you will receive that

24  decision and probably there will be no further proceedings.

25      But I will try to get a decision out as quickly as I can,

1    but don't look for it in a matter of days.  I think it's going

2    to take a little bit longer than that.  But thank you again for

3    the quality of the arguments.

4         (Proceedings adjourned at 4:54 p.m.)

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE