**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NASSER AL-AULAQI, on his own behalf and as next friend of Anwar Al-Aulaqi,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No.  10-1469 (JDB) |
| **BARACK H. OBAMA, in his official capacity as President of the United States; ROBERT M. GATES, in his official capacity as Secretary of Defense; and LEON E. PANETTA, in his official capacity as Director of the Central Intelligence Agency,** | |
| **Defendants.** | |

**<u>MEMORANDUM OPINION</u>**

On August 30, 2010, plaintiff Nasser Al-Aulaqi ("plaintiff") filed this action, claiming that the President, the Secretary of Defense, and the Director of the CIA (collectively, "defendants") have unlawfully authorized the targeted killing of plaintiff's son, Anwar Al-Aulaqi, a dual U.S.-Yemeni citizen currently hiding in Yemen who has alleged ties to al Qaeda in the Arabian Peninsula ("AQAP").  Plaintiff seeks an injunction prohibiting defendants from intentionally killing Anwar Al-Aulaqi "unless he presents a concrete, specific, and imminent threat to life or physical safety, and there are no means other than lethal force that could reasonably be employed to neutralize the threat."  <u>See</u> Compl., Prayer for Relief (c).  Defendants have responded with a motion to dismiss plaintiff's complaint on five threshold grounds: standing, the political question doctrine, the Court's exercise of its "equitable discretion," the

-1-

absence of a cause of action under the Alien Tort Statute ("ATS"), and the state secrets privilege.

This is a unique and extraordinary case. Both the threshold and merits issues present fundamental questions of separation of powers involving the proper role of the courts in our constitutional structure. Leading Supreme Court decisions from <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137 (1803), through Justice Jackson's celebrated concurrence in <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579 (1952), to the more recent cases dealing with Guantanamo detainees have been invoked to guide this Court's deliberations. Vital considerations of national security and of military and foreign affairs (and hence potentially of state secrets) are at play.

Stark, and perplexing, questions readily come to mind, including the following: How is it that judicial approval is required when the United States decides to target a U.S. citizen overseas for electronic surveillance, but that, according to defendants, judicial scrutiny is prohibited when the United States decides to target a U.S. citizen overseas for death? Can a U.S. citizen -- himself or through another -- use the U.S. judicial system to vindicate his constitutional rights while simultaneously evading U.S. law enforcement authorities, calling for "jihad against the West," and engaging in operational planning for an organization that has already carried out numerous terrorist attacks against the United States? Can the Executive order the assassination of a U.S. citizen without first affording him any form of judicial process whatsoever, based on the mere assertion that he is a dangerous member of a terrorist organization? How can the courts, as plaintiff proposes, make real-time assessments of the nature and severity of alleged threats to national security, determine the imminence of those threats, weigh the benefits and costs of possible diplomatic and military responses, and ultimately decide whether, and under what circumstances, the use of military force against such threats is justified? When would it

ever make sense for the United States to disclose in advance to the "target" of contemplated military action the precise standards under which it will take that military action?  And how does the evolving AQAP relate to core al Qaeda for purposes of assessing the legality of targeting AQAP (or its principals) under the September 18, 2001 Authorization for the Use of Military Force?

These and other legal and policy questions posed by this case are controversial and of great public interest.  "Unfortunately, however, no matter how interesting and no matter how important this case may be . . . we cannot address it unless we have jurisdiction."  United States v. White, 743 F.2d 488, 492 (7th Cir. 1984).  Before reaching the merits of plaintiff's claims, then, this Court must decide whether plaintiff is the proper person to bring the constitutional and statutory challenges he asserts, and whether plaintiff's challenges, as framed, state claims within the ambit of the Judiciary to resolve.  These jurisdictional issues pose "distinct and separate limitation[s], so that either the absence of standing or the presence of a political question suffices to prevent the power of the federal judiciary from being invoked by the complaining party."  Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 215 (1974) (internal citations omitted).

Although these threshold questions of jurisdiction may seem less significant than the questions posed by the merits of plaintiff's claims, "[m]uch more than legal niceties are at stake here" -- the "constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998).  Here, the jurisdictional hurdles that plaintiff must surmount are

both complex and at the heart of the intriguing nature of this case.  But "[a] court without jurisdiction is a court without power, no matter how appealing the case for exceptions may be," Bailey v. Sharp, 782 F.2d 1366, 1373 (7th Cir. 1986) (Easterbrook, J., concurring), and hence it is these threshold obstacles to reaching the merits of plaintiff's constitutional and statutory challenges that must be the initial focus of this Court's attention.  Because these questions of justiciability require dismissal of this case at the outset, the serious issues regarding the merits of the alleged authorization of the targeted killing of a U.S. citizen overseas must await another day or another (non-judicial) forum.

## **BACKGROUND**

This case arises from the United States's alleged policy of "authorizing, planning, and carrying out targeted killings, including of U.S. citizens, outside the context of armed conflict." See Compl. ¶ 13.  Specifically, plaintiff, a Yemeni citizen, claims that the United States has authorized the targeted killing of plaintiff's son, Anwar Al-Aulaqi, in violation of the Constitution and international law.  See id. ¶¶ 3-4, 9, 17, 21, 23.

Anwar Al-Aulaqi is a Muslim cleric with dual U.S.-Yemeni citizenship, who is currently believed to be in hiding in Yemen.  See id. ¶¶ 9, 26; see also Defs.' Mem. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") [Docket Entry 15], at 1; Pl.'s Mem. in Support of Pl.'s Mot. for Prelim. Inj. ("Pl.'s Mem.") [Docket Entry 3], Decl. of Ben Wizner ("Wizner Decl."), Ex. AA. Anwar Al-Aulaqi was born in New Mexico in 1971, and spent much of his early life in the United States, attending college at Colorado State University and receiving his master's degree from San Diego State University before moving to Yemen in 2004.  See Wizner Decl., Ex. AB, Decl. of Dr. Nasser Al-Aulaqi ("Al-Aulaqi Decl.") ¶¶ 3-4.  On July 16, 2010, the U.S. Treasury

Department's Office of Foreign Assets Control ("OFAC") designated Anwar Al-Aulaqi as a

Specially Designated Global Terrorist ("SDGT") in light of evidence that he was "acting for or on

behalf of al-Qa'ida in the Arabian Peninsula (AQAP)" and "providing financial, material or

technological support for, or other services to or in support of, acts of terrorism[.]"  See Defs.'

Mem. at 6-7 (quoting Designation of ANWAR AL-AULAQI Pursuant to Executive Order 13224

and the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594, 75 Fed. Reg. 43233 (July

16, 2010)) (hereinafter, "OFAC Designation").  In its designation, OFAC explained that Anwar

Al-Aulaqi had "taken on an increasingly operational role" in AQAP since late 2009, as he

"facilitated training camps in Yemen in support of acts of terrorism" and provided "instructions"

to Umar Farouk Abdulmutallab, the man accused of attempting to detonate a bomb aboard a

Detroit-bound Northwest Airlines flight on Christmas Day 2009.  See OFAC Designation.

Media sources have also reported ties between Anwar Al-Aulaqi and Nidal Malik Hasan, the

U.S. Army Major suspected of killing 13 people in a November 2009 shooting at Fort Hood,

Texas.  See, e.g., Wizner Decl., Exs. E, F, H, J, L, M, V, W.  According to a January 2010 Los

Angeles Times article, unnamed "U.S. officials" have discovered that Anwar Al-Aulaqi and

Hasan exchanged as many as eighteen e-mails prior to the Fort Hood shootings.  See id., Ex. E.

Recently, Anwar Al-Aulaqi has made numerous public statements calling for "jihad

against the West," praising the actions of "his students" Abdulmutallab and Hasan, and asking

others to "follow suit."  See, e.g., Wizner Decl., Ex. V; Defs.' Reply to Pl.'s Opp. to Defs.' Mot. to

Dismiss ("Defs.' Reply") [Docket Entry 29], Exs. 1-2; Defs.' Mem., Ex. 1, Unclassified Decl. of

James R. Clapper, Dir. of Nat'l Intelligence ("Clapper Decl.") ¶ 16.  Michael Leiter, Director of

the National Counterterrorism Center, has explained that Anwar Al-Aulaqi's "familiarity with the

West" is a "key concern[]" for the United States, see Defs.' Mem., Ex. 3, and media sources have similarly cited Anwar Al-Aulaqi's ability to communicate with an English-speaking audience as a source of "particular concern" to U.S. officials, see Wizner Decl., Ex. V.  But despite the United States's expressed "concern" regarding Anwar Al-Aulaqi's "familiarity with the West" and his "role in AQAP," see Defs.' Mem., Ex. 3, the United States has not yet publicly charged Anwar Al-Aulaqi with any crime.  See Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss ("Pl.'s Opp.") [Docket Entry 25], at 9.  For his part, Anwar Al-Aulaqi has made clear that he has no intention of making himself available for criminal prosecution in U.S. courts, remarking in a May 2010 AQAP video interview that he "will never surrender" to the United States, and that "[i]f the Americans want me, [they can] come look for me."  See Wizner Decl., Ex. V; see also Clapper Decl. ¶ 16; Defs.' Mem. at 14 n.5 (quoting Anwar Al-Aulaqi as stating, "I have no intention of turning myself in to [the Americans].  If they want me, let them search for me.").

Plaintiff does not deny his son's affiliation with AQAP or his designation as a SDGT. Rather, plaintiff challenges his son's alleged unlawful inclusion on so-called "kill lists" that he contends are maintained by the CIA and the Joint Special Operations Command ("JSOC").  See Pl.'s Mem. at 5; see also Compl. ¶¶ 3, 19.  In support of his claim that the United States has placed Anwar Al-Aulaqi on "kill lists," plaintiff cites a number of media reports, which attribute their information to anonymous U.S. military and intelligence sources.  See, e.g., Compl. ¶ 19; Pl.'s Mem. at 5; Wizner Decl., Exs. F, H, L.  For example, in January 2010, The Washington Post reported that, according to unnamed military officials, Anwar Al-Aulaqi was on "a shortlist of U.S. citizens" that JSOC was authorized to kill or capture.  See Wizner Decl., Ex. F.  A few months later, The Washington Post cited an anonymous U.S. official as stating that Anwar Al-

Aulaqi had become "the first U.S. citizen added to a list of suspected terrorists the CIA is authorized to kill." See id., Ex. L.  And in July 2010, National Public Radio announced -- on the basis of unidentified "[i]ntelligence sources" -- that the United States had already ordered "almost a dozen" unsuccessful drone and air-strikes targeting Anwar Al-Aulaqi in Yemen.  See id., Ex. S.

Based on these news reports, plaintiff claims that the United States has placed Anwar Al-Aulaqi on the CIA and JSOC "kill lists" without "charge, trial, or conviction."  See Compl. ¶ 1. Plaintiff alleges that individuals like his son are placed on "kill lists" after a "closed executive process" in which defendants and other executive officials determine that "secret criteria" have been satisfied.  See id. ¶ 21; Pl.'s Mem. at 5-6.  Plaintiff further avers "[u]pon information and belief" that once an individual is placed on a "kill list," he remains there for "months at a time." See Compl. ¶ 22; see also Pl.'s Mem. at 6; Wizner Decl., Ex. E (quoting unnamed U.S. officials as stating that "kill lists" are reviewed every six months and names are removed from the list if there is no longer intelligence linking the person to "known terrorists or [terrorist] plans"). Consequently, plaintiff argues, Anwar Al-Aulaqi is "now subject to a standing order that permits the CIA and JSOC to kill him . . . without regard to whether, at the time lethal force will be used, he presents a concrete, specific, and imminent threat to life, or whether there are reasonable means short of lethal force that could be used to address any such threat."  See Compl. ¶¶ 21, 23.

The United States has neither confirmed nor denied the allegation that it has issued a "standing order" authorizing the CIA and JSOC to kill plaintiff's son.  See Defs.' Mem. at 36; see also Mot. Hr'g Tr. [Docket Entry 30] 17:24-18:1, Nov. 8, 2010.  Additionally, the United States has neither confirmed nor denied whether -- if it has, in fact, authorized the use of lethal force against plaintiff's son -- the authorization was made with regard to whether Anwar Al-Aulaqi

presents a concrete, specific, and imminent threat to life, or whether there were reasonable means short of lethal force that could be used to address any such threat.  <u>See</u> Defs.' Mem. at 36.  The United States has, however, repeatedly stated that if Anwar Al-Aulaqi "were to surrender or otherwise present himself to the proper authorities in a peaceful and appropriate manner, legal principles with which the United States has traditionally and uniformly complied would prohibit using lethal force or other violence against him in such circumstances."  <u>Id.</u> at 2; <u>see also</u> Mot. Hr'g Tr. 15:2-9.

Nevertheless, plaintiff alleges that due to his son's inclusion on the CIA and JSOC "kill lists," Anwar Al-Aulaqi is in "hiding under threat of death and cannot access counsel or the courts to assert his constitutional rights without disclosing his whereabouts and exposing himself to possible attack by Defendants."  Compl. ¶ 9; <u>see also id.</u> ¶ 26; Al-Aulaqi Decl. ¶ 10 (stating that "[b]ecause the U.S. government is seeking to kill my son, as reported, he cannot access legal assistance or a court without risking his life").  Plaintiff therefore brings four claims -- three constitutional, and one statutory -- on his son's behalf.  He asserts that the United States's alleged policy of authorizing the targeted killing of U.S. citizens, including plaintiff's son, outside of armed conflict, "in circumstances in which they do not present concrete, specific, and imminent threats to life or physical safety, and where there are means other than lethal force that could reasonably be employed to neutralize any such threat," violates (1) Anwar Al-Aulaqi's Fourth Amendment right to be free from unreasonable seizures and (2) his Fifth Amendment right not to be deprived of life without due process of law.  <u>See</u> Compl. ¶¶ 27-28.  Plaintiff further claims that (3) the United States's refusal to disclose the criteria by which it selects U.S. citizens like plaintiff's son for targeted killing independently violates the notice requirement of the Fifth

Amendment Due Process Clause.  See id. ¶ 30.  Finally, plaintiff brings (4) a statutory claim

under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, alleging that the United States's "policy

of targeted killings violates treaty and customary international law."  See id. ¶ 29.

Plaintiff seeks both declaratory and injunctive relief.  First, he requests a declaration that,

outside of armed conflict, the Constitution prohibits defendants "from carrying out the targeted

killing of U.S. citizens," including Anwar Al-Aulaqi, "except in circumstances in which they

present a concrete, specific, and imminent threat to life or physical safety, and there are no means

other than lethal force that could reasonably be employed to neutralize the threat."  See Compl.,

Prayer for Relief (a); id. ¶ 6; Pl.'s Mem. at 39-40.  Second, plaintiff requests a declaration that,

outside of armed conflict, "treaty and customary international law" prohibit the targeted killing of

all individuals -- regardless of their citizenship -- except in those same, limited circumstances.

See Compl., Prayer for Relief (b); id. ¶ 6; Pl.'s Mem. at 40.  Third, plaintiff requests a

preliminary injunction prohibiting defendants from intentionally killing Anwar Al-Aulaqi "unless

he presents a concrete, specific, and imminent threat to life or physical safety, and there are no

means other than lethal force that could reasonably be employed to neutralize the threat."  See

Compl., Prayer for Relief (c); Pl.'s Mem. at 40.  Finally, plaintiff seeks an injunction ordering

defendants to disclose the criteria that the United States uses to determine whether a U.S. citizen

will be targeted for killing.  See Compl., Prayer for Relief (d); id. ¶ 6; Pl.'s Mem. at 40.

Presently before the Court is defendants' motion to dismiss plaintiff's complaint on five

distinct grounds: (1) standing; (2) political question; (3) "equitable discretion"; (4) lack of a

cause of action under the ATS; and (5) the state secrets privilege.  See Defs.' Mot. at 1.  On

November 8, 2010, this Court held a motions hearing on plaintiff's motion for a preliminary

injunction and defendants' motion to dismiss, and heard nearly three hours of argument from counsel for the parties.

## STANDARD OF REVIEW

Defendants assert three primary grounds for dismissal, arguing that (1) plaintiff fails to state an ATS claim upon which relief can be granted; (2) plaintiff lacks standing to bring his three constitutional claims; and (3) all of plaintiff's claims -- both statutory and constitutional -- present non-justiciable political questions. See Defs.' Mot. at 1; see also Mot. Hr'g Tr. 37:3-5 (in which defendants state that plaintiff's constitutional claims and his ATS claim are barred by the political question doctrine). The first of these three grounds for dismissal constitutes a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, whereas the latter two challenge subject matter jurisdiction and must be evaluated under Rule 12(b)(1). See Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987) (stating that "the defect of standing is a defect in subject matter jurisdiction"); Gonzalez-Vera v. Kissinger, 449 F.3d 1260, 1262 (D.C. Cir. 2006) (explaining that a dismissal under the political question doctrine constitutes a dismissal for lack of subject matter jurisdiction and "not an adjudication on the merits"). "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see Leatherman v. Tarrant Cnty. Narcotics and Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979). In other words, the factual allegations in the plaintiff's complaint must be presumed true, and the plaintiff must be given every favorable inference that may be drawn from the allegations of fact. Scheuer, 416 U.S. at 236; Sparrow v. United Air Lines, Inc.,

216 F.3d 1111, 1113 (D.C. Cir. 2000).  At the same time, however, the Court need not accept as

true "a legal conclusion couched as a factual allegation," nor need it accept inferences that are

unsupported by the facts set forth in the complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d

178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Under Rule 12(b)(1), the party seeking to invoke the jurisdiction of a federal court --

plaintiff in this case -- bears the burden of establishing that the court has jurisdiction to hear his

claims.  See U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000); Grand

Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (explaining

that a court has an "affirmative obligation to ensure that it is acting within the scope of its

jurisdictional authority"); Pitney Bowes, Inc. v. U.S. Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C.

1998).  Since the elements necessary to establish jurisdiction are "not mere pleading

requirements but rather an indispensable part of the plaintiff's case, each element must be

supported in the same way as any other matter on which the plaintiff bears the burden of proof;

i.e., with the manner and degree of evidence required at successive stages of the litigation."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  Although courts examining a Rule

12(b)(1) motion to dismiss -- such as for lack of standing -- will "construe the complaint in favor

of the complaining party," see Warth v. Seldin, 422 U.S. 490, 501 (1975), the "'plaintiff's factual

allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in

resolving a 12(b)(6) motion for failure to state a claim," Grand Lodge, 185 F. Supp. 2d at 13-14

(quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d

ed. 1987)).  Thus, a court may consider material other than the allegations of the complaint in

determining whether it has jurisdiction to hear the case, so long as the court accepts the factual

allegations in the complaint as true.  See Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249,

1253-54 (D.C. Cir. 2005); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3

(D.C. Cir. 1997); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

        To survive a motion to dismiss under Rule 12(b)(6), a complaint need only contain "'a

short and plain statement of the claim showing that the pleader is entitled to relief,'" such that the

defendant has "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47

(1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam).  Although "detailed

factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, a plaintiff

must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a

cause of action" in order to provide the "grounds" of "entitle[ment] to relief."  Twombly, 550

U.S. at 555-56; see also Papasan, 478 U.S. at 286.  Instead, "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft

v. Iqbal, --- U.S. ----, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570);

Atherton v. Dist. of Columbia Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009).  A

complaint is considered plausible on its face "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  Iqbal, 129 S. Ct. at 1949.  This amounts to a "two-pronged approach," under which a

court first identifies the factual allegations that are entitled to an assumption of truth and then

determines "whether they plausibly give rise to an entitlement to relief."  Id. at 1950-51.

# DISCUSSION

## I.    Standing

Before this Court may entertain the merits of his claims, plaintiff, as the party invoking

federal jurisdiction, must establish that he has the requisite standing to sue.  See Lujan, 504 U.S.

at 560-61.  Article III of the U.S. Constitution "limits the 'judicial power' of the United States to

the resolution of 'cases' and 'controversies,'" Valley Forge Christian Coll. v. Am. United for

Separation of Church and State, Inc., 454 U.S. 464, 471 (1982), and the doctrine of standing

serves to identify those "'Cases' and 'Controversies' that are of the justiciable sort referred to in

Article III" and which are thus "'appropriately resolved through the judicial process,'" Lujan, 504

U.S. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)).  "In essence the question

of standing is whether the litigant is entitled to have the court decide the merits of the dispute or

of particular issues."  See Warth, 422 U.S. at 498.

Standing doctrine encompasses "both constitutional limitations on federal-court

jurisdiction and prudential limitations on its exercise."  Id.  To establish the "irreducible

constitutional minimum of standing," a plaintiff must allege (1) an "injury in fact" which is "(a)

concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a

causal connection between the injury and the conduct complained of"; and (3) a likelihood "that

the injury will be redressed by a favorable decision."  Lujan, 504 U.S. at 560-61 (internal

quotation marks and citations omitted).  A "particularized" injury is defined as one that "affect[s]

the plaintiff in a personal and individual way."  Id. at 561 n.1.  Thus, Article III "requires the

party who invokes the court's authority to 'show that he personally has suffered some actual or

threatened injury as a result of the putatively illegal conduct of the defendant.'"  Valley Forge,

454 U.S. at 472 (quoting <u>Gladstone, Realtors v. Village of Bellwood</u>, 441 U.S. 91, 99 (1979))

(emphasis added).

Closely related to the constitutional requirement that a plaintiff must suffer a "personal"

injury to establish standing is the prudential requirement that a "plaintiff generally must assert his

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of

third parties." <u>Warth</u>, 422 U.S. at 499; <u>see also</u> <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984).  This

"self-imposed" judicial limitation on the exercise of federal jurisdiction serves dual purposes, as

it helps to prevent "the adjudication of rights which those not before the Court may not wish to

assert" and also seeks to ensure "that the most effective advocate of the rights at issue is present

to champion them." <u>Duke Power Co. v. Carolina Envtl. Study Group, Inc.</u>, 438 U.S. 59, 80

(1978).  Nevertheless, since the prohibition against one party asserting the legal rights of another

is prudential -- not constitutional -- the Supreme Court may "recognize[] exceptions to this

general rule," <u>see</u> <u>Coalition of Clergy, Lawyers, & Professors v. Bush</u>, 310 F.3d 1153, 1160 (9th

Cir. 2002), and it has done so in "narrowly limited" circumstances, <u>see</u> <u>Duke Power Co.</u>, 438

U.S. at 80.  The doctrines of "next friend" and "third party" standing constitute two such limited

exceptions to the general rule that a party may not bring suit to vindicate the legal rights of

another.  <u>See</u> <u>Whitmore</u>, 495 U.S. at 162-65; <u>Powers v. Ohio</u>, 499 U.S. 400, 410-11 (1991).

In his complaint, plaintiff purports to bring three constitutional claims as his son's "next

friend."  <u>See</u> Compl. ¶¶ 27-28, 30.  First, he claims that the United States's alleged policy of

authorizing the targeted killing of U.S. citizens, including his son, outside of armed conflict, and

"in circumstances in which they do not present concrete, specific, and imminent threats to life or

physical safety, and where there are means other than lethal force that could reasonably be

employed to neutralize any such threat," violates Anwar Al-Aulaqi's Fourth Amendment right to be free from unreasonable seizures.  See id. ¶ 27.  Second, plaintiff argues that this targeted killing policy violates Anwar Al-Aulaqi's Fifth Amendment right not to be deprived of life without due process of law.  See id. ¶ 28.  Third, plaintiff alleges that the failure to disclose the criteria by which U.S. citizens like Anwar Al-Aulaqi are selected for targeted killing violates those citizens' rights to notice under the Fifth Amendment Due Process Clause.  See id. ¶ 30.  In opposing defendants' motion to dismiss, plaintiff asserts an additional basis for raising these claims, maintaining that he also has third party standing to sue on his son's behalf.  See Pl.'s Opp. at 2-6, 11-15.  The Court will address plaintiff's arguments in support of "next friend" standing and third party standing in turn.[1]

A.    Next Friend Standing

"Next friend" standing originated in connection with petitions for habeas corpus, as early American courts allowed "next friends" to appear "on behalf of detained prisoners who [were] unable, usually because of mental incompetence or inaccessibility, to seek relief themselves."

---

[1]  Any contention that plaintiff has "direct party" or "individual" standing to bring claims alleging violations of his son's constitutional rights is mistaken.  Plaintiff does not assert that the alleged targeted killing of his son would violate plaintiff's own constitutional right to maintain a relationship with his adult child.  Nor could he.  See Butera v. Dist. of Columbia, 235 F.3d 637, 656 (D.C. Cir. 2001) (foreclosing the possibility of such a claim by holding that "a parent does not have a constitutionally-protected liberty interest in the companionship of a child who is past minority and independent").  Instead, plaintiff argues that the alleged inclusion of his son on a "kill list" violates plaintiff's son's rights under the Fourth and Fifth Amendments.  See Compl. ¶¶ 27-28, 30.  Thus, it is plaintiff's son -- and not plaintiff -- who would have "direct party" standing to pursue these claims.  See, e.g., Reed v. Islamic Republic of Iran, 439 F. Supp. 2d 53, 62 (D.D.C. 2006) (explaining that son's allegations that his father was subject to "torture, arbitrary and prolonged detention and hostage taking are third party claims because they arise from acts perpetrated against the plaintiff's father" and it is therefore the father, not the son, "who has direct party standing to bring an action on these claims.")

<u>See</u> <u>Whitmore</u>, 495 U.S. at 162.  Congress statutorily authorized "next friend" standing in the habeas corpus context in 1948, amending the habeas corpus statute to allow petitions to be "'signed and verified by the person for whose relief it is intended *or by someone acting in his behalf.*'"  <u>See</u> <u>id.</u> at 162-63 (quoting 28 U.S.C. § 2242) (emphasis in original).  In <u>Whitmore v. Arkansas</u>, the Supreme Court expressly declined to decide whether congressional authorization -- like that provided by 28 U.S.C. § 2242 -- is necessary to confer "next friend" standing outside the habeas corpus context.  <u>See</u> <u>id.</u> at 164-65.  The Court noted, however, that to the extent parties may ever invoke a "federal doctrine of 'next friend' standing" in non-habeas proceedings, the scope of that doctrine "is no broader than what is permitted by the habeas corpus statute, which codified the historical practice."  <u>Id.</u>

After examining "[d]ecisions applying the habeas corpus statute," the <u>Whitmore</u> Court set forth "two firmly rooted prerequisites" that must be satisfied in order for an individual to be accorded standing to proceed as another's "next friend."  <u>See</u> <u>id.</u> at 163.  First, the putative "'next friend' must provide an adequate explanation - such as inaccessibility, mental incompetence, or other disability - why the real party in interest cannot appear on his own behalf to prosecute the action."  <u>Id.</u>  Second, "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate."  <u>Id.</u>  The <u>Whitmore</u> Court further suggested that -- while not necessarily a "firmly rooted prerequisite" to "next friend" standing -- a "next friend" must also "have some significant relationship with the real party in interest."  <u>Id.</u> at 164.  The burden is on the putative "next friend" to prove "the propriety of his status and thereby justify the jurisdiction of the court."  <u>Id.</u>  Even where the requirements of "next friend" standing are met, the "'next friend' does not himself become a party to the . . . action in which he participates, but

-16-

simply pursues the cause on behalf of the . . . real party in interest." Id. at 163.  Thus, the "next

friend" relies "wholly on the injury to the real party in interest to satisfy constitutional standing

requirements." Id. at 178 n.6 (Marshall, J., dissenting).[2]

        1.    *Anwar Al-Aulaqi's Access to the Courts*

Plaintiff has failed to provide an adequate explanation for his son's inability to appear on

his own behalf, which is fatal to plaintiff's attempt to establish "next friend" standing.[3]   In his

complaint, plaintiff maintains that his son cannot bring suit on his own behalf because he is "in

hiding under threat of death" and any attempt to access counsel or the courts would "expos[e]

him[] to possible attack by Defendants."  Compl. ¶ 9; see also id. ¶ 26; Al-Aulaqi Decl. ¶ 10.

But while Anwar Al-Aulaqi may have chosen to "hide" from U.S. law enforcement authorities,

there is nothing preventing him from peacefully presenting himself at the U.S. Embassy in

---

    [2] Hence, if plaintiff satisfies the criteria for "next friend" standing, the Court would need to conduct a further inquiry to determine whether Anwar Al-Aulaqi meets the constitutional standing requirements of injury in fact, causation, and redressability.

    [3] Plaintiff is correct that for purposes of a motion to dismiss for lack of standing, the trial court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth, 422 U.S. at 501; see Pl.'s Opp. at 5 n.2. However, in the context of "next friend" standing, courts have refused -- even at the pleading stage -- to accept unsubstantiated allegations that the real party in interest is "incompetent" or "lacks access to the courts"; rather, courts have required that claims pertaining to incompetency or inaccessibility have some "support in the record." See, e.g., Demonsthenes v. Baal, 495 U.S. 731, 736 (1990) (refusing to grant next friend standing where state court determination that real party in interest was competent was "fairly supported by the record"); Diamond v. Charles, 476 U.S. 54, 67 (1986) (explaining that father lacked standing to sue on his daughter's behalf because he had failed "to adduce factual support" that his daughter "is currently a minor or that she is otherwise incapable of asserting her own rights"); Coalition of Clergy, 310 F.3d at 1160 (finding an evidentiary hearing on "inaccessibility" unnecessary where putative "next friend" failed to make even "a preliminary showing that upon remand it could prove" that the real parties in interest lacked access to the courts under Whitmore).  This Court thus need not accept plaintiff's bald assertion that his son lacks access to the courts if "the record makes clear the contrary." See Coalition of Clergy, 310 F.3d at 1160 n.2.

Yemen and expressing a desire to vindicate his constitutional rights in U.S. courts.  Defendants

have made clear -- and indeed, both international and domestic law would require -- that if

Anwar Al-Aulaqi were to present himself in that manner, the United States would be

"prohibit[ed] [from] using lethal force or other violence against him in such circumstances."  See

Defs.' Mem. at 2; see also id. at 5, 13-14; Mot. Hr'g Tr. 15:6-8 (government counsel states that "if

[Anwar Al-Aulaqi] does present himself, he is under no danger of the United States government

using lethal force" against him); Geneva Convention Relative to the Treatment of Prisoners of

War art. 3, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (explaining that "[i]n the case of

armed conflict not of an international character," a party to the conflict is prohibited from using

"violence to life and person" with respect to individuals "who have laid down their arms");

Hamdan v. Rumsfeld, 548 U.S. 557, 629-32 (2006) (holding that Geneva Convention Common

Article 3 applies to the current U.S. conflict with al Qaeda); Tennessee v. Garner, 471 U.S. 1, 11

(1985) (explaining in the domestic law enforcement context that "[a] police officer may not seize

an unarmed, nondangerous suspect by shooting him dead").

Plaintiff argues that to accept defendants' position -- that Anwar Al-Aulaqi can access the

U.S. judicial system so long as he "surrenders" -- "would require the Court to accept at the

standing stage what is disputed on the merits," since the Court would then be acknowledging that

Anwar Al-Aulaqi is, in fact, currently "a participant in an armed conflict against the United

States."  See Pl.'s Opp. at 9.  Not so.  The Court's conclusion that Anwar Al-Aulaqi can access

the U.S. judicial system by presenting himself in a peaceful manner implies no judgment as to

Anwar Al-Aulaqi's status as a potential terrorist.  All U.S. citizens may avail themselves of the

U.S. judicial system if they present themselves peacefully, and no U.S. citizen may

simultaneously avail himself of the U.S. judicial system and evade U.S. law enforcement authorities.  Anwar Al-Aulaqi is thus faced with the same choice presented to all U.S. citizens.[4]

It is certainly possible that Anwar Al-Aulaqi could be arrested -- and imprisoned -- if he were to come out of hiding to seek judicial relief in U.S. courts.  Without expressing an opinion as to the likelihood of Anwar Al-Aulaqi's future arrest or imprisonment, it is significant to note that an individual's incarceration does not render him unable to access the courts within the meaning of Whitmore.  See Avent v. Dist. of Columbia, 2009 WL 387668, at *1 (D.D.C. Feb. 13, 2009) (finding that parent lacked "next friend" standing to pursue claim on behalf of her incarcerated and mentally capable adult child); see also Arocho v. Camp Hill Corr. Facilities, 417 F. Supp. 2d 661, 662 (M.D. Pa. 2005) (denying father "next friend" standing to sue on behalf of his incarcerated adult son, who "had access to prison legal sources" and was fully capable of prosecuting the case on his own behalf).  Indeed, "prisoners can, and do, bring civil suits all the time."  Avent, 2009 WL 387668, at *1.  Given that an individual's actual incarceration is insufficient to show that he lacks access to the courts, the mere prospect of Anwar Al-Aulaqi's future incarceration fails to satisfy Whitmore's "inaccessibility" requirement.

---

[4]  In fact, it is possible that Anwar Al-Aulaqi would not even need to emerge from "hiding" in order to seek judicial relief.  The use of videoconferencing and other technology has made civil judicial proceedings possible even where the plaintiff himself cannot physically access the courtroom.  For example, courts frequently entertain habeas corpus petitions from detainees at Guantanamo Bay despite the fact that those detainees are not present in the courtroom.  See, e.g., Al-Maqaleh v. Gates, 604 F. Supp. 2d 205, 228 (D.D.C. 2009), rev'd and remanded on other grounds, 605 F.3d 84 (D.C. Cir. 2010) (explaining that "real-time video conferencing provides a workable substitute for an in-court appearance" and noting that this "is the process being used in scores of Guantanamo habeas proceedings now taking place in this District Court, in which no Guantanamo detainee has been physically transferred here").  There is no reason why -- if Anwar Al-Aulaqi wanted to seek judicial relief but feared the consequences of emerging from hiding -- he could not communicate with attorneys via the Internet from his current place of hiding.

Plaintiff argues, however, that if his son were to seek judicial relief, he would not be detained as an ordinary federal prisoner, but instead would be subject to "indefinite detention without charge."  See Pl.'s Opp. at 14; see also Mot. Hr'g Tr. 64:10-12.  It is true that courts have, in some instances, granted "next friend" standing to enemy combatants being held "incommunicado."  For example, in Padilla v. Rumsfeld, 352 F.3d 695 (2d Cir. 2003), *rev'd and remanded on other grounds*, 542 U.S. 426 (2004), the Second Circuit granted an attorney "next friend" standing to file a habeas petition on behalf of an American citizen who was being detained as an enemy combatant at a U.S. naval base in South Carolina.  See id. at 700, 703.  The court in Padilla had little difficulty concluding that the real party in interest was unable to "access the courts" under Whitmore, as he had been denied "any contact with his counsel, his family or any other non-military personnel" for eighteen months.  See id.  Similarly, in Hamdi v. Rumsfeld, 296 F.3d 278 (4th Cir. 2002), *vacated on other grounds,* 542 U.S. 507 (2004), the Fourth Circuit permitted the father of a military detainee to petition the court on his son's behalf, see id. at 280, as the son was being "held incommunicado and subjected to an infinite detention . . . without access to a lawyer," see Hamdi v. Rumsfeld, 243 F. Supp. 2d 527, 528 (E.D. Va. 2002).

But unlike the detainees in Padilla and Hamdi, Anwar Al-Aulaqi is not in U.S. custody, nor is he being held incommunicado against his will.  To the extent that Anwar Al-Aulaqi is currently incommunicado, that is the result of his own choice.  Moreover, there is reason to doubt whether Anwar Al-Aulaqi is, in fact, incommunicado.  Since his alleged period of hiding began in January 2010, see Al-Aulaqi Decl. ¶ 8, Anwar Al-Aulaqi has communicated with the outside world on numerous occasions, participating in AQAP video interviews and publishing online

-20-

articles in the AQAP magazine Inspire.  See, e.g., Defs.' Mem. at 14 n.5 (describing May 2010

AQAP video interview with Anwar Al-Aulaqi); Clapper Decl. ¶ 16 (same); Wizner Decl., Ex. V

(same); Defs.' Reply at 4 (referencing April 2010 and July 2010 Inspire articles written by Anwar

Al-Aulaqi); Defs.' Reply, Exs. 1-2 (providing copies of Anwar Al-Aulaqi's April 2010 and July

2010 Inspire articles).  Anwar Al-Aulaqi has continued to use his personal website to convey

messages to readers worldwide, see Wizner Decl., Ex. V, and a July 2010 online article written

by Anwar Al-Aulaqi advises readers that they "may contact Shayk [Anwar] Al-Aulaqi through

any of the emails listed on the contact page."  See Defs.' Reply at 4 n.4; id., Ex. 2.  Needless to

say, Anwar Al-Aulaqi's access to e-mail renders the circumstances of his existing, self-made

"confinement" far different than the confinement of the detainees in Padilla and Hamdi.

        Even if Anwar Al-Aulaqi were to be captured and detained, the conditions of his

confinement would still need to be akin to those in Padilla and Hamdi before his father could be

accorded standing to proceed as Anwar Al-Aulaqi's "next friend."  In cases brought by purported

"next friends" on behalf of detainees at Guantanamo Bay, courts have not presumed that the

detainees lack access to the U.S. judicial system, but have required the would-be "next friends" to

make a showing of inaccessibility.  See, e.g., Ahmed v. Bush, 2005 WL 6066070, at *1-2

(D.D.C. May 25, 2005) (ordering supplemental briefing to substantiate petitioner's claim to "next

friend" standing where petition had merely "presume[d], rather than demonstrate[d] through

facts, that [the detainee] ha[d] been denied access to the courts of the United States");

Fenstermaker v. Bush, 2007 WL 1705068, at *6 (S.D.N.Y. June 12, 2007) (finding that "next

friend" lacked standing to proceed, in part because he was "unable to demonstrate that the

Detainees cannot appear on their own behalf"); Does 1-570 v. Bush, 2006 WL 3096685, at *5

(D.D.C. Oct. 31, 2006) (questioning whether petitioners satisfied <u>Whitmore</u> "inaccessibility" requirement in light of evidence that Guantanamo Bay detainees have "been able to file petitions before the Court in large numbers").

Because Anwar Al-Aulaqi has not yet been detained, it is impossible to determine whether the nature of any such hypothetical detention would be more similar to that in <u>Padilla</u> and <u>Hamdi</u>, or to the Guantanamo Bay cases in which detainees have been found capable of bringing suit on their own behalf.  Regardless, the mere prospect of future detention is insufficient to warrant a finding that Anwar Al-Aulaqi currently lacks access to the courts.

2.      *Plaintiff's Dedication to Anwar Al-Aulaqi's "Best Interests"*

Not only has plaintiff failed to prove that Anwar Al-Aulaqi lacks access to the courts, but he has also failed to show that he is "truly dedicated" to Anwar Al-Aulaqi's "best interests." Plaintiff states that, as Anwar Al-Aulaqi's father, he "only wants to do what is in his [son's] best interests."  <u>See</u> Al-Aulaqi Decl. ¶ 11.  He further maintains that "he believe[s] taking legal action to stop the United States from killing [his] son is in his [son's] best interests."  <u>Id.</u>  Accepting these statements as true, they are nonetheless insufficient to establish that this lawsuit accords with Anwar Al-Aulaqi's best interests within the meaning of <u>Whitmore</u>.

Under the second prong of <u>Whitmore</u>, a purported "next friend" may not simply speculate as to the best interests of the party on whose behalf he seeks to litigate.  <u>See</u> <u>Does 1-570</u>, 2006 WL 3096685, at *5.  Rather, the "next friend" must provide some evidence that he is acting in accordance with the intentions or wishes of the real party in interest.  <u>See</u> <u>id.</u>  Courts have therefore refused to grant "next friend" standing where the putative "next friend" has never conferred with the party in interest and, as a result, can offer no "basis on which to conclude that

the [party] want[s] legal representation as a general matter or more specifically by counsel in the instant matter." Id.; see also Idris v. Obama, 667 F. Supp. 2d 25, 29 (D.D.C. 2009) (holding that "because [the putative 'next friend'] has never met with petitioner since his confinement, counsel cannot be certain that [the 'next friend'] represents petitioner's best interests").

In Does 1-570, the court denied standing to attorneys seeking to file habeas petitions as "next friends" on behalf of hundreds of unidentified Guantanamo Bay detainees with whom they had never met. See Does 1-570, 2006 WL 3096685, at *5, *8. As the court explained, "[w]hile it may be fair to assume that the detainees want to be released from detention in Guantanamo Bay, there may be reasons why detainees may not want to file habeas petitions as a vehicle for accomplishing this purpose." Id. at *6. For example, the court noted, "certain detainees may mistrust the United States judicial system and choose to avoid participating in such proceedings altogether." Id. Absent proof as to the specific "interests and preferences" of the detainees on whose behalf they sought to litigate, the attorneys in Does 1-570 could not meet "the requirements of 'next friend' standing pursuant to the second prong of Whitmore." See id. at *4, *5; see also Fenstermaker, 2007 WL 1705068, at *6 n. 10 (refusing to accord "next friend" standing to attorney seeking to represent Guantanamo Bay detainees when attorney conceded that if consulted, the detainees might express their desire to become "martyrs" rather than to litigate).

Here, plaintiff has presented no evidence that his son wants to vindicate his U.S. constitutional rights through the U.S. judicial system. Plaintiff concedes that he has not spoken to Anwar Al-Aulaqi since he was allegedly first targeted for "killing" by the United States, see Compl. ¶ 26; Al-Aulaqi Decl. ¶ 9; Pl.'s Opp. at 7, and hence plaintiff "cannot be certain that [he] represents [Anwar Al-Aulaqi's] best interests," see Idris, 667 F. Supp. 2d at 29. Although

plaintiff maintains that his son's "public silence with respect to the present lawsuit" supports an inference that Anwar Al-Aulaqi does not object to this litigation, see Pl.'s Opp. at 10, plaintiff cannot base his claim to "next friend" standing on his son's mere failure to expressly disavow this suit.  Rather, plaintiff bears the burden of showing that this action accords with his son's best interests.  See Whitmore, 495 U.S. at 164 (explaining that "[t]he burden is on the 'next friend' clearly to establish the propriety of his status and thereby justify the jurisdiction of the court").

Indeed, to the extent that Anwar Al-Aulaqi has made his personal preferences known, he has indicated precisely the opposite -- i.e., that he believes it is not in his best interests to prosecute this case.  According to plaintiff's complaint, the media first reported that Anwar Al-Aulaqi had been added to the JSOC "kill list" as early as January 2010.  See Compl. ¶ 19.  However, at no point has Anwar Al-Aulaqi sought to challenge his alleged inclusion on the CIA or JSOC "kill lists," nor has he communicated any desire to do so.  Although plaintiff maintains that "Anwar Al-Aulaqi cannot communicate with his father or counsel without endangering his own life," see Compl. ¶ 26 (emphasis added), this contention is belied by the numerous public statements that Anwar Al-Aulaqi has made since his alleged period of hiding began.  Several times during the past ten months, Anwar Al-Aulaqi has publicly expressed his desire for "jihad against the West," see Defs.' Reply, Ex. 2, and he has called upon Muslims to meet "American aggression" not with "pigeons and olive branches" but "with bullets and bombs."  See id., Ex. 1.  Given that Anwar Al-Aulaqi has been able to make such controversial statements with impunity, there is no reason to believe that he could not convey a desire to sue without somehow placing his life in danger.  Under these circumstances, the fact that Anwar Al-Aulaqi has chosen not to communicate any such desire strongly supports the inference that he does not want to litigate in

the U.S. courts.

This inference is further corroborated by the content of Anwar Al-Aulaqi's public statements, in which he has decried the U.S. legal system and suggested that Muslims are not bound by Western law.  As recently as April 2010, Anwar Al-Aulaqi wrote an article for the AQAP publication Inspire, in which he asserted that Muslims "should not be forced to accept rulings of courts of law that are contrary to the law of Allah."  See Defs.' Reply, Ex. 1.  According to Anwar Al-Aulaqi, Muslims need not adhere to the laws of the "civil state," since "the modern civil state of the West does not guarantee Islamic rights."  Id.  In a July 2010 Inspire article, Anwar Al-Aulaqi again expressed his belief that because Western "government, political parties, the police, [and] the intelligence services . . . are part of a system within which the defamation of Islam is . . . promoted . . . the attacking of any Western target [is] legal from an Islamic viewpoint."  Id., Ex. 2.  He went on to argue that a U.S. civilian who drew a cartoon depiction of Mohammed should be "a prime target of assassination" and that "[a]ssassinations, bombings, and acts of arson" constitute "legitimate forms of revenge against a system that relishes the sacrilege of Islam in the name of freedom."  Id.

Such statements -- which reveal a complete lack of respect for U.S. law and governmental structures as well as a belief that it is "legal" and "legitimate" to violate U.S. law -- do not reflect the views of an individual who would likely want to sue to vindicate his U.S. constitutional rights in U.S. courts.  After all, the substantive rights that are being asserted in this case are only provided to Anwar Al-Aulaqi by the U.S. Constitution and international law.  Yet he has made clear his belief that "international treaties" do not govern Muslims, and that Muslims are not bound by any law -- U.S., international, or otherwise -- that conflicts with the "law of Allah."

See id., Ex. 1.  There is, then, reason to doubt that Anwar Al-Aulaqi would even regard a ruling

from this Court as binding -- much less that he would want to litigate in order to obtain such a

ruling.  Anwar Al-Aulaqi's public statement that "[i]f the Americans want me, [they can] come

look for me" provides further evidence that he has no intention of making himself the subject of

litigation in U.S. courts.  See Wizner Decl., Ex. V; see also Defs.' Mem. at 14 n.5 (quoting

Anwar Al-Aulaqi as stating, "I have no intention of turning myself in . . . [i]f they want me, let

them search for me.").  In light of such remarks, this Court cannot conclude that Anwar Al-

Aulaqi believes "taking legal action to stop the United States from killing" him would be in his

"best interests."  See Al-Aulaqi Decl. ¶ 11.  While he may very well wish to avoid targeted

killing by the United States, all available evidence indicates that he does not wish "to file [suit]

as a vehicle for accomplishing this purpose."  See Does 1-570, 2006 WL 3096685, at *6.

        Plaintiff's mere assertion of a per se rule that a parent meets the "best interests" test does

not satisfy his burden of showing that he is acting in accordance with his son's best interests,

especially in the face of his son's numerous public statements suggesting the contrary.  See Pl.'s

Opp. at 6 (citing Vargas ex rel. Sagastegui v. Lambert, 159 F.3d 1161, 1168 (9th Cir. 1998)).

Although "[t]he existence of a significant relationship enhances the probability" that a putative

next friend "knows and is dedicated to the [absent party's] individual best interests," Coalition of

Clergy, 310 F.3d at 1162, courts have refused to infer -- simply on the basis of a close familial tie

-- that a putative "next friend" actually represents the absent party's best interests.  See, e.g.,

Anthem Life Ins. Co. v. Olguin, 2007 WL 1390672, at *2 (E.D. Cal. May 9, 2007) (explaining

that "a parent is not entitled to be the next friend of his or her child as a matter of absolute right"

and noting that "the best interests of a child and the best interests of even a loving parent can

-26-

conflict"); Finan v. Good Earth Tools, Inc., 2007 WL 1452246, at *2 (E.D. Mo. May 15, 2007)

(closely examining whether husband's interests might conflict with those of his incompetent wife

before allowing husband to file suit as his wife's "next friend").  In other words, where a party's

own views as to his best interests appear to conflict with those of a putative "next friend," a court

cannot substitute the views of the would-be "next friend" for those of the absent party, even

where the purported "next friend" is a loving parent who only wants what he rationally believes

to be in the best interests of his adult child.  See Gilmore v. Utah, 429 U.S. 1012, 1017 (1976).

Thus, courts have uniformly denied "next friend" standing to parents of death row inmates

seeking to stay their adult children's executions where the inmate is mentally competent and has

chosen not to seek a stay of execution on his own behalf.  See id.; see also Baal, 495 U.S. at 737;

Hauser v. Moore, 223 F.3d 1316, 1321 (11th Cir. 2000); Brewer v. Lewis, 989 F.2d 1021, 1027

(9th Cir. 1993).

        Hence, even accepting that plaintiff, as Anwar Al-Aulaqi's father, has a "significant

relationship" with his son, plaintiff nonetheless cannot establish "next friend" standing under the

second prong of Whitmore.  There is no dispute that Anwar Al-Aulaqi is mentally competent,

and the Court has found that he has access to the courts within the meaning of Whitmore.  And

yet, during the past ten months that his name has allegedly appeared on "kill lists," Anwar Al-

Aulaqi has neither filed suit on his own behalf nor expressed any desire to do so.  Moreover, all

available evidence as to Anwar Al-Aulaqi's "intentions and preferences" suggests that if

consulted, he would have no desire to use the U.S. judicial system as a means of preventing his

alleged targeting by the United States.  To allow plaintiff to sue as his son's "next friend" under

these circumstances would risk "allow[ing] the adjudication of rights which parties not before the

-27-

Court may not wish to assert." Duke Power, 438 U.S. at 80.  Because plaintiff cannot show that Anwar Al-Aulaqi lacks access to the courts and that he is acting in Anwar Al-Aulaqi's best interests, plaintiff lacks standing to bring constitutional claims as his son's "next friend."

B.     Third Party Standing

In opposing defendants' motion to dismiss, plaintiff argues -- for the first time -- that he "also has third-party standing to raise his son's constitutional claims." See Pl.'s Opp. at 11.  Like "next friend" standing, third party or *jus tertii* standing constitutes a "limited exception[]" to the general rule that "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." Powers, 499 U.S. at 410.  Because third party standing is the "exception" rather than the norm, the burden is on the plaintiff "to establish that [he] has third party standing, not on the defendant to rebut third party standing." Amato v. Wilentz, 952 F.2d 742, 750 (3d Cir. 1991).

In Powers v. Ohio, the Supreme Court held that a criminal defendant had third party standing to assert the equal protection rights of jurors allegedly excluded from serving at the defendant's trial on account of their race.  See Powers, 499 U.S. at 415.  In so doing, the Court articulated three requirements that must be satisfied before a litigant may be accorded third party standing.  See id. at 411.  First, he must show that he himself has suffered a concrete, redressable "injury in fact" adequate to satisfy Article III's case-or-controversy requirement.[5]  See id. Second, the litigant must have "a close relation to the third party." Id.  Third, there must be

_____

[5] From a constitutional perspective, third party standing thus parallels direct party standing; in either case, the plaintiff himself must satisfy Article III standing requirements of an injury in fact, which is caused by the defendant's conduct, and which is likely to be redressed by a favorable decision.  See Kowalski v. Tesmer, 543 U.S. 125, 129 n.2 (2004).

"some hindrance to the third party's ability to protect his or her own interests." Id.  The first of these requirements is constitutional, while the latter two are prudential.  See Caplin & Drysdale, Ctd. v. United States, 491 U.S. 617, 624 n.3 (1989).

Prior to Powers, the Supreme Court articulated an additional prudential factor for courts to consider in deciding whether to permit third party standing: "the impact of the litigation on third-party interests."  See id.  Where "genuine conflicts" exist between the litigant's interests and those of the absent third party, this factor "strongly counsels against third party standing." Amato, 952 F.2d at 750; see also Clifton Terrace Assocs., Ltd. v. United Tech. Corp., 929 F.2d 714, 722 (D.C. Cir. 1991) (denying third party standing where the litigant's "interests in the subject of this suit to some extent conflict with those of the [third parties] whose rights [the litigant] purports to advance").  Although Powers did not specifically list this factor in its three-part test for third party standing, "the opinion's later discussion of the relationship prong incorporated it."  Amato, 952 F.2d at 750 n.7; see also Powers, 499 U.S. at 414 (noting that the "excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom").  Courts examining claims of third party standing after Powers have continued to assess whether the litigant and the third party have common interests, either as an additional, independent prudential factor, see, e.g., Hutchins by Owens v. Dist. of Columbia, 144 F.3d 798, 803 (D.C. Cir. 1998) (listing the "impact of the litigation on the rights of the third party" as one of three prudential considerations), rev'd on other grounds, 188 F.3d 531 (D.C. Cir. 1999) (en banc), or as an aspect of the "close relationship" inquiry under Powers, see, e.g., Amato, 952 F.2d at 750 n.7 (explaining its decision to follow the Powers approach of "combining these closely linked factors"); Lepelletier v. FDIC, 164 F.3d 37, 44 (D.C. Cir. 1999)

(noting that courts applying <u>Powers</u> have "only required a 'close relation' in the sense that there must be an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third parties' interests").

Ultimately, plaintiff's belated argument in support of third party standing fares no better than his attempt to sue as his son's "next friend." Plaintiff cannot show that a parent suffers an injury in fact if his adult child is threatened with a future extrajudicial killing. Moreover, even if plaintiff could make such a showing, the prudential <u>Powers</u> factors militate against according plaintiff third party standing to assert violations of his son's constitutional rights. As the Supreme Court has observed, where "the interests of [a] parent and [a] child are not in parallel, and indeed, are potentially in conflict," a parent may not evade the requirements of "next friend" standing by instead bringing suit under the related doctrine of third party standing. <u>See</u> <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 15 (2004).

      1.    *Article III Standing Requirements*

In contrast to "next friend" standing, where the "next friend" relies on the injury to the real party in interest, third party standing requires that the plaintiff himself satisfy the demands of Article III. <u>See</u> <u>Kowalski</u>, 543 U.S. at 129 n.2. Plaintiff maintains that "[t]he threatened injury here -- the killing of Plaintiff's son -- is plainly sufficient to satisfy <u>Powers</u>' first requirement" that the party bringing suit suffer a constitutional injury in fact. <u>See</u> Pl.'s Opp. at 11. Whether plaintiff has met Article III standing requirements, however, is not nearly so plain as plaintiff suggests.

Under Article III, a party invoking the jurisdiction of a federal court must show that he has suffered an injury in fact, defined as "an invasion of a legally protected interest which is (a)

concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted).  When a plaintiff seeks to vindicate the rights of a third party not before the court, the plaintiff himself must suffer a concrete injury, which must be particularized in the sense that it "affect[s] the plaintiff in a personal and individual way." Id. at 561 n.1; see Caplin & Drysdale, 491 U.S. at 624 n.3.  At least one court has therefore denied standing to a father suing state actors for their alleged use of "excessive force" against his son, on the ground that the alleged injuries to the son did not impact the father "in a personal and individual way." Weakes v. FBI-MPD Safe Streets Task Force, 2006 WL 212141, at *2 (D.D.C. Jan. 27, 2006).

Plaintiff, however, does not merely allege that his son will be injured by defendants' use of "excessive force"; rather, plaintiff maintains that he, too, will be injured by defendants' use of lethal force, since defendants' extrajudicial killing of Anwar Al-Aulaqi would permanently sever plaintiff's relationship with his adult child.  See Pl.'s Opp. at 13 (explaining that "[i]n this case, a father seeks to preserve the very existence of a relationship with his son by protecting his son's right to life").  Although this Court does not question the severity of the emotional harm that plaintiff may suffer if his son were to be killed by the United States, emotional harm -- in and of itself -- is not sufficient to satisfy Article III's injury in fact requirement.  See, e.g., Humane Soc'y of U.S. v. Babbitt, 46 F.3d 93, 98 (D.C. Cir. 1995) (explaining that "general emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes").  Instead, a plaintiff can only establish an Article III injury in fact based on emotional harm if that alleged harm stems from the infringement of some "legally protected," see Lujan, 504 U.S. at 560, or "judicially cognizable," see Bennett v. Spear, 520 U.S. 154, 167 (1997), interest that is either

"recognized at common law or specifically recognized as such by the Congress."  <u>Sargeant v. Dixon</u>, 130 F.3d 1067, 1069 (D.C. Cir. 1997).[6]

Here, this Court has been unable to find any legal basis for such an interest, either statutory or otherwise.  The D.C. wrongful death statute does not provide a basis for plaintiff's alleged legally protected interest in preserving his relationship with his adult son, as it only protects persons who are "officially appointed executors or administrators of the child's estate."  <u>See</u> <u>Saunders v. Air Florida, Inc.</u>, 558 F. Supp. 1233, 1235 (D.D.C. 1983) (citing <u>Strother v. Dist. of Columbia</u>, 372 A.2d 1291, 1296 n.7 (D.C. 1977)) (finding that parents could not bring suit under the D.C. wrongful death statute where the adult child's widow, and not the parents, was the duly appointed administrator of the decedent's estate).  There is no evidence in the record to suggest that plaintiff is the "executor or administrator" of Anwar Al-Aulaqi's estate, and the Court is aware of no other possible statutory basis for plaintiff's alleged legally protected interest.

_____

[6]  In <u>Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus</u>, 317 F.3d 334 (D.C. Cir. 2003), the D.C. Circuit held that a former Ringling Brothers employee did allege an Article III injury in fact based on the "aesthetic and emotional injury," <u>id.</u> at 335 (internal quotation marks omitted), he suffered upon witnessing the "mistreatment of the [Asian] elephants to which he became emotionally attached during his tenure at Ringling Bros." <u>Id.</u> at 338.  The court explained that the former circus employee's "personal relationship with the elephants," coupled with his stated "desire to visit the elephants" in the future without detecting "the effects of mistreatment," satisfied the injury in fact requirement for standing, at least for purposes of a motion to dismiss.  <u>See id.</u> at 337-38.  At first glance, it would seem that if one suffers an Article III injury in fact when an elephant to whom one has an emotional attachment is threatened with future mistreatment, one must also suffer an injury in fact when one's adult son is threatened with future extrajudicial killing.  But the alleged injury in <u>Ringling Bros.</u> is distinguishable from plaintiff's alleged injury here in one legally significant respect: the plaintiff in <u>Ringling Bros.</u> could cite a statutory basis for his alleged interest in maintaining a relationship with the (unharmed) Asian elephants -- namely, the citizen-suit provision of the Endangered Species Act, which "allows <u>any person</u> to commence a civil suit to enjoin violations of the Act or its regulations." <u>See</u> 16 U.S.C. § 1540(g)(1)(A) (emphasis added).  By contrast, plaintiff can point to no statutory basis for his claim that as a parent he enjoys a legally protected interest in maintaining a relationship with his adult child.

Plaintiff also has no constitutionally protected interest in maintaining a relationship with his adult child.  In suits brought under 42 U.S.C. § 1983, several federal circuits have considered "whether the Constitution protects a parent's relationship with his adult children in the context of state action which has the incidental effect of severing that relationship." Russ v. Watts, 414 F.3d 783, 787 (7th Cir. 2005).[7]  To date, however, no court has held that a parent possesses a constitutionally protected liberty interest in maintaining a relationship with his adult child free from indirect government interference.  Rather, all circuits to address the issue "have expressly declined to find a violation of the familial liberty interest" where state action has only an incidental effect on the parent's relationship with his adult child, and "was not aimed specifically at interfering with the relationship."  See, e.g., Russ, 414 F.3d at 791 (declining to recognize a "constitutional right to recover for the loss of the companionship of an adult child" where the parent-child relationship "is terminated as an incidental result of state action"); McCurdy v. Dodd, 352 F.3d 820, 830 (3d Cir. 2003) (dismissing section 1983 claim against police officers implicated in the fatal shooting of plaintiff's son on the ground that "the fundamental guarantees of the Due Process Clause do not extend to a parent's interest in the companionship of his independent adult child"); Valdivieso Ortiz v. Burgos, 807 F.2d 6, 9 (1st Cir. 1986) (holding that stepfather of an adult inmate allegedly beaten to death by prison guards had no remedy under section 1983 for the "incidental deprivation" of his relationship with his adult stepson); cf.

_____

[7]  Suits brought under section 1983 "must be based upon the violation of [a] plaintiff's personal rights, and not the rights of someone else."  Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir. 1990); see also Claybrook v. Birchwell, 199 F.3d 350, 357 (6th Cir. 2000) (explaining that "a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort"); Dohaish v. Tooley, 670 F.2d 934, 936 (10th Cir. 1982) (stating that a 1983 civil rights action "does not accrue to a relative, even the father of the deceased").

Trujillo v. Bd. of Cnty. Comm'rs, 768 F.2d 1186, 1189-90 (10th Cir. 1985) (finding that mother

had a constitutionally protected liberty interest in her relationship with her adult son, but

dismissing claim against government officials allegedly responsible for son's death where there

was no allegation of the officials' <u>intent</u> to interfere with the parent-adult child relationship).

Most importantly, in <u>Butera v. Dist. of Columbia</u>, 235 F.3d at 656, the D.C. Circuit dismissed a

mother's section 1983 claim that her son's death during his employment with the D.C.

Metropolitan Police Department violated her due process right to the companionship of her adult

child.  As the D.C. Circuit held, "a parent does not have a constitutionally protected liberty

interest in the companionship of a child who is past minority and independent."  235 F.3d at

656.[8]

        To be sure, plaintiff does not actually need to show that he has a constitutionally

protected liberty interest in the preservation of his relationship with his adult son, since he --

unlike the mother in <u>Butera</u> -- does not bring suit under section 1983 for a violation of his own

constitutional rights.  Nevertheless, plaintiff does need to show that he has suffered an injury to

some legally protected interest.  <u>See</u> <u>Lujan</u>, 504 U.S. at 560; <u>Powers</u>, 499 U.S. at 411.  Because

plaintiff can cite no statutory basis for such an interest, and because there is no constitutional

basis for such an interest in light of <u>Butera</u>, the only remaining question is whether plaintiff's

_____

        [8] According to defendants, even if <u>Butera</u> had concluded that a parent enjoys a
constitutionally protected liberty interest in maintaining a relationship with his adult child,
plaintiff, "as an alien residing in Yemen . . . would not have [such] a liberty interest under the
Constitution that could support the third party standing argument he seeks to pursue."  <u>See</u> Defs.'
Reply at 7 n.7.  This argument is not without merit, as "[t]he Supreme Court has long held that
non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth
Amendment protections."  <u>See</u> <u>Jifry v. F.A.A.</u>, 370 F.3d 1174, 1182 (D.C. Cir. 2004).  But this
Court need not reach this issue in light of <u>Butera</u>'s clear holding that no parent -- regardless of his
citizenship -- enjoys such an interest.

alleged interest is somehow protected by common law.

But plaintiff has failed to cite a single case to support the argument that a parent enjoys a common law interest in maintaining a relationship with his adult child.  Although he cites a few cases in which courts have found that the separation of a parent from a child creates an Article III injury in fact, all of these cases involved minor rather than adult children.  See Pl.'s Opp. at 12 (citing Jones v. Prince George's Cnty., 348 F.3d 1014, 1018 (D.C. Cir. 2003) (holding that an infant child suffered an injury in fact when her father was wrongfully killed, thereby permanently depriving her of his "financial and emotional support"); Reed, 439 F. Supp. 2d at 58, 62 (concluding that a six-year-old boy suffered an injury in fact when his father was kidnaped, detained, and tortured for more than three years)); see also Payne-Barahona v. Gonzalez, 474 F.3d 1, 2 (1st Cir. 2007) (acknowledging as sufficient for Article III purposes the injury in fact that a father would sustain if he were deported and thereby separated from his minor children); Coleman v. United States, 454 F. Supp. 2d 757, 763 (N.D. Ill. 2006) (finding that minor child alleged injury in fact under Article III by showing that, "unless enjoined, Defendants will execute an order of removal that will force his mother to leave the United States").

On the other hand, courts have repeatedly emphasized the need for differential treatment of the parent-child relationship when it "involves two adults."  See Butera, 235 F.3d at 656.  As the D.C. Circuit has explained, "[w]hen children grow up, their dependence on their parents for guidance, socialization, and support gradually diminishes . . . [and] the strength and importance of the emotional bonds between them and their parents usually decrease."  Franz v. United States, 712 F.2d 1428, 1432 (D.C. Cir. 1983), addendum to 707 F.2d 582 (D.C. Cir. 1983).  The differences that emerge in the parent-child relationship as the child becomes an adult have been

held "sufficiently marked to warrant sharply different constitutional treatment." Id.  Hence,

although both the Supreme Court and the D.C. Circuit have recognized that a parent enjoys a

constitutionally protected liberty interest in maintaining a relationship with his minor child (and

is therefore entitled to procedural due process protections before the government directly

interferes with that relationship), see, e.g., Santosky v. Kramer, 455 U.S. 745, 753 (1982);

Stanley v. Illinois, 405 U.S. 645, 650 (1972); Franz v. United States, 707 F.2d 582, 599 (D.C.

Cir. 1983), the Supreme Court has never extended such a right beyond settings involving minor

children, see Ortiz, 807 F.2d at 8-9, and this Circuit expressly declined to make that extension in

Butera.

    There are many reasons why courts have been reluctant to extend procedural due process

protections to the relationship between a parent and his adult child, and these same reasons

counsel against recognizing plaintiff's alleged injury here as sufficient for standing.  In declining

to find that a parent enjoys a constitutionally protected liberty interest in maintaining a

relationship with his adult child, the First Circuit explained that a contrary holding "would

constitutionalize adjudication in a myriad of situations we think inappropriate for due process

scrutiny." See Ortiz, 807 F.2d at 9.  For example, the court noted, parents could then be expected

to sue for "the alleged wrongful prosecution and incarceration of a child or the alleged wrongful

discharge of a child from a state job, forcing the child to seek employment in another part of the

country." Id.  Similarly, if this Court were to recognize plaintiff's interest in preserving his

relationship with his adult son as legally protected, other parents could be expected to raise

claims in federal court asserting violations of their adult children's rights whenever their children

were arrested, incarcerated or discharged from government employment.  These claims would be

-36-

cognizable under third party standing doctrine, so long as the parent was able to demonstrate a

"close relationship" to the adult child and some "hindrance" to the adult child's ability to sue on

his own behalf.  See Powers, 499 U.S. at 411.

       This Court will not advance that outcome, absent case law holding that a parent enjoys a

legally protected interest in his relationship with his adult child.  Indeed, this Circuit's opinion in

Butera strongly suggests that such an interest should not be recognized, in light of the marked

changes that occur in the parent-child relationship once a child reaches the age of majority.  Like

the D.C. Circuit, this Court "does not minimize the devastating loss that a parent can experience

from the death of an adult child."  Butera, 235 F.3d at 656.  But not all devastating losses

constitute invasions of judicially cognizable interests.  And absent an invasion of such an

interest, plaintiff cannot show that he has suffered the requisite Article III injury in fact needed to

establish third party standing.[9]

--------

   [9] Defendants make much of the fact that plaintiff's alleged injury is "speculative," since plaintiff has not shown whether the United States is acting "in compliance with the standard plaintiff argues should be applied here."  See Defs.' Reply at 10; see also Defs.' Mem. at 16-18; Mot. Hr'g Tr. 29:12-31:12.  Because plaintiff has failed to allege an invasion of any legally protected interest, this Court need not address defendants' argument that the threatened extrajudicial killing of plaintiff's adult child is also too "speculative" to satisfy Article III.  The Court notes, however, that a threatened injury -- like that asserted by plaintiff here -- may form the basis of an Article III injury in fact so long as it is "certainly impending." See Whitmore, 495 U.S. at 158 (internal quotation marks and citations omitted); see also City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (explaining that "[t]he plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical") (internal quotation marks and citations omitted); Steffel v. Thompson, 415 U.S. 452, 459 (1974) (permitting plaintiff to challenge the legality of his potential arrest under a criminal trespass statute where plaintiff alleged threats of prosecution that were neither imaginary nor speculative); Navegar, Inc. v. United States, 103 F.3d 994, 998 (D.C. Cir. 1997) (explaining that where a criminal statute has not yet been enforced against a litigant, the litigant may still challenge the statute if she "can demonstrate that she faces a threat of prosecution . . . which is credible and immediate, and not merely abstract or speculative").

2.      *Prudential Standing Requirements*

Even assuming that plaintiff did suffer an "injury-in-fact, adequate to satisfy Article III's case-or-controversy requirement," this Court still must ask whether "prudential considerations . . . point to permitting [plaintiff] to advance his claim."  See Caplin & Drysdale, 491 U.S. at 624 n.3.  The Supreme Court has been clear in enumerating the relevant third party standing prudential considerations -- a close relationship and an identity of interests between the litigant and the third party as well as some hindrance to the third party's ability to litigate on his own behalf -- but the Court has been "less clear . . . about what to do with these factors."  Amato, 952 F.2d at 749; see also Amer. Immigration Lawyers Ass'n v. Reno, 199 F.3d 1352, 1362 (D.C. Cir. 2000) (noting that "the general state of third party standing law" is "not entirely clear"); Miller v. Albright, 523 U.S. 420, 455 n.1 (1998) (Scalia, J., concurring) (explaining that the Court's third party standing jurisprudence "is in need of what may charitably be called clarification").

Powers implied that a litigant must satisfy all of the prudential third party standing criteria in order to be accorded third party standing.  See Powers, 499 U.S. at 411 (stating that the litigant "must have a close relation to the third party, and there must exist some hindrance to the third party's ability to protect his or her own interests"); see also Amato, 952 F.2d at 749 (explaining that the Court's language in Powers "seemed to *require* certain showings from would-be third party claimants") (emphasis in original).  Yet the Supreme Court has, in some instances, been "quite forgiving" in its application of the Powers prudential factors (see Kowalski, 543 U.S. at 130), allowing third party standing even where there is no discernible "hindrance" to the third party's ability to litigate on his own behalf.  See, e.g., Caplin & Drysdale, 491 U.S. at 624 n.3 (granting third party standing to attorney challenging forfeiture law as a

violation of his client's Sixth Amendment rights although the client himself suffered no

"obstacles . . . to advancing his own constitutional claim"); Craig v. Boren, 429 U.S. 190, 192-97

(1976) (permitting vendor to bring third party challenge to state statute prohibiting sales of 3.2%

beer to males under age 21 but permitting sales to females between ages 18 and 21, even though

the suit could have been brought by a discriminated-against 18-to-21-year-old male); Miller, 523

U.S. at 433 (permitting daughter to raise equal protection claims on her father's behalf despite the

absence of any apparent obstacles to the father's assertion of his own constitutional rights).

In light of the Supreme Court's apparent willingness to dispense with the hindrance

requirement in certain circumstances, the Third Circuit has adopted a "more flexible balancing

approach" to the prudential Powers factors in order to determine whether third party standing is

appropriate.  See Amato, 952 F.2d at 742 (explaining that "we read the body of Supreme Court

precedent as (1) identifying factors that are relevant to determining third party standing and (2)

rendering an overall balance of factors dispositive").  The D.C. Circuit has, on occasion, also

used a balancing analysis of the Powers criteria for third party standing.  See, e.g., Hutchins, 144

F.3d at 803 (finding that third party standing was justified where "the closeness of the

relationship between parents and children and the magnitude of the potential impact of our

decision on children's rights outweigh[ed] the absence of [any barrier to the children's ability to

litigate on their own behalf]").  But most recently, the D.C. Circuit has stated that "when the

'Powers test' is applied, all three requirements must be met."  See Amer. Immigration Lawyers

Ass'n, 199 F.3d at 1362 n. 15.

The D.C. Circuit has also observed that the Supreme Court's seemingly inconsistent third

party standing jurisprudence can be reconciled without resort to balancing of the Powers factors.

See Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1280 (D.C.

Cir. 1994).  Instead, the court in Fair Emp't Council implied, the cases in which the Supreme

Court has found third party standing despite the absence of the Powers "hindrance" factor can be

understood as falling within an alternative test for third party standing provided by the D.C.

Circuit in Haitian Refugee Ctr. v. Gracey, 809 F.2d 794 (D.C. Cir. 1987).  See 28 F.3d at 1280-

81.  In Haitian Refugee -- which pre-dated Powers -- the court held that "third party standing . . .

is appropriate only when the third party's rights protect that party's relationship with the litigant."

See 809 F.2d at 809.  Although the D.C. Circuit has yet to clarify the precise impact of Powers

on the Haitian Refugee approach, it has recognized the possibility that the two tests "now coexist

and a party can establish third party standing by meeting either standard."  See Amer.

Immigration Lawyers Ass'n, 199 F.3d at 1362.  Thus, in its most recent in-depth discussion of

third party standing, the D.C. Circuit first examined whether the litigants could proceed under

Haitian Refugee and then whether they met the Powers prudential criteria for third party

standing.  See id.  Because the litigants could not show that the challenged government action

specifically targeted a protected "relationship" between the litigant and the third party (as

required by Haitian Refugee), and also could not establish "'some hindrance to the third party's

ability to protect his or her own interests'" (as required by Powers), the court in Amer.

Immigration Lawyers Ass'n found that prudential considerations precluded the litigants from

suing on behalf of the absent third parties.  Id. at 1362 (quoting Powers, 499 U.S. at 411).

      Here, plaintiff has similarly failed both the Powers and the Haitian Refugee tests for third

party standing.  Despite the arguable hindrance to Anwar Al-Aulaqi's ability to sue on his own

behalf, plaintiff lacks third party standing under Powers because his interests do not align with

those of his son.  Plaintiff also cannot pass the Haitian Refugee "relationship" inquiry, because none of the rights that plaintiff claims are infringed by the alleged targeted killing of his son constitute substantive protections of the father-adult son relationship, and the alleged targeted killing of plaintiff's adult son is not "designed to interfere with" the father-adult son relationship. See Haitian Refugee, 809 F.2d at 809-10.

(a)    Application of the Powers Factors

In order to establish third party standing under Powers, plaintiff must show (1) a close relationship with his son in the sense that they have an identity of interests and (2) some hindrance to Anwar Al-Aulaqi's ability to protect his own legal rights.  See Powers, 499 U.S. at 411.  These prudential standing requirements serve dual purposes.  First, the presence of a hindrance or genuine obstacle preventing the third party from asserting his own legal rights reduces the likelihood that the third party's absence is due to the fact that his rights are either "not truly at stake or not truly important to him."  See Singleton v. Wulff, 428 U.S. 106, 116 (1976). Application of this factor thus prevents courts from "adjudicat[ing] . . . rights unnecessarily," where "in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not."  Id. at 113-14. Second, the requirement that the litigant and the third party have a close relationship such that there is an identity of interests between them helps to ensure that there will be "little loss in terms of effective advocacy" by allowing the litigant to proceed on the absent third party's behalf.  See Craig, 429 U.S. at 194 (internal quotation marks and citation omitted).

Plaintiff is correct that "the 'hindrance' requirement under Powers has been more liberally construed and is significantly less stringent than the analogous consideration under the doctrine

-41-

of next friend standing."  See Pl.'s Opp. at 14.  Whereas one purporting to act as another's "next

friend" must show that the real party in interest is unable to access the courts, one seeking to

satisfy the hindrance requirement for third party standing need only demonstrate that there is

some impediment to the real party in interest's ability to assert his own legal rights.  See, e.g.,

Singleton, 428 U.S. at 118 (explaining that the obstacles to the third party bringing suit on his

own behalf need not be insurmountable in order to justify third party standing).  The Supreme

Court has recognized as sufficient hindrances justifying third party standing (1) a third party's

financial disincentive to litigate, see Powers, 499 U.S. at 414-15 (permitting criminal defendant

to bring third party challenge to alleged race-based exclusion of jurors in part because an

excluded juror would have only a "small financial stake" in the outcome of a suit but would be

forced to endure the "economic burdens of litigation"); (2) a party's desire to protect her personal

privacy, see Singleton, 428 U.S. at 118 (according physicians third party standing to assert the

rights of their women patients in challenging a statute as an unconstitutional "interference with

the abortion decision" in part because the pregnant women "may be chilled from such assertion

by a desire to protect the very privacy of [their] decision[s] from the publicity of a court suit");

and (3) the "imminent mootness" of a party's claims, see id. at 117 (describing the "imminent

mootness" of a pregnant woman's challenge to a statute restricting the circumstances in which

pregnant women may receive medicaid benefits for abortions); Craig, 429 U.S. at 192-93

(permitting vendor to continue equal protection challenge to a statute prohibiting certain alcohol

sales to male minors when the named plaintiff turned 21 during the course of the litigation); see

also Hutchins, 144 F.3d at 803 (allowing parents to bring third party challenge to D.C. curfew

law in part because a young plaintiff "might turn seventeen by the end" of the litigation, thereby

mooting his claims).

Anwar Al-Aulaqi certainly would face challenges if he were to sue on his own behalf. Although he can access U.S. courts within the meaning of Whitmore, this access is constrained as a result of Anwar Al-Aulaqi's current location in Yemen.  The D.C. Circuit has explained that individuals who reside outside the country and "far from the courthouse are hindered when it comes to taking legal action," although such hindrance -- in and of itself -- has not been found sufficient to justify third party standing.  See Amer. Immigration Lawyers Ass'n, 199 F.3d at 1364.  But here, plaintiff has alleged a further hindrance to his son's ability to bring suit: namely, Anwar Al-Aulaqi's inclusion on the CIA and JSOC "kill lists."

Anwar Al-Aulaqi would not be killed if he were to present himself in a peaceful manner and seek relief in U.S. courts, but he would expose himself to possible detention as an enemy combatant.  If Anwar Al-Aulaqi were to emerge from hiding and be detained, the present action -- which seeks to prevent defendants from unlawfully killing him -- would likely be deemed moot.  Given the Supreme Court's suggestion that the "imminent mootness" of a party's claims can constitute a sufficient hindrance under Powers, see Singleton, 428 U.S. at 117; Craig, 429 U.S. at 192-93, this case may satisfy that criterion.  Nevertheless, the purpose of the hindrance requirement is to ensure "that the rightholder did not simply decline to bring the claim on his own behalf, but could not in fact do so."  Miller, 523 U.S. at 450 (O'Connor, J., concurring).  It appears that Anwar Al-Aulaqi could have brought suit on his own behalf, but that he has simply declined to do so.  Unlike the third parties in Powers, then, who lacked a sufficient incentive to litigate, see Powers, 499 U.S. at 414-15, Anwar Al-Aulaqi should have the requisite incentive to sue, given that his life is allegedly at stake.  The fact that Anwar Al-Aulaqi has not brought suit

during the past ten months that his name has allegedly appeared on "kill lists" strongly suggests

that his rights are either "not truly at stake or not truly important to him." <u>Singleton</u>, 428 U.S. at

116.  Thus, despite the potential imminent mootness of Anwar Al-Aulaqi's claims, allowing

plaintiff to litigate the present action would not seem to further the purpose of the <u>Powers</u>

hindrance requirement.

But regardless of whether there is some hindrance to Anwar Al-Aulaqi's ability to litigate

within the meaning of <u>Powers</u>, plaintiff cannot meet the other <u>Powers</u> prudential requirement --

that he and his son have a close relationship such that they have an identity of interests.  It is true

that courts have often found the parent-child relationship sufficiently close to justify third party

standing.  <u>See, e.g.</u>, <u>Hutchins</u>, 144 F.3d at 803 (joining other circuits in concluding that "the

parent-child relationship is sufficiently close to meet [the] prudential standing requirements" of

third party standing); <u>Reed</u>, 439 F. Supp. 2d at 62 (explaining that "the relationship between a

son and his father constitutes the requisite close relationship for the second prong of the third

party standing test"); <u>Yaman v. U.S. Dep't of State</u>, 709 F. Supp. 2d 85, 90-91 (D.D.C. 2010)

(finding that a mother had third party standing to sue on behalf of her minor daughters where she

had "a close relation to her children," whose minority rendered them "hindered from bringing suit

on their own").  But none of these cases involved a parent-<u>adult</u> child relationship.  Moreover, in

these cases, there was no indication that the interests of the parent might diverge from those of

the minor child on whose behalf the parent sought to litigate.  The courts therefore had no reason

to examine the underlying purpose of the <u>Powers</u> close relationship prong, which is to ensure

"that the plaintiff will act as an effective advocate for the third party."  <u>Lepelletier</u>, 164 F.3d at 43

(quoting <u>Lepelletier v. FDIC</u>, 977 F. Supp. 456, 463 (D.D.C. 1997)).

In requiring a "close" relationship between a litigant and a third party, <u>Powers</u> did not

intend for close to be "synonymous with loving or affectionate."  <u>See</u> N. Jeremi Duru, <u>A Claim</u>

<u>for Third Party Standing in America's Prisons</u>, 20 BUFF. PUB. INT. L.J. 101, 116 (2002).  If that

were the case, <u>Powers</u> would not have accorded third party standing to a criminal defendant

asserting the equal protection rights of excluded jurors with whom he had never spoken.  Rather,

the Supreme Court "only required a 'close relation' in the sense that there must be an identity of

interests between the parties such that the plaintiff will act as an effective advocate of the third

party's interests."  <u>Lepelletier</u>, 164 F.3d at 44; <u>see also</u> <u>Powers</u>, 499 U.S. at 414 (describing the

relationship between criminal defendant and excluded juror as "close" in the sense that they

"have a common interest in eliminating racial discrimination from the courtroom").  Courts

examining claims of third party standing thus must assess "the extent of potential conflicts of

interests between the plaintiff and the third party whose rights are [being] asserted," <u>Amato</u>, 952

F.2d at 750, and deny third party standing where the litigant's "interests in the subject of [the] suit

to some extent conflict with those of the [third parties] whose rights [the litigant] purports to

advance," <u>Clifton Terrace Assocs.</u>, 929 F.2d at 722.

Although a parent may sometimes serve as an effective advocate for the interests of his

child, a parent may not be accorded third party standing where his interests are "potentially in

conflict" with his child's.  <u>See</u> <u>Elk Grove</u>, 542 U.S. at 15 (denying father standing to sue on

behalf of his minor daughter where he was not authorized to sue as his daughter's "next friend"

and where, "[i]n marked contrast to our case law on <i>jus tertii</i>, the interests of [the] parent and

[his] child are not parallel, and indeed, are potentially in conflict").  Here, plaintiff's interests are

potentially in conflict with those of his son.  Plaintiff maintains that he has an interest in

"preserv[ing] the very existence of a relationship with his son by protecting his son's right to life," Pl.'s Opp. at 13, and that he "believe[s] taking legal action to stop the United States from killing [Anwar Al-Aulaqi] is in [his son's] best interests," see Al-Aulaqi Decl. ¶ 11. Anwar Al-Aulaqi, however, has given no indication that he believes it is in his interest to take legal action to stop the United States from killing him. Not only has he failed to bring suit on his own behalf at any point over the past ten months -- despite the fact that his life is allegedly at stake -- but he has made numerous public statements condemning the U.S. judicial system, see, e.g., Defs.' Reply, Exs. 1-2, and has publicly announced that he has no intention of "surrendering" to the Americans. See Wizner Decl., Ex. V (quoting Anwar Al-Aulaqi as remarking, "[a]s for the Americans, I will never surrender to them"); see also Clapper Decl. ¶ 16; Defs.' Mem. at 14 n.5. Taken together, Anwar Al-Aulaqi's actions and statements strongly suggest that his interests do not include litigating in U.S. courts.

Whatever the reason for Anwar Al-Aulaqi's failure to seek legal redress for his alleged inclusion on the CIA and JSOC "kill lists" -- a mistrust of or disdain for the American judicial system, a desire to become a martyr, or a mere lack of interest in pursuing a case thousands of miles away from his current location -- this Court cannot subvert the purpose of the Powers prudential standing requirements by "adjudicat[ing] . . . rights unnecessarily" when "the holders of those rights . . . do not wish to assert them." Singleton, 428 U.S. at 114. As the Supreme Court has explained, "[i]t is not for this Court to employ untethered notions of what might be good public policy to expand our jurisdiction in an appealing case." Whitmore, 495 U.S. at 161. Because it does not appear as though plaintiff would be an effective advocate for his son in light of their seemingly divergent interests, plaintiff cannot satisfy the Powers prudential criteria for

third party standing.

        (b)      The "Relationship" Inquiry Under <u>Haitian Refugee</u>

In <u>Haitian Refugee</u>, the D.C. Circuit examined whether a non-profit organization

designed to assist Haitian refugees (and two of its members) had third party standing to assert the

rights of Haitian refugees in challenging the United States's program of interdicting

undocumented aliens on the high seas.  <u>See Haitian Refugee</u>, 809 F.2d at 796.  In an opinion by

Judge Bork, the D.C. Circuit held that "third party standing . . . is appropriate only when the third

party's rights protect that party's relationship with the litigant."  <u>See id.</u> at 809.  "If the

government has directly interfered with the litigant's ability to engage in conduct together with

the third party . . . by putting the litigant under a legal disability with criminal penalties . . . the

litigant has standing to challenge the government's interference by invoking the third party's

rights."  <u>Id.</u> at 808.  Hence, in <u>Craig v. Boren</u>, the Supreme Court had permitted beer vendors to

assert the equal protection rights of male beer purchasers in challenging a state statute that

prohibited sales of 3.2% beer to males under age 21 but permitted sales to females between ages

18 and 21.  <u>See id.</u> (citing <u>Craig v. Boren</u>, 429 U.S. at 192-97).  Similarly, in other cases where

"'enforcement of the challenged restriction against the litigant would result indirectly in the

violation of third parties' rights,'" <u>see id.</u> (quoting <u>Warth</u>, 422 U.S. at 510), the Supreme Court

found that the litigant had standing to challenge the restriction on behalf of the third parties.  <u>See,</u>

<u>e.g.</u>, <u>Carey v. Population Servs. Inc.</u>, 431 U.S. 678, 683-84 (1977) (permitting distributors of

contraceptives to assert the rights of "potential purchasers" in challenging the constitutionality of

a state law restricting the distribution of contraceptives); <u>Barrows v. Jackson</u>, 346 U.S. 249, 257

(1953) (allowing white property owners to raise the constitutional rights of black property

inhabitants as a defense in a lawsuit charging the white owners with breach of a racially discriminatory restrictive covenant).

Even where a statute does not impose legal sanctions on a litigant for maintaining a relationship with a third party, the statute may still be subject to third-party challenge if it "disrupt[s] a special relationship - protected by the rights in question - between the litigants and the third parties." Fair Emp't Council, 28 F.3d at 1281; see Caplin & Drysdale, 491 U.S. at 623-24 n. 3 (granting an attorney third party standing to assert a client's Sixth Amendment rights in challenging a forfeiture statute that prevented the client from paying the attorney's legal fees). Thus, in Singleton the Court permitted physicians to assert the constitutional rights of their low-income women patients in challenging a state statute that prohibited the use of medicaid benefits to pay for non-"medically indicated" abortions. See 428 U.S. at 118. Although the statute in Singleton did not impose "legal penalties" on physicians who continued to perform abortions on their low-income patients, it was nonetheless subject to challenge by the physicians, as it was "specifically intended to burden" the physicians' relationship with their low-income patients. See Haitian Refugee, 809 F.2d at 810.

Because the interdiction program in Haitian Refugee did not impose legal sanctions on the plaintiffs for maintaining a relationship with Haitian aliens, and was not "designed to interfere with" a special relationship between Haitian aliens and the plaintiffs, the court held that the plaintiffs lacked third party standing to challenge the program on behalf of Haitian aliens. See id. at 809-10. As the court explained, "none of the laws that the interdiction program [was] alleged to violate [were] substantive protections of a relationship between Haitian aliens and [the plaintiffs]" and any interference that the program caused to that relationship was only "an

unintended side effect of a program with other purposes."  Id.

Just as in Haitian Refugee, none of the Fourth and Fifth Amendment rights that plaintiff claims are infringed by the targeted killing of his son provide "substantive protections" of a father's relationship with his adult child.  Indeed, as explained earlier, plaintiff's relationship with his adult child is not entitled to any "substantive protection" under the U.S. Constitution. Moreover, defendants' alleged targeting of plaintiff's son is not designed to interfere with the father-adult son relationship.  Unlike cases in which a statute places legal sanctions on a litigant if he maintains a relationship with a third party, see, e.g., Craig v. Boren, 429 U.S. at 192-97, or cases in which a statute directly infringes upon a special relationship, see, e.g., Singleton, 428 U.S. at 118, any harm caused to plaintiff as a result of the extrajudicial killing of his son would be an "unintended side effect" of government action having other purposes.  Hence, plaintiff cannot establish third party standing under Haitian Refugee.

*****

Because plaintiff can satisfy neither the requirements of third party standing (under Haitian Refugee or Powers) nor the requirements of "next friend" standing (under Whitmore), all three of plaintiff's constitutional claims must be dismissed due to lack of standing.

## II.  The Alien Tort Statute

Plaintiff brings his fourth and final claim under the Alien Tort Statute ("ATS"), alleging that the United States's "policy of targeted killings violates treaty and customary international law."  See Compl. ¶ 29.  The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  Plaintiff is an alien, see Al-Aulaqi

Decl. ¶ 2, but in order for his ATS claim to survive a motion to dismiss, he must also show that (1) an alien suffers a legally cognizable tort -- which rises to the level of a "customary international law norm" -- when his U.S. citizen son is threatened with a future extrajudicial killing and (2) the United States has waived sovereign immunity for that type of claim.  Because plaintiff has failed to make either showing, his ATS claim must be dismissed.

    A.    <u>Plaintiff's Alleged ATS Cause of Action</u>

In <u>Sosa v. Alvarez-Machain</u>, 542 U.S. 692 (2004), the Supreme Court explained that Congress, in enacting the ATS as part of the Judiciary Act of 1789, "intended the ATS to furnish jurisdiction for a relatively modest set of actions" that were recognized at common law as being "torts in violation of the law of nations."  <u>Id.</u> at 720.  Specifically, the Court concluded that the ATS was originally meant to provide a cause of action for "three primary offenses": (1) violation of safe conducts; (2) infringement of the rights of ambassadors; and (3) piracy.  <u>Id.</u> at 724.  Citing historical evidence as to the limited scope of the ATS -- and additional reasons for exercising "great caution in adapting the law of nations to private rights," <u>id.</u> at 728 -- the Supreme Court held that ATS claims must allege violations of "the present-day law of nations" that "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized."  <u>Id.</u> at 725.  The Court further explained that all judicial determinations as to whether an alleged international law norm "is sufficiently definite to support a cause of action [under the present-day law of nations] should (and indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in federal courts."  <u>Id.</u> at 732-33.  Since <u>Sosa</u>, it has become clear that "[w]hile the ATS may provide subject-matter jurisdiction for

modern causes of action not recognized at the time of its initial passage in 1789, there is a 'high bar to new private causes of action for violating international law.'" Ali Shafi v. Palestinian Auth., 686 F. Supp. 2d 23, 26 (D.D.C. 2010) (quoting Sosa, 542 U.S. at 727); see also Saleh v. Titan Corp., 580 F.3d 1, 14 (D.C. Cir. 2009) (explaining that "[t]he Sosa Court, while opening the door a crack to the expansion of international law norms to be applied under the ATS, expressed the imperative of judicial restraint").

Plaintiff maintains that his alleged tort -- extrajudicial killing -- meets the high bar of Sosa, since there is a customary international law norm against state-sponsored extrajudicial killings, which has been "consistently recognized by U.S. courts" and "indeed codified in domestic law under the Torture Victim Protection Act." See Pl.'s Opp. at 39.[10]  Plaintiff is correct insofar as many U.S. courts have recognized a customary international law norm against past state-sponsored extrajudicial killings as the basis for an ATS claim. See, e.g., Wiwa, 626 F.

_____

[10]  The Torture Victim Protection Act of 1991 ("TVPA") provides in relevant part that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to an extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." 28 U.S.C. § 1350 note § 2(a)(2).  The Seventh Circuit has held that the TVPA "occup[ies] the field" with respect to claims alleging extrajudicial killing, see Enahoro v. Abubakar, 408 F.3d 877, 884-85 (7th Cir. 2005), but most courts have found that the TVPA does not preclude ATS claims for extrajudicial killing. See, e.g., Kadic v. Karadzic, 70 F.3d 232, 241 (2d Cir. 1995) (stating that "[t]he scope of the Alien Tort Act remains undiminished by enactment of the Torture Victim [Protection] Act"); In re XE Servs. Alien Tort Litig., 665 F. Supp. 2d 569, 593 n.29 (E.D. Va. 2009) (explaining that "most courts have held that the TVPA supplements the ATS, and does not preempt it"); Mujica v. Occidental Petroleum Corp., 381 F. Supp. 2d 1164, 1179 n.13 (C.D. Cal. 2005) (noting that "[t]he Court does not believe that the TVPA precludes claims of . . . extrajudicial killing under the ATS").  These courts view the TVPA and its legislative history as providing strong evidence that there is, in fact, a customary international law norm against extrajudicial killing, upon which an ATS claim may be based. See, e.g., In re XE Servs. Alien Tort Litig., 665 F. Supp. 2d at 593; Mujica, 381 F. Supp. 2d at 1178-79; Wiwa v. Royal Dutch Petroleum Co., 626 F. Supp. 2d 377, 383 n.4 (S.D.N.Y. 2009).

Supp. 2d at 383 n.4; Mujica, 381 F. Supp. 2d at 1178-79; Kadic, 70 F.3d at 241-45; Forti v.

Suarez-Mason, 672 F. Supp. 1531, 1542 (N.D. Cal. 1987), *recons. granted in part on other*

*grounds*, 694 F. Supp. 707 (N.D. Cal. 1988).  Significantly, however, plaintiff cites no case in

which a court has ever recognized a "customary international law norm" against a threatened

future extrajudicial killing, nor does he cite a single case in which an alien has ever been

permitted to recover under the ATS for the extrajudicial killing of his U.S. citizen child.  These

two features of plaintiff's ATS claim -- that it is based on a threat of a future extrajudicial killing,

not an actual extrajudicial killing, that is directed not to plaintiff or to his alien relative, but to his

U.S. citizen son -- render plaintiff's ATS claim fundamentally distinct from all extrajudicial

killing claims that courts have previously held cognizable under the ATS.

       Even assuming that the threat at issue were directed to plaintiff (rather than to plaintiff's

U.S. citizen son), there is no basis for the assertion that the threat of a future state-sponsored

extrajudicial killing -- as opposed to the commission of a past state-sponsored extrajudicial

killing -- constitutes a tort in violation of the "law of nations."  A threatened extrajudicial killing

could possibly -- depending on the precise nature of the threat -- form the basis of a state tort law

claim for assault, see REST. (SECOND) OF TORTS § 21 (1965) (explaining that an actor is subject

to liability for assault if he acts "with the intent to cause a harmful or offensive contact, or an

imminent apprehension of such a contact," and the other person "is thereby put in such imminent

apprehension"), or for intentional infliction of emotional distress, see id. § 46(1) (stating that

"[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe

emotional distress to another is subject to liability for such emotional distress, and if bodily harm

to the other results from it, for such bodily harm").  But common law tort claims for assault and

intentional infliction of emotional distress do not rise to the level of international torts that are

"sufficiently definite and accepted 'among civilized nations' to qualify for the ATS jurisdictional

grant."  See Ali Shafi, 686 F. Supp. 2d at 29 (quoting Sosa, 542 U.S. at 732).  Plaintiff cites no

treaty or international document that recognizes assault or intentional infliction of emotional

distress as a violation of the "present-day law of nations," nor does he cite any case in which a

court has ever found such common law torts cognizable under the ATS.  Indeed, there appears to

be only one case in which a court has even considered whether "fear" and "anguish" could form

the basis of an ATS claim.  See Mujica, 381 F. Supp. 2d at 1183.  There, the court expressly

rejected the plaintiffs' contention that psychic, emotional harms were sufficient to state a claim

under the ATS.  As that court explained, "[i]t would be impractical to recognize these allegations

as constituting an ATS claim because it would allow foreign plaintiffs to litigate claims in U.S.

courts that bear a strong resemblance to intentional infliction of emotional distress."  Id.  Such a

holding, the court noted, would make "broad swaths of conduct" actionable by aliens under the

ATS, id., which is precisely what the Supreme Court in Sosa warned against.

        In Sosa, the Supreme Court instructed federal courts to exercise "great caution" in

recognizing new causes of action under the ATS as violations of the "present-day law of

nations," and urged courts to consider "the practical consequences" of making such causes of

action available to litigants worldwide.  See Sosa, 542 U.S. at 728, 732-33.  If this Court were to

conclude that alleged government threats -- no matter how plausible or severe they may be --

constitute international torts committed in violation of the law of nations, federal courts could be

flooded with ATS suits from persons across the globe who alleged that they were somehow

placed in fear of danger as a result of contemplated government action.  Surely, as interpreted in

Sosa, the ATS was not intended to provide a federal forum for such speculative claims.

The precise relief that plaintiff seeks here -- an injunction against the President, the Secretary of Defense, and the Director of the CIA preventing them from carrying out specific national security measures abroad -- is, as defendants point out, both "novel" and "extraordinary." See Defs.' Mem. at 40.  The Supreme Court in Sosa did not call upon the federal courts to recognize such novel, extraordinary claims under the ATS, but rather merely "opened the door a crack to the possible recognition of new causes of action under international law (such as, perhaps, torture) if they were firmly grounded on an international consensus."  Saleh, 580 F.3d at 14; see also Sosa, 542 U.S. at 738 (declining to recognize a cause of action for "arbitrary" detentions under the ATS since "[c]reating a private cause of action to further that aspiration would go beyond any residual common law discretion we think it appropriate to exercise"). Here, it would be an abuse of this Court's discretion, properly constrained by Sosa, to recognize a cause of action under the ATS for alleged threats of state-sponsored extrajudicial killings, given that no court has ever found that the threat of a future extrajudicial killing is a recognized tort, much less one that violates the present-day law of nations.  Because plaintiff cannot point to a single case recognizing such a claim, his ATS claim cannot possibly be held to violate a "norm of customary international law so well defined as to support the creation of a federal remedy."  See Sosa, 542 U.S. at 738.

Moreover, even if the mere threat of a future state-sponsored extrajudicial killing did constitute a violation of the present-day law of nations, plaintiff could not bring an ATS claim based on the alleged threat of an extrajudicial killing of his U.S. citizen son.  Significantly, the ATS authorizes federal jurisdiction over "civil actions by an alien for a tort only, committed in

violation of the law of nations."  28 U.S.C. § 1350 (emphasis added).  Although plaintiff is an

alien, his son is a U.S. citizen, and as such, Anwar Al-Aulaqi is not authorized to sue under the

ATS.  Given that Anwar Al-Aulaqi could not maintain an ATS action, plaintiff cannot instead

bring an ATS action as a "next friend" or third party on Anwar Al-Aulaqi's behalf.  In other

words, plaintiff can only sue under the ATS if he alleges that he himself has suffered a tort that

rises to the level of a "customary international law norm."

Plaintiff has been far from clear in articulating whether his ATS claim is a third party or

"next friend" claim stemming from alleged violations of his U.S. citizen son's rights, or instead

an individual claim based on personal injuries that he would suffer if defendants' alleged

threatened extrajudicial killing of his son materialized.  In his complaint, plaintiff purports to

bring his ATS claim not as his son's "next friend" or as a third party, but "in his own right to

prevent the injury he would suffer if defendants were to kill his son."  See Compl. ¶ 29.  But in

opposing defendants' motion to dismiss, plaintiff explains that his cause of action under the ATS

is not premised upon intentional infliction of emotional distress, loss of consortium, or any other

"independent" tort that a parent himself might suffer as a result of his child's wrongful death.  See

Pl.'s Opp. at 39 (stating that plaintiff's claim is not "one for intentional infliction of emotional

distress").  Rather, plaintiff alleges that "Defendants' authorization for the targeted killing of his

son in Yemen would constitute an extrajudicial killing," and it is this "extrajudicial killing" --

and not any emotional injury sustained by plaintiff -- that forms the basis of plaintiff's ATS

claim.  See id.  At the November 8th motions hearing, plaintiff seemed to conflate his two

arguments, stating both that his ATS claim "[is] a claim based on the prohibition of extrajudicial

killing," (which, *a fortiori*, is a claim that belongs to Anwar Al-Aulaqi, and not to plaintiff), Mot.

Hr'g Tr. 92:15-16; see also id. 94:4-5 ("what we are talking about here is a claim for extrajudicial killing"); id. 95:24-96:1 ("the tort that would be occurring . . . would be a violation of the norm of extrajudicial killing"), and that he "is bringing the [ATS] claim in his own name for . . . the harm that he would suffer by virtue of the death of his son," see id., 92:15-21.

Plaintiff cannot have it both ways.  He either is bringing an ATS claim on behalf of his U.S. citizen son, alleging violations of Anwar Al-Aulaqi's right to be free from an extrajudicial killing, or he is bringing an ATS claim based on violations of his own right to be free from the emotional harm that he would suffer if his son were to be unlawfully killed.  But the former fails as a result of Anwar Al-Aulaqi's U.S. citizenship, and the latter fails because there is not even domestic consensus as to whether a parent can recover for emotional injuries stemming from the death of his adult child, much less universal agreement that such a tort is actionable.  See 22 AM. JUR. 2d DEATH § 208 (2010) (explaining that domestic courts are "divided on the question of whether the survivors of a tortiously killed child can recover damages for their grief or mental anguish"); see also 45 A.L.R. 4th 234 §§ 4-6 (1986) (noting that even where such recovery is allowed, courts are split as to whether parents can recover for mental anguish or grief stemming from the tortious death of an adult child).  Perhaps recognizing that he can prevail on neither claim, plaintiff seeks to create a novel "hybrid" ATS claim, under which a party can sue in his individual capacity not for his own injuries, but for injuries inflicted upon his adult child. Plaintiff analogizes his unique ATS claim to an action for wrongful death, in which, he alleges, a claimant can sue "for the wrongful death of another individual, for harm that [the] claimant herself has suffered."  See Mot. Hr'g Tr. 93:8-11; see also id. 95:24-96:5 (explaining that plaintiff's ATS claim is "no different than wrongful death actions where plaintiffs bring a claim

based on the wrongful death itself, but the injury [to the plaintiff] is of a different nature").

But domestic wrongful death law provides no basis for plaintiff's contention that an alien parent can bring an ATS claim "in his own right" for the threatened extrajudicial killing of his adult U.S. citizen child.  Although wrongful death statutes vary from state to state, there are two main types -- "Lord Campbell" statutes and "continuation" statutes.  See 12 AM. JUR. TRIALS 317 §§ 4-6 (1966).  The less common, continuation-type wrongful death statute creates no new cause of action, but merely provides that "the deceased victim's cause of action against the defendant-tortfeasor shall continue and survive for the benefit of the decedent's estate."  See id. § 5-6 (emphasis added).  The damages in a continuation wrongful death action are those sustained by the decedent himself (rather than by the decedent's heirs or beneficiaries) and therefore include "the value of the destruction of the decedent's earning capacity plus his inability to engage in all of life's activities."  See id. § 5.  Plaintiff clearly does not benefit by comparing his ATS claim to a claim brought under a continuation wrongful death statute, since such claims -- by their very nature -- may only be brought in the name of the decedent.  Here, plaintiff's ATS claim may not be brought in the name of his U.S. citizen son, who cannot sue under the ATS.

Plaintiff fares no better by analogizing his ATS claim to a wrongful death action brought under a Lord Campbell statute.  Deriving its name from Lord Campbell's Act, enacted by the British Parliament in 1864, modern-day Lord Campbell wrongful death statutes -- which exist in the majority of states -- create a new, independent cause of action in favor of certain statutorily designated beneficiaries, which is "distinct and separable from the victim's own right of action for his injuries."  See 12 AM. JUR TRIALS 317 §§ 3-4, 6.  Unlike continuation wrongful death statutes, Lord Campbell statutes do not permit recovery for "damages which [the decedent

himself] might have recovered for his injury if he had survived," but rather, establish a new form of "liability for the loss and damage sustained by relatives dependent upon the decedent." See Mich. Cent. R.R. Co. v. Vreeland, 227 U.S. 59, 69 (1913).  Although damages under Lord Campbell statutes traditionally included only pecuniary losses (such as loss of support), "a clear majority of States . . . either by express statutory provision or by judicial construction" now also permit recovery for certain emotional losses (such as loss of society).  See Sea-Land Servs., Inc. v. Gaudet, 414 U.S. 573, 584-87 (1974), *superseded by statute as stated in* Miles v. Apex Marine Corp., 498 U.S. 19, 30 n.1 (1990); see also 12 Am. Jur. Trials 317 § 19 (explaining that more recent cases interpreting Lord Campbell statutes have allowed damages for "matters not of a pecuniary nature such as loss of the decedent's society, association, and companionship").

Plaintiff's hybrid ATS claim is equally untenable when viewed as a kind of preemptive wrongful death action brought under a Lord Campbell statute.  Significantly, claims brought by a decedent's relatives under Lord Campbell statutes are not based on the harms that the decedent himself has suffered, but only on the injuries suffered by the decedent's relatives as a result of the death.  Here, plaintiff has not alleged that he would suffer any pecuniary losses as a result of his son's death, and he expressly disavows any intent to recover for emotional injuries that he would suffer if his son were to be unlawfully killed.  See Pl.'s Opp. at 39.  Plaintiff's hybrid ATS claim is thus not analogous to a Lord Campbell wrongful death action, which can only be brought by statutorily designated relatives for their own injuries.

Ultimately, the Court concludes, plaintiff's ATS claim is not based on any pecuniary or emotional injuries sustained by plaintiff, but on the injury that his U.S. citizen son would suffer if he were to be subject to a state-sponsored extrajudicial killing.  And despite his assertions to the

contrary, plaintiff cannot bring such a claim in his own right, since it is Anwar Al-Aulaqi, and

not plaintiff, who has allegedly been "targeted" for killing by the United States.  Thus, even if

plaintiff could establish that the threat of a future extrajudicial killing -- as opposed to the

commission of a past extrajudicial killing -- did constitute a violation of "customary international

law" (which he cannot), plaintiff would not be authorized to bring such a claim under the ATS on

behalf of his U.S. citizen son, who himself is not within the class of persons who can sue under

the Act.

       B.      <u>Sovereign Immunity Under the ATS</u>

    Because plaintiff brings his ATS claim against the President, the Secretary of Defense,

and the Director of the CIA in their official capacities, his suit is tantamount to a suit against the

United States itself.  <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-67 (1985).  "It is axiomatic that

the United States may not be sued without its consent and that the existence of such consent is a

prerequisite for jurisdiction."  <u>United States v. Mitchell</u>, 463 U.S. 206, 212 (1983).  Waivers of

sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied."

<u>Lane v. Pena</u>, 518 U.S. 187, 192 (1996); <u>see also</u> <u>United States v. King</u>, 395 U.S. 1, 4 (1969).

Moreover, all purported waivers of sovereign immunity will be "strictly construed . . . in favor of

the sovereign."  <u>Lane</u>, 518 U.S. at 187; <u>see also</u> <u>Soriano v. United States</u>, 352 U.S. 270, 276

(1957) (explaining that "this Court has long decided that limitations and conditions upon which

the Government consents to be sued must be strictly observed and exceptions thereto are not to

be implied").  Thus, assuming that plaintiff could allege a cognizable tort under the ATS, his

ATS claim still must fail absent a valid waiver of sovereign immunity.  The ATS "itself does not

provide a waiver of sovereign immunity," <u>Industria Panificadora, S.A. v. United States</u>, 957 F.2d

886, 887 (D.C. Cir. 1992); accord Sanchez-Espinoza v. Reagan, 770 F.2d 202, 207 (D.C. Cir.

1985), but plaintiff argues that his ATS claim may proceed against the United States either

because it is within the Administrative Procedure Act's waiver of sovereign immunity for claims

seeking non-monetary relief, or because it is within the so-called Larson-Dugan exception to

sovereign immunity.  See Pl.'s Opp. at 41.  Neither argument is persuasive.

1.    *Waiver of Sovereign Immunity Under the APA*

The APA provides that agency action "seeking relief other than money damages . . . shall

not be dismissed nor relief therein be denied on the ground that it is against the United States."  5

U.S.C. § 702.  This waiver of sovereign immunity is not available in suits against the President,

since the President is not an "agency" within the meaning of the APA.  See Franklin v.

Massachusetts, 505 U.S. 788, 800-01 (1992) (plurality opinion).  Plaintiff therefore may not

assert an ATS claim against the President through reliance on the APA's waiver of sovereign

immunity.  While the APA remains "arguably available" as a waiver of sovereign immunity with

respect to plaintiff's ATS claims against the Secretary of Defense and the Director of the CIA, see

Sanchez-Espinoza, 770 F.2d at 207 (recognizing the possibility that ATS suits seeking non-

monetary relief may proceed against the Secretary of Defense and the Director of the CIA under

the APA's waiver of sovereign immunity), there are several reasons to question whether the APA

should be interpreted as a waiver of sovereign immunity for an ATS claim like plaintiff's, which

seeks to enjoin U.S. military action abroad that allegedly "received the approval of the President,

. . . the Secretary of Defense, and the Director of the CIA."  See id. at 208; see also Compl. ¶ 21.

First, defendants' alleged action here might be considered agency action "committed to

agency discretion by law," in which case the APA's waiver of sovereign immunity would not

apply.  See 5 U.S.C. § 701(a)(2).  Agency action is deemed committed to agency discretion by

law if "'a court would have no meaningful standard against which to judge the agency's exercise

of discretion.'"  Al Odah v. United States, 321 F.3d 1134, 1150 (D.C. Cir. 2003) (Randolph, J.,

concurring) (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)), *rev'd and remanded*, Rasul

v. Bush, 542 U.S. 466 (2004).  Given the "lack of judicially manageable standards" by which the

Court can resolve this case, see discussion infra pp. 70-71, plaintiff's ATS claim may well seek to

challenge agency action that is committed to agency discretion by law.[11]

 Ultimately, however, this Court need not decide that issue.  Even if the action involved in

this case does not fall within the APA's exception for agency action committed to agency

discretion by law, this Court nonetheless would follow the approach adopted by the D.C. Circuit

in Sanchez-Espinoza and exercise its equitable discretion not to grant the relief sought.  There,

citizens of Nicaragua brought suit against federal officials under the ATS, alleging that the

---

 [11]  Defendants also argue that the Federal Tort Claims Act ("FTCA") precludes
application of the APA's waiver of sovereign immunity to ATS claims seeking injunctive relief.
See Defs.' Mem. at 41.  The APA's waiver of sovereign immunity does not apply "if any other
statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  See 5
U.S.C. § 702.  The FTCA waives sovereign immunity for suits against the U.S. government "for
money damages . . . for . . . personal injury or death caused by the negligent or wrongful act or
omission of any employee of the Government while acting within the scope of his office or
employment."  28 U.S.C. § 1346(b)(1).  Despite defendants' contention to the contrary, it does not
appear that the FTCA's waiver of sovereign immunity for tort claims seeking money damages
against the United States by implication precludes any injunctive relief.  The Supreme Court has
explained that "Congress follows the practice of explicitly stating when it means to make FTCA
an exclusive remedy."  Carlson v. Green, 446 U.S. 14, 20 (1980).  Defendants point to no
legislative history indicating that the FTCA was intended to provide the exclusive remedy for tort
claims against the United States, and the FTCA itself does not purport to forbid injunctive relief,
as it merely states that it is "exclusive of any other civil action or proceeding for money
damages."  28 U.S.C. § 2679(b)(1).  Moreover, in U.S. Info. Agency v. Krc, 989 F.2d 1211, 1216
(D.C. Cir. 1993), the D.C. Circuit expressly declined to adopt the view that the FTCA "impliedly
forbids specific relief [against the United States] for tortious interference with prospective
employment opportunities."

officials had "approved a plan submitted by the CIA for covert activities to destabilize and overthrow the government of Nicaragua." Sanchez-Espinoza, 770 F.2d at 205. The plaintiffs maintained that the defendants' support of the contras in Nicaragua led to "scores of attacks upon innocent Nicaraguan civilians" which resulted in "summary execution, murder, abduction, torture, rape, wounding, and the destruction of private property and public facilities." Id. (internal quotation marks and citation omitted). Just as in the present case, the plaintiffs in Sanchez-Espinoza argued that their ATS claims for non-monetary relief against federal officials sued in their official capacities could proceed pursuant to the APA's waiver of sovereign immunity. Recognizing that the APA's waiver of sovereign immunity was "arguably available" for these claims, the D.C. Circuit nonetheless noted that "all the bases for nonmonetary relief -- including injunction, mandamus, and declaratory judgment -- are discretionary." Id. at 207-08. As a result, the court held, "[a]t least where the authority for our interjection into so sensitive a foreign affairs matter as this are statutes no more specifically addressed to such concerns than the Alien Tort Statute and the APA, we think it would be an abuse of our discretion to provide discretionary relief." Id. at 208.

Here, plaintiff also asks this Court to interject itself into a "sensitive" foreign affairs matter, by issuing discretionary relief that would prohibit military and intelligence activities against an alleged enemy abroad. See Defs.' Mem. at 31 (describing plaintiff's request "to limit ex ante the circumstances in which force against an enemy overseas may be used in the future"). Just as in Sanchez-Espinoza, the military and intelligence activities at issue in this case allegedly "received the attention and approval of the President . . . the Secretary of Defense, and the Director of the CIA." See Sanchez-Espinoza, 770 F.2d at 208; see also Compl. ¶ 21.

Irrespective of whether this case is "a matter so entirely committed to the care of the political branches as to preclude our considering the issue at all," then, the Court concludes that it "at least requires the withholding of discretionary relief."  See Sanchez-Espinoza, 770 F.2d at 208.

The Supreme Court has repeatedly acknowledged the separation-of-powers concerns posed by any judicial attempt to "'enjoin the President in performance of his official duties.'"  See Franklin, 505 U.S. at 802-03 (quoting Mississippi v. Johnson, 74 U.S. 475, 501 (1866)); see also Massachusetts v. Mellon, 262 U.S. 447, 488 (1923) (noting the "general rule  . . . that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other").  Just as the issuance of "injunctive relief against the President personally is an extraordinary measure not lightly to be undertaken," Swan v. Clinton, 100 F.3d 973, 978 (D.C. Cir. 1996), so, too, would it be extraordinary for this Court to order declaratory and injunctive relief against the President's top military and intelligence advisors, with respect to military action abroad that the President himself is alleged to have authorized.  Given that there is no clear waiver of sovereign immunity permitting such "extraordinary relief," and that "[t]he Alien Tort Statute has never been held to cover suits against the United States or United States Government officials," see El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 858 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring),[12] this Court declines to exercise its equitable

---

[12]  One district court has concluded that the APA waives sovereign immunity with respect to "international law claims" seeking non-monetary relief.  See Rosner v. United States, 231 F. Supp. 2d 1202, 1211 (S.D. Fla. 2002).  There, Hungarian Jews and their descendants sued the United States, arguing that the U.S. Army wrongfully refused to return their property, which had been unlawfully expropriated by the pro-Nazi Hungarian Government during World War II. See id. at 1204-05.  In finding that the APA waived sovereign immunity for the plaintiffs' claims, the court in Rosner stressed that the conduct complained of, "although exercised by military personnel, [wa]s decidedly non-military in nature."  See id. at 1212.  Here, defendants' alleged conduct is "decidedly military in nature."

discretion to grant such relief here.

2.     *The Larson-Dugan Exception to Sovereign Immunity*

Plaintiff's argument that his ATS claim "may proceed under the 'Larson-Dugan' exception to sovereign immunity," see Pl.'s Opp. at 41, merits little discussion.  Under that exception -- derived from the Supreme Court's decisions in Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682 (1949), and Dugan v. Rank, 372 U.S. 609 (1963) -- "sovereign immunity does not apply as a bar to suits alleging that an officer's actions were unconstitutional or beyond statutory authority, on the grounds that 'where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions.'"  Swan, 100 F.3d at 981 (quoting Larson, 337 U.S. at 689); see also Wash. Legal Found. v. U.S. Sentencing Comm'n, 89 F.3d 897, 901 (D.C. Cir. 1996).  In other words, where an officer acts outside the bounds of his legal authority, he "'is not doing the business which the sovereign has empowered him to do, or he is doing it in a way which the sovereign has forbidden,'" and hence the officer's actions "'may be made the object of specific relief.'"  Wash. Legal Found., 89 F.3d at 901 (quoting Larson, 337 U.S. at 689).

However, the D.C. Circuit in Sanchez-Espinoza expressly stated that the Larson-Dugan exception to sovereign immunity "can have no application when the basis for jurisdiction requires action authorized by the sovereign as opposed to private wrongdoing."  Sanchez-Espinoza, 770 F.2d at 207.  Here, just as in Sanchez-Espinoza, the ATS is the statute that provides the basis for this Court's jurisdiction, and the D.C. Circuit has held that the ATS only confers jurisdiction over actions that are authorized by the sovereign.  See id. (explaining that "the law of nations -- so called 'customary international law,' arising from 'the customs and

usages of civilized nations' . . . does not reach private, non-state conduct").  Because it "would

make a mockery of the doctrine of sovereign immunity" if the Larson-Dugan exception were

interpreted as authorizing "federal courts . . . to sanction or enjoin . . . actions that are,

*concededly and as a jurisdictional necessity*, official actions of the United States," id. (emphasis

in original), this Court rejects plaintiff's contention that the Larson-Dugan exception applies to

the conduct challenged in this case.

## III.     **The Political Question Doctrine**

Defendants argue that even if plaintiff has standing to bring his constitutional claims or

states a cognizable claim under the ATS, his claims should still be dismissed because they raise

non-justiciable political questions.  Like standing, the political question doctrine is an aspect of

"the concept of justiciability, which expresses the jurisdictional limitations imposed on the

federal courts by the 'case or controversy' requirement of Article III of the Constitution."

Schlesinger, 418 U.S. at 215.  The political question doctrine "is 'essentially a function of the

separation of powers,'" El-Shifa, 607 F.3d at 840 (quoting Baker v. Carr, 369 U.S. 186, 217

(1962)), and "'excludes from judicial review those controversies which revolve around policy

choices and value determinations constitutionally committed for resolution to the halls of

Congress or the confines of the Executive Branch.'"  Id. (quoting Japan Whaling Ass'n v. Am.

Cetacean Soc'y, 478 U.S. 221, 230 (1986)).  The precise "'contours'" of the political question

doctrine remain "'murky and unsettled.'"  Harbury v. Hayden, 522 F.3d 413, 418 (D.C. Cir. 2008)

(quoting Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 803 n.3 (D.C. Cir. 1984) (Bork, J.,

concurring)); see also Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1514 (D.C. Cir. 1984)

(en banc), *vacated on other grounds*, 471 U.S. 1113 (1985) (describing the "shifting contours and

uncertain underpinnings" of the political question doctrine).  Still, the Supreme Court has

articulated six factors which are said to be "[p]rominent on the surface" of cases involving non-

justiciable political questions:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate
> political department; or [2] a lack of judicially discoverable and manageable standards for
> resolving it; or [3] the impossibility of deciding without an initial policy determination of
> a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking
> independent resolution without expressing lack of respect due coordinate branches of
> government; or [5] an unusual need for unquestioning adherence to a political decision
> already made; or [6] the potentiality of embarrassment from multifarious pronouncements
> by various departments on one question.

Baker, 369 U.S. at 217.  The first two factors -- a textual commitment to another branch of

government and a lack of judicially manageable standards -- are considered "the most important,"

see Harbury, 522 F.3d at 418, but in order for a case to be non-justiciable, the court "need only

conclude that one factor is present, not all," Schneider v. Kissinger, 412 F.3d 190, 194 (D.C. Cir.

2005).

    Unfortunately, the Baker factors are much easier to enumerate than they are to apply, and

it is perhaps for this reason that the political question doctrine "continues to be the subject of

scathing scholarly attack."  See Ramirez, 745 F.2d at 1514.  Dean Erwin Chemerinsky has gone

so far as to remark that the Baker criteria "seem useless in identifying what constitutes a political

question."  See Erwin Chemerinsky, Federal Jurisdiction 149 (5th ed. 2007).  According to him,

the political question doctrine cannot be understood by mechanically applying the factors

enumerated in Baker, but "only by examining the specific areas where the Supreme Court has

invoked [the doctrine]."  Id. at 150.  Although Dean Chemerinsky's derogation of the Baker

factors is extreme, it is true that "the category of political questions is more amenable to

description by infinite itemization than by generalization." Comm. of U.S. Citizens Living in

Nicaragua v. Reagan, 859 F.2d 929, 933 (D.C. Cir. 1988) (internal quotation marks and citations

omitted).

An examination of the specific areas in which courts have invoked the political question

doctrine reveals that national security, military matters and foreign relations are "'quintessential

sources of political questions.'"  See El-Shifa, 607 F.3d at 841 (quoting Bancoult v. McNamara,

445 F.3d 427, 433 (D.C. Cir. 2006)); see also Haig v. Agee, 453 U.S. 280, 292 (1981)

(explaining that "[m]atters intimately related to foreign policy and national security are rarely

proper subjects for judicial intervention").  As the D.C. Circuit recently explained, cases

involving national security and foreign relations "raise issues that 'frequently turn on standards

that defy judicial application' or 'involve the exercise of a discretion demonstrably committed to

the executive or legislature.'"  El-Shifa, 607 F.3d at 841 (quoting Baker, 369 U.S. at 211).  Unlike

the political branches, the Judiciary has "no covert agents, no intelligence sources, and no policy

advisors."  See Schneider, 412 F.3d at 196.  Courts are thus institutionally ill-equipped "to assess

the nature of battlefield decisions," DaCosta v. Laird, 471 F.2d 1146, 1155 (2d Cir. 1973), or to

"define the standard for the government's use of covert operations in conjunction with political

turmoil in another country," Schneider, 412 F.3d at 197.  These types of decisions involve

"delicate, complex" policy judgments with "large elements of prophecy," and "are decisions of a

kind for which the Judiciary has neither aptitude, facilities, nor responsibility." Chicago & S. Air

Lines v. Waterman Corp., 333 U.S. 103, 111 (1948).  The difficulty that U.S. courts would

encounter if they were tasked with "ascertaining the 'facts' of military decisions exercised

thousands of miles from the forum, lies at the heart of the determination whether the question

[posed] is a 'political' one." DaCosta, 471 F.2d at 1148.

At the same time, the Supreme Court has also made clear that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Baker, 369 U.S. at 211.[13] Although "'attacks on foreign policymaking are nonjusticiable, claims alleging non-compliance with the law are justiciable, even though the limited review that the court undertakes may have an effect on foreign affairs.'" Schneider, 412 F.3d at 198 (quoting DKT Memorial Fund Ltd. v. Agency for Int'l Dev., 810 F.2d 1236, 1238 (D.C. Cir. 1987)).  The political question doctrine, the Supreme Court has warned, was only designed to cover a "narrow" category of "carefully defined" cases, and should not be employed as "an ad hoc litmus test of [courts'] reactions to the desirability of and need for judicial application of constitutional or statutory standards to a given type of claim." Davis v. Bandemer, 478 U.S. 109, 126 (1986). Hence, in order to decide whether a particular legal challenge constitutes an impermissible "attack on foreign policymaking" or is instead a justiciable claim with a permissible "effect on foreign affairs," a court "must conduct 'a discriminating analysis of the particular question posed' in the 'specific case.'" El-Shifa, 607 F.3d at 841 (quoting Baker, 369 U.S. at 211).

Judicial resolution of the "particular questions" posed by plaintiff in this case would require this Court to decide: (1) the precise nature and extent of Anwar Al-Aulaqi's affiliation with AQAP; (2) whether AQAP and al Qaeda are so closely linked that the defendants' targeted killing of Anwar Al-Aulaqi in Yemen would come within the United States's current armed conflict with al Qaeda; (3) whether (assuming plaintiff's proffered legal standard applies) Anwar

---

[13]   Indeed, since Baker, the Supreme Court has only sustained a political question claim twice.  See Walter Nixon v. United States, 506 U.S. 224 (1993); Gilligan v. Morgan, 413 U.S. 1 (1973).

Al-Aulaqi's alleged terrorist activity renders him a "concrete, specific, and imminent threat to life

or physical safety," <u>see</u> Compl., Prayer for Relief (c); and (4) whether there are "means short of

lethal force" that the United States could "reasonably" employ to address any threat that Anwar

Al-Aulaqi poses to U.S. national security interests, <u>see</u> <u>id.</u>  Such determinations, in turn, would

require this Court, in defendants' view, to understand and assess "the capabilities of the [alleged]

terrorist operative to carry out a threatened attack, what response would be sufficient to address

that threat, possible diplomatic considerations that may bear on such responses, the vulnerability

of potential targets that the [alleged] terrorist[] may strike, the availability of military and non-

military options, and the risks to military and nonmilitary personnel in attempting application of

non-lethal force."  Defs.' Mem. at 26; <u>see also</u> Mot. Hr'g Tr. 38:6-14.  Viewed through these

prisms, it becomes clear that plaintiff's claims pose precisely the types of complex policy

questions that the D.C. Circuit has historically held non-justiciable under the political question

doctrine.

      Most recently, in <u>El-Shifa v. United States</u> the D.C. Circuit examined whether the

political question doctrine barred judicial resolution of claims by owners of a Sudanese

pharmaceutical plant who brought suit seeking to recover damages after their plant was destroyed

by an American cruise missile.  President Clinton had ordered the missile strike in light of

intelligence indicating that the plant was "'associated with the [Osama] bin Ladin network' and

'involved in the production of materials for chemical weapons.'"  <u>El-Shifa</u>, 607 F.3d at 838

(internal citation omitted).  The plaintiffs maintained that the U.S. government had been

negligent in determining that the plant was tied "to chemical weapons and Osama bin Laden,"

and therefore sought "a declaration that the government's failure to compensate them for the

destruction of the plant violated customary international law, a declaration that statements government officials made about them were defamatory, and an injunction requiring the government to retract those statements." Id. at 840.  Dismissing the plaintiffs' claims as non-justiciable under the political question doctrine, the D.C. Circuit explained that "[i]n military matters . . . the courts lack the competence to assess the strategic decision to employ force or to create standards to determine whether the use of force was justified or well-founded." Id. at 844.  Rather than endeavor to resolve questions beyond the Judiciary's institutional competence, the court held that "[i]f the political question doctrine means anything in the arena of national security and foreign relations, it means the courts cannot assess the merits of the President's decision to launch an attack on a foreign target." Id.

Here, plaintiff asks this Court to do exactly what the D.C. Circuit forbid in El-Shifa -- assess the merits of the President's (alleged) decision to launch an attack on a foreign target.  Although the "foreign target" happens to be a U.S. citizen, the same reasons that counseled against judicial resolution of the plaintiffs' claims in El-Shifa apply with equal force here.  Just as in El-Shifa, any judicial determination as to the propriety of a military attack on Anwar Al-Aulaqi would "'require this court to elucidate the . . . standards that are to guide a President when he evaluates the veracity of military intelligence.'" Id. at 846 (quoting El-Shifa Pharm. Indus. Co. v. United States, 378 F.3d 1346, 1365 (Fed. Cir. 2004)).  Indeed, that is just what plaintiff has asked this Court to do.  See Compl., Prayer for Relief (d) (requesting that the Court order the defendants to "disclose the criteria used in determining whether the government will carry out the targeted killing of a U.S. citizen").  But there are no judicially manageable standards by which courts can endeavor to assess the President's interpretation of military intelligence and his

resulting decision -- based on that intelligence -- whether to use military force against a terrorist target overseas.  See El-Shifa, 378 F.3d at 1367 n. 6 (expressing the view that "it would be difficult, if not extraordinary, for the federal courts to discover and announce the threshold standard by which the United States government evaluates intelligence in making a decision to commit military force in an effort to thwart an imminent terrorist attack on Americans").  Nor are there judicially manageable standards by which courts may determine the nature and magnitude of the national security threat posed by a particular individual.  In fact, the D.C. Circuit has expressly held that the question whether an organization's alleged "terrorist activity" threatens "the national security of the United States" is "nonjusticiable."  People's Mohahedin Org. of Iran v. U.S. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999).  Given that courts may not undertake to assess whether a particular organization's alleged terrorist activities threaten national security, it would seem axiomatic that courts must also decline to assess whether a particular individual's alleged terrorist activities threaten national security.  But absent such a judicial determination as to the nature and extent of the alleged national security threat that Anwar Al-Aulaqi poses to the United States, this Court cannot possibly determine whether the government's alleged use of lethal force against Anwar Al-Aulaqi would be "justified or well-founded."  See El-Shifa, 607 F.3d at 844.  Thus, the second Baker factor -- a "lack of judicially discoverable and manageable standards" for resolving the dispute -- strongly counsels against judicial review of plaintiff's claims.

The type of relief that plaintiff seeks only underscores the impropriety of judicial review here.  Plaintiff requests both a declaration setting forth the standard under which the United States can select individuals for targeted killing as well as an injunction prohibiting defendants

from intentionally killing Anwar Al-Aulaqi unless he meets that standard -- i.e., unless he "presents a concrete, specific, and imminent threat to life or physical safety, and there are no means other than lethal force that could reasonably be employed to neutralize the threat." Compl., Prayer for Relief (a), (c). Yet plaintiff concedes that the "'imminence' requirement" of his proffered legal standard would render any "real-time judicial review" of targeting decisions "infeasible," Pl.'s Opp. at 17, 30, and he therefore urges this Court to issue his requested preliminary injunction and then enforce the injunction "through an after-the-fact contempt motion or an after-the-fact damages action." Id. at 17-18. But as the D.C. Circuit has explained, "[i]t is not the role of judges to second-guess, with the benefit of hindsight, another branch's determination that the interests of the United States call for military action." El-Shifa, 607 F.3d at 844. Such military determinations are textually committed to the political branches. See Schneider, 412 F.3d at 194-95 (explaining that "Article I, Section 8 of the Constitution . . . is richly laden with the delegation of foreign policy and national security powers to Congress," while "Article II likewise provides allocation of foreign relations and national security powers to the President, the unitary chief executive" and Commander in Chief of the Army and Navy). Moreover, any post hoc judicial assessment as to the propriety of the Executive's decision to employ military force abroad "would be anathema to . . . separation of powers" principles. See El-Shifa, 607 F.3d at 845. The first, fourth, and sixth Baker factors thus all militate against judicial review of plaintiffs' claims, since there is a "textually demonstrable constitutional commitment" of the United States's decision to employ military force to coordinate political departments (Congress and the Executive), and any after-the-fact judicial review of the Executive's decision to employ military force abroad would reveal a "lack of respect due

coordinate branches of government" and create "the potentiality of embarrassment of multifarious pronouncements by various departments on one question."  Baker, 369 U.S. at 217.

The mere fact that the "foreign target" of military action in this case is an individual -- rather than alleged enemy property -- does not distinguish plaintiff's claims from those raised in El-Shifa for purposes of the political question doctrine.  The D.C. Circuit has on several occasions dismissed claims on political question grounds where resolution of those claims would require a judicial determination as to the propriety of the use of force by U.S. officials against a specific individual abroad.  For example, the court in Harbury v. Hayden dismissed as non-justiciable the claims of an American widow who alleged that her husband -- a Guatemalan rebel fighter -- had been tortured and killed by Guatemalan army officers working in conjunction with the CIA in Guatemala.  See 522 F.3d at 415.  Notwithstanding the plaintiff's contention that "U.S. officials were responsible for physically abusing and killing" her husband, the D.C. Circuit concluded that "the political question doctrine plainly applies to this case."  Id. at 420.

Similarly, in Schneider v. Kissinger, the D.C. Circuit deemed non-justiciable the claims raised by the decedents of a Chilean general, who alleged that the United States had caused the general's kidnaping, torture, and death in furtherance of its Cold War efforts to overthrow the leftist Chilean leader Salvador Allende.  412 F.3d at 191-92.  As the Schneider court explained, "in order to determine whether the covert operations which allegedly led to the tragic death of [the general] were wrongful," it would first need to determine "whether, 35 years ago, at the height of the Cold War . . . 'it was proper for an Executive Branch official . . . to support covert actions against' a committed Marxist who was set to take power in a Latin American country." Id. at 196-97 (internal citation omitted).  The court conceded that it may have been a "drastic

-73-

measure" for the United States to ally itself with "dissidents in another country to kidnap a

national of that country," but nonetheless concluded that any determination as to "whether drastic

measures should be taken in matters of foreign policy and national security is not the stuff of

adjudication, but of policymaking." Id. at 197.  Because there were no judicially "discoverable

and manageable standards for the resolution" of the plaintiffs' claims, the court dismissed the

case as posing a non-justiciable political question.  See id.; see also Gonzalez-Vera, 449 F.3d at

1264 (holding non-justiciable claims alleging that Henry Kissinger and other U.S. executive

officials cooperated with Chilean dictator Augusto Pinochet to commit human rights abuses in

Chile, since "[w]hatever Kissinger did as National Security Advisor or Secretary of State 'can

hardly be called anything other than foreign policy'") (internal citation omitted); Bancoult, 445

F.3d at 436 (dismissing claims by former residents of the Chagos Archipelago, who alleged that

the United States had caused the forcible relocation and killing of island residents in the 1960s in

order to establish a military base on the island, on the ground that the "specific tactical measures"

employed by the United States in depopulating the island were "inextricably intertwined with the

underlying strategy of establishing a regional military presence" -- an unreviewable political

question).

        Plaintiff's claim is distinguishable from those asserted in these cases in only one

meaningful respect: Anwar Al-Aulaqi -- unlike the Guatemalan rebel fighter in Harbury, the

Chilean general in Schneider, the other Chileans in Gonzalez-Vera, or the Chagos Archipelago

inhabitants in Bancoult -- is a U.S. citizen.  The significance of Anwar Al-Aulaqi's U.S.

citizenship is not lost on this Court.  Indeed, it does not appear that any court has ever -- on

political question doctrine grounds -- refused to hear a U.S. citizen's claim that his personal

constitutional rights have been violated as a result of U.S. government action taken abroad.

Nevertheless, there is inadequate reason to conclude that Anwar Al-Aulaqi's U.S. citizenship -- standing alone -- renders the political question doctrine inapplicable to plaintiff's claims.  Plaintiff cites two contexts in which courts have found claims asserting violations of U.S. citizens' constitutional rights to be justiciable despite the fact that those claims implicate grave national security and foreign policy concerns.  See Pl.'s Opp. at 22-23, 25-27.  Courts have been willing to entertain habeas petitions from U.S. citizens detained by the United States as enemy combatants, see, e.g., Hamdi, 542 U.S. at 509, and they have also heard claims from U.S. citizens alleging unconstitutional takings of their property by the U.S. military abroad, see, e.g., Ramirez de Arellano, 745 F.2d at 1511-12.  But habeas petitions and takings claims are both much more amenable to judicial resolution than the claims raised by plaintiff in this case.

Courts have been willing to hear habeas petitions (from both U.S. citizens and aliens) because "the Constitution specifically contemplates a judicial role" for claims by individuals challenging their detention by the Executive.  See El-Shifa, 607 F.3d at 848-49; see also Boumediene v. Bush, 553 U.S. 723, 745 (2008) (explaining that the Suspension Clause "protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account").  While the Suspension Clause reflects a "textually demonstrable commitment" of habeas corpus claims to the Judiciary, see Baker, 369 U.S. at 217, there is no "constitutional commitment to the courts for review of a military decision to launch a missile at a foreign target," El-Shifa, 607 F.3d at 849.  Indeed, such military decisions are textually committed not to the Judiciary, but to the political branches.  See Schneider, 412 F.3d at 194-96.  Moreover, the resolution of habeas petitions does not require expertise beyond the purview of the Judiciary.

Although plaintiff is correct to point out that habeas cases involving Guantanamo detainees often involve judicial scrutiny of highly sensitive military and intelligence information, see Mot. Hr'g Tr. 54:7-10, 83:24-84:1, such information is only used to determine whether "the United States has unjustly deprived an American citizen of liberty through acts it has already taken." Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 65 (D.D.C. 2004); see also Defs.' Mem. at 31. These post hoc determinations are "precisely what courts are accustomed to assessing." Abu Ali, 350 F. Supp. 2d at 65. But courts are certainly not accustomed to assessing claims like those raised by plaintiff here, which seek to prevent future U.S. military action in the name of national security against specifically contemplated targets by the imposition of judicially-prescribed legal standards enforced through "after-the-fact contempt motion[s]" or "after-the-fact damages action[s]." See Pl.'s Opp. at 17-18. Hence, the Baker factors dictate a different outcome for plaintiff's claims than for habeas petitions filed by detainees at Guantanamo Bay.

Plaintiff's claims are also fundamentally distinct from those in which U.S. citizens have been permitted to sue the United States for alleged unconstitutional takings of their property by the U.S. military abroad. In Ramirez de Arellano, the D.C. Circuit declined to dismiss as non-justiciable the claims brought by U.S. citizens who asserted that the U.S. military had unlawfully expropriated their cattle ranch in Honduras in violation of the Fifth Amendment. 745 F.2d at 1511-12. The D.C. Circuit, ruling en banc, explained that the plaintiffs' claims did not constitute a challenge "to the United States military presence in Honduras" but instead were "narrowly focused on the lawfulness of the United States defendants' occupation and use of the plaintiffs' cattle ranch." Id. at 1512. Once the court characterized the case as a land dispute between the plaintiffs and the U.S. government, it had little difficulty concluding that "adjudication of the

defendants' constitutional authority to occupy and use the plaintiffs' property" did not require "expertise beyond the capacity of the Judiciary" or "unquestioning adherence to a political decision by the Executive."  See id. at 1513, 1514; see also Comm. of U.S. Citizens Living in Nicaragua, 859 F.2d at 934-35 (finding justiciable the Fifth Amendment claims raised by U.S. citizens living in Nicaragua, who alleged that the United States's funding of the Contras in Nicaragua deprived them of their liberty and property without due process by making them "targets of the Contra 'resistance,'" but ultimately declining to hear the plaintiffs' claims since there was "no allegation that the United States itself has participated in or in any way sought to encourage injuries to Americans in Nicaragua").

Unlike Ramirez, the questions posed in this case do require both "expertise beyond the capacity of the Judiciary" and the need for "unquestioning adherence to a political decision by the Executive."  Here, plaintiff asks the Judiciary to limit the circumstances under which the United States may employ lethal force against an individual abroad whom the Executive has determined "plays an operational role in AQAP planning terrorist attacks against the United States."  Defs.' Mem. at 36; see also Clapper Decl. ¶¶ 13-17.  The injunctive and declaratory relief sought by plaintiff would thus be vastly more intrusive upon the powers of the Executive than the relief sought in Ramirez, where the court was only called upon to adjudicate "the defendants' constitutional authority to occupy and use the plaintiffs' property."  Ramirez, 745 F.2d at 1513. Moreover, although resolution of the plaintiffs' claims in Ramirez only required "interpretations of the Constitution and of federal statutes," which are "quintessential tasks of the federal Judiciary," see id., resolution of the claims in this case would require assessment of "strategic choices directing the nation's foreign affairs [that] are constitutionally committed to the political

branches," El-Shifa, 607 F.3d at 843.

To be sure, this Court recognizes the somewhat unsettling nature of its conclusion -- that there are circumstances in which the Executive's unilateral decision to kill a U.S. citizen overseas is "constitutionally committed to the political branches" and judicially unreviewable.  But this case squarely presents such a circumstance.  The political question doctrine requires courts to engage in a fact-specific analysis of the "particular question" posed by a specific case, see El-Shifa, 607 F.3d at 841 (quoting Baker, 369 U.S. at 211), and the doctrine does not contain any "carve-out" for cases involving the constitutional rights of U.S. citizens.  While it may be true that "the political question doctrine wanes" where the constitutional rights of U.S. citizens are at stake, Abu Ali, 350 F. Supp. at 64, it does not become inapposite.  Indeed, in one of the only two cases since Baker v. Carr in which the Supreme Court has dismissed a case on political question grounds, the plaintiffs were U.S. citizens alleging violations of their constitutional rights. See Gilligan v. Morgan, 413 U.S. 1, 3 (1973).

In Gilligan, students at Kent State University brought suit in the wake of the "Kent State massacre," seeking declaratory and injunctive relief that would prohibit the Ohio Governor from "prematurely ordering National Guard troops to duty in civil disorders" and "restrain leaders of the National Guard from future violation of the students' constitutional rights." Id.  According to the Court, the plaintiffs were, in essence, asking for "initial judicial review and continuing surveillance by a federal court over the training, weaponry, and orders of the Guard." Id. at 6. Dismissing the plaintiffs' claims as presenting non-justiciable political questions,[14] the Court

---

[14]  The precise scope of the Court's holding in Gilligan is not entirely clear.  Although the Court noted that "the questions to be resolved . . . are subjects committed expressly to the political branches of government," it went on to state that "[t]hese factors, when coupled with the

noted that "[i]t would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches."  Id. at 10.  As the Court explained, the Judiciary lacks the "competence" to make "complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force," and "[t]he ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability."  Id.

So, too, does the Constitution place responsibility for the military decisions at issue in this case "in the hands of those who are best positioned and most politically accountable for making them."  Hamdi, 542 U.S. at 531; see also Oetjen v. Cent. Leather Co., 246 U.S. 297, 302 (1918) (explaining that "[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative - 'the political' - departments of the government, and the propriety of what may be done in the exercise of this power is not subject to judicial inquiry or decision").  "Judges, deficient in military knowledge . . . and sitting thousands of miles away from the field of action, cannot reasonably or appropriately determine" if a specific military operation is necessary or wise.  DaCosta, 471 F.2d at 1155.  Whether the alleged "terrorist activities" of an individual so threaten the national security of the United States as to warrant that military action be taken against that individual is a "political judgment[]. . . [which] belong[s] in the domain of political power not subject to judicial intrusion or inquiry."  El-Shifa, 607 F.3d at 843 (internal quotation marks and citations omitted).

Contrary to plaintiff's assertion, in holding that the political question doctrine bars

_____

uncertainties as to whether a live controversy still exists and the infirmity of the posture of respondents as to standing, render the claim . . . nonjusticiable."  413 U.S. at 10.

plaintiff's claims, this Court does not hold that the Executive possesses "unreviewable authority to order the assassination of any American whom he labels an enemy of the state."  <u>See</u> Mot. Hr'g Tr. 118:1-2.  Rather, the Court only concludes that it lacks the capacity to determine whether a specific individual in hiding overseas, whom the Director of National Intelligence has stated is an "operational" member of AQAP, <u>see</u> Clapper Decl. ¶ 15, presents such a threat to national security that the United States may authorize the use of lethal force against him.  This Court readily acknowledges that it is a "drastic measure" for the United States to employ lethal force against one of its own citizens abroad, even if that citizen is currently playing an operational role in a "terrorist group that has claimed responsibility for numerous attacks against Saudi, Korean, Yemeni, and U.S. targets since January 2009," <u>id.</u> ¶ 13.  But as the D.C. Circuit explained in <u>Schneider</u>, a determination as to whether "drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policymaking."  412 F.3d at 197.  Because decision-making in the realm of military and foreign affairs is textually committed to the political branches, and because courts are functionally ill-equipped to make the types of complex policy judgments that would be required to adjudicate the merits of plaintiff's claims, the Court finds that the political question doctrine bars judicial resolution of this case.

## IV.    <u>The Military and State Secrets Privilege</u>

Defendants invoke the military and state secrets privilege as the final basis for dismissal of plaintiff's complaint.  The state secrets privilege is premised on the recognition that "in exceptional circumstances courts must act in the interest of the country's national security to prevent disclosure of state secrets, even to the point of dismissing a case entirely." <u>See</u> <u>Mohamed v. Jeppesen Dataplan, Inc.</u>, 614 F.3d 1070, 1077 (9th Cir. 2010) (en banc) (citing

Totten v. United States, 92 U.S. 105, 107 (1876)); see also United States v. Reynolds, 345 U.S. 1, 7-8 (1953).  As the Ninth Circuit has recently explained, "contemporary state secrets doctrine encompasses two applications of this principle.  One completely bars adjudication of claims premised on state secrets (the 'Totten bar'); the other is an evidentiary privilege ('the Reynolds privilege') that excludes privileged evidence from the case and *may* result in dismissal of the claims."  Jeppesen Dataplan, 614 F.3d at 1077 (emphasis in original).

The Totten bar only applies "'where the very subject matter of the action' is [itself] 'a matter of state secret.'"  Id. (quoting Reynolds, 345 U.S. at 11 n.26).  In contrast, successful invocation of the Reynolds privilege "remove[s] the privileged evidence from the litigation," but does not necessarily require the plaintiffs' claims to be dismissed.  Id. at 1079.  Nevertheless, in some instances, "the Reynolds privilege converges with the Totten bar," id. at 1083, and then "the assertion of the privilege will require dismissal because it will become apparent during the Reynolds analysis that the case cannot proceed without privileged evidence, or that litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets," id. at 1079.

Here, defendants do not argue that the very subject matter of this case is itself a "state secret."  See Mot. Hr'g Tr. 12:9-12.  Rather, they contend that this case is one in which the "Reynolds privilege converges with the Totten bar," because "specific categories of information properly protected against disclosure by the privilege would be necessary to litigate each of plaintiff's claims."  Defs.' Mem. at 43; see also Defs.' Reply at 23.[15]  Defendants correctly note

_____

[15]  In support of their state secrets assertion, defendants have provided brief public and lengthy classified declarations from the Director of National Intelligence, the Secretary of Defense, and the Director of the CIA, all of which this Court has very carefully reviewed.  Of

that the privilege protects information from disclosure "where there is a reasonable danger that disclosure would 'expose military matters which, in the interests of national security, should not be divulged.'"  Defs.' Mem. at 46 (quoting <u>Reynolds</u>, 345 U.S. at 10).  They argue that "where 'the claims and possible defenses are so infused with state secrets that the risk of disclosing them is both apparent and inevitable,' dismissal is required."  <u>Id.</u> at 52 (quoting <u>Jeppesen Dataplan</u>, 614 F.3d at 1089).  And here, according to defendants, that is most certainly the case because

> [i]n unclassified terms, [the disclosure harmful to national security] includes information needed to address whether or not, or under what circumstances, the United States may target a particular foreign terrorist organization and its senior leadership, the specific threat posed by al-Qaeda, AQAP, or Anwar al-Aulaqi, and other matters that plaintiff has put at issue, including any criteria governing the use of lethal force.

Defs.' Reply at 24; <u>see also</u> Defs.' Mem. at 48-49.

But defendants also correctly and forcefully observe that this Court need not, and should not, reach their claim of state secrets privilege because the case can be resolved on the other grounds they have presented.  It is certainly true that the state secrets privilege should be "invoked no more often or extensively than necessary."  <u>Jeppesen Dataplan</u>, 614 F.3d at 1080. Indeed, last year the Attorney General promulgated a policy confirming that the state secrets privilege will only be invoked in limited circumstances involving a significant risk of harm to national security and after detailed procedures are followed (including personal approval of the Attorney General).  <u>See</u> Defs.' Mem., Ex. 2.  And here, defendants have confirmed that the privilege has been invoked only after that careful review and adherence to the mandated

---

course, a court must engage in such a careful, independent review before sustaining an invocation of the state secrets privilege.  <u>See</u> <u>Jeppesen Dataplan</u>, 614 F.3d at 1086.

procedures under the Attorney General's policy.  See Defs.' Mem. at 44.[16]

Under the circumstances, and particularly given both the extraordinary nature of this case and the other clear grounds for resolving it, the Court will not reach defendants' state secrets privilege claim.  That is consistent with the request of the Executive Branch and with the law, and plaintiff does not contest that approach.  Indeed, given the nature of the state secrets assessment here based on careful judicial review of classified submissions to which neither plaintiff nor his counsel have access, there is little that plaintiff can offer with respect to this issue.[17]  But in any event, because plaintiff lacks standing and his claims are non-justiciable, and because the state secrets privilege should not be invoked "more often or extensively than necessary," see Jeppesen Dataplan, 614 F.3d at 1080, this Court will not reach defendants' invocation of the state secrets privilege.

## CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion to dismiss.  A separate order has been filed on this date.

---

[16]  So, too, defendants have established that the three procedural requirements for invocation of the state secrets privilege -- (1) a formal claim of privilege (2) by an appropriate department head (3) after personal consideration -- have been satisfied here.  See Reynolds, 345 U.S. at 7-8; Jeppesen Dataplan, 614 F.3d at 1080; Defs.' Mem. at 48-50.

[17]  Plaintiff's contention that media speculation and public disclosures concerning Anwar Al-Aulaqi undercut the state secrets privilege assertion is not persuasive.  Partial disclosure of some aspects of the relevant subject matter does not warrant disclosure of other information that risks serious harm to the national security.  Jeppesen Dataplan, 614 F.3d at 1090.  Nor does "media and public speculation" preclude assertion of the state secrets privilege where "official acknowledgment" would damage national security.  Afshar v. Dep't of State, 702 F.2d 1125, 1130-31 (D.C. Cir. 1983).